1  William N. Lobel, State Bar No. 93202
   wlobel@lwgfllp.com
2  Alan J. Friedman, State Bar No. 132580
   afriedman@lwgfllp.com
3  Beth E. Gaschen, State Bar No. 245894
   bgaschen@lwgfllp.com
4  **LOBEL WEILAND GOLDEN FRIEDMAN LLP**
   650 Town Center Drive, Suite 950
5  Costa Mesa, California 92626
   Telephone    714-966-1000
6  Facsimile    714-966-1002

7  Attorneys for Debtor and Debtor-in-Possession
   John Jean Bral

8

9              **UNITED STATES BANKRUPTCY COURT**

10            **CENTRAL DISTRICT OF CALIFORNIA**

11                **SANTA ANA DIVISION**

12  In re                                    Case No. 8:17-bk-10706-SC

13  JOHN JEAN BRAL,                          Chapter 11

14          Debtor.                          **DEBTOR'S AMENDED OBJECTION TO
                                             PROOF OF CLAIM FILED BY BARRY
15                                           BEITLER [CLAIM NO. 14]; AND
                                             MEMORANDUM OF POINTS AND
16                                           AUTHORITIES IN SUPPORT THEREOF**

17                                           **[DECLARATION OF JOHN JEAN BRAL IN
                                             SUPPORT THEREOF FILED
18                                           CONCURRENTLY HEREWITH]**

19                                           **DATE:    December 14, 2017
                                             TIME:    11:00 a.m.**
20                                           **Place:    Courtroom 5C
                                             411 West Fourth Street
21                                           Santa Ana, California 92701**

22

23

24

25

26

27

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1136155.1                                                        OBJECTION

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3   I.    INTRODUCTION..................................................................................................3

4   II.   STATEMENT OF FACTS.....................................................................................4

5         A.    Jurisdiction and Venue ...............................................................................4

6         B.    Relief Requested .........................................................................................5

7         C.    The Debtor and the Chapter 11 Filing ........................................................5

8         D.    The Bar Date and the Claim .......................................................................5

9         E.    Summary of Material Facts..........................................................................5

10              1.    General Background..........................................................................5

11              2.    Beitler's Claims Related to Mission....................................................6

12              3.    Beitler's Claims Related to Westcliff ..................................................7

13  III.  ANALYSIS ...........................................................................................................8

14        A.    The Standard for Allowance of Claims .......................................................8

15        B.    The Claim is Barred by the Statute of Limitations, the Parol
                Evidence Rule and the Doctrines of Waiver and Estoppel .........................9
16
          C.    If Not Disallowed, the Claim Should Be Determined on its
17              Merits and Beitler's Allegations are False.................................................12

18  IV.   RESERVATION OF RIGHTS ..............................................................................14

19  V.    CONCLUSION ...................................................................................................14

20

21

22

23

24

25

26

27

28

1136155.1

i

OBJECTION

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

## **Cases**

4

Burch v. Premier Homes, LLC,
199 Cal. App.4th 730, 131 Cal. Rptr. 3d 855 (2011) ........................................... 10

5

6

In re Allegheny Int'l, Inc.,
954 F.2d 167 (3d Cir.1992) ................................................................................ 8

7

8

In re Blixeth,
489 B.R. 154 (Bankr. D. Mo. 2013) .................................................................... 9

9

In re Consol. Pioneer,
178 B.R. 222 (9th Cir. BAP 1995) ...................................................................... 8

10

11

In re Gray,
522 B.R. 619 (Bankr. D. Idaho 2014) ................................................................. 8

12

In re Holm,
931 F.2d 620 (9th Cir. 1991) .............................................................................. 8

13

14

In re Parrott Broadcasting Ltd. P'ship,
492 B.R. 35 (Bankr. D. Idaho 2013) ................................................................... 9

15

Kay v. Kay,
188 Cal. App. 2d 214, 10 Cal. Rptr. 196 (1961) ................................................. 11

16

17

Khan v. CitiMortgage, Inc.,
975 F. Supp. 2d 1127 (E.D. Cal. 2013) .............................................................. 11

18

Lennar Mare Island, LLC v. Steadfast Ins. Co.,
139 F. Supp. 3d 1141 (E.D. Cal. 2015) ............................................................... 9

19

20

Lundell v. Anchor Const. Specialists, Inc.,
223 F.3d 1035 (9th Cir. 2000) ............................................................................ 8

21

N. Star Reins. Corp. v. Super. Ct.,
10 Cal. App. 4th 1815, 13 Cal. Rptr. 2d 775 (1992) ............................................ 9

22

23

Outboard Marine Corp. v. Super. Ct.,
52 Cal. App. 3d 30, 124 Cal. Rptr. 852 (1975) .................................................. 11

24

Pepper v. Litton,
308 U.S. 295, 304, 60 S.Ct. 244 (1939) .............................................................. 9

25

26

Saterbak v. Nat'l Default Servicing Corp.,
2016 WL 4430922 (S.D. Cal. Aug. 22, 2016) ...................................................... 9

27

Spencer v. Pugh (In re Pugh),
157 B.R. 898 (9th Cir. BAP 1993) ...................................................................... 9

28

ii

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

Vinci v. Waste Management, Inc.,
   36 Cal.App.4th 1811 (1995) .................................................................. 11

Youngman v. Nevada Irrigation,
   70 Cal. 2d 240, 74 Cal. Rptr. 398, 449 P.2d 462 (1969) ...................... 11

Zakaessian v. Zakaessian,
   70 Cal. App. 2d 721 (1945) ...................................................................... 9

**Statutes**

11 U.S.C. § 502(a) .......................................................................................... 8

11 U.S.C. § 502(b)(1) ...................................................................................... 8

Cal. Code. Civ. Proc. § 339 ........................................................................... 12

Cal. Code. Civ. Proc. § 1856(a) ..................................................................... 10

**Other Authorities**

2 Witkin, Cal. Evidence (5th Ed. 2012), Documentary Evidence, § 66, p. 207 ............... 10

3 L. King, COLLIER ON BANKRUPTCY § 502.02, at 502-22 (15th ed. 1991) .......................... 8

**Rules**

Fed. R. Bankr. P. 3001(f) ................................................................................ 8

1  **TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY**

2  **JUDGE, BARRY BEITLER, AND ALL OTHER INTERESTED PARTIES:**

3      **PLEASE TAKE NOTICE** that, pursuant to 11 U.S.C. § 502, Federal Rule of

4  Bankruptcy Procedure 3007, and Local Bankruptcy Rule 3007-1, on December 14, 2017,

5  at 11:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 5C of the

6  United States Bankruptcy Court, located at 411 West Fourth Street, Santa Ana, California

7  92701, a hearing will be held concerning this amended objection (the "Objection") of John

8  Jean Bral, the debtor and debtor-in-possession in the above-captioned chapter 11 case

9  (the "Debtor"), to Proof of Claim No. 14 ("Claim No. 14") filed by Barry Beitler ("Beitler").

10     **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 3007-

11  1(b)(3)(A), any response to the Objection must be filed and served not later than fourteen

12  (14) days prior to the hearing on the Objection (as further set forth in the Notice served

13  concurrently herewith).

14     **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 3007-

15  1(b)(3)(B), if a response is not timely filed and served, the Court may grant the relief

16  requested in the Objection without further notice or hearing.

17     **PLEASE TAKE FURTHER NOTICE** that the Objection is based on the amended

18  Notice of Hearing, the attached Memorandum of Points and Authorities, the concurrently

19  filed Declaration of John Jean Bral, the files and records of this Court related to the

20  Debtor's case, and upon such other oral and documentary evidence as may be presented

21  to the Court at or before the time of the hearing on the Objection.

22  ///

23  ///

24  ///

25

26

27

28

1136155.1

OBJECTION

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 • Fax 714-966-1002

1    **WHEREFORE**, the Debtor requests that the Court enter an Order (i) disallowing

2  Claim No. 14 in its entirety; or, alternatively, (ii) determining the amount of such unsecured

3  claim on the merits subject to proof in these proceedings and defenses thereto; and (iii)

4  for such other and further relief as may be just and proper under the circumstances of this

5  case.

6                                                        Respectfully submitted,

7  Dated:  October 13, 2017                    LOBEL WEILAND GOLDEN FRIEDMAN LLP

8

9                                            By:  */s/ Beth E. Gaschen*_____
                                                   WILLIAM N. LOBEL
10                                                 ALAN J. FRIEDMAN
                                                   BETH E. GASCHEN
11                                                 Attorneys for Debtor
                                                   and Debtor-in-Possession
12                                                 John Jean Bral

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1136155.1                                2                                OBJECTION

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

## I.    **INTRODUCTION**

John Jean Bral, the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor"), hereby submits this objection (the "Objection") to Claim No. 14 filed by Barry Beitler ("Beitler").  In support of the Objection, the Debtor relies on the following Memorandum of Points and Authorities and the Declaration of John Jean Bral filed concurrently herewith (the "Bral Declaration").

On June 16, 2017, Beitler filed a proof of claim ("Claim No. 14") as an unsecured claim in an undetermined amount based on "Capital contributions and other obligations of Debtor with respect to single purpose limited liability companies."  A true and complete copy of Claim No. 14 is attached hereto as Exhibit "1" and incorporated herein by this reference.[1]

Beitler, along with the Debtor, is a 47.5% member of Westcliff Investors, LLC ("Westcliff") and a 40.375% (Capital) and 42.30% (Profit and Loss) member of Mission Medical Investors, LLC ("Mission"),[2] two California limited liability companies (together, the "LLCs").  Beitler and the Debtor were co-managers of the LLCs and were jointly responsible for managing the affairs of these entities during their tenure as co-managers, including the retention and maintenance of their books and records.  True and correct copies of the operating agreements for these entities (the "OPAs") are attached to the Bral Declaration as Exhibits "1" and "3."

In Claim No. 14, Beitler alleges that the OPAs fail to accurately reflect his ownership interests, fail to give him credit for the contributions he made to the LLCs, and

---

[1] As set forth in Claim No. 14, the allegations in the Claim have also been raised in connection with a non-dischargeability action brought by Beitler against the Debtor (Adv. No. 8:17-ap-01092).  The Debtor has sought to have the issues regarding non-dischargeability separated from the issues of liability.  To the extent that liability on account of this Claim is considered, such determination is proper in connection with these claim objection proceedings.

[2] As to Westcliff, Claim No. 14 filed by Beitler substantially mirrors the allegations in Claim No. 16 filed by Beitler's sister, Betsy Boyd (the holder of a 5% membership interest in Westcliff).  Concurrently herewith, the Debtor has filed an objection to Claim No. 16 filed by Boyd.  The Debtor incorporates such objection to Claim No. 16 in this objection, to the extent relevant, as though fully set forth herein.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1 that funds have been diverted from the LLCs to his detriment.  According to the

2 allegations set forth in the attachment to Claim No. 14, the Debtor is responsible for these

3 purported drafting errors and alleged diversion of funds.

4     As discussed herein, Beitler's Claim No. 14 fails for numerous reasons.  First, the

5 Claim is barred by the statute of limitations.  Second, the allegations made in the Claim

6 are barred by the parol evidence rule.  Third, the Claim has been waived.  Fourth, Beitler

7 is estopped from making the Claim.  Lastly, to the extent that the Claim is not disallowed

8 in its entirety based on the foregoing reasons, and the merits of such Claim were to be

9 considered by this Court, the Debtor denies the allegations underlying Claim No. 14.

10     To the extent that Claim No. 14 is not disallowed in its entirety for the reasons set

11 forth herein, and the merits of such Claim were to be considered, the Debtor believes that

12 he would be successful on the issue of liability on the merits by way of the proceeding on

13 this Objection.[3]  Claim No. 14 is filed in an undermined amount, subject to proof by Beitler,

14 and is based solely on Beitler's unsubstantiated assertions set forth in Claim No. 14

15 (which itself attaches only the OPAs as support).  The Claim does not take into

16 consideration any of the Debtor's defenses to the asserted liability which, if the merits are

17 to be considered, must be considered in connection with the allowability of any such

18 Claim.  As further discussed herein, and in the Bral Declaration filed concurrently

19 herewith, the allegations underlying Claim No. 14 are false.

20 **II.**   **STATEMENT OF FACTS**

21     **A.**   **Jurisdiction and Venue**

22     This Court has jurisdiction to consider this Objection under 28 U.S.C. §§ 157 and

23 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2).  The Debtor consents to the

24 entry of a final order by the Court in connection with this Objection to the extent it is later

25 determined that the Court, absent consent of the parties, cannot enter final orders or

26 _____

27 [3] By filing Claim No. 14, Beitler has subjected himself to this Court's jurisdiction to determine the amount and allowability of his asserted claim against the Debtor.

28

1  judgments consistent with Article III of the United States Constitution.  Venue of this case

2  and this Objection in this district is proper under 28 U.S.C. §§ 1408 and 1409.

3  **B.    Relief Requested**

4      By this Objection, the Debtor seeks entry of an order pursuant to section 502(b) of

5  the Bankruptcy Code and Bankruptcy Rule 3007 (i) disallowing Claim No. 14 in its

6  entirety; or, alternatively, (ii) determining the amount of such unsecured claim on the

7  merits subject to proof in these proceedings; and (iii) for such other and further relief as

8  may be just and proper under the circumstances of this case.

9  **C.    The Debtor and the Chapter 11 Filing**

10      The Debtor commenced this case by filing a voluntary petition under chapter 11 of

11  title 11 of the United States Code on February 24, 2017 (the "Petition Date").  The Debtor

12  continues to manage his financial affairs and operate his bankruptcy estate as a debtor-in-

13  possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No request for

14  the appointment of a trustee or examiner has been made in this case.  No official

15  committee of unsecured creditors has been appointed in this case.

16  **D.    The Bar Date and the Claim**

17      This Court set a deadline of June 16, 2017 as the bar date for filing claims (the

18  "Claims Bar Date").  On April 21, 2017, the Debtor served all known creditors and parties-

19  in-interest with notice of the Claims Bar Date (the "Bar Date Notice") [Docket No. 47].

20  Pursuant to the Bar Date Notice, each creditor, subject to certain limited exceptions,

21  holding a claim against the Debtor was required to file a proof of claim on or before the

22  Claims Bar Date.  On June 16, 2017, Beitler filed Claim No. 14 as an unsecured claim in

23  an undetermined amount.

24  **E.    Summary of Material Facts**

25  **1.    General Background**

26      The Debtor and Beitler, a sophisticated investor, formed Westcliff and Mission in

27  2003.  Westcliff's OPA (the "Westcliff OPA") (Exhibit "1" to the Bral Declaration) is dated

28  February 20, 2003 and Mission's OPA (the "Mission OPA") (Exhibit "3" to the Bral

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  Declaration) is dated June 10, 2004.  Both agreements were signed by Beitler and the

2  Debtor.

3        The OPAs vest all managerial control in Beitler and the Debtor, as co-managers,

4  and designate the two men as the OPAs' tax matters partners.

5        After the LLCs were formed, Beitler set up the "quickbooks" based accounting

6  system that is still used by the LLCs today, and Beitler's personal accountant, Robert

7  Sargent, prepared the LLCs' tax returns and investor K-1s for approximately ten years.  At

8  no point in time during this period or thereafter did Beitler contend that the membership

9  percentage listed in the LLCs' tax returns and in his individual K-1 (prepared by his own

10 accountant) was inaccurate.  Moreover, unless Beitler has been operating as a tax

11 scofflaw for the past decade, he has filed at least ten personal tax returns wherein he

12 attested to the accuracy of the percentage he is now contesting under the penalty of

13 perjury.

14       At some point in 2013, Beitler launched a plan to take the Debtor's interest in the

15 LLCs for himself, without cause and without compensation.  In furtherance of this plan,

16 Beitler initiated a blizzard of litigation against the Debtor, knowing that the Debtor would

17 ultimately face a choice:  Consent to this unlawful taking, or be driven into insolvency by

18 legal fees and costs.  The latter eventuality has now come to fruition.  Beitler's Claim

19 before the Court is but a continuance of Beitler's malign strategy.

20              **2.      Beitler's Claims Related to Mission**

21       Beitler's Mission-related claims asserted by way of Claim No. 14 can be placed into

22 three categories.

23       The first category of claims is premised upon the contention that the Mission OPA

24 fails to accurately reflect the agreement of the parties (the "Contract Claims"), and these

25 inaccuracies are attributable to the Debtor's fraudulent conduct.  The first of these alleged

26 errors is the listing of Beitler's Class A membership interest, which appears as follows in

27 the Mission OPA:

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

| Member | Address | Capital Percentage | Capital Contributed |
|--------|---------|-------------------|---------------------|
| Barry Beitler and John Bral Split 50/50 | 825 South Barrington Ave. Los Angeles, CA 90049 | 61.40% | $1,950,000.00 |

According to Beitler, this entry is in error.  In this regard, Claim No. 14 sets forth as follows:

> Beitler is informed and believes that Bral, in documenting Beitler's and Bral's percentage interest in Mission, intentionally aggregated their membership interest, and did not segregate and allocate between Beitler and Bral their respective Capital Membership interests, in order to conceal Bral's failure to make certain capital contributions that would adversely adjust his percentage interest in Capital Membership relative to Beitler, and thereby conceal his failure to contribute the necessary capital to preserve his percentage interest in the Capital Membership of Mission.

(Claim No. 14, Ex. 1 hereto, p. 5).

The second category contains the member benefit claims (the "Member Benefit Claims").  The claims in this category are premised upon the contention that Mission, or more specifically, the Debtor as Mission's co-manager, failed to properly account for the capital contributions that Beitler made to this LLC.  This failure, according to Beitler, deprived him of the distribution and voting rights that he should have received based upon his greater level of contributions.

The third category of claims are the breach of contract claims (the "Breach Claims") wherein Beitler alleges that the Debtor diverted money from the LLCs to entities under his control, such as Bral Realty Advisors, Inc. and Venture RE Group.  It is not clear from the Claim whether the funds at issue were corporate funds, in which case the claim would be held by Mission, or whether the allegation is that the Debtor simply failed to give Beitler his alleged "share" of the payments.

### 3.    Beitler's Claims Related to Westcliff

The allegations made in the Claim relating to Westcliff fall into the same categories referenced above in connection with Mission.  In the Westcliff-centric Contract Claims, Beitler alleges that Exhibit A to the Westcliff OPA is incomplete.  Although it lists each

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  member's ownership percentage, it does not list the member's capital contribution.  This

2  omission, accordingly to Beitler, is somehow the Debtor's fault.

3      The Westcliff-centric Member Benefit Claims are the same as those alleged with

4  respect to Mission – in sum, that Bral failed to properly account for the greater capital

5  contributions that Beitler purportedly made to Westcliff and, as result, Beitler was denied

6  his proper share of distributions and greater voting rights.

7      The Breach Claims relating to Westcliff are the same as those alleged for Mission.

8      As the following analysis establishes, Claim No. 14 should be disallowed in its

9  entirety.

10  **III.    ANALYSIS**

11      **A.    The Standard for Allowance of Claims**

12      Pursuant to Federal Rule of Bankruptcy Procedure 3001(f) and section 502(a), a

13  timely filed and properly documented proof of claim is deemed prima facie valid.

14  Bankruptcy Code § 502(b)(1) provides that a claim will not be allowed to the extent that

15  the claim is for "an unenforceable debt against a debtor and property of the debtor, under

16  any agreement or applicable law for a reason other than because such claim is contingent

17  or unmatured . . ."

18      "[T]he burden of initially going forward with the evidence as to the validity and the

19  amount of the claim is that of the objector to that claim.  3 L. King, COLLIER ON

20  BANKRUPTCY § 502.02, at 502-22 (15th ed. 1991).  Once "the objector produces sufficient

21  evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts

22  to the claimant to prove the validity of the claim by a preponderance of the evidence."  In

23  re Consol. Pioneer, 178 B.R. 222, 226 (9th Cir. BAP 1995) (quoting In re Allegheny Int'l,

24  Inc., 954 F.2d 167, 173-74 (3d Cir.1992)).  The ultimate burden of persuasion remains at

25  all times upon the claimant.  Lundell v. Anchor Const. Specialists, Inc., 223 F.3d 1035,

26  1039 (9th Cir. 2000); In re Holm, 931 F.2d 620, 623 (9th Cir. 1991); In re Gray, 522 B.R.

27  619, 625 (Bankr. D. Idaho 2014) ("If the objector produces evidence sufficient to negate

28  the validity of the claim, the ultimate burden of persuasion remains on the claimant to

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   demonstrate by preponderance of the evidence that the claim deserves to share in the

2   distribution of the debtor's assets."); <u>Spencer v. Pugh (In re Pugh)</u>, 157 B.R. 898, 901 (9th

3   Cir. BAP 1993); <u>In re Parrott Broadcasting Ltd. P'ship,</u> 492 B.R. 35, 38 (Bankr. D. Idaho

4   2013); <u>In re Blixeth</u>, 489 B.R. 154 (Bankr. D. Mo. 2013) (once objecting party succeeds in

5   overcoming prima facie effect of procedurally proper proof of claim, burden shifts to

6   claimant to prove validity of its claim, and claimant must satisfy that burden by

7   preponderance of evidence).  *See also* <u>Pepper v. Litton</u>, 308 U.S. 295, 304, 60 S.Ct. 244

8   (1939) (stating that the bankruptcy court has the power to shift the circumstances

9   surrounding any claim to see that injustice or unfairness is not done in administering the

10  bankruptcy estate).

11          In this case, the Claim at issue is barred and any presumption of validity has been

12  overcome by the evidence and legal authorities cited herein.  Accordingly, the Debtor

13  seeks entry of an Order granting the Objection.

14  **B.**      **The Claim is Barred by the Statute of Limitations, the Parol Evidence**

15           **Rule and the Doctrines of Waiver and Estoppel**

16          The Mission OPA was executed in 2004 and the Westcliff OPA was executed in

17  2003.  Beitler's attempt to attack the content of these writings via the Contract Claims is

18  barred by the statute of limitations.  *See* <u>Lennar Mare Island, LLC v. Steadfast Ins. Co.</u>,

19  139 F. Supp. 3d 1141, 1165 (E.D. Cal. 2015) ("The statute of limitations for a reformation

20  claim is three years. Cal. Civ. Proc. Code § 338(d)"); <u>N. Star Reins. Corp. v. Super. Ct.</u>, 10

21  Cal. App. 4th 1815, 1818, 13 Cal. Rptr. 2d 775 (1992); <u>Saterbak v. Nat'l Default Servicing</u>

22  <u>Corp.</u>, 2016 WL 4430922, at 8 (S.D. Cal. Aug. 22, 2016) (Four-year statute of limitations

23  in Section 343 of the California Code of Civil Procedure requires applies to actions to set

24  aside or avoid a contract); <u>Zakaessian v. Zakaessian</u>, 70 Cal. App. 2d 721, 725 (1945).

25          To the extent that Beitler contends that he should be accorded relief under the

26  "date of discovery" exception to these statutes, this argument fails.  Beitler signed both of

27  the OPAs, his accountant prepared the corporate tax returns for almost ten years, he has

28  received annual K-1 forms listing his membership interest for over ten years, and he

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 • Fax 714-966-1002

1  presumably filed those K-1s with his personal return and thereby attested to their

2  accuracy under the penalty of perjury.  In sum, Beitler has known exactly what was

3  provided for in both of the OPAs for more than ten years.  He cannot seek to change a

4  word in these documents at this late date.  Such action is barred by the statute of

5  limitations.

6      Beitler's assertion that a series of early drafts of the OPAs (so-called "Alternative

7  OPAs" in the Claim) may contradict the content of the later executed OPAs is irrelevant

8  and precluded by California's parol evidence rule.  Cal. Code. Civ. Proc. § 1856(a)

9  ("Terms set forth in a writing intended by the parties as a final expression of their

10  agreement with respect to the terms included therein may not be contradicted by evidence

11  of a prior agreement or of a contemporaneous oral agreement.").  "Thus, if there has been

12  a legally effective act ... the exclusionary aspect of the parol evidence rule comes into

13  operation where the parties have adopted a writing or writings as a final and complete

14  expression of their understanding."  2 Witkin, Cal. Evidence (5th Ed. 2012), Documentary

15  Evidence, § 66, p. 207; Burch v. Premier Homes, LLC, 199 Cal. App.4th 730, 742, 131

16  Cal. Rptr. 3d 855 (2011).

17      Beitler's Member Benefit Claims are also barred by the statutes of limitations

18  discussed above, at least as to contributions that were made and not accounted for before

19  2013.  Likewise, the date of discovery rule is of no assistance to Beitler for the reasons

20  stated above.  If, as Beitler alleges, he made a capital contribution and did not see an

21  adjustment in his K-1 membership percentage at the end of the year, then he was bound

22  to take action.  His failure to do so within the statute of limitations period is fatal to the

23  Claim.

24      Beitler has also waived the Contract Claims and the Member Benefit Claims.  As

25  indicated in the Bral Declaration, Beitler set up the LLCs' accounting system and his

26  personal accountant prepared the LLCs' tax returns for almost ten years.  In each of these

27  years, the LLCs filed tax returns, and K-1s were issued to their members reflecting the

28  membership percentages that Beitler is now belatedly contending are in error.  Beitler

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    never objected to these filings and in fact received and filed his own K-1 each year without

2    objection.  This course of conduct effectuated a knowing waiver of his right to contest the

3    information listed in these returns and consequently in the OPAs. *See generally* Kay v.

4    Kay, 188 Cal. App. 2d 214, 218, 10 Cal. Rptr. 196, 198 (1961); Outboard Marine Corp. v.

5    Super. Ct., 52 Cal. App. 3d 30, 41, 124 Cal. Rptr. 852 (1975) ("Waiver is the voluntary

6    relinquishment of a known right.").

7         Beitler's Member Benefit Claims also ignore the proverbial "elephant in the room" –

8    Beitler has been a co-equal manager of the LLCs along with the Debtor since the

9    formation of the LLCs.  If the Form 1065s and K-1s filed by the LLCs each year for over

10   ten years were in error, a conclusion that is mandated if one accepts Beitler's Member

11   Benefit Claims, then Beitler is attempting to breach a promise that he made to the other

12   members.  He promised, through those tax filings—filings that he had co-equal

13   responsibility for—that the facts therein were true and hence they could rely upon the K-1s

14   when they filed their own returns.  Beitler cannot now contend that these promises were

15   false.  *See generally* Youngman v. Nevada Irrigation, 70 Cal. 2d 240, 249, 74 Cal. Rptr.

16   398, 449 P.2d 462 (1969); Khan v. CitiMortgage, Inc., 975 F. Supp. 2d 1127, 1137–38

17   (E.D. Cal. 2013) ("Promissory estoppel elements are "(1) a promise clear and

18   unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) his

19   reliance must be both reasonable and foreseeable; and (4) the party asserting the

20   estoppel must be injured by his reliance.").

21        In addition, Beitler's Breach of Contract claims are not assertable by him.  To the

22   extent that the allegedly diverted funds were the funds of the LLCs, claims as to such

23   diverted funds (to the extent such claims existed), would belong to the LLCs, not to

24   Beitler.  *See* Vinci v. Waste Management, Inc., 36 Cal.App.4th 1811, 1815 (1995)

25   (Remedy for corporate claim lies with the corporation, not the shareholder).  To the extent

26   Beitler is contending that the Debtor deprived him of his share of funds that were properly

27   payable to him, where is the contract?  It is not attached to the Claim.  To the extent that

28   the contract is oral, Beitler must prove its existence and terms, and prove that funds were

1  taken in violation thereof.  Moreover, if this alleged diversion occurred more than two

2  years ago, it would be barred. Cal. Code. Civ. Proc. § 339.

3      For all of these reasons, Claim No. 14 is properly disallowed in its entirety.

4  **C.**    **If Not Disallowed, the Claim Should Be Determined on its Merits and**

5        **Beitler's Allegations are False**

6      Claim No. 14 is based solely on Beitler's allegations, without any consideration of

7  the Debtor's defenses thereto.  To the extent not disallowed for the reasons set forth

8  hereinabove, Claim No. 14 should be determined by this Court in accordance with proof.

9      As set forth in the Bral Declaration filed concurrently herewith, and as discussed

10  herein, the allegations that form the basis of Claim No. 14 are false.

11      In this regard, in the case of Mission, Beitler and the Debtor each own a 40.375%

12  (capital) and 42.30% (profit and loss) interest in the entity.  In the case of Westcliff, Beitler

13  and the Debtor own a 47.5% interest in the entity and Boyd, Beitler's sister, owns a 5%

14  interest.  The OPAs accurately reflect the ownership interests of the members.

15      The LCCs were co-managed by Beitler and the Debtor and Beitler and the Debtor

16  were the LLCs' tax partners.  As co-manager, Beitler was jointly responsible for managing

17  the affairs of the LLCs, including the retention and maintenance of their books and

18  records.  Indeed, Beitler was initially responsible for setting up the accounting systems of

19  the LLCs which are still in use.  Beitler's personal accountant, Robert Sargent, prepared

20  the LLCs' tax returns for approximately ten years, including the K-1 forms that were issued

21  each year to the members which accurately reflected the membership interests and

22  capital accounts.  At no time did either Beitler (or Boyd) contact the Debtor to advise him

23  that they considered the tax filings (prepared by Beitler's accountant) to be in error.

24      The vague allegations made by Beitler (and Boyd) in their Claims regarding the

25  Debtor's alleged failure to properly account for the membership interests or capital

26  contributions and are false.  Notably, Boyd never even made a contribution for her interest

27  in Westcliff.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    Moreover, there is no support for the vague allegations that the Debtor diverted

2    funds from the LLCs (or from the other entitles defined in the Bral Declaration as the

3    "SPEs").[4]   To the extent that such allegations relate to management fees and

4    commissions paid to Venture RE Group and/or Bral Realty Advisors, Inc. (defined in the

5    Bral Declaration as "Service Payments"), such issues are discussed in detail in the Bral

6    Declaration and the Debtor's concurrently filed objection to Claims No. 9 and 11, filed by

7    Beitler and Beitler & Associates, Inc., dba Beitler Commercial Realty Services ("BCRS").

8    The Debtor's position with respect to the propriety of such Service Payments set forth in

9    such objections to Claims No. 9 and 11 are incorporated as though fully set forth herein.

10    It bears repeating that the SPEs were all formed prior to 2007.  Accordingly, the

11    vague allegations by Beitler (and Boyd) encompass a history of more than ten years.

12    Since Beitler (and Boyd) have failed to specify what contributions, ownership

13    interests and payments over the past decade were allegedly improper or unaccounted for,

14    the Debtor cannot specifically address these allegations at this juncture.  However, as set

15    forth in the Bral Declaration, to the best of the Debtor's knowledge, all capital contributions

16    to the SPEs were in fact properly accounted for and that the ownership interests specified

17    annually in the K-1 Forms that were sent to Beitler, and necessarily approved by Beitler as

18    a co-manager of all of the SPEs, were accurate, and the Service Payments were in fact

19    proper and authorized, and Beitler was always aware that these payments were being

20    made.

21    If and when Beitler (or Boyd) specify what contributions they allege were not

22    accounted for, what interest percentages are in error, or what payments were improper,

23    the Debtor will review the applicable books and records and address and rebut these

24    contentions in more detail.  The Debtor has every confidence that these records will rebut

25    these allegations.

26    _____

27    [4] The SPEs are Westcliff, Mission, Ocean View Medical Investors, LLC, Harbor Medical Investors, LLC,
Javaher Investors, LLC and Eyestreet Medical Investors, LLC.

28

1  **IV.    RESERVATION OF RIGHTS**

2      This Objection is limited to the grounds stated herein.  Accordingly, it is without

3  prejudice to the right of the Debtor to object to Claim No. 14 on any other ground

4  whatsoever, and the Debtor expressly reserves all further substantive and/or procedural

5  objections he may have.

6  **V.    CONCLUSION**

7      The Debtor objects to Claim No. 14 for the reasons stated herein, and the Debtor

8  moves this Court for an order (i) disallowing Claim No. 14 in its entirety; or alternatively,

9  (ii) determining the amount of such unsecured claim on its merits subject to proof in these

10  proceedings; and (iii) for such other and further relief as may be just and proper under the

11  circumstances of this case.

12                                     Respectfully submitted,

13  Dated: October 13, 2017            LOBEL WEILAND GOLDEN FRIEDMAN LLP

14

15                                     By:  */s/ Beth E. Gaschen*
                                            WILLIAM N. LOBEL
16                                          ALAN J. FRIEDMAN
                                            BETH E. GASCHEN
17                                          Attorneys for Debtor and
                                            Debtor-in-Possession

18

19

20

21

22

23

24

25

26

27

28

1136155.1                          14                              OBJECTION

EXHIBIT "1"

| Fill in this information to identify the case: |
|---|

| Debtor 1 | JOHN JEAN BRAL |
|---|---|
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Central District of California |
| Case number | 8:17-BK-10706-SC |

## Official Form 410

# Proof of Claim
4/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Barry Beitler

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Gary E. Klausner, Esq.
Name

10250 Constellation Blvd., Suite 1700
Number   Street

Los Angeles          CA        90067
City                State       ZIP Code

Contact phone (310) 229-1234

Contact email GEK@LNBYB.COM

Where should payments to the creditor be sent? (if different)

Barry Beitler
Name

825 Barrington Avenue
Number   Street

Los Angeles          CA        90048
City                State       ZIP Code

Contact phone

Contact email bbeitler@beitler.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___  ___  ___  ___

---

**7. How much is the claim?**   $ _To be determined_____ . Does this amount include interest or other charges?

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_Capital contributions and other obligations of Debtor with respect to single purpose limited liability companies._

---

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:**
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:            $_____

Amount of the claim that is secured:      $_____

Amount of the claim that is unsecured:  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:     $_____

Annual Interest Rate (when case was filed)_____%

☐ Fixed
☐ Variable

---

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.     $_____

---

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check all that apply:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

*  Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   06/15/2017
              MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

Name   Barry Beitler
       First name          Middle name          Last name

Title  _____

Company  _____
         Identify the corporate servicer as the company if the authorized agent is a servicer.

Address  825 Barrington Avenue
         Number     Street

         Los Angeles                    CA        90049
         City                           State     ZIP Code

Contact phone  _____   Email  bbeitler@beitler.com

---

## ATTACHMENT TO PROOF OF CLAIM OF BARRY BEITLER BASED ON CAPITAL CONTRIBUTION AND OTHER OBLIGATIONS OF JOHN BRAL WITH RESPECT TO SINGLE PURPOSE ENTITY LIMITED LIABILITY COMPANIES

### The Beitler-Bral SPEs

Barry Beitler ("Beitler" or "Claimant") and John Bral ("Bral") formed several single purpose entities as limited liability companies (collectively, "SPEs") to hold, operate and manage real property investments in which they each held a membership interest. The SPEs include, among others, Mission Medical Investors, LLC ("Mission") and Westcliff Investors, LLC ("Westcliff").

Each of the SPEs was governed by a written operating agreement ("OPA"). Copies of the operative OPAs for Mission and Westcliff are attached hereto as Exhibits "1" and "2", respectively.

### The Purported Membership Interests in the SPEs

### Capital Membership

The percentage of capital membership ("Capital Member" or Capital Membership") [*i.e.,* membership based on monetary contributions separate from membership based on non-monetary contributions] in each of the SPEs is based on the amount of capital contributed by each member relative to the aggregate capital contributed to the SPE by all of its Capital Membership. The percentage interest of Capital Membership is adjusted to reflect additional capital contributions made by each member. Moreover, the rights and privileges of Capital Membership, e.g., preferred returns, distributions, tax benefits, and voting rights (collectively, "Benefits"), among other things, is allocated pro-rata among the Capital Members, corresponding to their percentage interest relative to total capital contributed by each Capital Member for the time period such Benefits are issued by the SPE.

### Mission

The Mission OPA documents, in its Exhibit A-2, that Beitler and Bral purport to hold an aggregate 61.40% of Class A Membership in Mission, and documents, in its Exhibit A-1, that Beitler and Bral each respectively own 50% of Class B Membership in Mission (or 10% of the aggregate of all class of membership interests in Mission). Class A Membership purportedly reflects the capital contribution made by Beitler and Bral as of the date of the operating agreement, and Class B Membership is attributed to non-monetary contributions made by Beitler and Bral, respectively. Class B Membership, unlike Class A Membership, is not stated in the aggregate with respect to Beitler and Bral. Notwithstanding the aggregate designation with respect to Beitler and Bral in Class A Membership, at no time did Beitler and Bral have an agreement for collective ownership of Class A Membership interests in Mission. Beitler's and Bral's Class A Membership in Mission was, and is, at all times was intended to be, individually held and based on their individual capital contributions to Mission. The aggregate capital contribution made by Beitler and Bral in the amount of $1,950,000.00 thus purports to reflect a separate capital contribution made by Beitler and Bral, each in the amount of $975,000.00.

Beitler is informed and believes that Bral, in documenting Beitler's and Bral's percentage interest in Mission, intentionally aggregated their membership interest, and did not segregate and allocate between Beitler and Bral their respective Capital Membership interests, in order to conceal Bral's failure to make certain capital contributions that would adversely adjust his percentage interest in Capital Membership relative to Beitler, and thereby conceal his failure to contribute the necessary capital to preserve his percentage interest in the Capital Membership of Mission.

Moreover, the Mission OPA, which is dated as of June 10, 2004, (i) replaced a prior Mission operating agreement ("Prior OPA"), (ii) was not finalized until in or about December 2004, and (iii) did not account for membership interests under the Prior OPA that still existed as of June 10, 2004 and were not repurchased or terminated until sometime thereafter. For instance, the repurchase of the interest of one former member, the Levy Family Trust (the "Levy Membership Interest"), was not consummated until January 2005. Other members whose interests were repurchased after June 2004 included JKCM and M LLC and Davood Guity-Mehr.

Before the Mission OPA was executed, several different versions were prepared ("Alternate OPAs"), listing different purported members who are not included in the executed version. Bral has not provided documentation showing the membership interests or capital contributions of such members who were named in the Alternate OPAs, how their membership interests were repurchased, or the adjustment of the Capital Membership percentages resulting from repurchase of their Capital Membership. In addition, the Alternate OPAs inconsistently attributed to Beitler and Bral, in the aggregate, capital contributions of $1,305,000.00, $2,070,000.00, $1,680,000.00 and $1,917,000.00, without explaining the variations between or among these figures.

Westcliff

The Westcliff OPA documents that Beitler and Bral each own a 47.5% membership interest in Westcliff, with Betsy Boyd ("Boyd") holding the remaining 5% membership interest in Westcliff. Exhibit A to the Westcliff OPA designates the percentage of membership interest held in Westcliff by Beitler and Bral, but did not record the capital contributions made with respect to their membership interest, notwithstanding that the Westcliff OPA expressly provides that the amount of cash contribution to be made shall be stated in in Exhibit A opposite each member's name.

Bral's Control of the Records Pertaining to Membership Interests, Capital Membership and Benefits

Except for the initial period, Bral controlled the record keeping, the day to day bookkeeping of financial transactions and banking of Mission and Westcliff (and the other SPEs), and among other things, recorded the capital contributions made by each member and maintained the capital accounts for each member. Thus, Bral was responsible for maintaining the records to determine each member's, including Beitler's, percentage of Capital Membership interest in Westcliff and Mission, and the corresponding Benefits to which Beitler, Bral and the other members were entitled based on their respective percentage interests of Capital Membership.

Beitler has repeatedly demanded from Bral the delivery of pertinent financial information and documents, and access to the books and records of Mission and Westcliff (and the other SPEs), including, but not limited to, the QuickBooks in native file format to audit the financial transactions of Westcliff and Mission (and the other SPEs), to determine, among other things, (a) whether Beitler's initial capital contributions were properly recorded and reflect the appropriate percentage in Capital Membership, (b) if the proper adjustments to percentage to Capital Membership were made with respect to additional capital contributions made by Beitler in excess of other members' pro-rata percentage contributions in Mission and Westcliff (and the other SPEs), and (c) whether Beitler received the full complement of Benefits based on the respective OPAs and Beitler's percentage of Capital Membership in Mission and Westcliff (and the other SPEs). Notwithstanding Beitler's repeated request for financial information and documents, Bral has not delivered the necessary financial information and documents for Beitler to audit the transactions with respect to Mission, Westcliff and the other SPEs.

<u>Beitler's Claims</u>

Beitler is informed and believes that Bral, among other things, (a) did not properly account for Beitler's capital contributions to Mission and Westcliff, (b) did not properly account for Beitler's additional capital contributions to Mission and Westcliff, (c) did not accord Beitler the full complement of Benefits to which Beitler was entitled under the Westcliff and Mission OPAs, (d) conflated the Capital Membership in Mission to attribute Beitler's excess initial capital contribution in Mission relative to Bral's initial capital contribution in Mission so that Bral would maintain an equal Capital Membership interest in Mission relative to Beitler, (e) diverted payments from the SPEs, including Mission and Westcliff, to Bral and Bral's affiliates, Venture RE Group ("Venture") and Bral Realty Advisors, Inc. ("BRAI") for the payment of commissions for real estate brokerage services and property management services, and (f) manipulated the books and records of Mission and Westcliff (and the other SPEs) to not properly document and disclose capital contributions and percentage of Capital Membership, resulting in Bral being credited with Capital Memberships in excess of the amounts to which Bral was entitled.

Beitler's capital contributions for which Bral failed to account include without limitation the funds that Beitler contributed for Mission to repurchase the interests of former members. For example, the Levy Membership Interest was repurchased for $379,187.78, and Beitler funded that repurchase by wiring $385,000.00 to Mission, which then issued a check to the Levy Family Trust. Neither Bral nor any other member of Mission contributed capital to the repurchase of the Levy Membership Interest. Beitler is informed and believes that Bral failed to adjust Beitler's percentage Capital Membership interest in Mission, to reflect the capital Beitler contributed to this and other repurchases of interests of former members.

In addition, Beitler is informed and believes that Bral, as manager of the SPEs, (a) failed to distribute to Beitler funds, and allocate other Benefits, to which Beitler was entitled as a member of the SPEs, including those reflecting Beitler's additional capital contributions, and (b) instead wrongfully appropriated to himself, whether directly or through Venture or BRAI, funds and Benefits of the SPEs that otherwise would have been available for payment of distributions to which Beitler was entitled as a member of the SPEs.

Since, as discussed above, Bral controls the SPEs' books and records, and has failed to comply with Beitler's demands to disclose them, Beitler cannot at this time state the amount of his claim. Beitler reserves the right to amend this proof of claim after he has received all of the information necessary to calculate the precise amount of his claim.

Beitler's pending adversary action herein, Adversary No. 8:17-ap-01092, is based in part on allegations raised in this proof of claim.

### Reservation of Rights

Claimant reserves the right to (i) amend, update and/or supplement this Proof of Claim at any time and in any respect, (ii) file additional proofs of claim for additional claims which may be based on the same or additional documents or other liability or indebtedness of the Debtor to Claimant (iii) file a request for payment of administrative expenses in accordance with 11 U.S.C. §§ 503 and 507.

In addition to the foregoing, Claimant reserves all rights with respect to (a) any indebtedness owed to Claimant by any non-debtor affiliate or other entity related to the Debtor, and (b) any other amounts that may be owing to Claimant in respect of interest, fees, indemnities, costs and expenses to the extent permitted by applicable law.

Nothing contained in this Proof of Claim shall be construed as limiting Claimants rights, remedies and interests.

The filing of this proof of claim is not: (i) a waiver or release of Claimant's rights against any person, entity or property; (ii) a waiver of the right to move to withdraw the reference, or otherwise to challenge the jurisdiction of this Court, with respect to the subject matter of this Proof of Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving this Proof of Claim, or to assert that the reference has already been withdrawn with respect to the subject matter of this claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving this Proof of Claim; (iii) an election of remedy; or (iv) a waiver of any past, present or future defaults or events of default. Claimant specifically preserves all of Claimant's procedural and substantive defenses and rights with respect to any claim that may be asserted against Claimant by the Debtor or any of its debtor or non-debtor affiliates, or by any trustee for this estate.

# EXHIBIT 1

### AMENDED AND RESTATED
### OPERATING AGREEMENT FOR
### MISSION MEDICAL INVESTORS, LLC
### A CALIFORNIA LIMITED LIABILITY COMPANY

This Operating Agreement, is made as this 10th day of June, 2004 by and among the parties listed on the signatures pages hereof, with reference to the following facts:

A.      On December 4, 2003, Articles of Organization for MISSION MEDICAL INVESTORS, LLC, a California limited liability company (the Company), a limited liability company under the laws of the State of California, were filed with the California Secretary of State, Document Number 200333810155.

B.      An Operating Agreement was previously executed on December 10, 2003 for the operation and ownership of the building between Managing Members Barry Beitler ("Beitler") and John Bral ("Bral"), identified as Class B Members for their ownership interests without a capital contribution and numerous Members, identified as Class A Members who contributed cash including Beitler, Bral, and Dr. Jeffrey Gross ("Gross").

C.      The parties desire to amend and restate the previous Operating Agreement by:

1.      Buying all of the shares of the former Class A and B Members out plus a negotiated return other than Messrs. Bral, Beitler and Gross.

2.      Restructuring the Agreement to reflect a 20% Managing Member Class B Membership interest for no cash to Messrs. Bral and Beitler and create a 80% Class A interest for any and all new Members contributing cash based upon proportionate capital contributions of 100% of capital contributed for a 80% interest.

3.      Re-Capitalize the venture at a base price of $265 per rentable square foot with 100% of any and all costs required to refurbish and tenant improve the Property, carry the building, financing and leasing of the building, and any other miscellaneous costs on top of said $265 per square foot regardless of the costs therefore. All new Members acknowledge that the price paid for the building previously was less than $265 per square foot and said new price is the price established by the Members for this Amended and Restated Operating Agreement.

D.      The original Members represent and warrant that Mission Medical Investors, LLC is in good standing with the State of California, is not in default of any obligations as of the date of execution herewith and has no liabilities which would materially affect the restructured Membership hereunder. Acknowledgment is made that there is an existing real estate loan in place with First Regional Bank in a approximate amount of $8,265,000.00 which will be refinanced by a new loan upon lease-up of the Property (as hereinafter defined).

E.      The parties desire to adopt and approve this restated operating agreement for the Company.

NOW, THEREFORE, the parties (hereinafter sometimes collectively referred to as the Members, or individually as the Member) by this Agreement set forth the Operating Agreement for the Company under the laws of the State of California upon the terms and subject to the conditions of this Agreement.

### ARTICLE I

1

DEFINITIONS
ARTICLE 1 DEFINITIONS

When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement which are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

1.1     Act shall mean the Beverly-Killea Limited Liability Act, codified in the California Corporations Code, Section 17000 et seq., as the same may be amended from time to time.

1.2     Affiliate shall mean any individual, partnership, corporation, trust, or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member. The term control, as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1.3     Agreement shall mean this Operating Agreement, as originally executed and as amended from time to time.

1.4     Articles shall mean the Articles of Organization for the Company originally filed with the California Secretary of State and as amended from time to time.

1.5     Bankruptcy shall mean, (i) the entry of a decree or order for relief against any Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, Debtor Relief Law) generally affecting the rights of creditors and relief of debtors now or hereafter in effect; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of a Member's affairs; (iv) the filing of a petition in any such involuntary bankruptcy case, which petition remains not dismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by a Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by a Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

1.6     Capital Account shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.3.

1.7     Capital Contribution shall mean the total value of cash contributed to the Company by Members.

1.8     Code shall mean the Internal Revenue Code of 1986, as amended from time to time, and the provisions of succeeding law.

1.9     Company shall mean MISSION MEDICAL INVESTORS, LLC, a California Limited Liability Company.

1.10     Company Minimum Gain shall have the meaning ascribed to the term Partnership Minimum Gain in the Regulations Section 1.704-2(d).

1.11     Corporations Code shall mean the California Corporations Code, as amended from time to time, and the provisions of succeeding law.

2

EXHIBIT "1"
Page 24



1.12    <u>Dissolution Event</u> for the Company means the following:

With respect to any Member, one or more of the following:

    1.    When the period fixed for the duration of the Company expires as defined in 2.3 herein; or

    2.    By the unanimous written agreement of all Members.

1.13    "<u>Distributable Net Cash</u>" shall mean the amount of cash which the Manager deems available for distribution to the Members, taking into account all Company debts, liabilities, and obligations of the Company then due and amounts which the Manager deems necessary to place into reserves for customary and usual claims with respect to the Company's business.

1.14    <u>Economic Interest</u> shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a member, including, without limitation, the right to vote or participate in the management, or except as provided in Section 17106 of the Corporations Code, any right to information concerning the business and affairs of Company.

1.15    <u>Reserved</u>

1.16    <u>Fiscal Year</u> shall mean the Company's fiscal year, which shall be the calendar year.

1.17    <u>Former Members</u> shall have the meaning ascribed to it in Section 8.1.

1.18    <u>Former Member's Interest</u> shall have the meaning ascribed to it in Section 8.1.

1.19    <u>Majority Interest</u> shall mean Percentage Interests of one or more Members, which taken together exceeds fifty percent (50%) of the aggregate of all Percentage Interests.

1.20    <u>Manager</u> shall mean, BARRY BEITLER and JOHN BRAL, collectively, or any other person(s) or entity(ies) who succeed in their respective capacities.

1.21    <u>Member</u> shall mean each Person who (a) is an initial signatory to this Agreement; has been admitted to the Company as a Member in accordance with the Articles or this Agreement; or is an assignee who has become a Member in accordance with Article VII and (b) has not resigned, withdrawn, been expelled or, if other than an individual, dissolved. It shall refer to both classes of Members in the Company. Unless otherwise expressly mentioned, Member shall refer to and include both classes of Members.

1.21.1    <u>Class A Members</u> shall mean a class of Members that consist of those individuals, persons or entities that own eighty percent (80%) of all of the outstanding and issued Membership Interest in Company and are specifically named in Exhibit A-2 and who have contributed on a proportionate basis 100% of all cash required hereunder.

1.21.2    <u>Class B Members</u> shall mean a class of Members that consist of those individuals, persons or entities that own twenty percent (20%) of all of the outstanding and issued Membership Interest in Company and are specifically named in Exhibit A-1.

1.22    <u>Member Nonrecourse Debt</u> shall have the meaning ascribed to the term Partner Nonrecourse Debt in Regulations Section 1.704-2(b)(4).

3

1.23    Member Nonrecourse Deductions shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

1.24    Membership Interest shall mean a Member's entire interest in the Company including the Member's Economic Interest; the right to vote on or participate in the management; and the right to receive information concerning the business and affairs of the Company. A Membership Interest constitutes personal property.

1.25    Net Profits and Net Losses shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (and for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) with those adjustments required by Regulations Section 1.704-1(b)(2)(iv) for purposes of adjusting and maintaining Capital Accounts in accordance therewith.

1.26    Nonrecourse Liability shall have the meaning set forth in Regulations Section 1.752-1(a)(2).

1.27    Percentage Interest shall mean the percentage of a Member set forth opposite the name of such Member under the column Member's Percentage Interest in Exhibit A hereto; as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.

1.28    Person shall mean an individual, general partnership, limited partnership, limited liability company, corporation, trust, estate, real estate investment trust association or any other entity.

1.29    Regulations shall, unless the context clearly indicates otherwise, mean the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

1.30    Remaining Members shall have the meaning ascribed to it in Section 8.1.

1.31    Tax Matters Partner shall be BARRY BEITLER and JOHN BRAL, collectively, or their successors as designated pursuant to Section 9.8.

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1    Formation. Pursuant to the Act, the Members have formed a California Limited Liability Company under the laws of the State of California by filing the Articles with the California Secretary of State and entering into this Agreement. The rights and liabilities of the Members shall be determined pursuant to the Act and to this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2    Name. The name of the Company shall be MISSION MEDICAL INVESTORS, LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager deems appropriate or advisable. The Manager shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Manager considers appropriate or advisable. The phrase LLC shall always appear as part of the name of Company on all correspondence, stationary, checks, invoices and any and all documents and papers executed by Company and as otherwise required by the Act.

2.3    Term. The term of this Agreement shall be co-terminus with the period of duration of the Company, December 31, 2050, unless extended or sooner terminated as hereinafter provided.

2.4    Office and Agent. The Company shall continuously maintain an office and registered agent in the State of California as required by the Act. The principal office of the Company shall be as the Manager may determine. The Company also may have such offices, anywhere within and without the State of California, as the Manager from time to

4



EXHIBIT "1"
Page 26

time may determine, or the business of the Company may require. The registered agent shall be as stated in the Articles or as otherwise determined by the Manager.

2.5    Addresses of the Members and the Manager. The respective addresses of the Members and the Manager are set forth on Exhibit A.

2.6    Purposes of Company. The purpose of the Company is to engage in any lawful activity for which a Limited Liability Company may be organized under the Act. Notwithstanding the foregoing, however, the Company shall not engage in any business other than the following:

(1)    The business of development, operation, leasing and managing for rental and investment of that certain real property located at 27882 Forbes Road, Laguna Niguel (the "Property");

(2)    such other activities directly related to the foregoing business as may be necessary, advisable, or appropriate, in the reasonable opinion of the Manager to further the foregoing business.

2.7    Title to Property in the Name of the Company. Title to the real property purchased in accordance with 2.6 above shall be held and owned in the name of the Company

2.8    Tax Status of Company. The Members intend that the Company be treated as a partnership for income tax purposes and agree to take any actions necessary in order to obtain such treatment.

## ARTICLE III
## CAPITAL CONTRIBUTIONS

3.1    Initial Capital Contributions. Each Member shall contribute such amount as is set forth on Exhibit A as his, hers or its initial Capital Contribution within one year of the execution of this agreement. Exhibit A shall consist of Sections A-1 and A-2. Exhibit A-1 shall contain Class B Members and Exhibit A-2 shall contain Class A Members.

3.2    Additional Capital Contributions.

(1)    In addition, each Member shall contribute to the capital of the Company its pro rata share of such amounts as the Manager shall determine from time to time to be necessary in order to carry out the purposes of the Company set forth above within ten (10) days or thirty (30) days, depending on the amount of the capital call, after the call is made for same by the Manager.

(2)    If the Manager determines that the Company requires additional funds for any purpose, it may request that the Members contribute more funds to the Company. In such case, each Member shall contribute to the capital of the Company its pro rata share of such amounts as the Manager shall determine from time to time to be necessary in order to carry out the purposes of the Company set forth above within ten (10) business days if the total capital call is under ten thousand dollars ($10,000), or thirty (30) days if ten thousand dollars ($10,000) or over, after the call is made for same by the Manager.

(3)    Alternatively or additionally, Manager may reserve up to One Hundred Fifty Thousand dollars ($150,000) from Distributable Net Cash for such purposes.

(4)    If any Member fails to timely make its pro rata contribution as required above and required by the Manager, that Member or Members shall have his/her Membership Interest decreased proportionally for the failure to make such required

5

contributions. For example; Manager calls for one hundred thousand dollars. Member X, who owns eight percent (8%), fails to fund the call. The remaining Members must, pro rata, fill the capital call. Member X's interest is then reduced by itself, namely eight percent (8%) in this example, leaving Member X with seven point thirty-six percent (7.36%) interest. The diluted interest is then distributed to the Members making the capital call, pro rata.

3.3    <u>Capital Accounts</u>. The Company shall establish an individual Capital Account for each Member. The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv). If a Member transfers all or a part of his, hers or its Membership Interest in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations Section 1.704-1(b)(2)(iv)(1).

3.4    <u>No Interest or Preferred Return</u>. Except as otherwise expressly provided herein, no Member shall be entitled to receive any interest or preferred return on his, hers or its Capital Contributions.

3.4.1    <u>Preferred Return to Class A Members</u>. To the extent permitted by working capital requirements and other contingencies determined by the Manager, Company shall issue to Class A Members an eight percent (8%) preferred return, per annum, non-compounding, on their initial capital contribution set forth in Exhibit A-1 hereto. To the extent the preferred return cannot be issued in full because of Company's working capital requirements or other contingencies, the preferred return shall be issued in part and shall be carried forward to each successive year until paid. When the Class A Members have been paid an amount equal to the Class A Members' initial capital contribution, Class A Members shall no longer be entitled to any preferred return hereunder. Distributions will then be strictly based upon percentage ownership. The preferred return shall at all time be calculated based upon the then outstanding unpaid initial capital contribution of Class A Members.

3.4.2    <u>Preferred Return to Class B Members</u>. To the extent permitted by working capital requirements and other contingencies determined by the Manager, and Company's payment of an eight percent (8%) preferred return and no less to all of the Class A Members, Company shall issue an eight percent (8%) preferred return, per annum, not compounding to Class B Members, which Class B Member preferred return shall be calculated based on twenty percent (20 %) of the Preferred Return paid to Class A Members under Section 3.4.1.. To the extent the preferred return cannot be issued in full to the Class B Members because of Company's working capital requirements or other contingencies, the preferred return to Class B Members shall be carried forward to any successive year. For example, if Company distributes an eight percent (8%) preferred return to Class A Members, but only distributes a three percent (3%) preferred return to Class B Members, the Class B Members shall be entitled to an additional five percent (5%) return on a successive year. The amount of the preferred return paid to Class B Members is determined on an annual basis. The Preferred Return to Class B Members shall not be paid to Class B Members after the initial capital contribution of Class A Members has been repaid in full. After the Initial Capital Contribution is returned to the Class A Members, all distributions shall be made based upon percentage ownership. No Preferred Return shall be paid to Class B Members in any year except and unless the full eight percent (8%) preferred return has been paid to all of the Class A Members.

EXHIBIT "1"
Page 28

**3.4.3. Distributions After Payment of Preferred Return to Both Class A and Class B Members.** After payment of the preferred returns are made in full to both Class A Members and Class B Members, then any distributions from Company, in any period per annum, shall be made to all Members based on eighty percent (80%) to Class A and twenty percent (20%) to Class B.

**3.5   Limitation on Withdrawal of Capital Contribution.** No Member shall have the right to withdraw his, hers or its Capital Contribution or to demand and receive property of the Company or any distribution in return for his, hers or its Capital Contribution, except as may be specifically provided in this Agreement or permitted by law.

## ARTICLE IV
## MEMBERS

**4.1   Limited Liability.** Except as provided in California Corporations Code Section 17254 relating to distributions by Company and Section 17101(b) relating to responsibility of Members for certain unsatisfied debts or obligations of Company, no Member or Manager shall be liable under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of Company whether that liability or obligation arises in contract or tort. No Member shall be required to loan any funds to Company. No Member shall be required to make any contribution to Company by reason of any negative balance in his, hers or its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

**4.2   Admission of Additional Members.** The Manager, with the approval of all of the Members, may admit to the Company additional Members. Any additional Members shall obtain Membership Interests and will participate in the management, Net Profits, Net Losses, and distributions of the Company on such terms as are determined by the Manager and approved by the Members. Notwithstanding the foregoing, substitute members may only be admitted in accordance with Article VII.

**4.3   Purchase of Membership Interest.** Upon the transfer of a Member's Membership Interest in violation of this Agreement, or the occurrence of a Dissolution Event as to such Member which does not result in the dissolution of the Company, such Membership Interest may be purchased by the Company or remaining Members as provided herein. Each Member acknowledges and agrees that such right to purchase a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.

**4.4   Transactions With The Company.** Subject to any limitations set forth in this Agreement and with the prior unanimous approval of the Manager and Members, and after full disclosure of the Member's involvement, a Member may lend money to and transact other business with the Company. Subject to other applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

**4.5**   Except as otherwise authorized in this agreement, no Member is entitled to remuneration in a capacity acting for the Company or for Company business.

**4.6   Members Are Not Agents.** Pursuant to Section 5.1 and the Articles, the management of the Company shall be vested in the Manager, the designated property manager. No Member, acting solely in the capacity of a Member, is an agent of the Company nor can any Member in such capacity bind nor execute any instrument on behalf of the Company.

7



EXHIBIT "1"
Page 29

4.7    Voting Rights. Members shall have the right to approve or disapprove matters as specifically stated in this Agreement, including the following:

A.    Unanimous Approval. The following matters shall require the unanimous vote, approval or consent of all Members who are not the subject of a Dissolution Event or an assignor of a Membership Interest:

(i)    A decision to continue the business of the Company after the occurrence of a Dissolution Event set forth in 1.12.

(ii)    Except as provided in Article VII, the transfer of a Membership Interest and admission of the transferee or assignee as a Member of the Company.

(iii)    Any material amendment of the Articles or this Agreement.

(iv)    Purchase of additional real property by the Company.

(v)    Matters designated in paragraph C below of this Section 4.7.

B.    Approval by Members Holding a Majority Interest. Except as set forth in this Agreement in all other matters in which the vote, approval or consent of all Members is required, the vote, consent or approval of Members holding a Majority Interest (or, in instances in which there are defaulting Members, non-defaulting Members who hold a majority of the Percentage Interests held by all non-defaulting Members) shall be sufficient to authorize or approve such act; specifically including the right to sell, lease or re-finance the Company's Property.

C.    Other Voting Rights. Besides the rights granted in Sections 4.7A and 4.8A, Members may vote, consent or approve to the extent and on the terms provided in this Agreement in the following Sections:

(i)    Section 3.5 on remedies for a Member's failure to make a contribution;

(ii)    Section 4.2 on admission of new Members;

(iii)    Section 5.3B on a change in the purpose of the Company;

(iv)    Section 5.3B on reorganization of the Company;

(v)    Section 5.3B on other limitations on the Manager's authority;

(vi)    Section 5.8 on transactions with the Manager and Affiliates of the Manager;

(vii)    Section 5.10A on management fees payable to Manager; and

(viii)    Section 10.1 on dissolving the Company.

Any such vote, consent or approval must be unanimous.

4.8    Meetings of Members.

A.    Date, Time and Place of Meetings of Members; Secretary. Meetings of Members may be held at such date, time and place within the State of California as the Manager may fix from time to time. No annual or regular meetings of Members is required. At any Member's meeting, the Manager shall appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the

8

meeting which shall be placed in the minute book of the Company. Formal meetings of members are not required to take action.

      B.    <u>Power to Call Meetings</u>. Unless otherwise prescribed by the Act or by the Articles, meetings of the Members may be called by the Manager, or upon written demand of Members holding more than ten percent (10%) of the Percentage Interests for the purpose of addressing any matters on which the Members may vote.

      C.    <u>Notice of Meeting</u>. If a formal meeting is desired, written notice of a meeting of Members shall be sent or otherwise given to each Member in accordance with Section 4.9D not less than ten (10) nor more than sixty (60) days before the date of the meeting. The notice shall specify the place, date and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at this meeting. Upon written request to the Manager by any person entitled to call a meeting of Members, the Manager shall immediately cause notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the person calling the meeting, not less than ten (10) days nor more than sixty (60) days after the receipt of the request. If the notice is not given within twenty (20) days after the receipt of the request, the person entitled to call the meeting may give the notice.

      D.    <u>Manner of Giving Notice; Affidavit of Notice</u>. Notice of any meeting of Members shall be given either personally or by first-class mail or telegraphic or other written communication, charges prepaid, addressed to the Member at the address of that Member appearing on the books of the Company or given by the Member to the Company for the purpose of notice. Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by telegram or other means of written communication.

      If any notice addressed to a member at the address of that Member appearing on the books of the Company is returned to the Company by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice to the Member at that address, all future notices or reports shall be deemed to have been duly given without further mailing if these shall be available to the Member on written demand for the Member at the principal executive office of the Company for a period of one (1) year from the date of the giving of the notice.

      An affidavit of the mailing or other means of giving any notice of any meeting shall be executed by the Manager or any secretary, assistant secretary, or any transfer agent of the Company giving the notice, and shall be filed and maintained in the minute book of the Company.

      E.    <u>Validity of Action</u>. Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the notice of meeting or in any written waiver of notice.

      F.    <u>Quorum</u>. The presence in person or by proxy of the holders of a Majority Interest of Profits Interest and Capital Interest shall constitute a quorum at a meeting of Members. The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum (other than adjournment) is approved by at least Members holding a Majority Interest in Profit Interest and in Capital Interest.

      G.    <u>Adjourned Meeting; Notice</u>. Any Members meeting, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the Membership Interests represented at that meeting, either in person or by proxy, but in the absence of a quorum, no other business may be transacted at that meeting, except as provided in Section 4.9F. When any meeting of Members is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place are announced at a meeting at which the adjournment is taken, unless a new record date for the adjourned meeting is subsequently fixed, or unless the adjournment is for more than forty-five (45) days from the date set for the original meeting, in which case the Manager shall set a new record date. At any adjourned meeting the Company may transact any business which might have been transacted at the original meeting.

9



EXHIBIT "1"
Page 31

H.  <u>Waiver of Notice or Consent</u>. The actions taken at any meeting of Members however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, who was not present in person or by proxy, signs a written waiver of notice and consents to the holding of the meeting or approves the minutes of the meeting. All such waivers, consents or approvals shall be filed with the Company records or made a part of the minutes of the meeting.

Attendance of a person at a meeting shall constitute a waiver of notice of that meeting, except when the person objects at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened; and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters not included in the notice of the meeting if that objection is expressly made at the meeting. Neither the business to transacted nor the purpose of any meeting of Members need be specified in any written waiver of notice except as provided in Section 4.9E.

I.  <u>Action by Written Consent Without a Meeting</u>. Any action that may be taken at a meeting of Members may be taken without a meeting, if a consent in writing setting forth that action so taken, is signed and delivered to the Company within ten (10) days of the record date for that action by Members having not less than the minimum number of votes which would be necessary to authorize taking that action at a meeting at which all Members entitled to vote on such action were present and voted. All such consents shall be filed with the Manager or the secretary, if any, of the Company and shall be maintained in the Company records. The written consent or proxy of any Member may be revoked by a writing signed by such Member and received by the Manager or the secretary, if any, of the written consents containing the number of votes required to authorize the proposed action.

Unless the consents of all Members entitled to vote have been solicited in writing; *(i)* notice of any Member approval of an amendment to the Articles or this Agreement; a dissolution of the Company; or a merger of the Company without a meeting by less than unanimous written consent, shall be given at least ten (10) days before the consummation of the action authorized by such approval; and *(ii)* prompt notice shall be given of the taking of any other action approved by Members without a meeting by less than unanimous written consent, to those Members entitled to vote who have not consented in writing.

J.  <u>Telephonic Participation by Member at Meetings</u>. Members may participate in any Members meeting through the use of any means of conference telephones or similar communications equipment as long as all Members participating can hear one another. A Member so participating is deemed to be present in person at the meeting.

K.  <u>Record Date</u>. In order that the Company may determine the Members of record entitled to notices of any meeting or to vote, or entitled to receive any distribution or to exercise any rights in respect of any distribution or to exercise any rights in respect of any other lawful action, the Manager, or Members representing a majority of the Percentage Interests may fix, in advance, a record date, that is not more than sixty (60) days nor less than ten (10) days prior to the date of the meeting and not more than sixty (60) days prior to any other action. If no record date if fixed:

(i)  The record date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

(ii)  The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

(iii)  The record date for determining Members for any other purpose shall be at the close of business on the day on which the Manager adopt the resolution relating thereto, or the 60th day prior to the date of the other action, whichever is later.

10



EXHIBIT "1"
Page 32

(iv)   The determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless the Manager or the Members who called the meeting fix a new record date for the adjourned meeting, but the Manager or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than forty-five (45) days from the date set for the original meeting.

L.   Proxies. Every Member entitled to vote for the Manager or on any other matter shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the Member or his attorney in fact and filed with the Manager or secretary, if any, of the Company. A proxy shall be deemed signed if the Member's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission, electronic transmission or otherwise) by the Member or the Member's attorney in fact. A proxy may be transmitted by an oral telephone transmission if it is submitted with information from which it may be determined that the proxy was authorized by the Member or the Member's attorney in fact. A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless *(i)* revoked by the person executing it, before the vote pursuant to that proxy; by a writing delivered to the Company stating that the proxy is revoked; or by a subsequent proxy executed by, or attendance at the meeting and voting in person by, the person executing the proxy; or *(ii)* written notice of the death or incapacity of the maker of that proxy is received by the Company before the vote pursuant to that proxy is counted; provided, however, that no proxy shall be valid after the expiration of eleven (11) months from the date of the proxy, unless otherwise provided in the proxy. The revocability of a proxy which states on its face that it is irrevocable shall be governed by the provisions of Corporations Code Sections 705(e) and 705(f).

4.9   Certificate of Membership Interest.

A.   Certificate. A Membership Interest may be represented by a certificate of membership. The exact contents of a certificate of membership may be determined by action of the Manager but shall be issued substantially in conformity with the following requirements: The certificates of membership shall be respectively numbered serially, as they are issued; shall be impressed with the Company seal or a facsimile thereof, if any; and shall be signed by the Manager or officers of the Company. Each certificate of membership shall state the name of the Company; the fact that the Company is organized under the laws of the State of California; is a limited liability company; the name of the person to whom issued; the date of issue; and the Percentage Interests represented thereby. A statement of the designations, preferences, qualifications, limitations, restrictions, and special or relative rights of the Membership Interest, if any, shall be set forth in full or summarized on the face or back of the certificates which the Company shall issue, or in lieu thereof, the certificate may set forth that such a statement or summary will be furnished to any holder of a Membership Interest upon request without charge. Each certificate of membership shall be otherwise in such form as may be determined by the Manager.

B.   Cancellation of Certificate. All certificates of membership surrendered to the Company for transfer shall be cancelled and no new certificates of membership shall be issued in lieu thereof until the former certificates for a like number of Membership Interest shall have been surrendered and cancelled, except as herein provided with respect to lost, stolen, or destroyed certificates.

C.   Replacement of Lost, Stolen or Destroyed Certificate. Any Member claiming that his, hers or its certificate or membership is lost, stolen or destroyed may make an affidavit or affirmation of that fact and request a new certificate. Upon the giving of a satisfactory indemnity to the Company as reasonably required by the Manager, a new certificate may be issued of the same tenor and representing the same Percentage Interest of membership as was represented by the certificate alleged to be lost, stolen or destroyed.

11



## ARTICLE V
## MANAGEMENT AND CONTROL OF THE COMPANY

5.1    Management of the Company by the Manager.

A.    <u>Exclusive Management by Manager</u>.  The business, property and affairs of the Company shall be managed exclusively by the Manager.  Except for situations in which the approval of the Members is expressly required by the Articles or this Agreement, the Manager shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company; to make all decisions regarding those matters; and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.  No Member who is not a Manager shall have any authority to act for or to undertake or assume any obligation, debt, duty or responsibility on behalf of the Company.  Where this Agreement specifies an act of the Manager, unless otherwise expressly otherwise provided, it means an act taken by all persons comprising Manager.

B.    <u>Agency Authority of Manager</u>.  Either person comprising Manager, acting independently of the Members, is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts.  All checks, drafts, and other instruments obligating the Company to pay money, may be signed by either person comprising the Manager, acting alone, provided that such obligation is incurred in the ordinary course of managing the Company and/or the Property.  Any and all contracts on behalf of the Company and any obligations which are outside the ordinary course of business of the Company shall require the signature of both persons comprising the Manager.

5.2    Election of Manager.

A.    <u>Number</u>.  The Company shall have two (2) Managers.

B.    <u>Removal</u>.  No Manager may be removed by the vote of the Members except in the case of his malfeasance; or physical or mental incapacity; or gross negligence; or his material breach of any of the items set forth in Section 5.3 of this Agreement.

5.3    Powers of Manager.

A.    <u>Powers of the Manager</u>.  Without limiting the generality of Section 5.1, the Manager shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Corporations Code Section 17003.

B.    <u>Limitations On Powers of Manager</u>.  The Manager shall not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the unanimous affirmative vote or unanimous written consent of the Members:

(i)    The merger of the Company with another limited liability company or limited partnership, provided in no event shall a Member be required to become a general partner in a merger with a limited partnership without his express written consent or unless the agreement of merger provides each Member with the dissenter's rights described in the Act.

(ii)    The merger of the Company with a corporation or a general partnership or other Person.

(iii)    The establishment of different classes of Members.

12



      (iv)     An alteration of the primary purpose of the Company as set forth in Section 2.3.

      (v)     Transactions between the Company and the Manager or the Manager's Affiliates, or transactions in which the Manager or of any Manager's Affiliates has a material financial interest except to the extent where such transactions do not exceed commercially reasonable market rates.

      (vi)     Without limiting subsection (v), the lending of money by the Company to any Manager, Member or officer.

      (vii)     Any act which would make it impossible to carry on the ordinary business of the Company.

      (viii)     The amendment of this Agreement.

      (ix)     The purchase of additional real property by the Company.

    5.4    <u>Members Have No Managerial Authority</u>. The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Articles and except as expressly required by the Act. No Member shall have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, or to render it liable for any purpose.

    5.5    <u>Performance of Duties; Liability of Manager</u>. The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, negligence, reckless or intentional misconduct, or a knowing violation of law by the Manager. The Manager shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Company and shall use them solely for the benefit of the Company. The Manager shall perform managerial duties in good faith, in a manner reasonably believed to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position of like business experience would use under similar circumstance. A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Manager of the Company.

      In performing managerial duties, the Manager shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, of the following persons or groups unless they have knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that the Manager act in good faith and after reasonable inquiry when the need therefor is indicated by the circumstances:

      (a)     one or more officers, employees or other agents of the Company whom the Manager reasonably believes to be reliable and competent in the matters presented;

      (b)     any attorney, independent accountant, or other person as to matters which the Manager reasonably believes to be within such persons professional or expert competence; or

      (c)     a committee upon which the Manager does not serve, duly designated in accordance with a provision of the Articles or this Agreement, as to matters within its designated authority, which committee the Manager reasonably believes to merit competence.

    5.6    <u>Devotion of Time</u>. The Manager is not obligated to devote all of his time or business efforts to the affairs of the Company. The Manager shall devote whatever time, effort and skill as he deems appropriate for the operation of the Company.

    5.7    <u>Competing Activities</u>. The Manager and the officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's

13



business and that might be in direct or indirect competition with the Company. Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. The Manager shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Manager or any Member shall have the right to hold any investment opportunity or prospective economic advantage for his or her own account or to recommend such opportunity to Persons other than the Company. The Members acknowledge that the Manager and his or her Affiliates own and/or manage businesses, including businesses that may compete with the Company and for the Manager's time. The Members hereby waive any and all rights and claims which they may otherwise have against the Manager and officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates as a result of any such activities.

   5.8    Transactions Between the Company and the Manager. Notwithstanding that it may constitute a conflict of interest, the Manager may, and may cause Manager's Affiliates to engage in any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from Persons capable of similarly performing them and in similar transactions between parties operating at arms length, and provided that the Members having no interest in such transaction (other than their interests as Members) affirmatively vote unanimously or give their unanimous consent in writing to approve the transaction.

   A transaction between any of the Manager and/or the Manager's Affiliates, on the one hand, and the Company, on the other hand, shall be conclusively determined to constitute a transaction on terms and conditions, on an overall basis, fair and reasonable to the Company and at least as favorable to the Company as those generally available in a similar transaction between parties operating at arm's length if the Members having no interest in such transaction (other than their interests as Members) affirmatively vote unanimously or consent in writing unanimously to approve the transaction. The Company specifically acknowledges and hires Beitler Commercial Realty Services as leasing and or listing Broker, when necessary to lease or sell the property, at market rates as defined below or some other competent comparable leasing or sales brokerage firm. Further, the Company specifically hires Manager to act as property manager for the Company and its assets at market rates as defined below.

   5.9    Payments to the Manager. The Manager and Manager's Affiliates shall receive the following payments:

   A.    Services Performed by Manager. Except as otherwise provided herein, the Company shall not pay the Manager for services rendered to the Company in the reasonable scope of their management duties.

   B.    Expenses. The Company shall reimburse the Manager and Manager's Affiliates for the actual cost of goods and materials used for or by the Company. The Company shall also pay or reimburse any of the Manager or Manager's Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company and prepare the Articles and this Agreement.

   C.    Property Management Fee. There shall be a four percent (4%) of gross income per month fee for property management to a management company chosen by Manager. Whenever possible, Manager will lease the Property on a Triple Net (NNN) basis and pass through said management fee to the tenants on a monthly basis.

   D.    Property Brokerage Fee. There shall be sales commission of four percent (4%) paid to Beitler Commercial Realty Services as a listing Broker upon sale (which shall be spit 50/50 with a procuring Broker if any), and leasing commissions shall be paid to Beitler Commercial Realty Services (or to any other licensed real estate broker selected by Manager) at industry standard rates.

14



5.10    Act of Manager as Conclusive Evidence of Authority. Any note, mortgage, evidence of indebtedness, contract, certificate, statement, conveyance, or other instrument in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other person, when signed by the Manager, are not invalidated as to the Company by any lack of authority of the Manager in the absence of actual knowledge on the part of the other person that the Manager had no authority to execute the same.

5.11    Reserved.

5.12    Limited Liability. No Manager shall not be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being the Manager.

## ARTICLE VI
## ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

6.1    Allocations of Net Profit and Net Losses.

A.    Net Loss. Net Loss shall be allocated to the Members in proportion to their Percentage Interests.

B.    Net Profit. Net Profit shall be allocated to the Members (i) first, proportionately (based on the amount each Member is required to be allocated pursuant to this clause (i)) until each Member has been allocated a cumulative amount of Net Profit pursuant to this clause (i) equal to the sum of the cumulative amount of Net Loss previously allocated to such Member pursuant to Section 6.1A hereof, plus the cumulative amount of distributions previously made to such Members pursuant to Section *6.5(a)* hereof, (ii) thereafter, in proportion to their Percentage Interests.

6.2    Special Allocations.

A.    Minimum Gain Chargeback. Notwithstanding Section 6.1, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 6.2A shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2A. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f). This Section 6.2A is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

B.    Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt. Notwithstanding Section 6.1 of this Agreement, if there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any Fiscal Year, each Member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 6.2B shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2B. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4). This Section 6.2B is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

15



EXHIBIT "1"
Page 37

C.   Nonrecourse Deductions.  Notwithstanding Section 6.1, any nonrecourse deductions (as defined in Regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.

D.   Member Nonrecourse Deductions.  Notwithstanding Section 6.1, any Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i).

E.   Qualified Income Offset.  Notwithstanding Section 6.1, if a member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), or any other event creates a deficit balance in such Member's Capital Account (taking into account reductions for the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 6.2E shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article VI so that the net amount of any item so allocated and the income, gain, and losses allocated to each member pursuant to this Article VI to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Article VI if such unexpected adjustments, allocations, or distributions had not occurred.

6.3   Code Section 704(c) Allocations.  Notwithstanding any other provision in this Article VI, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this Section 6.3 are solely for purposes of federal, state and local taxes. As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other tax items or distributions pursuant to any provision of this Agreement.

6.4   Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest.  If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his, hers or its respective Membership Interest at the close of such day.

However, for the purpose of accounting convenience and simplicity, the Company shall treat a transfer of, or an increase or decrease in, a Membership Interest which occurs at any time during a semi-monthly period (commencing with the semi-monthly period including the date hereof) as having been consummated on the last day of such semi-monthly period, regardless of when during such semi-monthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first fifteen (15) days of any month will be deemed to have been made on the 15th day of the month).

Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Membership Interests as of the date such sale or other disposition occurs.

6.5   Distribution of Assets by the Company.  Subject to applicable law and any limitations contained elsewhere in this Agreement, the Manager may elect from time to time to distribute Distributable Cash to the Members, which distributions shall be in the following order of priority:

16



A.     Distributions from Operations.

(i)     If such Distributable Net Cash is from Company's operations, to the Members in proportion to their unreturned additional Capital Contribution until each Member has recovered his, her or its additional capital contribution.

(ii)     If such Distributable Net Cash is from Company's operations, to the Members of Class A, for their Preferred Return in Section 3.4.1 herein, in proportion to their Percentage Interest in Company in relation to each other.

(iii)     If such Distributable Net Cash is from Company's operations, to the Members of Class B, for their Preferred Return in Section 3.4.2 herein, in proportion to their Percentage Interest in Company in relation to each other.

(iv)     If such Distributable Net Cash is from Company's operations, to the Members of Class A and B in proportion to their pro rata Membership interest.

B.     Distributions from Sale, Financing or Refinancing of Company Real Property.

(i)     If such Distributable Net Cash is from the sale, financing or refinancing of the Company Property, to the Members in proportion to their unreturned additional Capital Contributions until each Member has recovered his, hers or its Additional Capital Contributions, if any, and then to Members in proportion to their unreturned initial Capital Contributions until each Member has recovered his, her or its initial Capital Contribution; and

(ii)     Thereafter, to the Members in proportion to their percentage interests.

such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor the Manager shall incur any liability for making any distributions under this Section 6.5.

The Manager may, in its sole discretion, limit distributions by maintaining a working capital reserve of up to One Hundred Fifty Thousand Dollars ($150,000.00).

6.6     Form of Distribution. A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members. Except upon a dissolution and the winding up of the Company, no Member may be compelled to accept a distribution of any asset in kind.

6.7     Restriction on Distributions.

A.     No distribution shall be made if, after giving effect to the distribution:

(i)     The Company would not be able to pay its debts as they become due in the usual course of business.

17



(ii)     The Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the distribution.

B.     The Manager may base a determination that a distribution is not prohibited on any of the following:

(i)     Financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances.

(ii)     A fair valuation.

(iii)     Any other method that is reasonable in the circumstances.

Except as provided in Section 17254(e) of the Corporations Code, the effect of a distribution is measured as of the date the distribution is authorized if the payment occurs within one hundred twenty (120) days after the date of authorization, or the date payment is made if it occurs more than one hundred twenty (120) days of the date of authorization.

C.     A Member or Manager who votes for a distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act if it is established that the Member or Manager did not act in compliance with Section 6.7 B or Section 10.4. Any Member or Manager who is so liable shall be entitled to compel contribution from (i) each other Member or Manager who also is so liable and (ii) each Member for the amount the Member received with knowledge of facts indicating that the distribution was made in violation of this Agreement or the Act.

6.8     Return of Distributions. Except for distributions made in violation of the Act or this Agreement, no Member or Economic Interest Owner shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company. The amount of any distribution returned to the Company by a Member or Economic Interest Owner or paid by a Member or Economic Interest Owner for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member or Economic Interest Owner.

6.9     Obligations of Members to Report Allocations. The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

## ARTICLE VII
## TRANSFER AND ASSIGNMENT OF INTERESTS

7.1     Transfer and Assignment of Interests. No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest except with the prior written

18



EXHIBIT "1"
Page 40

consent of other Members having a majority of the Percentage Interests of the other Percentage Interests. Transfers in violation of this Article VII shall only be effective to the extent set forth in Section 7.7. After the consummation of any transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

      7.2    <u>Further Restrictions on Transfer of Interests</u>. In addition to other restrictions found in this Agreement, no Member shall transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest: (i) without compliance with the legend described in Section 12.10, and (ii) if the transfer, assignment, sale or exchange would cause the termination of the Company under Section 708(b)(1)(B) of the Code, as determined by the Manager.

      7.3    <u>Substitution of Members</u>. A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirements of Sections 7.1 and 7.2 are met; (ii) such Person executes an instrument satisfactory to the Manager accepting and adopting the terms and provisions of this Agreement; and (iii) such person pays any reasonable expenses in connection with his, hers or its admission as a new Member. The admission of a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

      7.4    <u>Family and Affiliate Transfers</u>. The Membership Interest of any Member may be transferred subject to compliance with Section 7.2, and without the prior written consent of all Members, as required by Section 7.1, upon consent of the Manager, which shall not be unreasonably withheld, by the Member (i) by inter vivos gift or by testamentary transfer to any spouse, parent, sibling, in-law, child or grandchild of the Member; or to a trust for the benefit of the Member or such spouse, parent, sibling, in-law, child or grandchild of the Member; or (ii) to any Affiliate of the Member; it being agreed that in executing this Agreement, each Member has consented to such transfers.

      7.5    <u>Effective Date of Permitted Transfers</u>. Any permitted transfer of all or any portion of a Membership Interest shall be effective as of the first day of the month following the date upon which the requirements of Sections 7.1, 7.2 and 7.3 have been met. The Manager shall provide the Members with written notice of such transfer as promptly as possible after the requirements of Sections 7.1, 7.2 and 7.3 have been met. Any transferee of a Membership Interest shall take subject to the restrictions on transfer imposed by this Agreement and subject to allocation of profits and losses; and distributions set forth in Section 6.4.

      7.6    <u>Rights of Legal Representatives</u>. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, and/or other legal representative and/or beneficiary or successor may exercise all of the Member's rights for the purpose of settling the Member's estate and/or administering the Member's property, and shall succeed to Member's interest herein, except that any Class B Member's successor shall continue to be a Class B Member, but without any management rights as a Class B Member..

      7.7    <u>No Effect to Transfers in Violation of Agreement</u>. Upon any transfer of a Membership Interest in violation of this Article VII, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Economic Interest Owner and thereafter shall only receive the share of one (1) or more of the Company's Net

19



EXHIBIT "1"
Page 41

Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the Manager, a transfer in violation of this Article VII would cause the termination of the Company under the Code, in the sole discretion of the Manager, the transfer shall be null and void and the purported transferee shall not become either a Member or an Economic Interest Owner.

Upon and contemporaneously with any transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company for a purchase price of One Hundred Dollars ($100), all remaining rights and interests retained by the Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member.

Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who transfers a Membership Interest in violation of this Article VII is not unreasonable under the circumstances existing as of the date hereof

7.8     **Right of First Refusal**. Each time a Member proposes to transfer, assign, convey, *sell*, encumber or in any way alienate all or any part of his, hers or its Membership Interest (or as required by operation of law or other involuntary transfer to do so) other than pursuant to Section 7.4, such Member shall first offer such Membership Interest to the Company and the non-transferring Members in accordance with the following provisions:

A.     Such Member shall deliver a written notice to the Company and the other Members stating (i) such Member's bona fide intention to transfer such Membership Interest; (ii) the name and address of the proposed transferee; (iii) the Membership Interest to be transferred; and (iv) the purchase price in terms of payment for which the Member proposes to transfer such Membership Interest.

B.     Within thirty (30) days after receipt of the notice described in Section 7.8A, each non-transferring Member shall notify the Manager in writing of his, hers or its desire to purchase a portion of the Membership Interest being so transferred. The failure of any Member to submit a notice within the applicable period shall constitute an election on the part of that Member not to purchase any of the Membership Interest which may be so transferred. Each Member so electing to purchase shall be entitled to purchase a portion of such Membership Interest in the same proportion that the Percentage Interest of such Member bears to the aggregate of the Percentage Interests of all of the Members electing to so purchase the Membership Interest being transferred. In the event any Member elects to purchase none or less than all of his, hers or its pro rata share of such Membership Interest, then the other Members can elect to purchase more than their pro rata share. If such Members fail to purchase the entire Membership Interest being transferred, the Company may purchase any remaining share of such Membership Interest.

C.     Within sixty (60) days after receipt of the notice described in Section 7.8A, the Company and the Members electing to purchase such Membership Interest shall have the first right to purchase or obtain such Membership Interest upon the price and terms of payment designated in such notice. If such notice provides for the

20



EXHIBIT "1"
Page 42

payment of non-cash consideration, the Company and such purchasing Members each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Manager.

D.      If the Company or the other Members elect not to purchase or obtain all of the Membership Interest designated in such notice, then the transferring Member may transfer the Membership Interest described in the notice to the proposed transferee, providing such transfer (i) is completed with thirty (30) days after the expiration of the right of the Company and the other Members to purchase such Membership Interest, (ii) is made on terms no less favorable to the transferring Member than as designated in the notice, and (iii) the requirements of Sections 7.1, 7.2 and 7.3 relating to unanimous consent of Members, securities and tax requirements hereof are met. If such Membership Interest is not so transferred, the transferring Member must give notice in accordance with this Section prior to any other or subsequent transfer of such Membership Interest.

7.8.1   Right of First Refusal Among Class of Membership.  Notwithstanding anything to the contrary herein, any proposal by a Member to transfer, assign, convey, sell, encumber or in any way alienate all or part of his, hers or its Membership Interest (Selling Member), pursuant to Section 7.8, shall first proceed to commence the Right of First Refusal procedure provided in Section 7 among Members of the Selling Members class before proceeding with the Right of First Refusal to the other Members of Company not in the Selling Member's class. For example, a Member of Class A offering its Membership Interest shall first operate the Right of First Refusal among Members of Class A, and subject to whether any Membership Interest remains available, then to Members of Class B.

7.9      Effective Date of Permitted Transfers of an Interest.  Any permitted transfer of all or any portion of an Interest in Company will take effect on the first (1st) day of the month following receipt by the Members of written notice of transfer. Any transferee of an Interest in the Company shall take subject to the restrictions on transfer imposed by the Agreement.

7.10     Consequences of Pledge or Grant of Security Interest.  The pledge or granting of a security interest, lien or other encumbrance in or against any or all of the Interest of a Member shall not cause the Member to cease to be a Member or to grant anyone else the power to exercise any rights or powers of a Member.

## ARTICLE VIII
### CONSEQUENCES OF, DISSOLUTION, OR WITHDRAWAL OF MEMBER (S) OR HEIRS

8.1      Purchase of Member's Interest.  Upon the occurrence of any Dissolution Event and the unanimous consent by the remaining Members (Remaining Members) to continue the business of Company, and if applicable, the desire of the member or its heirs to the other Members (the Remaining Members) shall have an option to purchase such Membership Interest. Within ninety (90) days of the Unanimous Consent or within ninety (90) days of the receipt of the rightful demand for the return of its Capital Account by the Former Member or by such Former Member's trustee or heirs, or within in ninety (90) days of the inheritance or transfer by operation of law to a person, the Remaining Members shall notify the Manager in writing of their desires to purchase a portion of the Former Member's Interest.

8.2      Withdrawal.  Notwithstanding Section 8.1, only upon the withdrawal by a Member in accordance with Section 4.3, such Member shall be treated as a Former Member, and the Company and/or the Remaining Members shall

21

EXHIBIT "1"
Page 43

have the option to purchase, and the Former Member shall be obligated to sell, the Former Member's Interest as provided in this Article VIII.

8.3     Purchase Price.  The purchase price for the Former Member's Interest shall be the fair market value of the Former Member's Interest determined by three (3) independent appraisers, one (1) selected by the Former Member or such Former Member's legal representative, one (1) selected by the Company, and one (1) selected by the two (2) appraisers so named. The fair market value of the Former Member's Interest shall be the average of the two (2) appraisals closest in amount to each other. In all other events, the Former Member shall pay one-half (50%) of such expense of the appraisers and the Remaining Members shall pay one-half (50%) of such expense and the purchase price shall be the fair market value determined by appraisal reduced by six percent (6%) representing a reasonable and customary brokerage commission which would be paid to a broker in an arms length role and escrow closing costs. Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

8.4     Notice of Intent to Purchase.  Within thirty (30) days after the Manager has notified the Remaining Members as to the purchase price of the Former Member's Interest determined in accordance with Section 8.3, each Remaining Member shall notify the Manager in writing of his, hers or its desire to purchase a portion of the Former Member's Interest. The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest. Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Members Interest in the same proportion that the Percentage Interest of the Remaining Member bears to the aggregate of the Percentage Interests of all of the Remaining Members electing to purchase the Former Member's Interest.

8.5     Election to Purchase Less Than All of An Interest.  In the event any Remaining Member elects to purchase none or less than all of its pro rata part of the Former Member's Interest, then, at its election, those Remaining Members can elect to purchase more than their pro rata part, i.e., the proportion that the Percentage Interest of the Former Member bears to the aggregate of the Percentage Interests of all Members and the Former Member. If the Remaining Members fail to purchase the entire interest of the Former Member, Company may elect to purchase the former Member's Interest unpurchased portion. If none of the above elects to purchase, the same shall pass by operation of law to any assignee or shall remain in the hands of the Former Member, subject to any right of the holder of such interest to demand payment therefore according to California law. Notwithstanding any provision of the Agreement to the contrary, the remaining Members may mutually agree to an allocation of the Former Member's Interest to be purchased by each of them.

8.6     Payment of Purchase Price.  The purchase price shall be paid by the Company or the Remaining Members, as the case may be, either: (i) in equal monthly installments of principal together with interest amortized over a thirty (30) year period, commencing to accrue from the date of closing, at the then current Applicable Federal Rate (the AFR) under Section 1274(d) of the Internal Revenue Code (IRC) for the month in which the first payment is made (or a rate per annum equal to what the AFR would be for such month under IRC Section 1274(d) of the Code if the AFR is no longer published) to fully amortize such purchase price over such ten (10) payments with the first payment being due and payable 60 days after the determination of the fair market value of the Former Member's Interest in the Company, or (ii) within 60 days after the determination of the fair market value of the Former Member's Interest in the Company, as the Company or the Remaining Members, as the case may be, may elect in their sole discretion.

22

EXHIBIT "1"
Page 44

8.7    Closing of Purchase of Former Member's Interest.  The closing for the sale of a Former Member's Interest pursuant to this Article VIII shall be held at 10:00 a.m. at the principal office of the Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Former Member or such Former Member's legal representative shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest. The Former Member or such Former Member's legal representative, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

8.8    Purchase Terms Varied by Agreement.  Nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

## ARTICLE IX
## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

9.1    Books and Records.  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office in California all of the following:

A.    A current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner;

B.    A current list of the full name and business or residence address of each Manager.

C.    A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed.

D.    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

E.    A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

F.    Copies of the financial statements of the Company, if any, for the six (6) most recent Fiscal Years; and

23

G.      The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) Fiscal Years.

9.2     <u>Delivery to Members and Inspection.</u>

A.      Upon the request of any Member or Economic Interest Owner for purposes reasonably related to the interest of that Person as a Member or Economic Interest Owner, the Manager shall promptly deliver to the requesting Member or Economic Interest Owner, at the expense of the Company, a copy of the information required to be maintained by Sections 9.1A, B and D, and a copy of this Agreement.

B.      Each Member, Manager and Economic Interest Owner has the right, upon reasonable request for purposes reasonably related to the interest of the Person as Member, Manager or Economic Interest Owner, to:

(i)      inspect and copy during normal business hours any of the Company records described in Section 9.1A through G; and

(ii)     obtain from the Manager, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year, as well as any and all Company financial records.

C.      Members representing at least twenty-five percent (25%) of the Percentage Interests, or three (3) or more Members, make a written request to the Manager for an income statement of the Company for the initial three (3) month, six (6) month, or nine (9) month period of the current Fiscal Year ended more than thirty (30) days prior to the date of the request, and a balance sheet of the Company as of the end of that period. Such statement shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Manager that the statement was prepared without audit from the books and records of the Company. If so requested, the statement shall be delivered or mailed to the Members within thirty (30) days thereafter.

Any Member or a Member's designated representative has the right to inspect the books of the Company at reasonable times upon forty-eight (48) hours written notice to the Manager, but no more than once each calendar quarter for any one (1) Member.

D.      Any request, inspection or copying by a Member or Economic Interest Owner under this Section 9.2 may be made by that Person or that Person's agent or attorney.

E.      The Manager shall promptly furnish to a Member a copy of any amendment to the Articles or this Agreement executed by the Manager pursuant to a power of attorney from the Member.

F.      The Manager shall promptly furnish to a Member written notice of any action concerning the Company which is likely to have a substantial impact upon any of the Members.

9.3     <u>Quarterly Statements and Reports.</u>

24

A.    Upon request, the Manager shall cause quarterly reports to be sent to each of the Members no later than thirty (30) days after the close of each calendar quarter. The report shall contain a balance sheet as of the end of the calendar quarter and an income statement and statement of changes in financial position for the calendar quarter. Such financial statements shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Manager that the financial statements were prepared without audit from the books and records of the Company.

B.    The Manager shall cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Members' and Economic Interest Owners' federal and state income tax returns. The Manager shall send or cause to be sent to each Member or Economic Interest Owner within ninety (90) days after the end of each taxable year such information as is necessary to complete federal and state income tax or information returns, and, if the Company has thirty-five *(35)* or fewer Members, a copy of the Company's federal, state, and local income tax or information returns for that year.

C.    The Manager shall cause to be filed at least annually with the California Secretary of State the statement required under California Corporations Code ə 17060.

9.4    Financial and Other Information. The Manager shall provide such financial and other information relating to the Company or any other Person in which the Company owns, directly or indirectly, an equity interest, as a Member may reasonably request. The Manager shall distribute to the Members, promptly after the preparation or receipt thereof by the Manager, any financial or other information relating to any Person in which the Company owns, directly or indirectly, an equity interest, including any filings by such Person under the Securities Exchange Act of 1934, as amended, that is received by the Company with respect to any equity interest of the Company in such Person.

9.5    Filings. The Manager, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Manager, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Articles and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If the Manager is required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or refuses to do so, any other Manager or Member may prepare, execute and file that document with the California Secretary of State.

9.6    Bank Accounts. The Manager shall maintain the funds of the Company in one (1) or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

9.7    Accounting Decisions and Reliance on Others. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Manager. The Manager may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

9.8    Tax Matters for the Company Handled by Manager and Tax Matters Partner. The Manager shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members. The Tax Matters Partner, as defined in Code Section 6231, shall represent the Company (at the Company's

25

EXHIBIT "1"
Page 47

expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith. The Tax Matters Partner shall oversee the Company tax affairs in the overall best interests of the Company. If for any reason the Tax Matters Partner can no longer serve in that capacity or ceases to be a Member or Manager, as the case may be, Members holding a Majority Interest may designate another to be Tax Matters Partner.

   9.9  <u>Choice of Company's Accountant</u>. The Company's Accountant shall be selected by the Manager.

**ARTICLE X**
**DISSOLUTION AND WINDING UP**

   10.1  <u>Dissolution</u>. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first (1st) to occur of the following:

     A.  Upon the happening of any event of dissolution specified in the Articles;

     B.  Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the Corporations Code;

     C.  The occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Section 8.1 to continue the business of the Company within ninety (90) days after the occurrence of such event or the failure of the Company or the Remaining Members to purchase the Former Member's Interest as provided in Section 8.2; or

     D.  The sale of all or substantially all of the assets of Company.

   10.2  <u>Certificate of Dissolution</u>. As soon as possible following the occurrence of any of the events specified in Section 10.1, the Manager who has not wrongfully dissolved the Company or, if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Certificate as required by the Act. Upon the filing by the Certificate of Dissolution, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence continues until the certificate of cancellation of articles of organization Dissolution have been filed with the Secretary of State or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

   10.3  <u>Winding Up</u>. Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Manager who has not wrongfully dissolved the Company or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefore, to be applied and distributed as provided in Section *10.5*. The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the

26



EXHIBIT "1"
Page 48

Company. The Manager(s) or Members winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

10.4    _Distributions in Kind._ Any non-cash asset distributed to one (1) or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value. Such Net Profit or Net Loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by the Manager or by the Members or, if any Member objects, by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by the Manager or liquidating trustee and approved by the Members.

10.5.    _Order of Payment of Liabilities Upon Dissolution._

A.      The distribution of payments of the Company in the process of winding-up shall be made in the following order: (i) All known debts and liabilities of the Company, excluding debts and liabilities to Members who are creditors of the Company; (ii) All known debts and liabilities of the Company owed to Members who are creditors of the Company; (iii) The remaining assets shall be distributed to the Members in accordance with their positive Capital Account balances, after taking into account income and loss allocations and distributions (other than pursuant to Section 10.5A) for the Company's taxable year during which liquidation occurs.

Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

B.      The payment of a debt or liability, whether or not the whereabouts of the creditor is known, has been adequately provided for if:

(i)      Payment thereof has been assumed or guaranteed in good faith by one (1) or more financially responsible persons or by the United States government or any agency thereof; and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Members or Manager to be adequate at the time of any distribution of the assets pursuant to this Section.

(ii)     The amount of the debt or liability has been deposited as provided in Section 2008 of the Corporations Code.

This Section 10.5B shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

10.6    _Compliance with Regulations._ All payments to the Members upon the winding up and dissolution of Company shall be strictly in accordance with the positive Capital Account balance limitation of Regulations Section 1.704-1(b)(2)(ii)(b)(2).

27



     10.7    <u>Limitations on Payments Made in Dissolution</u>.  Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of Company for the return of his, hers or its positive Capital Account balance and shall have no recourse for his, hers or its Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Manager or any other Member except as provided in Article XI.

     10.8    <u>Certificate of Cancellation</u>.  The <u>Manager</u> or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a certificate of cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

     10.9    <u>No Action for Dissolution</u>.  Except as expressly permitted in this Agreement, a Member shall not take any voluntary action which directly causes a Dissolution Event. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 10.1. This Agreement has been drawn carefully to provide fair treatment to all parties and equitable payment in liquidation of the Economic Interests. Accordingly, except where the Manager has failed to liquidate the Company as required by this Article X, each Member hereby waives and renounces his, hers or its right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles or this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member. Damages for breach of this Section 10.9 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

28



## ARTICLE XI
## INDEMNIFICATION AND INSURANCE

11.1    <u>Indemnification of Agents</u>. The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or complete action, suit or proceeding by reason of the fact that he, she or it is or was a member, Manager, officer, employee or other agent of the Company or that, being or having been such a Member, Manager, officer, employee or agent, he, she or it is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability Company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an Agent), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit. The Manager shall be authorized, on behalf of the Company, to enter into indemnity agreements from time to time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Manager deems appropriate in the Manager's business judgment.

11.2    <u>Insurance</u>. The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 11.1 or under applicable law.


## ARTICLE XII
## INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Manager, the other Members, and the Company as follows:

12.1    <u>Pre-existing Relationship or Experience</u>. (i) He, she or it has a preexisting personal or business relationship with the Company or one (1) or more of its officer, Manager or control persons or (ii) by reason of his, hers or its business or financial experience, or by reason of the business or financial experience of his, hers or its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he, she or it is capable of evaluating the risks and merits of an investment in the Membership Interest and of protecting his, hers or its own interests in connection with this investment.

12.2    <u>No Advertising</u>. He, she or it has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

12.3    <u>Investment Intent</u>. He, she or it is acquiring the Membership Interest for investment purposes for his, hers or its own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest. No other person will have any direct or indirect beneficial interest in or right to the Membership Interest.



EXHIBIT "1"
Page 51

12.4    Purpose of Entity. If the Member is a corporation, partnership, limited liability company, trust, or other entity, it was not organized for the specific purpose of acquiring the Membership Interest.

12.5    Economic Risk; Consulted with Advisor; Speculative Nature. He, she or it is financially able to bear the economic risk of an investment in the Membership Interest, including the total loss thereof. In acquiring a Membership Interest, he, she or it has consulted with and has been guided by his own attorney, accountant or other personal investment or financial advisor with respect to and concerning the merits, risk and advisability of the purchase of the Membership Interest subscribed for herein or the undersigned has such knowledge and experience in financial, investment and business matters that he is capable of evaluating the merits, risk and advisability of an investment in the Membership Interest without the assistance of such an advisor. Further, he, she or it recognizes the speculative nature of the investment in the Membership Interest, including the fact that the Property being purchased by the Company is an empty building, with asbestos, and in need of millions of dollars in improvements.

12.6    No Registration of Membership Interest. He, she or it acknowledges that the Membership Interest has not been registered under the Securities Act of 1933, as amended (the Securities Act), or qualified under the California Corporate Securities Law of 1968, as amended, or any other applicable blue sky laws in reliance, in part, on his, hers or its representations, warranties, and agreements herein.

12.7    Membership Interest in Restricted Security. He, she or it understands that the Membership Interest is a restricted security under the Securities Act in that the Membership Interest will be acquired from the Company in a transaction not involving a public offering, and that the Membership Interest may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise the Membership Interest must be held indefinitely. In this connection, he, she or it understands the resale limitations imposed by the Securities Act and is familiar with SEC Rule 144, as presently in effect, and the conditions which must be met in order for the Rule to be available for resale of restricted securities, including the requirement that the securities must be held for at least two (2) years after purchase thereof from the Company prior to resale (three (3) years in the absence of publicly available information about the Company) and the condition that there be available to the public current information about the Company under certain circumstances. He, she or it understands that the Company has not made such information available to the public and has no present plans to do so.

12.8    No Obligation to Register. He, she or it represents, warrants, and agrees that the Company and the Manager is under no obligation to register or qualify the Membership Interest under the Securities Act or under any state securities law, or to assist him or it in complying with any exemption from registration and qualification.

12.9    No Disposition in Violation of Law. Without limiting the representations set forth above, and without limiting Article VII of this Agreement, he, she or it will not make any disposition of all or any part of the Membership Interest which will result in the violation by him or it or by the Company of the Securities Act, the California Corporate Securities Law of 1968, or any other applicable securities laws. Without limiting the foregoing, he, she or it agrees not to make any disposition of all or any part of the Membership Interest unless and until:

A.    There is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement and any applicable requirements of state securities laws; or

30

EXHIBIT "1"
Page 52



B.      (i) He, she or it has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (ii) if reasonably requested by the Manager, he, she or it has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

C.      In the case of any disposition of all or any part of the Membership Interest pursuant to SEC Rule 144, in addition to the matters set forth in Section 12.11B, he or she shall promptly forward to the Company a copy of any Form 144 filed with the SEC with respect to such disposition and a letter from the executing broker satisfactory to the Company evidencing compliance with SEC Rule 144. If SEC Rule 144 is amended or if the SEC's interpretations thereof in effect at the time of any such disposition have changed from its present interpretations thereof, he, she or it shall provide the Company with such additional documents as the Manager may reasonably require.

12.10    Legends.  He, she or it understands that the certificates (if any) evidencing the Membership Interest may bear one (1) or all of the following legends:

A.      THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY.  SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS WHICH ARE SET FORTH HEREIN.

B.      Any legend required by applicable state securities law.

12.11    Investment Risk.  He, she or it acknowledges that the Membership Interest is a speculative investment which involves a substantial degree of risk of loss by him, her or it of his, her or its entire investment in the Company, that he, she or it understands and takes full cognizance of the risk factors related to the purchase of the Membership Interest, and that the Company is newly organized and has no financial or operating history. Furthermore, the Property has asbestos, is vacant and earning no income and is in need of millions of dollars in improvements.

12.12    Investment Experience.  He, she or it is an experienced investor in unregistered and restricted securities of limited liability companies or limited partnerships.

12.13    Restrictions on Transferability.  He, she or it acknowledges that there are substantial restrictions on the transferability of the Membership Interest pursuant to this Agreement, that there is no public market for the Membership Interest and none is expected to develop, and that, accordingly, it may not be possible for him, her or it to liquidate his, hers or its investment in the Company.

12.14    Information Reviewed.  He, she or it has received and reviewed all information he, she or it considers necessary or appropriate for deciding whether to purchase the Membership Interest. He, she or it has had an opportunity to ask questions and receive answers from the Company and its officers, Manager and employees regarding the terms and

31

conditions of purchase of the Membership Interest and regarding the business, financial affairs, and other aspects of the Company and has further had the opportunity to obtain all information (to the extent the Company possesses or can acquire such information without unreasonable effort of expense) which he, she or it deems necessary to evaluate the investment and to verify the accuracy of information otherwise provided to him, her or it.

12.15   No Representations by Company. Neither any Manager, any agent or employee of the Company or of any of the Manager, or any other Person has at any time expressly or implicitly represented, guaranteed, or warranted to him, her or it that he, she or it may freely transfer the Membership Interest, that a percentage of profit and/or amount or type of consideration will be realized as a result of an investment in the Membership Interest, that past performance or experience on the part of the Manager or Manager's Affiliates or any other person in any way indicates the predictable results of the ownership of the Membership Interest or of the overall Company business, that any cash distributions from Company operations or otherwise will be made to the Members by any specific date or will be made at all, or that any specific tax benefits will accrue as a result of an investment in the Company.

12.15.1   Neither the Company nor any Manager, nor any agent or representative of the Company or any of the officers, directors, agents, Members or affiliates of either of them, has made any representations or warranties of any kind to induce the purchase of a Membership Interest in Company or to enter into this Agreement.

12.15.2   Any statements, brochures, information, data, and figures describing or relating in any way to the investment are based upon information obtained by the Company from sources which it deems reliable, but are not made or intended as representations, warranties, guarantees, promises or inducements by the Company.

12.15.3   Any projected or estimated figures of income, expense, depreciation and expenses of operation are estimates and projections only and are not warranted, represented, or guaranteed.

12.15.4   For acquiring a Membership Interest in Company, he she or it has been afforded the opportunity to ask questions and to receive answers concerning the Company's financial condition, business, assets, prospects, liabilities and the terms and conditions of this Agreement, and that the Manager and any agents or representatives of Company have answered all such questions to the satisfaction of the undersigned.

12.15.5   The Company is not liable or bound in any manner by statements, representations or information, if any, pertaining to the income or operation of, or by any matter affecting or relating to the investment, or by any information or data furnished by any person unless specifically set forth in this Agreement.

12.15.6   In acquiring their Membership Interest, each Member has been provided a projection of cash flow based on the expected amortization of the loan to be obtained by Company. Each Member acknowledges and understands that during the years set forth in the projection, it is anticipated that the Company will not be able to issue to Class A Members the full eight percent (8%) preferred return described in Section 3.4.1 hereof. Furthermore, the Members acknowledge that the projection is not an assurance or guaranty with respect to a return on each Member's initial contribution.

12.16   Consultation with Attorney. He, she or it has been advised to consult with his, hers or its own attorney regarding all legal matters concerning an investment in the Company and the tax consequences of participating in the Company, and has done so, to the extent he, she or it considers necessary.

32



12.17   Tax Consequences. He, she or it acknowledges that the tax consequences to him, her or it of investing in the Company will depend on his, hers or its particular circumstances, and neither the Company, the Manager, the Members, nor the partners, shareholders, members, managers, agents, officers, directors, employees, Affiliates, or consultants of any of them will be responsible or liable for the tax consequences to him, her or it of an investment in the Company. He, she or it will look solely to, and rely upon, his, hers or its own advisers with respect to the tax consequences of this investment.

12.18   No Assurance of Tax Benefits. He, she or it acknowledges that there can be no assurance that the Code or the Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Company and the members of some or all of the tax benefits they might now receive, nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service.

12.19   Indemnity. Each Member shall indemnify and hold harmless the Company, each and every Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, agents, attorneys, registered representatives, and control persons of any such entity who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by him or it including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the Company, each and every Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, attorneys. accountants, agents, registered representatives, and control persons of any such Person (including attorneys' fees, judgments, fines, and amounts paid in settlement, payable as incurred) incurred by such Person in connection with such action, suit, proceeding, or the like.

## ARTICLE XIII
## MISCELLANEOUS

13.1   Counsel to the Company. Counsel to the Company may also be counsel to any Manager or any Affiliate of a Manager. The Manager may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction (Rules). The Managers shall mutually select a law firm as legal counsel to the Company. Each Member acknowledges that Company Counsel does not represent any Member in the absence of a clear and explicit agreement to such effect between the Member and Company Counsel, and that in the absence of any such agreement Company Counsel shall owe no duties directly to a Member. In the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and a Manager (or Affiliate of a Manager) that Company Counsel represents, on the other hand, then each Member agrees that Company Counsel may represent either the Company or such Manager (or his, hers or its Affiliate), or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

13.2   Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members and Manager with respect to the subject matter herein and therein and

33



replace and supersede all prior written and oral agreements or statements by and among the Members and Manager or any of them. No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or Manager or have any force or effect whatsoever. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

13.3    Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

13.4    Parties in Interest. Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and Manager and his respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

13.5    Pronouns; Statutory References. All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference to the Code, the Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

13.6    Headings. All headings are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

13.7    Interpretation. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his, hers or its counsel.

13.8    References to this Agreement. Numbered or lettered articles, section and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

13.9    Jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under, or in connection with this Agreement or the transactions contemplated by this Agreement, provided such claim is not required to be arbitrated pursuant to Section 13.10. Each Member further agrees that personal jurisdiction over him or it may be effected by service of process by registered or certified mail addressed as provided in Section 13.14 of this Agreement, and that when so made shall be as if served upon him or it personally with the State of California.

13.10   Disputed Matters. Except as otherwise provided in this Agreement, any controversy or dispute arising out of this Agreement, the interpretation of any of the provisions hereof, or the action or inaction of any Member or Manager hereunder shall be submitted to arbitration in Los Angeles, California before the American Arbitration Association under the real estate arbitration rules then obtaining of the American Arbitration Association. Any award or decision obtained from any such arbitration proceeding shall be final and binding on the parties, and judgment upon any award thus obtained may be entered in any court having jurisdiction thereof. No action at law or in equity based upon any claim arising out of or related to this Agreement shall be instituted in any court by a Member except (a) an action to

34



compel arbitration pursuant to this Section 13.10 or (b) an action to enforce an award obtained in an arbitration proceeding in accordance with this Section 13.10.

13.11   Exhibits. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

13.12   Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

13.13   Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

13.14   Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member or Manager at the address specified in Exhibit A hereto. Any party may, at any time by giving five (5) days prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

13.15   Amendments. All amendments to this Agreement will be in writing and signed by all of the Members.

13.16   Reliance on Authority of Person Signing Agreement. If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

13.17   No Interest in Company Property; Waiver of Action for Partition. No Member or Economic Interest Owner has any interest in specific property of the Company. Without limiting the foregoing, each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that he, she or it may have to maintain any action for partition with respect to the property of the Company.

13.18   Multiple Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

13.19   Attorney Fees. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses.

13.20   Time is of the Essence. All dates and times in this Agreement are of the essence.

35



EXHIBIT "1"
Page 57

13.21   Remedies Cumulative. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

13.22   Special Power of Attorney.

      A.   Attorney in Fact. Each member grants the Manager a special power of attorney irrevocably making, constituting, and appointing the Manager as the Member's attorney in fact, with all power and authority to act in the Member's name and on the Member's behalf to execute, acknowledge and deliver and swear to in the execution, acknowledgment, delivery and filing of the following documents:

      (i)   Promissory notes to be delivered pursuant to Section 3.5;

      (ii)   Assignments of certificates of membership interest or other documents of transfer to be delivered pursuant to Section 3.5 or in connection with the purchase of a Membership Interest pursuant to Section 3.5, Section 7.7 or Article VIII;

      (iii)   Any other instrument or document that may be reasonably required by the Manager in connection with any of the foregoing or to reflect any reduction in the Member's Capital Account or Percentage Interest pursuant to Section 3.5; and

      (iv)   Any consent to the representation of the Company by counsel selected by the Manager as described in Section 13.1.

      B.   Irrevocable Power. The special power granted in Section 13.22A: (i) is irrevocable; (ii) is coupled with an interest; and (iii) shall survive a Member's death, incapacity or dissolution.

      C.   Signatures. The Manager may exercise the special power of attorney granted in Section 13.22A by a facsimile signature of the Manager or one of Manager's officers.

13.23   No Third Party Beneficiary. The Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of the Agreement as a third party beneficiary or otherwise.

13.24   Not for Benefit of Creditors. The provisions of the Agreement are intended only for the regulation of relations among Members and Company. The Agreement is not intended for the benefit of a creditor who is not a Member and does not grant any rights to or confer any benefits on any creditor who is not a Member or any other person who is not a Member, a Manager, or an officer.

13.25   Reserved.

13.26   Rights of Judgment Creditor of Member. On application to a court of competent jurisdiction by a judgment creditor of a Member, the court may charge the Member's interest with payment of the unsatisfied amount of the judgment with interest. To the extent so charged the judgment creditor has only the rights of an assignee of the

36



EXHIBIT "1"
Page 58

Member's interest. This Paragraph does not deprive any Member of the benefit of any exemption applicable to his interest.

13.27 Legal Representative or Successor of a Member. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage his, hers or its person or property, the executor, administrator, guardian, conservator or other legal representative may exercise all rights of the Member in the purpose of settling his, hers or its estate or administering his, hers or its property.

13.28 Number of Members. The Company shall at all times have at least two (2) members.

13.29 No Responsibility for Pre-Formation Commitments. In the event that any Member (or any of such Member's shareholders, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that related to or otherwise affects Company (other than for the existing loan with Pacific Western Bank, costs of rezoning the property as a medical usage, and real costs of operating the building prior to this new Agreement), neither Company nor any other Member shall have any liability or responsibility for or with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by Company pursuant to a written instrument signed by the Manager. Furthermore, neither Company nor any Member shall be responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or any of such Member's shareholders or Affiliates). Each Member is aware of, agrees to and acknowledges that transaction fees, acquisition fees and leasing commissions may be paid in the acquisition of the property or leases, the majority of which will be paid to Members of the Company. All Members agree to, approve and acknowledge that Company is placing a construction/permanent loan ("Loan") in the approximate amount of at least Eight Million Two Hundred Thousand Dollars ($8,200,000.00) on the Property at time of closing on the Property.

13.30 Cooperation in Tax Deferred Exchange. The Company has been formed, principally, to invest in real property. If the Company shall decide to sell the Project, then the Members shall cooperate with each other, in good faith, to facilitate any Member wishing to do a tax-deferred exchange with respect to such Member's beneficial interest in the Project, in lieu of such Member receiving his pro rata share of the net sales proceeds from any such sale. Such cooperation shall include, without limitation, the Company distributing such Member's pro rata beneficial interest in the Project to such Member, for such Member to hold as a tenant in common with the Company for a period of not less than 90 days (or such lesser number of days as the exchanging Member shall request) prior to the consummation of any such sale. The Member wishing to effectuate such a tax-deferred exchange shall bear all additional costs and expenses incurred in connection with effectuating the same.

IN WITNESS WHEREOF. all of the Members of Mission Medical Investors, LLC, A California limited liability company, have executed this Agreement, effective as of the date written above.


MEMBERS:


_____                    _____
BARRY BEITLER                              JOHN BRAL


37

IN WITNESS WHEREOF, all of the Members of Mission Medical Investors, LLC, A California limited liability company, have executed this Agreement, effective as of the date written above.

MEMBERS:

_____
BARRY BEITLER

_____
JOHN BRAL

_____
JEFFREY D. GROSS, M.D.
& MELISSA C. GROSS JTWROS

_____
JOSEPH C. BRAL

_____
SHAMS INVESTMENT GROUP LLC

_____
JULIET BRAL & MEHRDAD
TABAR

38

EXHIBIT "A - 1"

### Class "B" Investors

| | |
|---|---|
| Barry Beitler | 10 % |
| John Bral | <u>10 %</u> |
| Total Class B | 20 % |

39

EXHIBIT "A - 2"

Class "A" Investors and Capital Contributions

| Member | Address | Capital Percentage | Capital Contributed |
|---|---|---|---|
| Barry Beitler and John Bral Split 50/50 | 825 South Barrington Ave. Los Angeles, CA 90049 | 61.40% | $1,950,000.00 |
| Joseph C. Bral | 1 Half Moon Irvine, CA 92614 | 3.2% | $100,000.00 |
| Jeffrey D. Gross, M.D. & Melissa C. Gross | 10 Orion Way Coto de Casa, CA 92679 | 3.2% | $100,000.00 |
| SHANS Investment Group LLC | 16300 Sand Canyon Avenue Suite 903, Irvine, CA 92618 | 9% | $250,000.00 |
| Juliet Bral & Mehrdad Tabar | 1 Half Moon Irvine, CA 92614 | 3.2% | $100,000.00 |
| Total Capital | | 80.0% | $2,500,000.00 |

40

IN WITNESS WHEREOF. all of the Members of MISSION MEDICAL INVESTORS, LLC, A California limited liability company, have executed this Agreement, effective as of the date written above.

MEMBERS:

_____
BARRY BEITLER

_____
JOHN BRAL

_____
JEFFREY D. GROSS, M.D.
& MELISSA C. GROSS JTWROS

_____

_____
SHANS INVESTMENT GROUP LLC

_____

_____

_____

39

EXHIBIT "1"
Page 63

# EXHIBIT 2

OPERATING AGREEMENT
OF
WESTCLIFF INVESTORS, LLC,
a California Limited Liability Company


THIS OPERATING AGREEMENT (this "Agreement"), is made as of February 20, 2003, by and among BARRY BEITLER ("Beitler"), an individual, and JOHN BRAL ("Bral"), an individual and Betsy Boyd ("Boyd"), an individual, (collectively referred to as the "Members" or individually as a "Member"), with reference to the following facts:

A.  Articles of Organization (the "Articles") for WESTCLIFF INVESTORS, LLC (the "Company"), a limited liability company organized under the laws of the State of California, were filed with the California Secretary of State on February 20, 2003 as Document No. 2003039 / 0037

B.  The Members desire to adopt and approve an operating agreement for the Company under the Beverly-Killea Limited Liability Company Act (the "Act").

C.  The above individuals and only these individuals, as of the formation of this Operating Agreement shall serve to form Westcliff Investors, LLC.

NOW, THEREFORE, the Members by this Agreement set forth the operating agreement for the Company upon the terms and subject to the conditions of this Agreement.


ARTICLE I - ORGANIZATIONAL MATTERS


1.1  Name.  The name of the Company shall be "WESTCLIFF INVESTORS, LLC."  The Company may conduct business under that name or any other name approved by the Members.

1.2  Term.  The term of the Company commenced as of the date of the filing of the Articles of Organization and unless dissolved as set forth in Article 9.1, shall terminate on December 31, 2025 or as soon as agreed by the majority of the parties, subject to the Major Decisions provisions herein.

1.3  Office and Agent.  The Company shall continuously maintain an office and registered agent in the State of California as required by the Act.  The principal office of the

BB:\WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

1

Company shall be at 825 So. Barrington Avenue, Los Angeles, California 90049, or such location as the Members may determine. The registered agent shall by as stated in the Articles or as otherwise determined by the Members.

    1.4 <u>Business of the Company</u>. Notwithstanding the purpose of the Company which is described in the Articles, the Company shall not engage in any business other than the following without the consent of all of the Members:

        (i)    the business of acquiring, owning, developing, operating, managing and selling an office/medical building at 1901 Westcliff Drive, Newport Beach, California and;

        (ii)    such other activities directly related to the foregoing business as may be necessary or advisable in the reasonable opinion of the Members to further such business.

## ARTICLE II - CAPITAL CONTRIBUTIONS

    2.1 <u>Capital Contributions</u>.  Each Member shall make a cash contribution to the capital of the Company in the amount shown opposite the Member's name on Exhibit "A" attached hereto, other than for Betsy Boyd who shall have no initial or additional capital contribution obligations. Except as expressly provided herein, each Member shall be required to make any additional contributions to the capital of the Company, where necessary, other than for Betsy Boyd. Except as provided in section 2.6, below, additional contributions to the capital of the Company shall be made only with the unanimous written consent of the Members and shall be made by all Members in proportion to the Membership Interests of the Members, where necessary, other than for Betsy Boyd. In the event that a Member makes an additional capital contribution in excess of his proportionate share as so determined, such excess of his proportionate share as so determined, such excess portion shall be entitled to a preferred return of ten (10%) per annum, accruing and compounding quarterly, from the date of such excess contribution until such excess amount is distributed to such Member. Except as provided in this Agreement, no Member may withdraw its capital contribution. A Member shall not be personally liable to any other Member for repayment of any capital contribution made to the Company by such other Member.

    2.2 <u>Capital Accounts</u>.The Company shall establish an individual capital account (the "Capital Account") for each Member. The Company shall determine and maintain each Capital Account in accordance with Treasury Regulations Section 1.704-1(b) (2) (iv). Upon valid transfer of a Member's interest in the Company (the "Membership Interest") in accordance with Article VI, such Member's Capital Account shall carry over to the new owner.

    2.3 <u>No Interest</u>.  The Company shall not pay any interest on initial capital contributions.

BB h/ WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

2

However, any additional capital contributions, as provided herein, shall be entitled to a preferred return equal to ten percent (10%) per annum, accruing and compounding quarterly.

2.4 <u>Loans to The Company</u>. Any monies loaned to the LLC by Barry Beitler or John Bral are collectively referred to as the "Member Loans.") The Member Loans shall not bear interest and shall only be repaid through the cash flow of the Property or the sale or refinance of the Property. Any and all initial monies necessary for the purchase of the Property, classified as loans to the Company, shall be repaid first to Bral and Beitler in full prior to any distributions of sale or refinance proceeds to Betsy Boyd for her interest in said Property i.e. by way of example, if Bral and Beitler each put up $200,000 into the Property and the Property sells for a $500,000 profit, Bral and Beitler are to receive 100% of their contribution prior to any calculation for distribution to any Member, including Boyd.

2.5. <u>Additional Required Capital Contributions</u>. Prior to commencement of construction of any addition to the Project by the Company or should any capital call be necessary amongst the Members, the Members shall make additional capital contributions to the Company. Any additional capital contributions shall bear interest, as provided in Section 2.3 herein, and shall be made in the following proportions:

| | |
|---|---|
| Beitler | 50.0% |
| Bral | <u>50.0%</u> |
| Total | 100.0% |

Any additional capital contributions shall be made by the above Members who shall receive all additional contributions in full from future sale or refinance prior to any participation by Boyd in distributions as further outlined in 2.4 above.

ARTICLE III - MEMBERS

3.1 <u>Admission of Additional Members</u>. Additional Members may be admitted with the approval of all Members. Additional Members will participate in "Net Profits," "Net Losses" (as such terms are defined in Paragraph 5.1), and distributions of the Company on such terms as are determined by the Members. Exhibit "A" shall by amended upon the admission of an additional Member to set forth such Member's name and capital contribution.

3.2 <u>Withdrawal or Resignations</u>. Any Member may withdraw or resign as a Member at any time upon one hundred twenty (120) days prior written notice to the Company, without prejudice to the rights, if any, of the Company or the other Members under any contract to which the withdrawing Member is a party. In the event of such withdrawal, such Member's Membership Interest shall be terminated, such Member shall thereafter only have the rights of a

BB lw WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

3

EXHIBIT "1"
Page 67

transferee as described in Paragraph 6.3 and such Membership Interest shall be subject to purchase and sale as provided in Paragraph 7.2. (No other Member may withdraw, retire or resign from Company.)

3.3 <u>Payments to Members</u>. Except as specified in this Agreement or pursuant to a transaction permitted by Paragraph 4.6, no Member or person or entity controlled by, controlling or under common control with the Member (each such person or entity is defined as an "Affiliate"), is entitled to remuneration for services rendered or goods provided to the Company, except as specifically provided by the Company. However, the Company shall reimburse the Members and their Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company, prepare the Articles and this Agreement and, as approved by the Members, for the actual cost of goods and materials used by the Company. At all times, whenever a vacancy in the Property becomes available, Beitler Commercial Realty Services shall be hired for the leasing at market commission rates. Bral and Beitler agree to split equally (50%/50%) any and all commissions for leasing paid if any. The same shall be true of any commission on the future sale of the Property. It is expressly agreed that payment of any real estate commission owing by the Company to Beitler Commercial Real Estate shall be paid if Company has sufficient cash flow to pay such commission without preventing the Company from meeting its other obligations.

## ARTICLE IV – MANAGEMENT AND CONTROL OF THE COMPANY

4.1 <u>Management and Powers</u>. In entering into this Agreement, the intent of each Member is to engage actively in the management of the Company, however, Barry Beitler shall be designated as the Company's Managing Member. Accordingly, unless otherwise limited by the Articles or this Agreement, Barry Beitler, shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.

4.2 <u>Limitations on Power of Members</u>. No Member shall have authority to cause the Company to engage in the following transactions without first obtaining the written approval of both John Bral or Barry Beitler:

(A) The sale, exchange or other disposition of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan, or in multiple transactions over a twelve (12) month period, except in the orderly liquidation and winding up of the business of the Company upon its duly authorized dissolution.

EXHIBIT "1"
Page 68

(B) The refinance or financing of any kind or any transactions which may encumber the title of the Property.

(C) The merger of the Company with another limited liability company or corporation, general partnership, limited partnership or other entity (except that any act which would cause a Member to incur personal liability for the obligations of the Company or its successor shall also require the consent of such Member).

(D) An alteration of the authorized businesses of the Company as set forth in Paragraph 1.4.

(E) Any act which would make it impossible to carry on the ordinary business of the Company.

(F) The confession of a judgment against the Company.

(G) Any other transaction described in this Agreement as requiring the approval, consent or vote of the Members.

4.3  <u>Member Approval</u>.   No annual or regular meetings of the Members are required to be held.  However, if such meetings are held, such meetings shall be noticed as provided in this paragraph and shall be held and conducted pursuant to the Act.  In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Act.  Unless otherwise provided in this Agreement, approval of the Members shall mean the approval of Members who hold at least seventy-five percent (75%) of the Membership Interests.  All notices of meetings will be in writing and shall be deemed duly given: (i) if it is sent by telecopier to the Members at the telephone number provided by each Member for such purpose, in which case notice will be deemed to take place upon receipt; or (ii) if (and then three [3] business days after) it is sent by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient at the address set forth on Exhibit "A" to this Operating Agreement (as amended from time to time).  No meeting shall be held by the Members without (10) business days prior to notice, unless otherwise agreed in writing by all the Members.

4.4  <u>Devotion of Time</u>.   Each Member shall devote whatever time or effort as he or she deems appropriate for the furtherance of the Company's business.

4.5  <u>Competing Activities</u>.   The Members and their Affiliates may engage or invest in any activity, including without limitation those that might be in direct or indirect competition with the Company.  Neither the Company nor any Member shall have any right in or to such other activities or to the income or proceeds derived therefrom.  No Member shall be obligated to

BB 1/ WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

5

EXHIBIT "1"
Page 69

present any investment opportunity to the Company, even if the opportunity is of the character that, if presented to the Company could be taken by the Company. Each Member shall have the right to hold any investment opportunity for its own account of the recommend such opportunity to persons other than the Company. The Members acknowledge that certain Members and their Affiliates own and/or manage other businesses, including businesses that may compete with the company and for the Members' time. Each Member hereby waives any and all rights and claims which he or she may otherwise have against the other Members and their Affiliates as a result of any such activities.

4.6  <u>Transactions between the Company and the Members</u>.  Notwithstanding that it may constitute a conflict of interest, the Members and their Affiliates may engage in any transaction with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, or an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from persons capable of similarly performing them or if Members holding a majority of the Membership Interests held by the Members having no interest in such transaction (other than their interests as Members) approve the transaction in writing.

## ARTICLE V - ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

5.1  <u>Definitions</u>. When used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Treasury Regulations.

"<u>Company Minimum Gain</u>" shall have the meaning given to the term "Partner Nonrecourse Debt" in Treasury Regulations Section 1.704-2 (d).

"<u>Member Nonrecourse Debt</u>" shall have the meaning given to the term "Partner Nonrecourse Debt" in Treasury Regulations Section 1.704-2 (b) (4).

"<u>Member Nonrecourse Deductions</u>" shall mean items or Company loss, deduction, or Code Section 705 (a) (2) (B) expenditures which are attributable to Member Nonrecourse Debt.

"<u>Net Profits</u>" and "<u>Net Losses</u>" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting at the close

BB.W WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

EXHIBIT "1"
Page 70

of each fiscal year employed on the Company's information tax return filed for
Federal income tax purposes.

"Nonrecourse Liability" shall have the meaning set forth in Treasury
Regulation that have been issued by the U.S. Department of Treasury pursuant to
its authority under the Code, and any successor regulations.

5.2  Allocations of Net Profit and Net Loss (subject to Paragraphs 2.4 and 2.5 herein
which shall prevail).

(a)  Net Loss.  Net Loss shall be allocated among the Members in proportion to
their respective Membership Interests as set forth in Exhibit "A".

(b)  Net Profit.  Net Profit shall be allocated among the Members in the following
manner:

(i)  First, in the event of sale or refinance, to repay 100% of
all capital contributions or additional capital contributions made by
any Member;

(ii)  Second, to the Members to the extent of the
distributions made pursuant to paragraph 5.5(a), below;

(iii)    Thereafter, among the Members in proportion to
their respective Membership Interests as set forth in Exhibit "A."

5.3  Special Allocations.  Notwithstanding Paragraph 5.2:

(a)  Minimum Gain Chargeback.  If there is a net decrease in Company Minimum
Gain during any fiscal year, each Member shall be specially allocated items of Company income
and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to
the portion of such Member's share of the net decrease in Company Minimum Gain that is
allocable to the disposition of Company property subject to a Nonrecourse Liability net decrease
shall be determined in accordance with Treasury Regulations Section 1.704-2 (g) (2).
Allocations pursuant to this Paragraph 5.3 (a) shall be made in proportion to the amounts
required to be allocated to each Member under this Paragraph 5.3 (a).  The items to be so
allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f).  This
Paragraph 5.3 (a) is intended to comply with the minimum gain chargeback requirement
contained in Treasury Regulations Section 1.704-2 (f) and shall be interpreted consistently
therewith.

(b)  Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt.  If there
is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during

any fiscal year, each member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse (which share shall be determined in accordance with Treasury Regulations Section 1.704-2 (i) (5)) shall be specifically allocated items of Company income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2 (i) (5)). Allocations pursuant to this Paragraph 5.3 (b) shall be made in proportion to the amounts required to be allocated to each Member under this Paragraph 5.3 (b). The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2 (i) (4). This Paragraph 5.3 (b) is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2 (i) (4) and shall be interpreted consistently therewith.

      (c) <u>Nonrecourse Deductions</u>. Any nonrecourse deductions (as defined in Treasury Regulations Section 1.704-2 (b) (1)) for any fiscal year or other period shall be specially allocated to the Members in proportion to their Membership Interests.

      (d) <u>Member Nonrecourse Deductions</u>. Those items of expenditures which are attributable to Member Nonrecourse Debt for any fiscal year or other period shall be specifically allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Treasury Regulations Section 1.704-2 (i).

      (e) <u>Deficit Capital Account Restoration</u>. In the event the Company is "liquidated" within the meaning of Treasury Regulations Section 1.704-2 (b) (ii) (g), a Member whose Capital Account has a deficit balance (after giving effect to all contributions, distributions, and allocations for all Fiscal Years, including the Fiscal Year during which such liquidation occurs), such Member shall contribute to the capital of the Company the amount necessary to restore such deficit balance to 1.704-2 (b) (2) (ii) (<u>b</u>) (<u>3</u>).

    5.4 <u>Code Section 704(c) Allocations</u>. Notwithstanding any other provision in this Article V, in accordance with Code Section 704(c) and the Treasury Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated amount the Members so as to take account of any variation between the adjusted basis of such property to the Company for Federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this Paragraph 5.4 are solely for purposes of Federal, state and local taxes. As such, they shall not affect Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

    5.5 <u>Distribution of Assets by the Company</u>. Subject to applicable law and any limitations contained elsewhere in this Agreement, the Members holding at least

8

seventy-five percent (75%) of the Membership Interests may elect from time to time to cause the Company to make distributions. Any payment by the Company with respect to Member Loans shall be credited first to interest then accrued, and the remainder, if any, to principal; and interest shall cease to accrue upon the principal so credited as of the date that such payment is actually made.

(a) Distribution from the sale or refinance of the Project shall be made in the following order and priority:

(i) First, one hundred percent (100%) to Beitler and Bral in an amount sufficient to repay Beitler and Bral their unreturned capital contributions; until each Member has recovered the amount of its initial and additional capital contributions; and

(ii) Thereafter, to the Members in proportion to their Membership Interests.

(b) Distributions from the cash flow resulting from the operation of the Project shall be made in the following order and priority:

(i) First, one hundred percent (100%) to Beitler and Bral in an amount sufficient to provide to each of the Members the priority return on such Member's additional capital contributions to the company if so designated by the Co-Managing Members;

(ii) Thereafter, to the Members in proportion to their Membership Interests;

## Article VI - TRANSFER AND ASSIGNMENT OF INTERESTS

6.1 Transfer and Assignment of Interests.    No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of its Membership Interest (collectively, "transfer") except with the prior approval of all Members, which approval may be given or withheld in the sole discretion of the Members, other than for each Member's ability to put his or her respective interest in a Trust or other estate planning mechanism which shall not be considered a Transfer hereunder.

6.2 Transfers in Violation of this Agreement and Transfers of Partial Membership Interests.    Upon a transfer in violation of this Article VI, the transferee shall have no right to vote or participate in the management of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor would otherwise be entitled.  Notwithstanding the immediately preceding sentences, if, in the determination of the remaining Members, a transfer in violation of this Article VI would cause the termination of the Company under the Code, in the sole discretion of the remaining Members, the transfer shall be null and void.

BB lv WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

9

6.3 <u>Transfers in Violation of this Agreement and Transfers of Partial Membership Interests.</u>  Upon a transfer in violation of this Article VI, the transferee shall have no right to vote or participate in the management of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor would otherwise be entitled.  Notwithstanding the immediately preceding sentences, if, in the determination of the remaining Members, a transfer in violation of this Article VI would cause the termination of the Company under the Code, in the sole discretion of the remaining Members, the transfer shall be null and void.

## ARTICLE VII -   CONSEQUENCES OF DISSOLUTION EVENTS AND TERMINATION OF MEMBERSHIP INTEREST

7.1 <u>Dissolution Event</u> Upon the occurrence of the death, withdrawal, resignation, retirement, insanity, bankruptcy or dissolution of any Member (the "Dissolution Event"), the Company shall dissolve unless all of the remaining Members (the "Remaining Members") consent within ninety (90) days of the Dissolution Event to the continuation of the business of the Company.  If the Remaining Members so consent, the Company and/or the Remaining Members shall have the right to purchase and, if such right is exercised, the Member (or its legal representative) whose actions or conduct resulted in the Dissolution Event (the "Former Member") shall sell, the Former Member's Membership Interest (the "Former Member's Interest") as provided in this Article VII.

7.2 <u>Withdrawal.</u>   Notwithstanding Paragraph 7.1, upon the withdrawal by a Member in accordance with Paragraph 3.2 such Member shall be treated as a Former Member, and, unless the Company dissolves as a result of such withdrawal, the Company and/or the Remaining Members shall have the right to purchase and, if such right is exercised, the Former Member shall sell, the Former Member's Interest as provided in this Article VII.

7.3 <u>Purchase Price.</u>   The purchase price for the Former Member's Interest shall be the fair market value of the Former Member's Interest as determined by an independent appraiser jointly selected by the Former Member and Remaining Members holding a majority of the remaining Membership Interests.  The Company and the Former Member shall each pay one-half (1/2) if the cost of the appraisal.  Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

7.4 <u>Notice of Intent to Purchase.</u>   Within thirty (30) days after the fair market value of the Former Member's Interest has been determined in accordance with Paragraph 7.3, each Remaining Member shall notify the Members in writing of its desire to purchase a portion of the

DB I/ WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

10



EXHIBIT "1"
Page 74

Former Member's Interest. The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest in the same proportion that the Membership Interest of the Remaining Member bears to the aggregate of the Membership Interests of all or the Remaining Members electing to purchase the Former Member's Interest.

7.5 <u>Election to Purchase Less Than All of the Former Member's Interest</u>. If any Remaining Member elects to purchase none or less than all of its <u>pro rata</u> share of the Former Member's Interest, then the Remaining Members can elect to purchase more than their <u>pro rata</u> share. If the Remaining Member fail to purchase the entire interest of the Former Member, the Company may purchase any remaining share of the Former Member's Interest.

7.6 <u>Payment of Purchase Price</u>. The Company or the Remaining Members, as the case may be, shall pay at the closing one-fifth (1/5) of the purchase price and the balance of the purchase price shall be paid in four (4) equal annual principal installments, plus accrued interest, and be payable each year on the anniversary date of the closing. The unpaid principal balance shall accrue interest at the current applicable Federal rate as provided in the Code for the month in which the initial payment is made, but the Company and the Remaining Members shall have the right to prepay in full or in part at any time without penalty. The obligation of each purchasing Remaining Member, and the Company, as applicable, to pay its portion of the balance due shall be evidenced by a separate promissory note executed by the respective purchasing Remaining Member or the Company, as applicable. Each such promissory note shall be in an original principal amount equal to the portion owed by the respective purchasing Remaining Member or the Company, as applicable. The promissory note executed by each purchasing Remaining Member shall be secured by a pledge of that portion of the Former Member's Interest purchased by such Remaining Member.

7.7 <u>Closing of Purchase of Former Member's Interest</u>. The closing for the sale of a Former Member's Interest pursuant to this Article VII shall be held at 10:00 A.M. at the principal office of Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Former Member shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest. The Former Member, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be reasonably necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

ARTICLE VIII - ACCOUNTING, RECORDS, REPORTING BY MEMBERS

8.1 <u>Books and Records</u>. The books and records of the Company shall be kept in accordance with the accounting methods followed for Federal income tax purposes. The Company shall maintain at its principal office in California all of the following:

BB W WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

11

(a)  A current list of the full name and last known business or
residence address of each Member set forth in alphabetical order,
together with the capital contributions, capital account and
Membership Interest of each Member;

(b)  A copy of the Articles and any and all amendments thereto
together with executed copies of any powers of attorney pursuant
to which the Articles or any amendments thereto have been executed;

(c)  Copies of the Company's Federal, state, and local income tax or
information returns and reports, if any, for the six (6) most recent taxable
years;

(d)  A copy of this Agreement and any and all amendments thereto
together with executed copies of any powers of attorney pursuant to
which this Agreement or any amendments thereto have been executed;

(e)  Copies of the financial statements of the Company, if any, for the
six (6) most recent fiscal years; and

(f)  The Company's books and records as they relate to the internal affairs of the
Company for at least the current and past four (4) fiscal years.

8.2  Reports.    The Company shall cause to be filed, in accordance with the Act,
all reports and documents required to be filed with any governmental agency.  The Company
shall cause to be prepare at least annually information concerning the Company's operations
necessary for the completion of the Members' Federal and state income tax returns.  The
Company shall send or cause to be sent to each Member within ninety (90) days after the end of
each taxable year: (i) such information as is necessary to complete the Members' Federal and
state income tax or information returns and (ii) a copy of the Company's Federal, state, and local
income tax or information returns for the year.

8.3  Bank Accounts.    The Members shall maintain the funds of the Company in one    or
more separate bank accounts in the name of the Company, and shall not permit the funds of the
Company to be commingled in any fashion with the funds of any other person.  Any Member,
acting alone, is authorized to endorse checks, drafts, and other evidences of indebtedness made
payable to the order of the Company, but only for the purpose of deposit into the Company's
accounts.  All checks, drafts, and other instruments obligating the Company to pay money must
be signed by the Managing Member, acting alone up to $50,000.  Any obligation of the
Company over $50,000 shall require the Managing Member's signature with the written approval
of the Managing Member.

BB·IV WESTCLIFF INVESTORS·OPERATING AGREEMENT

12



EXHIBIT 1
Page 76

8.4 Tax Matters for the Company.  Beitler is designated as "Tax Matters Partner" (as defined in Code Section 6231), to represent the Company (at the Company's expense) in connection with all examination of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith, subject to the limitations contained in Paragraph 4.2.

## ARTICLE IX  -  DISSOLUTION AND WINDING UP

9.1 Conditions of Dissolution.  The Company shall dissolve upon the occurrence of any of the following events:

(a)  Upon the happening of any event of dissolution specified in the Articles;

(b)  Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the California Corporations Code;

(c)  Upon the vote of a majority of the Membership;

(d)  The occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Paragraph 7.1 to continue the business of the Company within ninety (90) days after the occurrence of such event; or

(e) The sale of all or substantially all of the assets of Company.

9.2 Winding Up.   Upon the dissolution of the Company, the Company's assets shall
be disposed of and its affairs wound up.  The Company shall give written notice of the
commencement of the dissolution to all of its known creditors.

9.3 Order of Payment of Liabilities Upon Dissolution.  After determining that all the
known debts and liabilities of the Company have been paid or adequately provided for, the
remaining assets shall be distributed to the Members in accordance with their positive Capital
Account balances, after taking into account income and loss allocations for the Company's
taxable year during which liquidation occurs.

9.4 Limitations on Payments Made in Dissolution.   Except as otherwise specifically
provided in this Agreement, each Member shall be entitled to look only to the assets of the
Company for the return of its capital contribution and/or share of Net Profits against any other
Member except as provided in Article X.

9.5 Certificates.   The Company shall file with the California Secretary of State a
Certificate of Dissolution upon the dissolution of the Company and a Certificate of Cancellation
upon the completion of the winding up of the Company's affairs.

## ARTICLE X  -  INDEMNIFICATION

10.1    Indemnification of Agents.    The Company shall indemnify any Member and
may indemnify any person who was or is a party or is threatened to be made a party to any
threatened, pending or completed action, suit or proceeding arising out of or connected to the
business of the company or that, being or having been such a Member, officer, employee or
agent, he or she is or was serving at the request of the Company as a manager, director, officer,
employee or other agent of another limited liability company, corporation, partnership,  joint
venture, trust or other enterprise to the fullest extent permitted by applicable law in effect on the
date hereof and to such greater extent as applicable law may hereafter from time to time permit.
Further, any Member shall indemnify and hold harmless the Company and/or the other Members
of the Company in the event that the Company and/or the other Members are made a party to any
threatened or pending action, suit or proceeding between or by a Member and a third party or
entity not arising out of or related to the business of Company.

## ARTICLE XI  - INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Members and
the Company as follows:

11.1  Preexisting Relationship or Experience.   It has a preexisting personal or business

BB w/ WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

EXHIBIT "1"
Page 78

relationship with the Company or one or more of its officers or controlling persons, or by reason of its business or financial experience, or by reason of the business or financial experience of its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, it is capable or evaluating the risks and merits of an investment in the Company and of protecting its own interests in connection with this investment.

11.2   <u>No Advertising</u>.  It has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, article or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

11.3   <u>Investment Intent</u>.   It is acquiring the Membership Interest for investment purposes for its own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest.  No other person will have any direct or indirect beneficial interest in or right to the Membership interest.


ARTICLE XII   -   MISCELLANEOUS

12.1   <u>Counsel to the Company</u>.   Counsel to the Company may also be counsel to any Member or any Affiliate of a Member.  The Members may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction (the "Rules").  The Company has initially selected Jeff Katofsky of the Law Offices of Jeff Katofsky, LLP (the Company Counsel"), as legal counsel to the Company.  Each Member acknowledges that the Company Counsel does not represent any Member in the absence of a clear and explicit agreement to such effect between the Member and the Company Counsel, and that in the absence of any such written agreement the Company Counsel shall owe no duties directly to a Member.  Each Member further acknowledges: (i) that the Company Counsel has represented the interests of Beitler  in connection with the formation of the Company and the preparation and negotiation of this Agreement, and John Bral has selected separate Counsel in connection with the formation of the Company and the preparation and negotiation of this Agreement, (ii) while communications with the Company Counsel concerning the formation of the Company and its Members may be confidential with respect to third parties, no Member has any expectation that such communications are confidential with respect to Members which are represented individually by the Company Counsel.

12.2   <u>Complete Agreement</u>.  This Agreement and the Articles constitute the complete and exclusive statement and agreement among the Members with respect to the subject matter herein and therein and replace and supersedes all prior written and oral agreements among the Member.  To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

BB.lp WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

15

12.3    Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

12.4    Interpretation. All pronouns shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the interpretation of any provision of this Agreement. Numbered or lettered articles, paragraphs and subparagraphs herein contained refer to articles, paragraphs and subparagraphs of this Agreement unless otherwise expressly stated. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden or proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member of its counsel.

12.5    Jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and Federal courts sitting in California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each Member further agrees that personal jurisdiction over it may be effected by service of process by registered or certified mail addressed as provided in Paragraph 12.8 of this Agreement, and that when so made shall be as if served upon it personally within the State of California.

12.6    Arbitration. Except as otherwise provided in this Agreement, any controversy between the parties arising out of this Agreement shall be submitted to the American Arbitration Association for arbitration in Los Angeles, California. The costs of the arbitration, including any American Arbitration Association administration fee, the arbitrator's fee, and costs for the use of facilities during the hearings, shall be borne equally by the parties to the arbitration. Attorneys' fees may be awarded to the prevailing or most prevailing party at the discretion of the arbitrator. The provisions of Sections 1282.6, 1283, and 1283.05 of the California Code of Civil Procedure apply to the arbitration. The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, or not available in a court of law. The decision of the arbitrator shall be final, binding and non-appealable.

12.7    Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

12.8    Notices. Any notices to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member at the address specified in Exhibit "A" hereto. Any party may, at any time by giving five (5) days' prior written notice to the other Members, designate any other address in substitution of the foregoing address to which

such notice will be given.

12.9  <u>Amendments</u>.  All amendments to this Agreement will be in writing and signed by all of the Members.

12.10  <u>Multiple Counterparts</u>. . This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

12.11  <u>Attorney Fees</u>.  In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment.  Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate allowed by law. For the purposes of this Paragraph: (i) attorney fees shall include, without limitation, fees incurred in the following: (1) post-judgment motions; (2) contempt proceedings; (3) garnishment, levy and debtor and third party examinations; (4) discovery; and (5) bankruptcy litigation and (ii) the term "prevailing party" shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

12.12  <u>Remedies Cumulative</u>.  The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

BB-W WESTCLIFFINVESTORS-OPERATING AGREEMENT



17



IN WITNESS WHEREOF, all of the Members of WESTCLIFF INVESTORS, LLC,
a California limited liability company, have executed this Agreement, consisting of pages,
including this page, and Exhibit "A", effective as of the date written above.

_____
Barry Beitler

_____
John Bral

_____
Betsy Boyd

## EXHIBIT "A"

### CAPITAL CONTRIBUTIONS
### AND ADDRESSES OF MEMBERS

### OF

### WESTCLIFF INVESTORS, LLC
### a California limited liability company

| Member's Name | Member's Address | Member's Initial Capital | Member's Membership Interest |
|---|---|---|---|
| Barry Beitler | 825 S. Barrington Los Angeles, CA 90049 | 50% of all required capital | 47.5% |
| John Bral | 64 Sandpiper Irvine, CA 92604 | 50% of all required capital | 47.5% |
| Betsy Boyd | 3456 Summerset Circle Costa Mesa, CA 92626 | -0- | 5.0% |
| TOTALS | | 100% of all required capital | 100.0% |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

**650 Town Center Drive, Suite 950, Costa Mesa, CA 92626**

A true and correct copy of the foregoing document entitled: **DEBTOR'S AMENDED OBJECTION TO PROOF OF CLAIM FILED BY BARRY BEITLER [CLAIM NO. 14]; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.    TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **October 13, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.    SERVED BY UNITED STATES MAIL**:
On **October 13, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.    SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **October 13, 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

SERVED VIA PERSONAL DELIVERY/ATTORNEY SERVICE
The Honorable Scott C. Clarkson
United States Bankruptcy Court
Central District of California
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5130/Courtesy Bin
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 10/13/2017 | Nancy Lockwood | /s/ Nancy Lockwood |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

SERVICE INFORMATION

**SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

- **Thomas H Casey**    kdriggers@tomcaseylaw.com, msilva@tomcaseylaw.com
- **Alan J Friedman**    afriedman@lwgfllp.com,
  nlockwood@lwgfllp.com;jokeefe@lwgfllp.com;banavim@lwgfllp.com;lgauthier@lwgfllp.com
- **Daniel K Fujimoto**    wdk@wolffirm.com
- **Beth Gaschen**    bgaschen@wgllp.com,
  kadele@wgllp.com;lfisk@wgllp.com;lgauthier@lwgfllp.com;nlockwood@lwgfllp.com
- **Michael J Hauser**    michael.hauser@usdoj.gov
- **Mark D Hurwitz**    mhurwitz@lsl-la.com, dsmall@lsl-la.com
- **Gary E Klausner**    gek@lnbyb.com
- **William N Lobel**    wlobel@lwgfllp.com,
  nlockwood@lwgfllp.com;jokeefe@lwgfllp.com;banavim@wgllp.com
- **Kathleen J McCarthy**    kdriggers@tomcaseylaw.com, msilva@tomcaseylaw.com
- **William F McDonald**    Caecf@tblaw.com, wfm@tblaw.com;snchampney@tblaw.com
- **Krikor J Meshefejian**    kjm@lnbrb.com
- **Edward G Schloss**    egs2@ix.netcom.com
- **Valerie Smith**    claims@recoverycorp.com
- **Daniel B Spitzer**    dspitzer@spitzeresq.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Zann R Welch**    ecfnotices@ascensioncapitalgroup.com

**SERVED BY UNITED STATES MAIL:**

Gary E. Klausner, Esq.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA  90067

Barry Beitler
825 Barrington Avenue
Los Angeles, CA  90048

Office of the United States Trustee
511 West Fourth Street, Suite 7160
Santa Ana, CA  92701