1  William N. Lobel, State Bar No. 93202
   wlobel@lwgfllp.com
2  Alan J. Friedman, State Bar No. 132580
   afriedman@lwgfllp.com
3  Beth E. Gaschen, State Bar No. 245894
   bgaschen@lwgfllp.com
4  **LOBEL WEILAND GOLDEN FRIEDMAN LLP**
   650 Town Center Drive, Suite 950
5  Costa Mesa, California 92626
   Telephone    714-966-1000
6  Facsimile    714-966-1002

7  Attorneys for Debtor and Debtor-in-Possession
   John Jean Bral

8

9              **UNITED STATES BANKRUPTCY COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11                **SANTA ANA DIVISION**

12  In re                                    Case No. 8:17-bk-10706-SC

13  JOHN JEAN BRAL,                          Chapter 11

14         Debtor.                           **DECLARATION OF JOHN JEAN BRAL IN
                                             SUPPORT OF DEBTOR'S OBJECTIONS
15                                           TO PROOFS OF CLAIM NO. 9, 11, 14, 16,
                                             19 AND 20**
16
                                            **DATE:    December 14, 2017**
17                                          **TIME:    11:00 a.m.**
                                            **Place:   Courtroom 5C**
18                                                     **411 West Fourth Street**
                                                       **Santa Ana, California 92701**
19

20

21

22

23

24

25

26

27

28

*(vertical text, left margin)* Lobel Weiland Golden Friedman LLP / 650 Town Center Drive, Suite 950 / Costa Mesa, California 92626 / Tel 714-966-1000 · Fax 714-966-1002

1136091.1                                                        DECLARATION

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

## DECLARATION OF JOHN JEAN BRAL

I, John J. Bral, declare as follows:

1.     I am the debtor and debtor-in-possession in the above-captioned case, and I am over the age of 18.  The following is based upon my personal knowledge, except as otherwise noted, and if called as a witness herein, I could and would competently testify thereto.  I make this declaration in support of the Objections to Proofs of Claim Nos. 9, 11, 14, 16, 19 and 20 filed concurrently herewith (the "Objections").  Any term not specifically defined herein shall have the meaning provided in the Objections.

2.     On June 16, 2017, Claim Nos. 9, 11, 14, 16, 19 and 20 were filed by the respective claimants (the "Claims").  True and complete copies of such Claims are attached as Exhibit "1" to each of the respective Objections and are incorporated herein by this reference.

### THE SPEs

3.     Prior to 2007, Barry Beitler ("Beitler") and I formed a series of limited liability companies to acquire and manage commercial real estate projects in Southern California. These SPEs include Westcliff Investors, LLC ("Westcliff"), Ocean View Medical Investors, LLC ("Ocean View"), Harbor Medical Investors, LLC ("Harbor"), and Mission Medical Investors, LLC ("Mission").

4.     I also formed Javaher Investors, LLC ("Javaher") and Eyestreet Medical Investors, LLC ("Eyestreet") which were entities that also owned and managed commercial real estate projects.  I am the co-manager of Javaher.  I do not own an interest in Javaher, but Westcliff is a member.  I am the co-manager of Eyestreet and I own a small membership interest in this entity.  Beitler did not hold an interest in either Javaher or Eyestreet.  Westcliff, Ocean View, Harbor, Mission, Javaher and Eyestreet are collectively the "SPEs" herein.

5. Beitler and I were initially designated as the co-managers of Westcliff, Ocean View, Harbor and Mission. I serve as the co-manager of Javaher and Eyestreet. The other manager of Eyestreet and Javaher is not Beitler.

6. Pursuant to the operating agreements, the co-managers of the Westcliff, Ocean View, Harbor and Mission were jointly responsible for managing the affairs of these entities, and jointly responsible for supervising the retention and maintenance of their books and records during their terms as co-managers. I was responsible for performing these duties for Javaher and Eyestreet.

7. The books and records of the SPEs were kept in the ordinary course of business, in a consistent and business-like manner. The accounting records of the SPEs were maintained on the QuickBooks software program.

8. Attached hereto are true and correct copies of the following operating agreements that govern the affairs of the SPEs:

a. Exhibit "1" -  Westcliff Operating Agreement;

b. Exhibit "2" – Ocean View Operating Agreement;

c. Exhibit "3" – Mission Operating Agreement;

d. Exhibit "4" – Javaher Operating Agreement;

e. Exhibit "5" – Harbor Operating Agreement; and

f. Exhibit "6" – Eyestreet Operating Agreement

**The Management Entities**

9. After the formation of the SPEs, these entities required management services, and brokerage services such as leasing and lease renewal.

10. In 2006, I formed Venture RE Group, a California corporation ("VREG"). Beitler owned a fifty percent interest in VREG. Attached hereto as Exhibit "7" is a true and correct copy of a K-1 Form that was issued to Beitler confirming his interest in this corporation. He received a similar tax form every year, since VREG had made the "subchapter S" election under the Internal Revenue Code.

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

11.    In October 8, 2013, I formed Bral Realty Advisors, Inc., a California corporation ("BRAI").

12.    Beitler & Associates is a California corporation owned by Beitler that operated under the dba Beitler Commercial Real Estate Services ("BCRS").

13.    In the Claims, Beitler alleges that he was entitled to a fifty percent ownership interest in VREG.  This is true and in fact he received this ownership interest as indicated in Exhibit "7."

14.    In the Claims, Beitler alleges that I agreed that he would receive fifty percent of the top line revenues generated by VREG.  This is false.  We agreed that I, as VREG's active and working corporate officer and the sales manager within VREG, would receive sixty percent of every commission paid to VREG on transactions that I worked on as an agent.  The remaining forty percent of the commission would be retained by VREG. Beitler, as a fifty percent shareholder of VREG, would then receive fifty percent of the year end profit generated by VREG and I, as the other fifty percent shareholder, would receive the balance of the profit.

**The Payments To The Management Entities**

15.    The management fees and leasing commissions that were paid to VREG and BRAI by the SPEs (the "Service Payments") were duly authorized, and they were payable for ordinary and necessary services.  These payments were reflected in the SPEs' books and records and in their tax returns.

16.    Pursuant to my agreement with Beitler, VREG received one hundred percent of the commissions generated from leasing activity performed for the benefit of the SPEs, with the exception of Westcliff lease commissions.  In the case of Westcliff, forty percent of the commissions were allocable to Beitler and were retained by Westcliff.

17.    As explained above, I was allocated sixty percent of the commissions paid to VREG by the SPEs.  The remaining forty percent was retained by VREG.  If, after paying corporate expenses, a profit was left over in the corporation, Beitler, as a fifty percent

1    shareholder of VREG, would receive half of this profit.  I never agreed to split the

2    commissions with Beitler fifty/fifty as alleged in the Claims.

3        18.    When property management fees were paid by the SPEs to VREG, these

4    payments would be used to pay ordinary course expenses and again, at the end of the

5    year, Beitler, as a fifty percent shareholder, would receive his half of the profits.

6        19.    In the Claims, Beitler, and his sister, Betsy Boyd ("Boyd"), and BCRS

7    generically allege that some of the Service Payments were improper, or alternatively, and

8    in contradiction of the prior allegation, that they were proper, but Beitler (and/or BCRS) did

9    not receive his "share" of these payments as agreed.

10        20.    The Service Payments were paid over a period of more than ten years.  A

11    general allegation that "some" of the payments were not proper or authorized is difficult to

12    respond to since these allegations encompass thousands of payments that were made by

13    eight separate entities.

14        21.    During the decade plus time frame encompassed by Beitler's, BCRS' and

15    Boyd's allegations, Beitler was fully aware of the payments, and in fact we routinely

16    discussed the same.

17        22.    Since Beitler, BCRS and Boyd have failed to specify what payments during

18    the past decade were allegedly improper or unauthorized I cannot specifically address

19    these allegations.  What I can say is that the Service Payments were, to the best of my

20    recollection and knowledge, in fact proper and authorized, and Beitler was always aware

21    that these payments were being made.

22        23.    If and when either Beitler, BCRS or Boyd specify what payments they are

23    referring to, and why they were improper or unauthorized, I will review the applicable

24    books and records and address and rebut these contentions in more detail.

25    **The Westcliff Allegations**

26        24.    Beitler and I formed Westcliff in 2003. It was registered with the California

27    Secretary of State on February 7, 2003.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

25. Westcliff has three members: Beitler, myself and Betsy Boyd. Betsy Boyd is Beitler's sister.

26. Westcliff's Operating Agreement was drafted by Beitler's office and presented to the members to be signed. It was signed by Beitler, Boyd and myself.

27. Beitler is a sophisticated businessman. He was fully aware of the contents of this writing when he signed it.

28. The Westcliff Operating Agreement accurately reflects the ownership interests held by Westcliff's members.

29. As indicated in the Westcliff Operating Agreement, Beitler and I each own a 47.5% interest in Westcliff. Boyd owns the remaining 5%.

30. Boyd did not make a capital contribution to Westcliff in exchange for her interest.

31. Beitler was initially responsible for setting up Westcliff's accounting system on the software program "QuickBooks."

32. Robert Sargent, Beitler's personal accountant, prepared Westcliff's tax returns for approximately ten years, including the K-1 forms that were issued each year to Westcliff's members.

33. As a part of the tax return preparation process, Mr. Sargent reviewed the financial data that appeared in Westcliff's books and records, as maintained on QuickBooks, and he prepared Westcliff's tax returns based upon these records. Mr. Sargent always insisted on getting the QuickBooks accounts sent to him (emailed) and didn't want the Accountant copy to be sent. Mr. Sargent would make all the entrees including the journal entrees and correction if any before returning the QuickBooks files to me so I would restore from the file that he would email which would override the existing file.

34. Attached hereto as Exhibit "8" are true and correct copies of the K-1 Forms that were issued to Beitler for the 2011 through 2016 tax years by Westcliff (the "Beitler K-1s").

**Lobel Weiland Golden Friedman LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

35.     Attached hereto as Exhibit "9" are true and correct copies of the K-1 Forms that were issued to Boyd for the 2011 through 2016 tax years by Westcliff (the "Boyd K-1s").

36.     The Beitler K-1s and the Boyd K-1s accurately reflect the ownership interests that are owned by Beitler and Boyd respectively, and they accurately reflect the capital accounts for these individuals.

37.     At no point in time did Beitler or Boyd contact me and advise me that either party considered these tax filings to be in error.

38.     The vague allegations made by Beitler and Boyd regarding my alleged failure to properly account for these capital contributions that they allegedly made to this entity are false.  Notably, Boyd never made a contribution.

39.     If and when Beitler and Boyd specify what contributions were not properly accounted for, I will review Westcliff's books and records a second time and address these allegations.  Until this occurs, I will reserve my right to supplement this declaration

**The Capital Contribution Allegations Relating to The Other SPEs**

40.     Beitler makes series of vague allegations in the Claims to the effect that he made capital contributions to the other SPEs that were not properly accounted for.  He further alleges that these capital contributions should have resulted in an adjustment of his percentage interest in these SPEs.

41.     The SPEs were all formed prior to 2007.  Accordingly, the vague allegations above encompass a history of more than ten years.

42.     Since Beitler has failed to specify what contributions or ownership interests he is referring to, I can only respond to his generic allegations by stating that to the best of my knowledge all capital contributions to the SPEs were in fact properly accounted for and

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  that the ownership interest specified annually in the K-1 Forms that were sent to Beitler,

2  and necessarily approved by Beitler as a co-manager of all of the SPEs[1], were accurate.

3       43.    If and when Beitler specifies what contributions were not accounted for or

4  what interest percentages are in error, I will review the SPEs books and records. I have

5  every confidence that these records will rebut his allegations.

6                              **Steward Financial, LLC**

7       44.    Ocean View was formed on June 10, 2005.  Beitler and I were designated

8  as the co-managers of this entity in Ocean View's operating agreement.

9       45.    Ocean View's sole asset was the office building commonly known as 441

10 Old Newport Road, Newport, California (the "Property").

11      46.    On or about October 5, 2005, Ocean View and BAB 8, LLC (owned by

12 Beitler), as borrowers (the "Ocean View Borrowers"), and First Regional Bank ("First

13 Regional"), as lender, entered into that certain Construction Loan Agreement (the "Loan

14 Agreement").  A true and correct copy of the Loan Agreement is attached hereto as

15 Exhibit "10."

16      47.    The Loan Agreement was secured by that certain Construction Deed of

17 Trust (the "Deed of Trust").  A true and correct copy of the Deed of Trust is attached

18 hereto as Exhibit "11."

19      48.    Beitler and I guaranteed the obligations in the Loan Agreement pursuant to

20 written guarantee agreements.  A true and correct copy of the guarantee that I executed is

21 attached hereto as Exhibit "12."

22      49.    In 2012, the Ocean View Borrowers failed to pay off the loan at maturity due

23 to a lack of funds.

24      50.    Although Beitler owed a fiduciary duty to Ocean View's members to make

25 every effort to preserve the value of the Property, instead of honoring this charge he

26 _____

27      [1] Beitler was not a co-manager of Javaher or Eyestreet.

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1  sought to profit at the expense of the other members.  He acquired First Citizen's interest

2  in the Loan Agreement and Deed of Trust through his alter ego, Steward Financial, LLC

3  ("Steward"), and then foreclosed upon the Property.  Steward acquired the Ocean View's

4  property via a credit bid of $4.1 million.

5        I declare under penalty of perjury that the foregoing is true and correct.

6        Executed this 13th day of October 2017, in Irvine, California.

7

8                                              _____

9                                              John Jean Bral

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lobel Weiland Golden Friedman LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-866-1000  Fax 714-866-1002

1136091.1                                9                                DECLARATION

# EXHIBIT "1"

OPERATING AGREEMENT
OF
WESTCLIFF INVESTORS, LLC,
a California Limited Liability Company

THIS OPERATING AGREEMENT (this "Agreement"), is made as of February **20**, 2003, by and among BARRY BEITLER ("Beitler"), an individual, and JOHN BRAL ("Bral"), an individual and Betsy Boyd ("Boyd"), an individual, (collectively referred to as the "Members" or individually as a "Member"), with reference to the following facts:

    A.  Articles of Organization (the "Articles") for WESTCLIFF INVESTORS, LLC (the "Company"), a limited liability company organized under the laws of the State of California, were filed with the California Secretary of State on February **20**, 2003 as Document No. **2003039/0037**

    B.    The Members desire to adopt and approve an operating agreement for the Company under the Beverly-Killea Limited Liability Company Act (the "Act").

    C.    The above individuals and only these individuals, as of the formation of this Operating Agreement shall serve to form Westcliff Investors, LLC.

    NOW, THEREFORE, the Members by this Agreement set forth the operating agreement for the Company upon the terms and subject to the conditions of this Agreement.

## ARTICLE I - ORGANIZATIONAL MATTERS

    1.1  <u>Name</u>. The name of the Company shall be "WESTCLIFF INVESTORS, LLC." The Company may conduct business under that name or any other name approved by the Members.

    1.2  <u>Term</u>. The term of the Company commenced as of the date of the filing of the Articles of Organization and unless dissolved as set forth in Article 9.1, shall terminate on December 31, 2025 or as soon as agreed by the majority of the parties, subject to the Major Decisions provisions herein.

    1.3  <u>Office and Agent</u>. The Company shall continuously maintain an office and registered agent in the State of California as required by the Act. The principal office of the

00 W WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

1



EXHIBIT "1"
Page 2 of 20

Company shall be at 825 So. Barrington Avenue, Los Angeles, California 90049, or such location as the Members may determine. The registered agent shall by as stated in the Articles or as otherwise determined by the Members.

      1.4 <u>Business of the Company</u>. Notwithstanding the purpose of the Company which is described in the Articles, the Company shall not engage in any business other than the following without the consent of all of the Members:

        (i)    the business of acquiring, owning, developing, operating, managing and selling an office/medical building at 1901 Westcliff Drive, Newport Beach, California and;

        (ii)    such other activities directly related to the foregoing business as may be necessary or advisable in the reasonable opinion of the Members to further such business.

## ARTICLE II - CAPITAL CONTRIBUTIONS

      2.1 <u>Capital Contributions</u>. Each Member shall make a cash contribution to the capital of the Company in the amount shown opposite the Member's name on Exhibit "A" attached hereto, other than for Betsy Boyd who shall have no initial or additional capital contribution obligations. Except as expressly provided herein, each Member shall be required to make any additional contributions to the capital of the Company, where necessary, other than for Betsy Boyd. Except as provided in section 2.6, below, additional contributions to the capital of the Company shall be made only with the unanimous written consent of the Members and shall be made by all Members in proportion to the Membership Interests of the Members, where necessary, other than for Betsy Boyd. In the event that a Member makes an additional capital contribution in excess of his proportionate share as so determined, such excess of his proportionate share as so determined, such excess portion shall be entitled to a preferred return of ten (10%) per annum, accruing and compounding quarterly, from the date of such excess contribution until such excess amount is distributed to such Member. Except as provided in this Agreement, no Member may withdraw its capital contribution. A Member shall not be personally liable to any other Member for repayment of any capital contribution made to the Company by such other Member.

      2.2 <u>Capital Accounts</u>.The Company shall establish an individual capital account (the "Capital Account") for each Member. The Company shall determine and maintain each Capital Account in accordance with Treasury Regulations Section 1.704-1(b) (2) (iv). Upon valid transfer of a Member's interest in the Company (the "Membership Interest") in accordance with Article VI, such Member's Capital Account shall carry over to the new owner.

      2.3 <u>No Interest</u>.    The Company shall not pay any interest on initial capital contributions.

DB 1w\WESTCLIFF\INVESTORS-OPERATING AGREEMENT-final

2

However, any additional capital contributions, as provided herein, shall be entitled to a preferred return equal to ten percent (10%) per annum, accruing and compounding quarterly.

2.4 Loans to The Company. Any monies loaned to the LLC by Barry Beitler or John Bral are collectively referred to as the "Member Loans.") The Member Loans shall not bear interest and shall only be repaid through the cash flow of the Property or the sale or refinance of the Property. Any and all initial monies necessary for the purchase of the Property, classified as loans to the Company, shall be repaid first to Bral and Beitler in full prior to any distributions of sale or refinance proceeds to Betsy Boyd for her interest in said Property i.e. by way of example, if Bral and Beitler each put up $200,000 into the Property and the Property sells for a $500,000 profit, Bral and Beitler are to receive 100% of their contribution prior to any calculation for distribution to any Member, including Boyd.

2.5. Additional Required Capital Contributions. Prior to commencement of construction of any addition to the Project by the Company or should any capital call be necessary amongst the Members, the Members shall make additional capital contributions to the Company. Any additional capital contributions shall bear interest, as provided in Section 2.3 herein, and shall be made in the following proportions:

| | |
|---|---|
| Beitler | 50.0% |
| Bral | 50.0% |
| Total | 100.0% |

Any additional capital contributions shall be made by the above Members who shall receive all additional contributions in full from future sale or refinance prior to any participation by Boyd in distributions as further outlined in 2.4 above.

ARTICLE III - MEMBERS

3.1 Admission of Additional Members. Additional Members may be admitted with the approval of all Members. Additional Members will participate in "Net Profits," "Net Losses" (as such terms are defined in Paragraph 5.1), and distributions of the Company on such terms as are determined by the Members. Exhibit "A" shall by amended upon the admission of an additional Member to set forth such Member's name and capital contribution.

3.2 Withdrawal or Resignations. Any Member may withdraw or resign as a Member at any time upon one hundred twenty (120) days prior written notice to the Company, without prejudice to the rights, if any, of the Company or the other Members under any contract to which the withdrawing Member is a party. In the event of such withdrawal, such Member's Membership Interest shall be terminated, such Member shall thereafter only have the rights of a

DB 1v WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

3





EXHIBIT "1"
Page 4 of 20

transferee as described in Paragraph 6.3 and such Membership Interest shall be subject to purchase and sale as provided in Paragraph 7.2.  (No other Member may withdraw, retire or resign from Company.)

3.3  <u>Payments to Members</u>.  Except as specified in this Agreement or pursuant to a transaction permitted by Paragraph 4.6, no Member or person or entity controlled by, controlling or under common control with the Member (each such person or entity is defined as an "Affiliate"), is entitled to remuneration for services rendered or goods provided to the Company, except as specifically provided by the Company.  However, the Company shall reimburse the Members and their Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company, prepare the Articles and this Agreement and, as approved by the Members, for the actual cost of goods and materials used by the Company.  At all times, whenever a vacancy in the Property becomes available, Beitler Commercial Realty Services shall be hired for the leasing at market commission rates.  Bral and Beitler agree to split (60%/40%) any and all commissions for leasing paid if any.  The same shall be true of any commission on the future sale of the Property.  It is expressly agreed that payment of any real estate commission owing by the Company to Beitler Commercial Real Estate shall be paid if Company has sufficient cash flow to pay such commission without preventing the Company from meeting its other obligations.

## ARTICLE IV - MANAGEMENT AND CONTROL OF THE COMPANY

4.1  <u>Management and Powers</u>.  In entering into this Agreement, the intent of each Member is to engage actively in the management of the Company, however, Barry Beitler and John Bral shall be designated as the Company's Co-Managing Members.  Accordingly, unless otherwise limited by the Articles or this Agreement, Barry Beitler and John Bral, shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters equally and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.

4.2  <u>Limitations on Power of Members</u>.  No Member shall have authority to cause the Company to engage in the following transactions without first obtaining the written approval of both John Bral ~~or~~ and Barry Beitler:

        (A) The sale, exchange or other disposition of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan, or in multiple transactions over a twelve (12) month period, except in the orderly liquidation and winding up of the business of the Company upon its duly authorized dissolution.

(B) The refinance or financing of any kind or any transactions which may encumber the title of the Property.

(C) The merger of the Company with another limited liability company or corporation, general partnership, limited partnership or other entity (except that any act which would cause a Member to incur personal liability for the obligations of the Company or its successor shall also require the consent of such Member).

(D) An alteration of the authorized businesses of the Company as set forth in Paragraph 1.4.

(E) Any act which would make it impossible to carry on the ordinary business of the Company.

(F) The confession of a judgment against the Company.

(G) Any other transaction described in this Agreement as requiring the approval, consent or vote of the Members.

4.3  Member Approval.    No annual or regular meetings of the Members are required to be held. However, if such meetings are held, such meetings shall be noticed as provided in this paragraph and shall be held and conducted pursuant to the Act. In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Act. Unless otherwise provided in this Agreement, approval of the Members shall mean the approval of Members who hold at least seventy-five percent (75%) of the Membership Interests. All notices of meetings will be in writing and shall be deemed duly given: (i) if it is sent by telecopier to the Members at the telephone number provided by each Member for such purpose, in which case notice will be deemed to take place upon receipt; or (ii) if (and then three [3] business days after) it is sent by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient at the address set forth on Exhibit "A" to this Operating Agreement (as amended from time to time). No meeting shall be held by the Members without (10) business days prior to notice, unless otherwise agreed in writing by all the Members.

4.4  Devotion of Time.    Each Member shall devote whatever time or effort as he or she deems appropriate for the furtherance of the Company's business.

4.5  Competing Activities.    The Members and their Affiliates may engage or invest in any activity, including without limitation those that might be in direct or indirect competition with the Company. Neither the Company nor any Member shall have any right in or to such other activities or to the income or proceeds derived therefrom. No Member shall be obligated to

DB IV WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

5





EXHIBIT "1"
Page 6 of 20

present any investment opportunity to the Company, even if the opportunity is of the character that, if presented to the Company could be taken by the Company. Each Member shall have the right to hold any investment opportunity for its own account of the recommend such opportunity to persons other than the Company. The Members acknowledge that certain Members and their Affiliates own and/or manage other businesses, including businesses that may compete with the company and for the Members' time. Each Member hereby waives any and all rights and claims which he or she may otherwise have against the other Members and their Affiliates as a result of any such activities.

4.6 Transactions between the Company and the Members. Notwithstanding that it may constitute a conflict of interest, the Members and their Affiliates may engage in any transaction with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, or an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from persons capable of similarly performing them or if Members holding a majority of the Membership Interests held by the Members having no interest in such transaction (other than their interests as Members) approve the transaction in writing.

## ARTICLE V - ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

5.1 Definitions. When used in this Agreement, the following terms shall have the meanings set forth below:

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Treasury Regulations.

"Company Minimum Gain" shall have the meaning given to the term "Partner Nonrecourse Debt" in Treasury Regulations Section 1.704-2 (d).

"Member Nonrecourse Debt" shall have the meaning given to the term "Partner Nonrecourse Debt" in Treasury Regulations Section 1.704-2 (b) (4).

"Member Nonrecourse Deductions" shall mean items or Company loss, deduction, or Code Section 705 (a) (2) (B) expenditures which are attributable to Member Nonrecourse Debt.

"Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting at the close

BB.lg-WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

6



EXHIBIT "1"
Page 7 of 20

of each fiscal year employed on the Company's information tax return filed for Federal income tax purposes.

"Nonrecourse Liability" shall have the meaning set forth in Treasury Regulation that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

5.2  Allocations of Net Profit and Net Loss (subject to Paragraphs 2.4 and 2.5 herein which shall prevail).

(a)  Net Loss.  Net Loss shall be allocated among the Members in proportion to their respective Membership Interests as set forth in Exhibit "A".

(b)  Net Profit.  Net Profit shall be allocated among the Members in the following manner:

(i)  First, in the event of sale or refinance, to repay 100% of all capital contributions or additional capital contributions made by any Member;

(ii)  Second, to the Members to the extent of the distributions made pursuant to paragraph 5.5(a), below;

(iii)    Thereafter, among the Members in proportion to their respective Membership Interests as set forth in Exhibit "A."

5.3  Special Allocations.  Notwithstanding Paragraph 5.2:

(a)  Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2 (g) (2). Allocations pursuant to this Paragraph 5.3 (a) shall be made in proportion to the amounts required to be allocated to each Member under this Paragraph 5.3 (a). The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f). This Paragraph 5.3 (a) is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2 (f) and shall be interpreted consistently therewith.

(b)  Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt. If there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during

any fiscal year, each member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse (which share shall be determined in accordance with Treasury Regulations Section 1.704-2 (i) (5)) shall be specifically allocated items of Company income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2 (i) (5)). Allocations pursuant to this Paragraph 5.3 (b) shall be made in proportion to the amounts required to be allocated to each Member under this Paragraph 5.3 (b). The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2 (i) (4). This Paragraph 5.3 (b) is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2 (i) (4) and shall be interpreted consistently therewith.

(c) <u>Nonrecourse Deductions</u>. Any nonrecourse deductions (as defined in Treasury Regulations Section 1.704-2 (b) (1)) for any fiscal year or other period shall be specially allocated to the Members in proportion to their Membership Interests.

(d) <u>Member Nonrecourse Deductions</u>. Those items of expenditures which are attributable to Member Nonrecourse Debt for any fiscal year or other period shall be specifically allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Treasury Regulations Section 1.704-2 (i).

(e) <u>Deficit Capital Account Restoration</u>. In the event the Company is "liquidated" within the meaning of Treasury Regulations Section 1.704-2 (b) (ii) (g), a Member whose Capital Account has a deficit balance (after giving effect to all contributions, distributions, and allocations for all Fiscal Years, including the Fiscal Year during which such liquidation occurs), such Member shall contribute to the capital of the Company the amount necessary to restore such deficit balance to 1.704-2 (b) (2) (ii) (b) (3).

5.4 <u>Code Section 704(c) Allocations</u>. Notwithstanding any other provision in this Article V, in accordance with Code Section 704(c) and the Treasury Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated amount the Members so as to take account of any variation between the adjusted basis of such property to the Company for Federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this Paragraph 5.4 are solely for purposes of Federal, state and local taxes. As such, they shall not affect Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

5.5 <u>Distribution of Assets by the Company</u>. Subject to applicable law and any limitations contained elsewhere in this Agreement, the Co-Managing Members holding at least

8



EXHIBIT "1"
Page 9 of 20

seventy-five percent (75%) of the Membership Interests may elect from time to time to cause the Company to make distributions. Any payment by the Company with respect to Member Loans shall be credited first to interest then accrued, and the remainder, if any, to principal; and interest shall cease to accrue upon the principal so credited as of the date that such payment is actually made.

(a) Distribution from the sale or refinance of the Project shall be made in the following order and priority:

(i) First, one hundred percent (100%) to Beitler and Bral in an amount sufficient to repay Beitler and Bral their unreturned capital contributions; until each Member has recovered the amount of its initial and additional capital contributions; and

(ii) Thereafter, to the Members in proportion to their Membership Interests.

(b) Distributions from the cash flow resulting from the operation of the Project shall be made in the following order and priority:

(i) First, one hundred percent (100%) to Beitler and Bral in an amount sufficient to provide to each of the Members the priority return on such Member's additional capital contributions to the company if so designated by the Co-Managing Members;

(ii) Thereafter, to the Members in proportion to their Membership Interests;

Article VI - TRANSFER AND ASSIGNMENT OF INTERESTS

6.1 Transfer and Assignment of Interests.    No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of its Membership Interest (collectively, "transfer") except with the prior approval of all Members, which approval may be given or withheld in the sole discretion of the Members, other than for each Member's ability to put his or her respective interest in a Trust or other estate planning mechanism which shall not be considered a Transfer hereunder.

6.2 Transfers in Violation of this Agreement and Transfers of Partial Membership Interests.    Upon a transfer in violation of this Article VI, the transferee shall have no right to vote or participate in the management of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the remaining Members, a transfer in violation of this Article VI would cause the termination of the Company under the Code, in the sole discretion of the remaining Members, the transfer shall be null and void.

BB\w WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

9

6.3 Transfers in Violation of this Agreement and Transfers of Partial Membership Interests. Upon a transfer in violation of this Article VI, the transferee shall have no right to vote or participate in the management of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the remaining Members, a transfer in violation of this Article VI would cause the termination of the Company under the Code, in the sole discretion of the remaining Members, the transfer shall be null and void.

## ARTICLE VII -    CONSEQUENCES OF DISSOLUTION EVENTS AND TERMINATION OF MEMBERSHIP INTEREST

7.1 Dissolution Event Upon the occurrence of the death, withdrawal, resignation, retirement, insanity, bankruptcy or dissolution of any Member (the "Dissolution Event"), the Company shall dissolve unless all of the remaining Members (the "Remaining Members") consent within ninety (90) days of the Dissolution Event to the continuation of the business of the Company. If the Remaining Members so consent, the Company and/or the Remaining Members shall have the right to purchase and, if such right is exercised, the Member (or its legal representative) whose actions or conduct resulted in the Dissolution Event (the "Former Member") shall sell, the Former Member's Membership Interest (the "Former Member's Interest") as provided in this Article VII.

7.2 Withdrawal.    Notwithstanding Paragraph 7.1, upon the withdrawal by a Member in accordance with Paragraph 3.2 such Member shall be treated as a Former Member, and, unless the Company dissolves as a result of such withdrawal, the Company and/or the Remaining Members shall have the right to purchase and, if such right is exercised, the Former Member shall sell, the Former Member's Interest as provided in this Article VII.

7.3 Purchase Price.    The purchase price for the Former Member's Interest shall be the fair market value of the Former Member's Interest as determined by an independent appraiser jointly selected by the Former Member and Remaining Members holding a majority of the remaining Membership Interests. The Company and the Former Member shall each pay one-half (1/2) if the cost of the appraisal. Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

7.4 Notice of Intent to Purchase.    Within thirty (30) days after the fair market value of the Former Member's Interest has been determined in accordance with Paragraph 7.3, each Remaining Member shall notify the Members in writing of its desire to purchase a portion of the

Former Member's Interest. The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest in the same proportion that the Membership Interest of the Remaining Member bears to the aggregate of the Membership Interests of all or the Remaining Members electing to purchase the Former Member's Interest.

7.5 <u>Election to Purchase Less Than All of the Former Member's Interest</u>. If any Remaining Member elects to purchase none or less than all of its pro rata share of the Former Member's Interest, then the Remaining Members can elect to purchase more than their pro rata share. If the Remaining Member fail to purchase the entire interest of the Former Member, the Company may purchase any remaining share of the Former Member's Interest.

7.6 <u>Payment of Purchase Price</u>. The Company or the Remaining Members, as the case may be, shall pay at the closing one-fifth (1/5) of the purchase price and the balance of the purchase price shall be paid in four (4) equal annual principal installments, plus accrued interest, and be payable each year on the anniversary date of the closing. The unpaid principal balance shall accrue interest at the current applicable Federal rate as provided in the Code for the month in which the initial payment is made, but the Company and the Remaining Members shall have the right to prepay in full or in part at any time without penalty. The obligation of each purchasing Remaining Member, and the Company, as applicable, to pay its portion of the balance due shall be evidenced by a separate promissory note executed by the respective purchasing Remaining Member or the Company, as applicable. Each such promissory note shall be in an original principal amount equal to the portion owed by the respective purchasing Remaining Member or the Company, as applicable. The promissory note executed by each purchasing Remaining Member shall be secured by a pledge of that portion of the Former Member's Interest purchased by such Remaining Member.

7.7 <u>Closing of Purchase of Former Member's Interest</u>. The closing for the sale of a Former Member's Interest pursuant to this Article VII shall be held at 10:00 A.M. at the principal office of Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Former Member shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest. The Former Member, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be reasonably necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

ARTICLE VIII - ACCOUNTING, RECORDS, REPORTING BY MEMBERS

8.1 <u>Books and Records</u>. The books and records of the Company shall be kept in accordance with the accounting methods followed for Federal income tax purposes. The Company shall maintain at its principal office in California all of the following:

BB b/ WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

11

(a) A current list of the full name and last known business or residence address of each Member set forth in alphabetical order, together with the capital contributions, capital account and Membership Interest of each Member;

(b) A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

(c) Copies of the Company's Federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

(d) A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

(e) Copies of the financial statements of the Company, if any, for the six (6) most recent fiscal years; and

(f) The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) fiscal years.

8.2 <u>Reports</u>.    The Company shall cause to be filed, in accordance with the Act, all reports and documents required to be filed with any governmental agency. The Company shall cause to be prepare at least annually information concerning the Company's operations necessary for the completion of the Members' Federal and state income tax returns. The Company shall send or cause to be sent to each Member within ninety (90) days after the end of each taxable year: (i) such information as is necessary to complete the Members' Federal and state income tax or information returns and (ii) a copy of the Company's Federal, state, and local income tax or information returns for the year.

8.3 <u>Bank Accounts</u>.    The Members shall maintain the funds of the Company in one   or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other person. Any Member, acting alone, is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts. All checks, drafts, and other instruments obligating the Company to pay money may be signed by any Co-Managing Member, acting alone up to $10,000. Any obligation of the Company over $10,000 shall require both Co-Managing Member's signatures or the written approval of both Co-Managing Members.

DB le WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

12





8.4 Tax Matters for the Company. Beitler is designated as "Tax Matters Partner" (as defined in Code Section 6231), to represent the Company (at the Company's expense) in connection with all examination of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith, subject to the limitations contained in Paragraph 4.2.

## ARTICLE IX - DISSOLUTION AND WINDING UP

9.1 Conditions of Dissolution. The Company shall dissolve upon the occurrence of any of the following events:

(a) Upon the happening of any event of dissolution specified in the Articles;

(b) Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the California Corporations Code;

(c) Upon the vote of both Co-Managing Members;

(d) The occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Paragraph 7.1 to continue the business of the Company within ninety (90) days after the occurrence of such event; or





(e) The sale of all or substantially all of the assets of Company.

9.2 Winding Up.   Upon the dissolution of the Company, the Company's assets shall be disposed of and its affairs wound up. The Company shall give written notice of the commencement of the dissolution to all of its known creditors.

9.3 Order of Payment of Liabilities Upon Dissolution.   After determining that all the known debts and liabilities of the Company have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with their positive Capital Account balances, after taking into account income and loss allocations for the Company's taxable year during which liquidation occurs.

9.4 Limitations on Payments Made in Dissolution.   Except as otherwise specifically provided in this Agreement, each Member shall be entitled to look only to the assets of the Company for the return of its capital contribution and/or share of Net Profits against any other Member except as provided in Article X.

9.5 Certificates.   The Company shall file with the California Secretary of State a Certificate of Dissolution upon the dissolution of the Company and a Certificate of Cancellation upon the completion of the winding up of the Company's affairs.

ARTICLE X  -  INDEMNIFICATION

10.1   Indemnification of Agents.   The Company shall indemnify any Member and may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding arising out of or connected to the business of the company or that, being or having been such a Member, officer, employee or agent, he or she is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit. Further, any Member shall indemnify and hold harmless the Company and/or the other Members of the Company in the event that the Company and/or the other Members are made a party to any threatened or pending action, suit or proceeding between or by a Member and a third party or entity not arising out of or related to the business of Company.

ARTICLE XI  - INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Members and the Company as follows:

11.1 Preexisting Relationship or Experience.   It has a preexisting personal or business

OB b/ WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

14



EXHIBIT "1"
Page 15 of 20

relationship with the Company or one or more of its officers or controlling persons, or by reason of its business or financial experience, or by reason of the business or financial experience of its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, it is capable or evaluating the risks and merits of an investment in the Company and of protecting its own interests in connection with this investment.

11.2    No Advertising.    It has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, article or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

11.3    Investment Intent.    It is acquiring the Membership Interest for investment purposes for its own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest. No other person will have any direct or indirect beneficial interest in or right to the Membership interest.

ARTICLE XII    -    MISCELLANEOUS

12.1    Counsel to the Company.    Counsel to the Company may also be counsel to any Member or any Affiliate of a Member. The Members may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction (the "Rules"). The Company has initially selected Jeff Katofsky of the Law Offices of Jeff Katofsky, LLP (the Company Counsel"), as legal counsel to the Company. Each Member acknowledges that the Company Counsel does not represent any Member in the absence of a clear and explicit agreement to such effect between the Member and the Company Counsel, and that in the absence of any such written agreement the Company Counsel shall owe no duties directly to a Member. Each Member further acknowledges: (i) that the Company Counsel has represented the interests of Beitler in connection with the formation of the Company and the preparation and negotiation of this Agreement, and John Bral has selected separate Counsel in connection with the formation of the Company and the preparation and negotiation of this Agreement, (ii) while communications with the Company Counsel concerning the formation of the Company and its Members may be confidential with respect to third parties, no Member has any expectation that such communications are confidential with respect to Members which are represented individually by the Company Counsel.

12.2    Complete Agreement.    This Agreement and the Articles constitute the complete and exclusive statement and agreement among the Members with respect to the subject matter herein and therein and replace and supersedes all prior written and oral agreements among the Member. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

BD by WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

15

12.3   Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

12.4   Interpretation. All pronouns shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the interpretation of any provision of this Agreement. Numbered or lettered articles, paragraphs and subparagraphs herein contained refer to articles, paragraphs and subparagraphs of this Agreement unless otherwise expressly stated. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden or proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member of its counsel.

12.5   Jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and Federal courts sitting in California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each Member further agrees that personal jurisdiction over it may be effected by service of process by registered or certified mail addressed as provided in Paragraph 12.8 of this Agreement, and that when so made shall be as if served upon it personally within the State of California.

12.6   Arbitration. Except as otherwise provided in this Agreement, any controversy between the parties arising out of this Agreement shall be submitted to the American Arbitration Association for arbitration in Los Angeles, California. The costs of the arbitration, including any American Arbitration Association administration fee, the arbitrator's fee, and costs for the use of facilities during the hearings, shall be borne equally by the parties to the arbitration. Attorneys' fees may be awarded to the prevailing or most prevailing party at the discretion of the arbitrator. The provisions of Sections 1282.6, 1283, and 1283.05 of the California Code of Civil Procedure apply to the arbitration. The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, or not available in a court of law. The decision of the arbitrator shall be final, binding and non-appealable.

12.7   Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

12.8   Notices. Any notices to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member at the address specified in Exhibit "A" hereto. Any party may, at any time by giving five (5) days' prior written notice to the other Members, designate any other address in substitution of the foregoing address to which

16





such notice will be given.

12.9   Amendments.   All amendments to this Agreement will be in writing and signed by all of the Members.

12.10   Multiple Counterparts.   This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

12.11   Attorney Fees.   In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate allowed by law. For the purposes of this Paragraph: (i) attorney fees shall include, without limitation, fees incurred in the following: (1) post-judgment motions; (2) contempt proceedings; (3) garnishment, levy and debtor and third party examinations; (4) discovery; and (5) bankruptcy litigation and (ii) the term "prevailing party" shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

12.12   Remedies Cumulative.   The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

12.13   Consent of Spouse.   Within ten (10) days after any individual becomes a Member or a Member marries, such Member shall have its spouse execute a consent substantially in the form attached to this Agreement.

IN WITNESS WHEREOF, all of the Members of WESTCLIFF INVESTORS, LLC, a California limited liability company, have executed this Agreement, consisting of pages, including this page, and Exhibit "A", effective as of the date written above.

Barry Beitler

John Braf

Betsy Boyd

EXHIBIT "A"

CAPITAL CONTRIBUTIONS
AND ADDRESSES OF MEMBERS

OF

WESTCLIFF INVESTORS, LLC
a California limited liability company

| Member's Name | Member's Address | Member's Initial Capital | Member's Membership Interest |
|---|---|---|---|
| Barry Beitler | 825 S. Barrington Los Angeles, CA 90049 | 50% of all required capital | 47.5% |
| John Bral | 64 Sandpiper Irvine, CA 92604 | 50% of all required capital | 47.5% |
| Betsy Boyd | 3456 Summerset Circle Costa Mesa, CA 92626 | -0- | 5.0% |
| TOTALS | | 100% of all required capital | 100.0% |

BB:lv WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

19



EXHIBIT "1"
Page 20 of 20

# EXHIBIT "2"

EXHIBIT "2"
Page 1 of 44

OPERATING AGREEMENT FOR
OCEAN VIEW MEDICAL INVESTORS, LLC
A CALIFORNIA LIMITED LIABILITY COMPANY

This Operating Agreement, is made as this 29th day of March, 2005 by and among the parties listed on the signatures pages hereof, with reference to the following facts:

    A.    On June 10, 2005, Articles of Organization for OCEAN VIEW MEDICAL INVESTORS, LLC, a California limited liability company (the Company), a limited liability company under the laws of the State of California, were filed with the California Secretary of State, Document Number 200516510027.

NOW, THEREFORE, the parties (hereinafter sometimes collectively referred to as the Members, or individually as the Member) by this Agreement set forth the Operating Agreement for the Company under the laws of the State of California upon the terms and subject to the conditions of this Agreement.

ARTICLE I
DEFINITIONS
ARTICLE I  DEFINITIONS

When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement which are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

    1.1    Act shall mean the Beverly-Killea Limited Liability Act, codified in the California Corporations Code, Section 17000 et seq., as the same may be amended from time to time.

    1.2    Affiliate shall mean any individual, partnership, corporation, trust, or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member. The term control, as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

    1.3    Agreement shall mean this Operating Agreement, as originally executed and as amended from time to time.

    1.4    Articles shall mean the Articles of Organization for the Company originally filed with the California Secretary of State and as amended from time to time.

    1.5    Bankruptcy shall mean, (i) the entry of a decree or order for relief against any Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, Debtor Relief Law) generally affecting the rights of creditors and relief of debtors now or hereafter in effect; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of a Member's affairs; (iv) the filing of a petition in any such involuntary bankruptcy case, which petition remains not dismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by a Member of a voluntary case under any applicable Debtor Relief Law now

1

EXHIBIT "2"
Page 2 of 44

or hereafter in effect; *(vi)* the consent by a Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or *(vii)* the making by a Member of any general assignment for the benefit of its creditors.

1.6    Capital Account shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.3.

1.7    Capital Contribution shall mean the total value of cash contributed to the Company by Members.

1.8    Code shall mean the Internal Revenue Code of 1986, as amended from time to time, and the provisions of succeeding law.

1.9    Company shall mean OCEAN VIEW MEDICAL INVESTORS, LLC, a California Limited Liability Company.

1.10    Company Minimum Gain shall have the meaning ascribed to the term Partnership Minimum Gain in the Regulations Section 1.704-2(d).

1.11    Corporations Code shall mean the California Corporations Code, as amended from time to time, and the provisions of succeeding law.

1.12    Dissolution Event for the Company means the following:

With respect to any Member, one or more of the following:

1.    When the period fixed for the duration of the Company expires as defined in 2.3 herein; or

2.    By the unanimous written agreement of all Members.

1.13    "Distributable Net Cash" shall mean the amount of cash which the Manager deems available for distribution to the Members, taking into account all Company debts, liabilities, and obligations of the Company then due and amounts which the Manager deems necessary to place into reserves for customary and usual claims with respect to the Company's business.

1.14    Economic Interest shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a member, including, without limitation, the right to vote or participate in the management, or except as provided in Section 17106 of the Corporations Code, any right to information concerning the business and affairs of Company.

1.15    Reserved

1.16    Fiscal Year shall mean the Company's fiscal year, which shall be the calendar year.

1.17    Former Members shall have the meaning ascribed to it in Section 8.1.

1.18    Former Member's Interest shall have the meaning ascribed to it in Section 8.1.

1.19    Majority Interest shall mean Percentage Interests of one or more Members, which taken together exceeds fifty percent (50%) of the aggregate of all Percentage Interests.

2

EXHIBIT "2"
Page 3 of 44

1.20    Manager shall mean, BARRY BEITLER and JOHN BRAL, collectively, or any other person(s) or entity(ies) who succeed in their respective capacities.

1.21    Member shall mean each Person who (a) is an initial signatory to this Agreement; has been admitted to the Company as a Member in accordance with the Articles or this Agreement; or is an assignee who has become a Member in accordance with Article VII and (b) has not resigned, withdrawn, been expelled or, if other than an individual, dissolved. It shall refer to both classes of Members in the Company. Unless otherwise expressly mentioned, Member shall refer to and include both classes of Members.

1.21.1    Class A Members shall mean a class of Members that consist of those individuals, persons or entities that own eighty percent (80%) of all of the outstanding and issued Membership Interest in Company and are specifically named in Exhibit A-2 and who have contributed on a proportionate basis 100% of all cash required hereunder.

1.21.2    Class B Members shall mean a class of Members that consist of those individuals, persons or entities that own twenty percent (20%) of all of the outstanding and issued Membership Interest in Company and are specifically named in Exhibit A-1.

1.22    Member Nonrecourse Debt shall have the meaning ascribed to the term Partner Nonrecourse Debt in Regulations Section 1.704-2(b)(4).

1.23    Member Nonrecourse Deductions shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

1.24    Membership Interest shall mean a Member's entire interest in the Company including the Member's Economic Interest; the right to vote on or participate in the management; and the right to receive information concerning the business and affairs of the Company. A Membership Interest constitutes personal property.

1.25    Net Profits and Net Losses shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (and for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) with those adjustments required by Regulations Section 1.704-1(b)(2)(iv) for purposes of adjusting and maintaining Capital Accounts in accordance therewith.

1.26    Nonrecourse Liability shall have the meaning set forth in Regulations Section 1.752-1(a)(2).

1.27    Percentage Interest shall mean the percentage of a Member set forth opposite the name of such Member under the column Member's Percentage Interest in Exhibit A hereto; as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.

1.28    Person shall mean an individual, general partnership, limited partnership, limited liability company, corporation, trust, estate, real estate investment trust association or any other entity.

1.29    Regulations shall, unless the context clearly indicates otherwise, mean the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

1.30    Remaining Members shall have the meaning ascribed to it in Section 8.1.

1.31    Tax Matters Partner shall be BARRY BEITLER and JOHN BRAL, collectively, or their successors as designated pursuant to Section 9.8.

3

EXHIBIT "2"
Page 4 of 44

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1    Formation. Pursuant to the Act, the Members have formed a California Limited Liability Company under the laws of the State of California by filing the Articles with the California Secretary of State and entering into this Agreement. The rights and liabilities of the Members shall be determined pursuant to the Act and to this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2    Name. The name of the Company shall be OCEAN VIEW MEDICAL INVESTORS, LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager deems appropriate or advisable. The Manager shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Manager considers appropriate or advisable. The phrase LLC shall always appear as part of the name of Company on all correspondence, stationary, checks, invoices and any and all documents and papers executed by Company and as otherwise required by the Act.

2.3    Term. The term of this Agreement shall be co-terminus with the period of duration of the Company, December 31, 2050, unless extended or sooner terminated as hereinafter provided.

2.4    Office and Agent. The Company shall continuously maintain an office and registered agent in the State of California as required by the Act. The principal office of the Company shall be as the Manager may determine. The Company also may have such offices, anywhere within and without the State of California, as the Manager from time to time may determine, or the business of the Company may require. The registered agent shall be as stated in the Articles or as otherwise determined by the Manager.

2.5    Addresses of the Members and the Manager. The respective addresses of the Members and the Manager are set forth on Exhibit A.

2.6    Purposes of Company. The purpose of the Company is to engage in any lawful activity for which a Limited Liability Company may be organized under the Act. Notwithstanding the foregoing, however, the Company shall not engage in any business other than the following:

(1)    The business of development, operation, leasing and managing for rental and investment of that certain real property located at 441 Old Newport Road, Newport Beach (the "Property");

(2)    such other activities directly related to the foregoing business as may be necessary, advisable, or appropriate, in the reasonable opinion of the Manager to further the foregoing business.

2.7    Title to Property in the Name of the Company. Title to the real property purchased in accordance with 2.6 above shall be held and owned in the name of the Company

2.8    Tax Status of Company. The Members intend that the Company be treated as a partnership for income tax purposes and agree to take any actions necessary in order to obtain such treatment.

4

EXHIBIT "2"
Page 5 of 44

ARTICLE III
CAPITAL CONTRIBUTIONS

3.1    Initial Capital Contributions. Each Member shall contribute such amount as is set forth on Exhibit A as his, hers or its initial Capital Contribution within one year of the execution of this agreement. Exhibit A shall consist of Sections A-1 and A-2. Exhibit A-1 shall contain Class B Members and Exhibit A-2 shall contain Class A Members.

3.2    Additional Capital Contributions.

(1)    In addition, each Member shall contribute to the capital of the Company its pro rata share of such amounts as the Manager shall determine from time to time to be necessary in order to carry out the purposes of the Company set forth above within ten (10) days or thirty (30) days, depending on the amount of the capital call, after the call is made for same by the Manager.

(2)    If the Manager determines that the Company requires additional funds for any purpose, it may request that the Members contribute more funds to the Company. In such case, each Member shall contribute to the capital of the Company its pro rata share of such amounts as the Manager shall determine from time to time to be necessary in order to carry out the purposes of the Company set forth above within ten (10) business days if the total capital call is under ten thousand dollars ($10,000), or thirty (30) days if ten thousand dollars ($10,000) or over, after the call is made for same by the Manager.

(3)    Alternatively or additionally, Manager may reserve up to One Hundred Fifty Thousand dollars ($150,000) from Distributable Net Cash for such purposes.

(4)    If any Member fails to timely make its pro rata contribution as required above and required by the Manager, that Member or Members shall have his/her Membership Interest decreased proportionally for the failure to make such required contributions. For example; Manager calls for one hundred thousand dollars. Member X, who owns eight percent (8%), fails to fund the call. The remaining Members must, pro rata, fill the capital call. Member X's interest is then reduced by itself, namely eight percent (8%) in this example, leaving Member X with seven point thirty-six percent (7.36%) interest. The diluted interest is then distributed to the Members making the capital call, pro rata.

3.3    Capital Accounts. The Company shall establish an individual Capital Account for each Member. The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv). If a Member transfers all or a part of his, hers or its Membership Interest in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations Section 1.704-1(b)(2)(iv)(1).

3.4    No Interest or Preferred Return. Except as otherwise expressly provided herein, no Member shall be entitled to receive any interest or preferred return on his, hers or its Capital Contributions.

3.4.1    Preferred Return to Class A Members. To the extent permitted by working capital requirements and other contingencies determined by the Manager, Company shall issue to Class A Members an eight percent (8%) preferred return, per annum, non-compounding, on their initial capital contribution set forth in Exhibit A-1 hereto. To the extent the preferred return cannot be issued in full because of Company's working capital requirements or other contingencies, the preferred return shall be issued in part and shall be carried forward to each successive year until paid. When the Class A Members have been paid an amount equal to the Class A Members' initial capital contribution,

5

Class A Members shall no longer be entitled to any preferred return hereunder. Distributions will then be strictly based upon percentage ownership. The preferred return shall at all time be calculated based upon the then outstanding unpaid initial capital contribution of Class A Members.

      3.4.2   Preferred Return to Class B Members.  To the extent permitted by working capital requirements and other contingencies determined by the Manager, and Company's payment of an eight percent (8%) preferred return and no less to all of the Class A Members, Company shall issue an eight percent (8%) preferred return, per annum, non-compounding to Class B Members, which Class B Member preferred return shall be calculated by assigning each of the Class B Members an assumed initial capital contribution equal to five percent (5%) of the total initial capital contribution of the Class A Members. To the extent the preferred return cannot be issued in full to the Class B Members because of Company's working capital requirements or other contingencies, the preferred return to Class B Members shall be carried forward to any successive year. For example, if Company distributes an eight percent (8%) preferred return to Class A Members, but only distributes a three percent (3%) preferred return to Class B Members, the Class B Members be entitled to an additional five percent (5%) return on a successive year. The amount of the preferred return paid to Class B Members is determined on an annual basis. The Preferred Return to Class B Members shall be paid to Class B Members after the initial capital contribution of Class A Members has been repaid in full. After the Initial Capital Contribution is returned to the Class A Members, all distributions shall be made based upon percentage ownership. No Preferred Return shall be paid to Class B Members in any year except and unless the full eight percent (8%) preferred return has been paid to all of the Class A Members.

      3.4.3.   Distributions After Payment of Preferred Return to Both Class A and Class B Members. After payment of the preferred returns are made in full to both Class A Members and Class B Members, then any distributions from Company, in any period per annum, shall be made to all Members based on eighty percent (80%) to Class A and twenty percent (20%) to Class B.

      3.5   Limitation on Withdrawal of Capital Contribution.  No Member shall have the right to withdraw his, hers or its Capital Contribution or to demand and receive property of the Company or any distribution in return for his, hers or its Capital Contribution, except as may be specifically provided in this Agreement or permitted by law.

## ARTICLE IV
## MEMBERS

      4.1   Limited Liability.  Except as provided in California Corporations Code Section 17254 relating to distributions by Company and Section 17101(b) relating to responsibility of Members for certain unsatisfied debts or obligations of Company, no Member or Manager shall be liable under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of Company whether that liability or obligation arises in contract or tort. No Member shall be required to loan any funds to Company. No Member shall be required to make any contribution to Company by reason of any negative balance in his, hers or its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

      4.2   Admission of Additional Members.  The Manager, with the approval of all of the Members, may admit to the Company additional Members. Any additional Members shall obtain Membership Interests and will participate in the management, Net Profits, Net Losses, and distributions of the Company on such terms as are determined by the Manager and approved by the Members. Notwithstanding the foregoing, substitute members may only be admitted in accordance with Article VII.

      4.3   Purchase of Membership Interest.  Upon the transfer of a Member's Membership Interest in violation of this Agreement, or the occurrence of a Dissolution Event as to such Member which does not result in the dissolution of the Company, such Membership Interest may be purchased by the Company or remaining Members as provided herein. Each Member acknowledges and agrees that such right to purchase a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.

6

4.4    Transactions With The Company. Subject to any limitations set forth in this Agreement and with the prior unanimous approval of the Manager and Members, and after full disclosure of the Member's involvement, a Member may lend money to and transact other business with the Company. Subject to other applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

4.5    Except as otherwise authorized in this agreement, no Member is entitled to remuneration in a capacity acting for the Company or for Company business.

4.6    Members Are Not Agents. Pursuant to Section 5.1 and the Articles, the management of the Company shall be vested in the Manager, the designated property manager.   No Member, acting solely in the capacity of a Member, is an agent of the Company nor can any Member in such capacity bind nor execute any instrument on behalf of the Company.

4.7    Voting Rights. Members shall have the right to approve or disapprove matters as specifically stated in this Agreement, including the following:

A.    Unanimous Approval. The following matters shall require the unanimous vote, approval or consent of all Members who are not the subject of a Dissolution Event or an assignor of a Membership Interest:

(i)    A decision to continue the business of the Company after the occurrence of a Dissolution Event set forth in 1.12.

(ii)    Except as provided in Article VII, the transfer of a Membership Interest and admission of the transferee or assignee as a Member of the Company.

(iii)    Any material amendment of the Articles or this Agreement.

(iv)    Purchase of additional real property by the Company.

B.    Approval by Members Holding a Majority Interest. Except as set forth in this Agreement in all other matters in which the vote, approval or consent of all Members is required, the vote, consent or approval of Members holding a Majority Interest (or, in instances in which there are defaulting Members, non-defaulting Members who hold a majority of the Percentage Interests held by all non-defaulting Members) shall be sufficient to authorize or approve such act; specifically including the right to sell, lease or re-finance the Company's Property.

C.    Other Voting Rights. Besides the rights granted in Sections 4.7A and 4.8A, Members may vote, consent or approve to the extent and on the terms provided in this Agreement in the following Sections:

(i)    Section 4.2 on admission of new Members;

(ii)    Section 5.3B on a change in the purpose of the Company

(iii)    Section 5.3B on reorganization of the Company;

(iv)    Section 5.3B on other limitations on the Manager's authority thereunder however the Members shall only be entitled to remove a Manager in the event such Manager has committed a malfeasance of a material nature relating to the management of the Company;

(v)    Section 5.8 on transactions with the Manager and Affiliates of the Manager except where otherwise expressly provided in Section 5.8;

7

(vi)    Section 5.9A on management fees payable to Manager except where otherwise expressly provided in Section 5.9; and

(vii)    Section 10.1 on dissolving the Company.

Any such vote, consent or approval must be unanimous.

4.8    Meetings of Members.

A.    Date, Time and Place of Meetings of Members; Secretary. Meetings of Members may be held at such date, time and place within the State of California as the Manager may fix from time to time. No annual or regular meetings of Members is required. At any Member's meeting, the Manager shall appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting which shall be placed in the minute book of the Company. Formal meetings of members are not required to take action.

B.    Power to Call Meetings. Unless otherwise prescribed by the Act or by the Articles, meetings of the Members may be called by the Manager, or upon written demand of Members holding more than ten percent (10%) of the Percentage Interests for the purpose of addressing any matters on which the Members may vote.

C.    Notice of Meeting. If a formal meeting is desired, written notice of a meeting of Members shall be sent or otherwise given to each Member in accordance with Section 4.9D not less than ten (10) nor more than sixty (60) days before the date of the meeting. The notice shall specify the place, date and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at this meeting. Upon written request to the Manager by any person entitled to call a meeting of Members, the Manager shall immediately cause notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the person calling the meeting, not less than ten (10) days nor more than sixty (60) days after the receipt of the request. If the notice is not given within twenty (20) days after the receipt of the request, the person entitled to call the meeting may give the notice.

D.    Manner of Giving Notice; Affidavit of Notice. Notice of any meeting of Members shall be given either personally or by first-class mail or telegraphic or other written communication, charges prepaid, addressed to the Member at the address of that Member appearing on the books of the Company or given by the Member to the Company for the purpose of notice. Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by telegram or other means of written communication.

If any notice addressed to a member at the address of that Member appearing on the books of the Company is returned to the Company by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice to the Member at that address, all future notices or reports shall be deemed to have been duly given without further mailing if these shall be available to the Member on written demand for the Member at the principal executive office of the Company for a period of one (1) year from the date of the giving of the notice.

An affidavit of the mailing or other means of giving any notice of any meeting shall be executed by the Manager or any secretary, assistant secretary, or any transfer agent of the Company giving the notice, and shall be filed and maintained in the minute book of the Company.

E.    Validity of Action. Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the notice of meeting or in any written waiver of notice.

8

EXHIBIT "2"
Page 9 of 44

F.    Quorum. The presence in person or by proxy of the holders of a Majority Interest of Profits Interest and Capital Interest shall constitute a quorum at a meeting of Members. The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum (other than adjournment) is approved by at least Members holding a Majority Interest in Profit Interest and in Capital Interest.

G.    Adjourned Meeting; Notice. Any Members meeting, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the Membership Interests represented at that meeting, either in person or by proxy, but in the absence of a quorum, no other business may be transacted at that meeting, except as provided in Section 4.9F. When any meeting of Members is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place are announced at a meeting at which the adjournment is taken, unless a new record date for the adjourned meeting is subsequently fixed, or unless the adjournment is for more than forty-five (45) days from the date set for the original meeting, in which case the Manager shall set a new record date. At any adjourned meeting the Company may transact any business which might have been transacted at the original meeting.

H.    Waiver of Notice or Consent. The actions taken at any meeting of Members however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, who was not present in person or by proxy, signs a written waiver of notice and consents to the holding of the meeting or approves the minutes of the meeting. All such waivers, consents or approvals shall be filed with the Company records or made a part of the minutes of the meeting.

Attendance of a person at a meeting shall constitute a waiver of notice of that meeting, except when the person objects at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened; and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters not included in the notice of the meeting if that objection is expressly made at the meeting. Neither the business to transact nor the purpose of any meeting of Members need be specified in any written waiver of notice except as provided in Section 4.9E.

I.    Action by Written Consent Without a Meeting. Any action that may be taken at a meeting of Members may be taken without a meeting, if a consent in writing setting forth that action so taken, is signed and delivered to the Company within ten (10) days of the record date for that action by Members having not less than the minimum number of votes which would be necessary to authorize taking that action at a meeting at which all Members entitled to vote on such action were present and voted. All such consents shall be filed with the Manager or the secretary, if any, of the Company and shall be maintained in the Company records. The written consent or proxy of any Member may be revoked by a writing signed by such Member and received by the Manager or the secretary, if any, of the written consents containing the number of votes required to authorize the proposed action.

Unless the consents of all Members entitled to vote have been solicited in writing; *(i)* notice of any Member approval of an amendment to the Articles or this Agreement; a dissolution of the Company; or a merger of the Company without a meeting by less than unanimous written consent, shall be given at least ten (10) days before the consummation of the action authorized by such approval; and *(ii)* prompt notice shall be given of the taking of any other action approved by Members without a meeting by less than unanimous written consent, to those Members entitled to vote who have not consented in writing.

J.    Telephonic Participation by Member at Meetings. Members may participate in any Members meeting through the use of any means of conference telephones or similar communications equipment as long as all Members participating can hear one another. A Member so participating is deemed to be present in person at the meeting.

9

EXHIBIT "2"
Page 10 of 44

K.      Record Date.  In order that the Company may determine the Members of record entitled to notices of any meeting or to vote, or entitled to receive any distribution or to exercise any rights in respect of any distribution or to exercise any rights in respect of any other lawful action, the Manager, or Members representing a majority of the Percentage Interests may fix, in advance, a record date, that is not more than sixty (60) days nor less than ten (10) days prior to the date of the meeting and not more than sixty (60) days prior to any other action.  If no record date is fixed:

(i)      The record date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

(ii)     The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

(iii)    The record date for determining Members for any other purpose shall be at the close of business on the day on which the Manager adopt the resolution relating thereto, or the 60th day prior to the date of the other action, whichever is later.

(iv)     The determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless the Manager or the Members who called the meeting fix a new record date for the adjourned meeting, but the Manager or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than forty-five (45) days from the date set for the original meeting.

L.      Proxies.  Every Member entitled to vote for the Manager or on any other matter shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the Member or his attorney in fact and filed with the Manager or secretary, if any, of the Company.  A proxy shall be deemed signed if the Member's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission, electronic transmission or otherwise) by the Member or the Member's attorney in fact.  A proxy may be transmitted by an oral telephone transmission if it is submitted with information from which it may be determined that the proxy was authorized by the Member or the Member's attorney in fact.  A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless (i) revoked by the person executing it, before the vote pursuant to that proxy; by a writing delivered to the Company stating that the proxy is revoked; or by a subsequent proxy executed by, or attendance at the meeting and voting in person by, the person executing the proxy; or (ii) written notice of the death or incapacity of the maker of that proxy is received by the Company before the vote pursuant to that proxy is counted; provided, however, that no proxy shall be valid after the expiration of eleven (11) months from the date of the proxy, unless otherwise provided in the proxy.  The revocability of a proxy which states on its face that it is irrevocable shall be governed by the provisions of Corporations Code Sections 705(e) and 705(f).

4.9     Certificate of Membership Interest.

A.      Certificate.  A Membership Interest may be represented by a certificate of membership.  The exact contents of a certificate of membership may be determined by action of the Manager but shall be issued substantially in conformity with the following requirements: The certificates of membership shall be respectively numbered serially, as they are issued; shall be impressed with the Company seal or a facsimile thereof, if any; and shall be signed by the Manager or officers of the Company.  Each certificate of membership shall state the name of the Company; the fact that the Company is organized under the laws of the State of California; is a limited liability company; the name of the person to whom issued; the date of issue; and the Percentage Interests represented thereby.  A statement of the designations, preferences, qualifications, limitations, restrictions, and special or relative rights of the Membership Interest, if any, shall be set forth in full or summarized on the face or back of the certificates which the Company shall issue, or in lieu thereof, the certificate may set forth that such a statement or summary will be furnished to any holder of a Membership Interest upon request without charge.  Each certificate of membership shall be otherwise in such form as may be determined by the Manager.

10

B.    Cancellation of Certificate.  All certificates of membership surrendered to the Company for transfer shall be cancelled and no new certificates of membership shall be issued in lieu thereof until the former certificates for a like number of Membership Interest shall have been surrendered and cancelled, except as herein provided with respect to lost, stolen, or destroyed certificates.

C.    Replacement of Lost, Stolen or Destroyed Certificate.  Any Member claiming that his, hers or its certificate or membership is lost, stolen or destroyed may make an affidavit or affirmation of that fact and request a new certificate.  Upon the giving of a satisfactory indemnity to the Company as reasonably required by the Manager, a new certificate may be issued of the same tenor and representing the same Percentage Interest of membership as was represented by the certificate alleged to be lost, stolen or destroyed.

**ARTICLE V**
**MANAGEMENT AND CONTROL OF THE COMPANY**

5.1    Management of the Company by the Manager.

A.    Exclusive Management by Manager.  The business, property and affairs of the Company shall be managed exclusively by the Manager.  Except for situations in which the approval of the Members is expressly required by the Articles or this Agreement, the Manager shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company; to make all decisions regarding those matters; and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.  No Member who is not a Manager shall have any authority to act for or to undertake or assume any obligation, debt, duty or responsibility on behalf of the Company.  Where this Agreement specifies an act of the Manager, unless otherwise expressly otherwise provided, it means an act taken by all persons comprising Manager.

B.    Agency Authority of Manager.  Either person comprising Manager, acting independently of the Members, is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts.  All checks, drafts, and other instruments obligating the Company to pay money, may be signed by either person comprising the Manager, acting alone, provided that such obligation is incurred in the ordinary course of managing the Company and/or the Property.  Any and all contracts on behalf of the Company and any obligations which are outside the ordinary course of business of the Company shall require the signature of both persons comprising the Manager.

5.2    Election of Manager.

A.    Number.  The Company shall have two (2) Managers.

B.    Removal.  No Manager may be removed by the vote of the Members except in the case of his malfeasance; or physical or mental incapacity; or gross negligence; or his material breach of any of the items set forth in Section 5.3 of this Agreement.

5.3    Powers of Manager.

A.    Powers of the Manager.  Without limiting the generality of Section 5.1, the Manager shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Corporations Code Section 17003.

11

B.    Limitations On Powers of Manager.  The Manager shall not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the unanimous affirmative vote or unanimous written consent of the Members:

(i)    The merger of the Company with another limited liability company or limited partnership, provided in no event shall a Member be required to become a general partner in a merger with a limited partnership without his express written consent or unless the agreement of merger provides each Member with the dissenter's rights described in the Act.

(ii)    The merger of the Company with a corporation or a general partnership or other Person.

(iii)    The establishment of different classes of Members.

(iv)    An alteration of the primary purpose of the Company as set forth in Section 2.3.

(v)    Transactions between the Company and the Manager or the Manager's Affiliates, or transactions in which the Manager or of any Manager's Affiliates has a material financial interest except to the extent where such transactions do not exceed commercially reasonable market rates.

(vi)    Without limiting subsection (v), the lending of money by the Company to any Manager, Member or officer.

(vii)    Any act which would make it impossible to carry on the ordinary business of the Company.

(viii)    The amendment of this Agreement.

(ix)    The purchase of additional real property by the Company, provided, however, that the Manager shall have the sole right to decide when to sell the real property owned by the Company and upon what terms and conditions.

5.4    Members Have No Managerial Authority.  The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Articles and except as expressly required by the Act.  No Member shall have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, or to render it liable for any purpose.

5.5    Performance of Duties; Liability of Manager.  The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, negligence, reckless or intentional misconduct, or a knowing violation of law by the Manager. The Manager shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Company and shall use them solely for the benefit of the Company.  The Manager shall perform managerial duties in good faith, in a manner reasonably believed to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position of like business experience would use under similar circumstance.  A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Manager of the Company.

In performing managerial duties, the Manager shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, of the following persons or groups unless they have knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that the Manager act in good faith and after reasonable inquiry when the need therefor is indicated by the circumstances:

12

EXHIBIT "2"
Page 13 of 44

(a)    one or more officers, employees or other agents of the Company whom the Manager reasonably believes to be reliable and competent in the matters presented;

(b)    any attorney, independent accountant, or other person as to matters which the Manager reasonably believes to be within such person's professional or expert competence; or

(c)    a committee upon which the Manager does not serve, duly designated in accordance with a provision of the Articles or this Agreement, as to matters within its designated authority, which committee the Manager reasonably believes to merit competence.

5.6    Devotion of Time.  The Manager is not obligated to devote all of his time or business efforts to the affairs of the Company.  The Manager shall devote whatever time, effort and skill as he deems appropriate for the operation of the Company.

5.7    Competing Activities.  The Manager and the officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company.  Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom.  The Manager shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company.  The Manager or any Member shall have the right to hold any investment opportunity or prospective economic advantage for his or her own account or to recommend such opportunity to Persons other than the Company.  The Members acknowledge that the Manager and his or her Affiliates own and/or manage businesses, including businesses that may compete with the Company and for the Manager's time.  The Members hereby waive any and all rights and claims which they may otherwise have against the Manager and officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates as a result of any such activities.

5.8    Transactions Between the Company and the Manager.  Notwithstanding that it may constitute a conflict of interest, the Manager may, and may cause Manager's Affiliates to engage in any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from Persons capable of similarly performing them and in similar transactions between parties operating at arm's length, and provided that the Members having no interest in such transaction (other than their interests as Members) affirmatively vote unanimously or give their unanimous consent in writing to approve the transaction.

A transaction between any of the Manager and/or the Manager's Affiliates, on the one hand, and the Company, on the other hand, shall be conclusively determined to constitute a transaction on terms and conditions, on an overall basis, fair and reasonable to the Company and at least as favorable to the Company as those generally available in a similar transaction between parties operating at arm's length if the Members having no interest in such transaction (other than their interests as Members) affirmatively vote unanimously or consent in writing unanimously to approve the transaction. The Company specifically acknowledges and hires Beitler Commercial Realty Services as leasing and or listing Broker, when necessary to lease or sell the property, at market rates as defined below or some other competent comparable leasing or sales brokerage firm. Further, the Company specifically hires Manager to act as property manager for the Company and its assets at market rates as defined below, provided that Manager shall have the right to have engage a third party management company or an affiliate of Manger to manage the real property.

5.9    Payments to the Manager.  The Manager and Manager's Affiliates shall receive the following payments:

13

A.    Services Performed by Manager. Except as otherwise provided herein, the Company shall not pay the Manager for services rendered to the Company in the reasonable scope of their management duties.

B.    Expenses. The Company shall reimburse the Manager and Manager's Affiliates for the actual cost of goods and materials used for or by the Company. The Company shall also pay or reimburse any of the Manager or Manager's Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company and prepare the Articles and this Agreement.

C.    Property Management Fee. There shall be a four percent (4%) of gross income per month fee for property management to a management company chosen by Manager. Whenever possible, Manager will lease the Property on a Triple Net (NNN) basis and pass through said management fee to the tenants on a monthly basis.

D.    Property Brokerage Fee. There shall be sales commission of four percent (4%) paid to Beitler Commercial Realty Services as a listing Broker upon sale (which shall be spit 50/50 with a procuring Broker if any), and leasing commissions shall be paid to Beitler Commercial Realty Services (or to any other licensed real estate broker selected by Manager) at industry standard rates.

5.10    Act of Manager as Conclusive Evidence of Authority. Any note, mortgage, evidence of indebtedness, contract, certificate, statement, conveyance, or other instrument in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other person, when signed by the Manager, are not invalidated as to the Company by any lack of authority of the Manager in the absence of actual knowledge on the part of the other person that the Manager had no authority to execute the same.

5.11    Reserved.

5.12    Limited Liability. No Manager shall not be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being the Manager.

## ARTICLE VI
## ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

6.1    Allocations of Net Profit and Net Losses.

A.    Net Loss. Net Loss shall be allocated to the Members in proportion to their Percentage Interests.

B.    Net Profit. Net Profit shall be allocated to the Members (i) first, proportionately (based on the amount each Member is required to be allocated pursuant to this clause (i)) until each Member has been allocated a cumulative amount of Net Profit pursuant to this clause (i) equal to the sum of the cumulative amount of Net Loss previously allocated to such Member pursuant to Section 6.1A hereof, plus the cumulative amount of distributions previously made to such Members pursuant to Section 6.5(a) hereof, (ii) thereafter, in proportion to their Percentage Interests.

6.2    Special Allocations.

A.    Minimum Gain Chargeback. Notwithstanding Section 6.1, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is alloeable to the disposition of Company property

14

EXHIBIT "2"
Page 15 of 44

subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 6.2A shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2A. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f). This Section 6.2A is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

      B.    Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt. Notwithstanding Section 6.1 of this Agreement, if there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any Fiscal Year, each Member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 6.2B shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2B. The items to be so allocated shall be determined in accordance with Regulations Section 1 .704-2(i)(4). This Section 6.2B is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1 .704-2(i)(4) and shall be interpreted consistently therewith.

      C.    Nonrecourse Deductions. Notwithstanding Section 6.1, any nonrecourse deductions (as defined in Regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.

      D.    Member Nonrecourse Deductions. Notwithstanding Section 6.1, any Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i).

      E.    Qualified Income Offset. Notwithstanding Section 6.1, if a member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), or any other event creates a deficit balance in such Member's Capital Account (taking into account reductions for the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 6.2E shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article VI so that the net amount of any item so allocated and the income, gain, and losses allocated to each member pursuant to this Article VI to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Article VI if such unexpected adjustments, allocations, or distributions had not occurred.

      6.3    Code Section 704(c) Allocations. Notwithstanding any other provision in this Article VI, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this Section 6.3 are solely for purposes of federal, state and local taxes. As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other tax items or distributions pursuant to any provision of this Agreement.

      6.4    Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest. If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company

15

EXHIBIT "2"
Page 16 of 44

for such Fiscal Year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his, hers or its respective Membership Interest at the close of such day.

However, for the purpose of accounting convenience and simplicity, the Company shall treat a transfer of, or an increase or decrease in, a Membership Interest which occurs at any time during a semi-monthly period (commencing with the semi-monthly period including the date hereof) as having been consummated on the last day of such semi-monthly period, regardless of when during such semi-monthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first fifteen (15) days of any month will be deemed to have been made on the 15th day of the month).

Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Membership Interests as of the date such sale or other disposition occurs.

6.5    Distribution of Assets by the Company.  Subject to applicable law and any limitations contained elsewhere in this Agreement, the Manager may elect from time to time to distribute Distributable Cash to the Members, which distributions shall be in the following order of priority:

A.    Distributions from Operations.

(i)    If such Distributable Net Cash is from Company's operations, to the Members in proportion to their unreturned additional Capital Contribution until each Member has recovered his, her or its additional capital contribution.

(ii)    If such Distributable Net Cash is from Company's operations, to the Members of Class A, for their Preferred Return in Section 3.4.1 herein, in proportion to their Percentage Interest in Company in relation to each other.

(iii)    If such Distributable Net Cash is from Company's operations, to the Members of Class B, for their Preferred Return in Section 3.4.2 herein, in proportion to their Percentage Interest in Company in relation to each other.

(iv)    If such Distributable Net Cash is from Company's operations, to the Members of Class A and B in proportion to their pro rata Membership interest.

B.    Distributions from Sale, Financing or Refinancing of Company Real Property.

(i)    If such Distributable Net Cash is from the sale, financing or refinancing of the Company Property, to the Members in proportion to their unreturned additional Capital Contributions until each Member has recovered his, hers or its Additional Capital Contributions, if any, and then to Members in proportion to their unreturned initial Capital Contributions until each Member has recovered his, her or its initial Capital Contribution; and

(ii)    Thereafter, to the Members in proportion to their percentage interests.

such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual date of distribution.  Neither the Company nor the Manager shall incur any liability for making any distributions under this Section 6.5.

16

The Manager may, in its sole discretion, limit distributions by maintaining a working capital reserve of up to One Hundred Fifty Thousand Dollars ($150,000.00).

     6.6    Form of Distribution. A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members. Except upon a dissolution and the winding up of the Company, no Member may be compelled to accept a distribution of any asset in kind.

     6.7    Restriction on Distributions.

        A.    No distribution shall be made if, after giving effect to the distribution:

        (i)    The Company would not be able to pay its debts as they become due in the usual course of business.

        (ii)    The Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the distribution.

        B.    The Manager may base a determination that a distribution is not prohibited on any of the following:

        (i)    Financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances.

        (ii)    A fair valuation.

        (iii)    Any other method that is reasonable in the circumstances.

Except as provided in Section 17254(e) of the Corporations Code, the effect of a distribution is measured as of the date the distribution is authorized if the payment occurs within one hundred twenty (120) days after the date of authorization, or the date payment is made if it occurs more than one hundred twenty (120) days of the date of authorization.

        C.    A Member or Manager who votes for a distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act if it is established that the Member or Manager did not act in compliance with Section 6.7 B or Section 10.4. Any Member or Manager who is so liable shall be entitled to compel contribution from (i) each other Member or Manager who also is so liable and (ii) each Member for the amount the Member received with knowledge of facts indicating that the distribution was made in violation of this Agreement or the Act.

17

EXHIBIT "2"
Page 18 of 44

6.8    Return of Distributions. Except for distributions made in violation of the Act or this Agreement, no Member or Economic Interest Owner shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company. The amount of any distribution returned to the Company by a Member or Economic Interest Owner or paid by a Member or Economic Interest Owner for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member or Economic Interest Owner.

6.9    Obligations of Members to Report Allocations. The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

## ARTICLE VII
## TRANSFER AND ASSIGNMENT OF INTERESTS

7.1    Transfer and Assignment of Interests. Except as otherwise expressly provide in this Article VII, no Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest except with the prior written consent of other Members having a majority of the Percentage Interests of the other Percentage Interests. Notwithstanding the foregoing, Managers shall have the right to transfer their respective Membership Interests, or any portions thereof, to the other Manager, or to an entity controlled solely by the Manager or both Managers and the consent of the non-Manager Members shall not be required. However, no such transfers between Managers or Manager controlled entities shall be permitted without the consent of the other Members if such transfer converts a Class A Membership to a Class B Membership or vice-versa. Transfers in violation of this Article VII shall only be effective to the extent set forth in Section 7.7. After the consummation of any transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

7.2    Further Restrictions on Transfer of Interests. In addition to other restrictions found in this Agreement, no Member shall transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest: (i) without compliance with the legend described in Section 12.10, and (ii) if the transfer, assignment, sale or exchange would cause the termination of the Company under Section 708(b)(1)(B) of the Code, as determined by the Manager.

7.3    Substitution of Members. A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirements of Sections 7.1 and 7.2 are met; (ii) such Person executes an instrument satisfactory to the Manager accepting and adopting the terms and provisions of this Agreement; and (iii) such person pays any reasonable expenses in connection with his, hers or its admission as a new Member. The admission of a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

7.4    Family and Affiliate Transfers. The Membership Interest of any Member may be transferred subject to compliance with Section 7.2, and without the prior written consent of all Members, as required by Section 7.1, upon

18

consent of the Manager, which shall not be unreasonably withheld, by the Member (i) by inter vivos gift or by testamentary transfer to any spouse, parent, sibling, in-law, child or grandchild of the Member; or to a trust for the benefit of the Member or such spouse, parent, sibling, in-law, child or grandchild of the Member; or (ii) to any Affiliate of the Member; it being agreed that in executing this Agreement, each Member has consented to such transfers, except that any Class B Member's successor shall continue to be a Class B Member, but without any management rights as a Class B Member.

7.5    Effective Date of Permitted Transfers. Any permitted transfer of all or any portion of a Membership Interest shall be effective as of the first day of the month following the date upon which the requirements of Sections 7.1, 7.2 and 7.3 have been met. The Manager shall provide the Members with written notice of such transfer as promptly as possible after the requirements of Sections 7.1, 7.2 and 7.3 have been met. Any transferee of a Membership Interest shall take subject to the restrictions on transfer imposed by this Agreement and subject to allocation of profits and losses; and distributions set forth in Section 6.4.

7.6    Rights of Legal Representatives. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, and/or other legal representative and/or beneficiary or successor may exercise all of the Member's rights for the purpose of settling the Member's estate and/or administering the Member's property, and shall succeed to Member's interest herein, except that any Class B Member's successor shall continue to be a Class B Member, but without any management rights as a Class B Member..

7.7    No Effect to Transfers in Violation of Agreement. Upon any transfer of a Membership Interest in violation of this Article VII, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Economic Interest Owner and thereafter shall only receive the share of one (1) or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the Manager, a transfer in violation of this Article VII would cause the termination of the Company under the Code, in the sole discretion of the Manager, the transfer shall be null and void and the purported transferee shall not become either a Member or an Economic Interest Owner.

Upon and contemporaneously with any transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company for a purchase price of One Hundred Dollars ($100), all remaining rights and interests retained by the Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member.

19

Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who transfers a Membership Interest in violation of this Article VII is not unreasonable under the circumstances existing as of the date hereof

7.8    Right of First Refusal. Each time a Member proposes to transfer, assign, convey, *sell,* encumber or in any way alienate all or any part of his, hers or its Membership Interest (or as required by operation of law or other involuntary transfer to do so) other than pursuant to Section 7.1 or 7.4, such Member shall first offer such Membership Interest to the Company and the non-transferring Members in accordance with the following provisions:

A.    Such Member shall deliver a written notice to the Company and the other Members stating (i) such Member's bona fide intention to transfer such Membership Interest; (ii) the name and address of the proposed transferee; (iii) the Membership Interest to be transferred; and (iv) the purchase price in terms of payment for which the Member proposes to transfer such Membership Interest.

B.    Within thirty (30) days after receipt of the notice described in Section 7.8A, each non-transferring Member shall notify the Manager in writing of his, hers or its desire to purchase a portion of the Membership Interest being so transferred. The failure of any Member to submit a notice within the applicable period shall constitute an election on the part of that Member not to purchase any of the Membership Interest which may be so transferred. Each Member so electing to purchase shall be entitled to purchase a portion of such Membership Interest in the same proportion that the Percentage Interest of such Member bears to the aggregate of the Percentage Interests of all of the Members electing to so purchase the Membership Interest being transferred. In the event any Member elects to purchase none or less than all of his, hers or its pro rata share of such Membership Interest, then the other Members can elect to purchase more than their pro rata share. If such Members fail to purchase the entire Membership Interest being transferred, the Company may purchase any remaining share of such Membership Interest.

C.    Within sixty (60) days after receipt of the notice described in Section 7.8A, the Company and the Members electing to purchase such Membership Interest shall have the first right to purchase or obtain such Membership Interest upon the price and terms of payment designated in such notice. If such notice provides for the payment of non-cash consideration, the Company and such purchasing Members each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Manager.

D.    If the Company or the other Members elect not to purchase or obtain all of the Membership Interest designated in such notice, then the transferring Member may transfer the Membership Interest described in the notice to the proposed transferee, providing such transfer (i) is completed with thirty (30) days after the expiration of the right of the Company and the other Members to purchase such Membership Interest, (ii) is made on terms no less favorable to the transferring Member than as designated in the notice, and (iii) the requirements of Sections 7.1, 7.2 and 7.3 relating to unanimous consent of Members, securities and tax requirements hereof are met. If such Membership Interest is not so transferred, the transferring Member must give notice in accordance with this Section prior to any other or subsequent transfer of such Membership Interest.

7.8.1    Right of First Refusal Among Class of Membership. Notwithstanding anything to the contrary herein, any proposal by a Member to transfer, assign, convey, sell, encumber or in any way alienate all or part of his, hers

20

41

or its Membership Interest (Selling Member), pursuant to Section 7.8, shall first proceed to commence the Right of First Refusal procedure provided in Section 7 among Members of the Selling Members class before proceeding with the Right of First Refusal to the other Members of Company not in the Selling Member's class. For example, a Member of Class A offering its Membership Interest shall first operate the Right of First Refusal among Members of Class A, and subject to whether any Membership Interest remains available, then to Members of Class B.

7.9     Effective Date of Permitted Transfers of an Interest. Any permitted transfer of all or any portion of an Interest in Company will take effect on the first (1st) day of the month following receipt by the Members of written notice of transfer. Any transferee of an Interest in the Company shall take subject to the restrictions on transfer imposed by the Agreement.

7.10     Consequences of Pledge or Grant of Security Interest. The pledge or granting of a security interest, lien or other encumbrance in or against any or all of the Interest of a Member shall not cause the Member to cease to be a Member or to grant anyone else the power to exercise any rights or powers of a Member.

## ARTICLE VIII
## CONSEQUENCES OF, DISSOLUTION, OR WITHDRAWAL OF MEMBER (S) OR HEIRS

8.1     Purchase of Member's Interest. Upon the occurrence of any Dissolution Event and the unanimous consent by the remaining Members (Remaining Members) to continue the business of Company, and if applicable, the desire of the member or its heirs to the other Members (the Remaining Members) shall have an option to purchase such Membership Interest. Within ninety (90) days of the Unanimous Consent or within ninety (90) days of the receipt of the rightful demand for the return of its Capital Account by the Former Member or by such Former Member's trustee or heirs, or within in ninety (90) days of the inheritance or transfer by operation of law to a person, the Remaining Members shall notify the Manager in writing of their desires to purchase a portion of the Former Member's Interest.

8.2     Withdrawal. Notwithstanding Section 8.1, only upon the withdrawal by a Member in accordance with Section 4.3, such Member shall be treated as a Former Member, and the Company and/or the Remaining Members shall have the option to purchase, and the Former Member shall be obligated to sell, the Former Member's Interest as provided in this Article VIII.

8.3     Purchase Price. The purchase price for the Former Member's Interest shall be the fair market value of the Former Member's Interest determined by three (3) independent appraisers, one (1) selected by the Former Member or such Former Member's legal representative, one (1) selected by the Company, and one (1) selected by the two (2) appraisers so named. The fair market value of the Former Member's Interest shall be the average of the two (2) appraisals closest in amount to each other. In all other events, the Former Member shall pay one-half (50%) of such expense of the appraisers and the Remaining Members shall pay one-half (50%) of such expense and the purchase price shall be the fair market value determined by appraisal reduced by six percent (6%) representing a reasonable and customary brokerage commission which would be paid to a broker in an arms length role and escrow closing costs. Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

21

8.4   <u>Notice of Intent to Purchase</u>. Within thirty (30) days after the Manager has notified the Remaining Members as to the purchase price of the Former Member's Interest determined in accordance with Section 8.3, each Remaining Member shall notify the Manager in writing of his, hers or its desire to purchase a portion of the Former Member's Interest. The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest. Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Members Interest in the same proportion that the Percentage Interest of the Remaining Member bears to the aggregate of the Percentage Interests of all of the Remaining Members electing to purchase the Former Member's Interest.

8.5   <u>Election to Purchase Less Than All of An Interest</u>. In the event any Remaining Member elects to purchase none or less than all of its pro rata part of the Former Member's Interest, then, at its election, those Remaining Members can elect to purchase more than their pro rata part, i.e., the proportion that the Percentage Interest of the Former Member bears to the aggregate of the Percentage Interests of all Members and the Former Member. If the Remaining Members fail to purchase the entire interest of the Former Member, Company may elect to purchase the former Member's Interest unpurchased portion. If none of the above elects to purchase, the same shall pass by operation of law to any assignee or shall remain in the hands of the Former Member, subject to any right of the holder of such interest to demand payment therefore according to California law. Notwithstanding any provision of the Agreement to the contrary, the remaining Members may mutually agree to an allocation of the Former Member's Interest to be purchased by each of them.

8.6   <u>Payment of Purchase Price</u>. The purchase price shall be paid by the Company or the Remaining Members, as the case may be, either: (i) in equal monthly installments of principal together with interest amortized over a thirty (30) year period, commencing to accrue from the date of closing, at the then current Applicable Federal Rate (the AFR) under Section 1274(d) of the Internal Revenue Code (IRC) for the month in which the first payment is made (or a rate per annum equal to what the AFR would be for such month under IRC Section 1274(d) of the Code if the AFR is no longer published) to fully amortize such purchase price over such ten (10) payments with the first payment being due and payable 60 days after the determination of the fair market value of the Former Member's Interest in the Company, or (ii) within 60 days after the determination of the fair market value of the Former Member's Interest in the Company, as the Company or the Remaining Members, as the case may be, may elect in their sole discretion.

8.7   <u>Closing of Purchase of Former Member's Interest</u>. The closing for the sale of a Former Member's Interest pursuant to this Article VIII shall be held at 10:00 a.m. at the principal office of the Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Former Member or such Former Member's legal representative shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest. The Former Member or such Former Member's legal representative, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

22

EXHIBIT "2"
Page 23 of 44

8.8    Purchase Terms Varied by Agreement. Nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

## ARTICLE IX
## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

9.1    Books and Records. The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office in California all of the following:

A.    A current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner;

B.    A current list of the full name and business or residence address of each Manager.

C.    A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed.

D.    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

E.    A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

F.    Copies of the financial statements of the Company, if any, for the six (6) most recent Fiscal Years; and

G.    The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) Fiscal Years.

9.2    Delivery to Members and Inspection.

A.    Upon the request of any Member or Economic Interest Owner for purposes reasonably related to the interest of that Person as a Member or Economic Interest Owner, the Manager shall promptly deliver to the requesting Member or Economic Interest Owner, at the expense of the Company, a copy of the information required to be maintained by Sections 9.1A, B and D, and a copy of this Agreement.

23

B.      Each Member, Manager and Economic Interest Owner has the right, upon reasonable request for purposes reasonably related to the interest of the Person as Member, Manager or Economic Interest Owner, to:

(i)      inspect and copy during normal business hours any of the Company records described in Section 9.1A through G; and

(ii)      obtain from the Manager, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year, as well as any and all Company financial records.

C.      Members representing at least twenty-five percent (25%) of the Percentage Interests, or three (3) or more Members, make a written request to the Manager for an income statement of the Company for the initial three (3) month, six (6) month, or nine (9) month period of the current Fiscal Year ended more than thirty (30) days prior to the date of the request, and a balance sheet of the Company as of the end of that period. Such statement shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Manager that the statement was prepared without audit from the books and records of the Company. If so requested, the statement shall be delivered or mailed to the Members within thirty (30) days thereafter.

Any Member or a Member's designated representative has the right to inspect the books of the Company at reasonable times upon forty-eight (48) hours written notice to the Manager, but no more than once each calendar quarter for any one (1) Member.

D.      Any request, inspection or copying by a Member or Economic Interest Owner under this Section 9.2 may be made by that Person or that Person's agent or attorney.

E.      The Manager shall promptly furnish to a Member a copy of any amendment to the Articles or this Agreement executed by the Manager pursuant to a power of attorney from the Member.

F.      The Manager shall promptly furnish to a Member written notice of any action concerning the Company which is likely to have a substantial impact upon any of the Members.

9.3      Quarterly Statements and Reports.

A.      Upon request, the Manager shall cause quarterly reports to be sent to each of the Members no later than thirty (30) days after the close of each calendar quarter. The report shall contain a balance sheet as of the end of the calendar quarter and an income statement and statement of changes in financial position for the calendar quarter. Such financial statements shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Manager that the financial statements were prepared without audit from the books and records of the Company.

B.      The Manager shall cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Members' and Economic Interest Owners' federal and state income tax returns. The Manager shall send or cause to be sent to each Member or Economic Interest Owner within ninety (90) days after the end

24

45

of each taxable year such information as is necessary to complete federal and state income tax or information returns, and, if the Company has thirty-five *(35)* or fewer Members, a copy of the Company's federal, state, and local income tax or information returns for that year.

C.    The Manager shall cause to be filed at least annually with the California Secretary of State the statement required under California Corporations Code § 17060.

9.4    Financial and Other Information. The Manager shall provide such financial and other information relating to the Company or any other Person in which the Company owns, directly or indirectly, an equity interest, as a Member may reasonably request. The Manager shall distribute to the Members, promptly after the preparation or receipt thereof by the Manager, any financial or other information relating to any Person in which the Company owns, directly or indirectly, an equity interest, including any filings by such Person under the Securities Exchange Act of 1934, as amended, that is received by the Company with respect to any equity interest of the Company in such Person.

9.5    Filings. The Manager, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Manager, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Articles and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If the Manager is required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or refuses to do so, any other Manager or Member may prepare, execute and file that document with the California Secretary of State.

9.6    Bank Accounts. The Manager shall maintain the funds of the Company in one (1) or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

9.7    Accounting Decisions and Reliance on Others. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Manager. The Manager may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

9.8    Tax Matters for the Company Handled by Manager and Tax Matters Partner. The Manager shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members. The Tax Matters Partner, as defined in Code Section 6231, shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith. The Tax Matters Partner shall oversee the Company tax affairs in the overall best interests of the Company. If for any reason the Tax Matters Partner can no longer serve in that capacity or ceases to be a Member or Manager, as the case may be, Members holding a Majority Interest may designate another to be Tax Matters Partner.

9.9    Choice of Company's Accountant. The Company's Accountant shall be selected by the Manager.

25

## ARTICLE X
### DISSOLUTION AND WINDING UP

10.1    <u>Dissolution</u>. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first (1st) to occur of the following:

A.    Upon the happening of any event of dissolution specified in the Articles;

B.    Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the Corporations Code;

C.    The occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Section 8.1 to continue the business of the Company within ninety (90) days after the occurrence of such event or the failure of the Company or the Remaining Members to purchase the Former Member's Interest as provided in Section 8.2; or

D.    The sale of all or substantially all of the assets of Company.

10.2    <u>Certificate of Dissolution</u>. As soon as possible following the occurrence of any of the events specified in Section 10.1, the Manager who has not wrongfully dissolved the Company or, if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Certificate as required by the Act. Upon the filing by the Certificate of Dissolution, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence continues until the certificate of cancellation of articles of organization Dissolution have been filed with the Secretary of State or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

10.3    <u>Winding Up</u>. Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Manager who has not wrongfully dissolved the Company or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section *10.5*. The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Manager(s) or Members winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

10.4    <u>Distributions in Kind</u>. Any non-cash asset distributed to one (1) or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value. Such Net Profit or Net Loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by the

26

EXHIBIT "2"
Page 27 of 44

Manager or by the Members or, if any Member objects, by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by the Manager or liquidating trustee and approved by the Members.

10.5.    Order of Payment of Liabilities Upon Dissolution.

A.    The distribution of payments of the Company in the process of winding-up shall be made in the following order: (i) All known debts and liabilities of the Company, excluding debts and liabilities to Members who are creditors of the Company; (ii) All known debts and liabilities of the Company owed to Members who are creditors of the Company; (iii) The remaining assets shall be distributed to the Members in accordance with their positive Capital Account balances, after taking into account income and loss allocations and distributions (other than pursuant to Section 10.5A) for the Company's taxable year during which liquidation occurs.

Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

B.    The payment of a debt or liability, whether or not the whereabouts of the creditor is known, has been adequately provided for if:

(i)    Payment thereof has been assumed or guaranteed in good faith by one (1) or more financially responsible persons or by the United States government or any agency thereof; and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Members or Manager to be adequate at the time of any distribution of the assets pursuant to this Section.

(ii)    The amount of the debt or liability has been deposited as provided in Section 2008 of the Corporations Code.

This Section 10.5B shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

10.6    Compliance with Regulations. All payments to the Members upon the winding up and dissolution of Company shall be strictly in accordance with the positive Capital Account balance limitation of Regulations Section 1.704-1(b)(2)(ii)(b)(2).

10.7    Limitations on Payments Made in Dissolution. Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of Company for the return of his, hers or its positive Capital Account balance and shall have no recourse for his, hers or its Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Manager or any other Member except as provided in Article XI.

10.8    Certificate of Cancellation. The Manager or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a certificate of cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

27

EXHIBIT "2"
Page 28 of 44

10.9    No Action for Dissolution. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action which directly causes a Dissolution Event. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 10.1. This Agreement has been drawn carefully to provide fair treatment to all parties and equitable payment in liquidation of the Economic Interests. Accordingly, except where the Manager has failed to liquidate the Company as required by this Article X, each Member hereby waives and renounces his, hers or its right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles or this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member. Damages for breach of this Section 10.9 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

## ARTICLE XI
## INDEMNIFICATION AND INSURANCE

11.1    Indemnification of Agents. The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or complete action, suit or proceeding by reason of the fact that he, she or it is or was a member, Manager, officer, employee or other agent of the Company or that, being or having been such a Member, Manager, officer, employee or agent, he, she or it is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability Company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an ⬚gent), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit. The Manager shall be authorized, on behalf of the Company, to enter into indemnity agreements from time to time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Manager deems appropriate in the Manager's business judgment.

11.2    Insurance. The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 11.1 or under applicable law.

## ARTICLE XII
## INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Manager, the other Members, and the Company as follows:

12.1    Pre-existing Relationship or Experience. (i) He, she or it has a preexisting personal or business relationship with the Company or one (1) or more of its officer, Manager or control persons or (ii) by reason of his, hers or its business or financial experience, or by reason of the business or financial experience of his, hers or its financial

28

EXHIBIT "2"
Page 29 of 44

advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he, she or it is capable of evaluating the risks and merits of an investment in the Membership Interest and of protecting his, hers or its own interests in connection with this investment.

12.2    No Advertising.  He, she or it has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

12.3    Investment Intent.  He, she or it is acquiring the Membership Interest for investment purposes for his, hers or its own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest. No other person will have any direct or indirect beneficial interest in or right to the Membership Interest.

12.4    Purpose of Entity.  If the Member is a corporation, partnership, limited liability company, trust, or other entity, it was not organized for the specific purpose of acquiring the Membership Interest.

12.5    Economic Risk; Consulted with Advisor; Speculative Nature.  He, she or it is financially able to bear the economic risk of an investment in the Membership Interest, including the total loss thereof.  In acquiring a Membership Interest, he, she or it has consulted with and has been guided by his own attorney, accountant or other personal investment or financial advisor with respect to and concerning the merits, risk and advisability of the purchase of the Membership Interest subscribed for herein or the undersigned has such knowledge and experience in financial, investment and business matters that he is capable of evaluating the merits, risk and advisability of an investment in the Membership Interest without the assistance of such an advisor. Further, he, she or it recognizes the speculative nature of the investment in the Membership Interest, including the fact that the Property being purchased by the Company is an empty building, with asbestos, and in need of millions of dollars in improvements.

12.6    No Registration of Membership Interest.  He, she or it acknowledges that the Membership Interest has not been registered under the Securities Act of 1933, as amended (the Securities Act), or qualified under the California Corporate Securities Law of 1968, as amended, or any other applicable blue sky laws in reliance, in part, on his, hers or its representations, warranties, and agreements herein.

12.7    Membership Interest in Restricted Security.  He, she or it understands that the Membership Interest is a restricted security under the Securities Act in that the Membership Interest will be acquired from the Company in a transaction not involving a public offering, and that the Membership Interest may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise the Membership Interest must be held indefinitely. In this connection, he, she or it understands the resale limitations imposed by the Securities Act and is familiar with SEC Rule 144, as presently in effect, and the conditions which must be met in order for the Rule to be available for resale of restricted securities, including the requirement that the securities must be held for at least two (2) years after purchase thereof from the Company prior to resale (three (3) years in the absence of publicly available information about the Company) and the condition that there be available to the public current information about the Company under certain circumstances. He, she or it understands that the Company has not made such information available to the public and has no present plans to do so.

29

12.8    No Obligation to Register. He, she or it represents, warrants, and agrees that the Company and the Manager is under no obligation to register or qualify the Membership Interest under the Securities Act or under any state securities law, or to assist him or it in complying with any exemption from registration and qualification.

12.9    No Disposition in Violation of Law. Without limiting the representations set forth above, and without limiting Article VII of this Agreement, he, she or it will not make any disposition of all or any part of the Membership Interest which will result in the violation by him or it or by the Company of the Securities Act, the California Corporate Securities Law of 1968, or any other applicable securities laws. Without limiting the foregoing, he, she or it agrees not to make any disposition of all or any part of the Membership Interest unless and until:

A.    There is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement and any applicable requirements of state securities laws; or

B.    (i) He, she or it has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (ii) if reasonably requested by the Manager, he, she or it has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

C.    In the case of any disposition of all or any part of the Membership Interest pursuant to SEC Rule 144, in addition to the matters set forth in Section 12.11B, he or she shall promptly forward to the Company a copy of any Form 144 filed with the SEC with respect to such disposition and a letter from the executing broker satisfactory to the Company evidencing compliance with SEC Rule 144. If SEC Rule 144 is amended or if the SEC's interpretations thereof in effect at the time of any such disposition have changed from its present interpretations thereof, he, she or it shall provide the Company with such additional documents as the Manager may reasonably require.

12.10    Legends. He, she or it understands that the certificates (if any) evidencing the Membership Interest may bear one (1) or all of the following legends:

A.    THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY. SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS WHICH ARE SET FORTH HEREIN.

B.    Any legend required by applicable state securities law.

12.11    Investment Risk. He, she or it acknowledges that the Membership Interest is a speculative investment which involves a substantial degree of risk of loss by him, her or it of his, her or its entire investment in the Company,

30

51

that he, she or it understands and takes full cognizance of the risk factors related to the purchase of the Membership Interest, and that the Company is newly organized and has no financial or operating history. Furthermore, the Property has asbestos, is vacant and earning no income and is in need of millions of dollars in improvements.

12.12    Investment Experience. He, she or it is an experienced investor in unregistered and restricted securities of limited liability companies or limited partnerships.

12.13    Restrictions on Transferability. He, she or it acknowledges that there are substantial restrictions on the transferability of the Membership Interest pursuant to this Agreement, that there is no public market for the Membership Interest and none is expected to develop, and that, accordingly, it may not be possible for him, her or it to liquidate his, hers or its investment in the Company.

12.14    Information Reviewed. He, she or it has received and reviewed all information he, she or it considers necessary or appropriate for deciding whether to purchase the Membership Interest. He, she or it has had an opportunity to ask questions and receive answers from the Company and its officers, Manager and employees regarding the terms and conditions of purchase of the Membership Interest and regarding the business, financial affairs, and other aspects of the Company and has further had the opportunity to obtain all information (to the extent the Company possesses or can acquire such information without unreasonable effort of expense) which he, she or it deems necessary to evaluate the investment and to verify the accuracy of information otherwise provided to him, her or it.

12.15    No Representations by Company. Neither any Manager, any agent or employee of the Company or of any of the Manager, or any other Person has at any time expressly or implicitly represented, guaranteed, or warranted to him, her or it that he, she or it may freely transfer the Membership Interest, that a percentage of profit and/or amount or type of consideration will be realized as a result of an investment in the Membership Interest, that past performance or experience on the part of the Manager or Manager's Affiliates or any other person in any way indicates the predictable results of the ownership of the Membership Interest or of the overall Company business, that any cash distributions from Company operations or otherwise will be made to the Members by any specific date or will be made at all, or that any specific tax benefits will accrue as a result of an investment in the Company.

12.15.1  Neither the Company nor any Manager, nor any agent or representative of the Company or any of the officers, directors, agents, Members or affiliates of either of them, has made any representations or warranties of any kind to induce the purchase of a Membership Interest in Company or to enter into this Agreement.

12.15.2  Any statements, brochures, information, data, and figures describing or relating in any way to the investment are based upon information obtained by the Company from sources which it deems reliable, but are not made or intended as representations, warranties, guarantees, promises or inducements by the Company.

12.15.3  Any projected or estimated figures of income, expense, depreciation and expenses of operation are estimates and projections only and are not warranted, represented, or guaranteed.

12.15.4  For acquiring a Membership Interest in Company, he she or it has been afforded the opportunity to ask questions and to receive answers concerning the Company's financial condition, business, assets,

31

EXHIBIT "2"
Page 32 of 44

prospects, liabilities and the terms and conditions of this Agreement, and that the Manager and any agents or representatives of Company have answered all such questions to the satisfaction of the undersigned.

        12.15.5 The Company is not liable or bound in any manner by statements, representations or information, if any, pertaining to the income or operation of, or by any matter affecting or relating to the investment, or by any information or data furnished by any person unless specifically set forth in this Agreement.

        12.15.6 In acquiring their Membership Interest, each Member has been provided a projection of cash flow based on the expected amortization of the loan to be obtained by Company. Each Member acknowledges and understands that during the years set forth in the projection, it is anticipated that the Company will not be able to issue to Class A Members the full eight percent (8%) preferred return described in Section 3.4.1 hereof. Furthermore, the Members acknowledge that the projection is not an assurance or guaranty with respect to a return on each Member's initial contribution.

      12.16   Consultation with Attorney. He, she or it has been advised to consult with his, hers or its own attorney regarding all legal matters concerning an investment in the Company and the tax consequences of participating in the Company, and has done so, to the extent he, she or it considers necessary.

      12.17   Tax Consequences. He, she or it acknowledges that the tax consequences to him, her or it of investing in the Company will depend on his, hers or its particular circumstances, and neither the Company, the Manager, the Members, nor the partners, shareholders, members, managers, agents, officers, directors, employees, Affiliates, or consultants of any of them will be responsible or liable for the tax consequences to him, her or it of an investment in the Company. He, she or it will look solely to, and rely upon, his, hers or its own advisers with respect to the tax consequences of this investment.

      12.18   No Assurance of Tax Benefits. He, she or it acknowledges that there can be no assurance that the Code or the Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Company and the members of some or all of the tax benefits they might now receive, nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service.

      12.19   Indemnity. Each Member shall indemnify and hold harmless the Company, each and every Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, agents, attorneys, registered representatives, and control persons of any such entity who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by him or it including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the Company, each and every Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, attorneys, accountants, agents, registered representatives, and control persons of any such Person (including attorneys' fees, judgments, fines, and amounts paid in settlement, payable as incurred) incurred by such Person in connection with such action, suit, proceeding, or the like.

32

ARTICLE XIII

MISCELLANEOUS

13.1    Counsel to the Company.  Counsel to the Company may also be counsel to any Manager or any Affiliate of a Manager. The Manager may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction (Rules). The Managers shall mutually select a law firm as legal counsel to the Company. Each Member acknowledges that Company Counsel does not represent any Member in the absence of a clear and explicit agreement to such effect between the Member and Company Counsel, and that in the absence of any such agreement Company Counsel shall owe no duties directly to a Member. In the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and a Manager (or Affiliate of a Manager) that Company Counsel represents, on the other hand, then each Member agrees that Company Counsel may represent either the Company or such Manager (or his, hers or its Affiliate), or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

13.2    Complete Agreement.  This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members and Manager with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and Manager or any of them. No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or Manager or have any force or effect whatsoever. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

13.3    Binding Effect.  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

13.4    Parties in Interest.  Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and Manager and his respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

13.5    Pronouns; Statutory References.  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference to the Code, the Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

13.6    Headings.  All headings are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

33

13.7    Interpretation. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his, hers or its counsel.

13.8    References to this Agreement. Numbered or lettered articles, section and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

13.9    Jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under, or in connection with this Agreement or the transactions contemplated by this Agreement, provided such claim is not required to be arbitrated pursuant to Section 13.10. Each Member further agrees that personal jurisdiction over him or it may be effected by service of process by registered or certified mail addressed as provided in Section 13.14 of this Agreement, and that when so made shall be as if served upon him or it personally with the State of California.

13.10    Disputed Matters. Except as otherwise provided in this Agreement, any controversy or dispute arising out of this Agreement, the interpretation of any of the provisions hereof, or the action or inaction of any Member or Manager hereunder shall be submitted to arbitration in Los Angeles, California before the American Arbitration Association under the real estate arbitration rules then obtaining of the American Arbitration Association. Any award or decision obtained from any such arbitration proceeding shall be final and binding on the parties, and judgment upon any award thus obtained may be entered in any court having jurisdiction thereof. No action at law or in equity based upon any claim arising out of or related to this Agreement shall be instituted in any court by a Member except (a) an action to compel arbitration pursuant to this Section 13.10 or (b) an action to enforce an award obtained in an arbitration proceeding in accordance with this Section 13.10.

13.11    Exhibits. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

13.12    Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

13.13    Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

13.14    Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member or Manager at the address specified in Exhibit A hereto. Any party may, at any time by giving five (5) days prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

13.15    Amendments. All amendments to this Agreement will be in writing and signed by all of the Members.

34

13.16    Reliance on Authority of Person Signing Agreement. If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

13.17    No Interest in Company Property; Waiver of Action for Partition. No Member or Economic Interest Owner has any interest in specific property of the Company. Without limiting the foregoing, each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that he, she or it may have to maintain any action for partition with respect to the property of the Company.

13.18    Multiple Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

13.19    Attorney Fees. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses.

13.20    Time is of the Essence. All dates and times in this Agreement are of the essence.

13.21    Remedies Cumulative. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

13.22    Special Power of Attorney.

A.    Attorney in Fact. Each member grants the Manager a special power of attorney irrevocably making, constituting, and appointing the Manager as the Member's attorney in fact, with all power and authority to act in the Member's name and on the Member's behalf to execute, acknowledge and deliver and swear to in the execution, acknowledgment, delivery and filing of the following documents:

(i)    Promissory notes to be delivered pursuant to Section 3.5;

(ii)    Assignments of certificates of membership interest or other documents of transfer to be delivered pursuant to Section 3.5 or in connection with the purchase of a Membership Interest pursuant to Section 3.5, Section 7.7 or Article VIII;

(iii)    Any other instrument or document that may be reasonably required by the Manager in connection with any of the foregoing or to reflect any reduction in the Member's Capital Account or Percentage Interest pursuant to Section 3.5; and

35

(iv)    Any consent to the representation of the Company by counsel selected by the Manager as described in Section 13.1.

B.    Irrevocable Power.  The special power granted in Section 13.22A: (i) is irrevocable; (ii) is coupled with an interest; and (iii) shall survive a Member's death, incapacity or dissolution.

C.    Signatures.  The Manager may exercise the special power of attorney granted in Section 13.22A by a facsimile signature of the Manager or one of Manager's officers.

13.23    No Third Party Beneficiary.  The Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of the Agreement as a third party beneficiary or otherwise.

13.24    Not for Benefit of Creditors.  The provisions of the Agreement are intended only for the regulation of relations among Members and Company.  The Agreement is not intended for the benefit of a creditor who is not a Member and does not grant any rights to or confer any benefits on any creditor who is not a Member or any other person who is not a Member, a Manager, or an officer.

13.25    Reserved.

13.26    Rights of Judgment Creditor of Member.  On application to a court of competent jurisdiction by a judgment creditor of a Member, the court may charge the Member's interest with payment of the unsatisfied amount of the judgment with interest.  To the extent so charged the judgment creditor has only the rights of an assignee of the Member's interest.  This Paragraph does not deprive any Member of the benefit of any exemption applicable to his interest.

13.27    Legal Representative or Successor of a Member.  If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage his, hers or its person or property, the executor, administrator, guardian, conservator or other legal representative may exercise all rights of the Member in the purpose of settling his, hers or its estate or administering his, hers or its property.

13.28    Number of Members.  The Company shall at all times have at least two (2) members.

13.29    No Responsibility for Pre-Formation Commitments.  In the event that any Member (or any of such Member's shareholders, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that related to or otherwise affects Company (other than for the existing loan with First Regional Bank, costs of rezoning the property as a medical usage, and real costs of operating the building prior to this new Agreement), neither Company nor any other Member shall have any liability or responsibility for or with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by Company pursuant to a written instrument signed by the Manager. Furthermore, neither Company nor any Member shall be responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or any of such Member's shareholders or Affiliates).  Each Member is aware of, agrees to and acknowledges that transaction fees, acquisition fees and leasing commissions may be paid in the acquisition

36

EXHIBIT "2"
Page 37 of 44

of the property or leases, the majority of which will be paid to Members of the Company. All Members agree to, approve and acknowledge that Company is placing a construction/permanent loan ("Loan") in the approximate amount of at least Four Million Seven Hundred Thousand Dollars ($4,700000.00) on the Property at time of closing on the Property.

     13.30   Cooperation in Tax Deferred Exchange. The Company has been formed, principally, to invest in real property. If the Company shall decide to sell the Project, then the Members shall cooperate with each other, in good faith, to facilitate any Member wishing to do a tax-deferred exchange with respect to such Member's beneficial interest in the Project, in lieu of such Member receiving his pro rata share of the net sales proceeds from any such sale. Such cooperation shall include, without limitation, the Company distributing such Member's pro rata beneficial interest in the Project to such Member, for such Member to hold as a tenant in common with the Company for a period of not less than 90 days (or such lesser number of days as the exchanging Member shall request) prior to the consummation of any such sale. The Member wishing to effectuate such a tax-deferred exchange shall bear all additional costs and expenses incurred in connection with effectuating the same.

EXHIBIT "2"
Page 38 of 44

IN WITNESS WHEREOF, all of the Members of OCEAN VIEW MEDICAL INVESTORS, LLC, A California limited liability company, have executed this Agreement, effective as of the date written above.

MEMBERS:

X _____
JERRY BEITLER

X _____
JOHN BRAL

MERLE S. ROBBOY, MD AND CROQETTE
ROBBOY JOINT TENANT

X _____
DAD? LLC

_____
Richard Kevin Quick And Carol Lynne Quick
Joint Tenant

38

59

IN WITNESS WHEREOF, all of the Members of OCEAN VIEW MEDICAL INVESTORS, LLC, A California limited liability company, have executed this Agreement, effective as of the date written above.

MEMBERS:

| | |
|---|---|
| _____ | _____ |
| Barry Beitler | John Bral |
| | |
| _____ | Merle S. Robboy, MD. And Geogette Robboy |
| TM Kalra | Joint Tenant |
| | |
| _____ | _____ |
| BAB 8 LLC | Richard Kevin Quick And Crista Lynne Quick |
| | Joint Tenant |
| | |
| _____ | _____ |
| Kathleen Huntsman | Ryan Huntsman |
| | |
| _____ | _____ |
| Joe C. Bral | Michael Meisenbach |
| | |
| Michael R. Schafer | |

38

p.3                                                                949.752.2583    Nov 10 06 11:25a

EXHIBIT "2"
Page 40 of 44

IN WITNESS WHEREOF, all of the Members of OCEAN VIEW MEDICAL INVESTORS, LLC, A California limited liability company, have executed this Agreement, effective as of the date written above.

MEMBERS:

_____
Barry Beitler

_____
John Bral

_____
TM Kalra

_____
Merla S. Robboy, MD and Georgette Robboy
Joint Tenants

_____
BAB II LLC

_____
Richard Kevin Quick And Crista Lynne Quick
Joint Tenant

_____
Kathleen Huntsman

_____
Ryan Huntsman

_____
Joe C. Bral

_____
Michael Meizenbach

_____
Michael R. Schafer

_____
Resource Services LTD Profit Sharing Plan

38



IN WITNESS WHEREOF, all of the Members of OCEAN VIEW MEDICAL INVESTORS, LLC, A California limited liability company, have executed this Agreement, effective as of the date written above.

MEMBERS:

_____                    _____
Barry Beitler                                John Bral

_____                    _____
TM Kalra                                     Merle S. Robboy, MD and Georgette Robboy
                                             Joint Tenants

_____                    Richard Kevin Quick And Crista Lynne Quick
BAB 8 LLC                                     Joint Tenant

_____                    _____
Kathleen Huntsman                            Ryan Huntsman

                                             _____
_____                    Michael Meisenbach
Joe C. Bral

37

62

EXHIBIT "A - 1"

Class "B" Investors

| | |
|---|---|
| Barry Beitler | 10 % |
| John Bral | 10 % |
| Total Class B | 20 % |

39

EXHIBIT "2"
Page 43 of 44

EXHIBIT "A - 2"

Class "A" Investors and Capital Contributions

| Member | Address | Capital Percentage | Capital Contributed |
|---|---|---|---|
| Barry Beitler and John Bral Split 50/50 | 825 South Barrington Ave. Los Angeles, CA  90049 | 43.0058% | $620,000.00 |
| Merle S. Robboy, MD. And Geogette Robboy Joint Tenant | 1119 Sunflower Avenue Costa Mesa 92626 | 3.4682% | $50,000.00 |
| BAB 8 LLC | 825 South Barrington Ave. Los Angeles, CA  90049 | 20% | $350,000.00 |
| Richard Kevin Quick And Crista Lynne Quick Joint Tenant | 3470 S. Crawford Glen Santa Ana, CA 92704 | 3.4682% | $50,000.00 |
| Ryan Huntsman | | 1.3873% | $20,000.00 |
| Joe C. Bral | 1 Half Moon Irvine CA | 1.7341% | $25,000.00 |
| Mike Meisenbach | C/O LEE ASSOCIATES 3991 MacArthur Blvd., Suite 100 Newport Beach CA 92660 | 3.4682% | $50,000.00 |
| Michael R. Schafer | C/O Schafer Group, Inc. 41619 Margarita Road, Suite 200 Temecula, CA  92591 | 3.4682% | $50,000.00 |
| | | | |
| Total Capital | | 80% | $1,215,000.00 |

40

# EXHIBIT "3"

EXHIBIT "3"
Page 1 of 40

AMENDED AND RESTATED
OPERATING AGREEMENT FOR
MISSION MEDICAL INVESTORS, LLC
A CALIFORNIA LIMITED LIABILITY COMPANY

This Operating Agreement, is made as this 10th day of June, 2004 by and among the parties listed on the signatures pages hereof, with reference to the following facts:

A.      On December 4, 2003, Articles of Organization for MISSION MEDICAL INVESTORS, LLC, a California limited liability company (the Company), a limited liability company under the laws of the State of California, were filed with the California Secretary of State, Document Number 200333810155.

B.      An Operating Agreement was previously executed on December 10, 2003 for the operation and ownership of the building between Managing Members Barry Beitler ("Beitler") and John Bral ("Bral"), identified as Class B Members for their ownership interests without a capital contribution and numerous Members, identified as Class A Members who contributed cash including Beitler, Bral, and Dr. Jeffrey Gross ("Gross").

C.      The parties desire to amend and restate the previous Operating Agreement by:

1.      Buying all of the shares of the former Class A and B Members out plus a negotiated return other than Messrs. Bral, Beitler and Gross.

2.      Restructuring the Agreement to reflect a 20% Managing Member Class B Membership interest for no cash to Messrs. Bral and Beitler and create a 80% Class A interest for any and all new Members contributing cash based upon proportionate capital contributions of 100% of capital contributed for a 80% interest.

3.      Re-Capitalize the venture at a base price of $265 per rentable square foot with 100% of any and all costs required to refurbish and tenant improve the Property; carry the building, financing and leasing of the building, and any other miscellaneous costs on top of said $265 per square foot regardless of the costs therefore. All new Members acknowledge that the price paid for the building previously was less than $265 per square foot and said new price is the price established by the Members for this Amended and Restated Operating Agreement.

D.      The original Members represent and warrant that Mission Medical Investors, LLC is in good standing with the State of California, is not in default of any obligations as of the date of execution herewith and has no liabilities which would materially affect the restructured Membership hereunder. Acknowledgment is made that there is an existing real estate loan in place with First Regional Bank in a approximate amount of $8,265,000.00 which will be refinanced by a new loan upon lease-up of the Property (as hereinafter defined).

E.      The parties desire to adopt and approve this restated operating agreement for the Company.

NOW, THEREFORE, the parties (hereinafter sometimes collectively referred to as the Members, or individually as the Member) by this Agreement set forth the Operating Agreement for the Company under the laws of the State of California upon the terms and subject to the conditions of this Agreement.

1

EXHIBIT "3"
Page 2 of 40

1.11    Corporations Code shall mean the California Corporations Code, as amended from time to time, and the provisions of succeeding law.

1.12    Dissolution Event for the Company means the following:

With respect to any Member, one or more of the following:

1.    When the period fixed for the duration of the Company expires as defined in 2.3 herein; or

2.    By the unanimous written agreement of all Members.

1.13    "Distributable Net Cash" shall mean the amount of cash which the Manager deems available for distribution to the Members, taking into account all Company debts, liabilities, and obligations of the Company then due and amounts which the Manager deems necessary to place into reserves for customary and usual claims with respect to the Company's business.

1.14    Economic Interest shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a member, including, without limitation, the right to vote or participate in the management, or except as provided in Section 17106 of the Corporations Code, any right to information concerning the business and affairs of Company.

1.15    Reserved

1.16    Fiscal Year shall mean the Company's fiscal year, which shall be the calendar year.

1.17    Former Members shall have the meaning ascribed to it in Section 8.1.

1.18    Former Member's Interest shall have the meaning ascribed to it in Section 8.1.

1.19    Majority Interest shall mean Percentage Interests of one or more Members, which taken together exceeds fifty percent (50%) of the aggregate of all Percentage Interests.

1.20    Manager shall mean, BARRY BEITLER and JOHN BRAL, collectively, or any other person(s) or entity(ies) who succeed in their respective capacities.

1.21    Member shall mean each Person who (a) is an initial signatory to this Agreement; has been admitted to the Company as a Member in accordance with the Articles or this Agreement; or is an assignee who has become a Member in accordance with Article VII and (b) has not resigned, withdrawn, been expelled or, if other than an individual, dissolved. It shall refer to both classes of Members in the Company. Unless otherwise expressly mentioned, Member shall refer to and include both classes of Members.

1.21.1    Class A Members shall mean a class of Members that consist of those individuals, persons or entities that own eighty percent (80%) of all of the outstanding and issued Membership Interest in Company and are specifically named in Exhibit A-2 and who have contributed on a proportionate basis 100% of all cash required hereunder.

1.21.2    Class B Members shall mean a class of Members that consist of those individuals, persons or entities that own twenty percent (20%) of all of the outstanding and issued Membership Interest in Company and are specifically named in Exhibit A-1.

3

EXHIBIT "3"
Page 3 of 40

1.22    Member Nonrecourse Debt shall have the meaning ascribed to the term Partner Nonrecourse Debt in Regulations Section 1.704-2(b)(4).

1.23    Member Nonrecourse Deductions shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

1.24    Membership Interest shall mean a Member's entire interest in the Company including the Member's Economic Interest; the right to vote on or participate in the management; and the right to receive information concerning the business and affairs of the Company. A Membership Interest constitutes personal property.

1.25    Net Profits and Net Losses shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (and for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) with those adjustments required by Regulations Section 1.704-1(b)(2)(iv) for purposes of adjusting and maintaining Capital Accounts in accordance therewith.

1.26    Nonrecourse Liability shall have the meaning set forth in Regulations Section 1.752-1(a)(2).

1.27    Percentage Interest shall mean the percentage of a Member set forth opposite the name of such Member under the column Member's Percentage Interest in Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.

1.28    Person shall mean an individual, general partnership, limited partnership, limited liability company, corporation, trust, estate, real estate investment trust association or any other entity.

1.29    Regulations shall, unless the context clearly indicates otherwise, mean the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

1.30    Remaining Members shall have the meaning ascribed to it in Section 8.1.

1.31    Tax Matters Partner shall be BARRY BEITLER and JOHN BRAL, collectively, or their successors as designated pursuant to Section 9.8.

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1    Formation. Pursuant to the Act, the Members have formed a California Limited Liability Company under the laws of the State of California by filing the Articles with the California Secretary of State and entering into this Agreement. The rights and liabilities of the Members shall be determined pursuant to the Act and to this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2    Name. The name of the Company shall be MISSION MEDICAL INVESTORS, LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager deems appropriate or advisable. The Manager shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Manager considers appropriate or advisable. The phrase LLC shall always appear as part of the name of Company on all correspondence, stationary, checks, invoices and any and all documents and papers executed by Company and as otherwise required by the Act.

2.3    Term. The term of this Agreement shall be co-terminus with the period of duration of the Company, December 31, 2050, unless extended or sooner terminated as hereinafter provided.

4

EXHIBIT "3"
Page 4 of 40

2.4　　Office and Agent. The Company shall continuously maintain an office and registered agent in the State of California as required by the Act. The principal office of the Company shall be as the Manager may determine. The Company also may have such offices, anywhere within and without the State of California, as the Manager from time to time may determine, or the business of the Company may require. The registered agent shall be as stated in the Articles or as otherwise determined by the Manager.

2.5　　Addresses of the Members and the Manager. The respective addresses of the Members and the Manager are set forth on Exhibit A.

2.6　　Purposes of Company. The purpose of the Company is to engage in any lawful activity for which a Limited Liability Company may be organized under the Act. Notwithstanding the foregoing, however, the Company shall not engage in any business other than the following:

(1)　　The business of development, operation, leasing and managing for rental and investment of that certain real property located at 27882 Forbes Road, Laguna Niguel (the "Property");

(2)　　such other activities directly related to the foregoing business as may be necessary, advisable, or appropriate, in the reasonable opinion of the Manager to further the foregoing business.

2.7　　Title to Property in the Name of the Company. Title to the real property purchased in accordance with 2.6 above shall be held and owned in the name of the Company

2.8　　Tax Status of Company. The Members intend that the Company be treated as a partnership for income tax purposes and agree to take any actions necessary in order to obtain such treatment.

## ARTICLE III
## CAPITAL CONTRIBUTIONS

3.1　　Initial Capital Contributions. Each Member shall contribute such amount as is set forth on Exhibit A as his, hers or its initial Capital Contribution within one year of the execution of this agreement. Exhibit A shall consist of Sections A-1 and A-2. Exhibit A-1 shall contain Class B Members and Exhibit A-2 shall contain Class A Members.

3.2　　Additional Capital Contributions.

(1)　　In addition, each Member shall contribute to the capital of the Company its pro rata share of such amounts as the Manager shall determine from time to time to be necessary in order to carry out the purposes of the Company set forth above within ten (10) days or thirty (30) days, depending on the amount of the capital call, after the call is made for same by the Manager.

(2)　　If the Manager determines that the Company requires additional funds for any purpose, it may request that the Members contribute more funds to the Company. In such case, each Member shall contribute to the capital of the Company its pro rata share of such amounts as the Manager shall determine from time to time to be necessary in order to carry out the purposes of the Company set forth above within ten (10) business days if the total capital call is under ten thousand dollars ($10,000), or thirty (30) days if ten thousand dollars ($10,000) or over, after the call is made for same by the Manager.

5

EXHIBIT "3"
Page 5 of 40

(3)    Alternatively or additionally, Manager may reserve up to One Hundred Fifty Thousand dollars ($150,000) from Distributable Net Cash for such purposes.

(4)    If any Member fails to timely make its pro rata contribution as required above and required by the Manager, that Member or Members shall have his/her Membership Interest decreased proportionally for the failure to make such required contributions. For example, Manager calls for one hundred thousand dollars. Member X, who owns eight percent (8%), fails to fund the call. The remaining Members must, pro rata, fill the capital call. Member X's interest is then reduced by itself, namely eight percent (8%) in this example, leaving Member X with seven point thirty-six percent (7.36%) interest. The diluted interest is then distributed to the Members making the capital call, pro rata.

3.3    Capital Accounts. The Company shall establish an individual Capital Account for each Member. The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv). If a Member transfers all or a part of his, hers or its Membership Interest in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations Section 1.704-1(b)(2)(iv)(1).

3.4    No Interest or Preferred Return. Except as otherwise expressly provided herein, no Member shall be entitled to receive any interest or preferred return on his, hers or its Capital Contributions.

3.4.1    Preferred Return to Class A Members. To the extent permitted by working capital requirements and other contingencies determined by the Manager, Company shall issue to Class A Members an eight percent (8%) preferred return, per annum, non-compounding, on their initial capital contribution set forth in Exhibit A-1 hereto. To the extent the preferred return cannot be issued in full because of Company's working capital requirements or other contingencies, the preferred return shall be issued in part and shall be carried forward to each successive year until paid. When the Class A Members have been paid an amount equal to the Class A Members' initial capital contribution, Class A Members shall no longer be entitled to any preferred return hereunder. Distributions will then be strictly based upon percentage ownership. The preferred return shall at all time be calculated based upon the then outstanding unpaid initial capital contribution of Class A Members.

3.4.2    Preferred Return to Class B Members. To the extent permitted by working capital requirements and other contingencies determined by the Manager, and Company's payment of an eight percent (8%) preferred return and no less to all of the Class A Members, Company shall issue an eight percent (8%) preferred return, per annum, not compounding to Class B Members, which Class B Member preferred return shall be calculated based on twenty percent (20 %) of the Preferred Return paid to Class A Members under Section 3.4.1, divided by the Class A Membership percentage and multiplied by the Class A Member return paid. To the extent the preferred return cannot be issued in full to the Class B Members because of Company's working capital requirements or other contingencies, the preferred return to Class B Members shall be carried forward to any successive year. For example, if Company distributes an eight percent (8%) preferred return to Class A Members, but only distributes a three percent (3%) preferred return to Class B Members, the Class B Members shall be entitled to an additional five percent (5%) return on a successive year. The amount of the preferred return paid to Class B Members is determined on an annual basis. The Preferred Return to Class B Members shall not be paid to Class B Members after the initial capital contribution of Class A Members has been repaid in full. After the Initial Capital Contribution is returned to the Class A Members, all distributions shall be made based upon percentage ownership. No Preferred Return shall be paid to Class B Members in any year except and unless the full eight percent (8%) preferred return has been paid to all of the Class A Members.

6

EXHIBIT "3"
Page 6 of 40

**3.4.3.** **Distributions After Payment of Preferred Return to Both Class A and Class B Members.** After payment of the preferred returns are made in full to both Class A Members and Class B Members, then any distributions from Company, in any period per annum, shall be made to all Members based on eighty percent (80%) to Class A and twenty percent (20%) to Class B.

**3.5** **Limitation on Withdrawal of Capital Contribution.** No Member shall have the right to withdraw his, hers or its Capital Contribution or to demand and receive property of the Company or any distribution in return for his, hers or its Capital Contribution, except as may be specifically provided in this Agreement or permitted by law.

**ARTICLE IV**

**MEMBERS**

**4.1** **Limited Liability.** Except as provided in California Corporations Code Section 17254 relating to distributions by Company and Section 17101(b) relating to responsibility of Members for certain unsatisfied debts or obligations of Company, no Member or Manager shall be liable under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of Company whether that liability or obligation arises in contract or tort. No Member shall be required to loan any funds to Company. No Member shall be required to make any contribution to Company by reason of any negative balance in his, hers or its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

**4.2** **Admission of Additional Members.** The Manager, with the approval of all of the Members, may admit to the Company additional Members. Any additional Members shall obtain Membership Interests and will participate in the management, Net Profits, Net Losses, and distributions of the Company on such terms as are determined by the Manager and approved by the Members. Notwithstanding the foregoing, substitute members may only be admitted in accordance with Article VII.

**4.3** **Purchase of Membership Interest.** Upon the transfer of a Member's Membership Interest in violation of this Agreement, or the occurrence of a Dissolution Event as to such Member which does not result in the dissolution of the Company, such Membership Interest may be purchased by the Company or remaining Members as provided herein. Each Member acknowledges and agrees that such right to purchase a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.

**4.4** **Transactions With The Company.** Subject to any limitations set forth in this Agreement and with the prior unanimous approval of the Manager and Members, and after full disclosure of the Member's involvement, a Member may lend money to and transact other business with the Company. Subject to other applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

**4.5** Except as otherwise authorized in this agreement, no Member is entitled to remuneration in a capacity acting for the Company or for Company business.

**4.6** **Members Are Not Agents.** Pursuant to Section 5.1 and the Articles, the management of the Company shall be vested in the Manager, the designated property manager.   No Member, acting solely in the capacity of a Member, is an agent of the Company nor can any Member in such capacity bind nor execute any instrument on behalf of the Company.

7

EXHIBIT "3"
Page 7 of 40

4.7    Voting Rights. Members shall have the right to approve or disapprove matters as specifically stated in this Agreement, including the following:

A.    Unanimous Approval. The following matters shall require the unanimous vote, approval or consent of all Members who are not the subject of a Dissolution Event or an assignor of a Membership Interest:

(i)    A decision to continue the business of the Company after the occurrence of a Dissolution Event set forth in 1.12.

(ii)    Except as provided in Article VII, the transfer of a Membership Interest and admission of the transferee or assignee as a Member of the Company.

(iii)    Any material amendment of the Articles or this Agreement.

(iv)    Purchase of additional real property by the Company.

(v)    Matters designated in paragraph C below of this Section 4.7.

B.    Approval by Members Holding a Majority Interest. Except as set forth in this Agreement in all other matters in which the vote, approval or consent of all Members is required, the vote, consent or approval of Members holding a Majority Interest (or, in instances in which there are defaulting Members, non-defaulting Members who hold a majority of the Percentage Interests held by all non-defaulting Members) shall be sufficient to authorize or approve such act, specifically including the right to sell, lease or re-finance the Company's Property.

C.    Other Voting Rights. Besides the rights granted in Sections 4.7A and 4.8A, Members may vote, consent or approve to the extent and on the terms provided in this Agreement in the following Sections:

(i)    Section 3.5 on remedies for a Member's failure to make a contribution;

(ii)    Section 4.2 on admission of new Members;

(iii)    Section 5.3B on a change in the purpose of the Company;

(iv)    Section 5.3B on reorganization of the Company;

(v)    Section 5.3B on other limitations on the Manager's authority;

(vi)    Section 5.8 on transactions with the Manager and Affiliates of the Manager;

(vii)    Section 5.10A on management fees payable to Manager; and

(viii)    Section 10.1 on dissolving the Company.

Any such vote, consent or approval must be unanimous.

4.8    Meetings of Members.

A.    Date, Time and Place of Meetings of Members; Secretary. Meetings of Members may be held at such date, time and place within the State of California as the Manager may fix from time to time. No annual or regular meetings of Members is required. At any Member's meeting, the Manager shall appoint a person to preside at the

8

72

meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting which shall be placed in the minute book of the Company. Formal meetings of members are not required to take action.

        B.     Power to Call Meetings. Unless otherwise prescribed by the Act or by the Articles, meetings of the Members may be called by the Manager, or upon written demand of Members holding more than ten percent (10%) of the Percentage Interests for the purpose of addressing any matters on which the Members may vote.

        C.     Notice of Meeting. If a formal meeting is desired, written notice of a meeting of Members shall be sent or otherwise given to each Member in accordance with Section 4.9D not less than ten (10) nor more than sixty (60) days before the date of the meeting. The notice shall specify the place, date and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at this meeting. Upon written request to the Manager by any person entitled to call a meeting of Members, the Manager shall immediately cause notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the person calling the meeting, not less than ten (10) days nor more than sixty (60) days after the receipt of the request. If the notice is not given within twenty (20) days after the receipt of the request, the person entitled to call the meeting may give the notice.

        D.     Manner of Giving Notice; Affidavit of Notice. Notice of any meeting of Members shall be given either personally or by first-class mail or telegraphic or other written communication, charges prepaid, addressed to the Member at the address of that Member appearing on the books of the Company or given by the Member to the Company for the purpose of notice. Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by telegram or other means of written communication.

        If any notice addressed to a member at the address of that Member appearing on the books of the Company is returned to the Company by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice to the Member at that address, all future notices or reports shall be deemed to have been duly given without further mailing if these shall be available to the Member on written demand for the Member at the principal executive office of the Company for a period of one (1) year from the date of the giving of the notice.

        An affidavit of the mailing or other means of giving any notice of any meeting shall be executed by the Manager or any secretary, assistant secretary, or any transfer agent of the Company giving the notice, and shall be filed and maintained in the minute book of the Company.

        E.     Validity of Action. Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the notice of meeting or in any written waiver of notice.

        F.     Quorum. The presence in person or by proxy of the holders of a Majority Interest of Profits Interest and Capital Interest shall constitute a quorum at a meeting of Members. The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum (other than adjournment) is approved by at least Members holding a Majority Interest in Profit Interest and in Capital Interest.

        G.     Adjourned Meeting; Notice. Any Members meeting, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the Membership Interests represented at that meeting, either in person or by proxy, but in the absence of a quorum, no other business may be transacted at that meeting, except as provided in Section 4.9F. When any meeting of Members is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place are announced at a meeting at which the adjournment is taken, unless a new record date for the adjourned meeting is subsequently fixed, or unless the adjournment is for more than forty-five (45) days from the date set for the original meeting, in which case the Manager shall set a new record date. At any adjourned meeting the Company may transact any business which might have been transacted at the original meeting.

9

EXHIBIT "3"
Page 9 of 40

H.   Waiver of Notice or Consent. The actions taken at any meeting of Members however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, who was not present in person or by proxy, signs a written waiver of notice and consents to the holding of the meeting or approves the minutes of the meeting. All such waivers, consents or approvals shall be filed with the Company records or made a part of the minutes of the meeting.

Attendance of a person at a meeting shall constitute a waiver of notice of that meeting, except when the person objects at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened; and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters not included in the notice of the meeting if that objection is expressly made at the meeting. Neither the business to transacted nor the purpose of any meeting of Members need be specified in any written waiver of notice except as provided in Section 4.9E.

I.   Action by Written Consent Without a Meeting. Any action that may be taken at a meeting of Members may be taken without a meeting, if a consent in writing setting forth that action to taken, is signed and delivered to the Company within ten (10) days of the record date for that action by Members having not less than the minimum number of votes which would be necessary to authorize taking that action at a meeting at which all Members entitled to vote on such action were present and voted. All such consents shall be filed with the Manager or the secretary, if any, of the Company and shall be maintained in the Company records. The written consent or proxy of any Member may be revoked by a writing signed by such Member and received by the Manager or the secretary, if any, of the written consents containing the number of votes required to authorize the proposed action.

Unless the consents of all Members entitled to vote have been solicited in writing; (i) notice of any Member approval of an amendment to the Articles or this Agreement; a dissolution of the Company; or a merger of the Company without a meeting by less than unanimous written consent, shall be given at least ten (10) days before the consummation of the action authorized by such approval; and (ii) prompt notice shall be given of the taking of any other action approved by Members without a meeting by less than unanimous written consent, to those Members entitled to vote who have not consented in writing.

J.   Telephonic Participation by Member at Meetings. Members may participate in any Members meeting through the use of any means of conference telephones or similar communications equipment as long as all Members participating can hear one another. A Member so participating is deemed to be present in person at the meeting.

K.   Record Date. In order that the Company may determine the Members of record entitled to notices of any meeting or to vote, or entitled to receive any distribution or to exercise any rights in respect of any distribution or to exercise any rights in respect of any other lawful action, the Manager, or Members representing a majority of the Percentage Interests may fix, in advance, a record date, that is not more than sixty (60) days nor less than ten (10) days prior to the date of the meeting and not more than sixty (60) days prior to any other action. If no record date if fixed:

(i)   The record date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

(ii)   The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

10

EXHIBIT "3"
Page 10 of 40

(iii)    The record date for determining Members for any other purpose shall be at the close of business on the day on which the Manager adopt the resolution relating thereto, or the 60th day prior to the date of the other action, whichever is later.

(iv)    The determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless the Manager or the Members who called the meeting fix a new record date for the adjourned meeting, but the Manager or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than forty-five (45) days from the date set for the original meeting.

L.    Proxies. Every Member entitled to vote for the Manager or on any other matter shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the Member or his attorney in fact and filed with the Manager or secretary, if any, of the Company. A proxy shall be deemed signed if the Member's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission, electronic transmission or otherwise) by the Member or the Member's attorney in fact. A proxy may be transmitted by an oral telephone transmission if it is submitted with information from which it may be determined that the proxy was authorized by the Member or the Member's attorney in fact. A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless (i) revoked by the person executing it, before the vote pursuant to that proxy; by a writing delivered to the Company stating that the proxy is revoked; or by a subsequent proxy executed by, or attendance at the meeting and voting in person by, the person executing the proxy; or (ii) written notice of the death or incapacity of the maker of that proxy is received by the Company before the vote pursuant to that proxy is counted; provided, however, that no proxy shall be valid after the expiration of eleven (11) months from the date of the proxy, unless otherwise provided in the proxy. The revocability of a proxy which states on its face that it is irrevocable shall be governed by the provisions of Corporations Code Sections 705(e) and 705(f).

4.9    Certificate of Membership Interest.

A.    Certificate. A Membership Interest may be represented by a certificate of membership. The exact contents of a certificate of membership may be determined by action of the Manager but shall be issued substantially in conformity with the following requirements: The certificates of membership shall be respectively numbered serially, as they are issued; shall be impressed with the Company seal or a facsimile thereof, if any; and shall be signed by the Manager or officers of the Company. Each certificate of membership shall state the name of the Company; the fact that the Company is organized under the laws of the State of California; is a limited liability company; the name of the person to whom issued; the date of issue; and the Percentage Interests represented thereby. A statement of the designations, preferences, qualifications, limitations, restrictions, and special or relative rights of the Membership Interest, if any, shall be set forth in full or summarized on the face or back of the certificates which the Company shall issue, or in lieu thereof, the certificate may set forth that such a statement or summary will be furnished to any holder of a Membership Interest upon request without charge. Each certificate of membership shall be otherwise in such form as may be determined by the Manager.

B.    Cancellation of Certificate. All certificates of membership surrendered to the Company for transfer shall be cancelled and no new certificates of membership shall be issued in lieu thereof until the former certificates for a like number of Membership Interest shall have been surrendered and cancelled, except as herein provided with respect to lost, stolen, or destroyed certificates.

C.    Replacement of Lost, Stolen or Destroyed Certificate. Any Member claiming that his, hers or its certificate or membership is lost, stolen or destroyed may make an affidavit or affirmation of that fact and request a new certificate. Upon the giving of a satisfactory indemnity to the Company as reasonably required by the Manager, a new certificate may be issued of the same tenor and representing the same Percentage Interest of membership as was represented by the certificate alleged to be lost, stolen or destroyed.

11

EXHIBIT "3"
Page 11 of 40

# ARTICLE V
## MANAGEMENT AND CONTROL OF THE COMPANY

5.1     Management of the Company by the Manager.

      A.     Exclusive Management by Manager. The business, property and affairs of the Company shall be managed exclusively by the Manager. Except for situations in which the approval of the Members is expressly required by the Articles or this Agreement, the Manager shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company; to make all decisions regarding those matters; and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs. No Member who is not a Manager shall have any authority to act for or to undertake or assume any obligation, debt, duty or responsibility on behalf of the Company. Where this Agreement specifies an act of the Manager, unless otherwise expressly otherwise provided, it means an act taken by all persons comprising Manager.

      B.     Agency Authority of Manager. Either person comprising Manager, acting independently of the Members, is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts. All checks, drafts, and other instruments obligating the Company to pay money, may be signed by either person comprising the Manager, acting alone, provided that such obligation is incurred in the ordinary course of managing the Company and/or the Property. Any and all contracts on behalf of the Company and any obligations which are outside the ordinary course of business of the Company shall require the signature of both persons comprising the Manager.

5.2     Election of Manager.

      A.     Number. The Company shall have two (2) Managers.

      B.     Removal. No Manager may be removed by the vote of the Members except in the case of his malfeasance; or physical or mental incapacity; or gross negligence; or his material breach of any of the items set forth in Section 5.3 of this Agreement.

5.3     Powers of Manager.

      A.     Powers of the Manager. Without limiting the generality of Section 5.1, the Manager shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Corporations Code Section 17003.

      B.     Limitations On Powers of Manager. The Manager shall not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the unanimous affirmative vote or unanimous written consent of the Members:

      (i)     The merger of the Company with another limited liability company or limited partnership, provided in no event shall a Member be required to become a general partner in a merger with a limited partnership without his express written consent or unless the agreement of merger provides each Member with the dissenter's rights described in the Act.

      (ii)     The merger of the Company with a corporation or a general partnership or other Person.

      (iii)     The establishment of different classes of Members.

12

EXHIBIT "3"
Page 12 of 40

(iv)    An alteration of the primary purpose of the Company as set forth in Section 2.3.

(v)    Transactions between the Company and the Manager or the Manager's Affiliates, or transactions in which the Manager or of any Manager's Affiliates has a material financial interest except to the extent where such transactions do not exceed commercially reasonable market rates.

(vi)    Without limiting subsection (v), the lending of money by the Company to any Manager, Member or officer.

(vii)    Any act which would make it impossible to carry on the ordinary business of the Company.

(viii)    The amendment of this Agreement.

(ix)    The purchase of additional real property by the Company.

5.4    Members Have No Managerial Authority. The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Articles and except as expressly required by the Act. No Member shall have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, or to render it liable for any purpose.

5.5    Performance of Duties; Liability of Manager. The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, negligence, reckless or intentional misconduct, or a knowing violation of law by the Manager. The Manager shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Company and shall use them solely for the benefit of the Company. The Manager shall perform managerial duties in good faith, in a manner reasonably believed to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position of like business experience would use under similar circumstance. A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Manager of the Company.

In performing managerial duties, the Manager shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, of the following persons or groups unless they have knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that the Manager act in good faith and after reasonable inquiry when the need therefor is indicated by the circumstances:

(a)    one or more officers, employees or other agents of the Company whom the Manager reasonably believes to be reliable and competent in the matters presented;

(b)    any attorney, independent accountant, or other person as to matters which the Manager reasonably believes to be within such persons professional or expert competence; or

(c)    a committee upon which the Manager does not serve, duly designated in accordance with a provision of the Articles or this Agreement, as to matters within its designated authority, which committee the Manager reasonably believes to merit competence.

5.6    Devotion of Time. The Manager is not obligated to devote all of his time or business efforts to the affairs of the Company. The Manager shall devote whatever time, effort and skill as he deems appropriate for the operation of the Company.

13

EXHIBIT "3"
Page 13 of 40

5.7    Competing Activities.  The Manager and the officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company.  Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom.  The Manager shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company.  The Manager or any Member shall have the right to hold any investment opportunity or prospective economic advantage for his or her own account or to recommend such opportunity to Persons other than the Company.  The Members acknowledge that the Manager and his or her Affiliates own and/or manage businesses, including businesses that may compete with the Company and for the Manager's time.  The Members hereby waive any and all rights and claims which they may otherwise have against the Manager and officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates as a result of any such activities.

5.8    Transactions Between the Company and the Manager.  Notwithstanding that it may constitute a conflict of interest, the Manager may, and may cause Manager's Affiliates to engage in any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from Persons capable of similarly performing them and in similar transactions between parties operating at arm's length, and provided that the Members having no interest in such transaction (other than their interests as Members) affirmatively vote unanimously or give their unanimous consent in writing to approve the transaction.

A transaction between any of the Manager and/or the Manager's Affiliates, on the one hand, and the Company, on the other hand, shall be conclusively determined to constitute a transaction on terms and conditions, on an overall basis, fair and reasonable to the Company and at least as favorable to the Company as those generally available in a similar transaction between parties operating at arm's length if the Members having no interest in such transaction (other than their interests as Members) affirmatively vote unanimously or consent in writing unanimously to approve the transaction.  The Company specifically acknowledges and hires Beitler Commercial Realty Services as leasing and or listing Broker, when necessary to lease or sell the property, at market rates as defined below or some other competent comparable leasing or sales brokerage firm.  Further, the Company specifically hires Manager to act as property manager for the Company and its assets at market rates as defined below.

5.9    Payments to the Manager.  The Manager and Manager's Affiliates shall receive the following payments:

A.    Services Performed by Manager.  Except as otherwise provided herein, the Company shall not pay the Manager for services rendered to the Company in the reasonable scope of their management duties.

B.    Expenses.  The Company shall reimburse the Manager and Manager's Affiliates for the actual cost of goods and materials used for or by the Company.  The Company shall also pay or reimburse any of the Manager or Manager's Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company and prepare the Articles and this Agreement.

C.    Property Management Fee.  There shall be a four percent (4%) of gross income per month fee for property management to a management company chosen by Manager.  Whenever possible, Manager will lease the Property on a Triple Net (NNN) basis and pass through said management fee to the tenants on a monthly basis.

D.    Property Brokerage Fee.  There shall be sales commission of four percent (4%) paid to Beitler Commercial Realty Services as a listing Broker upon sale (which shall be spit 50/50 with a procuring Broker if any), and

14

EXHIBIT "3"
Page 14 of 40

leasing commissions shall be paid to Beitler Commercial Realty Services (or to any other licensed real estate broker selected by Manager) at industry standard rates.

5.10    Act of Manager as Conclusive Evidence of Authority. Any note, mortgage, evidence of indebtedness, contract, certificate, statement, conveyance, or other instrument in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other person, when signed by the Manager, are not invalidated as to the Company by any lack of authority of the Manager in the absence of actual knowledge on the part of the other person that the Manager had no authority to execute the same.

5.11    Reserved.

5.12    Limited Liability. No Manager shall not be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being the Manager.

ARTICLE VI
ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

6.1    Allocations of Net Profit and Net Losses.

A.    Net Loss. Net Loss shall be allocated to the Members in proportion to their Percentage Interests.

B.    Net Profit. Net Profit shall be allocated to the Members (i) first, proportionately (based on the amount each Member is required to be allocated pursuant to this clause (i)) until each Member has been allocated a cumulative amount of Net Profit pursuant to this clause (i) equal to the sum of the cumulative amount of Net Loss previously allocated to such Member pursuant to Section 6.1A hereof, plus the cumulative amount of distributions previously made to such Members pursuant to Section 6.5(a) hereof, (ii) thereafter, in proportion to their Percentage Interests.

6.2    Special Allocations.

A.    Minimum Gain Chargeback. Notwithstanding Section 6.1, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company Income and gain for such Fiscal Year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 6.2A shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2A. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f). This Section 6.2A is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

B.    Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt. Notwithstanding Section 6.1 of this Agreement, if there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any Fiscal Year, each Member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Regulations Section

15

EXHIBIT "3"
Page 15 of 40

1.704-2(i)(5)). Allocations pursuant to this Section 6.2B shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2B. The items to be so allocated shall be determined in accordance with Regulations Section 1 .704-2(i)(4). This Section 6.2B is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1 .704-2(i)(4) and shall be interpreted consistently therewith.

C.    Nonrecourse Deductions.  Notwithstanding Section 6.1, any nonrecourse deductions (as defined in Regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.

D.    Member Nonrecourse Deductions.  Notwithstanding Section 6.1, any Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i).

E.    Qualified Income Offset.  Notwithstanding Section 6.1, if a member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), or any other event creates a deficit balance in such Member's Capital Account (taking into account reductions for the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 6.2E shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article VI so that the net amount of any item so allocated and the income, gain, and losses allocated to each member pursuant to this Article VI to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Article VI if such unexpected adjustments, allocations, or distributions had not occurred.

6.3    Code Section 704(c) Allocations.  Notwithstanding any other provision in this Article VI, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this Section 6.3 are solely for purposes of federal, state and local taxes. As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other tax items or distributions pursuant to any provision of this Agreement.

6.4    Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest.  If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his, hers or its respective Membership Interest at the close of such day.

However, for the purpose of accounting convenience and simplicity, the Company shall treat a transfer of, or an increase or decrease in, a Membership Interest which occurs at any time during a semi-monthly period (commencing with the semi-monthly period including the date hereof) as having been consummated on the last day of such semi-monthly period, regardless of when during such semi-monthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first fifteen (15) days of any month will be deemed to have been made on the 15th day of the month).

16

Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Membership Interests as of the date such sale or other disposition occurs.

6.5 __Distribution of Assets by the Company__. Subject to applicable law and any limitations contained elsewhere in this Agreement, the Manager may elect from time to time to distribute Distributable Cash to the Members, which distributions shall be in the following order of priority:

A. __Distributions from Operations__:

(i) If such Distributable Net Cash is from Company's operations, to the Members in proportion to their unreturned additional Capital Contribution until each Member has recovered his, her or its additional capital contribution.

(ii) If such Distributable Net Cash is from Company's operations, to the Members of Class A, for their Preferred Return in Section 3.4.1 herein, in proportion to their Percentage Interest in Company in relation to each other.

(iii) If such Distributable Net Cash is from Company's operations, to the Members of Class B, for their Preferred Return in Section 3.4.2 herein, in proportion to their Percentage Interest in Company in relation to each other.

(iv) If such Distributable Net Cash is from Company's operations, to the Members of Class A and B in proportion to their pro rata Membership interest.

B. __Distributions from Sale, Financing or Refinancing of Company Real Property__.

(i) If such Distributable Net Cash is from the sale, financing or refinancing of the Company Property, to the Members in proportion to their unreturned additional Capital Contributions until each Member has recovered his, hers or its Additional Capital Contributions, if any, and then to Members in proportion to their unreturned initial Capital Contributions until each Member has recovered his, her or its initial Capital Contribution; and

(ii) Thereafter, to the Members in proportion to their percentage interests;

such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor the Manager shall incur any liability for making any distributions under this Section 6.5.

The Manager may, in its sole discretion, limit distributions by maintaining a working capital reserve of up to One Hundred Fifty Thousand Dollars ($150,000.00).

6.6 __Form of Distribution__. A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members. Except upon a dissolution and the winding up of the Company, no Member may be compelled to accept a distribution of any asset in kind.

17

EXHIBIT "3"
Page 17 of 40

6.7     Restriction on Distributions.

A.      No distribution shall be made if, after giving effect to the distribution:

(i)      The Company would not be able to pay its debts as they become due in the usual course of business.

(ii)     The Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the distribution.

B.      The Manager may base a determination that a distribution is not prohibited on any of the following:

(i)      Financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances.

(ii)     A fair valuation.

(iii)    Any other method that is reasonable in the circumstances.

Except as provided in Section 17254(e) of the Corporations Code, the effect of a distribution is measured as of the date the distribution is authorized if the payment occurs within one hundred twenty (120) days after the date of authorization, or the date payment is made if it occurs more than one hundred twenty (120) days of the date of authorization.

C.      A Member or Manager who votes for a distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act if it is established that the Member or Manager did not act in compliance with Section 6.7 B or Section 10.4. Any Member or Manager who is so liable shall be entitled to compel contribution from (i) each other Member or Manager who also is so liable and (ii) each Member for the amount the Member received with knowledge of facts indicating that the distribution was made in violation of this Agreement or the Act.

6.8     Return of Distributions. Except for distributions made in violation of the Act or this Agreement, no Member or Economic Interest Owner shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company. The amount of any distribution returned to the Company by a Member or Economic Interest Owner or paid by a Member or Economic Interest Owner for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member or Economic Interest Owner.

18

6.9    Obligations of Members to Report Allocations. The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

ARTICLE VII
TRANSFER AND ASSIGNMENT OF INTERESTS

7.1    Transfer and Assignment of Interests. No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest except with the prior written consent of other Members having a majority of the Percentage Interests of the other Percentage Interests, Transfers in violation of this Article VII shall only be effective to the extent set forth in Section 7.7. After the consummation of any transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

7.2    Further Restrictions on Transfer of Interests. In addition to other restrictions found in this Agreement, no Member shall transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest: (i) without compliance with the legend described in Section 12.10, and (ii) if the transfer, assignment, sale or exchange would cause the termination of the Company under Section 708(b)(1)(B) of the Code, as determined by the Manager.

7.3    Substitution of Members. A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirements of Sections 7.1 and 7.2 are met; (ii) such Person executes an instrument satisfactory to the Manager accepting and adopting the terms and provisions of this Agreement; and (iii) such person pays any reasonable expenses in connection with his, hers or its admission as a new Member. The admission of a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

7.4    Family and Affiliate Transfers. The Membership Interest of any Member may be transferred subject to compliance with Section 7.2, and without the prior written consent of all Members, as required by Section 7.1, upon consent of the Manager, which shall not be unreasonably withheld, by the Member (i) by inter vivos gift or by testamentary transfer to any spouse, parent, sibling, in-law, child or grandchild of the Member; or to a trust for the benefit of the Member or such spouse, parent, sibling, in-law, child or grandchild of the Member; or (ii) to any Affiliate of the Member; it being agreed that in executing this Agreement, each Member has consented to such transfers.

7.5    Effective Date of Permitted Transfers. Any permitted transfer of all or any portion of a Membership Interest shall be effective as of the first day of the month following the date upon which the requirements of Sections 7.1, 7.2 and 7.3 have been met. The Manager shall provide the Members with written notice of such transfer as promptly as possible after the requirements of Sections 7.1, 7.2 and 7.3 have been met. Any transferee of a Membership Interest shall take subject to the restrictions on transfer imposed by this Agreement and subject to allocation of profits and losses; and distributions set forth in Section 6.4.

19

EXHIBIT "3"
Page 19 of 40

7.6     Rights of Legal Representatives.  If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, and/or other legal representative and/or beneficiary or successor may exercise all of the Member's rights for the purpose of settling the Member's estate and/or administering the Member's property, and shall succeed to Member's interest herein, except that any Class B Member's successor shall continue to be a Class B Member, but without any management rights as a Class B Member..

7.7     No Effect to Transfers in Violation of Agreement.  Upon any transfer of a Membership Interest in violation of this Article VII, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Economic Interest Owner and thereafter shall only receive the share of one (1) or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the Manager, a transfer in violation of this Article VII would cause the termination of the Company under the Code, in the sole discretion of the Manager, the transfer shall be null and void and the purported transferee shall not become either a Member or an Economic Interest Owner.

Upon and contemporaneously with any transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company for a purchase price of One Hundred Dollars ($100), all remaining rights and interests retained by the Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member..

Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who transfers a Membership Interest in violation of this Article VII is not unreasonable under the circumstances existing as of the date hereof

7.8     Right of First Refusal.  Each time a Member proposes to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest (or as required by operation of law or other involuntary transfer to do so) other than pursuant to Section 7.4, such Member shall first offer such Membership Interest to the Company and the non-transferring Members in accordance with the following provisions:

A.      Such Member shall deliver a written notice to the Company and the other Members stating (i) such Member's bona fide intention to transfer such Membership Interest; (ii) the name and address of the proposed transferee; (iii) the Membership Interest to be transferred; and (iv) the purchase price in terms of payment for which the Member proposes to transfer such Membership Interest.

B.      Within thirty (30) days after receipt of the notice described in Section 7.8A, each non-transferring Member shall notify the Manager in writing of his, hers or its desire to purchase a portion of the Membership

20

EXHIBIT "3"
Page 20 of 40

Interest being so transferred. The failure of any Member to submit a notice within the applicable period shall constitute an election on the part of that Member not to purchase any of the Membership Interest which may be so transferred. Each Member so electing to purchase shall be entitled to purchase a portion of such Membership Interest in the same proportion that the Percentage Interest of such Member bears to the aggregate of the Percentage Interests of all of the Members electing to so purchase the Membership Interest being transferred. In the event any Member elects to purchase none or less than all of his, hers or its pro rata share of such Membership Interest, then the other Members can elect to purchase more than their pro rata share. If such Members fail to purchase the entire Membership Interest being transferred, the Company may purchase any remaining share of such Membership Interest.

        C.    Within sixty (60) days after receipt of the notice described in Section 7.8A, the Company and the Members electing to purchase such Membership Interest shall have the first right to purchase or obtain such Membership Interest upon the price and terms of payment designated in such notice. If such notice provides for the payment of non-cash consideration, the Company and such purchasing Members each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Manager.

        D.    If the Company or the other Members elect not to purchase or obtain all of the Membership Interest designated in such notice, then the transferring Member may transfer the Membership Interest described in the notice to the proposed transferee, providing such transfer (i) is completed with thirty (30) days after the expiration of the right of the Company and the other Members to purchase such Membership Interest, (ii) is made on terms no less favorable to the transferring Member than as designated in the notice, and (iii) the requirements of Sections 7.1, 7.2 and 7.3 relating to unanimous consent of Members, securities and tax requirements hereof are met. If such Membership Interest is not so transferred, the transferring Member must give notice in accordance with this Section prior to any other or subsequent transfer of such Membership Interest.

        7.8.1    Right of First Refusal Among Class of Membership.  Notwithstanding anything to the contrary herein, any proposal by a Member to transfer, assign, convey, sell, encumber or in any way alienate all or part of his, hers or its Membership Interest (Selling Member), pursuant to Section 7.8, shall first proceed to commence the Right of First Refusal procedure provided in Section 7 among Members of the Selling Members class before proceeding with the Right of First Refusal to the other Members of Company not in the Selling Member's class.  For example, a Member of Class A offering its Membership Interest shall first operate the Right of First Refusal among Members of Class A, and subject to whether any Membership Interest remains available, then to Members of Class B.

    7.9    Effective Date of Permitted Transfers of an Interest.  Any permitted transfer of all or any portion of an Interest in Company will take effect on the first (1st) day of the month following receipt by the Members of written notice of transfer. Any transferee of an Interest in the Company shall take subject to the restrictions on transfer imposed by the Agreement.

    7.10    Consequences of Pledge or Grant of Security Interest.  The pledge or granting of a security interest, lien or other encumbrance in or against any or all of the Interest of a Member shall not cause the Member to cease to be a Member or to grant anyone else the power to exercise any rights or powers of a Member.

21

EXHIBIT "3"
Page 21 of 40

## ARTICLE VIII
## CONSEQUENCES OF, DISSOLUTION, OR WITHDRAWAL OF MEMBER (S) OR HEIRS

8.1     Purchase of Member's Interest.  Upon the occurrence of any Dissolution Event and the unanimous consent by the remaining Members (Remaining Members) to continue the business of Company, and if applicable, the desire of the member or its heirs to the other Members (the Remaining Members) shall have an option to purchase such Membership Interest. Within ninety (90) days of the Unanimous Consent or within ninety (90) days of the receipt of the rightful demand for the return of its Capital Account by the Former Member or by such Former Member's trustee or heirs, or within in ninety (90) days of the inheritance or transfer by operation of law to a person, the Remaining Members shall notify the Manager in writing of their desires to purchase a portion of the Former Member's Interest.

8.2     Withdrawal. Notwithstanding Section 8.1, only upon the withdrawal by a Member in accordance with Section 4.3, such Member shall be treated as a Former Member, and the Company and/or the Remaining Members shall have the option to purchase, and the Former Member shall be obligated to sell, the Former Member's Interest as provided in this Article VIII.

8.3     Purchase Price.  The purchase price for the Former Member's Interest shall be the fair market value of the Former Member's Interest determined by three (3) independent appraisers, one (1) selected by the Former Member or such Former Member's legal representative, one (1) selected by the Company, and one (1) selected by the two (2) appraisers so named. The fair market value of the Former Member's Interest shall be the average of the two (2) appraisals closest in amount to each other. In all other events, the Former Member shall pay one-half (50%) of such expense of the appraisers and the Remaining Members shall pay one-half (50%) of such expense and the purchase price shall be the fair market value determined by appraisal reduced by six percent (6%) representing a reasonable and customary brokerage commission which would be paid to a broker in an arms length role and escrow closing costs. Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

8.4     Notice of Intent to Purchase.  Within thirty (30) days after the Manager has notified the Remaining Members as to the purchase price of the Former Member's Interest determined in accordance with Section 8.3, each Remaining Member shall notify the Manager in writing of his, hers or its desire to purchase a portion of the Former Member's Interest. The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest. Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Members Interest in the same proportion that the Percentage Interest of the Remaining Member bears to the aggregate of the Percentage Interests of all of the Remaining Members electing to purchase the Former Member's Interest.

8.5     Election to Purchase Less Than All of An Interest.  In the event any Remaining Member elects to purchase none or less than all of its pro rata part of the Former Member's Interest, then, at its election, those Remaining Members can elect to purchase more than their pro rata part, i.e., the proportion that the Percentage Interest of the Former Member bears to the aggregate of the Percentage Interests of all Members and the Former Member. If the Remaining Members fail to purchase the entire interest of the Former Member, Company may elect to purchase the former Member's Interest unpurchased portion. If none of the above elects to purchase, the same shall pass by operation of law

22

EXHIBIT "3"
Page 22 of 40

to any assignee or shall remain in the hands of the Former Member, subject to any right of the holder of such interest to demand payment therefore according to California law. Notwithstanding any provision of the Agreement to the contrary, the remaining Members may mutually agree to an allocation of the Former Member's Interest to be purchased by each of them.

8.6    Payment of Purchase Price.  The purchase price shall be paid by the Company or the Remaining Members, as the case may be, either: (i) in equal monthly installments of principal together with interest amortized over a thirty (30) year period, commencing to accrue from the date of closing, at the then current Applicable Federal Rate (the AFR) under Section 1274(d) of the Internal Revenue Code (IRC) for the month in which the first payment is made (or a rate per annum equal to what the AFR would be for such month under IRC Section 1274(d) of the Code if the AFR is no longer published) to fully amortize such purchase price over such ten (10) payments with the first payment being due and payable 60 days after the determination of the fair market value of the Former Member's Interest in the Company, or (ii) within 60 days after the determination of the fair market value of the Former Member's Interest in the Company, as the Company or the Remaining Members, as the case may be, may elect in their sole discretion.

8.7    Closing of Purchase of Former Member's Interest.  The closing for the sale of a Former Member's Interest pursuant to this Article VIII shall be held at 10:00 a.m. at the principal office of the Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Former Member or such Former Member's legal representative shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest. The Former Member or such Former Member's legal representative, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

8.8    Purchase Terms Varied by Agreement.  Nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

## ARTICLE IX
## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

9.1    Books and Records.  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office in California all of the following:

A.    A current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner;

23

EXHIBIT "3"
Page 23 of 40

B.    A current list of the full name and business or residence address of each Manager.

C.    A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

D.    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

E.    A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

F.    Copies of the financial statements of the Company, if any, for the six (6) most recent Fiscal Years; and

G.    The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) Fiscal Years.

9.2    <u>Delivery to Members and Inspection</u>.

A.    Upon the request of any Member or Economic Interest Owner for purposes reasonably related to the interest of that Person as a Member or Economic Interest Owner, the Manager shall promptly deliver to the requesting Member or Economic Interest Owner, at the expense of the Company, a copy of the information required to be maintained by Sections 9.1A, B and D, and a copy of this Agreement.

B.    Each Member, Manager and Economic Interest Owner has the right, upon reasonable request for purposes reasonably related to the interest of the Person as Member, Manager or Economic Interest Owner, to:

(i)    inspect and copy during normal business hours any of the Company records described in Section 9.1A through G; and

(ii)    obtain from the Manager, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year, as well as any and all Company financial records.

C.    Members representing at least twenty-five percent (25%) of the Percentage Interests, or three (3) or more Members, make a written request to the Manager for an income statement of the Company for the initial three (3) month, six (6) month, or nine (9) month period of the current Fiscal Year ended more than thirty (30) days prior to the date of the request, and a balance sheet of the Company as of the end of that period. Such statement shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Manager that the statement was prepared without audit from the books and records of the Company. If so requested, the statement shall be delivered or mailed to the Members within thirty (30) days thereafter.

24

EXHIBIT "3"
Page 24 of 40

Any Member or a Member's designated representative has the right to inspect the books of the Company at reasonable times upon forty-eight (48) hours written notice to the Manager, but no more than once each calendar quarter for any one (1) Member.

D.    Any request, inspection or copying by a Member or Economic Interest Owner under this Section 9.2 may be made by that Person or that Person's agent or attorney.

E.    The Manager shall promptly furnish to a Member a copy of any amendment to the Articles or this Agreement executed by the Manager pursuant to a power of attorney from the Member.

F.    The Manager shall promptly furnish to a Member written notice of any action concerning the Company which is likely to have a substantial impact upon any of the Members.

9.3    Quarterly Statements and Reports:

A.    Upon request, the Manager shall cause quarterly reports to be sent to each of the Members no later than thirty (30) days after the close of each calendar quarter. The report shall contain a balance sheet as of the end of the calendar quarter and an income statement and statement of changes in financial position for the calendar quarter. Such financial statements shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Manager that the financial statements were prepared without audit from the books and records of the Company.

B.    The Manager shall cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Members' and Economic Interest Owners' federal and state income tax returns. The Manager shall send or cause to be sent to each Member or Economic Interest Owner within ninety (90) days after the end of each taxable year such information as is necessary to complete federal and state income tax or information returns, and, if the Company has thirty-five *(35)* or fewer Members, a copy of the Company's federal, state, and local income tax or information returns for that year.

C.    The Manager shall cause to be filed at least annually with the California Secretary of State the statement required under California Corporations Code э 17060.

9.4    Financial and Other Information. The Manager shall provide such financial and other information relating to the Company or any other Person in which the Company owns, directly or indirectly, an equity interest, as a Member may reasonably request. The Manager shall distribute to the Members, promptly after the preparation or receipt thereof by the Manager, any financial or other information relating to any Person in which the Company owns, directly or indirectly, an equity interest, including any filings by such Person under the Securities Exchange Act of 1934, as amended, that is received by the Company with respect to any equity interest of the Company in such Person.

9.5    Filings. The Manager, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Manager, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Articles and all reports required to be filed by the Company with those entities under the Act or other

25

EXHIBIT "3"
Page 25 of 40

then current applicable laws, rules, and regulations. If the Manager is required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or refuses to do so, any other Manager or Member may prepare, execute and file that document with the California Secretary of State.

9.6     Bank Accounts. The Manager shall maintain the funds of the Company in one (1) or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

9.7     Accounting Decisions and Reliance on Others. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Manager. The Manager may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

9.8     Tax Matters for the Company Handled by Manager and Tax Matters Partner. The Manager shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members. The Tax Matters Partner, as defined in Code Section 6231, shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith. The Tax Matters Partner shall oversee the Company tax affairs in the overall best interests of the Company. If for any reason the Tax Matters Partner can no longer serve in that capacity or ceases to be a Member or Manager, as the case may be, Members holding a Majority Interest may designate another to be Tax Matters Partner.

9.9     Choice of Company's Accountant. The Company's Accountant shall be selected by the Manager.

## ARTICLE X
## DISSOLUTION AND WINDING UP

10.1     Dissolution. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first (1st) to occur of the following:

A.     Upon the happening of any event of dissolution specified in the Articles;

B.     Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the Corporations Code;

C.     The occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Section 8.1 to continue the business of the Company within ninety (90) days after the occurrence of such event or the failure of the Company or the Remaining Members to purchase the Former Member's Interest as provided in Section 8.2; or

D.     The sale of all or substantially all of the assets of Company.

26

EXHIBIT "3"
Page 26 of 40

10.2    Certificate of Dissolution. As soon as possible following the occurrence of any of the events specified in Section 10.1, the Manager who has not wrongfully dissolved the Company or, if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Certificate as required by the Act. Upon the filing by the Certificate of Dissolution, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence continues until the certificate of cancellation of articles of organization Dissolution have been filed with the Secretary of State or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

10.3    Winding Up. Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Manager who has not wrongfully dissolved the Company or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof; shall cause the proceeds therefrom, to the extent sufficient therefore, to be applied and distributed as provided in Section 10.5. The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Manager(s) or Members winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

10.4    Distributions In Kind. Any non-cash asset distributed to one (1) or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value. Such Net Profit or Net Loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by the Manager or by the Members or, if any Member objects, by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by the Manager or liquidating trustee and approved by the Members.

10.5.    Order of Payment of Liabilities Upon Dissolution.

A.    The distribution of payments of the Company in the process of winding-up shall be made in the following order: (i) All known debts and liabilities of the Company, excluding debts and liabilities to Members who are creditors of the Company; (ii) All known debts and liabilities of the Company owed to Members who are creditors of the Company; (iii) The remaining assets shall be distributed to the Members in accordance with their positive Capital Account balances, after taking into account income and loss allocations and distributions (other than pursuant to Section 10.5A) for the Company's taxable year during which liquidation occurs.

Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

B.    The payment of a debt or liability, whether or not the whereabouts of the creditor is known, has been adequately provided for if:

27

91

(i)     Payment thereof has been assumed or guaranteed in good faith by one (1) or more financially responsible persons or by the United States government or any agency thereof; and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Members or Manager to be adequate at the time of any distribution of the assets pursuant to this Section.

(ii)    The amount of the debt or liability has been deposited as provided in Section 2008 of the Corporations Code.

This Section 10.5B shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

10.6    Compliance with Regulations. All payments to the Members upon the winding up and dissolution of Company shall be strictly in accordance with the positive Capital Account balance limitation of Regulations Section 1.704-1(b)(2)(ii)(b)(2).

10.7    Limitations on Payments Made in Dissolution. Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of Company for the return of his, hers or its positive Capital Account balance and shall have no recourse for his, hers or its Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Manager or any other Member except as provided in Article XI.

10.8    Certificate of Cancellation. The Manager or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a certificate of cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

10.9    No Action for Dissolution. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action which directly causes a Dissolution Event. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 10.1. This Agreement has been drawn carefully to provide fair treatment to all parties and equitable payment in liquidation of the Economic Interests. Accordingly, except where the Manager has failed to liquidate the Company as required by this Article X, each Member hereby waives and renounces his, hers or its right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles or this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member. Damages for breach of this Section 10.9 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

28

EXHIBIT "3"
Page 28 of 40

## ARTICLE XI
## INDEMNIFICATION AND INSURANCE

11.1    Indemnification of Agents.  The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or complete action, suit or proceeding by reason of the fact that he, she or it is or was a member, Manager, officer, employee or other agent of the Company or that, being or having been such a Member, Manager, officer, employee or agent, he, she or it is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability Company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an Agent), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit. The Manager shall be authorized, on behalf of the Company, to enter into indemnity agreements from time to time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Manager deems appropriate in the Manager's business judgment.

11.2    Insurance.  The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 11.1 or under applicable law.

## ARTICLE XII
## INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Manager, the other Members, and the Company as follows:

12.1    Pre-existing Relationship or Experience.  (i) He, she or it has a preexisting personal or business relationship with the Company or one (1) or more of its officer, Manager or control persons or (ii) by reason of his, hers or its business or financial experience, or by reason of the business or financial experience of his, hers or its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he, she or it is capable of evaluating the risks and merits of an investment in the Membership Interest and of protecting his, hers or its own interests in connection with this investment.

12.2    No Advertising.  He, she or it has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

12.3    Investment Intent.  He, she or it is acquiring the Membership Interest for investment purposes for his, hers or its own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest. No other person will have any direct or indirect beneficial interest in or right to the Membership Interest.

29

EXHIBIT "3"
Page 29 of 40

12.4    <u>Purpose of Entity</u>. If the Member is a corporation, partnership, limited liability company, trust, or other entity, it was not organized for the specific purpose of acquiring the Membership Interest.

12.5    <u>Economic Risk; Consulted with Advisor; Speculative Nature</u>. He, she or it is financially able to bear the economic risk of an investment in the Membership Interest, including the total loss thereof. In acquiring a Membership Interest, he, she or it has consulted with and has been guided by his own attorney, accountant or other personal investment or financial advisor with respect to and concerning the merits, risk and advisability of the purchase of the Membership Interest subscribed for herein or the undersigned has such knowledge and experience in financial, investment and business matters that he is capable of evaluating the merits, risk and advisability of an investment in the Membership Interest without the assistance of such an advisor. Further, he, she or it recognizes the speculative nature of the investment in the Membership Interest, including the fact that the Property being purchased by the Company is an empty building, with asbestos, and in need of millions of dollars in improvements.

12.6    <u>No Registration of Membership Interest</u>. He, she or it acknowledges that the Membership Interest has not been registered under the Securities Act of 1933, as amended (the Securities Act), or qualified under the California Corporate Securities Law of 1968, as amended, or any other applicable blue sky laws in reliance, in part, on his, hers or its representations, warranties, and agreements herein.

12.7    <u>Membership Interest in Restricted Security</u>. He, she or it understands that the Membership Interest is a restricted security under the Securities Act in that the Membership Interest will be acquired from the Company in a transaction not involving a public offering, and that the Membership Interest may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise the Membership Interest must be held indefinitely. In this connection, he, she or it understands the resale limitations imposed by the Securities Act and is familiar with SEC Rule 144, as presently in effect, and the conditions which must be met in order for the Rule to be available for resale of restricted securities, including the requirement that the securities must be held for at least two (2) years after purchase thereof from the Company prior to resale (three (3) years in the absence of publicly available information about the Company) and the condition that there be available to the public current information about the Company under certain circumstances. He, she or it understands that the Company has not made such information available to the public and has no present plans to do so.

12.8    <u>No Obligation to Register</u>. He, she or it represents, warrants, and agrees that the Company and the Manager is under no obligation to register or qualify the Membership Interest under the Securities Act or under any state securities law, or to assist him or it in complying with any exemption from registration and qualification.

12.9    <u>No Disposition in Violation of Law</u>. Without limiting the representations set forth above, and without limiting Article VII of this Agreement, he, she or it will not make any disposition of all or any part of the Membership Interest which will result in the violation by him or it or by the Company of the Securities Act, the California Corporate Securities Law of 1968, or any other applicable securities laws. Without limiting the foregoing, he, she or it agrees not to make any disposition of all or any part of the Membership Interest unless and until:

30

A.    There is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement and any applicable requirements of state securities laws; or

B.    (i) He, she or it has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (ii) if reasonably requested by the Manager, he, she or it has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

C.    In the case of any disposition of all or any part of the Membership Interest pursuant to SEC Rule 144, in addition to the matters set forth in Section 12.11B, he or she shall promptly forward to the Company a copy of any Form 144 filed with the SEC with respect to such disposition and a letter from the executing broker satisfactory to the Company evidencing compliance with SEC Rule 144. If SEC Rule 144 is amended or if the SEC's interpretations thereof in effect at the time of any such disposition have changed from its present interpretations thereof, he, she or it shall provide the Company with such additional documents as the Manager may reasonably require.

12.10    Legends. He, she or it understands that the certificates (if any) evidencing the Membership Interest may bear one (1) or all of the following legends:

A.    THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY. SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS WHICH ARE SET FORTH HEREIN.

B.    Any legend required by applicable state securities law.

12.11    Investment Risk. He, she or it acknowledges that the Membership Interest is a speculative investment which involves a substantial degree of risk of loss by him, her or it of his, her or its entire investment in the Company, that he, she or it understands and takes full cognizance of the risk factors related to the purchase of the Membership Interest, and that the Company is newly organized and has no financial or operating history. Furthermore, the Property has asbestos, is vacant and earning no income and is in need of millions of dollars in improvements.

12.12    Investment Experience. He, she or it is an experienced investor in unregistered and restricted securities of limited liability companies or limited partnerships.

12.13    Restrictions on Transferability. He, she or it acknowledges that there are substantial restrictions on the transferability of the Membership Interest pursuant to this Agreement, that there is no public market for the Membership

31

Interest and none is expected to develop, and that, accordingly, it may not be possible for him, her or it to liquidate his, hers or its investment in the Company.

12.14   Information Reviewed. He, she or it has received and reviewed all information he, she or it considers necessary or appropriate for deciding whether to purchase the Membership Interest. He, she or it has had an opportunity to ask questions and receive answers from the Company and its officers, Manager and employees regarding the terms and conditions of purchase of the Membership Interest and regarding the business, financial affairs, and other aspects of the Company and has further had the opportunity to obtain all information (to the extent the Company possesses or can acquire such information without unreasonable effort or expense) which he, she or it deems necessary to evaluate the investment and to verify the accuracy of information otherwise provided to him, her or it.

12.15   No Representations by Company. Neither any Manager, any agent or employee of the Company or of any of the Manager, or any other Person has at any time expressly or implicitly represented, guaranteed, or warranted to him, her or it that he, she or it may freely transfer the Membership Interest, that a percentage of profit and/or amount or type of consideration will be realized as a result of an investment in the Membership Interest, that past performance or experience on the part of the Manager or Manager's Affiliates or any other person in any way indicates the predictable results of the ownership of the Membership Interest or of the overall Company business, that any cash distributions from Company operations or otherwise will be made to the Members by any specific date or will be made at all, or that any specific tax benefits will accrue as a result of an investment in the Company.

12.15.1   Neither the Company nor any Manager, nor any agent or representative of the Company or any of the officers, directors, agents, Members or affiliates of either of them, has made any representations or warranties of any kind to induce the purchase of a Membership Interest in Company or to enter into this Agreement.

12.15.2   Any statements, brochures, information, data, and figures describing or relating in any way to the investment are based upon information obtained by the Company from sources which it deems reliable, but are not made or intended as representations, warranties, guarantees, promises or inducements by the Company.

12.15.3   Any projected or estimated figures of income, expense, depreciation and expenses of operation are estimates and projections only and are not warranted, represented, or guaranteed.

12.15.4   For acquiring a Membership Interest in Company, he she or it has been afforded the opportunity to ask questions and to receive answers concerning the Company's financial condition, business, assets, prospects, liabilities and the terms and conditions of this Agreement, and that the Manager and any agents or representatives of Company have answered all such questions to the satisfaction of the undersigned.

12.15.5   The Company is not liable or bound in any manner by statements, representations or information, if any, pertaining to the income or operation of, or by any matter affecting or relating to the investment, or by any information or data furnished by any person unless specifically set forth in this Agreement.

12.15.6   In acquiring their Membership Interest, each Member has been provided a projection of cash flow based on the expected amortization of the loan to be obtained by Company. Each Member acknowledges and understands that during the years set forth in the projection, it is anticipated that the Company will not be able to issue to

32

Class A Members the full eight percent (8%) preferred return described in Section 3.4.1 hereof. Furthermore, the Members acknowledge that the projection is not an assurance or guaranty with respect to a return on each Member's initial contribution.

12.16    Consultation with Attorney. He, she or it has been advised to consult with his, hers or its own attorney regarding all legal matters concerning an investment in the Company and the tax consequences of participating in the Company, and has done so, to the extent he, she or it considers necessary.

12.17    Tax Consequences. He, she or it acknowledges that the tax consequences to him, her or it of investing in the Company will depend on his, hers or its particular circumstances, and neither the Company, the Manager, the Members, nor the partners, shareholders, members, managers, agents, officers, directors, employees, Affiliates, or consultants of any of them will be responsible or liable for the tax consequences to him, her or it of an investment in the Company. He, she or it will look solely to, and rely upon, his, hers or its own advisers with respect to the tax consequences of this investment.

12.18    No Assurance of Tax Benefits. He, she or it acknowledges that there can be no assurance that the Code or the Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Company and the members of some or all of the tax benefits they might now receive, nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service.

12.19    Indemnity. Each Member shall indemnify and hold harmless the Company, each and every Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, agents, attorneys, registered representatives, and control persons of any such entity who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by him or it including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the Company, each and every Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, attorneys, accountants, agents, registered representatives, and control persons of any such Person (including attorneys' fees, judgments, fines, and amounts paid in settlement, payable as incurred) incurred by such Person in connection with such action, suit, proceeding, or the like.

## ARTICLE XIII
## MISCELLANEOUS

13.1    Counsel to the Company. Counsel to the Company may also be counsel to any Manager or any Affiliate of a Manager. The Manager may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction (Rules). The Managers shall mutually select a law firm as legal counsel to the Company. Each Member acknowledges that Company Counsel does not represent any Member in the absence of a clear and explicit agreement to such effect between the Member and Company Counsel, and that in the absence of any such

33

EXHIBIT "3"
Page 33 of 40

agreement Company Counsel shall owe no duties directly to a Member. In the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and a Manager (or Affiliate of a Manager) that Company Counsel represents, on the other hand, then each Member agrees that Company Counsel may represent either the Company or such Manager (or his, hers or its Affiliate), or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

13.2    Complete Agreement.  This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members and Manager with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and Manager or any of them. No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or Manager or have any force or effect whatsoever. To the extent that any provision of this Agreement or the Articles conflict with any provision of this Agreement, the Articles shall control.

13.3    Binding Effect.  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

13.4    Parties in Interest.  Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and Manager and his respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

13.5    Pronouns; Statutory References.  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference to the Code, the Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

13.6    Headings.  All headings are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

13.7    Interpretation.  In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his, hers or its counsel.

13.8    References to this Agreement.  Numbered or lettered articles, section and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

13.9    Jurisdiction.  Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under, or in connection with this Agreement or the transactions contemplated by this Agreement, provided such claim is not required to be arbitrated pursuant to Section 13.10. Each Member further agrees that personal jurisdiction over him or it may be effected by service of process by registered or certified mail addressed as provided in Section 13.14 of this Agreement, and that when so made shall be as if served upon him or it personally with the State of California.

34

EXHIBIT "3"
Page 34 of 40

13.10    Disputed Matters. Except as otherwise provided in this Agreement, any controversy or dispute arising out of this Agreement, the interpretation of any of the provisions hereof, or the action or inaction of any Member or Manager hereunder shall be submitted to arbitration in Los Angeles, California before the American Arbitration Association under the real estate arbitration rules then obtaining of the American Arbitration Association. Any award or decision obtained from any such arbitration proceeding shall be final and binding on the parties, and judgment upon any award thus obtained may be entered in any court having jurisdiction thereof. No action at law or in equity based upon any claim arising out of or related to this Agreement shall be instituted in any court by a Member except (a) an action to compel arbitration pursuant to this Section 13.10 or (b) an action to enforce an award obtained in an arbitration proceeding in accordance with this Section 13.10.

13.11    Exhibits. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

13.12    Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

13.13    Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

13.14    Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member or Manager at the address specified in Exhibit A hereto. Any party may, at any time by giving five (5) days prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

13.15    Amendments. All amendments to this Agreement will be in writing and signed by all of the Members.

13.16    Reliance on Authority of Person Signing Agreement. If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

13.17    No Interest in Company Property; Waiver of Action for Partition. No Member or Economic Interest Owner has any interest in specific property of the Company. Without limiting the foregoing, each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that he, she or it may have to maintain any action for partition with respect to the property of the Company.

35

13.18    Multiple Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

13.19    Attorney Fees. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses.

13.20    Time is of the Essence. All dates and times in this Agreement are of the essence.

13.21    Remedies Cumulative. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

13.22    Special Power of Attorney.

    A.    Attorney in Fact. Each member grants the Manager a special power of attorney irrevocably making, constituting, and appointing the Manager as the Member's attorney in fact, with all power and authority to act in the Member's name and on the Member's behalf to execute, acknowledge and deliver and swear to in the execution, acknowledgment, delivery and filing of the following documents:

        (i)    Promissory notes to be delivered pursuant to Section 3.5;

        (ii)    Assignments of certificates of membership interest or other documents of transfer to be delivered pursuant to Section 3.5 or in connection with the purchase of a Membership Interest pursuant to Section 3.5, Section 7.7 or Article VIII;

        (iii)    Any other instrument or document that may be reasonably required by the Manager in connection with any of the foregoing or to reflect any reduction in the Member's Capital Account or Percentage Interest pursuant to Section 3.5; and

        (iv)    Any consent to the representation of the Company by counsel selected by the Manager as described in Section 13.1.

    B.    Irrevocable Power. The special power granted in Section 13.22A: (i) is irrevocable; (ii) is coupled with an interest; and (iii) shall survive a Member's death, incapacity or dissolution.

    C.    Signatures. The Manager may exercise the special power of attorney granted in Section 13.22A by a facsimile signature of the Manager or one of Manager's officers.

13.23    No Third Party Beneficiary. The Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of the Agreement as a third party beneficiary or otherwise.

36

EXHIBIT "3"
Page 36 of 40

13.24    Not for Benefit of Creditors. The provisions of the Agreement are intended only for the regulation of relations among Members and Company. The Agreement is not intended for the benefit of a creditor who is not a Member and does not grant any rights to or confer any benefits on any creditor who is not a Member or any other person who is not a Member, a Manager, or an officer.

13.25    Reserved.

13.26    Rights of Judgment Creditor of Member. On application to a court of competent jurisdiction by a judgment creditor of a Member, the court may charge the Member's interest with payment of the unsatisfied amount of the judgment with interest. To the extent so charged the judgment creditor has only the rights of an assignee of the Member's interest. This Paragraph does not deprive any Member of the benefit of any exemption applicable to his interest.

13.27    Legal Representative or Successor of a Member. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage his, hers or its person or property, the executor, administrator, guardian, conservator or other legal representative may exercise all rights of the Member in the purpose of settling his, hers or its estate or administering his, hers or its property.

13.28    Number of Members. The Company shall at all times have at least two (2) members.

13.29    No Responsibility for Pre-Formation Commitments. In the event that any Member (or any of such Member's shareholders, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that related to or otherwise affects Company (other than for the existing loan with Pacific Western Bank, costs of rezoning the property as a medical usage, and real costs of operating the building prior to this new Agreement), neither Company nor any other Member shall have any liability or responsibility for or with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by Company pursuant to a written instrument signed by the Manager. Furthermore, neither Company nor any Member shall be responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or any of such Member's shareholders or Affiliates). Each Member is aware of, agrees to and acknowledges that transaction fees, acquisition fees and leasing commissions may be paid in the acquisition of the property or leases, the majority of which will be paid to Members of the Company. All Members agree to, approve and acknowledge that Company is placing a construction/permanent loan ("Loan") in the approximate amount of at least Eight Million Two Hundred Thousand Dollars ($8,200,000.00) on the Property at time of closing on the Property.

13.30    Cooperation in Tax Deferred Exchange. The Company has been formed, principally, to invest in real property. If the Company shall decide to sell the Project, then the Members shall cooperate with each other, in good faith, to facilitate any Member wishing to do a tax-deferred exchange with respect to such Member's beneficial interest in the Project. In lieu of such Member receiving his pro rata share of the net sales proceeds from any such sale. Such cooperation shall include, without limitation, the Company distributing such Member's pro rata beneficial interest in the Project to such Member, for such Member to hold as a tenant in common with the Company for a period of not less than 90 days (or such lesser number of days as the exchanging Member shall request) prior to the consummation of any such sale. The Member wishing to effectuate such a tax-deferred exchange shall bear all additional costs and expenses incurred in connection with effectuating the same.

37

EXHIBIT "3"
Page 37 of 40

Jun 22 06 09:35a          949.752.2583                    BEITLER REALTY                              p.1 PAGE  02

IN WITNESS WHEREOF, all of the Members of Mission Medical Investors, LLC, A California limited liability company, have executed this Agreement, effective as of the date written above.

MEMBERS:

_____
BARRY BEITLER

_____
JOHN BRAL

_____
JEFFREY D. GROSS, M.D.
& MELISSA C. GROSS JTWROS

_____
JOSEPH C. BRAL

_____
SHAMS INVESTMENT GROUP LLC

_____
JULIET BRAL & MEHRDAD
TABAR

38

EXHIBIT "A - I"

Class "B" Investors

| | |
|---|---|
| Barry Beitler | 10 % |
| John Bral | 10 % |
| Total Class B | 20 % |

39

## EXHIBIT "A - 2"

### Class "A" Investors and Capital Contributions

| Member | Address | Capital Percentage | Capital Contributed |
|---|---|---|---|
| Barry Beitler and John Bral Split 50/50 | 825 South Barrington Ave. Los Angeles, CA 90049 | 61.40% | $1,950,000.00 |
| Joseph C. Bral | 1 Half Moon Irvine, CA 92614 | 3.2% | $100,000.00 |
| Jeffrey D. Gross, M.D. & Melissa C. Gross | 10 Orion Way Coto de Casa, CA 92679 | 3.2% | $100,000.00 |
| SHANS Investment Group LLC | 16300 Sand Canyon Avenue Suite 903, Irvine, CA 92618 | 9% | $250,000.00 |
| Juliet Bral & Mehrdad Tabar | 1 Half Moon Irvine, CA 92614 | 3.2% | $100,000.00 |
| Total Capital | | 80.0% | $2,500,000.00 |

40

# EXHIBIT "4"

**OPERATING AGREEMENT FOR**
**JAVAHER INVESTORS LLC**
**A CALIFORNIA LIMITED LIABILITY COMPANY**

This Operating Agreement, is made as this 27th day of May, 2005 by and among the parties listed on the signatures pages hereof, with reference to the following facts:

A.      On May 27, 2005, Articles of Organization for JAVAHER INVESTORS LLC, a California limited liability company (the Company), a limited liability company under the laws of the State of California, were filed with the California Secretary of State, Document Number 200515210013.

NOW, THEREFORE, the parties (hereinafter sometimes collectively referred to as the Members, or individually as the Member) by this Agreement set forth the Operating Agreement for the Company under the laws of the State of California upon the terms and subject to the conditions of this Agreement.

**ARTICLE 1**
**DEFINITIONS**
**ARTICLE 1  DEFINITIONS**

When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement which are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

1.1      Act shall mean the Beverly-Killea Limited Liability Act, codified in the California Corporations Code, Section 17000 et seq., as the same may be amended from time to time.

1.2      Affiliate shall mean any individual, partnership, corporation, trust, or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member.  The term control, as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1.3      Agreement shall mean this Operating Agreement, as originally executed and as amended from time to time.

1.4      Articles shall mean the Articles of Organization for the Company originally filed with the California Secretary of State and as amended from time to time.

1.5      Bankruptcy shall mean, *(i)* the entry of a decree or order for relief against any Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, Debtor Relief Law) generally affecting the rights of creditors and relief of debtors now or hereafter in effect; *(ii)* the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; *(iii)* the ordering of the winding up or liquidation of a Member's affairs; *(iv)* the filing of a petition in any such involuntary bankruptcy case, which petition remains not dismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); *(v)* the commencement by a Member of a voluntary case under any applicable Debtor Relief Law now

1

or hereafter in effect; *(vi)* the consent by a Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or *(vii)* the making by a Member of any general assignment for the benefit of its creditors.

1.6     Capital Account shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.3.

1.7     Capital Contribution shall mean the total value of cash contributed to the Company by Members.

1.8     Code shall mean the Internal Revenue Code of 1986, as amended from time to time, and the provisions of succeeding law.

1.9     Company shall mean JAVAHER INVESTORS LLC, a California Limited Liability Company.

1.10    Company Minimum Gain shall have the meaning ascribed to the term Partnership Minimum Gain in the Regulations Section 1.704-2(d).

1.11    Corporations Code shall mean the California Corporations Code, as amended from time to time, and the provisions of succeeding law.

1.12    Dissolution Event for the Company means the following:

With respect to any Member, one or more of the following:

1.      When the period fixed for the duration of the Company expires as defined in 2.3 herein; or

2.      By the unanimous written agreement of all Members.

1.13    "Distributable Net Cash" shall mean the amount of cash which the Manager deems available for distribution to the Members, taking into account all Company debts, liabilities, and obligations of the Company then due and amounts which the Manager deems necessary to place into reserves for customary and usual claims with respect to the Company's business.

1.14    Economic Interest shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a member, including, without limitation, the right to vote or participate in the management, or except as provided in Section 17106 of the Corporations Code, any right to information concerning the business and affairs of Company.

1.15    Reserved

1.16    Fiscal Year shall mean the Company's fiscal year, which shall be the calendar year.

1.17    Former Members shall have the meaning ascribed to it in Section 8.1.

1.18    Former Member's Interest shall have the meaning ascribed to it in Section 8.1.

1.19    Majority Interest shall mean Percentage Interests of one or more Members, which taken together exceeds fifty percent (50%) of the aggregate of all Percentage Interests.

1.20    Manager shall mean, JOHN BRAL and HOOTAN DANESHMAND, collectively, or any other person(s) or entity (ies) who succeed in their respective capacities.

2

EXHIBIT "4"
Page 3 of 39

     1.21    <u>Member</u> shall mean each Person who (a) is an initial signatory to this Agreement; has been admitted to the Company as a Member in accordance with the Articles or this Agreement; or is an assignee who has become a Member in accordance with Article VII and (b) has not resigned, withdrawn, been expelled or, if other than an individual, dissolved. It shall refer to both classes of Members in the Company. Unless otherwise expressly mentioned, Member shall refer to and include both classes of Members.

     1.21.1   <u>Class A Members</u> shall mean a class of Members that consist of those individuals, persons or entities that own one hundred percent (100%) of all of the outstanding and issued Membership Interest in Company and are specifically named in Exhibit A-1 and who have contributed on a proportionate basis 100% of all cash required hereunder.

     1.22    <u>Member Nonrecourse Debt</u> shall have the meaning ascribed to the term Partner Nonrecourse Debt in Regulations Section 1.704-2(b)(4).

     1.23    <u>Member Nonrecourse Deductions</u> shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

     1.24    <u>Membership Interest</u> shall mean a Member's entire interest in the Company including the Member's Economic Interest; the right to vote on or participate in the management; and the right to receive information concerning the business and affairs of the Company. A Membership Interest constitutes personal property.

     1.25    <u>Net Profits</u> and <u>Net Losses</u> shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (and for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) with those adjustments required by Regulations Section 1.704-1(b)(2)(iv) for purposes of adjusting and maintaining Capital Accounts in accordance therewith.

     1.26    <u>Nonrecourse Liability</u> shall have the meaning set forth in Regulations Section 1.752-1(a)(2).

     1.27    <u>Percentage Interest</u> shall mean the percentage of a Member set forth opposite the name of such Member under the column Member's Percentage Interest in Exhibit A hereto; as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.

     1.28    <u>Person</u> shall mean an individual, general partnership, limited partnership, limited liability company, corporation, trust, estate, real estate investment trust association or any other entity.

     1.29    <u>Regulations</u> shall, unless the context clearly indicates otherwise, mean the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

     1.30    <u>Remaining Members</u> shall have the meaning ascribed to it in Section 8.1.

     1.31    <u>Tax Matters Partner</u> shall be JOHN BRAL and HOOTAN DANESHMAND, collectively, or their successors as designated pursuant to Section 9.8.

3

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1     Formation. Pursuant to the Act, the Members have formed a California Limited Liability Company under the laws of the State of California by filing the Articles with the California Secretary of State and entering into this Agreement. The rights and liabilities of the Members shall be determined pursuant to the Act and to this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2     Name. The name of the Company shall be JAVAHER INVESTORS LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager deems appropriate or advisable. The Manager shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Manager considers appropriate or advisable. The phrase LLC shall always appear as part of the name of Company on all correspondence, stationary, checks, invoices and any and all documents and papers executed by Company and as otherwise required by the Act.

2.3     Term. The term of this Agreement shall be co-terminus with the period of duration of the Company, December 31, 2050, unless extended or sooner terminated as hereinafter provided.

2.4     Office and Agent. The Company shall continuously maintain an office and registered agent in the State of California as required by the Act. The principal office of the Company shall be as the Manager may determine. The Company also may have such offices, anywhere within and without the State of California, as the Manager from time to time may determine, or the business of the Company may require. The registered agent shall be as stated in the Articles or as otherwise determined by the Manager.

2.5     Addresses of the Members and the Manager. The respective addresses of the Members and the Manager are set forth on Exhibit A.

2.6     Purposes of Company. The purpose of the Company is to engage in any lawful activity for which a Limited Liability Company may be organized under the Act. Notwithstanding the foregoing, however, the Company shall not engage in any business other than the following:

(1)     The business of development, operation, leasing and managing for rental and investment of that certain real property located at Parcel 12 of Tentative PM 11112, Bakersfield, CA (the "Property");

(2)     such other activities directly related to the foregoing business as may be necessary, advisable, or appropriate, in the reasonable opinion of the Manager to further the foregoing business.

2.7     Title to Property in the Name of the Company. Title to the real property purchased in accordance with 2.6 above shall be held and owned in the name of the Company

2.8     Tax Status of Company. The Members intend that the Company be treated as a partnership for income tax purposes and agree to take any actions necessary in order to obtain such treatment.

4

## ARTICLE III
## CAPITAL CONTRIBUTIONS

3.1    Initial Capital Contributions. Each Member shall contribute such amount as is set forth on Exhibit A as his, hers or its initial Capital Contribution within one year of the execution of this agreement. Exhibit A shall consist of Section A-1. Exhibit A-1 shall contain Class A Members.

3.2    Additional Capital Contributions.

(1)    In addition, each Member shall contribute to the capital of the Company its pro rata share of such amounts as the Manager shall determine from time to time to be necessary in order to carry out the purposes of the Company set forth above within ten (10) days or thirty (30) days, depending on the amount of the capital call, after the call is made for same by the Manager.

(2)    If the Manager determines that the Company requires additional funds for any purpose, it may request that the Members contribute more funds to the Company. In such case, each Member shall contribute to the capital of the Company its pro rata share of such amounts as the Manager shall determine from time to time to be necessary in order to carry out the purposes of the Company set forth above within ten (10) business days if the total capital call is under ten thousand dollars ($10,000), or thirty (30) days if ten thousand dollars ($10,000) or over, after the call is made for same by the Manager.

(3)    Alternatively or additionally, Manager may reserve up to One Hundred Fifty Thousand dollars ($150,000) from Distributable Net Cash for such purposes.

(4)    If any Member fails to timely make its pro rata contribution as required above and required by the Manager, that Member or Members shall have his/her Membership Interest decreased proportionally for the failure to make such required contributions. For example; Manager calls for one hundred thousand dollars. Member X, who owns eight percent (8%), fails to fund the call. The remaining Members must, pro rata, fill the capital call. Member X's interest is then reduced by itself, namely eight percent (8%) in this example, leaving Member X with seven point thirty-six percent (7.36%) interest. The diluted interest is then distributed to the Members making the capital call, pro rata.

3.3    Capital Accounts. The Company shall establish an individual Capital Account for each Member.  The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv). If a Member transfers all or a part of his, hers or its Membership Interest in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations Section 1.704-1(b)(2)(iv)(1).

3.4    No Interest or Preferred Return. Except as otherwise expressly provided herein, no Member shall be entitled to receive any interest or preferred return on his, hers or its Capital Contributions.

3.4.1    Preferred Return to Class A Members. To the extent permitted by working capital requirements and other contingencies determined by the Manager, Company shall issue to Class A Members an six percent (6%) preferred return, per annum, non-compounding, on their initial capital contribution set forth in Exhibit A-1 hereto. To the extent the preferred return cannot be issued in full because of Company's working capital requirements or other contingencies, the preferred return shall be issued in part and shall be carried forward to each successive year until paid. When the Class A Members have been paid an amount equal to the Class A Members' initial capital contribution,

5

EXHIBIT "4"
Page 6 of 39

Class A Members shall no longer be entitled to any preferred return hereunder.  Distributions will then be strictly based upon percentage ownership. The preferred return shall at all time be calculated based upon the then outstanding unpaid initial capital contribution of Class A Members.

3.5     Limitation on Withdrawal of Capital Contribution.  No Member shall have the right to withdraw his, hers or its Capital Contribution or to demand and receive property of the Company or any distribution in return for his, hers or its Capital Contribution, except as may be specifically provided in this Agreement or permitted by law.

**ARTICLE IV**
**MEMBERS**

4.1     Limited Liability.  Except as provided in California Corporations Code Section 17254 relating to distributions by Company and Section 17101(b) relating to responsibility of Members for certain unsatisfied debts or obligations of Company, no Member or Manager shall be liable under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of Company whether that liability or obligation arises in contract or tort. No Member shall be required to loan any funds to Company.  No Member shall be required to make any contribution to Company by reason of any negative balance in his, hers or its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

4.2     Admission of Additional Members.  The Manager, with the approval of all of the Members, may admit to the Company additional Members.  Any additional Members shall obtain Membership Interests and will participate in the management, Net Profits, Net Losses, and distributions of the Company on such terms as are determined by the Manager and approved by the Members.  Notwithstanding the foregoing, substitute members may only be admitted in accordance with Article VII.

4.3     Purchase of Membership Interest.  Upon the transfer of a Member's Membership Interest in violation of this Agreement, or the occurrence of a Dissolution Event as to such Member which does not result in the dissolution of the Company, such Membership Interest may be purchased by the Company or remaining Members as provided herein. Each Member acknowledges and agrees that such right to purchase a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.

4.4     Transactions With The Company.  Subject to any limitations set forth in this Agreement and with the prior unanimous approval of the Manager and Members, and after full disclosure of the Member's involvement, a Member may lend money to and transact other business with the Company.  Subject to other applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

4.5     Except as otherwise authorized in this agreement, no Member is entitled to remuneration in a capacity acting for the Company or for Company business.

4.6     Members Are Not Agents.  Pursuant to Section 5.1 and the Articles, the management of the Company shall be vested in the Manager, the designated property manager.   No Member, acting solely in the capacity of a Member, is an agent of the Company nor can any Member in such capacity bind nor execute any instrument on behalf of the Company.

6

EXHIBIT "4"
Page 7 of 39

4.7    Voting Rights. Members shall have the right to approve or disapprove matters as specifically stated in this Agreement, including the following:

A.    Unanimous Approval. The following matters shall require the unanimous vote, approval or consent of all Members who are not the subject of a Dissolution Event or an assignor of a Membership Interest:

(i)    A decision to continue the business of the Company after the occurrence of a Dissolution Event set forth in 1.12.

(ii)    Except as provided in Article VII, the transfer of a Membership Interest and admission of the transferee or assignee as a Member of the Company.

(iii)    Any material amendment of the Articles or this Agreement.

(iv)    Purchase of additional real property by the Company.

(v)    Matters designated in paragraph C below of this Section 4.7.

B.    Approval by Members Holding a Majority Interest. Except as set forth in this Agreement in all other matters in which the vote, approval or consent of all Members is required, the vote, consent or approval of Members holding a Majority Interest (or, in instances in which there are defaulting Members, non-defaulting Members who hold a majority of the Percentage Interests held by all non-defaulting Members) shall be sufficient to authorize or approve such act; specifically including the right to sell, lease or re-finance the Company's Property.

C.    Other Voting Rights. Besides the rights granted in Sections 4.7A and 4.8A, Members may vote, consent or approve to the extent and on the terms provided in this Agreement in the following Sections:

(i)    Section 3.5 on remedies for a Member's failure to make a contribution;

(ii)    Section 4.2 on admission of new Members;

(iii)    Section 5.3B on a change in the purpose of the Company;

(iv)    Section 5.3B on reorganization of the Company;

(v)    Section 5.3B on other limitations on the Manager's authority;

(vi)    Section 5.8 on transactions with the Manager and Affiliates of the Manager;

(vii)    Section 5.10A on management fees payable to Manager; and

(viii)    Section 10.1 on dissolving the Company.

Any such vote, consent or approval must be unanimous.

4.8    Meetings of Members.

A.    Date, Time and Place of Meetings of Members; Secretary. Meetings of Members may be held at such date, time and place within the State of California as the Manager may fix from time to time. No annual or regular meetings of Members is required. At any Member's meeting, the Manager shall appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the

7

EXHIBIT "4"
Page 8 of 39

meeting which shall be placed in the minute book of the Company. Formal meetings of members are not required to take action.

B.    Power to Call Meetings. Unless otherwise prescribed by the Act or by the Articles, meetings of the Members may be called by the Manager, or upon written demand of Members holding more than ten percent (10%) of the Percentage Interests for the purpose of addressing any matters on which the Members may vote.

C.    Notice of Meeting. If a formal meeting is desired, written notice of a meeting of Members shall be sent or otherwise given to each Member in accordance with Section 4.9D not less than ten (10) nor more than sixty (60) days before the date of the meeting. The notice shall specify the place, date and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at this meeting. Upon written request to the Manager by any person entitled to call a meeting of Members, the Manager shall immediately cause notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the person calling the meeting, not less than ten (10) days nor more than sixty (60) days after the receipt of the request. If the notice is not given within twenty (20) days after the receipt of the request, the person entitled to call the meeting may give the notice.

D.    Manner of Giving Notice; Affidavit of Notice. Notice of any meeting of Members shall be given either personally or by first-class mail or telegraphic or other written communication, charges prepaid, addressed to the Member at the address of that Member appearing on the books of the Company or given by the Member to the Company for the purpose of notice. Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by telegram or other means of written communication.

If any notice addressed to a member at the address of that Member appearing on the books of the Company is returned to the Company by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice to the Member at that address, all future notices or reports shall be deemed to have been duly given without further mailing if these shall be available to the Member on written demand for the Member at the principal executive office of the Company for a period of one (1) year from the date of the giving of the notice.

An affidavit of the mailing or other means of giving any notice of any meeting shall be executed by the Manager or any secretary, assistant secretary, or any transfer agent of the Company giving the notice, and shall be filed and maintained in the minute book of the Company.

E.    Validity of Action. Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the notice of meeting or in any written waiver of notice.

F.    Quorum. The presence in person or by proxy of the holders of a Majority Interest of Profits Interest and Capital Interest shall constitute a quorum at a meeting of Members. The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum (other than adjournment) is approved by at least Members holding a Majority Interest in Profit Interest and in Capital Interest.

G.    Adjourned Meeting; Notice. Any Members meeting, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the Membership Interests represented at that meeting, either in person or by proxy, but in the absence of a quorum, no other business may be transacted at that meeting, except as provided in Section 4.9F. When any meeting of Members is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place are announced at a meeting at which the adjournment is taken, unless a new record date for the adjourned meeting is subsequently fixed, or unless the adjournment is for more than forty-five (45) days from the date set for the original meeting, in which case the Manager shall set a new record date. At any adjourned meeting the Company may transact any business which might have been transacted at the original meeting.

8

H.     Waiver of Notice or Consent. The actions taken at any meeting of Members however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, who was not present in person or by proxy, signs a written waiver of notice and consents to the holding of the meeting or approves the minutes of the meeting. All such waivers, consents or approvals shall be filed with the Company records or made a part of the minutes of the meeting.

Attendance of a person at a meeting shall constitute a waiver of notice of that meeting, except when the person objects at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened; and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters not included in the notice of the meeting if that objection is expressly made at the meeting. Neither the business to transa cted nor the purpose of any meeting of Members need be specified in any written waiver of notice except as provided in Section 4.9E.

I.     Action by Written Consent Without a Meeting. Any action that may be taken at a meeting of Members may be taken without a meeting, if a consent in writing setting forth that action so taken, is signed and delivered to the Company within ten (10) days of the record date for that action by Members having not less than the minimum number of votes which would be necessary to authorize taking that action at a meeting at which all Members entitled to vote on such action were present and voted. All such consents shall be filed with the Manager or the secretary, if any, of the Company and shall be maintained in the Company records. The written consent or proxy of any Member may be revoked by a writing signed by such Member and received by the Manager or the secretary, if any, of the written consents containing the number of votes required to authorize the proposed action.

Unless the consents of all Members entitled to vote have been solicited in writing; *(i)* notice of any Member approval of an amendment to the Articles or this Agreement; a dissolution of the Company; or a merger of the Company without a meeting by less than unanimous written consent, shall be given at least ten (10) days before the consummation of the action authorized by such approval; and *(ii)* prompt notice shall be given of the taking of any other action approved by Members without a meeting by less than unanimous written consent, to those Members entitled to vote who have not consented in writing.

J.     Telephonic Participation by Member at Meetings. Members may participate in any Members meeting through the use of any means of conference telephones or similar communications equipment as long as all Members participating can hear one another. A Member so participating is deemed to be present in person at the meeting.

K.     Record Date. In order that the Company may determine the Members of record entitled to notices of any meeting or to vote, or entitled to receive any distribution or to exercise any rights in respect of any distribution or to exercise any rights in respect of any other lawful action, the Manager, or Members representing a majority of the Percentage Interests may fix, in advance, a record date, that is not more than sixty (60) days nor less than ten (10) days prior to the date of the meeting and not more than sixty (60) days prior to any other action. If no record date if fixed:

(i)     The record date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

(ii)     The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

(iii)     The record date for determining Members for any other purpose shall be at the close of business on the day on which the Manager adopt the resolution relating thereto, or the 60th day prior to the date of the other action, whichever is later.

9

(iv)    The determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless the Manager or the Members who called the meeting fix a new record date for the adjourned meeting, but the Manager or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than forty-five (45) days from the date set for the original meeting.

L.    _Proxies._ Every Member entitled to vote for the Manager or on any other matter shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the Member or his attorney in fact and filed with the Manager or secretary, if any, of the Company. A proxy shall be deemed signed if the Member's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission, electronic transmission or otherwise) by the Member or the Member's attorney in fact. A proxy may be transmitted by an oral telephone transmission if it is submitted with information from which it may be determined that the proxy was authorized by the Member or the Member's attorney in fact. A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless *(i)* revoked by the person executing it, before the vote pursuant to that proxy; by a writing delivered to the Company stating that the proxy is revoked; or by a subsequent proxy executed by, or attendance at the meeting and voting in person by, the person executing the proxy; or *(ii)* written notice of the death or incapacity of the maker of that proxy is received by the Company before the vote pursuant to that proxy is counted; provided, however, that no proxy shall be valid after the expiration of eleven (11) months from the date of the proxy, unless otherwise provided in the proxy. The revocability of a proxy which states on its face that it is irrevocable shall be governed by the provisions of Corporations Code Sections 705(e) and 705(f).

4.9    _Certificate of Membership Interest._

A.    _Certificate._ A Membership Interest may be represented by a certificate of membership. The exact contents of a certificate of membership may be determined by action of the Manager but shall be issued substantially in conformity with the following requirements: The certificates of membership shall be respectively numbered serially, as they are issued; shall be impressed with the Company seal or a facsimile thereof, if any; and shall be signed by the Manager or officers of the Company. Each certificate of membership shall state the name of the Company; the fact that the Company is organized under the laws of the State of California; is a limited liability company; the name of the person to whom issued; the date of issue; and the Percentage Interests represented thereby. A statement of the designations, preferences, qualifications, limitations, restrictions, and special or relative rights of the Membership Interest, if any, shall be set forth in full or summarized on the face or back of the certificates which the Company shall issue, or in lieu thereof, the certificate may set forth that such a statement or summary will be furnished to any holder of a Membership Interest upon request without charge. Each certificate of membership shall be otherwise in such form as may be determined by the Manager.

B.    _Cancellation of Certificate._ All certificates of membership surrendered to the Company for transfer shall be cancelled and no new certificates of membership shall be issued in lieu thereof until the former certificates for a like number of Membership Interest shall have been surrendered and cancelled, except as herein provided with respect to lost, stolen, or destroyed certificates.

C.    _Replacement of Lost, Stolen or Destroyed Certificate._ Any Member claiming that his, hers or its certificate or membership is lost, stolen or destroyed may make an affidavit or affirmation of that fact and request a new certificate. Upon the giving of a satisfactory indemnity to the Company as reasonably required by the Manager, a new certificate may be issued of the same tenor and representing the same Percentage Interest of membership as was represented by the certificate alleged to be lost, stolen or destroyed.

10

EXHIBIT "4"
Page 11 of 39

## ARTICLE V
## MANAGEMENT AND CONTROL OF THE COMPANY

5.1    <u>Management of the Company by the Manager.</u>

A.    <u>Exclusive Management by Manager.</u>  The business, property and affairs of the Company shall be managed exclusively by the Manager.  Except for situations in which the approval of the Members is expressly required by the Articles or this Agreement, the Manager shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company; to make all decisions regarding those matters; and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.  No Member who is not a Manager shall have any authority to act for or to undertake or assume any obligation, debt, duty or responsibility on behalf of the Company.  Where this Agreement specifies an act of the Manager, unless otherwise expressly otherwise provided, it means an act taken by all persons comprising Manager.

B.    <u>Agency Authority of Manager.</u>  Either person comprising Manager, acting independently of the Members, is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts.  All checks, drafts, and other instruments obligating the Company to pay money, may be signed by either person comprising the Manager, acting alone, provided that such obligation is incurred in the ordinary course of managing the Company and/or the Property.  Any and all contracts on behalf of the Company and any obligations which are outside the ordinary course of business of the Company shall require the signature of both persons comprising the Manager.

5.2    <u>Election of Manager.</u>

A.    <u>Number.</u>  The Company shall have two (2) Managers.

B.    <u>Removal.</u>  No Manager may be removed by the vote of the Members except in the case of his malfeasance; or physical or mental incapacity; or gross negligence; or his material breach of any of the items set forth in Section 5.3 of this Agreement.

5.3    <u>Powers of Manager.</u>

A.    <u>Powers of the Manager.</u>  Without limiting the generality of Section 5.1, the Manager shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Corporations Code Section 17003.

B.    <u>Limitations On Powers of Manager.</u>  The Manager shall not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the unanimous affirmative vote or unanimous written consent of the Members:

(i)    The merger of the Company with another limited liability company or limited partnership, provided in no event shall a Member be required to become a general partner in a merger with a limited partnership without his express written consent or unless the agreement of merger provides each Member with the dissenter's rights described in the Act.

(ii)    The merger of the Company with a corporation or a general partnership or other Person.

(iii)    The establishment of different classes of Members.

11

(iv)    An alteration of the primary purpose of the Company as set forth in Section 2.3.

(v)    Transactions between the Company and the Manager or the Manager's Affiliates, or transactions in which the Manager or of any Manager's Affiliates has a material financial interest except to the extent where such transactions do not exceed commercially reasonable market rates.

(vi)    Without limiting subsection (v), the lending of money by the Company to any Manager, Member or officer.

(vii)    Any act which would make it impossible to carry on the ordinary business of the Company.

(viii)    The amendment of this Agreement.

(ix)    The purchase of additional real property by the Company.

5.4    Members Have No Managerial Authority.  The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Articles and except as expressly required by the Act.  No Member shall have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, or to render it liable for any purpose.

5.5    Performance of Duties; Liability of Manager.  The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, negligence, reckless or intentional misconduct, or a knowing violation of law by the Manager.  The Manager shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Company and shall use them solely for the benefit of the Company.  The Manager shall perform managerial duties in good faith, in a manner reasonably believed to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position of like business experience would use under similar circumstance.  A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Manager of the Company.

In performing managerial duties, the Manager shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, of the following persons or groups unless they have knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that the Manager act in good faith and after reasonable inquiry when the need therefor is indicated by the circumstances:

(a)    one or more officers, employees or other agents of the Company whom the Manager reasonably believes to be reliable and competent in the matters presented;

(b)    any attorney, independent accountant, or other person as to matters which the Manager reasonably believes to be within such persons professional or expert competence; or

(c)    a committee upon which the Manager does not serve, duly designated in accordance with a provision of the Articles or this Agreement, as to matters within its designated authority, which committee the Manager reasonably believes to merit competence.

5.6    Devotion of Time.  The Manager is not obligated to devote all of his time or business efforts to the affairs of the Company.  The Manager shall devote whatever time, effort and skill as he deems appropriate for the operation of the Company.

5.7    Competing Activities.  The Manager and the officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's

12

business and that might be in direct or indirect competition with the Company. Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. The Manager shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Manager or any Member shall have the right to hold any investment opportunity or prospective economic advantage for his or her own account or to recommend such opportunity to Persons other than the Company. The Members acknowledge that the Manager and his or her Affiliates own and/or manage businesses, including businesses that may compete with the Company and for the Manager's time. The Members hereby waive any and all rights and claims which they may otherwise have against the Manager and officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates as a result of any such activities.

5.8    Transactions Between the Company and the Manager. Notwithstanding that it may constitute a conflict of interest, the Manager may, and may cause Manager's Affiliates to engage in any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from Persons capable of similarly performing them and in similar transactions between parties operating at arms length, and provided that the Members having no interest in such transaction (other than their interests as Members) affirmatively vote unanimously or give their unanimous consent in writing to approve the transaction.

A transaction between any of the Manager and/or the Manager's Affiliates, on the one hand, and the Company, on the other hand, shall be conclusively determined to constitute a transaction on terms and conditions, on an overall basis, fair and reasonable to the Company and at least as favorable to the Company as those generally available in a similar transaction between parties operating at arm's length if the Members having no interest in such transaction (other than their interests as Members) affirmatively vote unanimously or consent in writing unanimously to approve the transaction. The Company specifically acknowledges and hires Beitler Commercial Realty Services as leasing and or listing Broker, when necessary to lease or sell the property, at market rates as defined below or some other competent comparable leasing or sales brokerage firm. Further, the Company specifically hires Manager to act as property manager for the Company and its assets at market rates as defined below.

5.9    Payments to the Manager. The Manager and Manager's Affiliates shall receive the following payments:

A.    Services Performed by Manager. Except as otherwise provided herein, the Company shall not pay the Manager for services rendered to the Company in the reasonable scope of their management duties.

B.    Expenses. The Company shall reimburse the Manager and Manager's Affiliates for the actual cost of goods and materials used for or by the Company. The Company shall also pay or reimburse any of the Manager or Manager's Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company and prepare the Articles and this Agreement.

C.    Property Management Fee. There shall be a four percent (4%) of gross income per month fee for property management to a management company chosen by Manager. Whenever possible, Manager will lease the Property on a Triple Net (NNN) basis and pass through said management fee to the tenants on a monthly basis.

D.    Property Brokerage Fee. There shall be sales commission of four percent (4%) paid to Beitler Commercial Realty Services as a listing Broker upon sale (which shall be spit 50/50 with a procuring Broker if any), and leasing commissions shall be paid to Beitler Commercial Realty Services (or to any other licensed real estate broker selected by Manager) at industry standard rates.

13

5.10    Act of Manager as Conclusive Evidence of Authority. Any note, mortgage, evidence of indebtedness, contract, certificate, statement, conveyance, or other instrument in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other person, when signed by the Manager, are not invalidated as to the Company by any lack of authority of the Manager in the absence of actual knowledge on the part of the other person that the Manager had no authority to execute the same.

5.11    Reserved.

5.12    Limited Liability. No Manager shall not be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being the Manager.


**ARTICLE VI**
**ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS**

6.1    Allocations of Net Profit and Net Losses.

A.    Net Loss. Net Loss shall be allocated to the Members in proportion to their Percentage Interests.

B.    Net Profit. Net Profit shall be allocated to the Members (i) first, proportionately (based on the amount each Member is required to be allocated pursuant to this clause (i)) until each Member has been allocated a cumulative amount of Net Profit pursuant to this clause (i) equal to the sum of the cumulative amount of Net Loss previously allocated to such Member pursuant to Section 6.1A hereof, plus the cumulative amount of distributions previously made to such Members pursuant to Section *6.5(a)* hereof, (ii) thereafter, in proportion to their Percentage Interests.

6.2    Special Allocations.

A.    Minimum Gain Chargeback. Notwithstanding Section 6.1, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 6.2A shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2A. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f). This Section 6.2A is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

B.    Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt. Notwithstanding Section 6.1 of this Agreement, if there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any Fiscal Year, each Member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 6.2B shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2B. The items to be so allocated shall be determined in accordance with Regulations Section 1 .704-2(i)(4). This Section 6.2B is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1 .704-2(i)(4) and shall be interpreted consistently therewith.

14

       C.     Nonrecourse Deductions. Notwithstanding Section 6.1, any nonrecourse deductions (as defined in Regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.

       D.     Member Nonrecourse Deductions. Notwithstanding Section 6.1, any Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i).

       E.     Qualified Income Offset. Notwithstanding Section 6.1, if a member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), or any other event creates a deficit balance in such Member's Capital Account (taking into account reductions for the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 6.2E shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article VI so that the net amount of any item so allocated and the income, gain, and losses allocated to each member pursuant to this Article VI to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Article VI if such unexpected adjustments, allocations, or distributions had not occurred.

      6.3     Code Section 704(c) Allocations. Notwithstanding any other provision in this Article VI, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this Section 6.3 are solely for purposes of federal, state and local taxes. As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other tax items or distributions pursuant to any provision of this Agreement.

      6.4     Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest. If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his, hers or its respective Membership Interest at the close of such day.

      However, for the purpose of accounting convenience and simplicity, the Company shall treat a transfer of, or an increase or decrease in, a Membership Interest which occurs at any time during a semi-monthly period (commencing with the semi-monthly period including the date hereof) as having been consummated on the last day of such semi-monthly period, regardless of when during such semi-monthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first fifteen (15) days of any month will be deemed to have been made on the 15th day of the month).

      Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Membership Interests as of the date such sale or other disposition occurs.

      6.5     Distribution of Assets by the Company. Subject to applicable law and any limitations contained elsewhere in this Agreement, the Manager may elect from time to time to distribute Distributable Cash to the Members, which distributions shall be in the following order of priority:

15

A.    Distributions from Operations.

(i)    If such Distributable Net Cash is from Company's operations, to the Members in proportion to their unreturned additional Capital Contribution until each Member has recovered his, her or its additional capital contribution.

(ii)    If such Distributable Net Cash is from Company's operations, to the Members of Class A, for their Preferred Return in Section 3.4.1 herein, in proportion to their Percentage Interest in Company in relation to each other.

(iii)    If such Distributable Net Cash is from Company's operations, to the Members of Class B, for their Preferred Return in Section 3.4.2 herein, in proportion to their Percentage Interest in Company in relation to each other.

(iv)    If such Distributable Net Cash is from Company's operations, to the Members of Class A and B in proportion to their pro rata Membership interest.

B.    Distributions from Sale, Financing or Refinancing of Company Real Property.

(i)    If such Distributable Net Cash is from the sale, financing or refinancing of the Company Property, to the Members in proportion to their unreturned additional Capital Contributions until each Member has recovered his, hers or its Additional Capital Contributions, if any, and then to Members in proportion to their unreturned initial Capital Contributions until each Member has recovered his, her or its initial Capital Contribution; and

(ii)    Thereafter, to the Members in proportion to their percentage interests.

such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual date of distribution.  Neither the Company nor the Manager shall incur any liability for making any distributions under this Section 6.5.

The Manager may, in its sole discretion, limit distributions by maintaining a working capital reserve of up to One Hundred Fifty Thousand Dollars ($150,000.00).

6.6    Form of Distribution.  A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money.  No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members.  Except upon a dissolution and the winding up of the Company, no Member may be compelled to accept a distribution of any asset in kind.

6.7    Restriction on Distributions.

A.    No distribution shall be made if, after giving effect to the distribution:

(i)    The Company would not be able to pay its debts as they become due in the usual course of business.

16

(ii)    The Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the distribution.

B.    The Manager may base a determination that a distribution is not prohibited on any of the following:

(i)    Financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances.

(ii)    A fair valuation.

(iii)    Any other method that is reasonable in the circumstances.

Except as provided in Section 17254(e) of the Corporations Code, the effect of a distribution is measured as of the date the distribution is authorized if the payment occurs within one hundred twenty (120) days after the date of authorization, or the date payment is made if it occurs more than one hundred twenty (120) days of the date of authorization.

C.    A Member or Manager who votes for a distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act if it is established that the Member or Manager did not act in compliance with Section 6.7 B or Section 10.4. Any Member or Manager who is so liable shall be entitled to compel contribution from (i) each other Member or Manager who also is so liable and (ii) each Member for the amount the Member received with knowledge of facts indicating that the distribution was made in violation of this Agreement or the Act.

6.8    Return of Distributions. Except for distributions made in violation of the Act or this Agreement, no Member or Economic Interest Owner shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company. The amount of any distribution returned to the Company by a Member or Economic Interest Owner or paid by a Member or Economic Interest Owner for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member or Economic Interest Owner.

6.9    Obligations of Members to Report Allocations. The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

17

EXHIBIT "4"
Page 18 of 39

## ARTICLE VII
### TRANSFER AND ASSIGNMENT OF INTERESTS

7.1    Transfer and Assignment of Interests. No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest except with the prior written consent of other Members having a majority of the Percentage Interests of the other Percentage Interests. Transfers in violation of this Article VII shall only be effective to the extent set forth in Section 7.7. After the consummation of any transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

7.2    Further Restrictions on Transfer of Interests. In addition to other restrictions found in this Agreement, no Member shall transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest: (i) without compliance with the legend described in Section 12.10, and (ii) if the transfer, assignment, sale or exchange would cause the termination of the Company under Section 708(b)(1)(B) of the Code, as determined by the Manager.

7.3    Substitution of Members. A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirements of Sections 7.1 and 7.2 are met; (ii) such Person executes an instrument satisfactory to the Manager accepting and adopting the terms and provisions of this Agreement; and (iii) such person pays any reasonable expenses in connection with his, hers or its admission as a new Member. The admission of a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

7.4    Family and Affiliate Transfers. The Membership Interest of any Member may be transferred subject to compliance with Section 7.2, and without the prior written consent of all Members, as required by Section 7.1, upon consent of the Manager, which shall not be unreasonably withheld, by the Member (i) by inter vivos gift or by testamentary transfer to any spouse, parent, sibling, in-law, child or grandchild of the Member; or to a trust for the benefit of the Member or such spouse, parent, sibling, in-law, child or grandchild of the Member; or (ii) to any Affiliate of the Member; it being agreed that in executing this Agreement, each Member has consented to such transfers.

7.5    Effective Date of Permitted Transfers. Any permitted transfer of all or any portion of a Membership Interest shall be effective as of the first day of the month following the date upon which the requirements of Sections 7.1, 7.2 and 7.3 have been met. The Manager shall provide the Members with written notice of such transfer as promptly as possible after the requirements of Sections 7.1, 7.2 and 7.3 have been met. Any transferee of a Membership Interest shall take subject to the restrictions on transfer imposed by this Agreement and subject to allocation of profits and losses; and distributions set forth in Section 6.4.

7.6    Rights of Legal Representatives. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, and/or other legal representative and/or beneficiary or successor may exercise all of the Member's rights for the purpose of settling the Member's estate and/or administering the Member's property, and

18

shall succeed to Member's interest herein, except that any Class B Member's successor shall continue to be a Class B Member, but without any management rights as a Class B Member..

7.7    No Effect to Transfers in Violation of Agreement. Upon any transfer of a Membership Interest in violation of this Article VII, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Economic Interest Owner and thereafter shall only receive the share of one (1) or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the Manager, a transfer in violation of this Article VII would cause the termination of the Company under the Code, in the sole discretion of the Manager, the transfer shall be null and void and the purported transferee shall not become either a Member or an Economic Interest Owner.

Upon and contemporaneously with any transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company for a purchase price of One Hundred Dollars ($100), all remaining rights and interests retained by the Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member.

Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who transfers a Membership Interest in violation of this Article VII is not unreasonable under the circumstances existing as of the date hereof

7.8    Right of First Refusal. Each time a Member proposes to transfer, assign, convey, *sell,* encumber or in any way alienate all or any part of his, hers or its Membership Interest (or as required by operation of law or other involuntary transfer to do so) other than pursuant to Section 7.4, such Member shall first offer such Membership Interest to the Company and the non-transferring Members in accordance with the following provisions:

A.    Such Member shall deliver a written notice to the Company and the other Members stating (i) such Member's bona fide intention to transfer such Membership Interest; (ii) the name and address of the proposed transferee; (iii) the Membership Interest to be transferred; and (iv) the purchase price in terms of payment for which the Member proposes to transfer such Membership Interest.

B.    Within thirty (30) days after receipt of the notice described in Section 7.8A, each non-transferring Member shall notify the Manager in writing of his, hers or its desire to purchase a portion of the Membership Interest being so transferred. The failure of any Member to submit a notice within the applicable period shall constitute an election on the part of that Member not to purchase any of the Membership Interest which may be so transferred. Each Member so electing to purchase shall be entitled to purchase a portion of such Membership Interest in the same proportion that the Percentage Interest of such Member bears to the aggregate of the Percentage Interests of all of the Members electing to so purchase the Membership Interest being transferred. In the event any Member elects to purchase

19

none or less than all of his, hers or its pro rata share of such Membership Interest, then the other Members can elect to purchase more than their pro rata share. If such Members fail to purchase the entire Membership Interest being transferred, the Company may purchase any remaining share of such Membership Interest.

        C.      Within sixty (60) days after receipt of the notice described in Section 7.8A, the Company and the Members electing to purchase such Membership Interest shall have the first right to purchase or obtain such Membership Interest upon the price and terms of payment designated in such notice. If such notice provides for the payment of non-cash consideration, the Company and such purchasing Members each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Manager.

        D.      If the Company or the other Members elect not to purchase or obtain all of the Membership Interest designated in such notice, then the transferring Member may transfer the Membership Interest described in the notice to the proposed transferee, providing such transfer (i) is completed with thirty (30) days after the expiration of the right of the Company and the other Members to purchase such Membership Interest, (ii) is made on terms no less favorable to the transferring Member than as designated in the notice, and (iii) the requirements of Sections 7.1, 7.2 and 7.3 relating to unanimous consent of Members, securities and tax requirements hereof are met. If such Membership Interest is not so transferred, the transferring Member must give notice in accordance with this Section prior to any other or subsequent transfer of such Membership Interest.

        7.8.1    Right of First Refusal Among Class of Membership.  Notwithstanding anything to the contrary herein, any proposal by a Member to transfer, assign, convey, sell, encumber or in any way alienate all or part of his, hers or its Membership Interest (Selling Member), pursuant to Section 7.8, shall first proceed to commence the Right of First Refusal procedure provided in Section 7 among Members of the Selling Members class before proceeding with the Right of First Refusal to the other Members of Company not in the Selling Member's class. For example, a Member of Class A offering its Membership Interest shall first operate the Right of First Refusal among Members of Class A, and subject to whether any Membership Interest remains available, then to Members of Class B.

        7.9    Effective Date of Permitted Transfers of an Interest.  Any permitted transfer of all or any portion of an Interest in Company will take effect on the first (1st) day of the month following receipt by the Members of written notice of transfer. Any transferee of an Interest in the Company shall take subject to the restrictions on transfer imposed by the Agreement.

        7.10    Consequences of Pledge or Grant of Security Interest.  The pledge or granting of a security interest, lien or other encumbrance in or against any or all of the Interest of a Member shall not cause the Member to cease to be a Member or to grant anyone else the power to exercise any rights or powers of a Member.

## ARTICLE VIII
## CONSEQUENCES OF, DISSOLUTION, OR WITHDRAWAL OF MEMBER (S) OR HEIRS

        8.1    Purchase of Member's Interest.  Upon the occurrence of any Dissolution Event and the unanimous consent by the remaining Members (Remaining Members) to continue the business of Company, and if applicable, the

20

desire of the member or its heirs to the other Members (the Remaining Members) shall have an option to purchase such Membership Interest. Within ninety (90) days of the Unanimous Consent or within ninety (90) days of the receipt of the rightful demand for the return of its Capital Account by the Former Member or by such Former Member's trustee or heirs, or within in ninety (90) days of the inheritance or transfer by operation of law to a person, the Remaining Members shall notify the Manager in writing of their desires to purchase a portion of the Former Member's Interest.

8.2    <u>Withdrawal</u>. Notwithstanding Section 8.1, only upon the withdrawal by a Member in accordance with Section 4.3, such Member shall be treated as a Former Member, and the Company and/or the Remaining Members shall have the option to purchase, and the Former Member shall be obligated to sell, the Former Member's Interest as provided in this Article VIII.

8.3    <u>Purchase Price</u>. The purchase price for the Former Member's Interest shall be the fair market value of the Former Member's Interest determined by three (3) independent appraisers, one (1) selected by the Former Member or such Former Member's legal representative, one (1) selected by the Company, and one (1) selected by the two (2) appraisers so named. The fair market value of the Former Member's Interest shall be the average of the two (2) appraisals closest in amount to each other. In all other events, the Former Member shall pay one-half (50%) of such expense of the appraisers and the Remaining Members shall pay one-half (50%) of such expense and the purchase price shall be the fair market value determined by appraisal reduced by six percent (6%) representing a reasonable and customary brokerage commission which would be paid to a broker in an arms length role and escrow closing costs. Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

8.4    <u>Notice of Intent to Purchase</u>. Within thirty (30) days after the Manager has notified the Remaining Members as to the purchase price of the Former Member's Interest determined in accordance with Section 8.3, each Remaining Member shall notify the Manager in writing of his, hers or its desire to purchase a portion of the Former Member's Interest. The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest. Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Members Interest in the same proportion that the Percentage Interest of the Remaining Member bears to the aggregate of the Percentage Interests of all of the Remaining Members electing to purchase the Former Member's Interest.

8.5    <u>Election to Purchase Less Than All of An Interest</u>. In the event any Remaining Member elects to purchase none or less than all of its pro rata part of the Former Member's Interest, then, at its election, those Remaining Members can elect to purchase more than their pro rata part, i.e., the proportion that the Percentage Interest of the Former Member bears to the aggregate of the Percentage Interests of all Members and the Former Member. If the Remaining Members fail to purchase the entire interest of the Former Member, Company may elect to purchase the former Member's Interest unpurchased portion. If none of the above elects to purchase, the same shall pass by operation of law to any assignee or shall remain in the hands of the Former Member, subject to any right of the holder of such interest to demand payment therefore according to California law. Notwithstanding any provision of the Agreement to the contrary, the remaining Members may mutually agree to an allocation of the Former Member's Interest to be purchased by each of them.

21

8.6    <u>Payment of Purchase Price</u>.  The purchase price shall be paid by the Company or the Remaining Members, as the case may be, either: (i) in equal monthly installments of principal together with interest amortized over a thirty (30) year period, commencing to accrue from the date of closing, at the then current Applicable Federal Rate (the AFR) under Section 1274(d) of the Internal Revenue Code (IRC) for the month in which the first payment is made (or a rate per annum equal to what the AFR would be for such month under IRC Section 1274(d) of the Code if the AFR is no longer published) to fully amortize such purchase price over such ten (10) payments with the first payment being due and payable 60 days after the determination of the fair market value of the Former Member's Interest in the Company, or (ii) within 60 days after the determination of the fair market value of the Former Member's Interest in the Company, as the Company or the Remaining Members, as the case may be, may elect in their sole discretion.

8.7    <u>Closing of Purchase of Former Member's Interest</u>.  The closing for the sale of a Former Member's Interest pursuant to this Article VIII shall be held at 10:00 a.m. at the principal office of the Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Former Member or such Former Member's legal representative shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest. The Former Member or such Former Member's legal representative, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

8.8    <u>Purchase Terms Varied by Agreement</u>.  Nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

## ARTICLE IX
## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

9.1    <u>Books and Records</u>.  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office in California all of the following:

A.    A current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner;

B.    A current list of the full name and business or residence address of each Manager.

C.    A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed.

22

D.      Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

E.      A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

F.      Copies of the financial statements of the Company, if any, for the six (6) most recent Fiscal Years; and

G.      The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) Fiscal Years.

9.2     Delivery to Members and Inspection.

A.      Upon the request of any Member or Economic Interest Owner for purposes reasonably related to the interest of that Person as a Member or Economic Interest Owner, the Manager shall promptly deliver to the requesting Member or Economic Interest Owner, at the expense of the Company, a copy of the information required to be maintained by Sections 9.1A, B and D, and a copy of this Agreement.

B.      Each Member, Manager and Economic Interest Owner has the right, upon reasonable request for purposes reasonably related to the interest of the Person as Member, Manager or Economic Interest Owner, to:

(i)      inspect and copy during normal business hours any of the Company records described in Section 9.1A through G; and

(ii)     obtain from the Manager, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year, as well as any and all Company financial records.

C.      Members representing at least twenty-five percent (25%) of the Percentage Interests, or three (3) or more Members, make a written request to the Manager for an income statement of the Company for the initial three (3) month, six (6) month, or nine (9) month period of the current Fiscal Year ended more than thirty (30) days prior to the date of the request, and a balance sheet of the Company as of the end of that period. Such statement shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Manager that the statement was prepared without audit from the books and records of the Company. If so requested, the statement shall be delivered or mailed to the Members within thirty (30) days thereafter.

Any Member or a Member's designated representative has the right to inspect the books of the Company at reasonable times upon forty-eight (48) hours written notice to the Manager, but no more than once each calendar quarter for any one (1) Member.

D.      Any request, inspection or copying by a Member or Economic Interest Owner under this Section 9.2 may be made by that Person or that Person's agent or attorney.

23

E.       The Manager shall promptly furnish to a Member a copy of any amendment to the Articles or this Agreement executed by the Manager pursuant to a power of attorney from the Member.

F.       The Manager shall promptly furnish to a Member written notice of any action concerning the Company which is likely to have a substantial impact upon any of the Members.

9.3       Quarterly Statements and Reports.

A.       Upon request, the Manager shall cause quarterly reports to be sent to each of the Members no later than thirty (30) days after the close of each calendar quarter. The report shall contain a balance sheet as of the end of the calendar quarter and an income statement and statement of changes in financial position for the calendar quarter. Such financial statements shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Manager that the financial statements were prepared without audit from the books and records of the Company.

B.       The Manager shall cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Members' and Economic Interest Owners' federal and state income tax returns. The Manager shall send or cause to be sent to each Member or Economic Interest Owner within ninety (90) days after the end of each taxable year such information as is necessary to complete federal and state income tax or information returns, and, if the Company has thirty-five *(35)* or fewer Members, a copy of the Company's federal, state, and local income tax or information returns for that year.

C.       The Manager shall cause to be filed at least annually with the California Secretary of State the statement required under California Corporations Code    17060.

9.4       Financial and Other Information. The Manager shall provide such financial and other information relating to the Company or any other Person in which the Company owns, directly or indirectly, an equity interest, as a Member may reasonably request. The Manager shall distribute to the Members, promptly after the preparation or receipt thereof by the Manager, any financial or other information relating to any Person in which the Company owns, directly or indirectly, an equity interest, including any filings by such Person under the Securities Exchange Act of 1934, as amended, that is received by the Company with respect to any equity interest of the Company in such Person.

9.5       Filings. The Manager, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Manager, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Articles and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If the Manager is required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or refuses to do so, any other Manager or Member may prepare, execute and file that document with the California Secretary of State.

9.6       Bank Accounts. The Manager shall maintain the funds of the Company in one (1) or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

24

9.7    Accounting Decisions and Reliance on Others. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Manager. The Manager may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

9.8    Tax Matters for the Company Handled by Manager and Tax Matters Partner. The Manager shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members. The Tax Matters Partner, as defined in Code Section 6231, shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith. The Tax Matters Partner shall oversee the Company tax affairs in the overall best interests of the Company. If for any reason the Tax Matters Partner can no longer serve in that capacity or ceases to be a Member or Manager, as the case may be, Members holding a Majority Interest may designate another to be Tax Matters Partner.

9.9    Choice of Company's Accountant. The Company's Accountant shall be selected by the Manager.

## ARTICLE X
## DISSOLUTION AND WINDING UP

10.1    Dissolution. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first (1st) to occur of the following:

      A.    Upon the happening of any event of dissolution specified in the Articles;

      B.    Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the Corporations Code;

      C.    The occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Section 8.1 to continue the business of the Company within ninety (90) days after the occurrence of such event or the failure of the Company or the Remaining Members to purchase the Former Member's Interest as provided in Section 8.2; or

      D.    The sale of all or substantially all of the assets of Company.

10.2    Certificate of Dissolution. As soon as possible following the occurrence of any of the events specified in Section 10.1, the Manager who has not wrongfully dissolved the Company or, if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Certificate as required by the Act. Upon the filing by the Certificate of Dissolution, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence continues until the certificate of cancellation of articles of organization Dissolution have been filed with the Secretary of State or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

25

10.3    <u>Winding Up</u>. Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Manager who has not wrongfully dissolved the Company or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof; shall cause the proceeds there from, to the extent sufficient therefore, to be applied and distributed as provided in Section *10.5*. The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Manager(s) or Members winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

10.4    <u>Distributions in Kind</u>. Any non-cash asset distributed to one (1) or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value. Such Net Profit or Net Loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by the <u>Manager</u> or by the Members or, if any Member objects, by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by the <u>Manager</u> or liquidating trustee and approved by the Members.

10.5.    <u>Order of Payment of Liabilities Upon Dissolution</u>.

A.    The distribution of payments of the Company in the process of winding-up shall be made in the following order: (i) All known debts and liabilities of the Company, excluding debts and liabilities to Members who are creditors of the Company; (ii) All known debts and liabilities of the Company owed to Members who are creditors of the Company; (iii) The remaining assets shall be distributed to the Members in accordance with their positive Capital Account balances, after taking into account income and loss allocations and distributions (other than pursuant to Section 10.5A) for the Company's taxable year during which liquidation occurs.

Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

B.    The payment of a debt or liability, whether or not the whereabouts of the creditor is known, has been adequately provided for if:

(i)    Payment thereof has been assumed or guaranteed in good faith by one (1) or more financially responsible persons or by the United States government or any agency thereof; and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Members or <u>Manager</u> to be adequate at the time of any distribution of the assets pursuant to this Section.

(ii)    The amount of the debt or liability has been deposited as provided in Section 2008 of the Corporations Code.

26

131

EXHIBIT "4"
Page 27 of 39

This Section 10.5B shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

10.6    Compliance with Regulations.  All payments to the Members upon the winding up and dissolution of Company shall be strictly in accordance with the positive Capital Account balance limitation of Regulations Section 1.704-1(b)(2)(ii)(b)(2).

10.7    Limitations on Payments Made in Dissolution.  Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of Company for the return of his, hers or its positive Capital Account balance and shall have no recourse for his, hers or its Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Manager or any other Member except as provided in Article XI.

10.8    Certificate of Cancellation.  The Manager or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a certificate of cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

10.9    No Action for Dissolution.  Except as expressly permitted in this Agreement, a Member shall not take any voluntary action which directly causes a Dissolution Event. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 10.1. This Agreement has been drawn carefully to provide fair treatment to all parties and equitable payment in liquidation of the Economic Interests. Accordingly, except where the Manager has failed to liquidate the Company as required by this Article X, each Member hereby waives and renounces his, hers or its right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles or this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member. Damages for breach of this Section 10.9 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

27

## ARTICLE XI
### INDEMNIFICATION AND INSURANCE

11.1    <u>Indemnification of Agents</u>.  The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or complete action, suit or proceeding by reason of the fact that he, she or it is or was a member, Manager, officer, employee or other agent of the Company or that, being or having been such a Member, Manager, officer, employee or agent, he, she or it is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability Company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an  gent), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit. The Manager shall be authorized, on behalf of the Company, to enter into indemnity agreements from time to time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Manager deems appropriate in the Manager's business judgment.

11.2    <u>Insurance</u>.  The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 11.1 or under applicable law.

## ARTICLE XII
### INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Manager, the other Members, and the Company as follows:

12.1    <u>Pre-existing Relationship or Experience</u>.  (i) He, she or it has a preexisting personal or business relationship with the Company or one (1) or more of its officer, Manager or control persons or (ii) by reason of his, hers or its business or financial experience, or by reason of the business or financial experience of his, hers or its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he, she or it is capable of evaluating the risks and merits of an investment in the Membership Interest and of protecting his, hers or its own interests in connection with this investment.

12.2    <u>No Advertising</u>.  He, she or it has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

12.3    <u>Investment Intent</u>. He, she or it is acquiring the Membership Interest for investment purposes for his, hers or its own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest. No other person will have any direct or indirect beneficial interest in or right to the Membership Interest.

28

12.4    <u>Purpose of Entity</u>. If the Member is a corporation, partnership, limited liability company, trust, or other entity, it was not organized for the specific purpose of acquiring the Membership Interest.

12.5    <u>Economic Risk; Consulted with Advisor; Speculative Nature</u>. He, she or it is financially able to bear the economic risk of an investment in the Membership Interest, including the total loss thereof. In acquiring a Membership Interest, he, she or it has consulted with and has been guided by his own attorney, accountant or other personal investment or financial advisor with respect to the merits, risk and advisability of the purchase of the Membership Interest subscribed for herein or the undersigned has such knowledge and experience in financial, investment and business matters that he is capable of evaluating the merits, risk and advisability of an investment in the Membership Interest without the assistance of such an advisor. Further, he, she or it recognizes the speculative nature of the investment in the Membership Interest, including the fact that the Property being purchased by the Company is an empty building, with asbestos, and in need of millions of dollars in improvements.

12.6    <u>No Registration of Membership Interest</u>. He, she or it acknowledges that the Membership Interest has not been registered under the Securities Act of 1933, as amended (the Securities Act), or qualified under the California Corporate Securities Law of 1968, as amended, or any other applicable blue sky laws in reliance, in part, on his, hers or its representations, warranties, and agreements herein.

12.7    <u>Membership Interest in Restricted Security</u>. He, she or it understands that the Membership Interest is a restricted security under the Securities Act in that the Membership Interest will be acquired from the Company in a transaction not involving a public offering, and that the Membership Interest may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise the Membership Interest must be held indefinitely. In this connection, he, she or it understands the resale limitations imposed by the Securities Act and is familiar with SEC Rule 144, as presently in effect, and the conditions which must be met in order for the Rule to be available for resale of restricted securities, including the requirement that the securities must be held for at least two (2) years after purchase thereof from the Company prior to resale (three (3) years in the absence of publicly available information about the Company) and the condition that there be available to the public current information about the Company under certain circumstances. He, she or it understands that the Company has not made such information available to the public and has no present plans to do so.

12.8    <u>No Obligation to Register</u>. He, she or it represents, warrants, and agrees that the Company and the Manager is under no obligation to register or qualify the Membership Interest under the Securities Act or under any state securities law, or to assist him or it in complying with any exemption from registration and qualification.

12.9    <u>No Disposition in Violation of Law</u>. Without limiting the representations set forth above, and without limiting Article VII of this Agreement, he, she or it will not make any disposition of all or any part of the Membership Interest which will result in the violation by him or it or by the Company of the Securities Act, the California Corporate Securities Law of 1968, or any other applicable securities laws. Without limiting the foregoing, he, she or it agrees not to make any disposition of all or any part of the Membership Interest unless and until:

A.    There is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement and any applicable requirements of state securities laws; or

29

B.    (i) He, she or it has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (ii) if reasonably requested by the Manager, he, she or it has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

C.    In the case of any disposition of all or any part of the Membership Interest pursuant to SEC Rule 144, in addition to the matters set forth in Section 12.11B, he or she shall promptly forward to the Company a copy of any Form 144 filed with the SEC with respect to such disposition and a letter from the executing broker satisfactory to the Company evidencing compliance with SEC Rule 144. If SEC Rule 144 is amended or if the SEC's interpretations thereof in effect at the time of any such disposition have changed from its present interpretations thereof, he, she or it shall provide the Company with such additional documents as the Manager may reasonably require.

12.10    Legends. He, she or it understands that the certificates (if any) evidencing the Membership Interest may bear one (1) or all of the following legends:

A.    THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY.  SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS WHICH ARE SET FORTH HEREIN.

B.    Any legend required by applicable state securities law.

12.11    Investment Risk. He, she or it acknowledges that the Membership Interest is a speculative investment which involves a substantial degree of risk of loss by him, her or it of his, her or its entire investment in the Company, that he, she or it understands and takes full cognizance of the risk factors related to the purchase of the Membership Interest, and that the Company is newly organized and has no financial or operating history. Furthermore, the Property has asbestos, is vacant and earning no income and is in need of millions of dollars in improvements.

12.12    Investment Experience. He, she or it is an experienced investor in unregistered and restricted securities of limited liability companies or limited partnerships.

12.13    Restrictions on Transferability. He, she or it acknowledges that there are substantial restrictions on the transferability of the Membership Interest pursuant to this Agreement, that there is no public market for the Membership Interest and none is expected to develop, and that, accordingly, it may not be possible for him, her or it to liquidate his, hers or its investment in the Company.

12.14    Information Reviewed. He, she or it has received and reviewed all information he, she or it considers necessary or appropriate for deciding whether to purchase the Membership Interest. He, she or it has had an opportunity to ask questions and receive answers from the Company and its officers, Manager and employees regarding the terms and

30

conditions of purchase of the Membership Interest and regarding the business, financial affairs, and other aspects of the Company and has further had the opportunity to obtain all information (to the extent the Company possesses or can acquire such information without unreasonable effort of expense) which he, she or it deems necessary to evaluate the investment and to verify the accuracy of information otherwise provided to him, her or it.

12.15    No Representations by Company. Neither any Manager, any agent or employee of the Company or of any of the Manager, or any other Person has at any time expressly or implicitly represented, guaranteed, or warranted to him, her or it that he, she or it may freely transfer the Membership Interest, that a percentage of profit and/or amount or type of consideration will be realized as a result of an investment in the Membership Interest, that past performance or experience on the part of the Manager or Manager's Affiliates or any other person in any way indicates the predictable results of the ownership of the Membership Interest or of the overall Company business, that any cash distributions from Company operations or otherwise will be made to the Members by any specific date or will be made at all, or that any specific tax benefits will accrue as a result of an investment in the Company.

12.15.1    Neither the Company nor any Manager, nor any agent or representative of the Company or any of the officers, directors, agents, Members or affiliates of either of them, has made any representations or warranties of any kind to induce the purchase of a Membership Interest in Company or to enter into this Agreement.

12.15.2    Any statements, brochures, information, data, and figures describing or relating in any way to the investment are based upon information obtained by the Company from sources which it deems reliable, but are not made or intended as representations, warranties, guarantees, promises or inducements by the Company.

12.15.3    Any projected or estimated figures of income, expense, depreciation and expenses of operation are estimates and projections only and are not warranted, represented, or guaranteed.

12.15.4    For acquiring a Membership Interest in Company, he she or it has been afforded the opportunity to ask questions and to receive answers concerning the Company's financial condition, business, assets, prospects, liabilities and the terms and conditions of this Agreement, and that the Manager and any agents or representatives of Company have answered all such questions to the satisfaction of the undersigned.

12.15.5    The Company is not liable or bound in any manner by statements, representations or information, if any, pertaining to the income or operation of, or by any matter affecting or relating to the investment, or by any information or data furnished by any person unless specifically set forth in this Agreement.

12.15.6    In acquiring their Membership Interest, each Member has been provided a projection of cash flow based on the expected amortization of the loan to be obtained by Company. Each Member acknowledges and understands that during the years set forth in the projection, it is anticipated that the Company will not be able to issue to Class A Members the full eight percent (8%) preferred return described in Section 3.4.1 hereof. Furthermore, the Members acknowledge that the projection is not an assurance or guaranty with respect to a return on each Member's initial contribution.

12.16    Consultation with Attorney. He, she or it has been advised to consult with his, hers or its own attorney regarding all legal matters concerning an investment in the Company and the tax consequences of participating in the Company, and has done so, to the extent he, she or it considers necessary.

31

12.17    Tax Consequences. He, she or it acknowledges that the tax consequences to him, her or it of investing in the Company will depend on his, hers or its particular circumstances, and neither the Company, the Manager, the Members, nor the partners, shareholders, members, managers, agents, officers, directors, employees, Affiliates, or consultants of any of them will be responsible or liable for the tax consequences to him, her or it of an investment in the Company. He, she or it will look solely to, and rely upon, his, hers or its own advisers with respect to the tax consequences of this investment.

12.18    No Assurance of Tax Benefits. He, she or it acknowledges that there can be no assurance that the Code or the Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Company and the members of some or all of the tax benefits they might now receive, nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service.

12.19    Indemnity. Each Member shall indemnify and hold harmless the Company, each and every Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, agents, attorneys, registered representatives, and control persons of any such entity who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by him or it including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the Company, each and every Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, attorneys. accountants, agents, registered representatives, and control persons of any such Person (including attorneys' fees, judgments, fines, and amounts paid in settlement, payable as incurred) incurred by such Person in connection with such action, suit, proceeding, or the like.


## ARTICLE XIII
## MISCELLANEOUS

13.1    Counsel to the Company. Counsel to the Company may also be counsel to any Manager or any Affiliate of a Manager. The Manager may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction (Rules). The Managers shall mutually select a law firm as legal counsel to the Company. Each Member acknowledges that Company Counsel does not represent any Member in the absence of a clear and explicit agreement to such effect between the Member and Company Counsel, and that in the absence of any such agreement Company Counsel shall owe no duties directly to a Member. In the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and a Manager (or Affiliate of a Manager) that Company Counsel represents, on the other hand, then each Member agrees that Company Counsel may represent either the Company or such Manager (or his, hers or its Affiliate), or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

13.2    Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members and Manager with respect to the subject matter herein and therein and

replace and supersede all prior written and oral agreements or statements by and among the Members and Manager or any of them. No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or Manager or have any force or effect whatsoever. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

13.3    Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

13.4    Parties in Interest. Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and Manager and his respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

13.5    Pronouns; Statutory References. All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference to the Code, the Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

13.6    Headings. All headings are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

13.7    Interpretation. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his, hers or its counsel.

13.8    References to this Agreement. Numbered or lettered articles, section and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

13.9    Jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under, or in connection with this Agreement or the transactions contemplated by this Agreement, provided such claim is not required to be arbitrated pursuant to Section 13.10. Each Member further agrees that personal jurisdiction over him or it may be effected by service of process by registered or certified mail addressed as provided in Section 13.14 of this Agreement, and that when so made shall be as if served upon him or it personally with the State of California.

13.10    Disputed Matters. Except as otherwise provided in this Agreement, any controversy or dispute arising out of this Agreement, the interpretation of any of the provisions hereof, or the action or inaction of any Member or Manager hereunder shall be submitted to arbitration in Los Angeles, California before the American Arbitration Association under the real estate arbitration rules then obtaining of the American Arbitration Association. Any award or decision obtained from any such arbitration proceeding shall be final and binding on the parties, and judgment upon any award thus obtained may be entered in any court having jurisdiction thereof. No action at law or in equity based upon any claim arising out of or related to this Agreement shall be instituted in any court by a Member except (a) an action to

33

compel arbitration pursuant to this Section 13.10 or (b) an action to enforce an award obtained in an arbitration proceeding in accordance with this Section 13.10.

13.11    Exhibits. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

13.12    Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

13.13    Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

13.14    Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member or Manager at the address specified in Exhibit A hereto. Any party may, at any time by giving five (5) days prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

13.15    Amendments. All amendments to this Agreement will be in writing and signed by all of the Members.

13.16    Reliance on Authority of Person Signing Agreement. If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

13.17    No Interest in Company Property; Waiver of Action for Partition. No Member or Economic Interest Owner has any interest in specific property of the Company. Without limiting the foregoing, each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that he, she or it may have to maintain any action for partition with respect to the property of the Company.

13.18    Multiple Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

13.19    Attorney Fees. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses.

13.20    Time is of the Essence. All dates and times in this Agreement are of the essence.

34

13.21   Remedies Cumulative.  The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

13.22   Special Power of Attorney.

A.   Attorney in Fact.  Each member grants the Manager a special power of attorney irrevocably making, constituting, and appointing the Manager as the Member's attorney in fact, with all power and authority to act in the Member's name and on the Member's behalf to execute, acknowledge and deliver and swear to in the execution, acknowledgment, delivery and filing of the following documents:

(i)      Promissory notes to be delivered pursuant to Section 3.5;

(ii)     Assignments of certificates of membership interest or other documents of transfer to be delivered pursuant to Section 3.5 or in connection with the purchase of a Membership Interest pursuant to Section 3.5, Section 7.7 or Article VIII;

(iii)    Any other instrument or document that may be reasonably required by the Manager in connection with any of the foregoing or to reflect any reduction in the Member's Capital Account or Percentage Interest pursuant to Section 3.5; and

(iv)     Any consent to the representation of the Company by counsel selected by the Manager as described in Section 13.1.

B.   Irrevocable Power.  The special power granted in Section 13.22A: (i) is irrevocable; (ii) is coupled with an interest; and (iii) shall survive a Member's death, incapacity or dissolution.

C.   Signatures.  The Manager may exercise the special power of attorney granted in Section 13.22A by a facsimile signature of the Manager or one of Manager's officers.

13.23   No Third Party Beneficiary.  The Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of the Agreement as a third party beneficiary or otherwise.

13.24   Not for Benefit of Creditors.  The provisions of the Agreement are intended only for the regulation of relations among Members and Company.  The Agreement is not intended for the benefit of a creditor who is not a Member and does not grant any rights to or confer any benefits on any creditor who is not a Member or any other person who is not a Member, a Manager, or an officer.

13.25    Reserved.

13.26   Rights of Judgment Creditor of Member.  On application to a court of competent jurisdiction by a judgment creditor of a Member, the court may charge the Member's interest with payment of the unsatisfied amount of the judgment with interest.  To the extent so charged the judgment creditor has only the rights of an assignee of the

35

EXHIBIT "4"
Page 36 of 39

Member's interest. This Paragraph does not deprive any Member of the benefit of any exemption applicable to his interest.

13.27    Legal Representative or Successor of a Member. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage his, hers or its person or property, the executor, administrator, guardian, conservator or other legal representative may exercise all rights of the Member in the purpose of settling his, hers or its estate or administering his, hers or its property.

13.28    Number of Members. The Company shall at all times have at least two (2) members.

13.29    No Responsibility for Pre-Formation Commitments. In the event that any Member (or any of such Member's shareholders, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that related to or otherwise affects Company (other than for the existing loan with First Regional Bank, costs of rezoning the property as a medical usage, and real costs of operating the building), neither Company nor any other Member shall have any liability or responsibility for or with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by Company pursuant to a written instrument signed by the Manager. Furthermore, neither Company nor any Member shall be responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or any of such Member's shareholders or Affiliates). Each Member is aware of, agrees to and acknowledges that transaction fees, acquisition fees and leasing commissions may be paid in the acquisition of the property or leases, the majority of which will be paid to Members of the Company. All Members agree to, approve and acknowledge that Company is placing a construction/permanent loan ("Loan") in the approximate amount of at least One Million Nine Hundred Thousand Dollars ($1,900,000.00) on the Property at time of closing on the Property.

13.30    Cooperation in Tax Deferred Exchange. The Company has been formed, principally, to invest in real property. If the Company shall decide to sell the Project, then the Members shall cooperate with each other, in good faith, to facilitate any Member wishing to do a tax-deferred exchange with respect to such Member's beneficial interest in the Project, in lieu of such Member receiving his pro rata share of the net sales proceeds from any such sale. Such cooperation shall include, without limitation, the Company distributing such Member's pro rata beneficial interest in the Project to such Member, for such Member to hold as a tenant in common with the Company for a period of not less than 90 days (or such lesser number of days as the exchanging Member shall request) prior to the consummation of any such sale. The Member wishing to effectuate such a tax-deferred exchange shall bear all additional costs and expenses incurred in connection with effectuating the same.

36

IN WITNESS WHEREOF, all of the Members of JAVAHER INVESTORS LLC, A California limited liability company, have executed this Agreement, effective as of the date written above.

MEMBERS:

HOOTAN DANESHMAND                          WESTCLIFF INVESTORS LLC

HAM ID HAGHIGHAT

37

142

EXHIBIT "A - 1"

Class "A" Investors and Capital Contributions

| Member | Address | Capital Percentage | Capital Contributed |
|---|---|---|---|
| HOOTAN DANESHMAND | 27432 Portola Parkway<br>Lake Forest, CA 92610 | 37% | $202,669.28 |
| WESTCLIFF INVESTORS LLC | Park Plaza, Suite 1225<br>Irvine, CA 92614 | 26% | $142,416.25 |
| HAMID HAGHIGHAT | 17172 kanpen lane<br>Huntington Beach, CA 92647 | 37% | $202,669.28 |
| **Total Capital** | | **100%** | **$547,754.81** |

38

# EXHIBIT "5"

**OPERATING AGREEMENT FOR**
**HARBOR MEDICAL INVESTORS LLC**
**A CALIFORNIA LIMITED LIABILITY COMPANY**

This Operating Agreement, is made as this 20th day of April, 2006 by and among the parties listed on the signatures pages hereof, with reference to the following facts:

     A.     On April 26, 2006, Articles of Organization for HARBOR MEDICAL INVESTORS LLC, a California limited liability company (the Company), a limited liability company under the laws of the State of California, were filed with the California Secretary of State, Document Number 200611210081.

NOW, THEREFORE, the parties (hereinafter sometimes collectively referred to as the Members, or individually as the Member) by this Agreement set forth the Operating Agreement for the Company under the laws of the State of California upon the terms and subject to the conditions of this Agreement.

**ARTICLE 1**
**DEFINITIONS**
**ARTICLE 1  DEFINITIONS**

     When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement which are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

     1.1     Act shall mean the Beverly-Killea Limited Liability Act, codified in the California Corporations Code, Section 17000 et seq., as the same may be amended from time to time.

     1.2     Affiliate shall mean any individual, partnership, corporation, trust, or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member. The term control, as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

     1.3     Agreement shall mean this Operating Agreement, as originally executed and as amended from time to time.

     1.4     Articles shall mean the Articles of Organization for the Company originally filed with the California Secretary of State and as amended from time to time.

     1.5     Bankruptcy shall mean, *(i)* the entry of a decree or order for relief against any Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, Debtor Relief Law) generally affecting the rights of creditors and relief of debtors now or hereafter in effect; *(ii)* the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; *(iii)* the ordering of the winding up or liquidation of a Member's affairs; *(iv)* the filing of a petition in any such involuntary bankruptcy case, which petition remains not dismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); *(v)* the commencement by a Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; *(vi)* the consent by a Member to the entry of an order for relief in an involuntary case under any

1

EXHIBIT "5"
Page 2 of 41

such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or *(vii)* the making by a Member of any general assignment for the benefit of its creditors.

1.6     Capital Account shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.3.

1.7     Capital Contribution shall mean the total value of cash contributed to the Company by Members.

1.8     Code shall mean the Internal Revenue Code of 1986, as amended from time to time, and the provisions of succeeding law.

1.9     Company shall mean HARBOR MEDICAL INVESTORS LLC, a California Limited Liability Company.

1.10     Company Minimum Gain shall have the meaning ascribed to the term Partnership Minimum Gain in the Regulations Section 1.704-2(d).

1.11     Corporations Code shall mean the California Corporations Code, as amended from time to time, and the provisions of succeeding law.

1.12     Dissolution Event for the Company means the following:

With respect to any Member, one or more of the following:

       1.     When the period fixed for the duration of the Company expires as defined in 2.3 herein; or

       2.     By the unanimous written agreement of all Members.

1.13     "Distributable Net Cash" shall mean the amount of cash which the Manager deems available for distribution to the Members, taking into account all Company debts, liabilities, and obligations of the Company then due and amounts which the Manager deems necessary to place into reserves for customary and usual claims with respect to the Company's business.

1.14     Economic Interest shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a member, including, without limitation, the right to vote or participate in the management, or except as provided in Section 17106 of the Corporations Code, any right to information concerning the business and affairs of Company.

1.15     Reserved

1.16     Fiscal Year shall mean the Company's fiscal year, which shall be the calendar year.

1.17     Former Members shall have the meaning ascribed to it in Section 8.1.

1.18     Former Member's Interest shall have the meaning ascribed to it in Section 8.1.

1.19     Majority Interest shall mean Percentage Interests of one or more Members, which taken together exceeds fifty percent (50%) of the aggregate of all Percentage Interests.

1.20     Manager shall mean, BARRY BEITLER, JOHN BRAL and FARDAD FATERI, collectively, or any other person(s) or entity(ies) who succeed in their respective capacities.

2

1.21    Member shall mean each Person who (a) is an initial signatory to this Agreement; has been admitted to the Company as a Member in accordance with the Articles or this Agreement; or is an assignee who has become a Member in accordance with Article VII and (b) has not resigned, withdrawn, been expelled or, if other than an individual, dissolved. It shall refer to both classes of Members in the Company. Unless otherwise expressly mentioned, Member shall refer to and include both classes of Members.

      1.21.1    Class A Members shall mean a class of Members that consist of those individuals, persons or entities that own seventy percent (70%) of all of the outstanding and issued Membership Interest in Company and are specifically named in Exhibit A-2 and who have contributed on a proportionate basis 100% of all cash required hereunder.

      1.21.2    Class B Members shall mean a class of Members that consist of those individuals, persons or entities that own thirty percent (30%) of all of the outstanding and issued Membership Interest in Company and are specifically named in Exhibit A-1.

1.22    Member Nonrecourse Debt shall have the meaning ascribed to the term Partner Nonrecourse Debt in Regulations Section 1.704-2(b)(4).

1.23    Member Nonrecourse Deductions shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

1.24    Membership Interest shall mean a Member's entire interest in the Company including the Member's Economic Interest; the right to vote on or participate in the management; and the right to receive information concerning the business and affairs of the Company. A Membership Interest constitutes personal property.

1.25    Net Profits and Net Losses shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (and for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) with those adjustments required by Regulations Section 1.704-1(b)(2)(iv) for purposes of adjusting and maintaining Capital Accounts in accordance therewith.

1.26    Nonrecourse Liability shall have the meaning set forth in Regulations Section 1.752-1(a)(2).

1.27    Percentage Interest shall mean the percentage of a Member set forth opposite the name of such Member under the column Member's Percentage Interest in Exhibit A hereto; as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.

1.28    Person shall mean an individual, general partnership, limited partnership, limited liability company, corporation, trust, estate, real estate investment trust association or any other entity.

1.29    Regulations shall, unless the context clearly indicates otherwise, mean the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

1.30    Remaining Members shall have the meaning ascribed to it in Section 8.1.

1.31    Tax Matters Partner shall be BARRY BEITLER and JOHN BRAL, collectively, or their successors as designated pursuant to Section 9.8.

**ARTICLE II**
**ORGANIZATIONAL MATTERS**

3

EXHIBIT "5"
Page 4 of 41

2.1     Formation. Pursuant to the Act, the Members have formed a California Limited Liability Company under the laws of the State of California by filing the Articles with the California Secretary of State and entering into this Agreement. The rights and liabilities of the Members shall be determined pursuant to the Act and to this Agreement. To the extent the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2     Name. The name of the Company shall be HARBOR MEDICAL INVESTORS LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager deems appropriate or advisable. The Manager shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Manager considers appropriate or advisable. The phrase LLC shall always appear as part of the name of Company on all correspondence, stationary, checks, invoices and any and all documents and papers executed by Company and as otherwise required by the Act.

2.3     Term. The term of this Agreement shall be co-terminus with the period of duration of the Company, December 31, 2050, unless extended or sooner terminated as hereinafter provided.

2.4     Office and Agent. The Company shall continuously maintain an office and registered agent in the State of California as required by the Act. The principal office of the Company shall be as the Manager may determine. The Company also may have such offices, anywhere within and without the State of California, as the Manager from time to time may determine, or the business of the Company may require. The registered agent shall be as stated in the Articles or as otherwise determined by the Manager.

2.5     Addresses of the Members and the Manager. The respective addresses of the Members and the Manager are set forth on Exhibit A.

2.6     Purposes of Company. The purpose of the Company is to engage in any lawful activity for which a Limited Liability Company may be organized under the Act. Notwithstanding the foregoing, however, the Company shall not engage in any business other than the following:

(1)     The business of development, operation, leasing and managing for rental and investment of that certain real property located at 1601 Harbor Boulevard, Fullerton (the "Property");

(2)     such other activities directly related to the foregoing business as may be necessary, advisable, or appropriate, in the reasonable opinion of the Manager to further the foregoing business.

2.7     Title to Property in the Name of the Company. Title to the real property purchased in accordance with 2.6 above shall be held and owned in the name of the Company

2.8     Tax Status of Company. The Members intend that the Company be treated as a partnership for income tax purposes and agree to take any actions necessary in order to obtain such treatment.

ARTICLE III
CAPITAL CONTRIBUTIONS

4

     3.1   <u>Initial Capital Contributions</u>. Each Member shall contribute such amount as is set forth on Exhibit A as his, hers or its initial Capital Contribution within one year of the execution of this agreement. Exhibit A shall consist of Sections A-1 and A-2. Exhibit A-1 shall contain Class B Members and Exhibit A-2 shall contain Class A Members.

     3.2   <u>Additional Capital Contributions</u>.

(1)   In addition, each Member shall contribute to the capital of the Company its pro rata share of such amounts as the Manager shall determine from time to time to be necessary in order to carry out the purposes of the Company set forth above within ten (10) days or thirty (30) days, depending on the amount of the capital call, after the call is made for same by the Manager.

(2)   If the Manager determines that the Company requires additional funds for any purpose, it may request that the Members contribute more funds to the Company. In such case, each Member shall contribute to the capital of the Company its pro rata share of such amounts as the Manager shall determine from time to time to be necessary in order to carry out the purposes of the Company set forth above within ten (10) business days if the total capital call is under ten thousand dollars ($10,000), or thirty (30) days if ten thousand dollars ($10,000) or over, after the call is made for same by the Manager.

(3)   Alternatively or additionally, Manager may reserve up to One Hundred Fifty Thousand dollars ($150,000) from Distributable Net Cash for such purposes.

(4)   If any Member fails to timely make its pro rata contribution as required above and required by the Manager, that Member or Members shall have his/her Membership Interest decreased proportionally for the failure to make such required contributions. For example; Manager calls for one hundred thousand dollars. Member X, who owns eight percent (8%), fails to fund the call. The remaining Members must, pro rata, fill the capital call. Member X's interest is then reduced by itself, namely eight percent (8%) in this example, leaving Member X with seven point thirty-six percent (7.36%) interest. The diluted interest is then distributed to the Members making the capital call, pro rata.

     3.3   <u>Capital Accounts</u>. The Company shall establish an individual Capital Account for each Member. The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv). If a Member transfers all or a part of his, hers or its Membership Interest in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations Section 1.704-1(b)(2)(iv)(1).

     3.4   <u>No Interest or Preferred Return</u>. Except as otherwise expressly provided herein, no Member shall be entitled to receive any interest or preferred return on his, hers or its Capital Contributions.

     3.4.1   <u>Preferred Return to Class A Members</u>. To the extent permitted by working capital requirements and other contingencies determined by the Manager, Company shall issue to Class A Members an eight percent (8%) preferred return, per annum, non-compounding, on their initial capital contribution set forth in Exhibit A-1 hereto. To the extent the preferred return cannot be issued in full because of Company's working capital requirements or other contingencies, the preferred return shall be issued in part and shall be carried forward to each successive year until paid. When the Class A Members have been paid an amount equal to the Class A Members' initial capital contribution, Class A Members shall no longer be entitled to any preferred return hereunder. Distributions will then be strictly based upon percentage ownership. The preferred return shall at all time be calculated based upon the then outstanding unpaid initial capital contribution of Class A Members.

5

3.4.2    Preferred Return to Class B Members.  To the extent permitted by working capital requirements and other contingencies determined by the Manager, and Company's payment of an eight percent (8%) preferred return and no less to all of the Class A Members, Company shall issue an eight percent (8%) preferred return, per annum, non-compounding to Class B Members, which Class B Member preferred return shall be calculated by assigning each of the Class B Members an assumed initial capital contribution equal to thirty percent (30%) of the total initial capital contribution of the Class A Members. To the extent the preferred return cannot be issued in full to the Class B Members because of Company's working capital requirements or other contingencies, the preferred return to Class B Members shall be carried forward to any successive year.  For example, if Company distributes an eight percent (8%) preferred return to Class A Members, but only distributes a two & 4/10 percent (2.4%) preferred return to Class B Members, the Class B Members be entitled to an additional one percent (1%) return on a successive year. The amount of the preferred return paid to Class B Members is determined on an annual basis.  The Preferred Return to Class B Members shall be paid to Class B Members after the initial capital contribution of Class A Members has been repaid in full. After the Initial Capital Contribution is returned to the Class A Members, all distributions shall be made based upon percentage ownership. No Preferred Return shall be paid to Class B Members in any year except and unless the full eight percent (8%) preferred return has been paid to all of the Class A Members.

3.4.3.    Distributions After Payment of Preferred Return to Both Class A and Class B Members. After payment of the preferred returns are made in full to both Class A Members and Class B Members, then any distributions from Company, in any period per annum, shall be made to all Members based on seventy percent (70%) to Class A and thirty percent (30%) to Class B.

3.5    Limitation on Withdrawal of Capital Contribution.  No Member shall have the right to withdraw his, hers or its Capital Contribution or to demand and receive property of the Company or any distribution in return for his, hers or its Capital Contribution, except as may be specifically provided in this Agreement or permitted by law.

## ARTICLE IV
## MEMBERS

4.1    Limited Liability.  Except as provided in California Corporations Code Section 17254 relating to distributions by Company and Section 17101(b) relating to responsibility of Members for certain unsatisfied debts or obligations of Company, no Member or Manager shall be liable under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of Company whether that liability or obligation arises in contract or tort. No Member shall be required to loan any funds to Company. No Member shall be required to make any contribution to Company by reason of any negative balance in his, hers or its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

4.2    Admission of Additional Members.  The Manager, with the approval of all of the Members, may admit to the Company additional Members. Any additional Members shall obtain Membership Interests and will participate in the management, Net Profits, Net Losses, and distributions of the Company on such terms as are determined by the Manager and approved by the Members. Notwithstanding the foregoing, substitute members may only be admitted in accordance with Article VII.

4.3    Purchase of Membership Interest.  Upon the transfer of a Member's Membership Interest in violation of this Agreement, or the occurrence of a Dissolution Event as to such Member which does not result in the dissolution of the Company, such Membership Interest may be purchased by the Company or remaining Members as provided herein. Each Member acknowledges and agrees that such right to purchase a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.

4.4    Transactions With The Company.  Subject to any limitations set forth in this Agreement and with the prior unanimous approval of the Manager and Members, and after full disclosure of the Member's involvement, a Member may lend money to and transact other business with the Company. Subject to other applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

6

4.5     Except as otherwise authorized in this agreement, no Member is entitled to remuneration in a capacity acting for the Company or for Company business.

4.6     <u>Members Are Not Agents</u>. Pursuant to Section 5.1 and the Articles, the management of the Company shall be vested in the Manager, the designated property manager.   No Member, acting solely in the capacity of a Member, is an agent of the Company nor can any Member in such capacity bind nor execute any instrument on behalf of the Company.

4.7     <u>Voting Rights</u>. Members shall have the right to approve or disapprove matters as specifically stated in this Agreement, including the following:

A.     <u>Unanimous Approval</u>. The following matters shall require the unanimous vote, approval or consent of all Members who are not the subject of a Dissolution Event or an assignor of a Membership Interest:

(i)     A decision to continue the business of the Company after the occurrence of a Dissolution Event set forth in 1.12.

(ii)     Except as provided in Article VII, the transfer of a Membership Interest and admission of the transferee or assignee as a Member of the Company.

(iii)     Any material amendment of the Articles or this Agreement.

(iv)     Purchase of additional real property by the Company.

B.     <u>Approval by Members Holding a Majority Interest</u>. Except as set forth in this Agreement in all other matters in which the vote, approval or consent of all Members is required, the vote, consent or approval of Members holding a Majority Interest (or, in instances in which there are defaulting Members, non-defaulting Members who hold a majority of the Percentage Interests held by all non-defaulting Members) shall be sufficient to authorize or approve such act; specifically including the right to sell, lease or re-finance the Company's Property.

C.     <u>Other Voting Rights</u>. Besides the rights granted in Sections 4.7A and 4.8A, Members may vote, consent or approve to the extent and on the terms provided in this Agreement in the following Sections:

(i)     Section 4.2 on admission of new Members;

(ii)     Section 5.3B on a change in the purpose of the Company

(iii)     Section 5.3B on reorganization of the Company;

(iv)     Section 5.3B on other limitations on the Manager's authority thereunder however the Members shall only be entitled to remove a Manager in the event such Manager has committed a malfeasance of a material nature relating to the management of the Company;

(v)     Section 5.8 on transactions with the Manager and Affiliates of the Manager except where otherwise expressly provided in Section 5.8;

(vi)     Section 5.9A on management fees payable to Manager except where otherwise expressly provided in Section 5.9; and

(vii)     Section 10.1 on dissolving the Company.

7

EXHIBIT "5"
Page 8 of 41

Any such vote, consent or approval must be unanimous.

4.8     Meetings of Members.

A.      Date, Time and Place of Meetings of Members; Secretary. Meetings of Members may be held at such date, time and place within the State of California as the Manager may fix from time to time. No annual or regular meetings of Members is required. At any Member's meeting, the Manager shall appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting which shall be placed in the minute book of the Company. Formal meetings of members are not required to take action.

B.      Power to Call Meetings. Unless otherwise prescribed by the Act or by the Articles, meetings of the Members may be called by the Manager, or upon written demand of Members holding more than ten percent (10%) of the Percentage Interests for the purpose of addressing any matters on which the Members may vote.

C.      Notice of Meeting. If a formal meeting is desired, written notice of a meeting of Members shall be sent or otherwise given to each Member in accordance with Section 4.9D not less than ten (10) nor more than sixty (60) days before the date of the meeting. The notice shall specify the place, date and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at this meeting. Upon written request to the Manager by any person entitled to call a meeting of Members, the Manager shall immediately cause notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the person calling the meeting, not less than ten (10) days nor more than sixty (60) days after the receipt of the request. If the notice is not given within twenty (20) days after the receipt of the request, the person entitled to call the meeting may give the notice.

D.      Manner of Giving Notice; Affidavit of Notice. Notice of any meeting of Members shall be given either personally or by first-class mail or telegraphic or other written communication, charges prepaid, addressed to the Member at the address of that Member appearing on the books of the Company or given by the Member to the Company for the purpose of notice. Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by telegram or other means of written communication.

If any notice addressed to a member at the address of that Member appearing on the books of the Company is returned to the Company by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice to the Member at that address, all future notices or reports shall be deemed to have been duly given without further mailing if these shall be available to the Member on written demand for the Member at the principal executive office of the Company for a period of one (1) year from the date of the giving of the notice.

An affidavit of the mailing or other means of giving any notice of any meeting shall be executed by the Manager or any secretary, assistant secretary, or any transfer agent of the Company giving the notice, and shall be filed and maintained in the minute book of the Company.

E.      Validity of Action. Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the notice of meeting or in any written waiver of notice.

F.      Quorum. The presence in person or by proxy of the holders of a Majority Interest of Profits Interest and Capital Interest shall constitute a quorum at a meeting of Members. The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum (other than adjournment) is approved by at least Members holding a Majority Interest in Profit Interest and in Capital Interest.

G.      Adjourned Meeting; Notice. Any Members meeting, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the Membership Interests represented at that meeting, either

8

EXHIBIT "5"
Page 9 of 41

in person or by proxy, but in the absence of a quorum, no other business may be transacted at that meeting, except as provided in Section 4.9F. When any meeting of Members is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place are announced at a meeting at which the adjournment is taken, unless a new record date for the adjourned meeting is subsequently fixed, or unless the adjournment is for more than forty-five (45) days from the date set for the original meeting, in which case the Manager shall set a new record date. At any adjourned meeting the Company may transact any business which might have been transacted at the original meeting.

H.    Waiver of Notice or Consent. The actions taken at any meeting of Members however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, who was not present in person or by proxy, signs a written waiver of notice and consents to the holding of the meeting or approves the minutes of the meeting. All such waivers, consents or approvals shall be filed with the Company records or made a part of the minutes of the meeting.

Attendance of a person at a meeting shall constitute a waiver of notice of that meeting, except when the person objects at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened; and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters not included in the notice of the meeting if that objection is expressly made at the meeting. Neither the business to transacted nor the purpose of any meeting of Members need be specified in any written waiver of notice except as provided in Section 4.9E.

I.    Action by Written Consent Without a Meeting. Any action that may be taken at a meeting of Members may be taken without a meeting, if a consent in writing setting forth that action so taken, is signed and delivered to the Company within ten (10) days of the record date for that action by Members having not less than the minimum number of votes which would be necessary to authorize taking that action at a meeting at which all Members entitled to vote on such action were present and voted. All such consents shall be filed with the Manager or the secretary, if any, of the Company and shall be maintained in the Company records. The written consent or proxy of any Member may be revoked by a writing signed by such Member and received by the Manager or the secretary, if any, of the written consents containing the number of votes required to authorize the proposed action.

Unless the consents of all Members entitled to vote have been solicited in writing; *(i)* notice of any Member approval of an amendment to the Articles or this Agreement; a dissolution of the Company; or a merger of the Company without a meeting by less than unanimous written consent, shall be given at least ten (10) days before the consummation of the action authorized by such approval; and *(ii)* prompt notice shall be given of the taking of any other action approved by Members without a meeting by less than unanimous written consent, to those Members entitled to vote who have not consented in writing.

J.    Telephonic Participation by Member at Meetings. Members may participate in any Members meeting through the use of any means of conference telephones or similar communications equipment as long as all Members participating can hear one another. A Member so participating is deemed to be present in person at the meeting.

K.    Record Date. In order that the Company may determine the Members of record entitled to notices of any meeting or to vote, or entitled to receive any distribution or to exercise any rights in respect of any distribution or to exercise any rights in respect of any other lawful action, the Manager, or Members representing a majority of the Percentage Interests may fix, in advance, a record date, that is not more than sixty (60) days nor less than ten (10) days prior to the date of the meeting and not more than sixty (60) days prior to any other action. If no record date if fixed:

(i)    The record date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

9

(ii)      The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

(iii)      The record date for determining Members for any other purpose shall be at the close of business on the day on which the Manager adopt the resolution relating thereto, or the 60th day prior to the date of the other action, whichever is later.

(iv)      The determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless the Manager or the Members who called the meeting fix a new record date for the adjourned meeting, but the Manager or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than forty-five (45) days from the date set for the original meeting.

L.      Proxies. Every Member entitled to vote for the Manager or on any other matter shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the Member or his attorney in fact and filed with the Manager or secretary, if any, of the Company. A proxy shall be deemed signed if the Member's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission, electronic transmission or otherwise) by the Member or the Member's attorney in fact. A proxy may be transmitted by an oral telephone transmission if it is submitted with information from which it may be determined that the proxy was authorized by the Member or the Member's attorney in fact. A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless *(i)* revoked by the person executing it, before the vote pursuant to that proxy; by a writing delivered to the Company stating that the proxy is revoked; or by a subsequent proxy executed by, or attendance at the meeting and voting in person by, the person executing the proxy; or *(ii)* written notice of the death or incapacity of the maker of that proxy is received by the Company before the vote pursuant to that proxy is counted; provided, however, that no proxy shall be valid after the expiration of eleven (11) months from the date of the proxy, unless otherwise provided in the proxy. The revocability of a proxy which states on its face that it is irrevocable shall be governed by the provisions of Corporations Code Sections 705(e) and 705(f).

4.9      Certificate of Membership Interest.

A.      Certificate. A Membership Interest may be represented by a certificate of membership. The exact contents of a certificate of membership may be determined by action of the Manager but shall be issued substantially in conformity with the following requirements: The certificates of membership shall be respectively numbered serially, as they are issued; shall be impressed with the Company seal or a facsimile thereof, if any; and shall be signed by the Manager or officers of the Company. Each certificate of membership shall state the name of the Company; the fact that the Company is organized under the laws of the State of California; is a limited liability company; the name of the person to whom issued; the date of issue; and the Percentage Interests represented thereby. A statement of the designations, preferences, qualifications, limitations, restrictions, and special or relative rights of the Membership Interest, if any, shall be set forth in full or summarized on the face or back of the certificates which the Company shall issue, or in lieu thereof, the certificate may set forth that such a statement or summary will be furnished to any holder of a Membership Interest upon request without charge. Each certificate of membership shall be otherwise in such form as may be determined by the Manager.

B.      Cancellation of Certificate. All certificates of membership surrendered to the Company for transfer shall be cancelled and no new certificates of membership shall be issued in lieu thereof until the former certificates for a like number of Membership Interest shall have been surrendered and cancelled, except as herein provided with respect to lost, stolen, or destroyed certificates.

C.      Replacement of Lost, Stolen or Destroyed Certificate. Any Member claiming that his, hers or its certificate or membership is lost, stolen or destroyed may make an affidavit or affirmation of that fact and request a new certificate. Upon the giving of a satisfactory indemnity to the Company as reasonably required by the Manager, a new certificate may be issued of the same tenor and representing the same Percentage Interest of membership as was represented by the certificate alleged to be lost, stolen or destroyed.

10

## ARTICLE V
### MANAGEMENT AND CONTROL OF THE COMPANY

5.1    Management of the Company by the Manager.

A.    Exclusive Management by Manager.  The business, property and affairs of the Company shall be managed exclusively by the Manager.  Except for situations in which the approval of the Members is expressly required by the Articles or this Agreement, the Manager shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company; to make all decisions regarding those matters; and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.  No Member who is not a Manager shall have any authority to act for or to undertake or assume any obligation, debt, duty or responsibility on behalf of the Company.  Where this Agreement specifies an act of the Manager, unless otherwise expressly otherwise provided, it means an act taken by all persons comprising Manager.

B.    Agency Authority of Manager.  Either person comprising Manager, acting independently of the Members, is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts.  All checks, drafts, and other instruments obligating the Company to pay money, may be signed by either person comprising the Manager, acting alone, provided that such obligation is incurred in the ordinary course of managing the Company and/or the Property.  Any and all contracts on behalf of the Company and any obligations which are outside the ordinary course of business of the Company shall require the signature of both persons comprising the Manager.

C.    Major Decisions.  All Major Decisions, shall require the signature of 2 Managers.

5.2    Election of Manager.

A.    Number.  The Company shall have three (3) Managers.

B.    Removal.  No Manager may be removed by the vote of the Members except in the case of his malfeasance; or physical or mental incapacity; or gross negligence; or his material breach of any of the items set forth in Section 5.3 of this Agreement.

5.3    Powers of Manager.

A.    Powers of the Manager.  Without limiting the generality of Section 5.1, the Manager shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Corporations Code Section 17003.

B.    Limitations On Powers of Manager.  The Manager shall not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the unanimous affirmative vote or unanimous written consent of the Members:

(i)    The merger of the Company with another limited liability company or limited partnership, provided in no event shall a Member be required to become a general partner in a merger with a limited partnership without his express written consent or unless the agreement of merger provides each Member with the dissenter's rights described in the Act.

(ii)    The merger of the Company with a corporation or a general partnership or other Person.

11

EXHIBIT "5"
Page 12 of 41

(iii)    The establishment of different classes of Members.

(iv)    An alteration of the primary purpose of the Company as set forth in Section 2.3.

(v)    Transactions between the Company and the Manager or the Manager's Affiliates, or transactions in which the Manager or of any Manager's Affiliates has a material financial interest except to the extent where such transactions do not exceed commercially reasonable market rates.

(vi)    Without limiting subsection (v), the lending of money by the Company to any Manager, Member or officer.

(vii)    Any act which would make it impossible to carry on the ordinary business of the Company.

(viii)    The amendment of this Agreement.

(ix)    The purchase of additional real property by the Company, provided, however, that the Manager shall have the sole right to decide when to sell the real property owned by the Company and upon what terms and conditions.

5.4    <u>Members Have No Managerial Authority</u>.  The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Articles and except as expressly required by the Act.  No Member shall have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, or to render it liable for any purpose.

5.5    <u>Performance of Duties; Liability of Manager</u>.  The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, negligence, reckless or intentional misconduct, or a knowing violation of law by the Manager.  The Manager shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Company and shall use them solely for the benefit of the Company.  The Manager shall perform managerial duties in good faith, in a manner reasonably believed to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position of like business experience would use under similar circumstance.  A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Manager of the Company.

In performing managerial duties, the Manager shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, of the following persons or groups unless they have knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that the Manager act in good faith and after reasonable inquiry when the need therefor is indicated by the circumstances:

(a)    one or more officers, employees or other agents of the Company whom the Manager reasonably believes to be reliable and competent in the matters presented;

(b)    any attorney, independent accountant, or other person as to matters which the Manager reasonably believes to be within such person s professional or expert competence; or

(c)    a committee upon which the Manager does not serve, duly designated in accordance with a provision of the Articles or this Agreement, as to matters within its designated authority, which committee the Manager reasonably believes to merit competence.

12

5.6     Devotion of Time.  The Manager is not obligated to devote all of his time or business efforts to the affairs of the Company.  The Manager shall devote whatever time, effort and skill as he deems appropriate for the operation of the Company.

5.7     Competing Activities.  The Manager and the officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company.  Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom.  The Manager shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company.  The Manager or any Member shall have the right to hold any investment opportunity or prospective economic advantage for his or her own account or to recommend such opportunity to Persons other than the Company.  The Members acknowledge that the Manager and his or her Affiliates own and/or manage businesses, including businesses that may compete with the Company and for the Manager's time.  The Members hereby waive any and all rights and claims which they may otherwise have against the Manager and officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates as a result of any such activities.

5.8     Transactions Between the Company and the Manager.  Notwithstanding that it may constitute a conflict of interest, the Manager may, and may cause Manager's Affiliates to engage in any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from Persons capable of similarly performing them and in similar transactions between parties operating at arm's length, and provided that the Members having no interest in such transaction (other than their interests as Members) affirmatively vote unanimously or give their unanimous consent in writing to approve the transaction.

A transaction between any of the Manager and/or the Manager's Affiliates, on the one hand, and the Company, on the other hand, shall be conclusively determined to constitute a transaction on terms and conditions, on an overall basis, fair and reasonable to the Company and at least as favorable to the Company as those generally available in a similar transaction between parties operating at arm's length if the Members having no interest in such transaction (other than their interests as Members) affirmatively vote unanimously or consent in writing unanimously to approve the transaction. The Company specifically acknowledges and hires Beitler Commercial Realty Services as leasing and or listing Broker, when necessary to lease or sell the property, at market rates as defined below or some other competent comparable leasing or sales brokerage firm. Further, the Company specifically hires Manager to act as property manager for the Company and its assets at market rates as defined below, provided that Manager shall have the right to have engage a third party management company or an affiliate of Manger to manage the real property.

5.9     Payments to the Manager.  The Manager and Manager's Affiliates shall receive the following payments:

A.     Services Performed by Manager.  Except as otherwise provided herein, the Company shall not pay the Manager for services rendered to the Company in the reasonable scope of their management duties.

B.     Expenses.  The Company shall reimburse the Manager and Manager's Affiliates for the actual cost of goods and materials used for or by the Company.  The Company shall also pay or reimburse any of the Manager or Manager's Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company and prepare the Articles and this Agreement.

13

C.    Property Management Fee. There shall be a four percent (4%) of gross income per month fee for property management to a management company chosen by Manager. Whenever possible, Manager will lease the Property on a Triple Net (NNN) basis and pass through said management fee to the tenants on a monthly basis.

D.    Property Brokerage Fee. There shall be sales commission of four percent (4%) paid to Beitler Commercial Realty Services as a listing Broker upon sale (which shall be spit 50/50 with a procuring Broker if any), and leasing commissions shall be paid to Beitler Commercial Realty Services (or to any other licensed real estate broker selected by Manager) at industry standard rates.

5.10    Act of Manager as Conclusive Evidence of Authority. Any note, mortgage, evidence of indebtedness, contract, certificate, statement, conveyance, or other instrument in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other person, when signed by the Manager, are not invalidated as to the Company by any lack of authority of the Manager in the absence of actual knowledge on the part of the other person that the Manager had no authority to execute the same.

5.11    Reserved.

5.12    Limited Liability. No Manager shall not be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being the Manager.

## ARTICLE VI
## ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

6.1    Allocations of Net Profit and Net Losses.

A.    Net Loss.  Net Loss shall be allocated to the Members in proportion to their Percentage Interests.

B.    Net Profit. Net Profit shall be allocated to the Members (i) first, proportionately (based on the amount each Member is required to be allocated pursuant to this clause (i)) until each Member has been allocated a cumulative amount of Net Profit pursuant to this clause (i) equal to the sum of the cumulative amount of Net Loss previously allocated to such Member pursuant to Section 6.1A hereof, plus the cumulative amount of distributions previously made to such Members pursuant to Section 6.5(a) hereof, (ii) thereafter, in proportion to their Percentage Interests.

6.2    Special Allocations.

A.    Minimum Gain Chargeback. Notwithstanding Section 6.1, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 6.2A shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2A. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f). This Section 6.2A is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

14

B.    Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt. Notwithstanding Section 6.1 of this Agreement, if there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any Fiscal Year, each Member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 6.2B shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2B. The items to be so allocated shall be determined in accordance with Regulations Section 1 .704-2(i)(4). This Section 6.2B is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1 .704-2(i)(4) and shall be interpreted consistently therewith.

C.    Nonrecourse Deductions. Notwithstanding Section 6.1, any nonrecourse deductions (as defined in Regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.

D.    Member Nonrecourse Deductions. Notwithstanding Section 6.1, any Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i).

E.    Qualified Income Offset. Notwithstanding Section 6.1, if a member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), *(5)* or (6), or any other event creates a deficit balance in such Member's Capital Account (taking into account reductions for the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), *(5)* and (6) in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 6.2E shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article VI so that the net amount of any item so allocated and the income, gain, and losses allocated to each member pursuant to this Article VI to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Article VI if such unexpected adjustments, allocations, or distributions had not occurred.

6.3    Code Section 704(c) Allocations. Notwithstanding any other provision in this Article VI, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this Section 6.3 are solely for purposes of federal, state and local taxes. As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other tax items or distributions pursuant to any provision of this Agreement.

6.4    Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest. If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his, hers or its respective Membership Interest at the close of such day.

However, for the purpose of accounting convenience and simplicity, the Company shall treat a transfer of, or an increase or decrease in, a Membership Interest which occurs at any time during a semi-monthly period

15

(commencing with the semi-monthly period including the date hereof) as having been consummated on the last day of such semi-monthly period, regardless of when during such semi-monthly period such transfer, increase, or decrease actually occurs (*i.e.*, sales and dispositions made during the first fifteen *(15)* days of any month will be deemed to have been made on the 15th day of the month).

Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Membership Interests as of the date such sale or other disposition occurs.

6.5    Distribution of Assets by the Company.  Subject to applicable law and any limitations contained elsewhere in this Agreement, the Manager may elect from time to time to distribute Distributable Cash to the Members, which distributions shall be in the following order of priority:

A.    Distributions from Operations.

(i)    If such Distributable Net Cash is from Company's operations, to the Members in proportion to their unreturned additional Capital Contribution until each Member has recovered his, her or its additional capital contribution.

(ii)    If such Distributable Net Cash is from Company's operations, to the Members of Class A, for their Preferred Return in Section 3.4.1 herein, in proportion to their Percentage Interest in Company in relation to each other.

(iii)    If such Distributable Net Cash is from Company's operations, to the Members of Class B, for their Preferred Return in Section 3.4.2 herein, in proportion to their Percentage Interest in Company in relation to each other.

(iv)    If such Distributable Net Cash is from Company's operations, to the Members of Class A and B in proportion to their pro rata Membership interest.

B.    Distributions from Sale, Financing or Refinancing of Company Real Property.

(i)    If such Distributable Net Cash is from the sale, financing or refinancing of the Company Property, to the Members in proportion to their unreturned additional Capital Contributions until each Member has recovered his, hers or its Additional Capital Contributions, if any, and then to Members in proportion to their unreturned initial Capital Contributions until each Member has recovered his, her or its initial Capital Contribution; and

(ii)    Thereafter, to the Members in proportion to their percentage interests.

such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual date of distribution.  Neither the Company nor the Manager shall incur any liability for making any distributions under this Section 6.5.

The Manager may, in its sole discretion, limit distributions by maintaining a working capital reserve of up to One Hundred Fifty Thousand Dollars ($150,000.00).

6.6    Form of Distribution. A Member, regardless of the nature of the Member s Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money

16

being made to other Members. Except upon a dissolution and the winding up of the Company, no Member may be compelled to accept a distribution of any asset in kind.

    6.7    <u>Restriction on Distributions.</u>

    A.    No distribution shall be made if, after giving effect to the distribution:

    (i)    The Company would not be able to pay its debts as they become due in the usual course of business.

    (ii)    The Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the distribution.

    B.    The Manager may base a determination that a distribution is not prohibited on any of the following:

    (i)    Financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances.

    (ii)    A fair valuation.

    (iii)    Any other method that is reasonable in the circumstances.

Except as provided in Section 17254(e) of the Corporations Code, the effect of a distribution is measured as of the date the distribution is authorized if the payment occurs within one hundred twenty (120) days after the date of authorization, or the date payment is made if it occurs more than one hundred twenty (120) days of the date of authorization.

    C.    A Member or Manager who votes for a distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act if it is established that the Member or Manager did not act in compliance with Section 6.7 B or Section 10.4. Any Member or Manager who is so liable shall be entitled to compel contribution from (i) each other Member or Manager who also is so liable and (ii) each Member for the amount the Member received with knowledge of facts indicating that the distribution was made in violation of this Agreement or the Act.

    6.8    <u>Return of Distributions.</u> Except for distributions made in violation of the Act or this Agreement, no Member or Economic Interest Owner shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company. The amount of any distribution returned to the Company by a Member or Economic Interest Owner or paid by a Member or Economic Interest Owner for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member or Economic Interest Owner.

17

6.9    Obligations of Members to Report Allocations.  The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

## ARTICLE VII
## TRANSFER AND ASSIGNMENT OF INTERESTS

7.1    Transfer and Assignment of Interests.  Except as otherwise expressly provide in this Article VII, no Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest except with the prior written consent of other Members having a majority of the Percentage Interests of the other Percentage Interests.  Notwithstanding the foregoing, Managers shall have the right to transfer their respective Membership Interests, or any portions thereof, to the other Manager, or to an entity controlled solely by the Manager or both Managers and the consent of the non-Manager Members shall not be required.  However, no such transfers between Managers or Manager controlled entities shall be permitted without the consent of the other Members if such transfer converts a Class A Membership to a Class B Membership or vice-versa.  Transfers in violation of this Article VII shall only be effective to the extent set forth in Section 7.7. After the consummation of any transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

7.2    Further Restrictions on Transfer of Interests.  In addition to other restrictions found in this Agreement, no Member shall transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest: (i) without compliance with the legend described in Section 12.10, and (ii) if the transfer, assignment, sale or exchange would cause the termination of the Company under Section 708(b)(1)(B) of the Code, as determined by the Manager.

7.3    Substitution of Members.  A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirements of Sections 7.1 and 7.2 are met; (ii) such Person executes an instrument satisfactory to the Manager accepting and adopting the terms and provisions of this Agreement; and (iii) such person pays any reasonable expenses in connection with his, hers or its admission as a new Member. The admission of a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

7.4    Family and Affiliate Transfers. The Membership Interest of any Member may be transferred subject to compliance with Section 7.2, and without the prior written consent of all Members, as required by Section 7.1, upon consent of the Manager, which shall not be unreasonably withheld, by the Member (i) by inter vivos gift or by testamentary transfer to any spouse, parent, sibling, in-law, child or grandchild of the Member; or to a trust for the benefit of the Member or such spouse, parent, sibling, in-law, child or grandchild of the Member; or (ii) to any Affiliate of the Member; it being agreed that in executing this Agreement, each Member has consented to such transfers, except that any Class B Member's successor shall continue to be a Class B Member, but without any management rights as a Class B Member.

18

7.5    Effective Date of Permitted Transfers. Any permitted transfer of all or any portion of a Membership Interest shall be effective as of the first day of the month following the date upon which the requirements of Sections 7.1, 7.2 and 7.3 have been met. The Manager shall provide the Members with written notice of such transfer as promptly as possible after the requirements of Sections 7.1, 7.2 and 7.3 have been met. Any transferee of a Membership Interest shall take subject to the restrictions on transfer imposed by this Agreement and subject to allocation of profits and losses; and distributions set forth in Section 6.4.

7.6    Rights of Legal Representatives. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, and/or other legal representative and/or beneficiary or successor may exercise all of the Member's rights for the purpose of settling the Member's estate and/or administering the Member's property, and shall succeed to Member's interest herein, except that any Class B Member's successor shall continue to be a Class B Member, but without any management rights as a Class B Member..

7.7    No Effect to Transfers in Violation of Agreement. Upon any transfer of a Membership Interest in violation of this Article VII, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Economic Interest Owner and thereafter shall only receive the share of one (1) or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the Manager, a transfer in violation of this Article VII would cause the termination of the Company under the Code, in the sole discretion of the Manager, the transfer shall be null and void and the purported transferee shall not become either a Member or an Economic Interest Owner.

Upon and contemporaneously with any transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company for a purchase price of One Hundred Dollars ($100), all remaining rights and interests retained by the Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member.

Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who transfers a Membership Interest in violation of this Article VII is not unreasonable under the circumstances existing as of the date hereof

7.8    Right of First Refusal. Each time a Member proposes to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest (or as required by operation of law or other involuntary transfer to do so) other than pursuant to Section 7.1 or 7.4, such Member shall first offer such Membership Interest to the Company and the non-transferring Members in accordance with the following provisions:

19

EXHIBIT "5"
Page 20 of 41

A.      Such Member shall deliver a written notice to the Company and the other Members stating (i) such Member's bona fide intention to transfer such Membership Interest; (ii) the name and address of the proposed transferee; (iii) the Membership Interest to be transferred; and (iv) the purchase price in terms of payment for which the Member proposes to transfer such Membership Interest.

B.      Within thirty (30) days after receipt of the notice described in Section 7.8A, each non-transferring Member shall notify the Manager in writing of his, hers or its desire to purchase a portion of the Membership Interest being so transferred. The failure of any Member to submit a notice within the applicable period shall constitute an election on the part of that Member not to purchase any of the Membership Interest which may be so transferred. Each Member so electing to purchase shall be entitled to purchase a portion of such Membership Interest in the same proportion that the Percentage Interest of such Member bears to the aggregate of the Percentage Interests of all of the Members electing to so purchase the Membership Interest being transferred. In the event any Member elects to purchase none or less than all of his, hers or its pro rata share of such Membership Interest, then the other Members can elect to purchase more than their pro rata share. If such Members fail to purchase the entire Membership Interest being transferred, the Company may purchase any remaining share of such Membership Interest.

C.      Within sixty (60) days after receipt of the notice described in Section 7.8A, the Company and the Members electing to purchase such Membership Interest shall have the first right to purchase or obtain such Membership Interest upon the price and terms of payment designated in such notice. If such notice provides for the payment of non-cash consideration, the Company and such purchasing Members each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Manager.

D.      If the Company or the other Members elect not to purchase or obtain all of the Membership Interest designated in such notice, then the transferring Member may transfer the Membership Interest described in the notice to the proposed transferee, providing such transfer (i) is completed with thirty (30) days after the expiration of the right of the Company and the other Members to purchase such Membership Interest, (ii) is made on terms no less favorable to the transferring Member than as designated in the notice, and (iii) the requirements of Sections 7.1, 7.2 and 7.3 relating to unanimous consent of Members, securities and tax requirements hereof are met. If such Membership Interest is not so transferred, the transferring Member must give notice in accordance with this Section prior to any other or subsequent transfer of such Membership Interest.

7.8.1    Right of First Refusal Among Class of Membership.  Notwithstanding anything to the contrary herein, any proposal by a Member to transfer, assign, convey, sell, encumber or in any way alienate all or part of his, hers or its Membership Interest (Selling Member), pursuant to Section 7.8, shall first proceed to commence the Right of First Refusal procedure provided in Section 7 among Members of the Selling Members class before proceeding with the Right of First Refusal to the other Members of Company not in the Selling Member's class.  For example, a Member of Class A offering its Membership Interest shall first operate the Right of First Refusal among Members of Class A, and subject to whether any Membership Interest remains available, then to Members of Class B.

7.9    Effective Date of Permitted Transfers of an Interest.  Any permitted transfer of all or any portion of an Interest in Company will take effect on the first (1st) day of the month following receipt by the Members of written notice of transfer. Any transferee of an Interest in the Company shall take subject to the restrictions on transfer imposed by the Agreement.

20

7.10    Consequences of Pledge or Grant of Security Interest.  The pledge or granting of a security interest, lien or other encumbrance in or against any or all of the Interest of a Member shall not cause the Member to cease to be a Member or to grant anyone else the power to exercise any rights or powers of a Member.

## ARTICLE VIII
## CONSEQUENCES OF, DISSOLUTION, OR WITHDRAWAL OF MEMBER (S) OR HEIRS

8.1    Purchase of Member's Interest.  Upon the occurrence of any Dissolution Event and the unanimous consent by the remaining Members (Remaining Members) to continue the business of Company, and if applicable, the desire of the member or its heirs to the other Members (the Remaining Members) shall have an option to purchase such Membership Interest. Within ninety (90) days of the Unanimous Consent or within ninety (90) days of the receipt of the rightful demand for the return of its Capital Account by the Former Member or by such Former Member's trustee or heirs, or within in ninety (90) days of the inheritance or transfer by operation of law to a person, the Remaining Members shall notify the Manager in writing of their desires to purchase a portion of the Former Member's Interest.

8.2    Withdrawal.  Notwithstanding Section 8.1, only upon the withdrawal by a Member in accordance with Section 4.3, such Member shall be treated as a Former Member, and the Company and/or the Remaining Members shall have the option to purchase, and the Former Member shall be obligated to sell, the Former Member's Interest as provided in this Article VIII.

8.3    Purchase Price.  The purchase price for the Former Member's Interest shall be the fair market value of the Former Member's Interest determined by three (3) independent appraisers, one (1) selected by the Former Member or such Former Member's legal representative, one (1) selected by the Company, and one (1) selected by the two (2) appraisers so named. The fair market value of the Former Member's Interest shall be the average of the two (2) appraisals closest in amount to each other. In all other events, the Former Member shall pay one-half (50%) of such expense of the appraisers and the Remaining Members shall pay one-half (50%) of such expense and the purchase price shall be the fair market value determined by appraisal reduced by six percent (6%) representing a reasonable and customary brokerage commission which would be paid to a broker in an arms length role and escrow closing costs. Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

8.4    Notice of Intent to Purchase.  Within thirty (30) days after the Manager has notified the Remaining Members as to the purchase price of the Former Member's Interest determined in accordance with Section 8.3, each Remaining Member shall notify the Manager in writing of his, hers or its desire to purchase a portion of the Former Member's Interest. The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest. Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Members Interest in the same proportion that the Percentage Interest of the Remaining Member bears to the aggregate of the Percentage Interests of all of the Remaining Members electing to purchase the Former Member's Interest.

21

EXHIBIT "5"
Page 22 of 41

8.5    Election to Purchase Less Than All of An Interest.  In the event any Remaining Member elects to purchase none or less than all of its pro rata part of the Former Member's Interest, then, at its election, those Remaining Members can elect to purchase more than their pro rata part, i.e., the proportion that the Percentage Interest of the Former Member bears to the aggregate of the Percentage Interests of all Members and the Former Member. If the Remaining Members fail to purchase the entire interest of the Former Member, Company may elect to purchase the former Member's Interest unpurchased portion. If none of the above elects to purchase, the same shall pass by operation of law to any assignee or shall remain in the hands of the Former Member, subject to any right of the holder of such interest to demand payment therefore according to California law. Notwithstanding any provision of the Agreement to the contrary, the remaining Members may mutually agree to an allocation of the Former Member's Interest to be purchased by each of them.

8.6    Payment of Purchase Price.  The purchase price shall be paid by the Company or the Remaining Members, as the case may be, either: (i) in equal monthly installments of principal together with interest amortized over a thirty (30) year period, commencing to accrue from the date of closing, at the then current Applicable Federal Rate (the AFR) under Section 1274(d) of the Internal Revenue Code (IRC) for the month in which the first payment is made (or a rate per annum equal to what the AFR would be for such month under IRC Section 1274(d) of the Code if the AFR is no longer published) to fully amortize such purchase price over such ten (10) payments with the first payment being due and payable 60 days after the determination of the fair market value of the Former Member's Interest in the Company, or (ii) within 60 days after the determination of the fair market value of the Former Member's Interest in the Company, as the Company or the Remaining Members, as the case may be, may elect in their sole discretion.

8.7    Closing of Purchase of Former Member's Interest.  The closing for the sale of a Former Member's Interest pursuant to this Article VIII shall be held at 10:00 a.m. at the principal office of the Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Former Member or such Former Member's legal representative shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest. The Former Member or such Former Member's legal representative, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

8.8    Purchase Terms Varied by Agreement.  Nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

## ARTICLE IX
## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

9.1    Books and Records.  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office in California all of the following:

22

EXHIBIT "5"
Page 23 of 41

A.    A current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner;

B.    A current list of the full name and business or residence address of each Manager.

C.    A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed.

D.    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

E.    A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

F.    Copies of the financial statements of the Company, if any, for the six (6) most recent Fiscal Years; and

G.    The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) Fiscal Years.

9.2    <u>Delivery to Members and Inspection.</u>

A.    Upon the request of any Member or Economic Interest Owner for purposes reasonably related to the interest of that Person as a Member or Economic Interest Owner, the Manager shall promptly deliver to the requesting Member or Economic Interest Owner, at the expense of the Company, a copy of the information required to be maintained by Sections 9.1A, B and D, and a copy of this Agreement.

B.    Each Member, Manager and Economic Interest Owner has the right, upon reasonable request for purposes reasonably related to the interest of the Person as Member, Manager or Economic Interest Owner, to:

(i)    inspect and copy during normal business hours any of the Company records described in Section 9.1A through G; and

(ii)    obtain from the Manager, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year, as well as any and all Company financial records.

C.    Members representing at least twenty-five percent (25%) of the Percentage Interests, or three (3) or more Members, make a written request to the Manager for an income statement of the Company for the initial three (3) month, six (6) month, or nine (9) month period of the current Fiscal Year ended more than thirty (30) days prior to the date of the request, and a balance sheet of the Company as of the end of that period. Such statement shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the

23

certificate of the Manager that the statement was prepared without audit from the books and records of the Company. If so requested, the statement shall be delivered or mailed to the Members within thirty (30) days thereafter.

Any Member or a Member's designated representative has the right to inspect the books of the Company at reasonable times upon forty-eight (48) hours written notice to the Manager, but no more than once each calendar quarter for any one (1) Member.

D.      Any request, inspection or copying by a Member or Economic Interest Owner under this Section 9.2 may be made by that Person or that Person's agent or attorney.

E.      The Manager shall promptly furnish to a Member a copy of any amendment to the Articles or this Agreement executed by the Manager pursuant to a power of attorney from the Member.

F.      The Manager shall promptly furnish to a Member written notice of any action concerning the Company which is likely to have a substantial impact upon any of the Members.

9.3      Quarterly Statements and Reports.

A.      Upon request, the Manager shall cause quarterly reports to be sent to each of the Members no later than thirty (30) days after the close of each calendar quarter. The report shall contain a balance sheet as of the end of the calendar quarter and an income statement and statement of changes in financial position for the calendar quarter. Such financial statements shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Manager that the financial statements were prepared without audit from the books and records of the Company.

B.      The Manager shall cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Members' and Economic Interest Owners' federal and state income tax returns. The Manager shall send or cause to be sent to each Member or Economic Interest Owner within ninety (90) days after the end of each taxable year such information as is necessary to complete federal and state income tax or information returns, and, if the Company has thirty-five *(35)* or fewer Members, a copy of the Company's federal, state, and local income tax or information returns for that year.

C.      The Manager shall cause to be filed at least annually with the California Secretary of State the statement required under California Corporations Code § 17060.

9.4      Financial and Other Information. The Manager shall provide such financial and other information relating to the Company or any other Person in which the Company owns, directly or indirectly, an equity interest, as a Member may reasonably request. The Manager shall distribute to the Members, promptly after the preparation or receipt thereof by the Manager, any financial or other information relating to any Person in which the Company owns, directly or indirectly, an equity interest, including any filings by such Person under the Securities Exchange Act of 1934, as amended, that is received by the Company with respect to any equity interest of the Company in such Person.

9.5      Filings. The Manager, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Manager, at Company expense, shall also cause to be

24

prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Articles and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If the Manager is required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or refuses to do so, any other Manager or Member may prepare, execute and file that document with the California Secretary of State.

     9.6    <u>Bank Accounts</u>. The Manager shall maintain the funds of the Company in one (1) or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

     9.7    <u>Accounting Decisions and Reliance on Others</u>. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Manager. The Manager may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

     9.8    <u>Tax Matters for the Company Handled by Manager and Tax Matters Partner</u>. The <u>Manager</u> shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members. The Tax Matters Partner, as defined in Code Section 6231, shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith. The Tax Matters Partner shall oversee the Company tax affairs in the overall best interests of the Company. If for any reason the Tax Matters Partner can no longer serve in that capacity or ceases to be a Member or Manager, as the case may be, Members holding a Majority Interest may designate another to be Tax Matters Partner.

     9.9    <u>Choice of Company's Accountant</u>. The Company's Accountant shall be selected by the Manager.

**ARTICLE X**
**DISSOLUTION AND WINDING UP**

     10.1    <u>Dissolution</u>. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first (1st) to occur of the following:

     A.    Upon the happening of any event of dissolution specified in the Articles;

     B.    Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the Corporations Code;

     C.    The occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Section 8.1 to continue the business of the Company within ninety (90) days after the occurrence of such event or the failure of the Company or the Remaining Members to purchase the Former Member's Interest as provided in Section 8.2; or

     D.    The sale of all or substantially all of the assets of Company.

25

EXHIBIT "5"
Page 26 of 41

10.2    <u>Certificate of Dissolution</u>.  As soon as possible following the occurrence of any of the events specified in Section 10.1, the Manager who has not wrongfully dissolved the Company or, if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Certificate as required by the Act. Upon the filing by the Certificate of Dissolution, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence continues until the certificate of cancellation of articles of organization Dissolution have been filed with the Secretary of State or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

10.3    <u>Winding Up</u>.  Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Manager who has not wrongfully dissolved the Company or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof; shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section *10.5*. The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Manager(s) or Members winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

10.4    <u>Distributions in Kind</u>.  Any non-cash asset distributed to one (1) or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value. Such Net Profit or Net Loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by the <u>Manager</u> or by the Members or, if any Member objects, by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by the <u>Manager</u> or liquidating trustee and approved by the Members.

10.5.    <u>Order of Payment of Liabilities Upon Dissolution</u>.

A.    The distribution of payments of the Company in the process of winding-up shall be made in the following order: (i) All known debts and liabilities of the Company, excluding debts and liabilities to Members who are creditors of the Company; (ii) All known debts and liabilities of the Company owed to Members who are creditors of the Company; (iii) The remaining assets shall be distributed to the Members in accordance with their positive Capital Account balances, after taking into account income and loss allocations and distributions (other than pursuant to Section 10.5A) for the Company's taxable year during which liquidation occurs.

Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

B.    The payment of a debt or liability, whether or not the whereabouts of the creditor is known, has been adequately provided for if:

26

(i)    Payment thereof has been assumed or guaranteed in good faith by one (1) or more financially responsible persons or by the United States government or any agency thereof; and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Members or Manager to be adequate at the time of any distribution of the assets pursuant to this Section.

(ii)    The amount of the debt or liability has been deposited as provided in Section 2008 of the Corporations Code.

This Section 10.5B shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

10.6    Compliance with Regulations. All payments to the Members upon the winding up and dissolution of Company shall be strictly in accordance with the positive Capital Account balance limitation of Regulations Section 1.704-1(b)(2)(ii)(b)(2).

10.7    Limitations on Payments Made in Dissolution. Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of Company for the return of his, hers or its positive Capital Account balance and shall have no recourse for his, hers or its Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Manager or any other Member except as provided in Article XI.

10.8    Certificate of Cancellation. The Manager or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a certificate of cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

10.9    No Action for Dissolution. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action which directly causes a Dissolution Event. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 10.1. This Agreement has been drawn carefully to provide fair treatment to all parties and equitable payment in liquidation of the Economic Interests. Accordingly, except where the Manager has failed to liquidate the Company as required by this Article X, each Member hereby waives and renounces his, hers or its right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles or this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member. Damages for breach of this Section 10.9 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

## ARTICLE XI
## INDEMNIFICATION AND INSURANCE

11.1    Indemnification of Agents. The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or complete action, suit or proceeding by reason of the fact that

27

he, she or it is or was a member, Manager, officer, employee or other agent of the Company or that, being or having been such a Member, Manager, officer, employee or agent, he, she or it is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability Company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an   gent), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit. The Manager shall be authorized, on behalf of the Company, to enter into indemnity agreements from time to time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Manager deems appropriate in the Manager's business judgment.

11.2    Insurance. The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 11.1 or under applicable law.

## ARTICLE XII
## INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Manager, the other Members, and the Company as follows:

12.1    Pre-existing Relationship or Experience. (i) He, she or it has a preexisting personal or business relationship with the Company or one (1) or more of its officer, Manager or control persons or (ii) by reason of his, hers or its business or financial experience, or by reason of the business or financial experience of his, hers or its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he, she or it is capable of evaluating the risks and merits of an investment in the Membership Interest and of protecting his, hers or its own interests in connection with this investment.

12.2    No Advertising. He, she or it has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

12.3    Investment Intent. He, she or it is acquiring the Membership Interest for investment purposes for his, hers or its own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest. No other person will have any direct or indirect beneficial interest in or right to the Membership Interest.

12.4    Purpose of Entity. If the Member is a corporation, partnership, limited liability company, trust, or other entity, it was not organized for the specific purpose of acquiring the Membership Interest.

28

172

EXHIBIT "5"
Page 29 of 41

12.5    Economic Risk; Consulted with Advisor; Speculative Nature. He, she or it is financially able to bear the economic risk of an investment in the Membership Interest, including the total loss thereof. In acquiring a Membership Interest, he, she or it has consulted with and has been guided by his own attorney, accountant or other personal investment or financial advisor with respect to and concerning the merits, risk and advisability of the purchase of the Membership Interest subscribed for herein or the undersigned has such knowledge and experience in financial, investment and business matters that he is capable of evaluating the merits, risk and advisability of an investment in the Membership Interest without the assistance of such an advisor. Further, he, she or it recognizes the speculative nature of the investment in the Membership Interest, including the fact that the Property being purchased by the Company is an empty building, with asbestos, and in need of millions of dollars in improvements.

12.6    No Registration of Membership Interest. He, she or it acknowledges that the Membership Interest has not been registered under the Securities Act of 1933, as amended (the Securities Act), or qualified under the California Corporate Securities Law of 1968, as amended, or any other applicable blue sky laws in reliance, in part, on his, hers or its representations, warranties, and agreements herein.

12.7    Membership Interest in Restricted Security. He, she or it understands that the Membership Interest is a restricted security under the Securities Act in that the Membership Interest will be acquired from the Company in a transaction not involving a public offering, and that the Membership Interest may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise the Membership Interest must be held indefinitely. In this connection, he, she or it understands the resale limitations imposed by the Securities Act and is familiar with SEC Rule 144, as presently in effect, and the conditions which must be met in order for the Rule to be available for resale of restricted securities, including the requirement that the securities must be held for at least two (2) years after purchase thereof from the Company prior to resale (three (3) years in the absence of publicly available information about the Company) and the condition that there be available to the public current information about the Company under certain circumstances. He, she or it understands that the Company has not made such information available to the public and has no present plans to do so.

12.8    No Obligation to Register. He, she or it represents, warrants, and agrees that the Company and the Manager is under no obligation to register or qualify the Membership Interest under the Securities Act or under any state securities law, or to assist him or it in complying with any exemption from registration and qualification.

12.9    No Disposition in Violation of Law. Without limiting the representations set forth above, and without limiting Article VII of this Agreement, he, she or it will not make any disposition of all or any part of the Membership Interest which will result in the violation by him or it or by the Company of the Securities Act, the California Corporate Securities Law of 1968, or any other applicable securities laws. Without limiting the foregoing, he, she or it agrees not to make any disposition of all or any part of the Membership Interest unless and until:

A.    There is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement and any applicable requirements of state securities laws; or

B.    (i) He, she or it has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (ii) if reasonably

29

requested by the Manager, he, she or it has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

      C.     In the case of any disposition of all or any part of the Membership Interest pursuant to SEC Rule 144, in addition to the matters set forth in Section 12.11B, he or she shall promptly forward to the Company a copy of any Form 144 filed with the SEC with respect to such disposition and a letter from the executing broker satisfactory to the Company evidencing compliance with SEC Rule 144. If SEC Rule 144 is amended or if the SEC's interpretations thereof in effect at the time of any such disposition have changed from its present interpretations thereof, he, she or it shall provide the Company with such additional documents as the Manager may reasonably require.

     12.10    <u>Legends</u>. He, she or it understands that the certificates (if any) evidencing the Membership Interest may bear one (1) or all of the following legends:

      A.     THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY. SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS WHICH ARE SET FORTH HEREIN.

      B.     Any legend required by applicable state securities law.

     12.11    <u>Investment Risk</u>. He, she or it acknowledges that the Membership Interest is a speculative investment which involves a substantial degree of risk of loss by him, her or it of his, her or its entire investment in the Company, that he, she or it understands and takes full cognizance of the risk factors related to the purchase of the Membership Interest, and that the Company is newly organized and has no financial or operating history. Furthermore, the Property has asbestos, is vacant and earning no income and is in need of millions of dollars in improvements.

     12.12    <u>Investment Experience</u>. He, she or it is an experienced investor in unregistered and restricted securities of limited liability companies or limited partnerships.

     12.13    <u>Restrictions on Transferability</u>. He, she or it acknowledges that there are substantial restrictions on the transferability of the Membership Interest pursuant to this Agreement, that there is no public market for the Membership Interest and none is expected to develop, and that, accordingly, it may not be possible for him, her or it to liquidate his, hers or its investment in the Company.

     12.14    <u>Information Reviewed</u>. He, she or it has received and reviewed all information he, she or it considers necessary or appropriate for deciding whether to purchase the Membership Interest. He, she or it has had an opportunity to ask questions and receive answers from the Company and its officers, Manager and employees regarding the terms and conditions of purchase of the Membership Interest and regarding the business, financial affairs, and other aspects of the Company and has further had the opportunity to obtain all information (to the extent the Company possesses or can

30

acquire such information without unreasonable effort of expense) which he, she or it deems necessary to evaluate the investment and to verify the accuracy of information otherwise provided to him, her or it.

12.15   <u>No Representations by Company.</u> Neither any Manager, any agent or employee of the Company or of any of the Manager, or any other Person has at any time expressly or implicitly represented, guaranteed, or warranted to him, her or it that he, she or it may freely transfer the Membership Interest, that a percentage of profit and/or amount or type of consideration will be realized as a result of an investment in the Membership Interest, that past performance or experience on the part of the Manager or Manager's Affiliates or any other person in any way indicates the predictable results of the ownership of the Membership Interest or of the overall Company business, that any cash distributions from Company operations or otherwise will be made to the Members by any specific date or will be made at all, or that any specific tax benefits will accrue as a result of an investment in the Company.

12.15.1   Neither the Company nor any Manager, nor any agent or representative of the Company or any of the officers, directors, agents, Members or affiliates of either of them, has made any representations or warranties of any kind to induce the purchase of a Membership Interest in Company or to enter into this Agreement.

12.15.2   Any statements, brochures, information, data, and figures describing or relating in any way to the investment are based upon information obtained by the Company from sources which it deems reliable, but are not made or intended as representations, warranties, guarantees, promises or inducements by the Company.

12.15.3   Any projected or estimated figures of income, expense, depreciation and expenses of operation are estimates and projections only and are not warranted, represented, or guaranteed.

12.15.4   For acquiring a Membership Interest in Company, he she or it has been afforded the opportunity to ask questions and to receive answers concerning the Company's financial condition, business, assets, prospects, liabilities and the terms and conditions of this Agreement, and that the Manager and any agents or representatives of Company have answered all such questions to the satisfaction of the undersigned.

12.15.5   The Company is not liable or bound in any manner by statements, representations or information, if any, pertaining to the income or operation of, or by any matter affecting or relating to the investment, or by any information or data furnished by any person unless specifically set forth in this Agreement.

12.15.6   In acquiring their Membership Interest, each Member has been provided a projection of cash flow based on the expected amortization of the loan to be obtained by Company. Each Member acknowledges and understands that during the years set forth in the projection, it is anticipated that the Company will not be able to issue to Class A Members the full eight percent (8%) preferred return described in Section 3.4.1 hereof. Furthermore, the Members acknowledge that the projection is not an assurance or guaranty with respect to a return on each Member's initial contribution.

12.16   <u>Consultation with Attorney.</u> He, she or it has been advised to consult with his, hers or its own attorney regarding all legal matters concerning an investment in the Company and the tax consequences of participating in the Company, and has done so, to the extent he, she or it considers necessary.

31

12.17   <u>Tax Consequences</u>. He, she or it acknowledges that the tax consequences to him, her or it of investing in the Company will depend on his, hers or its particular circumstances, and neither the Company, the Manager, the Members, nor the partners, shareholders, members, managers, agents, officers, directors, employees, Affiliates, or consultants of any of them will be responsible or liable for the tax consequences to him, her or it of an investment in the Company. He, she or it will look solely to, and rely upon, his, hers or its own advisers with respect to the tax consequences of this investment.

12.18   <u>No Assurance of Tax Benefits</u>. He, she or it acknowledges that there can be no assurance that the Code or the Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Company and the members of some or all of the tax benefits they might now receive, nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service.

12.19   <u>Indemnity</u>. Each Member shall indemnify and hold harmless the Company, each and every Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, agents, attorneys, registered representatives, and control persons of any such entity who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by him or it including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the Company, each and every Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, attorneys. accountants, agents, registered representatives, and control persons of any such Person (including attorneys' fees, judgments, fines, and amounts paid in settlement, payable as incurred) incurred by such Person in connection with such action, suit, proceeding, or the like.

## ARTICLE XIII
## MISCELLANEOUS

13.1   <u>Counsel to the Company</u>. Counsel to the Company may also be counsel to any Manager or any Affiliate of a Manager. The Manager may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction (Rules). The Managers shall mutually select a law firm as legal counsel to the Company. Each Member acknowledges that Company Counsel does not represent any Member in the absence of a clear and explicit agreement to such effect between the Member and Company Counsel, and that in the absence of any such agreement Company Counsel shall owe no duties directly to a Member. In the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and a Manager (or Affiliate of a Manager) that Company Counsel represents, on the other hand, then each Member agrees that Company Counsel may represent either the Company or such Manager (or his, hers or its Affiliate), or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

13.2   <u>Complete Agreement</u>. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members and Manager with respect to the subject matter herein and therein and

32

replace and supersede all prior written and oral agreements or statements by and among the Members and Manager or any of them. No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or Manager or have any force or effect whatsoever. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

13.3    Binding Effect.  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

13.4    Parties in Interest.  Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and Manager and his respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

13.5    Pronouns; Statutory References.  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference to the Code, the Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

13.6    Headings.  All headings are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

13.7    Interpretation.  In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his, hers or its counsel.

13.8    References to this Agreement.  Numbered or lettered articles, section and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

13.9    Jurisdiction.  Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under, or in connection with this Agreement or the transactions contemplated by this Agreement, provided such claim is not required to be arbitrated pursuant to Section 13.10. Each Member further agrees that personal jurisdiction over him or it may be effected by service of process by registered or certified mail addressed as provided in Section 13.14 of this Agreement, and that when so made shall be as if served upon him or it personally with the State of California.

13.10    Disputed Matters.  Except as otherwise provided in this Agreement, any controversy or dispute arising out of this Agreement, the interpretation of any of the provisions hereof, or the action or inaction of any Member or Manager hereunder shall be submitted to arbitration in Los Angeles, California before the American Arbitration Association under the real estate arbitration rules then obtaining of the American Arbitration Association. Any award or decision obtained from any such arbitration proceeding shall be final and binding on the parties, and judgment upon any award thus obtained may be entered in any court having jurisdiction thereof. No action at law or in equity based upon any claim arising out of or related to this Agreement shall be instituted in any court by a Member except (a) an action to

33

EXHIBIT "5"
Page 34 of 41

compel arbitration pursuant to this Section 13.10 or (b) an action to enforce an award obtained in an arbitration proceeding in accordance with this Section 13.10.

13.11   Exhibits. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

13.12   Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

13.13   Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

13.14   Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member or Manager at the address specified in Exhibit A hereto. Any party may, at any time by giving five (5) days prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

13.15   Amendments. All amendments to this Agreement will be in writing and signed by all of the Members.

13.16   Reliance on Authority of Person Signing Agreement. If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

13.17   No Interest in Company Property; Waiver of Action for Partition. No Member or Economic Interest Owner has any interest in specific property of the Company. Without limiting the foregoing, each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that he, she or it may have to maintain any action for partition with respect to the property of the Company.

13.18   Multiple Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

13.19   Attorney Fees. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses.

13.20   Time is of the Essence. All dates and times in this Agreement are of the essence.

34

13.21    Remedies Cumulative.  The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

13.22    Special Power of Attorney.

A.    Attorney in Fact.  Each member grants the Manager a special power of attorney irrevocably making, constituting, and appointing the Manager as the Member's attorney in fact, with all power and authority to act in the Member's name and on the Member's behalf to execute, acknowledge and deliver and swear to in the execution, acknowledgment, delivery and filing of the following documents:

(i)    Promissory notes to be delivered pursuant to Section 3.5;

(ii)    Assignments of certificates of membership interest or other documents of transfer to be delivered pursuant to Section 3.5 or in connection with the purchase of a Membership Interest pursuant to Section 3.5, Section 7.7 or Article VIII;

(iii)    Any other instrument or document that may be reasonably required by the Manager in connection with any of the foregoing or to reflect any reduction in the Member's Capital Account or Percentage Interest pursuant to Section 3.5; and

(iv)    Any consent to the representation of the Company by counsel selected by the Manager as described in Section 13.1.

B.    Irrevocable Power.  The special power granted in Section 13.22A: (i) is irrevocable; (ii) is coupled with an interest; and (iii) shall survive a Member's death, incapacity or dissolution.

C.    Signatures.  The Manager may exercise the special power of attorney granted in Section 13.22A by a facsimile signature of the Manager or one of Manager's officers.

13.23    No Third Party Beneficiary.  The Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of the Agreement as a third party beneficiary or otherwise.

13.24    Not for Benefit of Creditors.  The provisions of the Agreement are intended only for the regulation of relations among Members and Company.  The Agreement is not intended for the benefit of a creditor who is not a Member and does not grant any rights to or confer any benefits on any creditor who is not a Member or any other person who is not a Member, a Manager, or an officer.

13.25    Reserved.

13.26    Rights of Judgment Creditor of Member.  On application to a court of competent jurisdiction by a judgment creditor of a Member, the court may charge the Member's interest with payment of the unsatisfied amount of the judgment with interest.  To the extent so charged the judgment creditor has only the rights of an assignee of the

35

Member's interest. This Paragraph does not deprive any Member of the benefit of any exemption applicable to his interest.

13.27    Legal Representative or Successor of a Member. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage his, hers or its person or property, the executor, administrator, guardian, conservator or other legal representative may exercise all rights of the Member in the purpose of settling his, hers or its estate or administering his, hers or its property.

13.28    Number of Members. The Company shall at all times have at least two (2) members.

13.29    No Responsibility for Pre-Formation Commitments. In the event that any Member (or any of such Member s shareholders, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that related to or otherwise affects Company (other than for the existing loan with Pacific Western Bank, costs of rezoning the property as a medical usage, and real costs of operating the building prior to this new Agreement), neither Company nor any other Member shall have any liability or responsibility for or with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by Company pursuant to a written instrument signed by the Manager. Furthermore, neither Company nor any Member shall be responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or any of such Member's shareholders or Affiliates). Each Member is aware of, agrees to and acknowledges that transaction fees, acquisition fees and leasing commissions may be paid in the acquisition of the property or leases, the majority of which will be paid to Members of the Company. All Members agree to, approve and acknowledge that Company is placing a construction/permanent loan ("Loan") in the approximate amount of at least Four Million Five Hundred Thousand Dollars ($4,500,000.00) on the Property at time of closing on the Property.

13.30    Cooperation in Tax Deferred Exchange. The Company has been formed, principally, to invest in real property. If the Company shall decide to sell the Project, then the Members shall cooperate with each other, in good faith, to facilitate any Member wishing to do a tax-deferred exchange with respect to such Member's beneficial interest in the Project, in lieu of such Member receiving his pro rata share of the net sales proceeds from any such sale. Such cooperation shall include, without limitation, the Company distributing such Member's pro rata beneficial interest in the Project to such Member, for such Member to hold as a tenant in common with the Company for a period of not less than 90 days (or such lesser number of days as the exchanging Member shall request) prior to the consummation of any such sale. The Member wishing to effectuate such a tax-deferred exchange shall bear all additional costs and expenses incurred in connection with effectuating the same.

Jun 15 08 08:01a                                                                    p.1

IN WITNESS WHEREOF, all of the Members of HARBOR MEDICAL INVESTORS LLC, A California limited liability company, have executed this Agreement, effective as of the date written above.

MEMBERS:

_____          _____
Barry Beitler                                      John Bral

CAMELI INVESTMENTS LLC.                         _____
                                                   Anant Desai

_____          _____
West Coast Radiology

_____          _____

_____          _____

_____          _____

37

181

P.2

IN WITNESS WHEREOF, all of the Members of HARBOR MEDICAL INVESTORS LLC. A California limited liability company, have executed this Agreement, effective as of the date written above.

MEMBERS:

_____                    _____
Barry Beitler                                     John Bral

                                           *Anant B. Desai*

                                           *Falguni A. Desai*
_____
CAMELI INVESTMENTS LLC.                      Anant B. Desai and Falguni A. Desai 1992 Family
                                           Declaration of Trust

_____
West Coast Radiology

_____                    _____

_____                    _____

_____                    _____

38

182

**EXHIBIT "A - 1"**

**Class "B" Investors**

| | |
|---|---|
| Barry Beitler | 10 % |
| John Bral | 10 % |
| Fardad Fateri | <u>10 %</u> |
| Total Class B | 30 % |

38

EXHIBIT "5"
Page 40 of 41

## EXHIBIT "A - 2"

### Class "A" Investors and Capital Contributions

| Member | Address | Capital Percentage | Capital Contributed |
|---|---|---|---|
| Barry Beitler and John Bral Split 50/50 | 1 Park Plaza, Suite 1225 Irvine, CA 92614 | 28% | $480,000 |
| CAMELI INVESTMENTS LLC. | 113 Bottlebrush Irvine, CA 92603 | 14% | $240,000 |
| Anant B.Desai and Falguni A. Desai 1992 Family Declaration of Trust | 1500 Ridgemont Court Fullerton, CA 92831 | 10% | $171,429 |
| TBD | | 18% | $308,571 |
| **Total Capital** | | 70% | $1,200,000.00 |

39

# EXHIBIT "6"

EXHIBIT "6"

OPERATING AGREEMENT FOR
EYESTREET MEDICAL INVESTORS, LLC
A CALIFORNIA LIMITED LIABILITY COMPANY

This Operating Agreement, is made as this 17th day of October, 2006 by and among the parties listed on the signatures pages hereof, with reference to the following facts:

      A.      On October 17, 2006, Articles of Organization for EYESTREET MEDICAL INVESTORS, LLC, a California limited liability company (the Company), a limited liability company under the laws of the State of California, were filed with the California Secretary of State, Document Number 200629210117.

NOW, THEREFORE, the parties (hereinafter sometimes collectively referred to as the Members, or individually as the Member) by this Agreement set forth the Operating Agreement for the Company under the laws of the State of California upon the terms and subject to the conditions of this Agreement.

ARTICLE 1
DEFINITIONS
ARTICLE 1  DEFINITIONS

      When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement which are not defined in this Article I shall have the meanings set forth elsewhere in this Agreement):

      1.1      Act shall mean the Beverly-Killea Limited Liability Act, codified in the California Corporations Code, Section 17000 et seq., as the same may be amended from time to time.

      1.2      Affiliate shall mean any individual, partnership, corporation, trust, or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member. The term control, as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

      1.3      Agreement shall mean this Operating Agreement, as originally executed and as amended from time to time.

      1.4      Articles shall mean the Articles of Organization for the Company originally filed with the California Secretary of State and as amended from time to time.

      1.5      Bankruptcy shall mean, (i) the entry of a decree or order for relief against any Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, Debtor Relief Law) generally affecting the rights of creditors and relief of debtors now or hereafter in effect; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of a Member's affairs; (iv) the filing of a petition in any such involuntary bankruptcy case, which petition remains not dismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by a Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by a Member to the entry of an order for relief in an involuntary case under any

1

EXHIBIT "6"
Page 2 of 43

such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or *(vii)* the making by a Member of any general assignment for the benefit of its creditors.

1.6    Capital Account shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.3.

1.7    Capital Contribution shall mean the total value of cash contributed to the Company by Members.

1.8    Code shall mean the Internal Revenue Code of 1986, as amended from time to time, and the provisions of succeeding law.

1.9    Company shall mean EYESTREET MEDICAL INVESTORS, LLC, a California Limited Liability Company.

1.10    Company Minimum Gain shall have the meaning ascribed to the term Partnership Minimum Gain in the Regulations Section 1.704-2(d).

1.11    Corporations Code shall mean the California Corporations Code, as amended from time to time, and the provisions of succeeding law.

1.12    Dissolution Event for the Company means the following:

With respect to any Member, one or more of the following:

    1.    When the period fixed for the duration of the Company expires as defined in 2.3 herein; or

    2.    By the unanimous written agreement of all Members.

1.13    "Distributable Net Cash" shall mean the amount of cash which the Manager deems available for distribution to the Members, taking into account all Company debts, liabilities, and obligations of the Company then due and amounts which the Manager deems necessary to place into reserves for customary and usual claims with respect to the Company's business.

1.14    Economic Interest shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a member, including, without limitation, the right to vote or participate in the management, or except as provided in Section 17106 of the Corporations Code, any right to information concerning the business and affairs of Company.

1.15    Reserved

1.16    Fiscal Year shall mean the Company's fiscal year, which shall be the calendar year.

1.17    Former Members shall have the meaning ascribed to it in Section 8.1.

1.18    Former Member's Interest shall have the meaning ascribed to it in Section 8.1.

1.19    Majority Interest shall mean Percentage Interests of one or more Members, which taken together exceeds seventy five percent (75%) of the aggregate of all Percentage Interests.

1.20    Manager shall mean, JOHN BRAL and DR. HOOTAN DANESHMAND, collectively, or any other person(s) or entity(ies) who succeed in their respective capacities.

2

EXHIBIT "6"
Page 3 of 43

1.21    Member shall mean each Person who (a) is an initial signatory to this Agreement; has been admitted to the Company as a Member in accordance with the Articles or this Agreement; or is an assignee who has become a Member in accordance with Article VII and (b) has not resigned, withdrawn, been expelled or, if other than an individual, dissolved. It shall refer to both classes of Members in the Company. Unless otherwise expressly mentioned, Member shall refer to and include both classes of Members.

1.21.1    Class A Members shall mean a class of Members that consist of those individuals, persons or entities that own ninety five percent (95%) of all of the outstanding and issued Membership Interest in Company and are specifically named in Exhibit A-2 and who have contributed on a proportionate basis 100% of all cash required hereunder.

1.21.2    Class B Members shall mean a class of Members that consist of those individuals, persons or entities that own five percent (5%) of all of the outstanding and issued Membership Interest in Company and are specifically named in Exhibit A-1.

1.22    Member Nonrecourse Debt shall have the meaning ascribed to the term Partner Nonrecourse Debt in Regulations Section 1.704-2(b)(4).

1.23    Member Nonrecourse Deductions shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

1.24    Membership Interest shall mean a Member's entire interest in the Company including the Member's Economic Interest; the right to vote on or participate in the management; and the right to receive information concerning the business and affairs of the Company. A Membership Interest constitutes personal property.

1.25    Net Profits and Net Losses shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (and for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) with those adjustments required by Regulations Section 1.704-1(b)(2)(iv) for purposes of adjusting and maintaining Capital Accounts in accordance therewith.

1.26    Nonrecourse Liability shall have the meaning set forth in Regulations Section 1.752-1(a)(2).

1.27    Percentage Interest shall mean the percentage of a Member set forth opposite the name of such Member under the column Member's Percentage Interest in Exhibit A hereto; as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.

1.28    Person shall mean an individual, general partnership, limited partnership, limited liability company, corporation, trust, estate, real estate investment trust association or any other entity.

1.29    Regulations shall, unless the context clearly indicates otherwise, mean the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

1.30    Remaining Members shall have the meaning ascribed to it in Section 8.1.

1.31    Tax Matters Partner shall be JOHN BRAL and DR. HOOTAN DANESHMAND, collectively, or their successors as designated pursuant to Section 9.8.


ARTICLE II
ORGANIZATIONAL MATTERS

3

EXHIBIT "6"
Page 4 of 43

2.1   <u>Formation</u>. Pursuant to the Act, the Members have formed a California Limited Liability Company under the laws of the State of California by filing the Articles with the California Secretary of State and entering into this Agreement. The rights and liabilities of the Members shall be determined pursuant to the Act and to this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2   <u>Name</u>. The name of the Company shall be EYESTREET MEDICAL INVESTORS, LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager deems appropriate or advisable. The Manager shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Manager considers appropriate or advisable. The phrase LLC shall always appear as part of the name of Company on all correspondence, stationary, checks, invoices and any and all documents and papers executed by Company and as otherwise required by the Act.

2.3   <u>Term</u>. The term of this Agreement shall be co-terminus with the period of duration of the Company, December 31, 2050, unless extended or sooner terminated as hereinafter provided.

2.4   <u>Office and Agent</u>. The Company shall continuously maintain an office and registered agent in the State of California as required by the Act. The principal office of the Company shall be as the Manager may determine. The Company also may have such offices, anywhere within and without the State of California, as the Manager from time to time may determine, or the business of the Company may require. The registered agent shall be as stated in the Articles or as otherwise determined by the Manager.

2.5   <u>Addresses of the Members and the Manager</u>. The respective addresses of the Members and the Manager are set forth on Exhibit A.

2.6   <u>Purposes of Company</u>. The purpose of the Company is to engage in any lawful activity for which a Limited Liability Company may be organized under the Act. Notwithstanding the foregoing, however, the Company shall not engage in any business other than the following:

(1)   The business of development, operation, leasing and managing for rental and investment of that certain real property located at 2525 Eye Street Bakersfield CA (the "Property") and any and all improvements upon the Property (the "EYE STREET MEDICAL PLAZA");

(2)   such other activities directly related to the foregoing business as may be necessary, advisable, or appropriate, in the reasonable opinion of the Manager to further the foregoing business.

2.7   <u>Title to Property in the Name of the Company</u>. Title to the real property purchased in accordance with 2.6 above shall be held and owned in the name of the Company

2.8   <u>Tax Status of Company</u>. The Members intend that the Company be treated as a partnership for income tax purposes and agree to take any actions necessary in order to obtain such treatment.

4

EXHIBIT "6"
Page 5 of 43

## ARTICLE III
## CAPITAL CONTRIBUTIONS

3.1    Initial Capital Contributions. Each Member shall contribute such amount as is set forth on Exhibit A as his, hers or its initial Capital Contribution within one year of the execution of this agreement. Exhibit A shall consist of Sections A-1 and A-2. Exhibit A-1 shall contain Class B Members and Exhibit A-2 shall contain Class A Members.

3.2    Additional Capital Contributions.

(1)    In addition, each Member shall contribute to the capital of the Company its pro rata share of such amounts as the Manager shall determine from time to time to be necessary in order to carry out the purposes of the Company set forth above within ten (10) days or thirty (30) days, depending on the amount of the capital call, after the call is made for same by the Manager.

(2)    If the Manager determines that the Company requires additional funds for any purpose, it may request that the Members contribute more funds to the Company. In such case, each Member shall contribute to the capital of the Company its pro rata share of such amounts as the Manager shall determine from time to time to be necessary in order to carry out the purposes of the Company set forth above within ten (10) business days if the total capital call is under ten thousand dollars ($10,000), or thirty (30) days if ten thousand dollars ($10,000) or over, after the call is made for same by the Manager.

(3)    Alternatively or additionally, Manager may reserve up to One Hundred Fifty Thousand dollars ($150,000) from Distributable Net Cash for such purposes.

(4)    If any Member fails to timely make its pro rata contribution as required above and required by the Manager, that Member or Members shall have his/her Membership Interest decreased proportionally for the failure to make such required contributions. For example; Manager calls for one hundred thousand dollars. Member X, who owns eight percent (8%), fails to fund the call. The remaining Members must, pro rata, fill the capital call. Member X's interest is then reduced by itself, namely eight percent (8%) in this example, leaving Member X with seven point thirty-six percent (7.36%) interest. The diluted interest is then distributed to the Members making the capital call, pro rata.

3.3    Capital Accounts. The Company shall establish an individual Capital Account for each Member. The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv). If a Member transfers all or a part of his, hers or its Membership Interest in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations Section 1.704-1(b)(2)(iv)(1).

3.4    No Interest or Preferred Return. Except as otherwise expressly provided herein, no Member shall be entitled to receive any interest or preferred return on his, hers or its Capital Contributions.

3.4.1    Preferred Return to Class A Members. To the extent permitted by working capital requirements and other contingencies determined by the Manager, Company shall issue to Class A Members an eight percent (8%) preferred return, per annum, non-compounding, on their initial capital contribution set forth in Exhibit A-1 hereto. To the extent the preferred return cannot be issued in full because of Company's working capital requirements or other contingencies, the preferred return shall be issued in part and shall be carried forward to each successive year until paid. When the Class A Members have been paid an amount equal to the Class A Members' initial capital contribution, Class A Members shall no longer be entitled to any preferred return hereunder. Distributions will then be strictly based

5

upon percentage ownership. The preferred return shall at all time be calculated based upon the then outstanding unpaid initial capital contribution of Class A Members.

3.4.2    Preferred Return to Class B Members.    To the extent permitted by working capital requirements and other contingencies determined by the Manager, and Company's payment of an eight percent (8%) preferred return and no less to all of the Class A Members, Company shall issue an eight percent (8%) preferred return, per annum, non-compounding to Class B Members, which Class B Member preferred return shall be calculated based on five percent (5%) of the Preferred Return paid to Class A Members under Section 3.4.1.. divided by the Class A Membership percentage and multiplied by the Class A Member return paid. To the extent the preferred return cannot be issued in full to the Class B Members because of Company's working capital requirements or other contingencies, the preferred return to Class B Members shall be carried forward to any successive year. For example, if Company distributes a eight percent (8%) preferred return to Class A Members, but only distributes a one percent (1%) preferred return to Class B Members, the Class B Members shall be entitled to an additional four percent (4%) return on a successive year. The amount of the preferred return paid to Class B Members is determined on an annual basis. The Preferred Return to Class B Members shall not be paid to Class B Members after the initial capital contribution of Class A Members has been repaid in full. After the Initial Capital Contribution is returned to the Class A Members, all distributions shall be made based upon percentage ownership. No Preferred Return shall be paid to Class B Members in any year except and unless the full eight percent (8%) preferred return has been paid to all of the Class A Members.

3.4.3.    Distributions After Payment of Preferred Return to Both Class A and Class B Members. After payment of the preferred returns are made in full to both Class A Members and Class B Members, then any distributions from Company, in any period per annum, shall be made to all Members based on ninety nine five percent (95%) to Class A and two percent (5%) to Class B.

3.5    Limitation on Withdrawal of Capital Contribution.    No Member shall have the right to withdraw his, hers or its Capital Contribution or to demand and receive property of the Company or any distribution in return for his, hers or its Capital Contribution, except as may be specifically provided in this Agreement or permitted by law.

## ARTICLE IV
## MEMBERS

4.1    Limited Liability.    Except as provided in California Corporations Code Section 17254 relating to distributions by Company and Section 17101(b) relating to responsibility of Members for certain unsatisfied debts or obligations of Company, no Member or Manager shall be liable under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of Company whether that liability or obligation arises in contract or tort. No Member shall be required to loan any funds to Company. No Member shall be required to make any contribution to Company by reason of any negative balance in his, hers or its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

4.2    Admission of Additional Members.    The Manager, with the approval of all of the Members, may admit to the Company additional Members. Any additional Members shall obtain Membership Interests and will participate in the management, Net Profits, Net Losses, and distributions of the Company on such terms as are determined by the Manager and approved by the Members. Notwithstanding the foregoing, substitute members may only be admitted in accordance with Article VII.

4.3    Purchase of Membership Interest.    Upon the transfer of a Member's Membership Interest in violation of this Agreement, or the occurrence of a Dissolution Event as to such Member which does not result in the dissolution of the Company, such Membership Interest may be purchased by the Company or remaining Members as provided herein. Each Member acknowledges and agrees that such right to purchase a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the date hereof.

6

EXHIBIT "6"
Page 7 of 43

4.4    Transactions With The Company. Subject to any limitations set forth in this Agreement and with the prior unanimous approval of the Manager and Members, and after full disclosure of the Member's involvement, a Member may lend money to and transact other business with the Company. Subject to other applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

4.5    Except as otherwise authorized in this agreement, no Member is entitled to remuneration in a capacity acting for the Company or for Company business.

4.6    Members Are Not Agents. Pursuant to Section 5.1 and the Articles, the management of the Company shall be vested in the Manager, the designated property manager. No Member, acting solely in the capacity of a Member, is an agent of the Company nor can any Member in such capacity bind nor execute any instrument on behalf of the Company.

4.7    Voting Rights. Members shall have the right to approve or disapprove matters as specifically stated in this Agreement, including the following:

A.    Unanimous Approval. The following matters shall require the unanimous vote, approval or consent of all Members who are not the subject of a Dissolution Event or an assignor of a Membership Interest:

(i)    A decision to continue the business of the Company after the occurrence of a Dissolution Event set forth in 1.12.

(ii)    Except as provided in Article VII, the transfer of a Membership Interest and admission of the transferee or assignee as a Member of the Company.

(iii)    Any material amendment of the Articles or this Agreement.

(iv)    Purchase of additional real property by the Company.

(v)    Matters designated in paragraph C below of this Section 4.7.

B.    Approval by Members Holding a Majority Interest. Except as set forth in this Agreement in all other matters in which the vote, approval or consent of all Members is required, the vote, consent or approval of Members holding a Majority Interest (or, in instances in which there are defaulting Members, non-defaulting Members who hold a majority of the Percentage Interests held by all non-defaulting Members) shall be sufficient to authorize or approve such act; specifically including the right to sell, lease or re-finance the Company's Property.

C.    Other Voting Rights. Besides the rights granted in Sections 4.7A and 4.8A, Members may vote, consent or approve to the extent and on the terms provided in this Agreement in the following Sections:

(i)    Section 3.5 on remedies for a Member's failure to make a contribution;

(ii)    Section 4.2 on admission of new Members;

(iii)    Section 5.3B on a change in the purpose of the Company;

(iv)    Section 5.3B on reorganization of the Company;

(v)    Section 5.3B on other limitations on the Manager's authority;

(vi)    Section 5.8 on transactions with the Manager and Affiliates of the Manager;

(vii)    Section 5.10A on management fees payable to Manager; and

7

EXHIBIT "6"
Page 8 of 43

(viii)    Section 10.1 on dissolving the Company.

Any such vote, consent or approval must be unanimous.

4.8    Meetings of Members.

A.    Date, Time and Place of Meetings of Members; Secretary. Meetings of Members may be held at such date, time and place within the State of California as the Manager may fix from time to time. No annual or regular meetings of Members is required. At any Member's meeting, the Manager shall appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting which shall be placed in the minute book of the Company. Formal meetings of members are not required to take action.

B.    Power to Call Meetings. Unless otherwise prescribed by the Act or by the Articles, meetings of the Members may be called by the Manager, or upon written demand of Members holding more than ten percent (10%) of the Percentage Interests for the purpose of addressing any matters on which the Members may vote.

C.    Notice of Meeting. If a formal meeting is desired, written notice of a meeting of Members shall be sent or otherwise given to each Member in accordance with Section 4.9D not less than ten (10) nor more than sixty (60) days before the date of the meeting. The notice shall specify the place, date and hour of the meeting and the general nature of the business to be transacted. No other business may be transacted at this meeting. Upon written request to the Manager by any person entitled to call a meeting of Members, the Manager shall immediately cause notice to be given to the Members entitled to vote that a meeting will be held at a time requested by the person calling the meeting, not less than ten (10) days nor more than sixty (60) days after the receipt of the request. If the notice is not given within twenty (20) days after the receipt of the request, the person entitled to call the meeting may give the notice.

D.    Manner of Giving Notice; Affidavit of Notice. Notice of any meeting of Members shall be given either personally or by first-class mail or telegraphic or other written communication, charges prepaid, addressed to the Member at the address of that Member appearing on the books of the Company or given by the Member to the Company for the purpose of notice. Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by telegram or other means of written communication.

If any notice addressed to a member at the address of that Member appearing on the books of the Company is returned to the Company by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice to the Member at that address, all future notices or reports shall be deemed to have been duly given without further mailing if these shall be available to the Member on written demand for the Member at the principal executive office of the Company for a period of one (1) year from the date of the giving of the notice.

An affidavit of the mailing or other means of giving any notice of any meeting shall be executed by the Manager or any secretary, assistant secretary, or any transfer agent of the Company giving the notice, and shall be filed and maintained in the minute book of the Company.

E.    Validity of Action. Any action approved at a meeting, other than by unanimous approval of those entitled to vote, shall be valid only if the general nature of the proposal so approved was stated in the notice of meeting or in any written waiver of notice.

F.    Quorum. The presence in person or by proxy of the holders of a Majority Interest of Profits Interest and Capital Interest shall constitute a quorum at a meeting of Members. The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum (other than adjournment) is approved by at least Members holding a Majority Interest in Profit Interest and in Capital Interest.

8

EXHIBIT "6"
Page 9 of 43

G.    Adjourned Meeting; Notice. Any Members meeting, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the Membership Interests represented at that meeting, either in person or by proxy, but in the absence of a quorum, no other business may be transacted at that meeting, except as provided in Section 4.9F. When any meeting of Members is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place are announced at a meeting at which the adjournment is taken, unless a new record date for the adjourned meeting is subsequently fixed, or unless the adjournment is for more than forty-five (45) days from the date set for the original meeting, in which case the Manager shall set a new record date. At any adjourned meeting the Company may transact any business which might have been transacted at the original meeting.

H.    Waiver of Notice or Consent. The actions taken at any meeting of Members however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, who was not present in person or by proxy, signs a written waiver of notice and consents to the holding of the meeting or approves the minutes of the meeting. All such waivers, consents or approvals shall be filed with the Company records or made a part of the minutes of the meeting.

Attendance of a person at a meeting shall constitute a waiver of notice of that meeting, except when the person objects at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened; and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters not included in the notice of the meeting if that objection is expressly made at the meeting. Neither the business to transacted nor the purpose of any meeting of Members need be specified in any written waiver of notice except as provided in Section 4.9E.

I.    Action by Written Consent Without a Meeting. Any action that may be taken at a meeting of Members may be taken without a meeting, if a consent in writing setting forth that action so taken, is signed and delivered to the Company within ten (10) days of the record date for that action by Members having not less than the minimum number of votes which would be necessary to authorize taking that action at a meeting at which all Members entitled to vote on such action were present and voted. All such consents shall be filed with the Manager or the secretary, if any, of the Company and shall be maintained in the Company records. The written consent or proxy of any Member may be revoked by a writing signed by such Member and received by the Manager or the secretary, if any, of the written consents containing the number of votes required to authorize the proposed action.

Unless the consents of all Members entitled to vote have been solicited in writing; *(i)* notice of any Member approval of an amendment to the Articles or this Agreement; a dissolution of the Company; or a merger of the Company without a meeting by less than unanimous written consent, shall be given at least ten (10) days before the consummation of the action authorized by such approval; and *(ii)* prompt notice shall be given of the taking of any other action approved by Members without a meeting by less than unanimous written consent, to those Members entitled to vote who have not consented in writing.

J.    Telephonic Participation by Member at Meetings. Members may participate in any Members meeting through the use of any means of conference telephones or similar communications equipment as long as all Members participating can hear one another. A Member so participating is deemed to be present in person at the meeting.

K.    Record Date. In order that the Company may determine the Members of record entitled to notices of any meeting or to vote, or entitled to receive any distribution or to exercise any rights in respect of any distribution or to exercise any rights in respect of any other lawful action, the Manager, or Members representing a majority of the Percentage Interests may fix, in advance, a record date, that is not more than sixty (60) days nor less than ten (10) days prior to the date of the meeting and not more than sixty (60) days prior to any other action. If no record date if fixed:

9

(i)    The record date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

(ii)    The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

(iii)    The record date for determining Members for any other purpose shall be at the close of business on the day on which the Manager adopt the resolution relating thereto, or the 60th day prior to the date of the other action, whichever is later.

(iv)    The determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless the Manager or the Members who called the meeting fix a new record date for the adjourned meeting, but the Manager or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than forty-five (45) days from the date set for the original meeting.

L.    Proxies. Every Member entitled to vote for the Manager or on any other matter shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the Member or his attorney in fact and filed with the Manager or secretary, if any, of the Company. A proxy shall be deemed signed if the Member's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission, electronic transmission or otherwise) by the Member or the Member's attorney in fact. A proxy may be transmitted by an oral telephone transmission if it is submitted with information from which it may be determined that the proxy was authorized by the Member or the Member's attorney in fact. A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless (i) revoked by the person executing it, before the vote pursuant to that proxy; by a writing delivered to the Company stating that the proxy is revoked; or by a subsequent proxy executed by, or attendance at the meeting and voting in person by, the person executing the proxy; or (ii) written notice of the death or incapacity of the maker of that proxy is received by the Company before the vote pursuant to that proxy is counted; provided, however, that no proxy shall be valid after the expiration of eleven (11) months from the date of the proxy, unless otherwise provided in the proxy. The revocability of a proxy which states on its face that it is irrevocable shall be governed by the provisions of Corporations Code Sections 705(e) and 705(f).

4.9    Certificate of Membership Interest.

A.    Certificate. A Membership Interest may be represented by a certificate of membership. The exact contents of a certificate of membership may be determined by action of the Manager but shall be issued substantially in conformity with the following requirements: The certificates of membership shall be respectively numbered serially, as they are issued; shall be impressed with the Company seal or a facsimile thereof, if any; and shall be signed by the Manager or officers of the Company. Each certificate of membership shall state the name of the Company; the fact that the Company is organized under the laws of the State of California; is a limited liability company; the name of the person to whom issued; the date of issue; and the Percentage Interests represented thereby. A statement of the designations, preferences, qualifications, limitations, restrictions, and special or relative rights of the Membership Interest, if any, shall be set forth in full or summarized on the face or back of the certificates which the Company shall issue, or in lieu thereof, the certificate may set forth that such a statement or summary will be furnished to any holder of a Membership Interest upon request without charge. Each certificate of membership shall be otherwise in such form as may be determined by the Manager.

B.    Cancellation of Certificate. All certificates of membership surrendered to the Company for transfer shall be cancelled and no new certificates of membership shall be issued in lieu thereof until the former certificates for a like number of Membership Interest shall have been surrendered and cancelled, except as herein provided with respect to lost, stolen, or destroyed certificates.

C.    Replacement of Lost, Stolen or Destroyed Certificate. Any Member claiming that his, hers or its certificate or membership is lost, stolen or destroyed may make an affidavit or affirmation of that fact and request a

10

new certificate. Upon the giving of a satisfactory indemnity to the Company as reasonably required by the Manager, a new certificate may be issued of the same tenor and representing the same Percentage Interest of membership as was represented by the certificate alleged to be lost, stolen or destroyed.

4.10    Condition of Membership Interest. Admission as a Member shall be conditioned upon (with exception of Westcliff Investors LLC): (i) Member contributing the initial Capital Contribution as required by this Operating Agreement; (ii) Member executing a lease for space within the Eye Street Medical Plaza substantially similar to Exhibit B in form and substance; and (iii) otherwise complying with the provisions and requirements of this Operating Agreement. The Members hereby agree and acknowledge that to the extent any Member is an entity, all individual principals, shareholders, members, and/or partners of such Member shall personally guaranty such lease.

### ARTICLE V
### MANAGEMENT AND CONTROL OF THE COMPANY

5.1    Management of the Company by the Manager.

A.    Exclusive Management by Manager. The business, property and affairs of the Company shall be managed exclusively by the Manager. Except for situations in which the approval of the Members is expressly required by the Articles or this Agreement, the Manager shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company; to make all decisions regarding those matters; and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs. No Member who is not a Manager shall have any authority to act for or to undertake or assume any obligation, debt, duty or responsibility on behalf of the Company. Where this Agreement specifies an act of the Manager, unless otherwise expressly otherwise provided, it means an act taken by all persons comprising Manager.

B.    Agency Authority of Manager. Either person comprising Manager, acting independently of the Members, is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts. All checks, drafts, and other instruments obligating the Company to pay money, may be signed by either person comprising the Manager, acting alone, provided that such obligation is incurred in the ordinary course of managing the Company and/or the Property. Any and all contracts on behalf of the Company and any obligations which are outside the ordinary course of business of the Company shall require the signature of both persons comprising the Manager.

5.2    Election of Manager.

A.    Number. The Company shall have two (2) Managers.

B.    Removal. No Manager may be removed by the vote of the Members except in the case of his malfeasance; or physical or mental incapacity; or gross negligence; or his material breach of any of the items set forth in Section 5.3 of this Agreement.

5.3    Powers of Manager.

A.    Powers of the Manager. Without limiting the generality of Section 5.1, the Manager shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Corporations Code Section 17003.

11

B.    Limitations On Powers of Manager.  The Manager shall not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the unanimous affirmative vote or unanimous written consent of the Members:

(i)    The merger of the Company with another limited liability company or limited partnership, provided in no event shall a Member be required to become a general partner in a merger with a limited partnership without his express written consent or unless the agreement of merger provides each Member with the dissenter's rights described in the Act.

(ii)    The merger of the Company with a corporation or a general partnership or other Person.

(iii)    The establishment of different classes of Members.

(iv)    An alteration of the primary purpose of the Company as set forth in Section 2.3.

(v)    Transactions between the Company and the Manager or the Manager's Affiliates, or transactions in which the Manager or of any Manager's Affiliates has a material financial interest except to the extent where such transactions do not exceed commercially reasonable market rates.

(vi)    Without limiting subsection (v), the lending of money by the Company to any Manager, Member or officer.

(vii)    Any act which would make it impossible to carry on the ordinary business of the Company.

(viii)    The amendment of this Agreement.

(ix)    The purchase of additional real property by the Company.

5.4    Members Have No Managerial Authority.  The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Articles and except as expressly required by the Act.  No Member shall have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, or to render it liable for any purpose.

5.5    Performance of Duties; Liability of Manager.  The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, negligence, reckless or intentional misconduct, or a knowing violation of law by the Manager.  The Manager shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Company and shall use them solely for the benefit of the Company.  The Manager shall perform managerial duties in good faith, in a manner reasonably believed to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position of like business experience would use under similar circumstance.  A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Manager of the Company.

In performing managerial duties, the Manager shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, of the following persons or groups unless they have knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that the Manager act in good faith and after reasonable inquiry when the need there for is indicated by the circumstances:

(a)    one or more officers, employees or other agents of the Company whom the Manager reasonably believes to be reliable and competent in the matters presented;

12

(b)    any attorney, independent accountant, or other person as to matters which the Manager reasonably believes to be within such persons professional or expert competence; or

(c)    a committee upon which the Manager does not serve, duly designated in accordance with a provision of the Articles or this Agreement, as to matters within its designated authority, which committee the Manager reasonably believes to merit competence.

5.6    Devotion of Time.  The Manager is not obligated to devote all of his time or business efforts to the affairs of the Company.  The Manager shall devote whatever time, effort and skill as he deems appropriate for the operation of the Company.

5.7    Competing Activities.  The Manager and the officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company.  Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom.  The Manager shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company.  The Manager or any Member shall have the right to hold any investment opportunity or prospective economic advantage for his or her own account or to recommend such opportunity to Persons other than the Company.  The Members acknowledge that the Manager and his or her Affiliates own and/or manage businesses, including businesses that may compete with the Company and for the Manager's time.  The Members hereby waive any and all rights and claims which they may otherwise have against the Manager and officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates as a result of any such activities.

5.8    Transactions Between the Company and the Manager.  Notwithstanding that it may constitute a conflict of interest, the Manager may, and may cause Manager's Affiliates to engage in any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from Persons capable of similarly performing them and in similar transactions between parties operating at arms length, and provided that the Members having no interest in such transaction (other than their interests as Members) affirmatively vote unanimously or give their unanimous consent in writing to approve the transaction.

A transaction between any of the Manager and/or the Manager's Affiliates, on the one hand, and the Company, on the other hand, shall be conclusively determined to constitute a transaction on terms and conditions, on an overall basis, fair and reasonable to the Company and at least as favorable to the Company as those generally available in a similar transaction between parties operating at arm's length if the Members having no interest in such transaction (other than their interests as Members) affirmatively vote unanimously or consent in writing unanimously to approve the transaction. The Company specifically acknowledges that JOHN BRAL is a Manager and is affiliated with Venture RE Group.  The Company specifically acknowledges and hires Venture RE Group as leasing and/or listing Broker, when necessary to lease or sell the property, and will pay to Venture RE Group the "Sales Commission" and "Lease Commissions" (as those terms are defined below). Further, the Company specifically hires Venture RE Group to act as property manager for the Company and its assets and will pay to Venture RE Group the "Property Management Fee" (as those terms are defined below).  The Company specifically acknowledges that Manager or Manager's affiliate shall manage and oversee the construction, development and construction of the tenant improvements of the EYE STREET MEDICAL PLAZA upon the Property, and the Company shall pay to Manager or Manager's affiliate the "Development and Construction Management Fee" (as that term is defined below).  Execution of this Operating Agreement hereby constitutes the approval and unanimous written consent of all of the Members of the transactions contemplated by the Company with Venture RE Group and/or the Manager and/or Manager's affiliate set forth in Sections 5.8 and 5.9.

13

EXHIBIT "6"
Page 14 of 43

5.9    Payments to the Manager.  The Manager and Manager's Affiliates shall receive the following payments:

A.    Services Performed by Manager.  Except as otherwise provided herein, the Company shall not pay the Manager for services rendered to the Company in the reasonable scope of their management duties.

B.    Expenses.  The Company shall reimburse the Manager and Manager's Affiliates for the actual cost of goods and materials used for or by the Company.  The Company shall also pay or reimburse any of the Manager or Manager's Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company and prepare the Articles and this Agreement.

C.    Property Management Fee.  There shall be a four percent (4%) of gross income per month fee (the "Property Management Fee") for property management paid to Venture RE Group.  Whenever possible, Manager will lease the Property on a Triple Net (NNN) basis and pass through said management fee to the tenants on a monthly basis.

D.    Property Brokerage Fee.  There shall be sales commission of four percent (4%) paid to Venture RE Group (the "Sales Commission") as a listing Broker upon sale (which shall be spit 50/50 with a procuring Broker if any), and leasing commissions shall be paid to Venture RE Group (the "Leasing Commissions") (or to any other licensed real estate broker selected by Manager) at industry standard rates.

E.    Construction Management Fee.  There shall be a fee equal to five percent (5%) of the total construction cost  including the tenant improvement (the "Construction Management Fee") paid to Manager or Manager's affiliate for management of the construction of the tenant improvement contemplated upon the Property.

5.10    Act of Manager as Conclusive Evidence of Authority.  Any note, mortgage, evidence of indebtedness, contract, certificate, statement, conveyance, or other instrument in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other person, when signed by the Manager, are not invalidated as to the Company by any lack of authority of the Manager in the absence of actual knowledge on the part of the other person that the Manager had no authority to execute the same.

5.11    Reserved.

5.12    Limited Liability.  No Manager shall not be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being the Manager.


## ARTICLE VI
## ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

6.1    Allocations of Net Profit and Net Losses.

A.    Net Loss.  Net Loss shall be allocated to the Members in proportion to their Percentage Interests.

B.    Net Profit.  Net Profit shall be allocated to the Members (i) first, proportionately (based on the amount each Member is required to be allocated pursuant to this clause (i)) until each Member has been allocated a cumulative amount of Net Profit pursuant to this clause (i) equal to the sum of the cumulative amount of Net Loss previously allocated to such Member pursuant to Section 6.1A hereof, plus the cumulative amount of distributions

14

previously made to such Members pursuant to Section *6.5(a)* hereof, (ii) thereafter, in proportion to their Percentage Interests.

      6.2     Special Allocations.

          A.     Minimum Gain Chargeback. Notwithstanding Section 6.1, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 6.2A shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2A. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f). This Section 6.2A is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

          B.     Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt. Notwithstanding Section 6.1 of this Agreement, if there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any Fiscal Year, each Member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 6.2B shall be made in proportion to the amounts required to be allocated to each member under this Section 6.2B. The items to be so allocated shall be determined in accordance with Regulations Section 1 .704-2(i)(4). This Section 6.2B is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1 .704-2(i)(4) and shall be interpreted consistently therewith.

          C.     Nonrecourse Deductions. Notwithstanding Section 6.1, any nonrecourse deductions (as defined in Regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.

          D.     Member Nonrecourse Deductions. Notwithstanding Section 6.1, any Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i).

          E.     Qualified Income Offset. Notwithstanding Section 6.1, if a member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), *(5)* or (6), or any other event creates a deficit balance in such Member's Capital Account (taking into account reductions for the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), *(5)* and (6)) in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 6.2E shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article VI so that the net amount of any item so allocated and the income, gain, and losses allocated to each member pursuant to this Article VI to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Article VI if such unexpected adjustments, allocations, or distributions had not occurred.

      6.3     Code Section 704(c) Allocations. Notwithstanding any other provision in this Article VI, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this Section 6.3

15

are solely for purposes of federal, state and local taxes. As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other tax items or distributions pursuant to any provision of this Agreement.

      6.4    <u>Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest</u>.  If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his, hers or its respective Membership Interest at the close of such day.

      However, for the purpose of accounting convenience and simplicity, the Company shall treat a transfer of, or an increase or decrease in, a Membership Interest which occurs at any time during a semi-monthly period (commencing with the semi-monthly period including the date hereof) as having been consummated on the last day of such semi-monthly period, regardless of when during such semi-monthly period such transfer, increase, or decrease actually occurs (*i.e.*, sales and dispositions made during the first fifteen *(15)* days of any month will be deemed to have been made on the 15th day of the month).

      Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Membership Interests as of the date such sale or other disposition occurs.

      6.5    <u>Distribution of Assets by the Company</u>.  Subject to applicable law and any limitations contained elsewhere in this Agreement, the Manager may elect from time to time to distribute Distributable Cash to the Members, which distributions shall be in the following order of priority:

      A.    <u>Distributions from Operations</u>.

      (i)    If such Distributable Net Cash is from Company's operations, to the Members in proportion to their unreturned additional Capital Contribution until each Member has recovered his, her or its additional capital contribution.

      (ii)    If such Distributable Net Cash is from Company's operations, to the Members of Class A, for their Preferred Return in Section 3.4.1 herein, in proportion to their Percentage Interest in Company in relation to each other.

      (iii)    If such Distributable Net Cash is from Company's operations, to the Members of Class B, for their Preferred Return in Section 3.4.2 herein, in proportion to their Percentage Interest in Company in relation to each other.

      (iv)    If such Distributable Net Cash is from Company's operations, to the Members of Class A and B in proportion to their pro rata Membership interest.

      B.    <u>Distributions from Sale, Financing or Refinancing of Company Real Property</u>.

      (i)    If such Distributable Net Cash is from the sale, financing or refinancing of the Company Property, to the Members in proportion to their unreturned additional Capital Contributions until each Member has recovered his, hers or its Additional Capital Contributions, if any, and then to Members in proportion to their unreturned initial Capital Contributions until each Member has recovered his, her or its initial Capital Contribution; and

      (ii)    Thereafter, to the Members in proportion to their percentage interests.

16

EXHIBIT "6"<br/>
Page 17 of 43

such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor the Manager shall incur any liability for making any distributions under this Section 6.5.

The Manager may, in its sole discretion, limit distributions by maintaining a working capital reserve of up to One Hundred Fifty Thousand Dollars ($150,000.00).

    6.6    <u>Form of Distribution</u>. A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members. Except upon a dissolution and the winding up of the Company, no Member may be compelled to accept a distribution of any asset in kind.

    6.7    <u>Restriction on Distributions</u>.

    A.    No distribution shall be made if, after giving effect to the distribution:

    (i)    The Company would not be able to pay its debts as they become due in the usual course of business.

    (ii)    The Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the distribution.

    B.    The Manager may base a determination that a distribution is not prohibited on any of the following:

    (i)    Financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances.

    (ii)    A fair valuation.

    (iii)    Any other method that is reasonable in the circumstances.

Except as provided in Section 17254(e) of the Corporations Code, the effect of a distribution is measured as of the date the distribution is authorized if the payment occurs within one hundred twenty (120) days after the date of authorization, or the date payment is made if it occurs more than one hundred twenty (120) days of the date of authorization.

17

C.     A Member or Manager who votes for a distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act if it is established that the Member or Manager did not act in compliance with Section 6.7 B or Section 10.4. Any Member or Manager who is so liable shall be entitled to compel contribution from (i) each other Member or Manager who also is so liable and (ii) each Member for the amount the Member received with knowledge of facts indicating that the distribution was made in violation of this Agreement or the Act.

6.8     Return of Distributions. Except for distributions made in violation of the Act or this Agreement, no Member or Economic Interest Owner shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company. The amount of any distribution returned to the Company by a Member or Economic Interest Owner or paid by a Member or Economic Interest Owner for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member or Economic Interest Owner.

6.9     Obligations of Members to Report Allocations. The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

**ARTICLE VII**
**TRANSFER AND ASSIGNMENT OF INTERESTS**

7.1     Transfer and Assignment of Interests. No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest except with the prior written consent of other Members having a majority of the Percentage Interests of the other Percentage Interests. Transfers in violation of this Article VII shall only be effective to the extent set forth in Section 7.7. After the consummation of any transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

7.2     Further Restrictions on Transfer of Interests. In addition to other restrictions found in this Agreement, no Member shall transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest: (i) without compliance with the legend described in Section 12.10, and (ii) if the transfer, assignment, sale or exchange would cause the termination of the Company under Section 708(b)(1)(B) of the Code, as determined by the Manager.

7.3     Substitution of Members. A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirements of Sections 7.1 and 7.2 are met; (ii) such Person executes an instrument satisfactory to the Manager accepting and adopting the terms and provisions of this Agreement; and (iii) such person pays any reasonable expenses in connection with his, hers or its admission as a new Member. The admission of a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

18

EXHIBIT "6"
Page 19 of 43

7.4    <u>Family and Affiliate Transfers</u>.  The Membership Interest of any Member may be transferred subject to compliance with Section 7.2, and without the prior written consent of all Members, as required by Section 7.1, upon consent of the Manager, which shall not be unreasonably withheld, by the Member (i) by inter vivos gift or by testamentary transfer to any spouse, parent, sibling, in-law, child or grandchild of the Member; or to a trust for the benefit of the Member or such spouse, parent, sibling, in-law, child or grandchild of the Member; or (ii) to any Affiliate of the Member; it being agreed that in executing this Agreement, each Member has consented to such transfers.

7.5    <u>Effective Date of Permitted Transfers</u>.  Any permitted transfer of all or any portion of a Membership Interest shall be effective as of the first day of the month following the date upon which the requirements of Sections 7.1, 7.2 and 7.3 have been met. The Manager shall provide the Members with written notice of such transfer as promptly as possible after the requirements of Sections 7.1, 7.2 and 7.3 have been met. Any transferee of a Membership Interest shall take subject to the restrictions on transfer imposed by this Agreement and subject to allocation of profits and losses; and distributions set forth in Section 6.4.

7.6    <u>Rights of Legal Representatives</u>.  If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, and/or other legal representative and/or beneficiary or successor may exercise all of the Member's rights for the purpose of settling the Member's estate and/or administering the Member's property, and shall succeed to Member's interest herein, except that any Class B Member's successor shall continue to be a Class B Member, but without any management rights as a Class B Member..

7.7    <u>No Effect to Transfers in Violation of Agreement</u>.  Upon any transfer of a Membership Interest in violation of this Article VII, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Economic Interest Owner and thereafter shall only receive the share of one (1) or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the Manager, a transfer in violation of this Article VII would cause the termination of the Company under the Code, in the sole discretion of the Manager, the transfer shall be null and void and the purported transferee shall not become either a Member or an Economic Interest Owner.

Upon and contemporaneously with any transfer, assignment, conveyance or sale (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company for a purchase price of One Hundred Dollars ($100), all remaining rights and interests retained by the Member that immediately before the transfer, assignment, conveyance or sale were associated with the transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member.

Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who transfers a Membership Interest in violation of this Article VII is not unreasonable under the circumstances existing as of the date hereof

19

EXHIBIT "6"
Page 20 of 43

7.8    <u>Right of First Refusal</u>. Each time a Member proposes to transfer, assign, convey, *sell,* encumber or in any way alienate all or any part of his, hers or its Membership Interest (or as required by operation of law or other involuntary transfer to do so) other than pursuant to Section 7.4, such Member shall first offer such Membership Interest to the Company and the non-transferring Members in accordance with the following provisions:

A.    Such Member shall deliver a written notice to the Company and the other Members stating (i) such Member's bona fide intention to transfer such Membership Interest; (ii) the name and address of the proposed transferee; (iii) the Membership Interest to be transferred; and (iv) the purchase price in terms of payment for which the Member proposes to transfer such Membership Interest.

B.    Within thirty (30) days after receipt of the notice described in Section 7.8A, each non-transferring Member shall notify the Manager in writing of his, hers or its desire to purchase a portion of the Membership Interest being so transferred. The failure of any Member to submit a notice within the applicable period shall constitute an election on the part of that Member not to purchase any of the Membership Interest which may be so transferred. Each Member so electing to purchase shall be entitled to purchase a portion of such Membership Interest in the same proportion that the Percentage Interest of such Member bears to the aggregate of the Percentage Interests of all of the Members electing to so purchase the Membership Interest being transferred. In the event any Member elects to purchase none or less than all of his, hers or its pro rata share of such Membership Interest, then the other Members can elect to purchase more than their pro rata share. If such Members fail to purchase the entire Membership Interest being transferred, the Company may purchase any remaining share of such Membership Interest.

C.    Within sixty (60) days after receipt of the notice described in Section 7.8A, the Company and the Members electing to purchase such Membership Interest shall have the first right to purchase or obtain such Membership Interest upon the price and terms of payment designated in such notice. If such notice provides for the payment of non-cash consideration, the Company and such purchasing Members each may elect to pay the consideration in cash equal to the good faith estimate of the present fair market value of the non-cash consideration offered as determined by the Manager.

D.    If the Company or the other Members elect not to purchase or obtain all of the Membership Interest designated in such notice, then the transferring Member may transfer the Membership Interest described in the notice to the proposed transferee, providing such transfer (i) is completed within thirty (30) days after the expiration of the right of the Company and the other Members to purchase such Membership Interest, (ii) is made on terms no less favorable to the transferring Member than as designated in the notice, and (iii) the requirements of Sections 7.1, 7.2 and 7.3 relating to unanimous consent of Members, securities and tax requirements hereof are met.  If such Membership Interest is not so transferred, the transferring Member must give notice in accordance with this Section prior to any other or subsequent transfer of such Membership Interest.

7.8.1    <u>Right of First Refusal Among Class of Membership</u>.  Notwithstanding anything to the contrary herein, any proposal by a Member to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his, hers or its Membership Interest (Selling Member), pursuant to Section 7.8, shall first proceed to commence the Right of First Refusal procedure provided in Section 7 among Members of the Selling Members class before proceeding with the Right of First Refusal to the other Members of Company not in the Selling Member's class. For example, a Member

20

of Class A offering its Membership Interest shall first operate the Right of First Refusal among Members of Class A, and subject to whether any Membership Interest remains available, then to Members of Class B.

7.9    <u>Effective Date of Permitted Transfers of an Interest</u>.  Any permitted transfer of all or any portion of an Interest in Company will take effect on the first (1st) day of the month following receipt by the Members of written notice of transfer. Any transferee of an Interest in the Company shall take subject to the restrictions on transfer imposed by the Agreement.

7.10    <u>Consequences of Pledge or Grant of Security Interest</u>.  The pledge or granting of a security interest, lien or other encumbrance in or against any or all of the Interest of a Member shall not cause the Member to cease to be a Member or to grant anyone else the power to exercise any rights or powers of a Member.

**ARTICLE VIII**
**CONSEQUENCES OF, DISSOLUTION, OR WITHDRAWAL OF MEMBER (S) OR HEIRS**

8.1    <u>Purchase of Member's Interest</u>.  Upon the occurrence of any Dissolution Event and the unanimous consent by the remaining Members (Remaining Members) to continue the business of Company, and if applicable, the desire of the member or its heirs to the other Members (the Remaining Members) shall have an option to purchase such Membership Interest. Within ninety (90) days of the Unanimous Consent or within ninety (90) days of the receipt of the rightful demand for the return of its Capital Account by the Former Member or by such Former Member's trustee or heirs, or within in ninety (90) days of the inheritance or transfer by operation of law to a person, the Remaining Members shall notify the Manager in writing of their desires to purchase a portion of the Former Member's Interest.

8.2    <u>Withdrawal</u>.  Notwithstanding Section 8.1, only upon the withdrawal by a Member in accordance with Section 4.3, such Member shall be treated as a Former Member, and the Company and/or the Remaining Members shall have the option to purchase, and the Former Member shall be obligated to sell, the Former Member's Interest as provided in this Article VIII.

8.3    <u>Purchase Price</u>.  The purchase price for the Former Member's Interest shall be the fair market value of the Former Member's Interest determined by three (3) independent appraisers, one (1) selected by the Former Member or such Former Member's legal representative, one (1) selected by the Company, and one (1) selected by the two (2) appraisers so named. The fair market value of the Former Member's Interest shall be the average of the two (2) appraisals closest in amount to each other. In all other events, the Former Member shall pay one-half (50%) of such expense of the appraisers and the Remaining Members shall pay one-half (50%) of such expense and the purchase price shall be the fair market value determined by appraisal reduced by six percent (6%) representing a reasonable and customary brokerage commission which would be paid to a broker in an arms length role and escrow closing costs. Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

8.4    <u>Notice of Intent to Purchase</u>.  Within thirty (30) days after the Manager has notified the Remaining Members as to the purchase price of the Former Member's Interest determined in accordance with Section 8.3, each Remaining Member shall notify the Manager in writing of his, hers or its desire to purchase a portion of the Former

21

EXHIBIT "6"
Page 22 of 43

Member's Interest. The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest. Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Members Interest in the same proportion that the Percentage Interest of the Remaining Member bears to the aggregate of the Percentage Interests of all of the Remaining Members electing to purchase the Former Member's Interest.

8.5    <u>Election to Purchase Less Than All of An Interest</u>.  In the event any Remaining Member elects to purchase none or less than all of its pro rata part of the Former Member's Interest, then, at its election, those Remaining Members can elect to purchase more than their pro rata part, i.e., the proportion that the Percentage Interest of the Former Member bears to the aggregate of the Percentage Interests of all Members and the Former Member. If the Remaining Members fail to purchase the entire interest of the Former Member, Company may elect to purchase the former Member's Interest un-purchased portion. If none of the above elects to purchase, the same shall pass by operation of law to any assignee or shall remain in the hands of the Former Member, subject to any right of the holder of such interest to demand payment therefore according to California law. Notwithstanding any provision of the Agreement to the contrary, the remaining Members may mutually agree to an allocation of the Former Member's Interest to be purchased by each of them.

8.6    <u>Payment of Purchase Price</u>.  The purchase price shall be paid by the Company or the Remaining Members, as the case may be, either: (i) in equal monthly installments of principal together with interest amortized over a thirty (30) year period, commencing to accrue from the date of closing, at the then current Applicable Federal Rate (the AFR) under Section 1274(d) of the Internal Revenue Code (IRC) for the month in which the first payment is made (or a rate per annum equal to what the AFR would be for such month under IRC Section 1274(d) of the Code if the AFR is no longer published) to fully amortize such purchase price over such ten (10) payments with the first payment being due and payable 60 days after the determination of the fair market value of the Former Member's Interest in the Company, or (ii) within 60 days after the determination of the fair market value of the Former Member's Interest in the Company, as the Company or the Remaining Members, as the case may be, may elect in their sole discretion.

8.7    <u>Closing of Purchase of Former Member's Interest</u>.  The closing for the sale of a Former Member's Interest pursuant to this Article VIII shall be held at 10:00 a.m. at the principal office of the Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Former Member or such Former Member's legal representative shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest. The Former Member or such Former Member's legal representative, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

8.8    <u>Purchase Terms Varied by Agreement</u>.  Nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

**ARTICLE IX**
**ACCOUNTING, RECORDS, REPORTING BY MEMBERS**
22

9.1    Books and Records.  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office in California all of the following:

A.    A current list of the full name and last known business or residence address of each Member and Economic Interest Owner set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Economic Interest Owner;

B.    A current list of the full name and business or residence address of each Manager.

C.    A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed.

D.    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

E.    A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

F.    Copies of the financial statements of the Company, if any, for the six (6) most recent Fiscal Years; and

G.    The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) Fiscal Years.

9.2    Delivery to Members and Inspection.

A.    Upon the request of any Member or Economic Interest Owner for purposes reasonably related to the interest of that Person as a Member or Economic Interest Owner, the Manager shall promptly deliver to the requesting Member or Economic Interest Owner, at the expense of the Company, a copy of the information required to be maintained by Sections 9.1A, B and D, and a copy of this Agreement.

B.    Each Member, Manager and Economic Interest Owner has the right, upon reasonable request for purposes reasonably related to the interest of the Person as Member, Manager or Economic Interest Owner, to:

(i)    inspect and copy during normal business hours any of the Company records described in Section 9.1A through G; and

(ii)    obtain from the Manager, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year, as well as any and all Company financial records.

23

EXHIBIT "6"
Page 24 of 43

C. Members representing at least twenty-five percent (25%) of the Percentage Interests, or three (3) or more Members, make a written request to the Manager for an income statement of the Company for the initial three (3) month, six (6) month, or nine (9) month period of the current Fiscal Year ended more than thirty (30) days prior to the date of the request, and a balance sheet of the Company as of the end of that period. Such statement shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Manager that the statement was prepared without audit from the books and records of the Company. If so requested, the statement shall be delivered or mailed to the Members within thirty (30) days thereafter.

Any Member or a Member's designated representative has the right to inspect the books of the Company at reasonable times upon forty-eight (48) hours written notice to the Manager, but no more than once each calendar quarter for any one (1) Member.

D. Any request, inspection or copying by a Member or Economic Interest Owner under this Section 9.2 may be made by that Person or that Person's agent or attorney.

E. The Manager shall promptly furnish to a Member a copy of any amendment to the Articles or this Agreement executed by the Manager pursuant to a power of attorney from the Member.

F. The Manager shall promptly furnish to a Member written notice of any action concerning the Company which is likely to have a substantial impact upon any of the Members.

9.3 <u>Quarterly Statements and Reports</u>.

A. Upon request, the Manager shall cause quarterly reports to be sent to each of the Members no later than thirty (30) days after the close of each calendar quarter. The report shall contain a balance sheet as of the end of the calendar quarter and an income statement and statement of changes in financial position for the calendar quarter. Such financial statements shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Manager that the financial statements were prepared without audit from the books and records of the Company.

B. The Manager shall cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Members' and Economic Interest Owners' federal and state income tax returns. The Manager shall send or cause to be sent to each Member or Economic Interest Owner within ninety (90) days after the end of each taxable year such information as is necessary to complete federal and state income tax or information returns, and, if the Company has thirty-five *(35)* or fewer Members, a copy of the Company's federal, state, and local income tax or information returns for that year.

C. The Manager shall cause to be filed at least annually with the California Secretary of State the statement required under California Corporations Code э 17060.

9.4 <u>Financial and Other Information</u>. The Manager shall provide such financial and other information relating to the Company or any other Person in which the Company owns, directly or indirectly, an equity interest, as a Member may reasonably request. The Manager shall distribute to the Members, promptly after the preparation or receipt thereof by the Manager, any financial or other information relating to any Person in which the Company owns, directly or

24

indirectly, an equity interest, including any filings by such Person under the Securities Exchange Act of 1934, as amended, that is received by the Company with respect to any equity interest of the Company in such Person.

9.5     Filings. The Manager, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Manager, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Articles and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If the Manager is required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or refuses to do so, any other Manager or Member may prepare, execute and file that document with the California Secretary of State.

9.6     Bank Accounts. The Manager shall maintain the funds of the Company in one (1) or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

9.7     Accounting Decisions and Reliance on Others. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Manager. The Manager may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

9.8     Tax Matters for the Company Handled by Manager and Tax Matters Partner. The Manager shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members. The Tax Matters Partner, as defined in Code Section 6231, shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith. The Tax Matters Partner shall oversee the Company tax affairs in the overall best interests of the Company. If for any reason the Tax Matters Partner can no longer serve in that capacity or ceases to be a Member or Manager, as the case may be, Members holding a Majority Interest may designate another to be Tax Matters Partner.

9.9     Choice of Company's Accountant. The Company's Accountant shall be selected by the Manager.

## ARTICLE X
### DISSOLUTION AND WINDING UP

10.1     Dissolution. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first (1st) to occur of the following:

A.     Upon the happening of any event of dissolution specified in the Articles;

B.     Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the Corporations Code;

25

C.    The occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Section 8.1 to continue the business of the Company within ninety (90) days after the occurrence of such event or the failure of the Company or the Remaining Members to purchase the Former Member's Interest as provided in Section 8.2; or

D.    The sale of all or substantially all of the assets of Company.

10.2    Certificate of Dissolution.  As soon as possible following the occurrence of any of the events specified in Section 10.1, the Manager who has not wrongfully dissolved the Company or, if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Certificate as required by the Act. Upon the filing by the Certificate of Dissolution, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence continues until the certificate of cancellation of articles of organization Dissolution have been filed with the Secretary of State or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

10.3    Winding Up.  Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Manager who has not wrongfully dissolved the Company or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof; shall cause the proceeds therefrom, to the extent sufficient therefore, to be applied and distributed as provided in Section *10.5*. The Persons winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Manager(s) or Members winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

10.4    Distributions in Kind.  Any non-cash asset distributed to one (1) or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value. Such Net Profit or Net Loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by the Manager or by the Members or, if any Member objects, by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by the Manager or liquidating trustee and approved by the Members.

10.5.    Order of Payment of Liabilities Upon Dissolution.

A.    The distribution of payments of the Company in the process of winding-up shall be made in the following order: (i) All known debts and liabilities of the Company, excluding debts and liabilities to Members who are creditors of the Company; (ii) All known debts and liabilities of the Company owed to Members who are creditors of the Company; (iii) The remaining assets shall be distributed to the Members in accordance with their positive Capital Account balances, after taking into account income and loss allocations and distributions (other than pursuant to Section 10.5A) for the Company's taxable year during which liquidation occurs.

26

EXHIBIT "6"
Page 27 of 43

Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

B.    The payment of a debt or liability, whether or not the whereabouts of the creditor is known, has been adequately provided for if:

(i)    Payment thereof has been assumed or guaranteed in good faith by one (1) or more financially responsible persons or by the United States government or any agency thereof; and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Members or Manager to be adequate at the time of any distribution of the assets pursuant to this Section.

(ii)    The amount of the debt or liability has been deposited as provided in Section 2008 of the Corporations Code.

This Section 10.5B shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

10.6    Compliance with Regulations.  All payments to the Members upon the winding up and dissolution of Company shall be strictly in accordance with the positive Capital Account balance limitation of Regulations Section 1.704-1(b)(2)(ii)(b)(2).

10.7    Limitations on Payments Made in Dissolution.  Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of Company for the return of his, hers or its positive Capital Account balance and shall have no recourse for his, hers or its Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Manager or any other Member except as provided in Article XI.

10.8    Certificate of Cancellation.  The Manager or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a certificate of cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

10.9    No Action for Dissolution.  Except as expressly permitted in this Agreement, a Member shall not take any voluntary action which directly causes a Dissolution Event. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 10.1. This Agreement has been drawn carefully to provide fair treatment to all parties and equitable payment in liquidation of the Economic Interests. Accordingly, except where the Manager has failed to liquidate the Company as required by this Article X, each Member hereby waives and renounces his, hers or its right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles or this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member. Damages for breach of this Section 10.9 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

27

EXHIBIT "6"
Page 28 of 43

## ARTICLE XI
### INDEMNIFICATION AND INSURANCE

11.1    Indemnification of Agents.  The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or complete action, suit or proceeding by reason of the fact that he, she or it is or was a member, Manager, officer, employee or other agent of the Company or that, being or having been such a Member, Manager, officer, employee or agent, he, she or it is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability Company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an agent), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit. The Manager shall be authorized, on behalf of the Company, to enter into indemnity agreements from time to time with any Person entitled to be indemnified by the Company hereunder, upon such terms and conditions as the Manager deems appropriate in the Manager's business judgment.

11.2    Insurance.  The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 11.1 or under applicable law.

## ARTICLE XII
### INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Manager, the other Members, and the Company as follows:

12.1    Pre-existing Relationship or Experience.  (i) He, she or it has a preexisting personal or business relationship with the Company or one (1) or more of its officer, Manager or control persons or (ii) by reason of his, hers or its business or financial experience, or by reason of the business or financial experience of his, hers or its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he, she or it is capable of evaluating the risks and merits of an investment in the Membership Interest and of protecting his, hers or its own interests in connection with this investment.

12.2    No Advertising.  He, she or it has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

12.3    Investment Intent.  He, she or it is acquiring the Membership Interest for investment purposes for his, hers or its own account only and not with a view to or for sale in connection with any distribution of all or any

28

part of the Membership Interest. No other person will have any direct or indirect beneficial interest in or right to the Membership Interest.

      12.4    <u>Purpose of Entity</u>. If the Member is a corporation, partnership, limited liability company, trust, or other entity, it was not organized for the specific purpose of acquiring the Membership Interest.

      12.5    <u>Economic Risk; Consulted with Advisor; Speculative Nature</u>. He, she or it is financially able to bear the economic risk of an investment in the Membership Interest, including the total loss thereof. In acquiring a Membership Interest, he, she or it has consulted with and has been guided by his own attorney, accountant or other personal investment or financial advisor with respect to and concerning the merits, risk and advisability of the purchase of the Membership Interest subscribed for herein or the undersigned has such knowledge and experience in financial, investment and business matters that he is capable of evaluating the merits, risk and advisability of an investment in the Membership Interest without the assistance of such an advisor. Further, he, she or it recognizes the speculative nature of the investment in the Membership Interest, including the fact that the Property being purchased by the Company is an empty building, with asbestos, and in need of millions of dollars in improvements.

      12.6    <u>No Registration of Membership Interest</u>. He, she or it acknowledges that the Membership Interest has not been registered under the Securities Act of 1933, as amended (the Securities Act), or qualified under the California Corporate Securities Law of 1968, as amended, or any other applicable blue sky laws in reliance, in part, on his, hers or its representations, warranties, and agreements herein.

      12.7    <u>Membership Interest in Restricted Security</u>. He, she or it understands that the Membership Interest is a restricted security under the Securities Act in that the Membership Interest will be acquired from the Company in a transaction not involving a public offering, and that the Membership Interest may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise the Membership Interest must be held indefinitely. In this connection, he, she or it understands the resale limitations imposed by the Securities Act and is familiar with SEC Rule 144, as presently in effect, and the conditions which must be met in order for the Rule to be available for resale of restricted securities, including the requirement that the securities must be held for at least two (2) years after purchase thereof from the Company prior to resale (three (3) years in the absence of publicly available information about the Company) and the condition that there be available to the public current information about the Company under certain circumstances. He, she or it understands that the Company has not made such information available to the public and has no present plans to do so.

      12.8    <u>No Obligation to Register</u>. He, she or it represents, warrants, and agrees that the Company and the Manager is under no obligation to register or qualify the Membership Interest under the Securities Act or under any state securities law, or to assist him or it in complying with any exemption from registration and qualification.

      12.9    <u>No Disposition in Violation of Law</u>. Without limiting the representations set forth above, and without limiting Article VII of this Agreement, he, she or it will not make any disposition of all or any part of the Membership Interest which will result in the violation by him or it or by the Company of the Securities Act, the California Corporate Securities Law of 1968, or any other applicable securities laws. Without limiting the foregoing, he, she or it agrees not to make any disposition of all or any part of the Membership Interest unless and until:

29

EXHIBIT "6"
Page 30 of 43

A.    There is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement and any applicable requirements of state securities laws; or

B.    (i) He, she or it has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (ii) if reasonably requested by the Manager, he, she or it has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

C.    In the case of any disposition of all or any part of the Membership Interest pursuant to SEC Rule 144, in addition to the matters set forth in Section 12.11B, he or she shall promptly forward to the Company a copy of any Form 144 filed with the SEC with respect to such disposition and a letter from the executing broker satisfactory to the Company evidencing compliance with SEC Rule 144. If SEC Rule 144 is amended or if the SEC's interpretations thereof in effect at the time of any such disposition have changed from its present interpretations thereof, he, she or it shall provide the Company with such additional documents as the Manager may reasonably require.

12.10    _Legends_. He, she or it understands that the certificates (if any) evidencing the Membership Interest may bear one (1) or all of the following legends:

A.    THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY. SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS WHICH ARE SET FORTH HEREIN.

B.    Any legend required by applicable state securities law.

12.11    _Investment Risk_. He, she or it acknowledges that the Membership Interest is a speculative investment which involves a substantial degree of risk of loss by him, her or it of his, her or its entire investment in the Company, that he, she or it understands and takes full cognizance of the risk factors related to the purchase of the Membership Interest, and that the Company is newly organized and has no financial or operating history. Furthermore, the Property has asbestos, is vacant and earning no income and is in need of millions of dollars in improvements.

12.12    _Investment Experience_. He, she or it is an experienced investor in unregistered and restricted securities of limited liability companies or limited partnerships.

12.13    _Restrictions on Transferability_. He, she or it acknowledges that there are substantial restrictions on the transferability of the Membership Interest pursuant to this Agreement, that there is no public market for the Membership Interest and none is expected to develop, and that, accordingly, it may not be possible for him, her or it to liquidate his, hers or its investment in the Company.

30

12.14    <u>Information Reviewed</u>. He, she or it has received and reviewed all information he, she or it considers necessary or appropriate for deciding whether to purchase the Membership Interest. He, she or it has had an opportunity to ask questions and receive answers from the Company and its officers, Manager and employees regarding the terms and conditions of purchase of the Membership Interest and regarding the business, financial affairs, and other aspects of the Company and has further had the opportunity to obtain all information (to the extent the Company possesses or can acquire such information without unreasonable effort of expense) which he, she or it deems necessary to evaluate the investment and to verify the accuracy of information otherwise provided to him, her or it.

12.15    <u>No Representations by Company</u>. Neither any Manager, any agent or employee of the Company or of any of the Manager, or any other Person has at any time expressly or implicitly represented, guaranteed, or warranted to him, her or it that he, she or it may freely transfer the Membership Interest, that a percentage of profit and/or amount or type of consideration will be realized as a result of an investment in the Membership Interest, that past performance or experience on the part of the Manager or Manager's Affiliates or any other person in any way indicates the predictable results of the ownership of the Membership Interest or of the overall Company business, that any cash distributions from Company operations or otherwise will be made to the Members by any specific date or will be made at all, or that any specific tax benefits will accrue as a result of an investment in the Company.

12.15.1    Neither the Company nor any Manager, nor any agent or representative of the Company or any of the officers, directors, agents, Members or affiliates of either of them, has made any representations or warranties of any kind to induce the purchase of a Membership Interest in Company or to enter into this Agreement.

12.15.2    Any statements, brochures, information, data, and figures describing or relating in any way to the investment are based upon information obtained by the Company from sources which it deems reliable, but are not made or intended as representations, warranties, guarantees, promises or inducements by the Company.

12.15.3    Any projected or estimated figures of income, expense, depreciation and expenses of operation are estimates and projections only and are not warranted, represented, or guaranteed.

12.15.4    For acquiring a Membership Interest in Company, he she or it has been afforded the opportunity to ask questions and to receive answers concerning the Company's financial condition, business, assets, prospects, liabilities and the terms and conditions of this Agreement, and that the Manager and any agents or representatives of Company have answered all such questions to the satisfaction of the undersigned.

12.15.5    The Company is not liable or bound in any manner by statements, representations or information, if any, pertaining to the income or operation of, or by any matter affecting or relating to the investment, or by any information or data furnished by any person unless specifically set forth in this Agreement.

12.15.6    In acquiring their Membership Interest, each Member has been provided a projection of cash flow based on the expected amortization of the loan to be obtained by Company. Each Member acknowledges and understands that during the years set forth in the projection, it is anticipated that the Company will not be able to issue to Class A Members the full eight percent (8%) preferred return described in Section 3.4.1 hereof. Furthermore, the Members acknowledge that the projection is not an assurance or guaranty with respect to a return on each Member's initial contribution.

31

12.16    <u>Consultation with Attorney</u>. He, she or it has been advised to consult with his, hers or its own attorney regarding all legal matters concerning an investment in the Company and the tax consequences of participating in the Company, and has done so, to the extent he, she or it considers necessary.

12.17    <u>Tax Consequences</u>. He, she or it acknowledges that the tax consequences to him, her or it of investing in the Company will depend on his, hers or its particular circumstances, and neither the Company, the Manager, the Members, nor the partners, shareholders, members, managers, agents, officers, directors, employees, Affiliates, or consultants of any of them will be responsible or liable for the tax consequences to him, her or it of an investment in the Company. He, she or it will look solely to, and rely upon, his, hers or its own advisers with respect to the tax consequences of this investment.

12.18    <u>No Assurance of Tax Benefits</u>. He, she or it acknowledges that there can be no assurance that the Code or the Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Company and the members of some or all of the tax benefits they might now receive, nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service.

12.19    <u>Indemnity</u>. Each Member shall indemnify and hold harmless the Company, each and every Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, agents, attorneys, registered representatives, and control persons of any such entity who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by him or it including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the Company, each and every Manager, each and every other Member, and any officers, directors, shareholders, managers, members, employees, partners, attorneys. accountants, agents, registered representatives, and control persons of any such Person (including attorneys' fees, judgments, fines, and amounts paid in settlement, payable as incurred) incurred by such Person in connection with such action, suit, proceeding, or the like.

## ARTICLE XIII
## MISCELLANEOUS

13.1    <u>Counsel to the Company</u>. Counsel to the Company may also be counsel to any Manager or any Affiliate of a Manager. The Manager may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction (Rules). The Managers shall mutually select a law firm as legal counsel to the Company. Each Member acknowledges that Company Counsel does not represent any Member in the absence of a clear and explicit agreement to such effect between the Member and Company Counsel, and that in the absence of any such agreement Company Counsel shall owe no duties directly to a Member. In the event any dispute or controversy arises between any Members and the Company, or between any Members or the Company, on the one hand, and a Manager (or Affiliate of a Manager) that Company Counsel represents, on the other hand, then each Member agrees that Company

32

EXHIBIT "6"
Page 33 of 43

Counsel may represent either the Company or such Manager (or his, hers or its Affiliate), or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

13.2    Complete Agreement.  This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members and Manager with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and Manager or any of them. No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or Manager or have any force or effect whatsoever. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

13.3    Binding Effect.  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

13.4    Parties in Interest.  Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and Manager and his respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

13.5    Pronouns; Statutory References.  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference to the Code, the Regulations, the Act, Corporations Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

13.6    Headings.  All headings are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

13.7    Interpretation.  In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his, hers or its counsel.

13.8    References to this Agreement. Numbered or lettered articles, section and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

13.9    Jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under, or in connection with this Agreement or the transactions contemplated by this Agreement, provided such claim is not required to be arbitrated pursuant to Section 13.10. Each Member further agrees that personal jurisdiction over him or it may be effected by service of process by registered or certified mail addressed as provided in Section 13.14 of this Agreement, and that when so made shall be as if served upon him or it personally with the State of California.

13.10    Disputed Matters.  Except as otherwise provided in this Agreement, any controversy or dispute arising out of this Agreement, the interpretation of any of the provisions hereof, or the action or inaction of any Member or Manager hereunder shall be submitted to arbitration in Los Angeles, California before the American Arbitration

33

EXHIBIT "6"
Page 34 of 43

Association under the real estate arbitration rules then obtaining of the American Arbitration Association. Any award or decision obtained from any such arbitration proceeding shall be final and binding on the parties, and judgment upon any award thus obtained may be entered in any court having jurisdiction thereof. No action at law or in equity based upon any claim arising out of or related to this Agreement shall be instituted in any court by a Member except (a) an action to compel arbitration pursuant to this Section 13.10 or (b) an action to enforce an award obtained in an arbitration proceeding in accordance with this Section 13.10.

13.11    Exhibits. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

13.12    Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

13.13    Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

13.14    Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member or Manager at the address specified in Exhibit A hereto. Any party may, at any time by giving five (5) days prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

13.15    Amendments. All amendments to this Agreement will be in writing and signed by all of the Members.

13.16    Reliance on Authority of Person Signing Agreement. If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

13.17    No Interest in Company Property; Waiver of Action for Partition. No Member or Economic Interest Owner has any interest in specific property of the Company. Without limiting the foregoing, each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that he, she or it may have to maintain any action for partition with respect to the property of the Company.

13.18    Multiple Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

13.19    Attorney Fees. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the

34

EXHIBIT "6"
Page 35 of 43

other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses.

13.20   Time is of the Essence.  All dates and times in this Agreement are of the essence.

13.21   Remedies Cumulative.  The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

13.22   Special Power of Attorney.

A.      Attorney in Fact.  Each member grants the Manager a special power of attorney irrevocably making, constituting, and appointing the Manager as the Member's attorney in fact, with all power and authority to act in the Member's name and on the Member's behalf to execute, acknowledge and deliver and swear to in the execution, acknowledgment, delivery and filing of the following documents:

(i)      Promissory notes to be delivered pursuant to Section 3.5;

(ii)     Assignments of certificates of membership interest or other documents of transfer to be delivered pursuant to Section 3.5 or in connection with the purchase of a Membership Interest pursuant to Section 3.5, Section 7.7 or Article VIII;

(iii)    Any other instrument or document that may be reasonably required by the Manager in connection with any of the foregoing or to reflect any reduction in the Member's Capital Account or Percentage Interest pursuant to Section 3.5; and

(iv)     Any consent to the representation of the Company by counsel selected by the Manager as described in Section 13.1.

B.      Irrevocable Power.  The special power granted in Section 13.22A: (i) is irrevocable; (ii) is coupled with an interest; and (iii) shall survive a Member's death, incapacity or dissolution.

C.      Signatures.  The Manager may exercise the special power of attorney granted in Section 13.22A by a facsimile signature of the Manager or one of Manager's officers.

13.23   No Third Party Beneficiary.  The Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of the Agreement as a third party beneficiary or otherwise.

13.24   Not for Benefit of Creditors.  The provisions of the Agreement are intended only for the regulation of relations among Members and Company. The Agreement is not intended for the benefit of a creditor who is not a Member and does not grant any rights to or confer any benefits on any creditor who is not a Member or any other person who is not a Member, a Manager, or an officer.

35

13.25    Reserved.

13.26    Rights of Judgment Creditor of Member.  On application to a court of competent jurisdiction by a judgment creditor of a Member, the court may charge the Member's interest with payment of the unsatisfied amount of the judgment with interest. To the extent so charged the judgment creditor has only the rights of an assignee of the Member's interest. This Paragraph does not deprive any Member of the benefit of any exemption applicable to his interest.

13.27    Legal Representative or Successor of a Member.  If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage his, hers or its person or property, the executor, administrator, guardian, conservator or other legal representative may exercise all rights of the Member in the purpose of settling his, hers or its estate or administering his, hers or its property.

13.28    Number of Members.  The Company shall at all times have at least two (2) members.

13.29    No Responsibility for Pre-Formation Commitments.  In the event that any Member (or any of such Member's shareholders, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that related to or otherwise affects Company (other than for the existing loan with First Regional Bank, costs of rezoning the property as a medical usage, and real costs of operating the building), neither Company nor any other Member shall have any liability or responsibility for or with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by Company pursuant to a written instrument signed by the Manager.  Furthermore, neither Company nor any Member shall be responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or any of such Member's shareholders or Affiliates). Each Member is aware of, agrees to and acknowledges that transaction fees, acquisition fees and leasing commissions may be paid in the acquisition of the property or leases, the majority of which will be paid to Members of the Company.  All Members agree to, approve and acknowledge that Company is placing a construction/permanent loan ("Loan") in the approximate amount of at least three Million One Hundred Thousand Dollars ($3,100,000.00) on the Property at time of closing on the Property.

13.30    Cooperation in Tax Deferred Exchange.  The Company has been formed, principally, to invest in real property. If the Company shall decide to sell the Project, then the Members shall cooperate with each other, in good faith, to facilitate any Member wishing to do a tax-deferred exchange with respect to such Member's beneficial interest in the Project, in lieu of such Member receiving his pro rata share of the net sales proceeds from any such sale. Such cooperation shall include, without limitation, the Company distributing such Member's pro rata beneficial interest in the Project to such Member, for such Member to hold as a tenant in common with the Company for a period of not less than 90 days (or such lesser number of days as the exchanging Member shall request) prior to the consummation of any such sale. The Member wishing to effectuate such a tax-deferred exchange shall bear all additional costs and expenses incurred in connection with effectuating the same.

36

*[Signatures are on the following page.]*

37

IN WITNESS WHEREOF. all of the Members of EYESTREET MEDICAL INVESTORS, LLC, A California limited liability company, have executed this Agreement, effective as of the date written above.

MEMBERS:

WESTCLIFF INVESTORS LLC

By: _____
Name:    John Bral
Authorized Agent

HOOTAN DANESHMAND M.D.

By: _____
Name:    Hootan Daneshmand

REBECCA RIVERA M.D.

By: _____
Name:    Rebecca Rivera

ELVA LOPEZ M.D.

By: _____
Name:    Elva Lopez

By: _____
Name:

BY: _____
Name:

By: _____
Name:

38

SPOUSAL CONSENT

The undersigned is the spouse of _____ and acknowledges that she has read the foregoing Operating Agreement dated _____, 2006, and understands its provisions. The undersigned is aware that, by the provisions of the Operating Agreement, she and her spouse have agreed to sell or transfer all her Membership Interest in the Company, including any community property interest or quasi–community property interest, in accordance with the terms and provisions of the Operating Agreement. The undersigned hereby expressly approves of and agrees to be bound by the provisions of the Agreement in its entirety, including, but not limited to, those provisions relating to the sales and transfers of Membership Interests and the restrictions thereon. If the undersigned predeceases her spouse when her spouse owns any Membership Interest in the Company, she hereby agrees not to devise or bequeath whatever community property interest or quasi–community property interest she may have in the Company in contravention of the Agreement.

Dated: _____

By: _____
Printed Name: _____

39

EXHIBIT "6"
Page 40 of 43

## SPOUSAL CONSENT

The undersigned is the spouse of _____ and acknowledges that she has read the foregoing Operating Agreement dated _____, 2006, and understands its provisions. The undersigned is aware that, by the provisions of the Operating Agreement, she and her spouse have agreed to sell or transfer all her Membership Interest in the Company, including any community property interest or quasi–community property interest, in accordance with the terms and provisions of the Operating Agreement. The undersigned hereby expressly approves of and agrees to be bound by the provisions of the Agreement in its entirety, including, but not limited to, those provisions relating to the sales and transfers of Membership Interests and the restrictions thereon. If the undersigned predeceases her spouse when her spouse owns any Membership Interest in the Company, she hereby agrees not to devise or bequeath whatever community property interest or quasi–community property interest she may have in the Company in contravention of the Agreement.

Dated: _____

By: _____
Printed Name:

40

EXHIBIT "6"
Page 41 of 43

**EXHIBIT "A - 1"**

**Class "B" Investors**

| | |
|---|---|
| John Bral | 2.5 % |
| Hootan Daneshmand | <u>2.5 %</u> |
| Total Class B | 5 % |

41

EXHIBIT "A - 2"

Class "A" Investors and Capital Contributions

| Member | Address | Percentage Interest | Capital Contributed |
|---|---|---|---|
| WESTCLIFF INVESTORS LLC | 1 Park Plaza, Suite 1225 Irvine CA 92614 | 23.75% | $275,500.00 |
| HOOTAN DANESHMAND M.D. | 27462 Portola Pkwy, Suite 100 Foothill Ranch, CA  92610 | 23.75% | $275,500.00 |
| REBECCA RIVERA M.D. | | 23.75% | $275,500.00 |
| ELVA LOPEZ M.D. | | 23.75% | $275,500.00 |
| **Total Capital** | | **95%** | **$1,102,000.00** |

42

EXHIBIT "6"
Page 43 of 43

# EXHIBIT "7"

228

671112

| Schedule K-1 | 2012 | ☐ Final K-1    ☐ Amended K-1 | OMB No. 1545-0130 |
|---|---|---|---|

**Schedule K-1 (Form 1120S)**
Department of the Treasury
Internal Revenue Service

For calendar year 2012, or tax
year beginning _____ , 2012
ending _____ , ___

**Shareholder's Share of Income, Deductions, Credits, etc** ▸ See page 2 of form and separate instructions.

| **Part I** | **Information About the Corporation** |
|---|---|

**A** Corporation's employer identification number

**B** Corporation's name, address, city, state, and ZIP code
VENTURE RE GROUP
2601 MAIN STREET #560
IRVINE, CA 92614

**C** IRS Center where corporation filed return
e-file

| **Part II** | **Information About the Shareholder** |
|---|---|

**D** Shareholder's identifying number

**E** Shareholder's name, address, city, state, and ZIP code
BARRY BEITLER
825 S BARRINGTON AVE
LOS ANGELES, CA 90049

**F** Shareholder's percentage of stock
ownership for tax year...................... 50 %

F
O
R

I
R
S

U
S
E

O
N
L
Y

| **Part III** | **Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items** | | |
|---|---|---|---|
| 1 | Ordinary business income (loss)  -37,496. | 13 | Credits |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | | |
| 4 | Interest income | | |
| 5a | Ordinary dividends | | |
| 5b | Qualified dividends | 14 | Foreign transactions |
| 6 | Royalties | | |
| 7 | Net short-term capital gain (loss) | | |
| 8a | Net long-term capital gain (loss) | | |
| 8b | Collectibles (28%) gain (loss) | | |
| 8c | Unrecaptured section 1250 gain | | |
| 9 | Net section 1231 gain (loss) | | |
| 10 | Other income (loss) | 15 A | Alternative minimum tax (AMT) items  -22. |
| 11 | Section 179 deduction | 16 C | Items affecting shareholder basis  5,362. |
| 12 | Other deductions | | |
| | | 17 | Other information |
| | | *See attached statement for additional information. | |

BAA  **For Paperwork Reduction Act Notice, see Instructions for Form 1120S.**          IRS.gov/form1120s          Schedule K-1 (Form 1120S) 2012

Shareholder 1

SPSA0412L   12/27/12

EXHIBIT "7"
Page 2 of 6

Schedule K-1 (Form 1120S) 2012  VENTURE RE GROUP                                                                 Page 2

This list identifies the codes used on Schedule K-1 for all shareholders and provides summarized reporting information for shareholders who file Form 1040. For detailed reporting and filing information, see the separate Shareholder's Instructions for Schedule K-1 and the instructions for your income tax return.

**1 Ordinary business income (loss).** Determine whether the income (loss) is passive or nonpassive and enter on your return as follows:

*Report on*

| | |
|---|---|
| Passive loss | See the Shareholder's Instructions |
| Passive income | Schedule E, line 28, column (g) |
| Nonpassive loss | Schedule E, line 28, column (h) |
| Nonpassive income | Schedule E, line 28, column (j) |

**2 Net rental real estate income (loss)** — See the Shareholder's Instructions

**3 Other net rental income (loss)**

| | |
|---|---|
| Net income | Schedule E, line 28, column (g) |
| Net loss | See the Shareholder's Instructions |

**4 Interest income** — Form 1040, line 8a
**5 a Ordinary dividends** — Form 1040, line 9a
**5 b Qualified dividends** — Form 1040, line 9b
**6 Royalties** — Schedule E, line 4
**7 Net short-term capital gain (loss)** — Schedule D, line 5
**8 a Net long-term capital gain (loss)** — Schedule D, line 12
**8 b Collectibles (28%) gain (loss)** — 28% Rate Gain Worksheet, line 4 (Schedule D instructions)
**8 c Unrecaptured section 1250 gain** — See the Shareholder's Instructions
**9 Net section 1231 gain (loss)** — See the Shareholder's Instructions
**10 Other income (loss)**

*Code*

| | |
|---|---|
| A Other portfolio income (loss) | See the Shareholder's Instructions |
| B Involuntary conversions | See the Shareholder's Instructions |
| C Sec. 1256 contracts and straddles | Form 6781, line 1 |
| D Mining exploration costs recapture | See Pub 535 |
| E Other income (loss) | See the Shareholder's Instructions |

**11 Section 179 deduction** — See the Shareholder's Instructions
**12 Other deductions**

| | |
|---|---|
| A Cash contributions (50%) | |
| B Cash contributions (30%) | |
| C Noncash contributions (50%) | |
| D Noncash contributions (30%) | See the Shareholder's Instructions |
| E Capital gain property to a 50% organization (30%) | |
| F Capital gain property (20%) | |
| G Contributions (100%) | |
| H Investment interest expense | Form 4952, line 1 |
| I Deductions — royalty income | Schedule E, line 19 |
| J Section 59(e)(2) expenditures | See the Shareholder's Instructions |
| K Deductions — portfolio (2% floor) | Schedule A, line 23 |
| L Deductions — portfolio (other) | Schedule A, line 28 |
| M Preproductive period expenses | See the Shareholder's Instructions |
| N Commercial revitalization deduction from rental real estate activities | See Form 8582 instructions |
| O Reforestation expense deduction | See the Shareholder's Instructions |
| P Domestic production activities information | Form 8903 instructions |
| Q Qualified production activities income | Form 8903, line 7b |
| R Employer's Form W-2 wages | Form 8903, line 17 |
| S Other deductions | See the Shareholder's Instructions |

**13 Credits**

| | |
|---|---|
| A Low-income housing credit (section 42(j)(5)) from pre-2008 buildings | |
| B Low-income housing credit (other) from pre-2008 buildings | |
| C Low-income housing credit (section 42(j)(5)) from post-2007 buildings | |
| D Low-income housing credit (other) from post-2007 buildings | See the Shareholder's Instructions |
| E Qualified rehabilitation expenditures (rental real estate) | |
| F Other rental real estate credits | |
| G Other rental credits | |
| H Undistributed capital gains credit | Form 1040, line 71, box a |
| I Alcohol and cellulosic biofuel fuels credit | |
| J Work opportunity credit | |
| K Disabled access credit | See the Shareholder's Instructions |
| L Empowerment zone and renewal community employment credit | |

*Code*                                                               *Report on*

| | |
|---|---|
| M Credit for increasing research activities | |
| N Credit for employer social security and Medicare taxes | See the Shareholder's Instructions |
| O Backup withholding | |
| P Other credits | |

**14 Foreign transactions**

| | |
|---|---|
| A Name of country or U.S. possession | |
| B Gross income from all sources | Form 1116, Part I |
| C Gross income sourced at shareholder level | |

*Foreign gross income sourced at corporate level*

| | |
|---|---|
| D Passive category | |
| E General category | Form 1116, Part I |
| F Other | |

*Deductions allocated and apportioned at shareholder level*

| | |
|---|---|
| G Interest expense | Form 1116, Part I |
| H Other | Form 1116, Part I |

*Deductions allocated and apportioned at corporate level to foreign source income*

| | |
|---|---|
| I Passive category | |
| J General category | Form 1116, Part I |
| K Other | |

*Other information*

| | |
|---|---|
| L Total foreign taxes paid | Form 1116, Part II |
| M Total foreign taxes accrued | Form 1116, Part II |
| N Reduction in taxes available for credit | Form 1116, line 12 |
| O Foreign trading gross receipts | Form 8873 |
| P Extraterritorial income exclusion | Form 8873 |
| Q Other foreign transactions | See the Shareholder's Instructions |

**15 Alternative minimum tax (AMT) items**

| | |
|---|---|
| A Post-1986 depreciation adjustment | |
| B Adjusted gain or loss | |
| C Depletion (other than oil & gas) | See the Shareholder's Instructions and the Instructions for Form 6251 |
| D Oil, gas, & geothermal — gross income | |
| E Oil, gas, & geothermal — deductions | |
| F Other AMT items | |

**16 Items affecting shareholder basis**

| | |
|---|---|
| A Tax-exempt interest income | Form 1040, line 8b |
| B Other tax-exempt income | |
| C Nondeductible expenses | See the Shareholder's Instructions |
| D Distributions | |
| E Repayment of loans from shareholders | |

**17 Other information**

| | |
|---|---|
| A Investment income | Form 4952, line 4a |
| B Investment expenses | Form 4952, line 5 |
| C Qualified rehabilitation expenditures (other than rental real estate) | See the Shareholder's Instructions |
| D Basis of energy property | See the Shareholder's Instructions |
| E Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| F Recapture of low-income housing credit (other) | Form 8611, line 8 |
| G Recapture of investment credit | See Form 4255 |
| H Recapture of other credits | See the Shareholder's Instructions |
| I Look-back interest — completed long-term contracts | See Form 8697 |
| J Look-back interest — income forecast method | See Form 8866 |
| K Dispositions of property with section 179 deductions | |
| L Recapture of section 179 deduction | |
| M Section 453(l)(3) information | |
| N Section 453A(c) information | |
| O Section 1260(b) information | |
| P Interest allocable to production expenditures | See the Shareholder's Instructions |
| Q CCF nonqualified withdrawals | |
| R Depletion information — oil and gas | |
| S Amortization of reforestation costs | |
| T Section 108(i) information | |
| U Other information | |

Shareholder 1 : BARRY BEITLER                    12L  12/27/12                    Schedule K-1 (Form 1120S) 2012

EXHIBIT "7"
Page 3 of 6

| TAXABLE YEAR | **Shareholder's Share of Income,** | | CALIFORNIA SCHEDULE |
|---|---|---|---|
| **2012** | **Deductions, Credits, etc.** | ■ | **K-1 (100S)** |

For use by an S corporation and its shareholders only.

| For calendar year 2012 or fiscal year beginning month | day | year | , and ending month | day | year |
|---|---|---|---|---|---|

Shareholder's identifying number     | California corporation number

Shareholder's name, address, and ZIP Code | Corporation's name, address, and ZIP Code

BARRY BEITLER
825 S BARRINGTON AVE
LOS ANGELES, CA 90049

VENTURE RE GROUP
2601 MAIN STREET #560
IRVINE, CA 92614

**A** Shareholder's percentage of stock ownership at year end .................................................... ●    50 %

**B** Reportable transaction or tax shelter registration number(s):

**C** Check here if this is: **(1)** ☐ A final Schedule K-1    **(2)** ☐ An amended Schedule K-1

**D** What type of entity is this shareholder?.....● **(1)** ☒ Individual **(2)** ☐ Estate/Trust **(3)** ☐ Qualified Exempt Organization **(4)** ☐ Single Member LLC

**E** Is this shareholder a resident of California? ......................................................... ☒ Yes ► ☐ No

Caution: Refer to the shareholder's instructions for Schedule K-1 (100S) before entering information from this schedule on your California tax return.

| | | (a)<br>Pro-rata share items | (b)<br>Amount from federal Schedule K-1 (1120S) | (c)<br>California adjustment | (d)<br>Total amounts using California law Combine (b) and (c) where applicable | (e)<br>California source amounts and credits |
|---|---|---|---|---|---|---|
| **I**n**c**o**m**e**/**L**o**s**s | 1 | Ordinary business income (loss) ....... | -37,496. | 400. | ● -37,096. | ► |
| | 2 | Net rental real estate income (loss) ... | | | ● | |
| | 3 | Other net rental income (loss) . . . . . . . . . . . . . . . . . . | | | | |
| | 4 | Interest income. . . . . . . . . . . . . . . . | | | ● | ► |
| | 5 | Dividends. See instructions . . . . . . . . . . | | | ● | ► |
| | 6 | Royalties. . . . . . . . . . . . . . . . . . . | | | ● | ► |
| | 7 | Net short-term capital gain (loss) . . . . . . | | | ● | ► |
| | 8 | Net long-term capital gain (loss) . . . . . . | | | ● | ► |
| | 9 | Net Section 1231 gain (loss) . . . . . . . . . . | | | ● | ► |
| Other Inc or Loss | 10a | Other portfolio income (loss). Attach schedule. . . . . . . . . . . . . . . . . . | | | ● | ► |
| | b | Other income (loss). . . . . . . . . . . . . . . . . . | | | ● | ► |
| **D**e**d**u**c**t**i**o**n**s | 11 | Expense deduction for recovery property (IRC Section 179 and R&TC Sections 17267.2, 17267.6 and 17268). Attach schedules. . . . . . . . . . . . . . . | | | | |
| | 12a | Charitable contributions. . . . . . . . . . . . . | | | | ► |
| | b | Investment interest expense. . . . . . . . . . | | | ● | ► |
| | c 1 | Section 59(e)(2) expenditures. . . . . . . | | | | |
| | 2 | Type of expenditures . . | | | | |
| | d | Deductions — portfolio. . . . . . . . . . . . . . | | | | |
| | e | Other deductions . . . . . . . . . . . . . . | | | | |
| **C**r**e**d**i**t**s | 13a | Low-income housing credit. See instructions. Attach schedule. . . . . . | | | ● | ► |
| | b | Credits related to rental real estate activities other than on line 13(a). Attach schedule . . . . . . . . . . | | | ● | ► |
| | c | Credits related to other rental activities. See instructions. Attach sch. . . . . . . . . . | | | ● | ► |
| | d | Other credits. Attach schedule . . . . . . . . . . . . . . . . . . . | | | ● | ► |
| | e | New jobs credit. . . . . . . . . . . . . . . . | | | ● | ► |
| | 14 | Total withholding (equals amount on Form 592-B if calendar year). . . . . . . | | | ● | ► |

CASA0712L  12/19/12

SHAREHOLDER 1

VENTURE RE GROUP

| (a) Pro-rata share items | (b) Amount from federal Schedule K-1 (1120S) | (c) California adjustment | (d) Total amounts using California law Combine (b) and (c) where applicable | (e) California source amounts and credits |
|---|---|---|---|---|
| **Alternative Minimum Tax Items** | | | | |
| 15 a Depreciation adjustment on property placed in service after 12/31/86 . . . . . . | | | −22. | |
| b Adjusted gain or loss . . . . . . . . . . . . . . . | | | | |
| c Depletion (other than oil and gas) . . . . . . | | | | |
| d (1) Gross income from oil, gas, and geothermal properties . . . . . . . . . . | | | | |
| (2) Deductions allocable to oil, gas, and geothermal properties . . . . . . . | | | | |
| e Other AMT items. Attach schedule . . . . . . . . . . . . . . . | | | | |
| **Items Affecting Shareholder Basis** | | | | |
| 16 a Tax-exempt interest income . . . . . . . . . . | | | | |
| b Other tax-exempt income . . . . . . . . . . . | | | | |
| c Nondeductible expenses . . . . SEE ATT | 5,362. | 400. | 5,762. | |
| d Total property distributions (including cash) other than dividends distribution reported on line 17c . . . . . . . . . . . . . . | | ● | ▶ | |
| e Repayment of loans from shareholders . . . | | ● | ▶ | |
| **Other Info** | | | | |
| 17 a Investment income. See instructions . . . . | | | | |
| b Investment expenses. See instructions . . . | | | | |
| c Total taxable dividend distribution paid from accumulated earnings and profits. See instructions . . . . . . . . . . . . . . . . . . | | | ▶ | |
| d Other information. See instructions . . . . . | SEE ATTACHED | | SEE ATTACHED | |
| **Other State Taxes** | | | | |
| 18 a Type of income | | | | |
| b Name of state. | | | | |
| c Total gross income from sources outside California. Attach schedule. | | | | |
| d Total applicable deductions and losses. Attach sch . . . . . . | | | | |
| e Total other state taxes. Check one: ☐ Paid   ☐ Accrued . . . . . . . | | ● | ▶ | |

**Other Shareholder Information**

Table 1 – Each shareholder's share of nonbusiness income from intangibles. See instructions.

Interest . . . . . . . . . . . . . . $ _____   Royalties. . . . . . . . . . . . $ _____   Dividends. $ _____

1231 Gains/Losses . . . . $ _____   Capital Gains/Losses . . $ _____   Other . . . . . $ _____

**FOR USE BY SHAREHOLDERS ONLY. SEE INSTRUCTIONS.**

Table 2 – Shareholder's pro-rata share of business income and factors – See instructions.

A  Shareholder's share of the S corporation's business income . . . . . . . . . . . . . . . . . . . . . . . $ _____

B  Shareholder's share of the nonbusiness income from real and tangible property sourced or allocable to California:

Capital Gains/Losses . . . . . . . . $ _____   Rents/Royalties. . . . . $ _____

1231 Gains/Losses . . . . . . . . . $ _____   Other . . . . . . . . . . . . . . $ _____

C  Shareholder's share of the S corporation's property, payroll, and sales:   California Sales – Doing Business Test $ _____

| Factors | | Total within and outside California | Total within California |
|---|---|---|---|
| Property: | Beginning | $ | $ |
| | Ending | $ | $ |
| | Annual Rent Expense | $ | $ |
| Payroll | | $ | $ |
| Sales | | $ | $ |

SHAREHOLDER 1 : BARRY BEITLER

EXHIBIT "7"
Page 5 of 6

VENTURE RE GROUP

Schedule K-1 (Form 100S) 2012                    Supplemental Information                    Page    3

**Line 16c, column (d)**
**Nondeductible Expenses**

| | | |
|---|---|---:|
| Disallowed Meals and Entertainment | $ | 4,686. |
| Donation | | 500. |
| Penalties | | 176. |
| State and Local Taxes Based on Income or Profits | | 400. |
| Total | $ | 5,762. |

**Supplemental Information**

| | | |
|---|---|---:|
| S Corporation's Aggregate Gross Receipts | $ | 246,590. |

Shareholder 1 : BARRY BEITLER

SPSL1201L  05/21/12

EXHIBIT "7"
Page 6 of 6

# EXHIBIT "8"

| Schedule K-1 **(Form 1065)** | **2011** | ☐ Final K-1 ☐ Amended K-1 | 651111 OMB No. 1545-0099 |

Department of the Treasury
Internal Revenue Service

For calendar year 2011, or tax
year beginning _____ , 2011
ending _____

**Partner's Share of Income, Deductions, Credits, etc.**  ► **See separate instructions.**

| **Part I** | **Information About the Partnership** |

**A** Partnership's employer identification number

**B** Partnership's name, address, city, state, and ZIP code

WESTCLIFF INVESTORS, LLC
C/O 2601 MAIN ST, SUITE 560
IRVINE, CA 92614

**C** IRS Center where partnership filed return
Ogden, UT

**D** ☐ Check if this is a publicly traded partnership (PTP)

| **Part II** | **Information About the Partner** |

**E** Partner's identifying number

**F** Partner's name, address, city, state, and ZIP code

BARRY BEITLER
825 S BARRINGTON AVE
LOS ANGELES, CA 90049

**G** ☒ General partner or LLC member-manager   ☐ Limited partner or other LLC member

**H** ☒ Domestic partner   ☐ Foreign partner

**I** What type of entity is this partner? Individual

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 47.5 % | 47.5 % |
| Loss | 47.5 % | 47.5 % |
| Capital | 47.5 % | 47.5 % |

**K** Partner's share of liabilities at year end:
Nonrecourse . . . . . . . . . . . . . . . . . $
Qualified nonrecourse financing . . . . . . $ 1,832,888.
Recourse . . . . . . . . . . . . . . . . . . . . $

**L** Partner's capital account analysis:
Beginning capital account . . . . . . . . . . . $ 277,512.
Capital contributed during the year . . . . . $ 170,127.
Current year increase (decrease) . . . . . . $ 21,204.
Withdrawals and distributions . . . . . . . . $ ( 91,175. )
Ending capital account . . . . . . . . . . . . . $ 377,668.

☒ Tax basis  ☐ GAAP  ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes  ☒ No
If 'Yes', attach statement (see instructions)

**Part III** **Partner's Share of Current Year Income, Deductions, Credits, and Other Items**

| 1 | Ordinary business income (loss) -1,316. | 15 | Credits |
| 2 | Net rental real estate income (loss) * 22,638. | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| 12 | Section 179 deduction | 19 | Distributions A 91,175. |
| 13 | Other deductions A 118. | 20 | Other information |
| 14 | Self-employment earnings (loss) A -1,226. | | |

*See attached statement for additional information.

F O R   I R S   U S E   O N L Y

BAA For Paperwork Reduction Act Notice, see Instructions for Form 1065.    Schedule K-1 (Form 1065) 2011

Partner 1

PTPA0312L  08/18/11

WESTCLIFF INVESTORS, LLC

Schedule K-1 (Form 1065) 2011                    Supplemental Information                                    Page    2

**Box 2**
**Rental Real Estate Activities**

| Property Address | Gross Income | Net Expenses | Net Income | Passive Nonpass | Sec. 1231 Total |
|---|---|---|---|---|---|
| 1901 WESTCLIFF DRIVE NEWPORT BEACH, CA | 224,853. | 186,473. $ | 38,380. | Passive | |
| Passthrough Rental Real Estate | | | -15,742. | | |
| | | Total $ | 22,638. | | |

Partner 1:  BARRY BEITLER

SPSL1201L  05/04/11

236

EXHIBIT "8"
Page 3 of 46

WESTCLIFF INVESTORS, LLC

## 2011 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

Note: The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

Partner's Name: **BARRY BEITLER**

Partner's identification number

| Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|
| A  JAVAHER INVESTORS LLC | | Passive | |
| B  EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| C  JAVAHER INVESTORS LLC | | Passive | |
| D | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **Income (Loss)** | Ordinary business income (loss) | | -90. | -99. | |
| | Net rental real estate income (loss) | | -5,950. | -9,792. | |
| | Other net rental income (loss) | | | | |
| | Guaranteed payments | | | | |
| | Interest | | | | |
| | Ordinary dividends | | | | |
| | Qualified dividends | | | | |
| | Royalties | | | | |
| | Net short-term capital gain (loss) | | | | |
| | Net long-term capital gain (loss) | | | | |
| | Collectibles (28%) gain (loss) | | | | |
| | Unrecaptured section 1250 gain | | | | |
| | Net section 1231 gain (loss) | | | | |
| | Other income (loss) | | | | |
| **Deductions** | Section 179 deduction | | | | |
| | Charitable contributions | | | | |
| | Investment interest expense | | | | |
| | Section 59(e)(2) expense: Intangible Drilling costs | | | | |
| | Section 59(e)(2) expense: Dry Hole expense | | | | |
| | Other section 59(e)(2) expenses | | | | |
| | Other deductions | | | | |
| **Self-Employ-ment** | Net earnings (loss) from self-employment | | | -99. | |
| | Gross farming or fishing income | | | | |
| | Gross nonfarm income | | | | |
| **Credits** | Low-income housing credit: | | | | |
| | (A)  Section 42(j)(5): Pre-2008 | | | | |
| | (B)  Other: Pre-2008 | | | | |
| | (C)  Section 42(j)(5): Post-2007 | | | | |
| | (D)  Other: Post-2007 | | | | |
| | Qualified rehabilitation expenditures related to rental real estate act. | | | | |
| | Other rental real estate credits | | | | |
| | Other rental credits | | | | |
| | Work opportunity credit | | | | |
| | Alcohol and cellulosic biofuel fuels credit | | | | |
| | Disabled access credit | | | | |
| | Empowerment zone employment credit | | | | |
| | Credit for increasing research activities | | | | |
| | Credit for employer Soc. Sec. tax paid on certain employee tips | | | | |
| | Orphan drug credit | | | | |
| | Enhanced oil recovery credit | | | | |
| | Indian employment credit | | | | |
| | Small employer pension plan startup costs credit | | | | |
| | Credit for employer-provided childcare | | | | |
| | Alternative motor vehicle credit | | | | |
| | Other credits | | | | |

Partner 1:  BARRY BEITLER

PTPL1102L  05/03/11

EXHIBIT "8"
Page 4 of 46

WESTCLIFF INVESTORS, LLC

## 2011 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

Note: The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner's Name | Partner's identification number |
|---|---|
| BARRY BEITLER | |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|---|
| A | JAVAHER INVESTORS LLC | | Passive | |
| B | EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| C | JAVAHER INVESTORS LLC | | Passive | |
| D | | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **Foreign Trans-actions** | Gross income from all sources | | | | |
| | Gross income sourced at partner level | | | | |
| | Foreign gross income sourced at partnership level — Passive category | | | | |
| | General category | | | | |
| | Other | | | | |
| | Deductions allocated & apportioned at partner level — Interest expense | | | | |
| | Other | | | | |
| | Deductions allocated & apportioned at partnership level — Passive category | | | | |
| | General category | | | | |
| | Other | | | | |
| | Foreign taxes paid | | | | |
| | Foreign taxes accrued | | | | |
| | Reduction in tax available for credit | | | | |
| | Foreign trading gross receipts | | | | |
| | Extraterritorial income exclusion | | | | |
| | Other foreign transactions | | | | |
| **Alternative Minimum Tax (AMT) Items** | Post-1986 depreciation adjustment | | | | |
| | Adjusted gain or loss | | | | |
| | Depletion (other than oil and gas) | | | | |
| | Oil, gas and geothermal properties — gross income | | | | |
| | Oil, gas and geothermal properties — deductions | | | | |
| | A.C.E. depreciation adjustment | | | | |
| | A.C.E. adjusted gain or (loss) | | | | |
| | Accel. depreciation on real property placed in service before 1987 | | | | |
| | Accel. depr. on leased personal prop. placed in service before 1987 | | | | |
| | Other AMT items | | | | |
| **Tax-Exempt Inc & Non-deductible Exp** | Tax-exempt interest income | | | | |
| | Other tax-exempt income | | | | |
| | Nondeductible expenses | | | | |
| **Other Information** | Investment income | | | | |
| | Investment expenses | | | | |
| | Recapture of low-income housing credit — 42(j)(5) partnerships | | | | |
| | Recapture of low-income housing credit — other | | | | |
| | Supplemental Information: | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Partner 1:  BARRY BEITLER

PTPL1103L  05/03/11

238

☐ Final K-1     ☐ Amended K-1

651112

OMB No. 1545-0099

**Schedule K-1**
**(Form 1065)**

**2012**

For calendar year 2012, or tax
year beginning _____, 2012
ending _____

Department of the Treasury
Internal Revenue Service

**Partner's Share of Income, Deductions, Credits, etc.** ► See separate Instructions.

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) -1,185. | 15 | Credits |
| 2 | Net rental real estate income (loss) * -24,547. | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| 12 | Section 179 deduction | 19 | Distributions A 153,650. |
| 13 | Other deductions | 20 | Other information |
| 14 | Self-employment earnings (loss) A -886. | | |

**Part I    Information About the Partnership**

**A** Partnership's employer identification number

**B** Partnership's name, address, city, state, and ZIP code

WESTCLIFF INVESTORS, LLC
C/O 2601 MAIN ST, SUITE 560
IRVINE, CA 92614

**C** IRS Center where partnership filed return
Ogden, UT

**D** ☐ Check if this is a publicly traded partnership (PTP)

**Part II    Information About the Partner**

**E** Partner's identification number

**F** Partner's name, address, city, state, and ZIP code

BARRY BEITLER
825 S BARRINGTON AVE
LOS ANGELES, CA 90049

**G** ☒ General partner or LLC member-manager    ☐ Limited partner or other LLC member

**H** ☒ Domestic partner    ☐ Foreign partner

**I1** What type of entity is this partner? (see instr) Individual

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc), check here (see instructions).............. ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 47.5 % | 47.5 % |
| Loss | 47.5 % | 47.5 % |
| Capital | 47.5 % | 47.5 % |

**K** Partner's share of liabilities at year end:

Nonrecourse ......................... $ _____
Qualified nonrecourse financing ....... $ 1,811,326.
Recourse ............................. $ _____

**L** Partner's capital account analysis:

Beginning capital account............. $ 377,668.
Capital contributed during the year..... $ 177,392.
Current year increase (decrease)....... $ -25,732.
Withdrawals and distributions......... $ ( 153,650.)
Ending capital account................ $ 375,678.

☒ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No
If 'Yes', attach statement (see instructions)

*See attached statement for additional information.

F
O
R

I
R
S

U
S
E

O
N
L
Y

BAA For Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2012

PTPA0312L 01/02/13

Partner 1

EXHIBIT "8"
Page 6 of 46

Schedule K-1 (Form 1065) 2012   WESTCLIFF INVESTORS, LLC                                      Page **2**

This list identifies the codes used on Schedule K-1 for all partners and provides summarized reporting information for partners who file Form 1040. For detailed reporting and filing information, see the separate Partner's Instructions for Schedule K-1 and the instructions for your income tax return.

| | | Report on |
|---|---|---|
| **1** | Ordinary business income (loss). Determine whether the income (loss) is passive or nonpassive and enter on your return as follows. | |
| | Passive loss | See the Partner's Instructions |
| | Passive income | Schedule E, line 28, column (g) |
| | Nonpassive loss | Schedule E, line 28, column (h) |
| | Nonpassive income | Schedule E, line 28, column (j) |
| **2** | Net rental real estate income (loss) | See the Partner's Instructions |
| **3** | Other net rental income (loss) | |
| | Net income | Schedule E, line 28, column (g) |
| | Net loss | See the Partner's Instructions |
| **4** | Guaranteed payments | Schedule E, line 28, column (j) |
| **5** | Interest income | Form 1040, line 8a |
| **6 a** | Ordinary dividends | Form 1040, line 9a |
| **6 b** | Qualified dividends | Form 1040, line 9b |
| **7** | Royalties | Schedule E, line 4 |
| **8** | Net short-term capital gain (loss) | Schedule D, line 5 |
| **9 a** | Net long-term capital gain (loss) | Schedule D, line 12 |
| **9 b** | Collectibles (28%) gain (loss) | 28% Rate Gain Worksheet, line 4 (Schedule D Instructions) |
| **9 c** | Unrecaptured section 1250 gain | See the Partner's Instructions |
| **10** | Net section 1231 gain (loss) | See the Partner's Instructions |
| **11** | Other income (loss) | |
| | **Code** | |
| | A Other portfolio income (loss) | See the Partner's Instructions |
| | B Involuntary conversions | See the Partner's Instructions |
| | C Section 1256 contracts and straddles | Form 6781, line 1 |
| | D Mining exploration costs recapture | See Pub 535 |
| | E Cancellation of debt | Form 1040, line 21 or Form 982 |
| | F Other income (loss) | See the Partner's Instructions |
| **12** | Section 179 deduction | See the Partner's Instructions |
| **13** | Other deductions | |
| | A Cash contributions (50%) | |
| | B Cash contributions (30%) | |
| | C Noncash contributions (50%) | |
| | D Noncash contributions (30%) | See the Partner's Instructions |
| | E Capital gain property to a 50% organization (30%) | |
| | F Capital gain property (20%) | |
| | G Contributions (100%) | |
| | H Investment interest expense | Form 4952, line 1 |
| | I Deductions — royalty income | Schedule E, line 19 |
| | J Section 59(e)(2) expenditures | See the Partner's Instructions |
| | K Deductions — portfolio (2% floor) | Schedule A, line 23 |
| | L Deductions — portfolio (other) | Schedule A, line 28 |
| | M Amounts paid for medical insurance | Schedule A, line 1 or Form 1040, line 29 |
| | N Educational assistance benefits | See the Partner's Instructions |
| | O Dependent care benefits | Form 2441, line 12 |
| | P Preproductive period expenses | See the Partner's Instructions |
| | Q Commercial revitalization deduction from rental real estate activities | See Form 8582 Instructions |
| | R Pensions and IRAs | See the Partner's Instructions |
| | S Reforestation expense deduction | See the Partner's Instructions |
| | T Domestic production activities information | See Form 8903 Instructions |
| | U Qualified production activities income | Form 8903, line 7b |
| | V Employer's Form W-2 wages | Form 8903, line 17 |
| | W Other deductions | See the Partner's Instructions |
| **14** | Self-employment earnings (loss) | |
| | Note. *If you have a section 179 deduction or any partner-level deductions, see the Partner's Instructions before completing Schedule SE.* | |
| | A Net earnings (loss) from self-employment | Schedule SE, Section A or B |
| | B Gross farming or fishing income | See the Partner's Instructions |
| | C Gross non-farm income | See the Partner's Instructions |
| **15** | Credits | |
| | A Low-income housing credit (section 42(j)(5)) from pre-2008 buildings | |
| | B Low-income housing credit (other) from pre-2008 buildings | |
| | C Low-income housing credit (section 42(j)(5)) from post-2007 buildings | See the Partner's Instructions |
| | D Low-income housing credit (other) from post-2007 buildings | |
| | E Qualified rehabilitation expenditures (rental real estate) | |
| | F Other rental real estate credits | |
| | G Other rental credits | |
| | H Undistributed capital gains credit | Form 1040, line 71; check box a |
| | I Alcohol and cellulosic biofuel fuels credit | See the Partner's Instructions |

| | | Report on |
|---|---|---|
| | **Code** | |
| | J Work opportunity credit | |
| | K Disabled access credit | |
| | L Empowerment zone and renewal community employment credit | |
| | M Credit for increasing research activities | See the Partner's Instructions |
| | N Credit for employer social security and Medicare taxes | |
| | O Backup withholding | |
| **16** | Foreign transactions | |
| | A Name of country or U.S. possession | |
| | B Gross income from all sources | Form 1116, Part I |
| | C Gross income sourced at partner level | |
| | *Foreign gross income sourced at partnership level* | |
| | D Passive category | |
| | E General category | Form 1116, Part I |
| | F Other | |
| | *Deductions allocated and apportioned at partner level* | |
| | G Interest expense | Form 1116, Part I |
| | H Other | Form 1116, Part I |
| | *Deductions allocated and apportioned at partnership level to foreign source income* | |
| | I Passive category | |
| | J General category | Form 1116, Part I |
| | K Other | |
| | *Other information* | |
| | L Total foreign taxes paid | Form 1116, Part II |
| | M Total foreign taxes accrued | Form 1116, Part II |
| | N Reduction in taxes available for credit | Form 1116, line 12 |
| | O Foreign trading gross receipts | Form 8873 |
| | P Extraterritorial income exclusion | Form 8873 |
| | Q Other foreign transactions | See the Partner's Instructions |
| **17** | Alternative minimum tax (AMT) items | |
| | A Post-1986 depreciation adjustment | |
| | B Adjusted gain or loss | See the Partner's Instructions and the Instructions for Form 6251 |
| | C Depletion (other than oil & gas) | |
| | D Oil, gas, & geothermal — gross income | |
| | E Oil, gas, & geothermal — deductions | |
| | F Other AMT items | |
| **18** | Tax-exempt income and nondeductible expenses | |
| | A Tax-exempt interest income | Form 1040, line 8b |
| | B Other tax-exempt income | See the Partner's Instructions |
| | C Nondeductible expenses | See the Partner's Instructions |
| **19** | Distributions | |
| | A Cash and marketable securities | |
| | B Distribution subject to section 737 | See the Partner's Instructions |
| | C Other property | |
| **20** | Other information | |
| | A Investment income | Form 4952, line 4a |
| | B Investment expenses | Form 4952, line 5 |
| | C Fuel tax credit information | Form 4136 |
| | D Qualified rehabilitation expenditures (other than rental real estate) | See the Partner's Instructions |
| | E Basis of energy property | See the Partner's Instructions |
| | F Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| | G Recapture of low-income housing credit (other) | Form 8611, line 8 |
| | H Recapture of investment credit | See Form 4255 |
| | I Recapture of other credits | See the Partner's Instructions |
| | J Look-back interest — completed long-term contracts | See Form 8697 |
| | K Look-back interest — income forecast method | See Form 8866 |
| | L Dispositions of property with section 179 deductions | |
| | M Recapture of section 179 deduction | |
| | N Interest expense for corporate partners | |
| | O Section 453(l)(3) information | |
| | P Section 453A(c) information | |
| | Q Section 1260(b) information | |
| | R Interest allocable to production expenditures | See the Partner's Instructions |
| | S CCF nonqualified withdrawals | |
| | T Depletion information — oil and gas | |
| | U Amortization of reforestation costs | |
| | V Unrelated business taxable income | |
| | W Precontribution gain (loss) | |
| | X Section 108(i) information | |
| | Y Other information | |

Partner 1:   BARRY BEITLER

PTPA0312L  01/02/13                                      Schedule K-1 (Form 1065) 2012

EXHIBIT "8"
Page 7 of 46

WESTCLIFF INVESTORS, LLC

Schedule K-1 (Form 1065) 2012 | Supplemental Information | Page **3**

**Box 2**
**Rental Real Estate Activities**

| Property Type and Address | Gross Income | Net Expenses | Net Income | Passive Nonpass | Sec. 1231 Total |
|---|---|---|---|---|---|
| Type: 4 – Commercial | | | | | |
| 1901 WESTCLIFF DRIVE NEWPORT BEACH, CA | 233,694. | 256,353. $ | -22,659. | Passive | |
| Passthrough Rental Real Estate | | | -1,888. | | |
| | | Total $ | -24,547. | | |

Partner 1:   BARRY BEITLER

SPSL1201L  05/21/12

EXHIBIT "8"
Page 8 of 46

WESTCLIFF INVESTORS, LLC

## 2012 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

Note: The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

Partner's Name

**BARRY BEITLER**

Partner's identification number

| Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|
| A EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| B JAVAHER INVESTORS LLC | | Passive | |
| C | | | |
| D | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **Income (Loss)** | Ordinary business income (loss)........................ | -300. | -68. | | |
| | Net rental real estate income (loss)...................... | -5,201. | 3,313. | | |
| | Other net rental income (loss)........................... | | | | |
| | Guaranteed payments................................... | | | | |
| | Interest............................................... | | | | |
| | Ordinary dividends..................................... | | | | |
| | Qualified dividends.................................... | | | | |
| | Royalties.............................................. | | | | |
| | Net short-term capital gain (loss)....................... | | | | |
| | Net long-term capital gain (loss)........................ | | | | |
| | Collectibles (28%) gain (loss).......................... | | | | |
| | Unrecaptured section 1250 gain......................... | | | | |
| | Net section 1231 gain (loss)............................ | | | | |
| | Other income (loss)................................... | | | | |
| **Deductions** | Section 179 deduction................................. | | | | |
| | Charitable contributions............................... | | | | |
| | Investment interest expense............................ | | | | |
| | Section 59(e)(2) expense: Intangible Drilling costs........ | | | | |
| | Section 59(e)(2) expense: Dry Hole expense.............. | | | | |
| | Other section 59(e)(2) expenses........................ | | | | |
| | Other deductions...................................... | | | | |
| **Self-Employment** | Net earnings (loss) from self-employment................ | | -68. | | |
| | Gross farming or fishing income......................... | | | | |
| | Gross nonfarm income.................................. | | | | |
| **Credits** | Low-income housing credit: | | | | |
| | (A)  Section 42(j)(5): Pre-2008......................... | | | | |
| | (B)  Other: Pre-2008................................... | | | | |
| | (C)  Section 42(j)(5): Post-2007........................ | | | | |
| | (D)  Other: Post-2007.................................. | | | | |
| | Qualified rehabilitation expenditures related to rental real estate act...... | | | | |
| | Other rental real estate credits......................... | | | | |
| | Other rental credits................................... | | | | |
| | Work opportunity credit................................ | | | | |
| | Alcohol and cellulosic biofuel fuels credit................. | | | | |
| | Disabled access credit................................. | | | | |
| | Empowerment zone employment credit................... | | | | |
| | Credit for increasing research activities.................. | | | | |
| | Credit for employer Soc. Sec. tax paid on certain employee tips......... | | | | |
| | Orphan drug credit.................................... | | | | |
| | Enhanced oil recovery credit........................... | | | | |
| | Indian employment credit.............................. | | | | |
| | Small employer pension plan startup costs credit.. ....... | | | | |
| | Credit for employer-provided childcare............. ...... | | | | |
| | Alternative motor vehicle credit........ ................ | | | | |
| | Other credits......................................... | | | | |

Partner 1:  BARRY BEITLER

PTPL1102L  06/04/12

EXHIBIT "8"
Page 9 of 46

WESTCLIFF INVESTORS, LLC

## 2012 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

Note: The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner's Name | | | | | Partner's identification number | |
|---|---|---|---|---|---|---|
| BARRY BEITLER | | | | | | |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | | Check box if fully disposed in current year | |
|---|---|---|---|---|---|---|
| A | EYE STREET MEDICAL INVESTORS, LLC | | Passive | | | |
| B | JAVAHER INVESTORS LLC | | Passive | | | |
| C | | | | | | |
| D | | | | | | |

| | | | Passthrough Entities | | | |
|---|---|---|---|---|---|---|
| | | | **A** | **B** | **C** | **D** |
| **Foreign Trans- actions** | Gross income from all sources................ | | | | | |
| | Gross income sourced at partner level........... | | | | | |
| | Foreign gross income sourced at partnership level | Passive category......... | | | | |
| | | General category......... | | | | |
| | | Other..................... | | | | |
| | Deductions allocated & apportioned at partner level | Interest expense......... | | | | |
| | | Other..................... | | | | |
| | Deductions allocated & apportioned at partnership level | Passive category......... | | | | |
| | | General category......... | | | | |
| | | Other..................... | | | | |
| | Foreign taxes paid..................... | | | | | |
| | Foreign taxes accrued.................. | | | | | |
| | Reduction in tax available for credit.......... | | | | | |
| | Foreign trading gross receipts........... | | | | | |
| | Extraterritorial income exclusion........... | | | | | |
| | Other foreign transactions............... | | | | | |
| **Alter- native Mini- mum Tax (AMT) Items** | Post-1986 depreciation adjustment........... | | | | | |
| | Adjusted gain or loss................... | | | | | |
| | Depletion (other than oil and gas)............ | | | | | |
| | Oil, gas and geothermal properties — gross income...... | | | | | |
| | Oil, gas and geothermal properties — deductions......... | | | | | |
| | A.C.E. depreciation adjustment............ | | | | | |
| | A.C.E. adjusted gain or (loss)............ | | | | | |
| | Accel. depreciation on real property placed in service before 1987....... | | | | | |
| | Accel. depr. on leased personal prop. placed in service before 1987...... | | | | | |
| | Other AMT items....................... | | | | | |
| **Tax- Exempt Inc & Non- deduc- tible Exp** | Tax-exempt interest income............... | | | | | |
| | Other tax-exempt income............... | | | | | |
| | Nondeductible expenses................ | | | | | |
| **Other Infor- mation** | Investment income................... | | | | | |
| | Investment expenses................. | | | | | |
| | Recapture of low-income housing credit — 42(j)(5) partnerships........ | | | | | |
| | Recapture of low-income housing credit — other......... | | | | | |
| | Supplemental Information: | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Partner 1:   BARRY BEITLER

PTPL1103L  06/04/12

EXHIBIT "8"
Page 10 of 46

| TAXABLE YEAR 2012 | Member's Share of Income, Deductions, Credits, etc. | | CALIFORNIA SCHEDULE K-1 (568) |
|---|---|---|---|

For calendar year 2012 or fiscal year beginning month _____ day _____ year 2012, and ending month _____ day _____ year _____

Member's identifying number _____

Member's name, address, city, state, and ZIP Code

LLC's FEIN _____

California Secretary of State file number _____

LLC's name, address, city, state, and ZIP Code

BARRY BEITLER
825 S BARRINGTON AVE
LOS ANGELES, CA 90049

WESTCLIFF INVESTORS, LLC
C/O 2601 MAIN ST, SUITE 560
IRVINE, CA 92614

**A** What type of entity is this member?
(1) [X] Individual
(2) [ ] S Corporation
(3) [ ] Estate/Trust
(4) [ ] C Corporation
(5) [ ] General Partnership
(6) [ ] Limited Partnership
(7) [ ] LLP
(8) [ ] LLC
(9) [ ] IRA/Keogh/SEP
(10) [ ] Exempt Organization
(11) [ ] Disregarded Entity

**B** Is this member a foreign member?....... ● _____ Yes X No

**C** Enter member's percentage (without regard to special allocations) of:
| | (I) Before decrease or termination | (II) End of year |
|---|---|---|
| Profit sharing........ | _____ % | 47.5000 % |
| Loss sharing ......... | _____ % | 47.5000 % |
| Ownership of capital.. | _____ % | 47.5000 % |

**D** Member's share of liabilities:
Nonrecourse ...........................● $ _____
Qualified nonrecourse financing..........● $ 1,811,326.
Other...................................● $ _____

**E** Reportable transaction or tax shelter registration number(s)............. _____

**F** (1) Check here if this is a publicly traded partnership as defined in IRC Section 469(k)(2)......................... [ ]
(2) Check here if this is an investment partnership (R&TC Sections 17955 and 23040.1)................ [ ]

**G** Check here if this is: ●
(1) [ ] A final Schedule K-1 (568)   (2) [ ] An amended Schedule K-1 (568)

**H** Is this member a resident of California?...... X Yes ► _____ No

**I** Analysis of member's capital account: Check the box ● (1) [X] Tax Basis   (2) [ ] GAAP   (3) [ ] Sec 704(b) Book   (4) [ ] Other (explain)

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Member's share of line 3, line 4, and line 7 Form 568, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year, combine column (a) through column (d) |
|---|---|---|---|---|
| ● 377,668. | ● 177,392. | ● -25,732. | ( 153,650.) | ● 375,678. |

**Caution:** Refer to Member's Instructions for Schedule K-1 (568) before entering information from this schedule on your California return.

| | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (1065) | (c) California adjustments | (d) Total amounts using California law. Combine col. (b) and col. (c) where applicable | (e) California source amounts and credits |
|---|---|---|---|---|---|
| **Income (Loss)** | 1 Ordinary income (loss) from trade or business activities .................. | -1,185. | 1,116. ● | -69. ► | |
| | 2 Net income (loss) from rental real estate activities ........PG. 4 | -24,547. | 916. ● | -23,631. ► | |
| | 3 Net income (loss) from other rental activities ..................... | | ● | ► | |
| | 4 Guaranteed payments to members..... | | ● | ► | |
| | 5 Interest income .................... | | ● | ► | |
| | 6 Dividends ......................... | | ● | ► | |
| | 7 Royalties ......................... | | ● | ► | |
| | 8 Net short-term capital gain (loss)..... | | ● | ► | |
| | 9 Net long-term capital gain (loss)...... | | ● | ► | |
| | 10a Total gain under IRC Section 1231 (other than due to casualty or theft) ... | | ● | ► | |
| | b Total loss under IRC Section 1231 (other than due to casualty or theft) ... | | ● | ► | |
| | 11a Other portfolio income (loss). Attach schedule ................... | | ● | ► | |
| | b Total other income. Attach schedule ................... | | ● | ► | |
| | c Total other loss. Attach schedule ................... | | ● | ► | |

MEMBER 1

CALA0212L 12/24/12

EXHIBIT "8"
Page 11 of 46

WESTCLIFF INVESTORS, LLC

| | (a)<br>Distributive share items | (b)<br>Amounts from<br>federal Schedule K-1<br>(1065) | (c)<br>California<br>adjustments | (d)<br>Total amounts using<br>California law. Combine<br>column (b) and column (c) | (e)<br>California source<br>amounts and credits |
|---|---|---|---|---|---|
| Deduc-<br>tions | 12 Expense deduction for recovery property (IRC Section 179 and R&TC Sections 17267.2, 17267.6 and 17268) | | | | |
| | 13a Charitable contributions . . . . . . . . . . . . . . . . . . | | | | |
| | b Investment interest expense . . . . . . . . . | | | | |
| | c 1 Total expenditures to which an IRC Section 59(e) election may apply. . . . | | | | |
| | 2 Type of expenditures | | | | |
| | d Deductions related to portfolio income Attach schedule. . . . . . . . . . . . . . . . . | | | | |
| | e Other deductions. Attach schedule. . . . . . . . . . . . . . . . . | | | | |
| Credits | 15a Total withholding (equals amount on Form 592-B if calendar year LLC). . . . . | | | ● | ▶ |
| | b Low-income housing credit. . . . . . . . . . | | | | |
| | c Credits other than line 15b related to rental real estate activities. Attach schedule. . . . . . . . . . . . . . . . . . . . . | | | | |
| | d Credits related to other rental activities. Attach schedule. . . . . . . . . . | | | | |
| | e Nonconsenting nonresident member's tax paid by LLC . . . . . . . . . . . . . . . . . | | | | |
| | f Other credits — Attach required sched-ules or statements . . . . . . . . . . . . . . . | | | | |
| | g New jobs credit . . . . . . . . . . . . . . . . . . | | | | |
| Alter-<br>native<br>Mini-<br>mum<br>Tax<br>(AMT)<br>Items | 17a Depreciation adjustment on property placed in service after 1986 . . . . . . . . . | | | | |
| | b Adjusted gain or loss. . . . . . . . . . . . . . | | | | |
| | c Depletion (other than oil and gas). . . . . | | | | |
| | d Gross income from oil, gas, and geothermal properties. . . . . . . . . . . . . | | | | |
| | e Deductions allocable to oil, gas, and geothermal properties . . . . . . . . . | | | | |
| | f Other alternative minimum tax items. Attach schedule. . . . . . . . . . . . . . . . . | | | | |
| Tax-<br>exempt<br>Income<br>and<br>Nonde-<br>ductible<br>Expenses | 18a Tax-exempt interest income . . . . . . . . . | | | | |
| | b Other tax-exempt income . . . . . . . . . . . | | | | |
| | c Nondeductible expenses. . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| Distribu-<br>tions | 19a Distributions of money (cash and marketable securities) . . . . . | 153,650. | | 153,650. | |
| | b Distributions of property other than money . . . . . . . . . . . . . . . . . . . | | | | |
| Other<br>Informa-<br>tion | 20a Investment income. . . . . . . . . . . . . . . . | | | | |
| | b Investment expenses . . . . . . . . . . . . . . | | | | |
| | c Other information. See instructions. . . . | | | SEE ATTACHED | |

MEMBER 1:  BARRY BEITLER

EXHIBIT "8"
Page 12 of 46

WESTCLIFF INVESTORS, LLC

**Other Member Information**

Table 1 — Member's share of nonbusiness income from intangibles (source of income is dependent on residence or commercial domicile of the member):

| | | | | | |
|---|---|---|---|---|---|
| Interest | $ _____ | Sec 1231 Gains/Losses | $ _____ | Capital Gains/Losses | $ _____ |
| Dividends | $ _____ | Royalties | $ _____ | Other | $ _____ |

FOR USE BY MEMBERS ONLY — See instructions.

**Table 2** — Member's share of distributive items.

**A** Member's share of the LLC's business income. See instructions . . . . . . . . . . . . . . . . . . . . . . . $ _____

**B** Member's share of nonbusiness income from real and tangible personal property sourced or allocable to California.

| | | | |
|---|---|---|---|
| Capital Gains/Losses | $ _____ | Rents/Royalties | $ _____ |
| Section 1231 Gains/Losses | $ _____ | Other | $ _____ |

**C** Member's distributive share of the LLC's property, payroll, and sales:  California Sales — Doing Business Test   $ _____

| Factors | | Total within and outside California | Total within California |
|---|---|---|---|
| Property: | Beginning | $ | $ |
| | Ending | $ | $ |
| | Annual rent expense | $ | $ |
| Payroll | | $ | $ |
| Sales | | $ | $ |

MEMBER 1:  BARRY BEITLER

WESTCLIFF INVESTORS, LLC

| Schedule K-1 (Form 568) 2012 | Supplemental Information (continued) | Page 4 |

**Line 2, column (d)**
**Rental Real Estate Activities**

| Property Address | Gross Income | Net Expenses | Net Income | Passive Nonpass | Sec. 1231 Total |
|---|---|---|---|---|---|
| 1901 WESTCLIFF DRIVE NEWPORT BEACH, CA | $ 233,694. | 256,602. | $ -22,908. | Passive | |
| Passthrough Rental Real Estate | | | -724. | | |
| Rounding or Specially Allocated Net Income (Loss) Adjustment | | | 1. | | |
| | | Total | $ -23,631. | | |

**Line 20c - Column d**
**Other Information**

Proportionate Int. of Aggregate Gross Receipts................................... $  285,943.

Total $  285,943.

Member 1:  BARRY BEITLER

SPSL1201L  05/21/12

247

WESTCLIFF INVESTORS, LLC

## CALIFORNIA
## 2012 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

Note: The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1, pages 1 & 2.

Partner's Name

BARRY BEITLER

Partner's identification number

| Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|
| A EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| B JAVAHER INVESTORS LLC | | Passive | |
| C | | | |
| D | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| Income (Loss) | Ordinary income (loss) from trade or business activities... | | -68. | | |
| | Net income (loss) from rental real estate activities........ | -4,037. | 3,313. | | |
| | Net income (loss) from other rental activities.............. | | | | |
| | Interest................................................ | | | | |
| | Dividends.............................................. | | | | |
| | Royalties.............................................. | | | | |
| | Short term capital gain (loss)........................... | | | | |
| | Long term capital gain (loss).......................... | | | | |
| | Other portfolio income (loss)........................... | | | | |
| | Guaranteed payments.................................. | | | | |
| | Net gain (loss) under sec. 1231 (other than due to casualty or theft)..... | | | | |
| | Other income (loss)................................... | | | | |
| Deductions | Charitable contributions............................... | | | | |
| | Section 179 expense deduction......................... | | | | |
| | Deductions related to portfolio income.................. | | | | |
| | Other deductions...................................... | | | | |
| | Interest expense on investment debts................... | | | | |
| Credits | Withholding on partners................................ | | | | |
| | Low-income housing credit............................. | | | | |
| | Other credits related to rental real estate activities....... | | | | |
| | Credits related to other rental activities................ | | | | |
| | Other Credits......................................... | | | | |
| Adjustments and Tax Preference Items | Depreciation adjustment on property placed in service after 1986........ | | | | |
| | Adjusted gain or loss................................. | | | | |
| | Depletion (other than oil and gas)...................... | | | | |
| | Gross income from oil, gas or geothermal properties..... | | | | |
| | Deductions allocable to oil, gas or geothermal properties... | | | | |
| | A.C.E. depreciation adjustment......................... | | | | |
| | A.C.E. adjusted gain or (loss)......................... | | | | |
| | Accel. Depreciation on real property placed in service before 1987....... | | | | |
| | Accel. Depr. on leased personal prop. placed in service before 1987...... | | | | |
| | Other adjustments and tax preference items............ | | | | |
| Other | Section 59(e) expense: Intangible Drilling Costs.......... | | | | |
| | Section 59(e) expense: Dry Hole expense............... | | | | |
| | Other Section 59(e) expenses.......................... | | | | |
| | Tax-exempt interest income............................ | | | | |
| | Other tax-exempt income.............................. | | | | |
| | Nondeductible expenses............................... | | | | |
| | Distributions of money (cash and marketable securities)... | | | | |
| | Distributions of property other than money.............. | | | | |

CAPL0312L  05/21/12

Member 1:  BARRY BEITLER

248

WESTCLIFF INVESTORS, LLC

## CALIFORNIA
## 2012 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

Page 2

Note: The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1, pages 1 & 2.

Partner's Name

Partner's Identification number

BARRY BEITLER

| Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|
| A EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| B JAVAHER INVESTORS LLC | | Passive | |
| C | | | |
| D | | | |

| | | Passthrough Entities | | |
|---|---|---|---|---|
| | A | B | C | D |
| Other Items: | | | | |
| Proportionate interest of aggregate gross receipts......... | 36,057. | 16,192. | | |

Other

CAPL0312L  05/21/12

Member 1:  BARRY BEITLER

EXHIBIT "8"
Page 16 of 46

☐ Final K-1   ☐ Amended K-1

651113

OMB No. 1545-0099

**Schedule K-1**
(Form 1065)

**2013**

Department of the Treasury
Internal Revenue Service

For calendar year 2013, or tax
year beginning _____, 2013
ending _____

**Partner's Share of Income, Deductions,
Credits, etc.**        ► See separate instructions.

| **Part I** | Information About the Partnership |
|---|---|

**A** Partnership's employer identification number

**B** Partnership's name, address, city, state, and ZIP code

WESTCLIFF INVESTORS, LLC
C/O 2601 MAIN ST, SUITE 560
IRVINE, CA 92614

**C** IRS Center where partnership filed return
Ogden, UT

**D** ☐ Check if this is a publicly traded partnership (PTP)

| **Part II** | Information About the Partner |
|---|---|

**E** Partner's identifying number

**F** Partner's name, address, city, state, and ZIP code

BARRY BEITLER
825 S BARRINGTON AVE
LOS ANGELES, CA 90049

**G** ☒ General partner or LLC member-manager   ☐ Limited partner or other LLC member

**H** ☒ Domestic partner   ☐ Foreign partner

**I1** What type of entity is this partner?........ Individual

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc), check here (see instructions)............................ ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 47.5 % | 47.5 % |
| Loss | 47.5 % | 47.5 % |
| Capital | 47.5 % | 47.5 % |

**K** Partner's share of liabilities at year end:

| | |
|---|---|
| Nonrecourse.........................$ | |
| Qualified nonrecourse financing........$ | 2,012,735. |
| Recourse............................$ | |

**L** Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account..............$ | 138,400. |
| Capital contributed during the year.....$ | 18,500. |
| Current year increase (decrease).......$ | 55,930. |
| Withdrawals and distributions.........$ ( | 40,812.) |
| Ending capital account ...............$ | 172,018. |

☒ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No
If 'Yes', attach statement (see instructions)

| **Part III** | **Partner's Share of Current Year Income, Deductions, Credits, and Other Items** |
|---|---|

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) -1,067. | 15 | Credits |
| 2 | Net rental real estate income (loss) * 55,821. | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| | | 19 | Distributions |
| 12 | Section 179 deduction | A | 40,812. |
| 13 | Other deductions A 484. | 20 | Other information |
| 14 | Self-employment earnings (loss) A -876. | | |

*See attached statement for additional information.

F O R   I R S   U S E   O N L Y

BAA For Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2013

PTPA0312L  12/05/13

Partner 1

EXHIBIT "8"
Page 17 of 46

Schedule K-1 (Form 1065) 2013    WESTCLIFF INVESTORS, LLC                                                                 Page **2**

This list identifies the codes used on Schedule K-1 for all partners and provides summarized reporting information for partners who file Form 1040. For detailed reporting and filing information, see the separate Partner's Instructions for Schedule K-1 and the instructions for your tax return.

| | | Report on |
|---|---|---|
| **1** | Ordinary business income (loss). Determine whether the income (loss) is passive or nonpassive and enter on your return as follows. | |
| | Passive loss | See the Partner's Instructions |
| | Passive income | Schedule E, line 28, column (g) |
| | Nonpassive loss | Schedule E, line 28, column (h) |
| | Nonpassive income | Schedule E, line 28, column (j) |
| **2** | Net rental real estate income (loss) | See the Partner's Instructions |
| **3** | Other net rental income (loss) | |
| | Net income | Schedule E, line 28, column (g) |
| | Net loss | See the Partner's Instructions |
| **4** | Guaranteed payments | Schedule E, line 28, column (j) |
| **5** | Interest income | Form 1040, line 8a |
| **6 a** | Ordinary dividends | Form 1040, line 9a |
| **6 b** | Qualified dividends | Form 1040, line 9b |
| **7** | Royalties | Schedule E, line 4 |
| **8** | Net short-term capital gain (loss) | Schedule D, line 5 |
| **9 a** | Net long-term capital gain (loss) | Schedule D, line 12 |
| **9 b** | Collectibles (28%) gain (loss) | 28% Rate Gain Worksheet, line 4 (Schedule D Instructions) |
| **9 c** | Unrecaptured section 1250 gain | See the Partner's Instructions |
| **10** | Net section 1231 gain (loss) | See the Partner's Instructions |
| **11** | Other income (loss) | |
| | **Code** | |
| | A Other portfolio income (loss) | See the Partner's Instructions |
| | B Involuntary conversions | See the Partner's Instructions |
| | C Section 1256 contracts and straddles | Form 6781, line 1 |
| | D Mining exploration costs recapture | See Pub 535 |
| | E Cancellation of debt | Form 1040, line 21 or Form 982 |
| | F Other income (loss) | See the Partner's Instructions |
| **12** | Section 179 deduction | See the Partner's Instructions |
| **13** | Other deductions | |
| | A Cash contributions (50%) | |
| | B Cash contributions (30%) | |
| | C Noncash contributions (50%) | |
| | D Noncash contributions (30%) | |
| | E Capital gain property to a 50% organization (30%) | See the Partner's Instructions |
| | F Capital gain property (20%) | |
| | G Contributions (100%) | |
| | H Investment interest expense | Form 4952, line 1 |
| | I Deductions — royalty income | Schedule E, line 19 |
| | J Section 59(e)(2) expenditures | See the Partner's Instructions |
| | K Deductions — portfolio (2% floor) | Schedule A, line 23 |
| | L Deductions — portfolio (other) | Schedule A, line 28 |
| | M Amounts paid for medical insurance | Schedule A, line 1 or Form 1040, line 29 |
| | N Educational assistance benefits | See the Partner's Instructions |
| | O Dependent care benefits | Form 2441, line 12 |
| | P Preproductive period expenses | See the Partner's Instructions |
| | Q Commercial revitalization deduction from rental real estate activities | See Form 8582 Instructions |
| | R Pensions and IRAs | See the Partner's Instructions |
| | S Reforestation expense deduction | See the Partner's Instructions |
| | T Domestic production activities information | See Form 8903 Instructions |
| | U Qualified production activities income | Form 8903, line 7b |
| | V Employer's Form W-2 wages | Form 8903, line 17 |
| | W Other deductions | See the Partner's Instructions |
| **14** | Self-employment earnings (loss) | |

**Note.** *If you have a section 179 deduction or any partner-level deductions, see the Partner's Instructions before completing Schedule SE.*

| | | |
|---|---|---|
| | A Net earnings (loss) from self-employment | Schedule SE, Section A or B |
| | B Gross farming or fishing income | See the Partner's Instructions |
| | C Gross non-farm income | See the Partner's Instructions |
| **15** | Credits | |
| | A Low-income housing credit (section 42(j)(5)) from pre-2008 buildings | |
| | B Low-income housing credit (other) from pre-2008 buildings | |
| | C Low-income housing credit (section 42(j)(5)) from post-2007 buildings | |
| | D Low-income housing credit (other) from post-2007 buildings | See the Partner's Instructions |
| | E Qualified rehabilitation expenditures (rental real estate) | |
| | F Other rental real estate credits | |
| | G Other rental credits | |
| | H Undistributed capital gains credit | Form 1040, line 71; check box a |
| | I Biofuel producer credit | |
| | J Work opportunity credit | See the Partner's Instructions |
| | K Disabled access credit | |

| | | Report on |
|---|---|---|
| | **Code** | |
| | L Empowerment zone and renewal community employment credit | |
| | M Credit for increasing research activities | See the Partner's Instructions |
| | N Credit for employer social security and Medicare taxes | |
| | O Backup withholding | |
| | P Other credits | |
| **16** | Foreign transactions | |
| | A Name of country or U.S. possession | |
| | B Gross income from all sources | Form 1116, Part I |
| | C Gross income sourced at partnership level | |
| | *Foreign gross income sourced at partnership level* | |
| | D Passive category | |
| | E General category | Form 1116, Part I |
| | F Other | |
| | *Deductions allocated and apportioned at partner level* | |
| | G Interest expense | Form 1116, Part I |
| | H Other | Form 1116, Part I |
| | *Deductions allocated and apportioned at partnership level to foreign source income* | |
| | I Passive category | |
| | J General category | Form 1116, Part I |
| | K Other | |
| | *Other information* | |
| | L Total foreign taxes paid | Form 1116, Part II |
| | M Total foreign taxes accrued | Form 1116, Part II |
| | N Reduction in taxes available for credit | Form 1116, line 12 |
| | O Foreign trading gross receipts | Form 8873 |
| | P Extraterritorial income exclusion | Form 8873 |
| | Q Other foreign transactions | See the Partner's Instructions |
| **17** | Alternative minimum tax (AMT) items | |
| | A Post-1986 depreciation adjustment | |
| | B Adjusted gain or loss | See the Partner's Instructions and the Instructions for Form 6251 |
| | C Depletion (other than oil & gas) | |
| | D Oil, gas, & geothermal — gross income | |
| | E Oil, gas, & geothermal — deductions | |
| | F Other AMT items | |
| **18** | Tax-exempt income and nondeductible expenses | |
| | A Tax-exempt interest income | Form 1040, line 8b |
| | B Other tax-exempt income | See the Partner's Instructions |
| | C Nondeductible expenses | See the Partner's Instructions |
| **19** | Distributions | |
| | A Cash and marketable securities | |
| | B Distribution subject to section 737 | See the Partner's Instructions |
| | C Other property | |
| **20** | Other information | |
| | A Investment income | Form 4952, line 4a |
| | B Investment expenses | Form 4952, line 5 |
| | C Fuel tax credit information | Form 4136 |
| | D Qualified rehabilitation expenditures (other than rental real estate) | See the Partner's Instructions |
| | E Basis of energy property | See the Partner's Instructions |
| | F Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| | G Recapture of low-income housing credit (other) | Form 8611, line 8 |
| | H Recapture of investment credit | See Form 4255 |
| | I Recapture of other credits | See the Partner's Instructions |
| | J Look-back interest — completed long-term contracts | See Form 8697 |
| | K Look-back interest — income forecast method | See Form 8866 |
| | L Dispositions of property with section 179 deductions | |
| | M Recapture of section 179 deduction | |
| | N Interest expense for corporate partners | |
| | O Section 453(l)(3) information | |
| | P Section 453A(c) information | |
| | Q Section 1260(b) information | |
| | R Interest allocable to production expenditures | See the Partner's Instructions |
| | S CCF nonqualified withdrawals | |
| | T Depletion information — oil and gas | |
| | U Amortization of reforestation costs | |
| | V Unrelated business taxable income | |
| | W Precontribution gain (loss) | |
| | X Section 108(i) information | |
| | Y Net investment income | |
| | Z Other information | |

Partner 1:  BARRY BEITLER

PTPA0312L  12/05/13        Schedule **K-1** (Form 1065) 2013

EXHIBIT "8"
Page 18 of 46

WESTCLIFF INVESTORS, LLC

Schedule K-1 (Form 1065) 2013          **Supplemental Information**          Page   3

**Box 2**
**Rental Real Estate Activities**

| Property Type and Address | Gross Income | Net Expenses | Net Income | Passive Nonpass | Sec. 1231 Total |
|---|---|---|---|---|---|
| Type: 4 - Commercial | | | | | |
| 1901 WESTCLIFF DRIVE NEWPORT BEACH, CA | | | | | |
| | 253,646. | 209,628. | $ 44,018. | Passive | |
| Passthrough Rental Real Estate | | | 11,803. | | |
| | | Total | $ 55,821. | | |

Partner 1:  BARRY BEITLER

SPSL1201L  05/16/13

EXHIBIT "8"
Page 19 of 46

WESTCLIFF INVESTORS, LLC

## 2013 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner's Name | | Partner's identification number |
|---|---|---|
| BARRY BEITLER | | |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|---|
| A | EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| B | JAVAHER INVESTORS LLC | | Passive | |
| C | | | | |
| D | | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| Income (Loss) | Ordinary business income (loss) | -191. | -68. | | |
| | Net rental real estate income (loss) | 6,853. | 4,950. | | |
| | Other net rental income (loss) | | | | |
| | Guaranteed payments | | | | |
| | Interest | | | | |
| | Ordinary dividends | | | | |
| | Qualified dividends | | | | |
| | Royalties | | | | |
| | Net short-term capital gain (loss) | | | | |
| | Net long-term capital gain (loss) | | | | |
| | Collectibles (28%) gain (loss) | | | | |
| | Unrecaptured section 1250 gain | | | | |
| | Net section 1231 gain (loss) | | | | |
| | Other income (loss) | | | | |
| Deductions | Section 179 deduction | | | | |
| | Charitable contributions | | | | |
| | Investment interest expense | | | | |
| | Section 59(e)(2) expense: Intangible Drilling costs | | | | |
| | Section 59(e)(2) expense: Dry Hole expense | | | | |
| | Other section 59(e)(2) expenses | | | | |
| | Other deductions | | | | |
| Self-Employment | Net earnings (loss) from self-employment | | -68. | | |
| | Gross farming or fishing income | | | | |
| | Gross nonfarm income | | | | |
| Credits | Low-income housing credit: | | | | |
| | (A)   Section 42(j)(5): Pre-2008 | | | | |
| | (B)   Other: Pre-2008 | | | | |
| | (C)   Section 42(j)(5): Post-2007 | | | | |
| | (D)   Other: Post-2007 | | | | |
| | Qualified rehabilitation expenditures related to rental real estate act. | | | | |
| | Other rental real estate credits | | | | |
| | Other rental credits | | | | |
| | Work opportunity credit | | | | |
| | Biofuel producer credit | | | | |
| | Disabled access credit | | | | |
| | Empowerment zone employment credit | | | | |
| | Credit for increasing research activities | | | | |
| | Credit for employer Soc. Sec. tax paid on certain employee tips | | | | |
| | Orphan drug credit | | | | |
| | Enhanced oil recovery credit | | | | |
| | Indian employment credit | | | | |
| | Small employer pension plan startup costs credit | | | | |
| | Credit for employer-provided childcare | | | | |
| | Alternative motor vehicle credit | | | | |
| | Other credits | | | | |

Partner 1:   BARRY BEITLER

PTPL1102L  12/18/13

EXHIBIT "8"
Page 20 of 46

WESTCLIFF INVESTORS, LLC

## 2013 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner's Name | | | Partner's identification number |
|---|---|---|---|
| BARRY BEITLER | | | |

| Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|
| A  EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| B  JAVAHER INVESTORS LLC | | Passive | |
| C | | | |
| D | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | **A** | **B** | **C** | **D** |
| **Foreign Trans-actions** | Gross income from all sources............................ | | | | |
| | Gross income sourced at partner level................... | | | | |
| | Foreign gross income sourced at partnership level — Passive category......... | | | | |
| | General category........ | | | | |
| | Other........................ | | | | |
| | Deductions allocated & apportioned at partner level — Interest expense........... | | | | |
| | Other.......................... | | | | |
| | Deductions allocated & apportioned at partnership level — Passive category......... | | | | |
| | General category........ | | | | |
| | Other........................ | | | | |
| | Foreign taxes paid......................................... | | | | |
| | Foreign taxes accrued..................................... | | | | |
| | Reduction in tax available for credit..................... | | | | |
| | Foreign trading gross receipts........................... | | | | |
| | Extraterritorial income exclusion......................... | | | | |
| | Other foreign transactions................................ | | | | |
| **Altern-ative Mini-mum Tax (AMT) Items** | Post-1986 depreciation adjustment...................... | | | | |
| | Adjusted gain or loss...................................... | | | | |
| | Depletion (other than oil and gas)....................... | | | | |
| | Oil, gas and geothermal properties — gross income....... | | | | |
| | Oil, gas and geothermal properties — deductions.......... | | | | |
| | A.C.E. depreciation adjustment.......................... | | | | |
| | A.C.E. adjusted gain or (loss)............................ | | | | |
| | Accel. depreciation on real property placed in service before 1987....... | | | | |
| | Accel. depr. on leased personal prop. placed in service before 1987...... | | | | |
| | Other AMT items........................................... | | | | |
| **Tax-Exempt Inc & Non-deductible Exp** | Tax-exempt interest income............................... | | | | |
| | Other tax-exempt income.................................. | | | | |
| | Nondeductible expenses.................................. | | | | |
| **Other Infor-mation** | Investment income......................................... | | | | |
| | Investment expenses...................................... | | | | |
| | Recapture of low-income housing credit — 42(j)(5) partnerships......... | | | | |
| | Recapture of low-income housing credit — other.......... | | | | |
| | Supplemental Information: | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Partner 1:  BARRY BEITLER

PTPL1103L  05/15/13

EXHIBIT "8"
Page 21 of 46

| TAXABLE YEAR **2013** | **Member's Share of Income, Deductions, Credits, etc.** | ■ | CALIFORNIA SCHEDULE **K-1 (568)** |

TYB  01-01-2013  TYE  12-31-2013

BARRY          BEITLER

825 S BARRINGTON AVE
LOS ANGELES      CA   90049


            200303910037
WESTCLIFF INVESTORS LLC

C/O 2601 MAIN ST SUITE 560
IRVINE        CA   92614

---

**A** What type of entity is this member? ●

(1) [x] Individual         (4) [ ] C Corporation      (7) [ ] LLP          (10) [ ] Exempt Organization

(2) [ ] S Corporation      (5) [ ] General Partnership (8) [ ] LLC          (11) [ ] Disregarded Entity

(3) [ ] Estate/Trust       (6) [ ] Limited Partnership (9) [ ] IRA/Keogh/SEP

**B** Is this member a foreign member? .................................................................... ● [ ] Yes  [x] No

**C** Enter member's percentage (without regard to special allocations) of:

| | (i) Before decrease or termination | (ii) End of year |
|---|---|---|
| Profit sharing ................................ | % ● | 47.5000 % |
| Loss sharing ................................. | % ● | 47.5000 % |
| Ownership of capital ......................... | % ● | 47.5000 % |

**D** Member's share of liabilities:

Nonrecourse ............................................................... ● $ [        ]

Qualified nonrecourse financing ............................... ● $ 2,012,735.

Other ........................................................................ ● $ [        ]

**E** Reportable transaction or tax shelter registration number(s) ........................ [        ]

**F** (1) Check here if this is a publicly traded partnership as defined in IRC Section 469(k)(2) ................................. ● ⊙ [ ]

   (2) Check here if this is an investment partnership (R&TC Sections 17955 and 23040.1) ............................... ● ⊙ [ ]

**G** Check here if this is: ●  (1) [ ] A final Schedule K-1 (568)   (2) [ ] An amended Schedule K-1 (568)

**H** Is this member a resident of California? ............................................ ● [x] Yes  [ ] No

CALA0212L 02/03/14

MEMBER 1

EXHIBIT "8"
Page 22 of 46

WESTCLIFF INVESTORS LLC

**I** Analysis of member's capital account: Check the box • (1) [X] Tax Basis    (2) [ ] GAAP    (3) [ ] Sec 704(b) Book    (4) [ ] Other (explain) _____

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Member's share of line 3, line 4, and line 7 Form 568, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year, combine column (a) through column (d) |
|---|---|---|---|---|
| • 138,400. | • 18,500. | • 55,930. | • ( 40,812. ) | • 172,018. |

Caution: Refer to Member's Instructions for Schedule K-1 (568) before entering information from this schedule on your California return.

| | | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (1065) | (c) California adjustments | (d) Total amounts using California law. Combine column (b) and column (c) where applicable | (e) California source amounts and credits |
|---|---|---|---|---|---|---|
| **Income (Loss)** | 1 | Ordinary income (loss) from trade or business activities. . . . . . . . . . . . . . . . . . | −1,067. | 1,067. | • | ▶ |
| | 2 | Net income (loss) from rental real estate activities. . . . . . . . . . . . PG. 5 | 55,821. | 3,692. | • 59,513. | ▶ |
| | 3 | Net income (loss) from other rental activities. . . . . . . . . . . . . . . . . . . . . . . . . | | | ◉ | ◉ |
| | 4 | Guaranteed payments to members . . . . . | | | • | ▶ |
| | 5 | Interest income. . . . . . . . . . . . . . . . . . . . . | | | • | ▶ |
| | 6 | Dividends . . . . . . . . . . . . . . . . . . . . . . . . | | | • | ▶ |
| | 7 | Royalties. . . . . . . . . . . . . . . . . . . . . . . . | | | • | ▶ |
| | 8 | Net short-term capital gain (loss). . . . . . | | | • | ▶ |
| | 9 | Net long-term capital gain (loss) . . . . . . | | | • | ▶ |
| | 10a | Total gain under IRC Section 1231 (other than due to casualty or theft) . . . | | | • | ▶ |
| | b | Total loss under IRC Section 1231 (other than due to casualty or theft) . . . . | | | • | ▶ |
| | 11a | Other portfolio income (loss). Attach schedule. . . . . . . . . . . . . . . . . . . | | | • | ▶ |
| | b | Total other income. Attach schedule. . . . . . . . . . . . . . . . . . . | | | • | ▶ |
| | c | Total other loss. Attach schedule. . . . . . . . . . . . . . . . . . . | | | • | ▶ |
| **Deduc-tions** | 12 | Expense deduction for recovery property (IRC Section 179 and R&TC Sections 17267.2 and 17268) . . . . . . . . . . . . . . . . . . . . | | | | |
| | 13a | Charitable contributions. . . . . . . . . . . . . . PG. 5 | 484. | | 484. | |
| | b | Investment interest expense. . . . . . . . . . | | | | |
| | c 1 | Total expenditures to which an IRC Section 59(e) election may apply. . . . . | | | | |
| | 2 | Type of expenditures _____ | | | | |
| | d | Deductions related to portfolio income Attach schedule. . . . . . . . . . . . . . . . . . | | | | |
| | e | Other deductions. Attach schedule. . . . . . . . . . . . . . . . . . . | | | | |

MEMBER 1:  BARRY BEITLER

Side 2  Schedule K-1 (568) 2013    059    7902134    CALA0212L 02/03/14

EXHIBIT "8"
Page 23 of 46

WESTCLIFF INVESTORS LLC

| | (a)<br>Distributive share items | (b)<br>Amounts from<br>federal Schedule K-1<br>(1065) | (c)<br>California<br>adjustments | (d)<br>Total amounts using<br>California law. Combine<br>column (b) and column (c) | (e)<br>California source<br>amounts and credits |
|---|---|---|---|---|---|
| Credits | 15a Total withholding (equals amount on Form 592-B if calendar year LLC)...... | | | ● | ► |
| | b Low-income housing credit .......... | | | | |
| | c Credits other than line 15b related to rental real estate activities. Attach schedule........................ | | | | |
| | d Credits related to other rental activities. Attach schedule .......... | | | | |
| | e Nonconsenting nonresident member's tax paid by LLC................... | | | | |
| | f Other credits — Attach required schedules or statements................. | | | | |
| | g New jobs credit..................... | | | | |
| Alternative Minimum Tax (AMT) Items | 17a Depreciation adjustment on property placed in service after 1986..... | | | ◉ | ◉ |
| | b Adjusted gain or loss.............. | | | | |
| | c Depletion (other than oil and gas)..... | | | | |
| | d Gross income from oil, gas, and geothermal properties .............. | | | | |
| | e Deductions allocable to oil, gas, and geothermal properties.......... | | | | |
| | f Other alternative minimum tax items. Attach schedule...................... | | | | |
| Tax-exempt Income and Nondeductible Expenses | 18a Tax-exempt interest income.......... | | | | |
| | b Other tax-exempt income ........... | | | | |
| | c Nondeductible expenses....................... | | | | |
| Distributions | 19a Distributions of money (cash and marketable securities)...... | 40,812. | | ◉      40,812. | |
| | b Distributions of property other than money................... | | | ◉ | |
| Other Information | 20a Investment income ................ | | | | |
| | b Investment expenses.............. | | | | |
| | c Other information. See instructions..... | | | SEE ATTACHED | |

MEMBER 1:  BARRY BEITLER

EXHIBIT "8"
Page 24 of 46

WESTCLIFF INVESTORS LLC

**Other Member Information**

**Table 1** — Member's share of nonbusiness income from intangibles (source of income is dependent on residence or commercial domicile of the member):

| | | | | | |
|---|---|---|---|---|---|
| Interest | $ | Sec 1231 Gains/Losses | $ | Capital Gains/Losses | $ |
| Dividends | $ | Royalties | $ | Other | $ |

FOR USE BY MEMBERS ONLY — See instructions.

**Table 2** — Member's share of distributive items.

**A** Member's share of the LLC's business income. See instructions. $ _____

**B** Member's share of nonbusiness income from real and tangible personal property sourced or allocable to California.

| | | | |
|---|---|---|---|
| Capital Gains/Losses | $ | Rents/Royalties | $ |
| Section 1231 Gains/Losses | $ | Other | $ |

**C** Member's distributive share of the LLC's property, payroll, and sales:

| Factors | Total within and outside California | Total within California |
|---|---|---|
| Property: Beginning.................................. | $ | $ |
| Property: Ending..................................... | $ | $ |
| Property: Annual rent expense...................... | $ | $ |
| Payroll................................................ | $ | $ |
| Sales ................................................. | $ | $ |

MEMBER 1:  BARRY BEITLER

| | | | |
|---|---|---|---|
| Side 4 Schedule K-1 (568) 2013 | 059 | 7904134 | CALA0212L 02/03/14 |

EXHIBIT "8"
Page 25 of 46

WESTCLIFF INVESTORS LLC

| Schedule K-1 (Form 568) 2013 | Supplemental Information (continued) | | | | | Page 5 |

**Line 2, column (d)**
**Rental Real Estate Activities**

| Property Address | Gross Income | Net Expenses | Net Income | Passive Nonpass | Sec. 1231 Total |
|---|---|---|---|---|---|
| 1901 WESTCLIFF DRIVE NEWPORT BEACH, CA | $ 253,646. | 204,733. | $ 48,913. | Passive | |
| Passthrough Rental Real Estate | | | 10,600. | | |
| | | Total | $ 59,513. | | |

**Line 13a, column (d)**
**Charitable Contributions**

| | |
|---|---|
| Cash Contributions - 50% Limitation............................................... | $ 484. |
| Total | $ 484. |

**Line 20c - Column d**
**Other Information**

| | |
|---|---|
| Proportionate Int. of Aggregate Gross Receipts................................... | $ 307,248. |
| Total | $ 307,248. |

Member 1:  BARRY BEITLER

SPSL1201L  05/16/13

WESTCLIFF INVESTORS, LLC

## CALIFORNIA
## 2013 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1, pages 1 & 2.

Partner's Name

BARRY BEITLER

Partner's identification number

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|---|
| A | EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| B | JAVAHER INVESTORS LLC | | Passive | |
| C | | | | |
| D | | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | **A** | **B** | **C** | **D** |
| Income (Loss) | Ordinary income (loss) from trade or business activities... | | | | |
| | Net income (loss) from rental real estate activities........ | 5,650. | 4,950. | | |
| | Net income (loss) from other rental activities............ | | | | |
| | Interest................................................ | | | | |
| | Dividends.............................................. | | | | |
| | Royalties.............................................. | | | | |
| | Short term capital gain (loss)........................... | | | | |
| | Long term capital gain (loss).......................... | | | | |
| | Other portfolio income (loss)......................... | | | | |
| | Guaranteed payments ................................. | | | | |
| | Net gain (loss) under sec. 1231 (other than due to casualty or theft)..... | | | | |
| | Other income (loss).................................... | | | | |
| Deductions | Charitable contributions............................... | | | | |
| | Section 179 expense deduction......................... | | | | |
| | Deductions related to portfolio income ................. | | | | |
| | Other deductions...................................... | | | | |
| | Interest expense on investment debts.................. | | | | |
| Credits | Withholding on partners................................ | | | | |
| | Low-income housing credit............................. | | | | |
| | Other credits related to rental real estate activities....... | | | | |
| | Credits related to other rental activities ................ | | | | |
| | Other Credits......................................... | | | | |
| Adjustments and Tax Preference Items | Depreciation adjustment on property placed in service after 1986....... | | | | |
| | Adjusted gain or loss ................................. | | | | |
| | Depletion (other than oil and gas) ..................... | | | | |
| | Gross income from oil, gas or geothermal properties.... | | | | |
| | Deductions allocable to oil, gas or geothermal properties.. | | | | |
| | A.C.E. depreciation adjustment........................ | | | | |
| | A.C.E. adjusted gain or (loss).......................... | | | | |
| | Accel. Depreciation on real property placed in service before 1987...... | | | | |
| | Accel. Depr. on leased personal prop. placed in service before 1987...... | | | | |
| | Other adjustments and tax preference items............. | | | | |
| Other | Section 59(e) expense: Intangible Drilling Costs.......... | | | | |
| | Section 59(e) expense: Dry Hole expense............... | | | | |
| | Other Section 59(e) expenses......................... | | | | |
| | Tax-exempt interest income........................... | | | | |
| | Other tax-exempt income............................. | | | | |
| | Nondeductible expenses .............................. | | | | |
| | Distributions of money (cash and marketable securities) .. | | | | |
| | Distributions of property other than money .............. | | | | |

CAPL0312L  05/14/13

Member 1:  BARRY BEITLER

EXHIBIT "8"
Page 27 of 46

WESTCLIFF INVESTORS, LLC

Page 2

## CALIFORNIA
## 2013 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1, pages 1 & 2.

Partner's Name

BARRY BEITLER

Partner's Identification number

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|---|
| A | EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| B | JAVAHER INVESTORS LLC | | Passive | |
| C | | | | |
| D | | | | |

| | Passthrough Entities | | | |
|---|---|---|---|---|
| | A | B | C | D |
| **Other Items:** | | | | |
| Proportionate interest of aggregate gross receipts......... | 37,698. | 15,904. | | |

Other

CAPL0312L  05/14/13

Member 1:  BARRY BEITLER

EXHIBIT "8"
Page 28 of 46

☐ Final K-1    ☐ Amended K-1        651113
                                    OMB No. 1545-0123

**Schedule K-1**
(Form 1065)

**2014**

For calendar year 2014, or tax
year beginning _____, 2014
ending _____

Department of the Treasury
Internal Revenue Service

**Partner's Share of Income, Deductions, Credits, etc.**  ► See separate instructions.

**Part III  Partner's Share of Current Year Income, Deductions, Credits, and Other Items**

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) | 15 | Credits |
| 2 | Net rental real estate income (loss) **89,062.** | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| 12 | Section 179 deduction | 19 | Distributions. A **33,032.** |
| 13 | Other deductions A **1,187.** | 20 | Other information |
| 14 | Self-employment earnings (loss) | | |

**Part I  Information About the Partnership**

A  Partnership's employer identification number

B  Partnership's name, address, city, state, and ZIP code

WESTCLIFF INVESTORS, LLC
2601 MAIN STREET, SUITE 960
IRVINE, CA 92614

C  IRS Center where partnership filed return
E-FILE

D  ☐ Check if this is a publicly traded partnership (PTP)

**Part II  Information About the Partner**

E  Partner's identifying number

F  Partner's name, address, city, state, and ZIP code

BARRY BEITLER
825 S BARRINGTON AVE
LOS ANGELES, CA 90049

G  ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

H  ☒ Domestic partner   ☐ Foreign partner

I1  What type of entity is this partner? ...... INDIVIDUAL

I2  If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ................ ☐

J  Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 47.5 % | 47.5 % |
| Loss | 47.5 % | 47.5 % |
| Capital | 47.5 % | 47.5 % |

K  Partner's share of liabilities at year end:
Nonrecourse.................... $ 34,036.
Qualified nonrecourse financing....... $ 1,964,335.
Recourse..................... $ _____

L  Partner's capital account analysis:
Beginning capital account............. $ 172,018.
Capital contributed during the year..... $ _____
Current year increase (decrease)...... $ 87,875.
Withdrawals & distributions........... $ ( 33,032.)
Ending capital account............... $ 226,861.
☒ Tax basis  ☐ GAAP  ☐ Section 704(b) book
☐ Other (explain)

M  Did the partner contribute property with a built-in gain or loss?
☐ Yes  ☒ No
If 'Yes', attach statement (see instructions)

*See attached statement for additional information.

F O R   I R S   U S E   O N L Y

BAA  For Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2014

PARTNER 1

PTPA0312L 11/28/14

262

Schedule K-1 (Form 1065) 2014    WESTCLIFF INVESTORS, LLC    Page 2

This list identifies the codes used on Schedule K-1 for all partners and provides summarized reporting information for partners who file Form 1040. For detailed reporting and filing information, see the separate Partner's Instructions for Schedule K-1 and the instructions for your income tax return.

| 1 | Ordinary business income (loss). Determine whether the income (loss) is passive or nonpassive and enter on your return as follows. | |
| | | Report on |
| | Passive loss | See the Partner's Instructions |
| | Passive income | Schedule E, line 28, column (g) |
| | Nonpassive loss | Schedule E, line 28, column (h) |
| | Nonpassive income | Schedule E, line 28, column (j) |
| 2 | Net rental real estate income (loss) | See the Partner's Instructions |
| 3 | Other net rental income (loss) | |
| | Net income | Schedule E, line 28, column (g) |
| | Net loss | See the Partner's Instructions |
| 4 | Guaranteed payments | Schedule E, line 28, column (j) |
| 5 | Interest income | Form 1040, line 8a |
| 6 a | Ordinary dividends | Form 1040, line 9a |
| 6 b | Qualified dividends | Form 1040, line 9b |
| 7 | Royalties | Schedule E, line 4 |
| 8 | Net short-term capital gain (loss) | Schedule D, line 5 |
| 9 a | Net long-term capital gain (loss) | Schedule D, line 12 |
| 9 b | Collectibles (28%) gain (loss) | 28% Rate Gain Worksheet, line 4 (Schedule D Instructions) |
| 9 c | Unrecaptured section 1250 gain | See the Partner's Instructions |
| 10 | Net section 1231 gain (loss) | See the Partner's Instructions |
| 11 | Other income (loss) | |
| | Code | |
| A | Other portfolio income (loss) | See the Partner's Instructions |
| B | Involuntary conversions | See the Partner's Instructions |
| C | Sec. 1256 contracts & straddles | Form 6781, line 1 |
| D | Mining exploration costs recapture | Pub. 535 |
| E | Cancellation of debt | Form 1040, line 21 or Form 982 |
| F | Other income (loss) | See the Partner's Instructions |
| 12 | Section 179 deduction | See the Partner's Instructions |
| 13 | Other deductions | |
| A | Cash contributions (50%) | |
| B | Cash contributions (30%) | |
| C | Noncash contributions (50%) | |
| D | Noncash contributions (30%) | See the Partner's Instructions |
| E | Capital gain property to a 50% organization (30%) | |
| F | Capital gain property (20%) | |
| G | Contributions (100%) | |
| H | Investment interest expense | Form 4952, line 1 |
| I | Deductions — royalty income | Schedule E, line 19 |
| J | Section 59(e)(2) expenditures | See the Partner's Instructions |
| K | Deductions — portfolio (2% floor) | Schedule A, line 23 |
| L | Deductions — portfolio (other) | Schedule A, line 28 |
| M | Amounts paid for medical insurance | Schedule A, line 1 or Form 1040, line 29 |
| N | Educational assistance benefits | See the Partner's Instructions |
| O | Dependent care benefits | Form 2441, line 12 |
| P | Preproductive period expenses | See the Partner's Instructions |
| Q | Commercial revitalization deduction from rental real estate activities | See Form 8582 Instructions |
| R | Pensions and IRAs | See the Partner's Instructions |
| S | Reforestation expense deduction | See the Partner's Instructions |
| T | Domestic production activities information | See Form 8903 Instructions |
| U | Qualified production activities income | Form 8903, line 7b |
| V | Employer's Form W-2 wages | Form 8903, line 17 |
| W | Other deductions | See the Partner's Instructions |
| 14 | Self-employment earnings (loss) | |

Note. If you have a section 179 deduction or any partner-level deductions, see the Partner's Instructions before completing Schedule SE.

| A | Net earnings (loss) from self-employment | Schedule SE, Section A or B |
| B | Gross farming or fishing income | See the Partner's Instructions |
| C | Gross non-farm income | See the Partner's Instructions |
| 15 | Credits | |
| A | Low-income housing credit (section 42(j)(5)) from pre-2008 buildings | |
| B | Low-income housing credit (other) from pre-2008 buildings | |
| C | Low-income housing credit (section 42(j)(5)) from post-2007 buildings | |
| D | Low-income housing credit (other) from post-2007 buildings | See the Partner's Instructions |
| E | Qualified rehabilitation expenditures (rental real estate) | |
| F | Other rental real estate credits | |
| G | Other rental credits | |
| H | Undistributed capital gains credit | Form 1040, line 73; check box a |
| I | Biofuel producer credit | |
| J | Work opportunity credit | See the Partner's Instructions |
| K | Disabled access credit | |

| | Code | Report on |
| L | Empowerment zone employment credit | |
| M | Credit for increasing research activities | |
| N | Credit for employer social security and Medicare taxes | See the Partner's Instructions |
| O | Backup withholding | |
| P | Other credits | |
| 16 | Foreign transactions | |
| A | Name of country or U.S. possession | |
| B | Gross income from all sources | Form 1116, Part I |
| C | Gross income sourced at partner level | |
| | Foreign gross income sourced at partnership level | |
| D | Passive category | |
| E | General category | Form 1116, Part I |
| F | Other | |
| | Deductions allocated and apportioned at partner level | |
| G | Interest expense | Form 1116, Part I |
| H | Other | Form 1116, Part I |
| | Deductions allocated and apportioned at partnership level to foreign source income | |
| I | Passive category | |
| J | General category | Form 1116, Part I |
| K | Other | |
| | Other information | |
| L | Total foreign taxes paid | Form 1116, Part II |
| M | Total foreign taxes accrued | Form 1116, Part II |
| N | Reduction in taxes available for credit | Form 1116, line 12 |
| O | Foreign trading gross receipts | Form 8873 |
| P | Extraterritorial income exclusion | Form 8873 |
| Q | Other foreign transactions | See the Partner's Instructions |
| 17 | Alternative minimum tax (AMT) items | |
| A | Post-1986 depreciation adjustment | |
| B | Adjusted gain or loss | |
| C | Depletion (other than oil & gas) | See the Partner's Instructions and the Instructions for Form 6251 |
| D | Oil, gas, & geothermal — gross income | |
| E | Oil, gas, & geothermal — deductions | |
| F | Other AMT items | |
| 18 | Tax-exempt income and nondeductible expenses | |
| A | Tax-exempt interest income | Form 1040, line 8b |
| B | Other tax-exempt income | See the Partner's Instructions |
| C | Nondeductible expenses | See the Partner's Instructions |
| 19 | Distributions | |
| A | Cash and marketable securities | |
| B | Distribution subject to section 737 | See the Partner's Instructions |
| C | Other property | |
| 20 | Other information | |
| A | Investment income | Form 4952, line 4a |
| B | Investment expenses | Form 4952, line 5 |
| C | Fuel tax credit information | Form 4136 |
| D | Qualified rehabilitation expenditures (other than rental real estate) | See the Partner's Instructions |
| E | Basis of energy property | See the Partner's Instructions |
| F | Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| G | Recapture of low-income housing credit (other) | Form 8611, line 8 |
| H | Recapture of investment credit | See Form 4255 |
| I | Recapture of other credits | See the Partner's Instructions |
| J | Look-back interest — completed long-term contracts | See Form 8697 |
| K | Look-back interest — income forecast method | See Form 8866 |
| L | Dispositions of property with section 179 deductions | |
| M | Recapture of section 179 deduction | |
| N | Interest expense for corporate partners | |
| O | Section 453(l)(3) information | |
| P | Section 453A(c) information | |
| Q | Section 1260(b) information | |
| R | Interest allocable to production expenditures | See the Partner's Instructions |
| S | CCF nonqualified withdrawals | |
| T | Depletion information — oil and gas | |
| U | Reserved | |
| V | Unrelated business taxable income | |
| W | Precontribution gain (loss) | |
| X | Section 108(i) information | |
| Y | Net investment income | |
| Z | Other information | |

PARTNER 1:   BARRY BEITLER

PTPA0312L  11/28/14    Schedule K-1 (Form 1065) 2014

EXHIBIT "8"
Page 30 of 46

WESTCLIFF INVESTORS, LLC

SCHEDULE K-1 (FORM 1065) 2014     **SUPPLEMENTAL INFORMATION**     PAGE   3

**BOX 2**
**RENTAL REAL ESTATE ACTIVITIES**

| PROPERTY TYPE AND ADDRESS | GROSS INCOME | NET EXPENSES | NET INCOME | PASSIVE NONPASS | SEC. 1231 TOTAL |
|---|---|---|---|---|---|
| TYPE: 4 - COMMERCIAL | | | | | |
| 1901 WESTCLIFF DR NEWPORT BEACH, CA 92660 | 290,864. | 202,186. $ | 88,678. | PASSIVE | |
| PASSTHROUGH RENTAL REAL ESTATE | | | 384. | | |
| | | TOTAL $ | 89,062. | | |

PARTNER 1:  BARRY BEITLER

SPSL1201L  05/12/14

264

**TAXABLE YEAR** **Member's Share of Income,**
**2014** **Deductions, Credits, etc.**

■

CALIFORNIA SCHEDULE
**K-1 (568)**

TYB  01-01-2014  TYE  12-31-2014

BARRY        BEITLER

825 S BARRINGTON AVE
LOS ANGELES      CA   90049

      200303910037
WESTCLIFF INVESTORS LLC

2601 MAIN STREET SUITE 960
IRVINE        CA   92614

**A** What type of entity is this member? ●

(1) [X] Individual
(2) [ ] S Corporation
(3) [ ] Estate/Trust
(4) [ ] C Corporation
(5) [ ] General Partnership
(6) [ ] Limited Partnership
(7) [ ] LLP
(8) [ ] LLC
(9) [ ] IRA/Keogh/SEP
(10) [ ] Exempt Organization
(11) [ ] Disregarded Entity

**B** Is this member a foreign member? ..................................................................... ● [ ] Yes  [X] No

**C** Enter member's percentage (without regard to special allocations) of:

| | (i) Before decrease or termination | (ii) End of year |
|---|---|---|
| Profit sharing ....................................... | % | ● 47.5000 % |
| Loss sharing ........................................ | % | ● 47.5000 % |
| Ownership of capital ............................ | % | ● 47.5000 % |

**D** Member's share of liabilities:

Nonrecourse ......................................................................................... ● $ 34,036.
Qualified nonrecourse financing ........................................................... ● $ 1,964,335.
Other .................................................................................................... ● $

**E** Reportable transaction or tax shelter registration number(s) ........................................

**F** (1) Check here if this is a publicly traded partnership as defined in IRC Section 469(k)(2) .......................................... ● [ ]

(2) Check here if this is an investment partnership (R&TC Sections 17955 and 23040.1) ....................................... ● [ ]

**G** Check here if this is: ● (1) [ ] A final Schedule K-1 (568)  (2) [ ] An amended Schedule K-1 (568)

**H** Is this member a resident of California? ........................................................... ● [X] Yes  ► [ ] No

MEMBER 1

CALA0212L 01/15/15

■ For Privacy Notice, get FTB 1131 ENG/SP.   059      7901144        Schedule K-1 (568) 2014 Side 1 ■

EXHIBIT "8"
Page 32 of 46

WESTCLIFF INVESTORS LLC

| I Analysis of member's capital account: Check the box | ● (1) | X Tax Basis | (2) ☐ GAAP | (3) ☐ Sec 704(b) Book | (4) ☐ Other (explain) |
|---|---|---|---|---|---|

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Member's share of line 3, line 4, and line 7 Form 568, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year, combine column (a) through column (d) |
|---|---|---|---|---|
| ● 172,018. | ● | ● 87,876. | ● ( 33,032.) | ● 226,862. |

**Caution:** Refer to Member's Instructions for Schedule K-1 (568) before entering information from this schedule on your California return.

| | | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (1065) | (c) California adjustments | (d) Total amounts using California law. Combine column (b) and column (c) where applicable | (e) California source amounts and credits |
|---|---|---|---|---|---|---|
| Income (Loss) | 1 | Ordinary income (loss) from trade or business activities . . . . . . . . . . . . . . . . | | | ● | ► |
| | 2 | Net income (loss) from rental real estate activities. . . . . . . . P.G. .5 | 89,062. | 6,625. | ● 95,687. | ► |
| | 3 | Net income (loss) from other rental activities. . . . . . . . . . . . . . . . . . . . . . | | | ◉ | ◉ |
| | 4 | Guaranteed payments to members. . . . . | | | ● | ► |
| | 5 | Interest income . . . . . . . . . . . . . . . . . . | | | ● | ► |
| | 6 | Dividends . . . . . . . . . . . . . . . . . . . . . . | | | ● | ► |
| | 7 | Royalties . . . . . . . . . . . . . . . . . . . . . . . | | | ● | ► |
| | 8 | Net short-term capital gain (loss) . . . . . | | | ● | ► |
| | 9 | Net long-term capital gain (loss) . . . . . . | | | ● | ► |
| | 10a | Total gain under IRC Section 1231 (other than due to casualty or theft). . . . | | | ● | ► |
| | b | Total loss under IRC Section 1231 (other than due to casualty or theft). . . . | | | ● | ► |
| | 11a | Other portfolio income (loss). Attach schedule . . . . . . . . . . . . . . . . . | | | ● | ► |
| | b | Total other income. Attach schedule . . . . . . . . . . . . . . . . | | | ● | ► |
| | c | Total other loss. Attach schedule . . . . . . . . . . . . . . . . | | | ● | ► |
| Deduc-tions | 12 | Expense deduction for recovery property (IRC Section 179). . . . . . . . . . . . . . . . . . . . . . | | | | |
| | 13a | Charitable contributions . . . . . . . . . . . . . P.G. .5 | 1,187. | | 1,187. | |
| | b | Investment interest expense . . . . . . . . . | | | | |
| | c 1 | Total expenditures to which an IRC Section 59(e) election may apply . . . . | | | | |
| | 2 | Type of expenditures | | | | |
| | d | Deductions related to portfolio income Attach schedule . . . . . . . . . . . . . . . . . | | | | |
| | e | Other deductions. Attach schedule . . . . . . . . . . . . . . . . . | | | | |

MEMBER 1:  BARRY BEITLER

EXHIBIT "8"
Page 33 of 46

WESTCLIFF INVESTORS LLC

| | Distributive share items | (a) | (b) Amounts from federal Schedule K-1 (1065) | (c) California adjustments | (d) Total amounts using California law. Combine column (b) and column (c) | (e) California source amounts and credits |
|---|---|---|---|---|---|---|
| **Credits** | 15a Total withholding (equals amount on Form 592-B if calendar year LLC) | | | | • | ▶ |
| | b Low-income housing credit | | | | | |
| | c Credits other than line 15b related to rental real estate activities. Attach schedule | | | | | |
| | d Credits related to other rental activities. Attach schedule | | | | | |
| | e Nonconsenting nonresident member's tax paid by LLC | | | | | |
| | f Other credits — Attach required schedules or statements | | | | | |
| | g New employment credit | | | | | |
| **Alternative Minimum Tax (AMT) Items** | 17a Depreciation adjustment on property placed in service after 1986 | | | | ⊙ | ⊙ |
| | b Adjusted gain or loss | | | | | |
| | c Depletion (other than oil and gas) | | | | | |
| | d Gross income from oil, gas, and geothermal properties | | | | | |
| | e Deductions allocable to oil, gas, and geothermal properties | | | | | |
| | f Other alternative minimum tax items. Attach schedule | | | | | |
| **Tax-exempt Income and Nondeductible Expenses** | 18a Tax-exempt interest income | | | | | |
| | b Other tax-exempt income | | | | | |
| | c Nondeductible expenses | | | 538. | 538. | |
| **Distributions** | 19a Distributions of money (cash and marketable securities) | | 33,032. | ⊙ | 33,032. | |
| | b Distributions of property other than money | | | ⊙ | | |
| **Other Information** | 20a Investment income | | | | | |
| | b Investment expenses | | | | | |
| | c Other information. See instructions | | | | SEE ATTACHED | |

MEMBER 1:  BARRY BEITLER

EXHIBIT "8"
Page 34 of 46

WESTCLIFF INVESTORS LLC

**Other Member Information**

**Table 1** — Member's share of nonbusiness income from intangibles (source of income is dependent on residence or commercial domicile of the member):

| | | | | | |
|---|---|---|---|---|---|
| Interest $ | | Sec 1231 Gains/Losses $ | | Capital Gains/Losses $ | |
| Dividends $ | | Royalties $ | | Other $ | |

FOR USE BY MEMBERS ONLY — See instructions.

**Table 2** — Member's share of distributive items.

**A**  Member's share of the LLC's business income. See instructions.   $ _____

**B**  Member's share of nonbusiness income from real and tangible personal property sourced or allocable to California.

| | | | |
|---|---|---|---|
| Capital Gains/Losses | $ | Rents/Royalties | $ |
| Section 1231 Gains/Losses | $ | Other | $ |

**C**  Member's distributive share of the LLC's property, payroll, and sales:

| Factors | Total within and outside California | Total within California |
|---|---|---|
| Property: Beginning ............................. | $ | $ |
| Property: Ending ................................. | $ | $ |
| Property: Annual rent expense ..................... | $ | $ |
| Payroll.......................................... | $ | $ |
| Sales............................................ | $ | $ |

MEMBER 1:  BARRY BEITLER

WESTCLIFF INVESTORS LLC

| SCHEDULE K-1 (FORM 565) 2014 | SUPPLEMENTAL INFORMATION (CONTINUED) | PAGE 5 |

**LINE 2, COLUMN (D)**
**RENTAL REAL ESTATE ACTIVITIES**

| PROPERTY ADDRESS | GROSS INCOME | NET EXPENSES | NET INCOME | PASSIVE NONPASS | SEC. 1231 TOTAL |
|---|---|---|---|---|---|
| 1901 WESTCLIFF DR NEWPORT BEACH, CA 92660 | $ 290,864. | 195,720. | $ 95,144. | PASSIVE | |
| PASSTHROUGH RENTAL REAL ESTATE | | | 543. | | |
| | | TOTAL | $ 95,687. | | |

**LINE 13A, COLUMN (D)**
**CHARITABLE CONTRIBUTIONS**

CASH CONTRIBUTIONS - 50% LIMITATION.................................................... $     1,187.
                                                              TOTAL $     1,187.

**LINE 20C - COLUMN D**
**OTHER INFORMATION**

PROPORTIONATE INT. OF AGGREGATE GROSS RECEIPTS................................. $   343,939.
                                                              TOTAL $   343,939.

MEMBER 1:  BARRY BEITLER

JPSL1201L  05/12/14

651113

□ Final K-1    □ Amended K-1    OMB No. 1545-0123

**Schedule K-1**
**(Form 1065)**

**2015**

For calendar year 2015, or tax
year beginning _____, 2015
ending _____

Department of the Treasury
Internal Revenue Service

**Partner's Share of Income, Deductions,
Credits, etc.**    ► **See separate instructions.**

## Part I    Information About the Partnership

**A**  Partnership's employer identification number

**B**  Partnership's name, address, city, state, and ZIP code

WESTCLIFF INVESTORS, LLC
2601 MAIN STREET, SUITE 960
IRVINE, CA 92614

**C**  IRS Center where partnership filed return
E-FILE

**D**  □ Check if this is a publicly traded partnership (PTP)

## Part II    Information About the Partner

**E**  Partner's identifying number

**F**  Partner's name, address, city, state, and ZIP code

BARRY BEITLER
825 S BARRINGTON AVE
LOS ANGELES, CA 90049

**G**  □ General partner or LLC    ☒ Limited partner or other
member-manager           LLC member

**H**  ☒ Domestic partner    □ Foreign partner

**I1**  What type of entity is this partner? ....... INDIVIDUAL

**I2**  If this partner is a retirement plan (IRA/SEP/Keogh/etc.),
check here .......................................... □

**J**  Partner's share of profit, loss, and capital (see instructions):

|         | Beginning | Ending |
|---------|-----------|--------|
| Profit  | 47.5 %    | 47.5 % |
| Loss    | 47.5 %    | 47.5 % |
| Capital | 47.5 %    | 47.5 % |

**K**  Partner's share of liabilities at year end:

Nonrecourse ......................... $ 34,036.
Qualified nonrecourse financing ........ $ 1,917,183.
Recourse ............................. $

**L**  Partner's capital account analysis:

Beginning capital account ............. $ 226,861.
Capital contributed during the year ..... $
Current year increase (decrease)....... $ 101,940.
Withdrawals & distributions .......... $ ( 80,900.)
Ending capital account .............. $ 247,901.

☒ Tax basis    □ GAAP    □ Section 704(b) book
□ Other (explain)

**M**  Did the partner contribute property with a built-in gain or loss?
□ Yes    ☒ No
If 'Yes', attach statement (see instructions)

## Part III    Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | |
|---|---|
| 1   Ordinary business income (loss) | 15   Credits |
| 2   Net rental real estate income (loss) *  101,940. | |
| 3   Other net rental income (loss) | 16   Foreign transactions |
| 4   Guaranteed payments | |
| 5   Interest income | |
| 6a  Ordinary dividends | |
| 6b  Qualified dividends | |
| 7   Royalties | |
| 8   Net short-term capital gain (loss) | |
| 9a  Net long-term capital gain (loss) | 17   Alternative minimum tax (AMT) items |
| 9b  Collectibles (28%) gain (loss) | |
| 9c  Unrecaptured section 1250 gain | |
| 10  Net section 1231 gain (loss) | 18   Tax-exempt income and nondeductible expenses |
| 11  Other income (loss) | |
| 12  Section 179 deduction | 19   Distributions A  80,900. |
| 13  Other deductions | 20   Other information |
| 14  Self-employment earnings (loss) | |

*See attached statement for additional information.

F
O
R

I
R
S

U
S
E

O
N
L
Y

**BAA  For Paperwork Reduction Act Notice, see Instructions for Form 1065.**    Schedule K-1 (Form 1065) 2015

PARTNER 1

PTPA0312L  07/22/15

Schedule K-1 (Form 1065) 2015   WESTCLIFF INVESTORS, LLC   Page **2**

This list identifies the codes used on Schedule K-1 for all partners and provides summarized reporting information for partners who file Form 1040. For detailed reporting and filing information, see the separate Partner's Instructions for Schedule K-1 and the instructions for your income tax return.



| | | Report on |
|---|---|---|
| 1 | Ordinary business income (loss). Determine whether the income (loss) is passive or nonpassive and enter on your return as follows. | |
| | Passive loss | See the Partner's Instructions |
| | Passive income | Schedule E, line 28, column (g) |
| | Nonpassive loss | Schedule E, line 28, column (h) |
| | Nonpassive income | Schedule E, line 28, column (j) |
| 2 | Net rental real estate income (loss) | See the Partner's Instructions |
| 3 | Other net rental income (loss) | |
| | Net income | Schedule E, line 28, column (g) |
| | Net loss | See the Partner's Instructions |
| 4 | Guaranteed payments | Schedule E, line 28, column (j) |
| 5 | Interest income | Form 1040, line 8a |
| 6 a | Ordinary dividends | Form 1040, line 9a |
| 6 b | Qualified dividends | Form 1040, line 9b |
| 7 | Royalties | Schedule E, line 4 |
| 8 | Net short-term capital gain (loss) | Schedule D, line 5 |
| 9 a | Net long-term capital gain (loss) | Schedule D, line 12 |
| 9 b | Collectibles (28%) gain (loss) | 28% Rate Gain Worksheet, line 4 (Schedule D Instructions) |
| 9 c | Unrecaptured section 1250 gain | See the Partner's Instructions |
| 10 | Net section 1231 gain (loss) | See the Partner's Instructions |
| 11 | Other income (loss) | |
| | **Code** | |
| | A Other portfolio income (loss) | See the Partner's Instructions |
| | B Involuntary conversions | See the Partner's Instructions |
| | C Sec. 1256 contracts & straddles | Form 6781, line 1 |
| | D Mining exploration costs recapture | See Pub. 535 |
| | E Cancellation of debt | Form 1040, line 21 or Form 982 |
| | F Other income (loss) | See the Partner's Instructions |
| 12 | Section 179 deduction | See the Partner's Instructions |
| 13 | Other deductions | |
| | A Cash contributions (50%) | |
| | B Cash contributions (30%) | |
| | C Noncash contributions (50%) | |
| | D Noncash contributions (30%) | See the Partner's Instructions |
| | E Capital gain property to a 50% organization (30%) | |
| | F Capital gain property (20%) | |
| | G Contributions (100%) | |
| | H Investment interest expense | Form 4952, line 1 |
| | I Deductions — royalty income | Schedule E, line 19 |
| | J Section 59(e)(2) expenditures | See the Partner's Instructions |
| | K Deductions — portfolio (2% floor) | Schedule A, line 23 |
| | L Deductions — portfolio (other) | Schedule A, line 28 |
| | M Amounts paid for medical insurance | Schedule A, line 1 or Form 1040, line 29 |
| | N Educational assistance benefits | See the Partner's Instructions |
| | O Dependent care benefits | Form 2441, line 12 |
| | P Preproductive period expenses | See the Partner's Instructions |
| | Q Commercial revitalization deduction from rental real estate activities | See Form 8582 Instructions |
| | R Pensions and IRAs | See the Partner's Instructions |
| | S Reforestation expense deduction | See the Partner's Instructions |
| | T Domestic production activities information | See Form 8903 Instructions |
| | U Qualified production activities income | Form 8903, line 7b |
| | V Employer's Form W-2 wages | Form 8903, line 17 |
| | W Other deductions | See the Partner's Instructions |
| 14 | **Self-employment earnings (loss)** | |

Note. If you have a section 179 deduction or any partner-level deductions, see the Partner's Instructions before completing Schedule SE.

| | | |
|---|---|---|
| | A Net earnings (loss) from self-employment | Schedule SE, Section A or B |
| | B Gross farming or fishing income | See the Partner's Instructions |
| | C Gross non-farm income | See the Partner's Instructions |
| 15 | **Credits** | |
| | A Low-income housing credit (section 42(j)(5)) from pre-2008 buildings | |
| | B Low-income housing credit (other) from pre-2008 buildings | |
| | C Low-income housing credit (section 42(j)(5)) from post-2007 buildings | |
| | D Low-income housing credit (other) from post-2007 buildings | See the Partner's Instructions |
| | E Qualified rehabilitation expenditures (rental real estate) | |
| | F Other rental real estate credits | |
| | G Other rental credits | |
| | H Undistributed capital gains credit | Form 1040, line 73; check box a |
| | I Biofuel producer credit | |
| | J Work opportunity credit | See the Partner's Instructions |
| | K Disabled access credit | |

| | | Report on |
|---|---|---|
| | L Empowerment zone employment credit | |
| | M Credit for increasing research activities | |
| | N Credit for employer social security and Medicare taxes | See the Partner's Instructions |
| | O Backup withholding | |
| | P Other credits | |
| 16 | **Foreign transactions** | |
| | A Name of country or U.S. possession | |
| | B Gross income from all sources | Form 1116, Part I |
| | C Gross income sourced at partnership level | |
| | *Foreign gross income sourced at partnership level* | |
| | D Passive category | |
| | E General category | Form 1116, Part I |
| | F Other | |
| | *Deductions allocated and apportioned at partner level* | |
| | G Interest expense | Form 1116, Part I |
| | H Other | Form 1116, Part I |
| | *Deductions allocated and apportioned at partnership level to foreign source income* | |
| | I Passive category | |
| | J General category | Form 1116, Part I |
| | K Other | |
| | *Other information* | |
| | L Total foreign taxes paid | Form 1116, Part II |
| | M Total foreign taxes accrued | Form 1116, Part II |
| | N Reduction in taxes available for credit | Form 1116, line 12 |
| | O Foreign trading gross receipts | Form 8873 |
| | P Extraterritorial income exclusion | Form 8873 |
| | Q Other foreign transactions | See the Partner's Instructions |
| 17 | **Alternative minimum tax (AMT) items** | |
| | A Post-1986 depreciation adjustment | |
| | B Adjusted gain or loss | See the Partner's Instructions and the Instructions for Form 6251 |
| | C Depletion (other than oil & gas) | |
| | D Oil, gas, & geothermal — gross income | |
| | E Oil, gas, & geothermal — deductions | |
| | F Other AMT items | |
| 18 | **Tax-exempt income and nondeductible expenses** | |
| | A Tax-exempt interest income | Form 1040, line 8b |
| | B Other tax-exempt income | See the Partner's Instructions |
| | C Nondeductible expenses | See the Partner's Instructions |
| 19 | **Distributions** | |
| | A Cash and marketable securities | |
| | B Distribution subject to section 737 | See the Partner's Instructions |
| | C Other property | |
| 20 | **Other information** | |
| | A Investment income | Form 4952, line 4a |
| | B Investment expenses | Form 4952, line 5 |
| | C Fuel tax credit information | Form 4136 |
| | D Qualified rehabilitation expenditures (other than rental real estate) | See the Partner's Instructions |
| | E Basis of energy property | See the Partner's Instructions |
| | F Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| | G Recapture of low-income housing credit (other) | Form 8611, line 8 |
| | H Recapture of investment credit | See Form 4255 |
| | I Recapture of other credits | See the Partner's Instructions |
| | J Look-back interest — completed long-term contracts | See Form 8697 |
| | K Look-back interest — income forecast method | See Form 8866 |
| | L Dispositions of property with section 179 deductions | |
| | M Recapture of section 179 deduction | |
| | N Interest expense for corporate partners | |
| | O Section 453(l)(3) information | |
| | P Section 453A(c) information | |
| | Q Section 1260(b) information | |
| | R Interest allocable to production expenditures | See the Partner's Instructions |
| | S CCF nonqualified withdrawals | |
| | T Depletion information — oil and gas | |
| | U Reserved | |
| | V Unrelated business taxable income | |
| | W Precontribution gain (loss) | |
| | X Section 108(i) information | |
| | Y Net investment income | |
| | Z Other information | |

PARTNER 1:  BARRY BEITLER

PTPA0312L  07/22/15        Schedule K-1 (Form 1065) 2015

EXHIBIT "8"
Page 38 of 46

WESTCLIFF INVESTORS, LLC

SCHEDULE K-1 (FORM 1065) 2015          **SUPPLEMENTAL INFORMATION**                    PAGE   3

**BOX 2**
**RENTAL REAL ESTATE ACTIVITIES**

| PROPERTY TYPE AND ADDRESS | GROSS INCOME | NET EXPENSES | NET INCOME | PASSIVE NONPASS | SEC. 1231 TOTAL |
|---|---|---|---|---|---|
| TYPE: 4 - COMMERCIAL | | | | | |
| 1901 WESTCLIFF DR NEWPORT BEACH, CA 92660 | 298,360. | 198,557. $ | 99,803. | PASSIVE | |
| PASSTHROUGH RENTAL REAL ESTATE | | | 2,137. | | |
| | | TOTAL | $   101,940. | | |

PARTNER 1:  BARRY BEITLER

SPSL1201L  05/13/15

272

| TAXABLE YEAR | **Member's Share of Income,** | ■ | CALIFORNIA SCHEDULE |
|---|---|---|---|
| **2015** | **Deductions, Credits, etc.** | | **K-1 (568)** |

TYB   01-01-2015   TYE   12-31-2015

BARRY          BEITLER

825 S BARRINGTON AVE
LOS ANGELES      CA   90049

          200303910037
WESTCLIFF INVESTORS LLC

2601 MAIN STREET SUITE 960
IRVINE          CA   92614

---

**A** What type of entity is this member? ●

(1) [X] Individual  (4) [ ] C Corporation  (7) [ ] LLP  (10) [ ] Exempt Organization

(2) [ ] S Corporation  (5) [ ] General Partnership  (8) [ ] LLC  (11) [ ] Disregarded Entity

(3) [ ] Estate/Trust  (6) [ ] Limited Partnership  (9) [ ] IRA/Keogh/SEP

**B** Is this member a foreign member? ...................................................................... ● [ ] Yes  [X] No

**C** Enter member's percentage (without regard to special allocations) of:

| | (i) Before decrease or termination | (ii) End of year |
|---|---|---|
| Profit sharing .............................................. | % ● | 47.5000 % |
| Loss sharing ............................................... | % ● | 47.5000 % |
| Ownership of capital ...................................... | % ● | 47.5000 % |

**D** Member's share of liabilities:
Nonrecourse ............................................................................ ● $ 34,036.

Qualified nonrecourse financing ...................................................... ● $ 1,917,183.

Other ...................................................................................... ● $

**E** Reportable transaction or tax shelter registration number(s) ...........................................

**F** (1) Check here if this is a publicly traded partnership as defined in IRC Section 469(k)(2) .................................... ● ⊙ [ ]

(2) Check here if this is an investment partnership (R&TC Sections 17955 and 23040.1) .............................. ● ⊙ [ ]

**G** Check here if this is: ● (1) [ ] A final Schedule K-1 (568)  (2) [ ] An amended Schedule K-1 (568)

**H** Is this member a resident of California? ................................................................... ● [X] Yes  ● [ ] No

CALA0212L  11/23/15

MEMBER 1

| ■ | For Privacy Notice, get FTB 1131 ENG/SP. | 059 | 7901154 | | Schedule K-1 (568) 2015 Side 1 | ■ |

273

| Member's name | Member's identifying number |
|---|---|
| BARRY BEITLER | |

**I** Analysis of member's capital account: Check the box ● (1) [X] Tax Basis  (2) ☐ GAAP  (3) ☐ Sec 704(b) Book  (4) ☐ Other (explain)

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Member's share of line 3, line 4, and line 7 Form 568, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year, combine column (a) through column (d) |
|---|---|---|---|---|
| ● 226,862. | ● | ● 101,941. | ● ( 80,900.) | 247,903. |

**Caution:** Refer to Member's Instructions for Schedule K-1 (568) before entering information from this schedule on your California return.

| | | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (1065) | (c) California adjustments | (d) Total amounts using California law. Combine column (b) and column (c) where applicable | (e) California source amounts and credits |
|---|---|---|---|---|---|---|
| **Income (Loss)** | 1 | Ordinary income (loss) from trade or business activities . . . . . . . . . . . . . . . . | | | ● | ► |
| | 2 | Net income (loss) from rental real estate activities . . . . . . . . . . . . PG. 5 | 101,940. | 119. | ● 102,059. | ► |
| | 3 | Net income (loss) from other rental activities . . . . . . . . . . . . . . . . . . . . . | | | ⊙ | ⊙ |
| | 4 | Guaranteed payments to members . . . . . | | | ● | ► |
| | 5 | Interest income . . . . . . . . . . . . . . . . . . . | | | ● | ► |
| | 6 | Dividends . . . . . . . . . . . . . . . . . . . . . . | | | ● | ► |
| | 7 | Royalties . . . . . . . . . . . . . . . . . . . . . | | | ● | ► |
| | 8 | Net short-term capital gain (loss) . . . . . | | | ● | ► |
| | 9 | Net long-term capital gain (loss) . . . . . . | | | ● | ► |
| | 10a | Total gain under IRC Section 1231 (other than due to casualty or theft) . . . . | | | ● | ► |
| | b | Total loss under IRC Section 1231 (other than due to casualty or theft) . . . . | | | ● | ► |
| | 11a | Other portfolio income (loss). Attach schedule . . . . . . . . . . . . . . . . . | | | ● | ► |
| | b | Total other income. Attach schedule . . . . . . . . . . . . . . . . . . . | | | ● | ► |
| | c | Total other loss. Attach schedule . . . . . . . . . . . . . . . . | | | ● | ► |
| **Deductions** | 12 | Expense deduction for recovery property (IRC Section 179) . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| | 13a | Charitable contributions . . . . . . . . . . . . . . . . . . . | | | | |
| | b | Investment interest expense . . . . . . . . | | | | |
| | c 1 | Total expenditures to which an IRC Section 59(e) election may apply . . . . . | | | | |
| | 2 | Type of expenditures | | | | |
| | d | Deductions related to portfolio income Attach schedule . . . . . . . . . . . . . . | | | | |
| | e | Other deductions. Attach schedule . . . . . . . . . . . . . . . . . . | | | | |

MEMBER 1:  BARRY BEITLER

Member's name

BARRY BEITLER

Member's identifying number

| | (a)<br>Distributive share items | (b)<br>Amounts from federal Schedule K-1 (1065) | (c)<br>California adjustments | (d)<br>Total amounts using California law. Combine column (b) and column (c) | (e)<br>California source amounts and credits |
|---|---|---|---|---|---|
| **Credits** | **15a** Total withholding (equals amount on Form 592-B if calendar year LLC)..... | | | ● | ▶ |
| | **b** Low-income housing credit.......... | | | | |
| | **c** Credits other than line 15b related to rental real estate activities. Attach schedule...................... | | | | |
| | **d** Credits related to other rental activities. Attach schedule.......... | | | | |
| | **e** Nonconsenting nonresident member's tax paid by LLC................... | | | | |
| | **f** Other credits — Attach required schedules or statements................. | | | | |
| | **g** New employment credit............ | | | | |
| **Alternative Minimum Tax (AMT) Items** | **17a** Depreciation adjustment on property placed in service after 1986.......... | | | ◉ | ◉ |
| | **b** Adjusted gain or loss............... | | | | |
| | **c** Depletion (other than oil and gas) ..... | | | | |
| | **d** Gross income from oil, gas, and geothermal properties ............. | | | | |
| | **e** Deductions allocable to oil, gas, and geothermal properties........... | | | | |
| | **f** Other alternative minimum tax items. Attach schedule...................... | | | | |
| **Tax-exempt Income and Nondeductible Expenses** | **18a** Tax-exempt interest income.......... | | | | |
| | **b** Other tax-exempt income............ | | | | |
| | **c** Nondeductible expenses......................... | | 538. | 538. | |
| **Distributions** | **19a** Distributions of money (cash and marketable securities) ...... | 80,900. | | ◉ 80,900. | |
| | **b** Distributions of property other than money...................... | | | ◉ | |
| **Other Information** | **20a** Investment income ................ | | | | |
| | **b** Investment expenses............... | | | | |
| | **c** Other information. See instructions..... | | | SEE ATTACHED | |

MEMBER 1:  BARRY BEITLER

EXHIBIT "8"
Page 42 of 46

| Member's name | Member's identifying number |
|---|---|
| BARRY BEITLER | |

**Other Member Information**

**Table 1** — Member's share of nonbusiness income from intangibles (source of income is dependent on residence or commercial domicile of the member):

| Interest | $ | Sec 1231 Gains/Losses | $ | Capital Gains/Losses | $ |
|---|---|---|---|---|---|
| Dividends | $ | Royalties | $ | Other | $ |

FOR USE BY MEMBERS ONLY — See instructions.

**Table 2** — Member's share of distributive items.

**A** Member's share of the LLC's business income. See instructions. $

**B** Member's share of nonbusiness income from real and tangible personal property sourced or allocable to California.

| Capital Gains/Losses | $ | Rents/Royalties | $ |
|---|---|---|---|
| Section 1231 Gains/Losses | $ | Other | $ |

**C** Member's distributive share of the LLC's property, payroll, and sales:

| Factors | Total within and outside California | Total within California |
|---|---|---|
| Property:  Beginning............................... | $ | $ |
| Property:  Ending..................................... | $ | $ |
| Property:  Annual rent expense....................... | $ | $ |
| Payroll.................................................. | $ | $ |
| Sales ................................................. | $ | $ |

MEMBER 1:  BARRY BEITLER    .

EXHIBIT "8"
Page 43 of 46

BARRY BEITLER

SCHEDULE K-1 (FORM 568) 2015          SUPPLEMENTAL INFORMATION (CONTINUED)                          PAGE  5

## LINE 2, COLUMN (D)
## RENTAL REAL ESTATE ACTIVITIES

| PROPERTY ADDRESS | GROSS INCOME | NET EXPENSES | NET INCOME | PASSIVE NONPASS | SEC. 1231 TOTAL |
|---|---|---|---|---|---|
| 1901 WESTCLIFF DR NEWPORT BEACH, CA 92660 | $ 298,360. | 198,597. | $  99,763. | PASSIVE | |
| PASSTHROUGH RENTAL REAL ESTATE | | | 2,296. | | |
| | | TOTAL | $  102,059. | | |

## LINE 20C - COLUMN D
## OTHER INFORMATION

PROPORTIONATE INT. OF AGGREGATE GROSS RECEIPTS.................................. $     298,360.

                                                                   TOTAL  $     298,360.

MEMBER 1:  BARRY BEITLER

SPSL1201L  05/13/15

651113

| ☐ Final K-1 | ☐ Amended K-1 | OMB No. 1545-0123 |

**Schedule K-1**
**(Form 1065)**

Department of the Treasury
Internal Revenue Service

**2016**

For calendar year 2016, or tax
year beginning _____, 2016
ending _____

**Partner's Share of Income, Deductions, Credits, etc.** ► **See separate instructions.**

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) | 15 | Credits |
| 2 * | Net rental real estate income (loss) 117,103. | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| 12 | Section 179 deduction | 19 | Distributions A        40,450. |
| 13 | Other deductions | 20 | Other information |
| 14 | Self-employment earnings (loss) | | |

*See attached statement for additional information.

## Part I   Information About the Partnership

A   Partnership's employer identification number

B   Partnership's name, address, city, state, and ZIP code

WESTCLIFF INVESTORS, LLC
2601 MAIN STREET, SUITE 960
IRVINE, CA 92614

C   IRS Center where partnership filed return
E-FILE

D   ☐ Check if this is a publicly traded partnership (PTP)

## Part II   Information About the Partner

E   Partner's identifying number

F   Partner's name, address, city, state, and ZIP code

BARRY BEITLER
825 S BARRINGTON AVE
LOS ANGELES, CA 90049

G   ☐ General partner or LLC member-manager    ☒ Limited partner or other LLC member

H   ☒ Domestic partner    ☐ Foreign partner

I1   What type of entity is this partner? ....... INDIVIDUAL

I2   If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ........................................ ☐

J   Partner's share of profit, loss, and capital (see instructions):

|  | Beginning | Ending |
|---|---|---|
| Profit | 47.5 % | 47.5 % |
| Loss | 47.5 % | 47.5 % |
| Capital | 47.5 % | 47.5 % |

K   Partner's share of liabilities at year end:

| Nonrecourse ........................ $ | 34,035. |
| Qualified nonrecourse financing ........ $ | 1,867,762. |
| Recourse ........................... $ | |

L   Partner's capital account analysis:

| Beginning capital account ............. $ | 247,901. |
| Capital contributed during the year ..... $ | |
| Current year increase (decrease) ....... $ | 117,103. |
| Withdrawals & distributions ........... $ ( | 40,450.) |
| Ending capital account ............... $ | 324,554. |

☒ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☐ Other (explain)

M   Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No
If 'Yes', attach statement (see instructions)

F O R   I R S   U S E   O N L Y

**BAA For Paperwork Reduction Act Notice, see Instructions for Form 1065.**    Schedule K-1 (Form 1065) 2016

PARTNER 1

PTPA0312L   08/26/16

EXHIBIT "8"
Page 45 of 46

WESTCLIFF INVESTORS, LLC

SCHEDULE K-1 (FORM 1065) 2016          **SUPPLEMENTAL INFORMATION**                    PAGE    2

**BOX 2**
**RENTAL REAL ESTATE ACTIVITIES**

| PROPERTY TYPE AND ADDRESS | GROSS INCOME | NET EXPENSES | NET INCOME | PASSIVE NONPASS | SEC. 1231 TOTAL |
|---|---|---|---|---|---|
| TYPE: 4 - COMMERCIAL | | | | | |
| 1901 WESTCLIFF DR NEWPORT BEACH, CA 92660 | | | | | |
| | 302,813. | 190,901. $ | 111,912. | PASSIVE | |
| PASSTHROUGH RENTAL REAL ESTATE | | | 5,191. | | |
| | | TOTAL $ | 117,103. | | |

PARTNER 1:  BARRY BEITLER

SPSL1201L  06/16/16

EXHIBIT "8"
Page 46 of 46

# EXHIBIT "9"

651111

| Final K-1 ☐ | Amended K-1 ☐ | OMB No. 1545-0099 |

**Schedule K-1**
(Form 1065)

Department of the Treasury
Internal Revenue Service

**2011**

For calendar year 2011, or tax
year beginning _____, 2011
ending _____

**Partner's Share of Income, Deductions, Credits, etc.** ► See separate instructions.

**Part III  Partner's Share of Current Year Income, Deductions, Credits, and Other Items**

| 1 | Ordinary business income (loss) | 15 | Credits |
|---|---|---|---|
| | -138. | | |
| 2 | Net rental real estate income (loss) | | |
| * | 2,383. | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| 12 | Section 179 deduction | 19 | Distributions |
| | | A | 8,700. |
| 13 | Other deductions | 20 | Other information |
| A | 13. | | |
| 14 | Self-employment earnings (loss) | | |
| A | -128. | | |

**Part I  Information About the Partnership**

A  Partnership's employer identification number

B  Partnership's name, address, city, state, and ZIP code

WESTCLIFF INVESTORS, LLC
C/O 2601 MAIN ST, SUITE 560
IRVINE, CA 92614

C  IRS Center where partnership filed return
Ogden, UT

D  ☐ Check if this is a publicly traded partnership (PTP)

**Part II  Information About the Partner**

E  Partner's identifying number

F  Partner's name, address, city, state, and ZIP code

BETSY BOYD
3453 SUMMERSET CIRCLE
COSTA MESA, CA 92626

G  ☒ General partner or LLC member-manager  ☐ Limited partner or other LLC member

H  ☒ Domestic partner  ☐ Foreign partner

I  What type of entity is this partner? Individual

J  Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 5 % | 5 % |
| Loss | 5 % | 5 % |
| Capital | 5 % | 5 % |

K  Partner's share of liabilities at year end:

Nonrecourse ............................ $
Qualified nonrecourse financing ....... $  192,936.
Recourse .............................. $

L  Partner's capital account analysis:

Beginning capital account ............. $  -22,601.
Capital contributed during the year ... $
Current year increase (decrease) ...... $  2,232.
Withdrawals and distributions ......... $ (  8,700.)
Ending capital account ................ $  -29,069.

☒ Tax basis  ☐ GAAP  ☐ Section 704(b) book
☐ Other (explain)

M  Did the partner contribute property with a built-in gain or loss?
☐ Yes  ☒ No
If 'Yes', attach statement (see instructions)

*See attached statement for additional information.

FOR IRS USE ONLY

BAA  For Paperwork Reduction Act Notice, see Instructions for Form 1065.
Partner 3

Schedule K-1 (Form 1065) 2011
PTPA0312L  08/18/11

EXHIBIT "9"
Page 2 of 40

WESTCLIFF INVESTORS, LLC

Schedule K-1 (Form 1065) 2011       **Supplemental Information**       Page 2

**Box 2**
**Rental Real Estate Activities**

| Property Address | Gross Income | Net Expenses | Net Income | Passive Nonpass | Sec. 1231 Total |
|---|---|---|---|---|---|
| 1901 WESTCLIFF DRIVE NEWPORT BEACH, CA | 23,669. | 19,629. | $ 4,040. | Passive | |
| Passthrough Rental Real Estate | | | -1,657. | | |
| | | Total | $ 2,383. | | |

Partner 3:   BETSY BOYD

SPSL1201L  05/04/11

EXHIBIT "9"
Page 3 of 40

WESTCLIFF INVESTORS, LLC

## 2011 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

Note: The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner's Name | | Partner's identification number |
|---|---|---|
| BETSY BOYD | | |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|---|
| A | JAVAHER INVESTORS LLC | | Passive | |
| B | EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| C | JAVAHER INVESTORS LLC | | Passive | |
| D | | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| Income (Loss) | Ordinary business income (loss) | | -10. | -10. | |
| | Net rental real estate income (loss) | | -626. | -1,031. | |
| | Other net rental income (loss) | | | | |
| | Guaranteed payments | | | | |
| | Interest | | | | |
| | Ordinary dividends | | | | |
| | Qualified dividends | | | | |
| | Royalties | | | | |
| | Net short-term capital gain (loss) | | | | |
| | Net long-term capital gain (loss) | | | | |
| | Collectibles (28%) gain (loss) | | | | |
| | Unrecaptured section 1250 gain | | | | |
| | Net section 1231 gain (loss) | | | | |
| | Other income (loss) | | | | |
| Deduc-tions | Section 179 deduction | | | | |
| | Charitable contributions | | | | |
| | Investment interest expense | | | | |
| | Section 59(e)(2) expense: Intangible Drilling costs | | | | |
| | Section 59(e)(2) expense: Dry Hole expense | | | | |
| | Other section 59(e)(2) expenses | | | | |
| | Other deductions | | | | |
| Self-Employ-ment | Net earnings (loss) from self-employment | | | -10. | |
| | Gross farming or fishing income | | | | |
| | Gross nonfarm income | | | | |
| Credits | Low-income housing credit: | | | | |
| | (A)  Section 42(j)(5): Pre-2008 | | | | |
| | (B)  Other: Pre-2008 | | | | |
| | (C)  Section 42(j)(5): Post-2007 | | | | |
| | (D)  Other: Post-2007 | | | | |
| | Qualified rehabilitation expenditures related to rental real estate act. | | | | |
| | Other rental real estate credits | | | | |
| | Other rental credits | | | | |
| | Work opportunity credit | | | | |
| | Alcohol and cellulosic biofuel fuels credit | | | | |
| | Disabled access credit | | | | |
| | Empowerment zone employment credit | | | | |
| | Credit for increasing research activities | | | | |
| | Credit for employer Soc. Sec. tax paid on certain employee tips | | | | |
| | Orphan drug credit | | | | |
| | Enhanced oil recovery credit | | | | |
| | Indian employment credit | | | | |
| | Small employer pension plan startup costs credit | | | | |
| | Credit for employer-provided childcare | | | | |
| | Alternative motor vehicle credit | | | | |
| | Other credits | | | | |

Partner 3:  BETSY BOYD

PTPL1102L  05/03/11

WESTCLIFF INVESTORS, LLC

## 2011 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

Note: The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

Partner's Name: **BETSY BOYD**

Partner's identification number

| Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|
| A  JAVAHER INVESTORS LLC | | Passive | |
| B  EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| C  JAVAHER INVESTORS LLC | | Passive | |
| D | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| Foreign Transactions | Gross income from all sources............................ | | | | |
| | Gross income sourced at partner level................... | | | | |
| | Foreign gross income sourced at partnership level — Passive category.......... | | | | |
| | General category.......... | | | | |
| | Other......... | | | | |
| | Deductions allocated & apportioned at partner level — Interest expense.......... | | | | |
| | Other.......... | | | | |
| | Deductions allocated & apportioned at partnership level — Passive category.......... | | | | |
| | General category.......... | | | | |
| | Other......... | | | | |
| | Foreign taxes paid...................................... | | | | |
| | Foreign taxes accrued................................... | | | | |
| | Reduction in tax available for credit..................... | | | | |
| | Foreign trading gross receipts........................... | | | | |
| | Extraterritorial income exclusion......................... | | | | |
| | Other foreign transactions.............................. | | | | |
| Alternative Minimum Tax (AMT) Items | Post-1986 depreciation adjustment....................... | | | | |
| | Adjusted gain or loss................................... | | | | |
| | Depletion (other than oil and gas)....................... | | | | |
| | Oil, gas and geothermal properties — gross income....... | | | | |
| | Oil, gas and geothermal properties — deductions.......... | | | | |
| | A.C.E. depreciation adjustment.......................... | | | | |
| | A.C.E. adjusted gain or (loss)........................... | | | | |
| | Accel. depreciation on real property placed in service before 1987........ | | | | |
| | Accel. depr. on leased personal prop. placed in service before 1987. | | | | |
| | Other AMT items....................................... | | | | |
| Tax-Exempt Inc & Non-deductible Exp | Tax-exempt interest income.............................. | | | | |
| | Other tax-exempt income............................... | | | | |
| | Nondeductible expenses................................ | | | | |
| Other Information | Investment income..................................... | | | | |
| | Investment expenses................................... | | | | |
| | Recapture of low-income housing credit — 42(j)(5) partnerships........ | | | | |
| | Recapture of low-income housing credit — other........... | | | | |
| | Supplemental Information: | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Partner 3:  BETSY BOYD

PTPL1103L  05/03/11

EXHIBIT "9"
Page 5 of 40

| ☐ Final K-1 | ☐ Amended K-1 | 651112 |
| | | OMB No. 1545-0099 |

**Schedule K-1**
(Form 1065)

Department of the Treasury
Internal Revenue Service

**2012**

For calendar year 2012, or tax
year beginning _____, 2012
ending _____

**Partner's Share of Income, Deductions,
Credits, etc.**        ► See separate Instructions.

## Part III — Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) -125. | 15 | Credits |
| 2 | Net rental real estate income (loss) -2,584. | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| | | 19 | Distributions |
| 12 | Section 179 deduction | A | 15,700. |
| 13 | Other deductions | 20 | Other information |
| 14 | Self-employment earnings (loss) A -93. | | |

*See attached statement for additional information.

### Part I — Information About the Partnership

A  Partnership's employer identification number

B  Partnership's name, address, city, state, and ZIP code

WESTCLIFF INVESTORS, LLC
C/O 2601 MAIN ST, SUITE 560
IRVINE, CA 92614

C  IRS Center where partnership filed return
Ogden, UT

D  ☐ Check if this is a publicly traded partnership (PTP)

### Part II — Information About the Partner

E  Partner's identifying number

F  Partner's name, address, city, state, and ZIP code

BETSY BOYD
3453 SUMMERSET CIRCLE
COSTA MESA, CA 92626

G  ☒ General partner or LLC member-manager    ☐ Limited partner or other LLC member

H  ☒ Domestic partner    ☐ Foreign partner

I1  What type of entity is this partner? (see instr)  Individual

I2  If this partner is a retirement plan (IRA/SEP/Keogh/etc),
check here (see instructions) .................. ☐

J  Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 5 % | 5 % |
| Loss | 5 % | 5 % |
| Capital | 5 % | 5 % |

K  Partner's share of liabilities at year end:

Nonrecourse ...................... $
Qualified nonrecourse financing ....... $ 190,666.
Recourse .......................... $

L  Partner's capital account analysis:

Beginning capital account............. $ -29,069.
Capital contributed during the year..... $
Current year increase (decrease)....... $ -2,709.
Withdrawals and distributions.......... $ ( 15,700.)
Ending capital account................ $ -47,478.

☒ Tax basis  ☐ GAAP  ☐ Section 704(b) book
☐ Other (explain)

M  Did the partner contribute property with a built-in gain or loss?
☐ Yes  ☒ No
If 'Yes', attach statement (see instructions)

FOR IRS USE ONLY

BAA For Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2012

PTPA0312L  01/02/13

Partner 3

EXHIBIT "9"
Page 6 of 40

Schedule K-1 (Form 1065) 2012   **WESTCLIFF INVESTORS, LLC**                                      Page 2

This list identifies the codes used on Schedule K-1 for all partners and provides summarized reporting information for partners who file Form 1040. For detailed reporting and filing information, see the separate Partner's Instructions for Schedule K-1 and the instructions for your income tax return.

| | | Code | Report on |
|---|---|---|---|
| **1** | **Ordinary business income (loss).** Determine whether the income (loss) is passive or nonpassive and enter on your return as follows. | **J** Work opportunity credit | |
| | *Report on* | **K** Disabled access credit | |
| Passive loss | See the Partner's Instructions | **L** Empowerment zone and renewal community employment credit | |
| Passive income | Schedule E, line 28, column (g) | **M** Credit for increasing research activities | See the Partner's Instructions |
| Nonpassive loss | Schedule E, line 28, column (h) | **N** Credit for employer social security and Medicare taxes | |
| Nonpassive income | Schedule E, line 28, column (j) | **O** Backup withholding | |
| **2** Net rental real estate income (loss) | See the Partner's Instructions | **P** Other credits | |
| **3** Other net rental income (loss) | | **16 Foreign transactions** | |
| Net income | Schedule E, line 28, column (g) | **A** Name of country or U.S. possession | |
| Net loss | See the Partner's Instructions | **B** Gross income from all sources | Form 1116, Part I |
| **4** Guaranteed payments | Schedule E, line 28, column (j) | **C** Gross income sourced at partner level | |
| **5** Interest income | Form 1040, line 8a | *Foreign gross income sourced at partnership level* | |
| **6 a** Ordinary dividends | Form 1040, line 9a | **D** Passive category | |
| **6 b** Qualified dividends | Form 1040, line 9b | **E** General category | Form 1116, Part I |
| **7** Royalties | Schedule E, line 4 | **F** Other | |
| **8** Net short-term capital gain (loss) | Schedule D, line 5 | *Deductions allocated and apportioned at partner level* | |
| **9 a** Net long-term capital gain (loss) | Schedule D, line 12 | **G** Interest expense | Form 1116, Part I |
| **9 b** Collectibles (28%) gain (loss) | 28% Rate Gain Worksheet, line 4 (Schedule D Instructions) | **H** Other | Form 1116, Part I |
| | | *Deductions allocated and apportioned at partnership level to foreign source income* | |
| **9 c** Unrecaptured section 1250 gain | See the Partner's Instructions | **I** Passive category | |
| **10** Net section 1231 gain (loss) | See the Partner's Instructions | **J** General category | Form 1116, Part I |
| **11** Other income (loss) | | **K** Other | |
| *Code* | | *Other information* | |
| **A** Other portfolio income (loss) | See the Partner's Instructions | **L** Total foreign taxes paid | Form 1116, Part II |
| **B** Involuntary conversions | See the Partner's Instructions | **M** Total foreign taxes accrued | Form 1116, Part II |
| **C** Section 1256 contracts and straddles | Form 6781, line 1 | **N** Reduction in taxes available for credit | Form 1116, line 12 |
| **D** Mining exploration costs recapture | See Pub 535 | **O** Foreign trading gross receipts | Form 8873 |
| **E** Cancellation of debt | Form 1040, line 21 or Form 982 | **P** Extraterritorial income exclusion | Form 8873 |
| **F** Other income (loss) | See the Partner's Instructions | **Q** Other foreign transactions | See the Partner's Instructions |
| **12** Section 179 deduction | See the Partner's Instructions | **17 Alternative minimum tax (AMT) items** | |
| **13** Other deductions | | **A** Post-1986 depreciation adjustment | |
| **A** Cash contributions (50%) | | **B** Adjusted gain or loss | |
| **B** Cash contributions (30%) | | **C** Depletion (other than oil & gas) | See the Partner's Instructions and the Instructions for Form 6251 |
| **C** Noncash contributions (50%) | See the Partner's Instructions | **D** Oil, gas, & geothermal — gross income | |
| **D** Noncash contributions (30%) | | **E** Oil, gas, & geothermal — deductions | |
| **E** Capital gain property to a 50% organization (30%) | | **F** Other AMT items | |
| **F** Capital gain property (20%) | | **18 Tax-exempt income and nondeductible expenses** | |
| **G** Contributions (100%) | | **A** Tax-exempt interest income | Form 1040, line 8b |
| **H** Investment interest expense | Form 4952, line 1 | **B** Other tax-exempt income | See the Partner's Instructions |
| **I** Deductions — royalty income | Schedule E, line 19 | **C** Nondeductible expenses | See the Partner's Instructions |
| **J** Section 59(e)(2) expenditures | See the Partner's Instructions | **19 Distributions** | |
| **K** Deductions — portfolio (2% floor) | Schedule A, line 23 | **A** Cash and marketable securities | |
| **L** Deductions — portfolio (other) | Schedule A, line 28 | **B** Distribution subject to section 737 | See the Partner's Instructions |
| **M** Amounts paid for medical insurance | Schedule A, line 1 or Form 1040, line 29 | **C** Other property | |
| **N** Educational assistance benefits | See the Partner's Instructions | **20 Other information** | |
| **O** Dependent care benefits | Form 2441, line 12 | **A** Investment income | Form 4952, line 4a |
| **P** Preproductive period expenses | See the Partner's Instructions | **B** Investment expenses | Form 4952, line 5 |
| **Q** Commercial revitalization deduction from rental real estate activities | See Form 8582 Instructions | **C** Fuel tax credit information | Form 4136 |
| **R** Pensions and IRAs | See the Partner's Instructions | **D** Qualified rehabilitation expenditures (other than rental real estate) | See the Partner's Instructions |
| **S** Reforestation expense deduction | See the Partner's Instructions | **E** Basis of energy property | See the Partner's Instructions |
| **T** Domestic production activities information | See Form 8903 Instructions | **F** Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| **U** Qualified production activities income | Form 8903, line 7b | **G** Recapture of low-income housing credit (other) | Form 8611, line 8 |
| **V** Employer's Form W-2 wages | Form 8903, line 17 | **H** Recapture of investment credit | See Form 4255 |
| **W** Other deductions | See the Partner's Instructions | **I** Recapture of other credits | See the Partner's Instructions |
| **14** Self-employment earnings (loss) | | **J** Look-back interest — completed long-term contracts | See Form 8697 |
| *Note. If you have a section 179 deduction or any partner-level deductions, see the Partner's Instructions before completing Schedule SE.* | | **K** Look-back interest — income forecast method | See Form 8866 |
| **A** Net earnings (loss) from self-employment | Schedule SE, Section A or B | **L** Dispositions of property with section 179 deductions | |
| **B** Gross farming or fishing income | See the Partner's Instructions | **M** Recapture of section 179 deduction | |
| **C** Gross non-farm income | See the Partner's Instructions | **N** Interest expense for corporate partners | |
| **15** Credits | | **O** Section 453(l)(3) information | |
| **A** Low-income housing credit (section 42(j)(5)) from pre-2008 buildings | | **P** Section 453A(c) information | |
| **B** Low-income housing credit (other) from pre-2008 buildings | | **Q** Section 1260(b) information | See the Partner's Instructions |
| **C** Low-income housing credit (section 42(j)(5)) from post-2007 buildings | See the Partner's Instructions | **R** Interest allocable to production expenditures | |
| **D** Low-income housing credit (other) from post-2007 buildings | | **S** CCF nonqualified withdrawals | |
| **E** Qualified rehabilitation expenditures (rental real estate) | | **T** Depletion information — oil and gas | |
| **F** Other rental real estate credits | | **U** Amortization of reforestation costs | |
| **G** Other rental credits | | **V** Unrealized business taxable income | |
| **H** Undistributed capital gains credit | Form 1040, line 71; check box a | **W** Precontribution gain (loss) | |
| **I** Alcohol and cellulosic biofuel fuels credit | See the Partner's Instructions | **X** Section 108(i) information | |
| | | **Y** Other information | |

Partner 3:  BETSY BOYD

PTPA0312L  01/02/13              Schedule K-1 (Form 1065) 2012

286

WESTCLIFF INVESTORS, LLC

| Schedule K-1 (Form 1065) 2012 | Supplemental Information | Page 3 |

**Box 2**
**Rental Real Estate Activities**

| Property Type and Address | Gross Income | Net Expenses | Net Income | Passive Nonpass | Sec. 1231 Total |
|---|---|---|---|---|---|
| Type: 4 - Commercial | | | | | |
| 1901 WESTCLIFF DRIVE NEWPORT BEACH, CA | 24,599. | 26,985. $ | -2,386. | Passive | |
| Passthrough Rental Real Estate | | | -199. | | |
| Rounding or Specially Allocated | | | | | |
| Net Income (Loss) Adjustment | | | 1. | | |
| | | Total $ | -2,584. | | |

Partner 3:  BETSY BOYD

SPSL1201L  05/21/12

EXHIBIT "9"
Page 8 of 40

WESTCLIFF INVESTORS, LLC

## 2012 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

Partner's Name

BETSY BOYD

Partner's identification number

| Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|
| A  EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| B  JAVAHER INVESTORS LLC | | Passive | |
| C | | | |
| D | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | **A** | **B** | **C** | **D** |
| Income (Loss) | Ordinary business income (loss) .......................... | -32. | -7. | | |
| | Net rental real estate income (loss) ...................... | -547. | 349. | | |
| | Other net rental income (loss) ........................... | | | | |
| | Guaranteed payments .................................... | | | | |
| | Interest................................................ | | | | |
| | Ordinary dividends ..................................... | | | | |
| | Qualified dividends ..................................... | | | | |
| | Royalties .............................................. | | | | |
| | Net short-term capital gain (loss)........................ | | | | |
| | Net long-term capital gain (loss) ........................ | | | | |
| | Collectibles (28%) gain (loss) ........................... | | | | |
| | Unrecaptured section 1250 gain.......................... | | | | |
| | Net section 1231 gain (loss) ............................ | | | | |
| | Other income (loss)..................................... | | | | |
| Deductions | Section 179 deduction................................... | | | | |
| | Charitable contributions ................................ | | | | |
| | Investment interest expense ............................. | | | | |
| | Section 59(e)(2) expense: Intangible Drilling costs ........ | | | | |
| | Section 59(e)(2) expense: Dry Hole expense.............. | | | | |
| | Other section 59(e)(2) expenses.......................... | | | | |
| | Other deductions........................................ | | | | |
| Self-Employment | Net earnings (loss) from self-employment................. | | -7. | | |
| | Gross farming or fishing income......................... | | | | |
| | Gross nonfarm income................................... | | | | |
| Credits | Low-income housing credit: | | | | |
| | (A)  Section 42(j)(5): Pre-2008.......................... | | | | |
| | (B)  Other: Pre-2008................................... | | | | |
| | (C)  Section 42(j)(5): Post-2007......................... | | | | |
| | (D)  Other: Post-2007.................................. | | | | |
| | Qualified rehabilitation expenditures related to rental real estate act...... | | | | |
| | Other rental real estate credits.......................... | | | | |
| | Other rental credits..................................... | | | | |
| | Work opportunity credit................................. | | | | |
| | Alcohol and cellulosic biofuel fuels credit ................. | | | | |
| | Disabled access credit................................... | | | | |
| | Empowerment zone employment credit.................... | | | | |
| | Credit for increasing research activities................... | | | | |
| | Credit for employer Soc. Sec. tax paid on certain employee tips .......... | | | | |
| | Orphan drug credit...................................... | | | | |
| | Enhanced oil recovery credit............................. | | | | |
| | Indian employment credit................................ | | | | |
| | Small employer pension plan startup costs credit.......... | | | | |
| | Credit for employer-provided childcare.................... | | | | |
| | Alternative motor vehicle credit .......................... | | | | |
| | Other credits........................................... | | | | |

Partner 3:  BETSY BOYD

PTPL1102L  06/04/12

288

WESTCLIFF INVESTORS, LLC

## 2012 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

Note: The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner's Name | | | | Partner's identification number | | |
|---|---|---|---|---|---|---|
| BETSY BOYD | | | | | | |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year | | |
|---|---|---|---|---|---|---|
| A | EYE STREET MEDICAL INVESTORS, LLC | | Passive | | | |
| B | JAVAHER INVESTORS LLC | | Passive | | | |
| C | | | | | | |
| D | | | | | | |

| | Passthrough Entities | | | |
|---|---|---|---|---|
| | A | B | C | D |
| **Foreign Transactions** Gross income from all sources................. | | | | |
| Gross income sourced at partner level.................. | | | | |
| Foreign gross income sourced at partnership level — Passive category......... | | | | |
| General category......... | | | | |
| Other......... | | | | |
| Deductions allocated & apportioned at partner level — Interest expense......... | | | | |
| Other......... | | | | |
| Deductions allocated & apportioned at partnership level — Passive category......... | | | | |
| General category......... | | | | |
| Other......... | | | | |
| Foreign taxes paid ...................... | | | | |
| Foreign taxes accrued...................... | | | | |
| Reduction in tax available for credit ......... | | | | |
| Foreign trading gross receipts................. | | | | |
| Extraterritorial income exclusion ................ | | | | |
| Other foreign transactions ................. | | | | |
| **Alternative Minimum Tax (AMT) Items** Post-1986 depreciation adjustment................. | | | | |
| Adjusted gain or loss................. | | | | |
| Depletion (other than oil and gas)................. | | | | |
| Oil, gas and geothermal properties — gross income ....... | | | | |
| Oil, gas and geothermal properties — deductions.......... | | | | |
| A.C.E. depreciation adjustment ................ | | | | |
| A.C.E. adjusted gain or (loss)................ | | | | |
| Accel. depreciation on real property placed in service before 1987........ | | | | |
| Accel. depr. on leased personal prop. placed in service before 1987........ | | | | |
| Other AMT items................. | | | | |
| **Tax-Exempt Inc & Nondeduc-tible Exp** Tax-exempt interest income................. | | | | |
| Other tax-exempt income................. | | | | |
| Nondeductible expenses................. | | | | |
| **Other Information** Investment income................. | | | | |
| Investment expenses................. | | | | |
| Recapture of low-income housing credit — 42(j)(5) partnerships ......... | | | | |
| Recapture of low-income housing credit — other................. | | | | |
| Supplemental Information: | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Partner 3:   BETSY BOYD

PTPL1103L  06/04/12

| TAXABLE YEAR **Member's Share of Income,** | CALIFORNIA SCHEDULE |
|---|---|
| **2012** **Deductions, Credits, etc.** | **K-1 (568)** |

For calendar year 2012 or fiscal year beginning month _____ day _____ year 2012, and ending month _____ day _____ year _____

| **Member's identifying number** _____ | **LLC's FEIN** _____ |
|---|---|
| Member's name, address, city, state, and ZIP Code | **California Secretary of State file number** |
| | LLC's name, address, city, state, and ZIP Code |
| BETSY BOYD | WESTCLIFF INVESTORS, LLC |
| 3453 SUMMERSET CIRCLE | C/O 2601 MAIN ST, SUITE 560 |
| COSTA MESA, CA 92626 | IRVINE, CA 92614 |

**A** What type of entity is this member?
- (1) [X] Individual
- (2) [ ] S Corporation
- (3) [ ] Estate/Trust
- (4) [ ] C Corporation
- (5) [ ] General Partnership
- (6) [ ] Limited Partnership
- (7) [ ] LLP
- (8) [ ] LLC
- (9) [ ] IRA/Keogh/SEP
- (10) [ ] Exempt Organization
- (11) [ ] Disregarded Entity

**B** Is this member a foreign member?........ ● ___ Yes ___ X No

**C** Enter member's percentage (without regard to special allocations) of:

| | | (i) Before decrease or termination | (ii) End of year |
|---|---|---|---|
| Profit sharing........ | | _____ % | 5.0000 % |
| Loss sharing......... | | _____ % | 5.0000 % |
| Ownership of capital.. | | _____ % | 5.0000 % |

**D** Member's share of liabilities:
- Nonrecourse............................... ● $ _____
- Qualified nonrecourse financing........... ● $ 190,666.
- Other.................................... ● $ _____

**E** Reportable transaction or tax shelter registration number(s)............

**F (1)** Check here if this is a publicly traded partnership as defined in IRC Section 469(k)(2)........................ [ ]

**(2)** Check here if this is an investment partnership (R&TC Sections 17955 and 23040.1)........................ [ ]

**G** Check here if this is: ●
(1) [ ] A final Schedule K-1 (568)   (2) [ ] An amended Schedule K-1 (568)

**H** Is this member a resident of California?...... X Yes ▶ ___ No

**I** Analysis of member's capital account: Check the box ● (1) [X] Tax Basis   (2) [ ] GAAP   (3) [ ] Sec 704(b) Book   (4) [ ] Other (explain)

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Member's share of line 3, line 4, and line 7 Form 568, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year, combine column (a) through column (d) |
|---|---|---|---|---|
| ● -29,069. | ● | ● -2,709. | ● 15,700. ) | ● -47,478. |

**Caution:** Refer to Member's Instructions for Schedule K-1 (568) before entering information from this schedule on your California return.

| | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (1065) | (c) California adjustments | (d) Total amounts using California law. Combine col. (b) and col. (c) where applicable | (e) California source amounts and credits |
|---|---|---|---|---|---|
| | **1** Ordinary income (loss) from trade or business activities................ | -125. | 118. | ● -7. ▶ | |
| | **2** Net income (loss) from rental real estate activities........PG. 4 | -2,584. | 96. | ● -2,488. ▶ | |
| | **3** Net income (loss) from other rental activities.................. | | | ● ▶ | |
| | **4** Guaranteed payments to members..... | | | ● ▶ | |
| Income (Loss) | **5** Interest income................... | | | ● ▶ | |
| | **6** Dividends...................... | | | ● ▶ | |
| | **7** Royalties..................... | | | ● ▶ | |
| | **8** Net short-term capital gain (loss)..... | | | ● ▶ | |
| | **9** Net long-term capital gain (loss)...... | | | ● ▶ | |
| | **10a** Total gain under IRC Section 1231 (other than due to casualty or theft).. | | | ● ▶ | |
| | **b** Total loss under IRC Section 1231 (other than due to casualty or theft)... | | | ● ▶ | |
| | **11a** Other portfolio income (loss). Attach schedule.................. | | | ● ▶ | |
| | **b** Total other income. Attach schedule................... | | | ● ▶ | |
| | **c** Total other loss. Attach schedule.................. | | | ● ▶ | |

MEMBER 3

CALA0212L  12/24/12

EXHIBIT "9"
Page 11 of 40

WESTCLIFF INVESTORS, LLC

| | (a)<br>Distributive share items | (b)<br>Amounts from<br>federal Schedule K-1<br>(1065) | (c)<br>California<br>adjustments | (d)<br>Total amounts using<br>California law. Combine<br>column (b) and column (c) | (e)<br>California source<br>amounts and credits |
|---|---|---|---|---|---|
| **Deductions** | 12 Expense deduction for recovery property (IRC Section 179 and R&TC Sections 17267.2, 17267.6 and 17268) . . . . . . . . . . . . . . . . | | | | |
| | 13a Charitable contributions . . . . . . . . . . . . . . . . . . | | | | |
| | b Investment interest expense . . . . . . . . . | | | | |
| | c 1 Total expenditures to which an IRC Section 59(e) election may apply . . . . | | | | |
| | 2 Type of expenditures | | | | |
| | d Deductions related to portfolio income Attach schedule . . . . . . . . . . . . . . . . . | | | | |
| | e Other deductions. Attach schedule . . . . . . . . . . . . . . . | | | | |
| **Credits** | 15a Total withholding (equals amount on Form 592-B if calendar year LLC) . . . . . | | | ● | ► |
| | b Low-income housing credit . . . . . . . . . | | | | |
| | c Credits other than line 15b related to rental real estate activities. Attach schedule . . . . . . . . . . . . . . . . | | | | |
| | d Credits related to other rental activities. Attach schedule . . . . . . . . . | | | | |
| | e Nonconsenting nonresident member's tax paid by LLC . . . . . . . . . . . . . . . . . | | | | |
| | f Other credits — Attach required schedules or statements . . . . . . . . . . . . . . . | | | | |
| | g New jobs credit . . . . . . . . . . . . . . . | | | | |
| **Alternative Minimum Tax (AMT) Items** | 17a Depreciation adjustment on property placed in service after 1986 . . . . . . . . | | | | |
| | b Adjusted gain or loss . . . . . . . . . . . . . . | | | | |
| | c Depletion (other than oil and gas) . . . . . . . | | | | |
| | d Gross income from oil, gas, and geothermal properties. . . . . . . . . . . . . | | | | |
| | e Deductions allocable to oil, gas, and geothermal properties . . . . . . . . . | | | | |
| | f Other alternative minimum tax items. Attach schedule . . . . . . . . . . . . . . . | | | | |
| **Tax-exempt Income and Nondeductible Expenses** | 18a Tax-exempt interest income . . . . . . . . | | | | |
| | b Other tax-exempt income . . . . . . . . . | | | | |
| | c Nondeductible expenses . . . . . . . . . . . . . . . . . . | | | | |
| **Distributions** | 19a Distributions of money (cash and marketable securities) . . . . . | 15,700. | | 15,700. | |
| | b Distributions of property other than money . . . . . . . . . . . . . . . . . . | | | | |
| **Other Information** | 20a Investment income . . . . . . . . . . . . . . . | | | | |
| | b Investment expenses . . . . . . . . . . . . | | | | |
| | c Other information. See instructions . . . . | | | SEE ATTACHED | |

MEMBER 3:   BETSY BOYD

Side 2 Schedule K-1 (568) 2012    059    7902124    CALA0212L 12/24/12

WESTCLIFF INVESTORS, LLC

**Other Member Information**

Table 1 — Member's share of nonbusiness income from intangibles (source of income is dependent on residence or commercial domicile of the member):

| | | | | | |
|---|---|---|---|---|---|
| Interest | $_____ | Sec 1231 Gains/Losses | $_____ | Capital Gains/Losses | $_____ |
| Dividends | $_____ | Royalties | $_____ | Other | $_____ |

FOR USE BY MEMBERS ONLY — See instructions.

**Table 2** — Member's share of distributive items.

A  Member's share of the LLC's business income. See instructions .......................... $_____

B  Member's share of nonbusiness income from real and tangible personal property sourced or allocable to California.

| | | | |
|---|---|---|---|
| Capital Gains/Losses | $_____ | Rents/Royalties | $_____ |
| Section 1231 Gains/Losses | $_____ | Other | $_____ |

C  Member's distributive share of the LLC's property, payroll, and sales:  California Sales – Doing Business Test  $_____

| Factors | Total within and outside California | Total within California |
|---|---|---|
| Property:  Beginning | $ | $ |
| Ending | $ | $ |
| Annual rent expense | $ | $ |
| Payroll | $ | $ |
| Sales | $ | $ |

MEMBER 3:  BETSY BOYD

EXHIBIT "9"
Page 13 of 40

WESTCLIFF INVESTORS, LLC

Schedule K-1 (Form 568) 2012          Supplemental Information (continued)                          Page  4

**Line 2, column (d)**
**Rental Real Estate Activities**

| Property Address | Gross Income | Net Expenses | Net Income | Passive Nonpass | Sec. 1231 Total |
|---|---|---|---|---|---|
| 1901 WESTCLIFF DRIVE NEWPORT BEACH, CA | $ 24,599. | 27,011. $ | -2,412. | Passive | |
| Passthrough Rental Real Estate | | | -76. | | |
| | | Total $ | -2,488. | | |

**Line 20c - Column d**
**Other Information**

Proportionate Int. of Aggregate Gross Receipts................................. $        30,099.
                                                          Total $        30,099.

Member 3:  BETSY BOYD

SPSL1201L  05/21/12

EXHIBIT "9"
Page 14 of 40

WESTCLIFF INVESTORS, LLC

# CALIFORNIA
## 2012 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1, pages 1 & 2.

| Partner's Name | | | Partner's Identification number |
|---|---|---|---|
| BETSY BOYD | | | |

| Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|
| A  EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| B  JAVAHER INVESTORS LLC | | Passive | |
| C | | | |
| D | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | **A** | **B** | **C** | **D** |
| Income (Loss) | Ordinary income (loss) from trade or business activities... | | −7. | | |
| | Net income (loss) from rental real estate activities........ | −425. | 349. | | |
| | Net income (loss) from other rental activities ............. | | | | |
| | Interest ...................................................... | | | | |
| | Dividends .................................................... | | | | |
| | Royalties..................................................... | | | | |
| | Short term capital gain (loss)............................... | | | | |
| | Long term capital gain (loss) ............................... | | | | |
| | Other portfolio income (loss) ............................... | | | | |
| | Guaranteed payments.......................................... | | | | |
| | Net gain (loss) under sec. 1231 (other than due to casualty or theft) ..... | | | | |
| | Other income (loss)........................................... | | | | |
| Deductions | Charitable contributions..................................... | | | | |
| | Section 179 expense deduction................................ | | | | |
| | Deductions related to portfolio income ...................... | | | | |
| | Other deductions ............................................. | | | | |
| | Interest expense on investment debts........................ | | | | |
| Credits | Withholding on partners....................................... | | | | |
| | Low-income housing credit .................................... | | | | |
| | Other credits related to rental real estate activities........ | | | | |
| | Credits related to other rental activities.................... | | | | |
| | Other Credits................................................. | | | | |
| Adjustments and Tax Preference Items | Depreciation adjustment on property placed in service after 1986........ | | | | |
| | Adjusted gain or loss ........................................ | | | | |
| | Depletion (other than oil and gas)........................... | | | | |
| | Gross income from oil, gas or geothermal properties.......... | | | | |
| | Deductions allocable to oil, gas or geothermal properties.. | | | | |
| | A.C.E. depreciation adjustment............................... | | | | |
| | A.C.E. adjusted gain or (loss) ............................... | | | | |
| | Accel. Depreciation on real property placed in service before 1987....... | | | | |
| | Accel. Depr. on leased personal prop. placed in service before 1987...... | | | | |
| | Other adjustments and tax preference items.............. | | | | |
| Other | Section 59(e) expense: Intangible Drilling Costs ........... | | | | |
| | Section 59(e) expense: Dry Hole expense................ | | | | |
| | Other Section 59(e) expenses ................................ | | | | |
| | Tax-exempt interest income................................... | | | | |
| | Other tax-exempt income..................................... | | | | |
| | Nondeductible expenses ...................................... | | | | |
| | Distributions of money (cash and marketable securities)... | | | | |
| | Distributions of property other than money................. | | | | |

CAPL0312L  05/21/12

Member 3:  BETSY BOYD

WESTCLIFF INVESTORS, LLC

### CALIFORNIA
### 2012 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

Page 2

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1, pages 1 & 2.

Partner's Name

BETSY BOYD

Partner's Identification number

| Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|
| A  EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| B  JAVAHER INVESTORS LLC | | Passive | |
| C | | | |
| D | | | |

| | Passthrough Entities | | | |
|---|---|---|---|---|
| Other Items: | A | B | C | D |
| Proportionate interest of aggregate gross receipts......... | 3,795. | 1,704. | | |

Other

CAPL0312L  05/21/12

Member 3:  BETSY BOYD

295

☐ Final K-1    ☐ Amended K-1

651113

OMB No. 1545-0099

## Schedule K-1
(Form 1065)

## 2013

For calendar year 2013, or tax
year beginning _____, 2013
ending _____, .

Department of the Treasury
Internal Revenue Service

## Partner's Share of Income, Deductions, Credits, etc.    ► See separate instructions.

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) -112. | 15 | Credits |
| 2 | Net rental real estate income (loss) 5,876. | | |
| * 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6 a | Ordinary dividends | | |
| 6 b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9 a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| 9 b | Collectibles (28%) gain (loss) | | |
| 9 c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| 12 | Section 179 deduction | 19 | Distributions A 4,000. |
| 13 | Other deductions A 51. | 20 | Other information |
| 14 | Self-employment earnings (loss) A -92 | | |

### Part I    Information About the Partnership

A   Partnership's employer identification number

B   Partnership's name, address, city, state, and ZIP code

WESTCLIFF INVESTORS, LLC
C/O 2601 MAIN ST, SUITE 560
IRVINE, CA 92614

C   IRS Center where partnership filed return
Ogden, UT

D   ☐ Check if this is a publicly traded partnership (PTP)

### Part II    Information About the Partner

E   Partner's identifying number

F   Partner's name, address, city, state, and ZIP code

BETSY BOYD
3453 SUMMERSET CIRCLE
COSTA MESA, CA 92626

G   ☒ General partner or LLC member-manager    ☐ Limited partner or other LLC member

H   ☒ Domestic partner    ☐ Foreign partner

I1  What type of entity is this partner? ........ Individual

I2  If this partner is a retirement plan (IRA/SEP/Keogh/etc), check here (see instructions) ....................... ☐

J   Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 5 % | 5 % |
| Loss | 5 % | 5 % |
| Capital | 5 % | 5 % |

K   Partner's share of liabilities at year end:

Nonrecourse ......................... $
Qualified nonrecourse financing ........ $  211,867.
Recourse ............................ $

L   Partner's capital account analysis:

Beginning capital account .............. $  -49,037.
Capital contributed during the year ..... $
Current year increase (decrease) ....... $  5,888.
Withdrawals and distributions .......... $ ( 4,000.)
Ending capital account ................ $  -47,149.

☒ Tax basis    ☐ GAAP    ☐ Section 704(b) book
☐ Other (explain)

M   Did the partner contribute property with a built-in gain or loss?
☐ Yes    ☒ No
If 'Yes', attach statement (see instructions)

*See attached statement for additional information.

F O R   I R S   U S E   O N L Y

BAA  For Paperwork Reduction Act Notice, see Instructions for Form 1065.    Schedule K-1 (Form 1065) 2013

PTPA0312L  12/05/13

Partner 3

Schedule K-1 (Form 1065) 2013    WESTCLIFF INVESTORS, LLC    Page **2**

This list identifies the codes used on Schedule K-1 for all partners and provides summarized reporting information for partners who file Form 1040. For detailed reporting and filing information, see the separate Partner's Instructions for Schedule K-1 and the instructions for your income tax return.

| | | |
|---|---|---|
| **1** | **Ordinary business income (loss).** Determine whether the income (loss) is passive or nonpassive and enter on your return as follows. | |
| | | *Report on* |
| | Passive loss | See the Partner's Instructions |
| | Passive income | Schedule E, line 28, column (g) |
| | Nonpassive loss | Schedule E, line 28, column (h) |
| | Nonpassive income | Schedule E, line 28, column (j) |
| **2** | **Net real estate income (loss)** | See the Partner's Instructions |
| **3** | **Other net rental income (loss)** | |
| | Net income | Schedule E, line 28, column (g) |
| | Net loss | See the Partner's Instructions |
| **4** | **Guaranteed payments** | Schedule E, line 28, column (j) |
| **5** | **Interest income** | Form 1040, line 8a |
| **6 a** | **Ordinary dividends** | Form 1040, line 9a |
| **6 b** | **Qualified dividends** | Form 1040, line 9b |
| **7** | **Royalties** | Schedule E, line 4 |
| **8** | **Net short-term capital gain (loss)** | Schedule D, line 5 |
| **9 a** | **Net long-term capital gain (loss)** | Schedule D, line 12 |
| **9 b** | **Collectibles (28%) gain (loss)** | 28% Rate Gain Worksheet, line 4 (Schedule D Instructions) |
| **9 c** | **Unrecaptured section 1250 gain** | See the Partner's Instructions |
| **10** | **Net section 1231 gain (loss)** | See the Partner's Instructions |
| **11** | **Other income (loss)** | |
| | *Code* | |
| | A  Other portfolio income (loss) | See the Partner's Instructions |
| | B  Involuntary conversions | See the Partner's Instructions |
| | C  Section 1256 contracts and straddles | Form 6781, line 1 |
| | D  Mining exploration costs recapture | See Pub 535 |
| | E  Cancellation of debt | Form 1040, line 21 or Form 982 |
| | F  Other income (loss) | See the Partner's Instructions |
| **12** | **Section 179 deduction** | See the Partner's Instructions |
| **13** | **Other deductions** | |
| | A  Cash contributions (50%) | |
| | B  Cash contributions (30%) | |
| | C  Noncash contributions (50%) | |
| | D  Noncash contributions (30%) | See the Partner's instructions |
| | E  Capital gain property to a 50% organization (30%) | |
| | F  Capital gain property (20%) | |
| | G  Contributions (100%) | |
| | H  Investment interest expense | Form 4952, line 1 |
| | I  Deductions — royalty income | Schedule E, line 19 |
| | J  Section 59(e)(2) expenditures | See the Partner's Instructions |
| | K  Deductions — portfolio (2% floor) | Schedule A, line 23 |
| | L  Deductions — portfolio (other) | Schedule A, line 28 |
| | M  Amounts paid for medical insurance | Schedule A, line 1 or Form 1040, line 29 |
| | N  Educational assistance benefits | See the Partner's Instructions |
| | O  Dependent care benefits | Form 2441, line 12 |
| | P  Preproductive period expenses | See the Partner's Instructions |
| | Q  Commercial revitalization deduction from rental real estate activities | See Form 8582 Instructions |
| | R  Pensions and IRAs | See the Partner's Instructions |
| | S  Reforestation expense deduction | See the Partner's Instructions |
| | T  Domestic production activities information | See Form 8903 Instructions |
| | U  Qualified production activities income | Form 8903, line 7b |
| | V  Employer's Form W-2 wages | Form 8903, line 17 |
| | W  Other deductions | See the Partner's Instructions |
| **14** | **Self-employment earnings (loss)** | |

**Note.** *If you have a section 179 deduction or any partner-level deductions, see the Partner's Instructions before completing Schedule SE.*

| | | |
|---|---|---|
| | A  Net earnings (loss) from self-employment | Schedule SE, Section A or B |
| | B  Gross farming or fishing income | See the Partner's Instructions |
| | C  Gross non-farm income | See the Partner's Instructions |
| **15** | **Credits** | |
| | A  Low-income housing credit (section 42(j)(5)) from pre-2008 buildings | |
| | B  Low-income housing credit (other) from pre-2008 buildings | |
| | C  Low-income housing credit (section 42(j)(5)) from post-2007 buildings | |
| | D  Low-income housing credit (other) from post-2007 buildings | See the Partner's Instructions |
| | E  Qualified rehabilitation expenditures (rental real estate) | |
| | F  Other rental real estate credits | |
| | G  Other rental credits | |
| | H  Undistributed capital gains credit | Form 1040, line 71; check box a |
| | I  Biofuel producer credit | |
| | J  Work opportunity credit | See the Partner's Instructions |
| | K  Disabled access credit | |

| | | |
|---|---|---|
| | *Code* | *Report on* |
| | L  Empowerment zone and renewal community employment credit | See the Partner's Instructions |
| | M  Credit for increasing research activities | |
| | N  Credit for employer social security and Medicare taxes | |
| | O  Backup withholding | |
| | P  Other credits | |
| **16** | **Foreign transactions** | |
| | A  Name of country or U.S. possession | |
| | B  Gross income from all sources | Form 1116, Part I |
| | C  Gross income sourced at partner level | |
| | *Foreign gross income sourced at partnership level* | |
| | D  Passive category | |
| | E  General category | Form 1116, Part I |
| | F  Other | |
| | *Deductions allocated and apportioned at partner level* | |
| | G  Interest expense | Form 1116, Part I |
| | H  Other | Form 1116, Part I |
| | *Deductions allocated and apportioned at partnership level to foreign source income* | |
| | I  Passive category | |
| | J  General category | Form 1116, Part I |
| | K  Other | |
| | *Other information* | |
| | L  Total foreign taxes paid | Form 1116, Part II |
| | M  Total foreign taxes accrued | Form 1116, Part II |
| | N  Reduction in taxes available for credit | Form 1116, line 12 |
| | O  Foreign trading gross receipts | Form 8873 |
| | P  Extraterritorial income exclusion | Form 8873 |
| | Q  Other foreign transactions | See the Partner's Instructions |
| **17** | **Alternative minimum tax (AMT) items** | |
| | A  Post-1986 depreciation adjustment | |
| | B  Adjusted gain or loss | |
| | C  Depletion (other than oil & gas) | See the Partner's Instructions and the Instructions for Form 6251 |
| | D  Oil, gas, & geothermal — gross income | |
| | E  Oil, gas, & geothermal — deductions | |
| | F  Other AMT items | |
| **18** | **Tax-exempt income and nondeductible expenses** | |
| | A  Tax-exempt interest income | Form 1040, line 8b |
| | B  Other tax-exempt income | See the Partner's Instructions |
| | C  Nondeductible expenses | See the Partner's Instructions |
| **19** | **Distributions** | |
| | A  Cash and marketable securities | |
| | B  Distribution subject to section 737 | See the Partner's Instructions |
| | C  Other property | |
| **20** | **Other information** | |
| | A  Investment income | Form 4952, line 4a |
| | B  Investment expenses | Form 4952, line 5 |
| | C  Fuel tax credit information | Form 4136 |
| | D  Qualified rehabilitation expenditures (other than rental real estate) | See the Partner's Instructions |
| | E  Basis of energy property | See the Partner's Instructions |
| | F  Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| | G  Recapture of low-income housing credit (other) | Form 8611, line 8 |
| | H  Recapture of investment credit | See Form 4255 |
| | I  Recapture of other credits | See the Partner's Instructions |
| | J  Look-back interest — completed long-term contracts | See Form 8697 |
| | K  Look-back interest — income forecast method | See Form 8866 |
| | L  Dispositions of property with section 179 deductions | |
| | M  Recapture of section 179 deduction | |
| | N  Interest expense for corporate partners | |
| | O  Section 453(l)(3) information | |
| | P  Section 453A(c) information | |
| | Q  Section 1260(b) information | |
| | R  Interest allocable to production expenditures | See the Partner's Instructions |
| | S  CCF nonqualified withdrawals | |
| | T  Depletion information — oil and gas | |
| | U  Amortization of reforestation costs | |
| | V  Unrelated business taxable income | |
| | W  Precontribution gain (loss) | |
| | X  Section 108(i) information | |
| | Y  Net investment income | |
| | Z  Other information | |

**Partner 3:  BETSY BOYD**

PTPA0312L  12/05/13      Schedule **K-1** (Form 1065) 2013

EXHIBIT "9"
Page 18 of 40

WESTCLIFF INVESTORS, LLC

Schedule K-1 (Form 1065) 2013      **Supplemental Information**      Page  **3**

**Box 2**
**Rental Real Estate Activities**

| Property Type and Address | Gross Income | Net Expenses | Net Income | Passive Nonpass | Sec. 1231 Total |
|---|---|---|---|---|---|
| Type: 4 - Commercial | | | | | |
| 1901 WESTCLIFF DRIVE NEWPORT BEACH, CA | | | | | |
| | 26,700. | 22,066. $ | 4,634. | Passive | |
| Passthrough Rental Real Estate | | | 1,242. | | |
| | | Total $ | 5,876. | | |

Partner 3:  BETSY BOYD

SPSL1201L  05/16/13

WESTCLIFF INVESTORS, LLC

## 2013 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner's Name | Partner's Identification number |
|---|---|
| BETSY BOYD | : |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|---|
| A | EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| B | JAVAHER INVESTORS LLC | | Passive | |
| C | | | | |
| D | | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **Income (Loss)** | Ordinary business income (loss) ........................ | -20. | -7. | | |
| | Net rental real estate income (loss) ..................... | 721. | 521. | | |
| | Other net rental income (loss) ......................... | | | | |
| | Guaranteed payments ................................ | | | | |
| | Interest ........................................... | | | | |
| | Ordinary dividends.................................. | | | | |
| | Qualified dividends................................. | | | | |
| | Royalties.......................................... | | | | |
| | Net short-term capital gain (loss) ..................... | | | | |
| | Net long-term capital gain (loss) ...................... | | | | |
| | Collectibles (28%) gain (loss)......................... | | | | |
| | Unrecaptured section 1250 gain........................ | | | | |
| | Net section 1231 gain (loss) .......................... | | | | |
| | Other income (loss).................................. | | | | |
| **Deductions** | Section 179 deduction................................ | | | | |
| | Charitable contributions ............................. | | | | |
| | Investment interest expense.......................... | | | | |
| | Section 59(e)(2) expense: Intangible Drilling costs ...... | | | | |
| | Section 59(e)(2) expense: Dry Hole expense............. | | | | |
| | Other section 59(e)(2) expenses ....................... | | | | |
| | Other deductions.................................... | | | | |
| **Self-Employ-ment** | Net earnings (loss) from self-employment .............. | | -7. | | |
| | Gross farming or fishing income ...................... | | | | |
| | Gross nonfarm income ............................... | | | | |
| **Credits** | Low-income housing credit: | | | | |
| | (A)   Section 42(j)(5): Pre-2008 ...................... | | | | |
| | (B)   Other: Pre-2008.............................. | | | | |
| | (C)   Section 42(j)(5): Post-2007..................... | | | | |
| | (D)   Other: Post-2007.............................. | | | | |
| | Qualified rehabilitation expenditures related to rental real estate act. ...... | | | | |
| | Other rental real estate credits........................ | | | | |
| | Other rental credits ................................. | | | | |
| | Work opportunity credit.............................. | | | | |
| | Biofuel producer credit .............................. | | | | |
| | Disabled access credit ............................... | | | | |
| | Empowerment zone employment credit................. | | | | |
| | Credit for increasing research activities.................. | | | | |
| | Credit for employer Soc. Sec. tax paid on certain employee tips ......... | | | | |
| | Orphan drug credit.................................. | | | | |
| | Enhanced oil recovery credit.......................... | | | | |
| | Indian employment credit............................ | | | | |
| | Small employer pension plan startup costs credit ......... | | | | |
| | Credit for employer-provided childcare.................. | | | | |
| | Alternative motor vehicle credit ....................... | | | | |
| | Other credits ...................................... | | | | |

Partner 3:  BETSY BOYD

PTPL1102L  12/18/13

WESTCLIFF INVESTORS, LLC

## 2013 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

Note: The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner's Name | | Partner's identification number |
|---|---|---|
| BETSY BOYD | | |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|---|
| A | EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| B | JAVAHER INVESTORS LLC | | Passive | |
| C | | | | |
| D | | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **Foreign Trans-actions** | Gross income from all sources............................ | | | | |
| | Gross income sourced at partner level............. | | | | |
| | Foreign gross income sourced at partnership level — Passive category......... | | | | |
| | General category......... | | | | |
| | Other...................... | | | | |
| | Deductions allocated & apportioned at partner level — Interest expense.......... | | | | |
| | Other...................... | | | | |
| | Deductions allocated & apportioned at partnership level — Passive category......... | | | | |
| | General category......... | | | | |
| | Other...................... | | | | |
| | Foreign taxes paid...................................... | | | | |
| | Foreign taxes accrued................................... | | | | |
| | Reduction in tax available for credit................. | | | | |
| | Foreign trading gross receipts........................ | | | | |
| | Extraterritorial income exclusion...................... | | | | |
| | Other foreign transactions............................. | | | | |
| **Altern-ative Mini-mum Tax (AMT) Items** | Post-1986 depreciation adjustment.................... | | | | |
| | Adjusted gain or loss................................... | | | | |
| | Depletion (other than oil and gas)..................... | | | | |
| | Oil, gas and geothermal properties — gross income....... | | | | |
| | Oil, gas and geothermal properties — deductions.......... | | | | |
| | A.C.E. depreciation adjustment........................ | | | | |
| | A.C.E. adjusted gain or (loss)......................... | | | | |
| | Accel. depreciation on real property placed in service before 1987........ | | | | |
| | Accel. depr. on leased personal prop. placed in service before 1987...... | | | | |
| | Other AMT items........................................ | | | | |
| **Tax-Exempt Inc & Non-deduc-tible Exp** | Tax-exempt interest income............................ | | | | |
| | Other tax-exempt income............................... | | | | |
| | Nondeductible expenses................................ | | | | |
| **Other Infor-mation** | Investment income...................................... | | | | |
| | Investment expenses................................... | | | | |
| | Recapture of low-income housing credit — 42(j)(5) partnerships........ | | | | |
| | Recapture of low-income housing credit — other.......... | | | | |
| | Supplemental Information: | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Partner 3:  BETSY BOYD

PTPL1103L  05/15/13

EXHIBIT "9"
Page 21 of 40

| TAXABLE YEAR | **Member's Share of Income,** | | CALIFORNIA SCHEDULE |
|---|---|---|---|
| **2013** | **Deductions, Credits, etc.** | ■ | **K-1 (568)** |

TYB  01-01-2013  TYE  12-31-2013

BETSY          BOYD

3453 SUMMERSET CIRCLE
COSTA MESA         CA   92626

       200303910037
WESTCLIFF INVESTORS LLC

C/O 2601 MAIN ST SUITE 560
IRVINE            CA   92614

A  What type of entity is this member? ●

(1) [X] Individual          (4) [ ] C Corporation        (7) [ ] LLP            (10) [ ] Exempt Organization

(2) [ ] S Corporation       (5) [ ] General Partnership   (8) [ ] LLC            (11) [ ] Disregarded Entity

(3) [ ] Estate/Trust        (6) [ ] Limited Partnership   (9) [ ] IRA/Keogh/SEP

B  Is this member a foreign member? ........................................................ ● [ ] Yes  [X] No

C  Enter member's percentage (without regard to special allocations) of:   (i) Before decrease or termination   (ii) End of year

Profit sharing ........................................ [          ] %  ● [     5.0000 ] %

Loss sharing .......................................... [          ] %  ● [     5.0000 ] %

Ownership of capital .................................. [          ] %  ● [     5.0000 ] %

D  Member's share of liabilities:
Nonrecourse .......................................... ● $ [              ]

Qualified nonrecourse financing ....................... ● $ [     211,867. ]

Other ................................................ ● $ [              ]

E  Reportable transaction or tax shelter registration number(s) ............... [                    ]

F  (1) Check here if this is a publicly traded partnership as defined in IRC Section 469(k)(2) .................... ◉ [ ]

   (2) Check here if this is an investment partnership (R&TC Sections 17955 and 23040.1) ...................... ◉ [ ]

G  Check here if this is: ●  (1) [ ] A final Schedule K-1 (568)   (2) [ ] An amended Schedule K-1 (568)

H  Is this member a resident of California? ........................................ ● [X] Yes  [ ] No

MEMBER 3

CALA0212L 02/03/14

EXHIBIT "9"
Page 22 of 40

■

WESTCLIFF INVESTORS LLC

I Analysis of member's capital account: Check the box ● (1) [X] Tax Basis   (2) ☐ GAAP   (3) ☐ Sec 704(b) Book   (4) ☐ Other (explain) _____

| (a)<br>Capital account at beginning of year | (b)<br>Capital contributed during year | (c)<br>Member's share of line 3, line 4,<br>and line 7 Form 568, Schedule M-2 | (d)<br>Withdrawals<br>and distributions | (e)<br>Capital account at end of year,<br>combine column<br>(a) through column (d) |
|---|---|---|---|---|
| ● −49,037. | ● | ● 5,888. | ● ( 4,000.) | ● −47,149. |

**Caution:** Refer to Member's Instructions for Schedule K-1 (568) before entering information from this schedule on your California return.

| | (a)<br>Distributive share items | (b)<br>Amounts from<br>federal Schedule K-1<br>(1065) | (c)<br>California<br>adjustments | (d)<br>Total amounts using<br>California law. Combine<br>column (b) and column (c)<br>where applicable | (e)<br>California source<br>amounts and credits |
|---|---|---|---|---|---|
| Income<br>(Loss) | 1  Ordinary income (loss) from trade or business activities. . . . . . . . . . . . . . . . | −112. | 112. | ● | ▶ |
| | 2  Net income (loss) from rental real estate activities. . . . . . . . . . PG. 5 | 5,876. | 389. | ● 6,265. | ▶ |
| | 3  Net income (loss) from other rental activities. . . . . . . . . . . . . . . . . . . | | | ◉ | ◉ |
| | 4  Guaranteed payments to members . . . . . | | | ● | ▶ |
| | 5  Interest income. . . . . . . . . . . . . . . . . . | | | ● | ▶ |
| | 6  Dividends . . . . . . . . . . . . . . . . . . . . | | | ● | ▶ |
| | 7  Royalties . . . . . . . . . . . . . . . . . . . . | | | ● | ▶ |
| | 8  Net short-term capital gain (loss). . . . . . | | | ● | ▶ |
| | 9  Net long-term capital gain (loss) . . . . . . | | | ● | ▶ |
| | 10a Total gain under IRC Section 1231 (other than due to casualty or theft) . . . | | | ● | |
| | b  Total loss under IRC Section 1231 (other than due to casualty or theft) . . . . | | | ● | ▶ |
| | 11a Other portfolio income (loss). Attach schedule. . . . . . . . . . . . . . . . . . | | | ● | ▶ |
| | b  Total other income. Attach schedule. . . . . . . . . . . . . . . . . . | | | ● | ▶ |
| | c  Total other loss. Attach schedule. . . . . . . . . . . . . . . . . . | | | ● | ▶ |
| Deduc-<br>tions | 12  Expense deduction for recovery property (IRC Section 179 and R&TC Sections 17267.2 and 17268) . . . . . . . . . . . . . . . . | | | | |
| | 13a Charitable contributions. . . . . . . . . . . . . . PG. 5 | 51. | | 51. | |
| | b  Investment interest expense. . . . . . . . . | | | | |
| | c 1 Total expenditures to which an IRC Section 59(e) election may apply. . . . . | | | | |
| | 2  Type of expenditures _____ | | | | |
| | d  Deductions related to portfolio income Attach schedule. . . . . . . . . . . . . . . . | | | | |
| | e  Other deductions. Attach schedule. . . . . . . . . . . . . . . . | | | | |

MEMBER 3:  BETSY BOYD

**Side 2** Schedule K-1 (568) 2013   059   7902134   CALA0212L 02/03/14

EXHIBIT "9"
Page 23 of 40

WESTCLIFF INVESTORS LLC

| | (a)<br>Distributive share items | (b)<br>Amounts from federal Schedule K-1 (1065) | (c)<br>California adjustments | (d)<br>Total amounts using California law. Combine column (b) and column (c) | (e)<br>California source amounts and credits |
|---|---|---|---|---|---|
| **Credits** | **15a** Total withholding (equals amount on Form 592-B if calendar year LLC)...... | | | ● | ► |
| | **b** Low-income housing credit.......... | | | | |
| | **c** Credits other than line 15b related to rental real estate activities. Attach schedule...................... | | | | |
| | **d** Credits related to other rental activities. Attach schedule........... | | | | |
| | **e** Nonconsenting nonresident member's tax paid by LLC................... | | | | |
| | **f** Other credits — Attach required schedules or statements................. | | | | |
| | **g** New jobs credit................... | | | | |
| **Alternative Minimum Tax (AMT) Items** | **17a** Depreciation adjustment on property placed in service after 1986..... | | | ◉ | ◉ |
| | **b** Adjusted gain or loss.............. | | | | |
| | **c** Depletion (other than oil and gas)..... | | | | |
| | **d** Gross income from oil, gas, and geothermal properties.............. | | | | |
| | **e** Deductions allocable to oil, gas, and geothermal properties.......... | | | | |
| | **f** Other alternative minimum tax items. Attach schedule................... | | | | |
| **Tax-exempt Income and Nondeductible Expenses** | **18a** Tax-exempt interest income......... | | | | |
| | **b** Other tax-exempt income........... | | | | |
| | **c** Nondeductible expenses...................... | | | | |
| **Distributions** | **19a** Distributions of money (cash and marketable securities)...... | 4,000. | | ◉    4,000. | |
| | **b** Distributions of property other than money.................... | | | ◉ | |
| **Other Information** | **20a** Investment income................. | | | | |
| | **b** Investment expenses............. | | | | |
| | **c** Other information. See instructions..... | | | SEE ATTACHED | |

MEMBER 3:  BETSY BOYD

EXHIBIT "9"
Page 24 of 40

WESTCLIFF INVESTORS LLC

**Other Member Information**

Table 1 — Member's share of nonbusiness income from intangibles (source of income is dependent on residence or commercial domicile of the member):

| Interest | $ | Sec 1231 Gains/Losses | $ | Capital Gains/Losses | $ |
|---|---|---|---|---|---|
| Dividends | $ | Royalties | $ | Other | $ |

FOR USE BY MEMBERS ONLY — See instructions.

**Table 2** — Member's share of distributive items.

A  Member's share of the LLC's business income. See instructions.    $

B  Member's share of nonbusiness income from real and tangible personal property sourced or allocable to California.

| Capital Gains/Losses | $ | Rents/Royalties | $ |
|---|---|---|---|
| Section 1231 Gains/Losses | $ | Other | $ |

C  Member's distributive share of the LLC's property, payroll, and sales:

| Factors | Total within and outside California | Total within California |
|---|---|---|
| Property:  Beginning............................... | $ | $ |
| Property:  Ending...................................... | $ | $ |
| Property:  Annual rent expense...................... | $ | $ |
| Payroll..................................................... | $ | $ |
| Sales ...................................................... | $ | $ |

MEMBER 3:  BETSY BOYD

EXHIBIT "9"
Page 25 of 40

WESTCLIFF INVESTORS LLC

Schedule K-1 (Form 568) 2013                Supplemental Information (continued)                Page    5

**Line 2, column (d)**
**Rental Real Estate Activities**

| Property Address | Gross Income | Net Expenses | Net Income | Passive Nonpass | Sec. 1231 Total |
|---|---|---|---|---|---|
| 1901 WESTCLIFF DRIVE NEWPORT BEACH, CA | $ 26,700. | 21,551. | $ 5,149. | Passive | |
| Passthrough Rental Real Estate | | | 1,116. | | |
| | | Total | $ 6,265. | | |

**Line 13a, column (d)**
**Charitable Contributions**

| | | |
|---|---|---|
| Cash Contributions - 50% Limitation................................................... | $ | 51. |
| | Total $ | 51. |

**Line 20c - Column d**
**Other Information**

| | | |
|---|---|---|
| Proportionate Int. of Aggregate Gross Receipts.................................... | $ | 32,342. |
| | Total $ | 32,342. |

Member 3:   BETSY BOYD

SPSL1201L  05/16/13

EXHIBIT "9"
Page 26 of 40

WESTCLIFF INVESTORS, LLC

## CALIFORNIA
## 2013 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

Note: The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1, pages 1 & 2.

Partner's Name: BETSY BOYD

Partner's identification number

| Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|
| A  EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| B  JAVAHER INVESTORS LLC | | Passive | |
| C | | | |
| D | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| Income (Loss) | Ordinary income (loss) from trade or business activities... | | | | |
| | Net income (loss) from rental real estate activities........ | 595. | 521. | | |
| | Net income (loss) from other rental activities............. | | | | |
| | Interest................................................ | | | | |
| | Dividends.............................................. | | | | |
| | Royalties.............................................. | | | | |
| | Short term capital gain (loss)........................... | | | | |
| | Long term capital gain (loss).......................... | | | | |
| | Other portfolio income (loss)........................... | | | | |
| | Guaranteed payments ................................. | | | | |
| | Net gain (loss) under sec. 1231 (other than due to casualty or theft)..... | | | | |
| | Other income (loss).................................... | | | | |
| Deductions | Charitable contributions................................ | | | | |
| | Section 179 expense deduction........................ | | | | |
| | Deductions related to portfolio income .................. | | | | |
| | Other deductions...................................... | | | | |
| | Interest expense on investment debts................... | | | | |
| Credits | Withholding on partners............................... | | | | |
| | Low-income housing credit............................. | | | | |
| | Other credits related to rental real estate activities....... | | | | |
| | Credits related to other rental activities ................. | | | | |
| | Other Credits.......................................... | | | | |
| Adjustments and Tax Preference Items | Depreciation adjustment on property placed in service after 1986........ | | | | |
| | Adjusted gain or loss ................................. | | | | |
| | Depletion (other than oil and gas) ..................... | | | | |
| | Gross income from oil, gas or geothermal properties.... | | | | |
| | Deductions allocable to oil, gas or geothermal properties.. | | | | |
| | A.C.E. depreciation adjustment........................ | | | | |
| | A.C.E. adjusted gain or (loss)......................... | | | | |
| | Accel. Depreciation on real property placed in service before 1987...... | | | | |
| | Accel. Depr. on leased personal prop. placed in service before 1987...... | | | | |
| | Other adjustments and tax preference items.............. | | | | |
| Other | Section 59(e) expense: Intangible Drilling Costs.......... | | | | |
| | Section 59(e) expense: Dry Hole expense............... | | | | |
| | Other Section 59(e) expenses......................... | | | | |
| | Tax-exempt interest income............................ | | | | |
| | Other tax-exempt income.............................. | | | | |
| | Nondeductible expenses............................... | | | | |
| | Distributions of money (cash and marketable securities) .. | | | | |
| | Distributions of property other than money ............... | | | | |

CAPL0312L  05/14/13

Member 3:  BETSY BOYD

WESTCLIFF INVESTORS, LLC

Page 2

## CALIFORNIA
## 2013 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1, pages 1 & 2.

Partner's Name

BETSY BOYD

Partner's identification number

| Name of Passthrough Entity | Employer Identification No. | Type of Entity | Check box if fully disposed in current year |
|---|---|---|---|
| A EYE STREET MEDICAL INVESTORS, LLC | | Passive | |
| B JAVAHER INVESTORS LLC | | Passive | |
| C | | | |
| D | | | |

| | Passthrough Entities | | | |
|---|---|---|---|---|
| | A | B | C | D |
| Other Items: | | | | |
| Proportionate interest of aggregate gross receipts......... | | | | |
| | 3,968. | 1,674. | | |

Other

CAPL0312L  05/14/13

Member 3:  BETSY BOYD

| Schedule K-1<br>(Form 1065)<br><br>Department of the Treasury<br>Internal Revenue Service | **2014**<br>For calendar year 2014, or tax<br>year beginning _____ , 2014<br>ending _____ | | 651113 |
|---|---|---|---|

☐ Final K-1    ☐ Amended K-1    OMB No. 1545-0123

| | **Part III** | **Partner's Share of Current Year Income, Deductions, Credits, and Other Items** |
|---|---|---|

**Partner's Share of Income, Deductions, Credits, etc.**    ▶ See separate instructions.

| Part I | Information About the Partnership |
|---|---|

**A** Partnership's employer identification number

**B** Partnership's name, address, city, state, and ZIP code

WESTCLIFF INVESTORS, LLC
2601 MAIN STREET, SUITE 960
IRVINE, CA 92614

**C** IRS Center where partnership filed return
E-FILE

**D** ☐ Check if this is a publicly traded partnership (PTP)

| Part II | Information About the Partner |
|---|---|

**E** Partner's identifying number

**F** Partner's name, address, city, state, and ZIP code

BETSY BOYD
3453 SUMMERSET CIRCLE
COSTA MESA, CA 92626

**G** ☐ General partner or LLC member-manager    ☒ Limited partner or other LLC member

**H** ☒ Domestic partner    ☐ Foreign partner

**I1** What type of entity is this partner? . . . . . . . INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here. . . . . . . . . . . . . . . . . . . . . . . . ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 5 % | 5 % |
| Loss | 5 % | 5 % |
| Capital | 5 % | 5 % |

**K** Partner's share of liabilities at year end:

| | |
|---|---|
| Nonrecourse . . . . . . . . . . . . . . . . . . . . . . $ | 3,583. |
| Qualified nonrecourse financing . . . . . . . $ | 206,772. |
| Recourse . . . . . . . . . . . . . . . . . . . . . . . . $ | |

**L** Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account . . . . . . . . . . . $ | -47,149. |
| Capital contributed during the year . . . . . $ | |
| Current year increase (decrease) . . . . . . . $ | 9,250. |
| Withdrawals & distributions . . . . . . . . . . $ ( | 6,750.) |
| Ending capital account . . . . . . . . . . . . . . $ | -44,649. |

☒ Tax basis    ☐ GAAP    ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes    ☒ No
If 'Yes', attach statement (see instructions)

| # | Item | | # | Item | |
|---|---|---|---|---|---|
| 1 | Ordinary business income (loss) | | 15 | Credits | |
| 2 | Net rental real estate income (loss) | 9,375. | | | |
| 3 | Other net rental income (loss) | | 16 | Foreign transactions | |
| 4 | Guaranteed payments | | | | |
| 5 | Interest income | | | | |
| 6 a | Ordinary dividends | | | | |
| 6 b | Qualified dividends | | | | |
| 7 | Royalties | | | | |
| 8 | Net short-term capital gain (loss) | | | | |
| 9 a | Net long-term capital gain (loss) | | 17 | Alternative minimum tax (AMT) items | |
| 9 b | Collectibles (28%) gain (loss) | | | | |
| 9 c | Unrecaptured section 1250 gain | | | | |
| 10 | Net section 1231 gain (loss) | | 18 | Tax-exempt income and nondeductible expenses | |
| 11 | Other income (loss) | | | | |
| | | | 19 | Distributions | |
| 12 | Section 179 deduction | | A | | 6,750. |
| 13 | Other deductions | | 20 | Other information | |
| A | | 125. | | | |
| 14 | Self-employment earnings (loss) | | | | |

*See attached statement for additional information.

FOR IRS USE ONLY

2* (on line 2)

BAA For Paperwork Reduction Act Notice, see Instructions for Form 1065.        Schedule K-1 (Form 1065) 2014

PTPA0312L  11/28/14

PARTNER 3

EXHIBIT "9"
Page 29 of 40

WESTCLIFF INVESTORS, LLC

SCHEDULE K-1 (FORM 1065) 2014      **SUPPLEMENTAL INFORMATION**      PAGE  2

**BOX 2**
**RENTAL REAL ESTATE ACTIVITIES**

| PROPERTY TYPE AND ADDRESS | GROSS INCOME | NET EXPENSES | NET INCOME | PASSIVE NONPASS | SEC. 1231 TOTAL |
|---|---|---|---|---|---|
| TYPE: 4 - COMMERCIAL | | | | | |
| 1901 WESTCLIFF DR NEWPORT BEACH, CA 92660 | | | | | |
| | 30,617. | 21,283. $ | 9,334. | PASSIVE | |
| PASSTHROUGH RENTAL REAL ESTATE | | | 40. | | |
| ROUNDING OR SPECIALLY ALLOCATED | | | | | |
| NET INCOME (LOSS) ADJUSTMENT | | | 1. | | |
| | | TOTAL $ | 9,375. | | |

PARTNER 3:  BETSY BOYD

SPSL1201L  05/12/14

651113

| ☐ Final K-1 | ☐ Amended K-1 | OMB No. 1545-0123 |

**Schedule K-1**
(Form 1065)

Department of the Treasury
Internal Revenue Service

## 2015

For calendar year 2015, or tax
year beginning _____ , 2015
ending _____ ,

### Partner's Share of Income, Deductions, Credits, etc.    ► See separate instructions.

| **Part I** | Information About the Partnership |

**A** Partnership's employer identification number

**B** Partnership's name, address, city, state, and ZIP code

WESTCLIFF INVESTORS, LLC
2601 MAIN STREET, SUITE 960
IRVINE, CA 92614

**C** IRS Center where partnership filed return
E-FILE

**D** ☐ Check if this is a publicly traded partnership (PTP)

| **Part II** | Information About the Partner |

**E** Partner's identifying number

**F** Partner's name, address, city, state, and ZIP code

BETSY BOYD
3453 SUMMERSET CIRCLE
COSTA MESA, CA 92626

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H** ☒ Domestic partner   ☐ Foreign partner

**I1** What type of entity is this partner? ........ INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here .............................. ☐

**J** Partner's share of profit, loss, and capital (see instructions):

|  | Beginning | Ending |
|---|---|---|
| Profit | 5 % | 5 % |
| Loss | 5 % | 5 % |
| Capital | 5 % | 5 % |

**K** Partner's share of liabilities at year end:

| Nonrecourse ......................... $ | 3,583. |
| Qualified nonrecourse financing ........ $ | 201,809. |
| Recourse ........................... $ | |

**L** Partner's capital account analysis:

| Beginning capital account ............. $ | -44,649. |
| Capital contributed during the year ..... $ | |
| Current year increase (decrease) ....... $ | 10,731. |
| Withdrawals & distributions ........... $ ( | 8,721.) |
| Ending capital account ............... $ | -42,639. |

☒ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No
If 'Yes', attach statement (see instructions)

### Part III  Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| 1 | Ordinary business income (loss) | 15 | Credits |
| 2 | Net rental real estate income (loss) | | |
| * | 10,731. | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6 a | Ordinary dividends | | |
| 6 b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9 a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| 9 b | Collectibles (28%) gain (loss) | | |
| 9 c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| 12 | Section 179 deduction | 19 | Distributions |
| | | A | 8,721. |
| 13 | Other deductions | 20 | Other information |
| 14 | Self-employment earnings (loss) | | |

*See attached statement for additional information.

| F O R   I R S   U S E   O N L Y |

BAA For Paperwork Reduction Act Notice, see Instructions for Form 1065.      Schedule K-1 (Form 1065) 2015

PTPA0312L  07/22/15

PARTNER 3

EXHIBIT "9"
Page 31 of 40

Schedule K-1 (Form 1065) 2015    WESTCLIFF INVESTORS, LLC    Page 2

This list identifies the codes used on Schedule K-1 for all partners and provides summarized reporting information for partners who file Form 1040. For detailed reporting and filing information, see the separate Partner's Instructions for Schedule K-1 and the instructions for your income tax return.

| | | Report on |
|---|---|---|
| **1** | **Ordinary business income (loss).** Determine whether the income (loss) is passive or nonpassive and enter on your return as follows. | |
| | Passive loss | See the Partner's Instructions |
| | Passive income | Schedule E, line 28, column (g) |
| | Nonpassive loss | Schedule E, line 28, column (h) |
| | Nonpassive income | Schedule E, line 28, column (j) |
| **2** | **Net rental real estate income (loss)** | See the Partner's Instructions |
| **3** | **Other net rental income (loss)** | |
| | Net income | Schedule E, line 28, column (g) |
| | Net loss | See the Partner's Instructions |
| **4** | **Guaranteed payments** | Schedule E, line 28, column (j) |
| **5** | **Interest income** | Form 1040, line 8a |
| **6 a** | **Ordinary dividends** | Form 1040, line 9a |
| **6 b** | **Qualified dividends** | Form 1040, line 9b |
| **7** | **Royalties** | Schedule E, line 4 |
| **8** | **Net short-term capital gain (loss)** | Schedule D, line 5 |
| **9 a** | **Net long-term capital gain (loss)** | Schedule D, line 12 |
| **9 b** | **Collectibles (28%) gain (loss)** | 28% Rate Gain Worksheet, line 4 (Schedule D Instructions) |
| **9 c** | **Unrecaptured section 1250 gain** | See the Partner's Instructions |
| **10** | **Net section 1231 gain (loss)** | See the Partner's Instructions |
| **11** | **Other income (loss)** | |
| | **Code** | |
| | A Other portfolio income (loss) | See the Partner's Instructions |
| | B Involuntary conversions | See the Partner's Instructions |
| | C Sec. 1256 contracts & straddles | Form 6781, line 1 |
| | D Mining exploration costs recapture | See Pub. 535 |
| | E Cancellation of debt | Form 1040, line 21 or Form 982 |
| | F Other income (loss) | See the Partner's Instructions |
| **12** | **Section 179 deduction** | See the Partner's Instructions |
| **13** | **Other deductions** | |
| | A Cash contributions (50%) | |
| | B Cash contributions (30%) | |
| | C Noncash contributions (50%) | |
| | D Noncash contributions (30%) | See the Partner's Instructions |
| | E Capital gain property to a 50% organization (30%) | |
| | F Capital gain property (20%) | |
| | G Contributions (100%) | |
| | H Investment interest expense | Form 4952, line 1 |
| | I Deductions — royalty income | Schedule E, line 19 |
| | J Section 59(e)(2) expenditures | See the Partner's Instructions |
| | K Deductions — portfolio (2% floor) | Schedule A, line 23 |
| | L Deductions — portfolio (other) | Schedule A, line 28 |
| | M Amounts paid for medical insurance | Schedule A, line 1 or Form 1040, line 29 |
| | N Educational assistance benefits | See the Partner's Instructions |
| | O Dependent care benefits | Form 2441, line 12 |
| | P Preproductive period expenses | See the Partner's Instructions |
| | Q Commercial revitalization deduction from rental real estate activities | See Form 8582 Instructions |
| | R Pensions and IRAs | See the Partner's Instructions |
| | S Reforestation expense deduction | See the Partner's Instructions |
| | T Domestic production activities information | See Form 8903 Instructions |
| | U Qualified production activities income | Form 8903, line 7b |
| | V Employer's Form W-2 wages | Form 8903, line 17 |
| | W Other deductions | See the Partner's Instructions |
| **14** | **Self-employment earnings (loss)** | |

**Note.** If you have a section 179 deduction or any partner-level deductions, see the Partner's Instructions before completing Schedule SE.

| | | |
|---|---|---|
| | A Net earnings (loss) from self-employment | Schedule SE, Section A or B |
| | B Gross farming or fishing income | See the Partner's Instructions |
| | C Gross non-farm income | See the Partner's Instructions |
| **15** | **Credits** | |
| | A Low-income housing credit (section 42(j)(5)) from pre-2008 buildings | |
| | B Low-income housing credit (other) from pre-2008 buildings | |
| | C Low-income housing credit (section 42(j)(5)) from post-2007 buildings | |
| | D Low-income housing credit (other) from post-2007 buildings | See the Partner's Instructions |
| | E Qualified rehabilitation expenditures (rental real estate) | |
| | F Other rental real estate credits | |
| | G Other rental credits | |
| | H Undistributed capital gains credit | Form 1040, line 73; check box a |
| | I Biofuel producer credit | |
| | J Work opportunity credit | See the Partner's Instructions |
| | K Disabled access credit | |

| | | Report on |
|---|---|---|
| | L Empowerment zone employment credit | |
| | M Credit for increasing research activities | |
| | N Credit for employer social security and Medicare taxes | See the Partner's Instructions |
| | O Backup withholding | |
| | P Other credits | |
| **16** | **Foreign transactions** | |
| | A Name of country or U.S. possession | |
| | B Gross income from all sources | Form 1116, Part I |
| | C Gross income sourced at partner level | |
| | *Foreign gross income sourced at partnership level* | |
| | D Passive category | |
| | E General category | Form 1116, Part I |
| | F Other | |
| | *Deductions allocated and apportioned at partner level* | |
| | G Interest expense | Form 1116, Part I |
| | H Other | Form 1116, Part I |
| | *Deductions allocated and apportioned at partnership level to foreign source income* | |
| | I Passive category | |
| | J General category | Form 1116, Part I |
| | K Other | |
| | *Other information* | |
| | L Total foreign taxes paid | Form 1116, Part II |
| | M Total foreign taxes accrued | Form 1116, Part II |
| | N Reduction in taxes available for credit | Form 1116, line 12 |
| | O Foreign trading gross receipts | Form 8873 |
| | P Extraterritorial income exclusion | Form 8873 |
| | Q Other foreign transactions | See the Partner's Instructions |
| **17** | **Alternative minimum tax (AMT) items** | |
| | A Post-1986 depreciation adjustment | |
| | B Adjusted gain or loss | |
| | C Depletion (other than oil & gas) | See the Partner's Instructions and the Instructions for Form 6251 |
| | D Oil, gas, & geothermal — gross income | |
| | E Oil, gas, & geothermal — deductions | |
| | F Other AMT items | |
| **18** | **Tax-exempt income and nondeductible expenses** | |
| | A Tax-exempt interest income | Form 1040, line 8b |
| | B Other tax-exempt income | See the Partner's Instructions |
| | C Nondeductible expenses | See the Partner's Instructions |
| **19** | **Distributions** | |
| | A Cash and marketable securities | |
| | B Distribution subject to section 737 | See the Partner's Instructions |
| | C Other property | |
| **20** | **Other information** | |
| | A Investment income | Form 4952, line 4a |
| | B Investment expenses | Form 4952, line 5 |
| | C Fuel tax credit information | Form 4136 |
| | D Qualified rehabilitation expenditures (other than rental real estate) | See the Partner's Instructions |
| | E Basis of energy property | See the Partner's Instructions |
| | F Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| | G Recapture of low-income housing credit (other) | Form 8611, line 8 |
| | H Recapture of investment credit | See Form 4255 |
| | I Recapture of other credits | See the Partner's Instructions |
| | J Look-back interest — completed long-term contracts | See Form 8697 |
| | K Look-back interest — income forecast method | See Form 8866 |
| | L Dispositions of property with section 179 deductions | |
| | M Recapture of section 179 deduction | |
| | N Interest expense for corporate partners | |
| | O Section 453(l)(3) information | |
| | P Section 453A(c) information | |
| | Q Section 1260(b) information | |
| | R Interest allocable to production expenditures | See the Partner's Instructions |
| | S CCF nonqualified withdrawals | |
| | T Depletion information — oil and gas | |
| | U Reserved | |
| | V Unrelated business taxable income | |
| | W Precontribution gain (loss) | |
| | X Section 108(i) information | |
| | Y Net investment income | |
| | Z Other information | |

PARTNER 3:   BETSY BOYD

PTPA0312L  07/22/15    Schedule K-1 (Form 1065) 2015

EXHIBIT "9"
Page 32 of 40

WESTCLIFF INVESTORS, LLC

SCHEDULE K-1 (FORM 1065) 2015                    **SUPPLEMENTAL INFORMATION**                    PAGE  3

**BOX 2**
**RENTAL REAL ESTATE ACTIVITIES**

| PROPERTY TYPE AND ADDRESS | GROSS INCOME | NET EXPENSES | NET INCOME | PASSIVE NONPASS | SEC. 1231 TOTAL |
|---|---|---|---|---|---|
| TYPE: 4 – COMMERCIAL | | | | | |
| 1901 WESTCLIFF DR NEWPORT BEACH, CA 92660 | 31,406. | 20,901. $ | 10,505. | PASSIVE | |
| PASSTHROUGH RENTAL REAL ESTATE | | | 225. | | |
| ROUNDING OR SPECIALLY ALLOCATED | | | | | |
| NET INCOME (LOSS) ADJUSTMENT | | | 1. | | |
| | | TOTAL $ | 10,731. | | |

PARTNER 3:  BETSY BOYD

SPSL1201L  05/13/15

| TAXABLE YEAR | **Member's Share of Income,** | ■ | CALIFORNIA SCHEDULE |
|---|---|---|---|
| **2015** | **Deductions, Credits, etc.** | | **K-1 (568)** |

TYB  01-01-2015  TYE  12-31-2015

BETSY         BOYD

3453 SUMMERSET CIRCLE
COSTA MESA         CA   92626

          200303910037
WESTCLIFF INVESTORS LLC

2601 MAIN STREET SUITE 960
IRVINE            CA   92614

**A**  What type of entity is this member? ●

(1) [X] Individual        (4) [ ] C Corporation        (7) [ ] LLP        (10) [ ] Exempt Organization

(2) [ ] S Corporation     (5) [ ] General Partnership   (8) [ ] LLC        (11) [ ] Disregarded Entity

(3) [ ] Estate/Trust      (6) [ ] Limited Partnership   (9) [ ] IRA/Keogh/SEP

**B**  Is this member a foreign member? ........................................................ ●  [ ] Yes   [X] No

**C**  Enter member's percentage (without regard to special allocations) of:

|  | (i) Before decrease or termination | (ii) End of year |
|---|---|---|
| Profit sharing ......................................... | % ● | 5.0000 % |
| Loss sharing .......................................... | % ● | 5.0000 % |
| Ownership of capital................................ | % ● | 5.0000 % |

**D**  Member's share of liabilities:

Nonrecourse ............................................................................... ● $  3,583.

Qualified nonrecourse financing ................................................... ● $  201,809.

Other.......................................................................................... ● $

**E**  Reportable transaction or tax shelter registration number(s)........................................

**F** (1)  Check here if this is a publicly traded partnership as defined in IRC Section 469(k)(2)...................................... ● ⦿ [ ]

(2)  Check here if this is an investment partnership (R&TC Sections 17955 and 23040.1) .................................... ● ⦿ [ ]

**G**  Check here if this is: ● (1) [ ] A final Schedule K-1 (568)   (2) [ ] An amended Schedule K-1 (568)

**H**  Is this member a resident of California?................................................................. ● [X] Yes  ▶ [ ] No

MEMBER 3

CALA0212L 11/23/15

**Member's name:** BETSY BOYD

**Member's identifying number:**

I Analysis of member's capital account: Check the box ● (1) [X] Tax Basis  (2) [ ] GAAP  (3) [ ] Sec 704(b) Book  (4) [ ] Other (explain)

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Member's share of line 3, line 4, and line 7 Form 568, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year, combine column (a) through column (d) |
|---|---|---|---|---|
| ● −44,650. | ● | ● 10,730. | ● ( 8,721.) | ● −42,641. |

Caution: Refer to Member's Instructions for Schedule K-1 (568) before entering information from this schedule on your California return.

| | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (1065) | (c) California adjustments | (d) Total amounts using California law. Combine column (b) and column (c) where applicable | (e) California source amounts and credits |
|---|---|---|---|---|---|
| **Income (Loss)** | 1 Ordinary income (loss) from trade or business activities | | | ● | ► |
| | 2 Net income (loss) from rental real estate activities....PG 5 | 10,731. | 12. | ● 10,743. | ► |
| | 3 Net income (loss) from other rental activities | | | ◉ | ◉ |
| | 4 Guaranteed payments to members | | | ● | ► |
| | 5 Interest income | | | ● | ► |
| | 6 Dividends | | | ● | ► |
| | 7 Royalties | | | ● | ► |
| | 8 Net short-term capital gain (loss) | | | ● | ► |
| | 9 Net long-term capital gain (loss) | | | ● | ► |
| | 10a Total gain under IRC Section 1231 (other than due to casualty or theft) | | | ● | ► |
| | b Total loss under IRC Section 1231 (other than due to casualty or theft) | | | ● | ► |
| | 11a Other portfolio income (loss). Attach schedule | | | ● | ► |
| | b Total other income. Attach schedule | | | ● | ► |
| | c Total other loss. Attach schedule | | | ● | ► |
| **Deductions** | 12 Expense deduction for recovery property (IRC Section 179) | | | | |
| | 13a Charitable contributions | | | | |
| | b Investment interest expense | | | | |
| | c 1 Total expenditures to which an IRC Section 59(e) election may apply | | | | |
| | 2 Type of expenditures | | | | |
| | d Deductions related to portfolio income Attach schedule | | | | |
| | e Other deductions. Attach schedule | | | | |

MEMBER 3:  BETSY BOYD

EXHIBIT "9"
Page 35 of 40

| Member's name | | | | |
|---|---|---|---|---|
| BETSY BOYD | | | Member's identifying number | |

| | | (a)<br>Distributive share items | (b)<br>Amounts from<br>federal Schedule K-1<br>(1065) | (c)<br>California<br>adjustments | (d)<br>Total amounts using<br>California law. Combine<br>column (b) and column (c) | (e)<br>California source<br>amounts and credits |
|---|---|---|---|---|---|---|
| **Credits** | 15a | Total withholding (equals amount on Form 592-B if calendar year LLC) . . . . . | | | ● | ▶ |
| | b | Low-income housing credit . . . . . . . . . | | | | |
| | c | Credits other than line 15b related to rental real estate activities. Attach schedule . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| | d | Credits related to other rental activities. Attach schedule . . . . . . . . . . | | | | |
| | e | Nonconsenting nonresident member's tax paid by LLC . . . . . . . . . . . . . . . . . | | | | |
| | f | Other credits — Attach required schedules or statements . . . . . . . . . . . . . . . | | | | |
| | g | New employment credit . . . . . . . . . . . | | | | |
| **Alternative Minimum Tax (AMT) Items** | 17a | Depreciation adjustment on property placed in service after 1986 . . . . . . . . | | | ◉ | ◉ |
| | b | Adjusted gain or loss . . . . . . . . . . . . . | | | | |
| | c | Depletion (other than oil and gas) . . . . . | | | | |
| | d | Gross income from oil, gas, and geothermal properties . . . . . . . . . . . . | | | | |
| | e | Deductions allocable to oil, gas, and geothermal properties . . . . . . . . . . | | | | |
| | f | Other alternative minimum tax items. Attach schedule . . . . . . . . . . . . . . . . . | | | | |
| **Tax-exempt Income and Nondeductible Expenses** | 18a | Tax-exempt interest income . . . . . . . . . | | | | |
| | b | Other tax-exempt income . . . . . . . . . . . | | | | |
| | c | Nondeductible expenses . . . . . . . . . . . . . . . . . . . . . | | 57. | 57. | |
| **Distributions** | 19a | Distributions of money (cash and marketable securities) . . . . . . | 8,721. | | ◉ | 8,721. |
| | b | Distributions of property other than money . . . . . . . . . . . . . . . . . . . . . | | | ◉ | |
| **Other Information** | 20a | Investment income . . . . . . . . . . . . . . . | | | | |
| | b | Investment expenses . . . . . . . . . . . . . . | | | | |
| | c | Other information. See instructions . . . . . | | | SEE ATTACHED | |

MEMBER 3:   BETSY BOYD

EXHIBIT "9"
Page 36 of 40

Member's name
BETSY BOYD

Member's identifying number

**Other Member Information**

**Table 1** — Member's share of nonbusiness income from intangibles (source of income is dependent on residence or commercial domicile of the member):

| | | | | | | |
|---|---|---|---|---|---|---|
| Interest | $ | | Sec 1231 Gains/Losses | $ | Capital Gains/Losses | $ |
| Dividends | $ | | Royalties | $ | Other | $ |

FOR USE BY MEMBERS ONLY — See instructions.

**Table 2** — Member's share of distributive items.

**A**  Member's share of the LLC's business income. See instructions.   $ _____

**B**  Member's share of nonbusiness income from real and tangible personal property sourced or allocable to California.

| | | | |
|---|---|---|---|
| Capital Gains/Losses | $ | Rents/Royalties | $ |
| Section 1231 Gains/Losses | $ | Other | $ |

**C**  Member's distributive share of the LLC's property, payroll, and sales:

| Factors | Total within and outside California | Total within California |
|---|---|---|
| Property:  Beginning.................................. | $ | $ |
| Property:  Ending..................................... | $ | $ |
| Property:  Annual rent expense...................... | $ | $ |
| Payroll................................................ | $ | $ |
| Sales................................................. | $ | $ |

MEMBER 3:  BETSY BOYD

EXHIBIT "9"
Page 37 of 40

BETSY BOYD

SCHEDULE K-1 (FORM 568) 2015          SUPPLEMENTAL INFORMATION (CONTINUED)                    PAGE   5

**LINE 2, COLUMN (D)**
**RENTAL REAL ESTATE ACTIVITIES**

| PROPERTY ADDRESS | GROSS INCOME | NET EXPENSES | NET INCOME | PASSIVE NONPASS | SEC. 1231 TOTAL |
|---|---|---|---|---|---|
| 1901 WESTCLIFF DR NEWPORT BEACH, CA 92660 | $ 31,406. | 20,905. | $ 10,501. | PASSIVE | |
| PASSTHROUGH RENTAL REAL ESTATE | | | 242. | | |
| | | TOTAL | $ 10,743. | | |

**LINE 20C - COLUMN D**
**OTHER INFORMATION**

PROPORTIONATE INT. OF AGGREGATE GROSS RECEIPTS..................................... $     31,406.
                                                                    TOTAL $     31,406.

MEMBER 3:   BETSY BOYD

SPSL1201L  05/13/15

317

☐ Final K-1    ☐ Amended K-1

651113

OMB No. 1545-0123

**Schedule K-1**
(Form 1065)

**2016**

Department of the Treasury
Internal Revenue Service

For calendar year 2016, or tax
year beginning _____, 2016
ending _____,

**Partner's Share of Income, Deductions, Credits, etc.**    ► See separate instructions.

## Part I — Information About the Partnership

A  Partnership's employer identification number

B  Partnership's name, address, city, state, and ZIP code

WESTCLIFF INVESTORS, LLC
2601 MAIN STREET, SUITE 960
IRVINE, CA 92614

C  IRS Center where partnership filed return
E-FILE

D  ☐ Check if this is a publicly traded partnership (PTP)

## Part II — Information About the Partner

E  Partner's identifying number

F  Partner's name, address, city, state, and ZIP code

BETSY BOYD
3453 SUMMERSET CIRCLE
COSTA MESA, CA 92626

G  ☐ General partner or LLC member-manager    ☒ Limited partner or other LLC member

H  ☒ Domestic partner    ☐ Foreign partner

I1  What type of entity is this partner? ....... INDIVIDUAL

I2  If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here.................................... ☐

J  Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 5 % | 5 % |
| Loss | 5 % | 5 % |
| Capital | 5 % | 5 % |

K  Partner's share of liabilities at year end:

Nonrecourse ......................... $ 3,583.
Qualified nonrecourse financing ........ $ 196,606.
Recourse ............................. $

L  Partner's capital account analysis:

Beginning capital account ............. $ -42,639.
Capital contributed during the year ..... $
Current year increase (decrease)....... $ 12,327.
Withdrawals & distributions ........... $ ( 10,700.)
Ending capital account ............... $ -41,012.

☒ Tax basis    ☐ GAAP    ☐ Section 704(b) book
☐ Other (explain)

M  Did the partner contribute property with a built-in gain or loss?
☐ Yes    ☒ No
If 'Yes', attach statement (see instructions)

## Part III — Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | | |
|---|---|---|---|---|
| 1 | Ordinary business income (loss) | | 15 | Credits |
| 2 * | Net rental real estate income (loss) 12,327. | | | |
| 3 | Other net rental income (loss) | | 16 | Foreign transactions |
| 4 | Guaranteed payments | | | |
| 5 | Interest income | | | |
| 6a | Ordinary dividends | | | |
| 6b | Qualified dividends | | | |
| 7 | Royalties | | | |
| 8 | Net short-term capital gain (loss) | | | |
| 9a | Net long-term capital gain (loss) | | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | | |
| 9c | Unrecaptured section 1250 gain | | | |
| 10 | Net section 1231 gain (loss) | | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | | |
| 12 | Section 179 deduction | | 19 | Distributions |
| | | | A | 10,700. |
| 13 | Other deductions | | 20 | Other information |
| 14 | Self-employment earnings (loss) | | | |

*See attached statement for additional information.

F O R   I R S   U S E   O N L Y

BAA  For Paperwork Reduction Act Notice, see Instructions for Form 1065.    Schedule K-1 (Form 1065) 2016

PARTNER 3

PTPA0312L  08/26/16

WESTCLIFF INVESTORS, LLC .

SCHEDULE K-1 (FORM 1065) 2016          **SUPPLEMENTAL INFORMATION**                                    PAGE   2

**BOX 2**
**RENTAL REAL ESTATE ACTIVITIES**

| PROPERTY TYPE AND ADDRESS | GROSS INCOME | NET EXPENSES | NET INCOME | PASSIVE NONPASS | SEC. 1231 TOTAL |
|---|---|---|---|---|---|
| TYPE: 4 - COMMERCIAL | | | | | |
| 1901 WESTCLIFF DR NEWPORT BEACH, CA 92660 | 31,875. | 20,095. $ | 11,780. | PASSIVE | |
| PASSTHROUGH RENTAL REAL ESTATE | | | 546. | | |
| ROUNDING OR SPECIALLY ALLOCATED | | | | | |
| NET INCOME (LOSS) ADJUSTMENT | | | 1. | | |
| | | TOTAL $ | 12,327. | | |

PARTNER 3:  BETSY BOYD

SPSL1201L  06/16/16

EXHIBIT "9"
Page 40 of 40

## CONSTRUCTION LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $4,725,000.00 | 10-05-2005 | 10-01-2007 | 9744781 | 1A / 74 | | RED. | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "*****" has been omitted due to text length limitations.

**Borrower:** Ocean View Medical Investors, LLC
BAB 8, LLC
825 S. Barrington Avenue
Los Angeles, CA 90049

**Lender:** FIRST REGIONAL BANK
South Bay Regional Office
990 West 190th Street, Suite 440
Torrance, CA 90502
(310) 538-1776

**THIS CONSTRUCTION LOAN AGREEMENT** dated October 5, 2005, is made and executed between Ocean View Medical Investors, LLC; and BAB 8, LLC ("Borrower") and FIRST REGIONAL BANK ("Lender") on the following terms and conditions. Borrower has applied to Lender for one or more loans for purposes of constructing the Improvements on the Real Property described below. Lender is willing to lend the loan amount to Borrower solely under the terms and conditions specified in this Agreement and in the Related Documents, to each of which Borrower agrees. Borrower understands and agrees that: (A) In granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement, and (B) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of October 5, 2005, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**LOAN.** The Loan shall be in an amount not to exceed the principal sum of U.S. $4,725,000.00 and shall bear interest on so much of the principal sum as shall be advanced pursuant to the terms of this Agreement and the Related Documents. The Loan shall bear interest on each Advance from the date of the Advance in accordance with the terms of the Note. Borrower shall use the Loan Funds solely for the following specific purposes: Minimum advance of $20,000.00, no more than twice per month. The Loan amount shall be subject at all times to all maximum limits and conditions set forth in this Agreement or in any of the Related Documents, including without limitation, any limits relating to loan to value ratios and acquisition and Project costs.

**PROJECT DESCRIPTION.** The word "Project" as used in this Agreement means the construction and completion of all improvements contemplated by this Agreement, including without limitation the erection of the building or structure on the Real Property identified in this Agreement by Borrower and Lender, installation of equipment and fixtures, landscaping, and all other work necessary to make the Project usable and complete for the intended purposes. The Project includes the following work:

To convert the Medical building to support the Hoag Hospital and surrounding medical services.

The word "Property" as used in this Agreement means the Real Property together with all improvements, all equipment, fixtures, and other articles of personal property now or subsequently attached or affixed to the Real Property, together with all accessions, parts, and additions to, all replacements of, and all substitutions for any of such property, and all proceeds (including insurance proceeds and refunds of premiums) from any sale or other disposition of such property. The real estate described below constitutes the Real Property as used in this Agreement.

**FEES AND EXPENSES.** Whether or not the Project shall be consummated, Borrower shall assume and pay upon demand all out-of-pocket expenses incurred by Lender in connection with the preparation of loan documents and the making of the Loan, including without limitation the following: (A) all closing costs, loan fees, and disbursements; (B) all expenses of Lender's legal counsel; and (C) all title examination fees, title insurance premiums, appraisal fees, survey costs, required fees, and filing and recording fees.

**NO CONSTRUCTION PRIOR TO RECORDING OF SECURITY DOCUMENT.** Borrower will not permit any work or materials to be furnished in connection with the Project until (A) Borrower has signed the Related Documents; (B) Lender's mortgage or deed of trust and other Security Interests in the Property have been duly recorded and perfected; (C) Lender has been provided evidence, satisfactory to Lender, that Borrower has obtained all insurance required under this Agreement or any Related Documents and that Lender's liens on the Property and Improvements are valid perfected first liens, subject only to such exceptions, if any, acceptable to Lender.

**MULTIPLE BORROWERS.** This Agreement has been executed by multiple obligors who are referred to in this Agreement individually, collectively and interchangeably as "Borrower." Unless specifically stated to the contrary, the word "Borrower" as used in this Agreement, including without limitation all representations, warranties and covenants, shall include all Borrowers. Borrower understands and agrees that, with or without notice to any one Borrower, Lender may: (A) make one or more additional secured or unsecured loans or otherwise extend additional credit with respect to any other Borrower; (B) with respect to any other Borrower alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any indebtedness, including increases and decreases of the rate of interest on the indebtedness; (C) exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral; (D) release, substitute, agree not to sue, or deal with any one or more of Borrower's or any other Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) determine how, when and what application of payments and credits shall be made on any indebtedness; (F) apply such security and direct the order or manner of sale of any Collateral, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) sell, transfer, assign or grant participations in all or any part of the Loan; (H) exercise or refrain from exercising any rights against Borrower or others, or otherwise act or refrain from acting; (I) settle or compromise any indebtedness; and (J) subordinate the payment of all or any part of any of Borrower's indebtedness to Lender to the payment of any liabilities which may be due Lender or others.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Ocean View Medical Investors, LLC is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Ocean View Medical Investors, LLC is duly authorized to transact business in all other states in which Ocean View Medical Investors, LLC is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Ocean View Medical Investors, LLC is doing business. Specifically, Ocean View Medical Investors, LLC is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Ocean View Medical Investors, LLC has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Ocean View Medical Investors, LLC maintains an office at 825 S. Barrington Avenue, Los Angeles, CA 90049. Unless Ocean View Medical Investors, LLC has designated otherwise in writing, the principal office is the office at which Ocean View Medical Investors, LLC keeps its books and records including its records concerning the Collateral. Ocean View Medical Investors, LLC will notify Lender prior to any change in the location of Ocean View Medical Investors, LLC's state of organization or any change in Ocean View Medical Investors, LLC's name. Ocean View Medical Investors, LLC shall do all things



EXHIBIT "10"
Page 1 of 11



**CONSTRUCTION LOAN AGREEMENT**
**(Continued)**

| Loan No: 9744781 | Page 2 |
|---|---|

necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Ocean View Medical Investors, LLC and Ocean View Medical Investors, LLC's business activities.

BAB 8, LLC is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. BAB 8, LLC is duly authorized to transact business in all other states in which BAB 8, LLC is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which BAB 8, LLC is doing business. Specifically, BAB 8, LLC is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. BAB 8, LLC has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. BAB 8, LLC maintains an office at 825 S. Barrington Avenue, Los Angeles, CA 90049. Unless BAB 8, LLC has designated otherwise in writing, the principal office is the office at which BAB 8, LLC keeps its books and records including its records concerning the Collateral. BAB 8, LLC will notify Lender prior to any change in the location of BAB 8, LLC's state of organization or any change in BAB 8, LLC's name. BAB 8, LLC shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to BAB 8, LLC and BAB 8, LLC's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of organization or membership agreements, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**Title to Property.** Borrower has, or on the date of first disbursement of Loan proceeds will have, good and marketable title to the Collateral free and clear of all defects, liens, and encumbrances, excepting only liens for taxes, assessments, or governmental charges or levies not yet delinquent or payable without penalty or interest, and such liens and encumbrances as may be approved in writing by the Lender. The Collateral is contiguous to publicly dedicated streets, roads, or highways providing access to the Collateral.

**Project Costs.** The total cost for the Project shall not exceed $6,249,876.00. The Project costs are true and accurate estimates of the costs necessary to complete the Improvements in a good and workmanlike manner according to the Plans and Specifications presented by Borrower to Lender, and Borrower shall take all steps necessary to prevent the actual cost of the Improvements from exceeding the Project costs.

98

EXHIBIT "10"
Page 2 of 11



**CONSTRUCTION LOAN AGREEMENT**
**(Continued)**

Loan No: 9744781                                                                                           Page 3

**Utility Services.** All utility services appropriate to the use of the Project after completion of construction are available at the boundaries of the Collateral.

**Assessment of Property.** The Collateral is and will continue to be assessed and taxed as an independent parcel by all governmental authorities.

**Compliance with Governing Authorities.** Borrower has examined and is familiar with all the easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements affecting the Project. The Project will at all times and in all respects conform to and comply with the requirements of such easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, and shall be deemed made and restated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the Initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Equity Funds.** Borrower shall provide evidence of equity funds totaling **$1,249,876.00** prior to the initial advance from the Loan Fund. Lender may, at Lender's option, require that the equity funds be deposited with Lender as a portion of the Loan Fund, which funds shall be disbursed prior to any Loan proceeds.

**Approval of Contractors, Subcontractors, and Materialman.** Lender shall have approved a list of all contractors employed in connection with the construction of the Improvements, showing the name, address, and telephone number of each contractor, a general description of the nature of the work to be done, the labor and materials to be supplied, the names of materialmen, if known, and the approximate dollar value of the labor, work, or materials with respect to each contractor or materialman. Lender shall have the right to communicate with any person to verify the facts disclosed by the list or by any application for any Advance, or for any other purpose.

**Plans, Specifications, and Permits.** Lender shall have received and accepted a complete set of written Plans and Specifications setting forth all improvements for the Project, and Borrower shall have furnished to Lender copies of all permits and requisite approvals of any governmental body necessary for the construction and use of the Project.

**Architect's and Construction Contracts.** Borrower shall have furnished in form and substance satisfactory to Lender an executed copy of the Architect's Contract and an executed copy of the Construction Contract.

**Related and Support Documents.** Borrower shall provide to Lender in form satisfactory to Lender the following support documents for the Loan: Assignment of Architect's Contract and Assignment of Construction Contract.

**Budget and Schedule of Estimated Advances.** Lender shall have approved detailed budget and cash flow projections of total Project costs and a schedule of the estimated amount and time of disbursements of each Advance.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the consummation of the Project and duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, in their sole discretion, may require.

**Bond.** If requested by Lender, Borrower shall have furnished a performance and payment bond in an amount equal to 100% of the amount of the Construction Contract, as well as a materialmen's and mechanics' payment bond, with such riders and supplements as Lender may require, each in form and substance satisfactory to Lender, naming the General Contractor as principal and Lender as an additional obligee. Any required bonds and the contracts which they cover must be duly recorded or filed in accordance with California Civil Code Section 3235, if required by Lender.

**Appraisal.** If required by Lender, an appraisal shall be prepared for the Property, at Borrower's expense, which in form and substance shall be satisfactory to Lender, in Lender's sole discretion, including applicable regulatory requirements.

**Plans and Specifications.** If requested by Lender, Borrower shall have assigned to Lender on Lender's forms the Plans and Specifications for the Project.

**Environmental Report.** If requested by Lender, Borrower shall have furnished to Lender, at Borrower's expense, an environmental report and certificate on the Property in form and substance satisfactory to Lender, prepared by an engineer or other expert satisfactory to Lender stating that the Property complies with all applicable provisions and requirements of the "Hazardous Substances" paragraph set forth in this Agreement.

**Soil Report.** If requested by Lender, Borrower shall have furnished to Lender, at Borrower's expenses, a soil report for the Property in form and substance satisfactory to Lender, prepared by a registered engineer satisfactory to Lender stating that the Property is free from soil or other geological conditions that would preclude its use or development as contemplated without extra expense for precautionary, corrective or remedial measures.

**Survey.** If requested by Lender, Borrower shall have furnished to Lender a survey of recent date, prepared and certified by a qualified surveyor and providing that the Improvements, if constructed in accordance with the Plans and Specifications, shall lie wholly within the boundaries of the Collateral without encroachment or violation of any zoning ordinances, building codes or regulations, or setback requirements, together with such other information as Lender in its sole discretion may require.

**Zoning.** Borrower shall have furnished evidence satisfactory to Lender that the Collateral is duly and validly zoned for the construction, maintenance, and operation of the Project.

**Title Insurance.** Borrower shall have provided to Lender an ALTA Lender's extended coverage policy of title insurance with such endorsements as Lender may require, issued by a title insurance company acceptable to Lender and in a form, amount, and content satisfactory to Lender, insuring or agreeing to insure that Lender's security agreement or other security document on the Property is or will be upon recordation a valid first lien on the Property free and clear of all defects, liens, encumbrances, and exceptions except those as specifically accepted by Lender in writing. If requested by Lender, Borrower shall provide to Lender, at Borrower's expense, a foundation endorsement (CLTA 102.5 or its equivalent) to the title policy upon the completion of each foundation for the Improvements, showing no encroachments, and upon completion an endorsement which insures the lien-free completion of the Improvements (CLTA 101 series, as required by Lender). Specifically, Borrower shall provide to Lender the following title insurance endorsements: 100, 116, 102.5, 103.7, 111.5, 8.1.

**Insurance.** Unless waived by Lender in writing, Borrower shall have delivered to Lender the following insurance policies or evidence thereof:  (a)

EXHIBIT "10"
Page 3 of 11



**CONSTRUCTION LOAN AGREEMENT**
(Continued)

| Loan No: 9744781 | | Page 4 |
| --- | --- | --- |

an all risks course of construction insurance policy (builder's risk), with extended coverage covering the Improvements issued in an amount and by a company acceptable to Lender, containing a loss payable or other endorsement satisfactory to Lender insuring Lender as mortgagee, together with such other endorsements as may be required by Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender; (b) owners and General Contractor general liability insurance, public liability and workmen's compensation insurance; (c) flood insurance if required by Lender or applicable law; and (d) all other insurance required by this Agreement or by the Related Documents.

**Workers' Compensation Coverage.** Provide to Lender proof of the General Contractor's compliance with all applicable workers' compensation laws and regulations with regard to all work performed on the Project.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Satisfactory Construction.** All work usually done at the stage of construction for which disbursement is requested shall have been done in a good and workmanlike manner and all materials and fixtures usually furnished and installed at that stage of construction shall have been furnished and installed, all in compliance with the Plans and Specifications. Borrower shall also have furnished to Lender such proofs as Lender may require to establish the progress of the work, compliance with applicable laws, freedom of the Property from liens, and the basis for the requested disbursement.

**Certification.** Borrower shall have furnished to Lender a certification by an engineer, architect, or other qualified inspector acceptable to Lender that the construction of the Improvements has complied and will continue to comply with all applicable statutes, ordinances, codes, regulations, and similar requirements.

**Lien Waivers.** Borrower shall have obtained and attached to each application for an Advance, including the Advance to cover final payment to the General Contractor, executed acknowledgments of payments of all sums due and releases of mechanic's and materialmen's liens, satisfactory to Lender, from any party having lien rights, which acknowledgments of payment and releases of liens shall cover all work, labor, equipment, materials done, supplied, performed, or furnished prior to such application for an Advance.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**DISBURSEMENT OF LOAN FUNDS.** The following provisions relate to the disbursement of funds from the Loan Fund.

**Application for Advances.** Each application shall be stated on a standard A/A payment request form or other form approved by Lender, executed by Borrower, and supported by such evidence as Lender shall reasonably require. Borrower shall apply only for disbursement with respect to work actually done by the General Contractor and for materials and equipment actually incorporated into the Project. Each application for an Advance shall be deemed a certification of Borrower that as of the date of such application, all representations and warranties contained in the Agreement are true and correct, and that Borrower is in compliance with all of the provisions of this Agreement. Under no circumstances shall Lender be required to make any Loan Advance in an amount less than 20,000.00.

**Loan to Value.** Unless waived by Lender in writing, the ratio of the amount of the Loan to the Value of the Property as completed shall not exceed 73.200%.

**Payments.** At the sole option of Lender, Advances may be paid in the joint names of Borrower and the General Contractor, subcontractor(s), or supplier(s) in payment of sums due under the Construction Contract. At its sole option, Lender may directly pay the General Contractor and any subcontractors or other parties the sums due under the Construction Contract. Borrower appoints Lender as its attorney-in-fact to make such payments. This power shall be deemed coupled with an interest, shall be irrevocable, and shall survive an Event of Default under this Agreement.

**Projected Cost Overruns.** If Lender at any time determines in its sole discretion that the amount in the Loan Fund is insufficient, or will be insufficient, to complete fully and to pay for the Project, then within ten (10) days after receipt of a written request from Lender, Borrower shall deposit in the Loan Fund an amount equal to the deficiency as determined by Lender. The judgment and determination of Lender under this section shall be final and conclusive. Any such amounts deposited by Borrower shall be disbursed prior to any Loan proceeds.

**Final Payment to General Contractor.** Upon completion of the Project and fulfillment of the Construction Contract to the satisfaction of Lender and provided sufficient Loan Funds are available, Lender shall make an Advance to cover the final payment due to the General Contractor upon delivery to Lender of endorsements to the ALTA title insurance policy following the posting of the completion notice, as provided under applicable law. Construction shall not be deemed complete for purposes of final disbursement unless and until Lender shall have received all of the following:

(1) Evidence satisfactory to Lender that all work under the Construction Contract requiring inspection by any governmental authority with jurisdiction has been duly inspected and approved by such authority, that a certificate of occupancy has been issued, and that all parties performing work have been paid, or will be paid, for such work;

(2) A certification by an engineer, architect, or other qualified inspector acceptable to Lender that the Improvements have been completed substantially in accordance with the Plans and Specifications and the Construction Contract, that direct connection has been made to all utilities set forth in the Plans and Specifications, and that the Project is ready for occupancy; and

(3) Acceptance of the completed Improvements by Lender and Borrower.

**Construction Default.** If Borrower fails in any respect to comply with the provisions of this Agreement or if construction ceases before completion regardless of the reason, Lender, at its option, may refuse to make further Advances, may accelerate the indebtedness under the terms of the Note, and without thereby impairing any of its rights, powers, or privileges, may enter into possession of the construction site and perform or cause to be performed any and all work and labor necessary to complete the Improvements, substantially in accordance with the Plans and Specifications.

**Damage or Destruction.** If any of the Collateral or Improvements is damaged or destroyed by casualty of any nature, within sixty (60) days thereafter Borrower shall restore the Collateral and Improvements to the condition in which they were before such damage or destruction with funds other than those in the Loan Fund. Lender shall not be obligated to make disbursements under this Agreement until such restoration has been accomplished.

**Adequate Security.** When any event occurs that Lender determines may endanger completion of the Project or the fulfillment of any condition or covenant in this Agreement, Lender may require Borrower to furnish, within ten (10) days after delivery of a written request, adequate security to eliminate, reduce, or indemnify Lender against, such danger. In addition, upon such occurrence, Lender in its sole discretion may advance funds or agree to undertake to advance funds to any party to eliminate, reduce, or indemnify Lender against, such danger or to complete the Project. All sums paid by Lender pursuant to such agreements or undertakings shall be for Borrower's account and shall be without prejudice to Borrower's rights, if any, to receive such funds from the party to whom paid. All sums expended by Lender in the exercise of its option to complete the Project or protect Lender's interests shall be payable to Lender on demand together with interest from the date of the Advance at the rate



**CONSTRUCTION LOAN AGREEMENT**
(Continued)

Loan No: 9744781                                                          Page 5

applicable to the Loan. In addition, any Advance of funds under this Agreement, including without limitation direct disbursements to the General Contractor or other parties in payment of sums due under the Construction Contract, shall be deemed to have been expended by or on behalf of Borrower and to have been secured by Lender's Deed of Trust, if any, on the Collateral.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**LIMITATION OF RESPONSIBILITY.** The making of any Advance by Lender shall not constitute or be interpreted as either (A) an approval or acceptance by Lender of the work done through the date of the Advance, or (B) a representation or indemnity by Lender to any party against any deficiency or defect in the work or against any breach of any contract. Inspections and approvals of the Plans and Specifications, the Improvements, the workmanship and materials used in the Improvements, and the exercise of any other right of inspection, approval, or inquiry granted to Lender in this Agreement are acknowledged to be solely for the protection of Lender's interests, and under no circumstances shall they be construed to impose any responsibility or liability of any nature whatsoever on Lender to any party. Neither Borrower nor any contractor, subcontractor, materialman, laborer, or any other person shall rely, or have any right to rely, upon Lender's determination of the appropriateness of any Advance. No disbursement or approval by Lender shall constitute a representation by Lender as to the nature of the Project, its construction, or its intended use for Borrower or for any other person, nor shall it constitute an indemnity by Lender to Borrower or to any other person against any deficiency or defects in the Project or against any breach of any contract.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with such financial statements and other related information at such frequencies and in such detail as Lender may reasonably request.

**Additional Information.** Furnish such additional information and statements, lists of assets and liabilities, agings of receivables and payables, inventory schedules, budgets, forecasts, tax returns, and other reports with respect to Borrower's financial condition and business operations as Lender may request from time to time.

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Insurance.** Maintain fire and other risk insurance, hail, federal crop insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantor named below, on Lender's forms, and in the amount and under the conditions set forth in those guaranties.

| Name of Guarantor | Amount |
|---|---|
| Barry Beitler | Unlimited |

**Loan Fees, Charges and Expenses.** Whether or not the Project is completed, Borrower also shall pay upon demand all out-of-pocket expenses incurred by Lender in connection with the preparation of loan documents and the making of the Loan, including, without limitation, all closing costs, fees, and disbursements, all expenses of Lender's legal counsel, and all title examination fees, title insurance premiums, appraisal fees, survey costs, required fees, and filing and recording fees.

**Loan Proceeds.** Use all Loan proceeds solely for the following specific purposes:  Minimum advance of $20,000.00, no more than twice per month.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

101

EXHIBIT "10"
Page 5 of 11



**CONSTRUCTION LOAN AGREEMENT**
**(Continued)**

Loan No: 9744781                                                                                                    Page 6

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Construction of the Project.** Commence construction of the Project no later than October 5, 2005, and cause the Improvements to be constructed and equipped in a diligent and orderly manner and in strict accordance with the Plans and Specifications approved by Lender, the Construction Contract, and all applicable laws, ordinances, codes, regulations, and rights of adjoining or concurrent property owners. Borrower agrees to complete the Project for purposes of final payment to the General Contractor on or before October 5, 2005, regardless of the reason for any delay.

**Defects.** Upon demand of Lender, promptly correct any defect in the Improvements or any departure from the Plans and Specifications not approved by Lender in writing before further work shall be done upon the portion of the Improvements affected.

**Project Claims and Litigation.** Promptly inform Lender of (1) all material adverse changes in the financial condition of the General Contractor; (2) any litigation and claims, actual or threatened, affecting the Project or the General Contractor, which could materially affect the successful completion of the Project or the ability of the General Contractor to complete the Project as agreed; and (3) any condition or event which constitutes a breach or default under any of the Related Documents or any contract related to the Project.

**Payment of Claims and Removal of Liens.** (1) Cause all claims for labor done and materials and services furnished in connection with the Improvements to be fully paid and discharged in a timely manner, (2) diligently file or procure the filing of a valid notice of completion of the Improvements, or such comparable document as may be permitted under applicable lien laws, (3) diligently file or procure the filing of a notice of cessation, or such comparable document as may be permitted under applicable lien laws, upon the happening of cessation of labor on the Improvements for a continuous period of thirty (30) days or more, and (4) take all reasonable steps necessary to remove all claims of liens against the Collateral, the Improvements, or any part of the Collateral or Improvements, or any rights or interests appurtenant to the Collateral or Improvements. Upon Lender's request, Borrower shall make such demands or claims upon or against laborers, materialmen, subcontractors, or other persons who have furnished or claim to have furnished labor, services, or materials in connection with the Improvements, which demands or claims shall under the laws of the State of California require diligent assertions of lien claims upon penalty of loss or waiver thereof. Borrower shall, within ten (10) days after the filing of any claim of lien that is disputed or contested by Borrower, record or cause the General Contractor for the construction of the Improvements to record in the appropriate governmental office, a surety bond pursuant to California law sufficient to release the claim of lien and, within five (5) days of Lender's demand, make suitable provision by deposit of funds with Lender in an amount satisfactory to Lender or by bond satisfactory to Lender for the possibility that the contest will be unsuccessful. If Borrower fails to remove any lien on the Collateral or Improvements or provide a bond or deposit pursuant to this provision, Lender may pay such lien, or may contest the validity of the lien, and Borrower shall pay all costs and expenses of such contest, including Lender's reasonable attorneys' fees.

**Taxes and Claims.** Pay and discharge when due all of Borrower's indebtedness, obligations, and claims that, if unpaid, might become a lien or charge upon the Collateral or Improvements; provided, however, that Borrower shall not be required to pay and discharge any such indebtedness, obligation, or claim so long as (1) its legality shall be contested in good faith by appropriate proceedings, (2) the indebtedness, obligation, or claim does not become a lien or charge upon the Collateral or Improvements, and (3) Borrower shall have established on its books adequate reserves with respect to the amount contested in accordance with GAAP. If the indebtedness, obligation, or claim does become a lien or charge upon the Collateral or Improvements, Borrower shall remove the lien or charge as provided in the preceding paragraph.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests in the Collateral and Improvements.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and Indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Modification of Contract.** Make or permit to be made any modification of the Construction Contract.

**Liens.** Create or allow to be created any lien or charge upon the Collateral or the Improvements.

**Agreements.** Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**GENERAL PROJECT PROVISIONS.** The following provisions relate to the construction and completion of the Project:

EXHIBIT "10"
Page 6 of 11

## CONSTRUCTION LOAN AGREEMENT
### (Continued)

Loan No: 9744781                                                                 Page 7

**Change Orders.** All requests for changes in the Plans and Specifications, other than minor changes involving no extra cost, must be in writing, signed by Borrower and the architect, and delivered to Lender for its approval. Borrower will not permit the performance of any work pursuant to any change order or modification of the Construction Contract or any subcontract without the written approval of Lender. Borrower will obtain any required permits or authorizations from governmental authorities having jurisdiction before approving or requesting a new change order.

**Purchase of Materials; Conditional Sales Contracts.** No materials, equipment, fixtures, or articles of personal property placed in or incorporated into the Project shall be purchased or installed under any Security Agreement or other agreement whereby the seller reserves or purports to reserve title or the right of removal or repossession, or the right to consider such items as personal property after their incorporation into the Project, unless otherwise authorized by Lender in writing.

**Lender's Right of Entry and Inspection.** Lender and its agents shall have at all times the right of entry and free access to the Property and the right to inspect all work done, labor performed, and materials furnished with respect to the Project. Lender shall have unrestricted access to and the right to copy all records, accounting books, contracts, subcontracts, bills, statements, vouchers, and supporting documents of Borrower relating in any way to the Project.

**Lender's Right to Stop Work.** If Lender in good faith determines that any work or materials do not conform to the approved Plans and Specifications or sound building practices, or otherwise depart from any of the requirements of this Agreement, Lender may require the work to be stopped and withhold disbursements until the matter is corrected. In such event, Borrower will promptly correct the work to Lender's satisfaction. No such action by Lender will affect Borrower's obligation to complete the Improvements on or before the Completion Date. Lender is under no duty to supervise or inspect the construction or examine any books and records. Any inspection or examination by Lender is for the sole purpose of protecting Lender's security and preserving Lender's rights under this Agreement. No default of Borrower will be waived by any inspection by Lender. In no event will any inspection by Lender be a representation that there has been or will be compliance with the Plans and Specifications or that the construction is free from defective materials or workmanship.

**Indemnity.** Borrower shall indemnify and hold Lender harmless from any and all claims asserted against Lender or the Property by any person, entity, or governmental body, or arising out of or in connection with the Property, Improvements, or Project. Lender shall be entitled to appear in any proceedings to defend itself against such claims, and all costs and expenses attorneys' fees incurred by Lender in connection with such defense shall be paid by Borrower to Lender. Lender shall, in its sole discretion, be entitled to settle or compromise any asserted claims against it, and such settlement shall be binding upon Borrower for purposes of this indemnification. All amounts paid by Lender under this paragraph shall be secured by Lender's security agreement or Deed of Trust, if any, on the Property, shall be deemed an additional principal Advance under the Loan, payable upon demand, and shall bear interest at the rate applicable to the Loan.

**Publicity.** Lender may display a sign at the construction site informing the public that Lender is the construction lender for the Project. Lender may obtain other publicity in connection with the Project through press releases and participation in ground-breaking and opening ceremonies and similar events.

**Actions.** Lender shall have the right to commence, appear in, or defend any action or proceeding purporting to affect the rights, duties, or liabilities of the parties to this Agreement, or the disbursement of funds from the Loan Fund. In connection with this right, Lender may incur and pay reasonable costs, expenses and attorneys' fees. Borrower covenants to pay to Lender on demand all such expenses, together with interest from the date Lender incurs the expense at the rate specified in the Note) and Lender is authorized to disburse funds from the Loan Fund for such purposes.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any Loan.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Construction Contract.** The Improvements are not constructed in accordance with the Plans and Specifications or in accordance with the terms of the Construction Contract.

**Cessation of Construction.** Prior to the completion of construction of the Improvements and equipping of the Project, the construction of the Improvements or the equipping of the Project is abandoned or work thereon ceases for a period of more than ten (10) days for any reason, or the Improvements are not completed for purposes of final payment to the General Contractor prior to October 5, 2006, regardless of the reason for the delay.

**Transfer of Property.** Sale, transfer, hypothecation, assignment, or conveyance of the Property or the Improvements or any portion thereof or interest therein by Borrower or any Borrower without Lender's prior written consent.

## CONSTRUCTION LOAN AGREEMENT
### (Continued)

Loan No: 9744781                                                                 Page 8

**Condemnation.** All or any material portion of the Collateral is condemned, seized, or appropriated without compensation, and Borrower does not within thirty (30) days after such condemnation, seizure, or appropriation, initiate and diligently prosecute appropriate action to contest in good faith the validity of such condemnation, seizure, or appropriation.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT; REMEDIES.** Upon the occurrence of any Event of Default and at any time thereafter, Lender may, at its option, but without any obligation to do so, and in addition to any other right Lender without notice to Borrower may have, do any one or more of the following without notice to Borrower: (a) Cancel this Agreement; (b) Institute appropriate proceedings to enforce the performance of this Agreement; (c) Withhold further disbursement of Loan Funds; (d) Expend funds necessary to remedy the default; (e) Take possession of the Property and continue construction of the Project; (f) Accelerate maturity of the Note and/or Indebtedness and demand payment of all sums due under the Note and/or Indebtedness; (g) Bring an action on the Note and/or Indebtedness; (h) Foreclose Lender's security agreement or Deed of Trust, if any, on the Property in any manner available under law; and (i) Exercise any other right or remedy which it has under the Note or Related Documents, or which is otherwise available at law or in equity or by statute.

**COMPLETION OF IMPROVEMENTS BY LENDER.** If Lender takes possession of the Collateral, it may take any and all actions necessary in its judgment to complete construction of the Improvements, including but not limited to making changes in the Plans and Specifications, work, or materials and entering into, modifying or terminating any contractual arrangements, subject to Lender's right at any time to discontinue any work without liability. If Lender elects to complete the Improvements, it will not assume any liability to Borrower or to any other person for completing the Improvements or for the manner or quality of construction of the Improvements, and Borrower expressly waives any such liability. Borrower irrevocably appoints Lender as its attorney-in-fact, with full power of substitution, to complete the Improvements, at Lender's option, either in Borrower's name or in its own name. In any event, all sums expended by Lender in completing the construction of the Improvements will be considered to have been disbursed to Borrower and will be secured by the Collateral for the Loan. Any such sums that cause the principal amount of the Loan to exceed the face amount of the Note will be considered to be an additional Loan to Borrower, bearing interest at the Note rate and being secured by the Collateral. For these purposes, Borrower assigns to Lender all of its right, title and interest in and to the Project Documents; however Lender will not have any obligation under the Project Documents unless Lender expressly hereafter agrees to assume such obligations in writing. Lender will have the right to exercise any rights of Borrower under the Project Documents upon the occurrence of an Event of Default. Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement or by any other writing, shall be cumulative and may be exercised singularly or concurrently.

**ADDITIONAL DOCUMENTS.** Borrower shall provide Lender with the following additional documents:

**Articles of Organization and Company Resolutions.** Ocean View Medical Investors, LLC has provided or will provide Lender with a certified copy of Ocean View Medical Investors, LLC's Articles of Organization, together with a certified copy of resolutions properly adopted by the members of the company, under which the members authorized one or more designated members or employees to execute this Agreement, the Note and any and all Security Agreements directly or indirectly securing repayment of the same, and to consummate the borrowings and other transactions as contemplated under this Agreement, and to consent to the remedies following any default by Ocean View Medical Investors, LLC as provided in this Agreement and in any Security Agreements.

**Articles of Organization and Company Resolutions.** BAB 8, LLC has provided or will provide Lender with a certified copy of BAB 8, LLC's Articles of Organization, together with a certified copy of resolutions properly adopted by the members of the company, under which the members authorized one or more designated members or employees to execute this Agreement, the Note and any and all Security Agreements directly or indirectly securing repayment of the same, and to consummate the borrowings and other transactions as contemplated under this Agreement, and to consent to the remedies following any default by BAB 8, LLC as provided in this Agreement and in any Security Agreements.

**Opinion of Counsel.** When required by Lender, Borrower has provided or will provide Lender with an opinion of Borrower's counsel certifying to and that: (1) Borrower's Note, any Security Agreements and this Agreement constitute valid and binding obligations on Borrower's part that are enforceable in accordance with their respective terms; (2) Borrower is validly existing and in good standing; (3) Borrower has authority to enter into this Agreement and to consummate the transactions contemplated under this Agreement; and (4) such other matters as may have been requested by Lender or by Lender's counsel.

**INTEREST RESERVE.** As part of the total Loan Fund, Lender and Borrower have agreed to set aside an Interest Reserve Fund for payment of interest. Lender will advance funds from this Interest Reserve Fund to keep interest payments current. Should the funds set aside in the Interest Reserve Fund be completely disbursed, Borrower agrees to maintain the interest payments current or to replenish the Interest Reserve Fund with sufficient funds as required by Lender. Borrower may not use any portion of the Interest Reserve Fund for the payment of the costs of constructing the Improvements or equipping the Project.

**ADVANCE AUTHORITY.** Any one (1) of the following persons currently are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of their authority:

X_____        X_____
Barry Beitler                            John Bral

**INDEMNITY.** If any work or materials are furnished on the project prior to Lender's Deed of Trust and other security interest in the property being duly recorded or perfected, before Lender will be obligated to make any advances of Loan proceeds, Borrower must make adequate indemnity arrangements with the title company insuring Lender's Deed of Trust including disclosure to the title company that the work of improvement has commenced prior to such recordation or perfection, and title company must issue its commitment to insure the lien of the Lender's Deed of Trust notwithstanding such prior commencement of the work of improvement.

**COST BREAKDOWN.** All disbursements shall be based upon a detailed breakdown of the costs of construction of the Improvements and any financing or development costs for which Borrower might request disbursement. The initial cost breakdown, as approved by Lender, is attached as Exhibit "B". Disbursements need not be made by Lender unless and until the revised cost breakdown is approved. Lender reserves the right to approve or

EXHIBIT "10"
Page 8 of 11



Loan No: 9744781

## CONSTRUCTION LOAN AGREEMENT
(Continued)

Page 9

disapprove any revised cost breakdown in its sole discretion.

**CONDITION FOR DISBURSEMENT.** Prior to any loan funds being disbursed FRB must receive signed Budget and Contract.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Authority to File Notices.** Borrower appoints and designates Lender as its attorney-in-fact to file for the record any notice that Lender deems necessary to protect its interest under this Agreement. This power shall be deemed coupled with an interest and shall be irrevocable while any sum or performance remains due and owing under any of the Related Documents.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Indemnification of Lender.** Borrower agrees to indemnify, to defend and to save and hold Lender harmless from any and all claims, suits, obligations, damages, losses, costs and expenses (including, without limitation, Lender's attorneys' fees, as well as Lender's architect's and engineering fees), demands, liabilities, penalties, fines and forfeitures of any nature whatsoever that may be asserted against or incurred by Lender, its officers, directors, employees, and agents arising out of, relating to, or in any manner occasioned by this Agreement and the exercise of the rights and remedies granted Lender under this. The foregoing indemnity provisions shall survive the cancellation of this Agreement as to all matters arising or accruing prior to such cancellation and the foregoing indemnity shall survive in the event that Lender elects to exercise any of the remedies as provided under this Agreement following default hereunder.

**Joint and Several Liability.** All obligations of Borrower under this Agreement shall be joint and several, and all references to Borrower shall mean each and every Borrower. This means that each Borrower signing below is responsible for all obligations in this Agreement. Where any one or more of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any person or circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other person or circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated



# CONSTRUCTION LOAN AGREEMENT
## (Continued)

| Loan No: 9744781 | | Page 10 |

to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Construction Loan Agreement, as this Construction Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Construction Loan Agreement from time to time.

**Architect's Contract.** The words "Architect's Contract" mean the architect's contract between Borrower and the architect for the Project.

**Borrower.** The word "Borrower" means Ocean View Medical Investors, LLC; and BAB 8, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Completion Date.** The words "Completion Date" mean October 5, 2005.

**Construction Contract.** The words "Construction Contract" mean the contract between Borrower and the general contractor for the Project, and any subcontracts with subcontractors, materialmen, laborers, or any other person or entity for performance of work on the Project or the delivery of materials to the Project.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan and any guarantor under a completion guaranty agreement.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future buildings, structures, facilities, fixtures, additions, and similar construction on the Collateral.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means FIRST REGIONAL BANK, its successors and assigns.

**Loan.** The word "Loan" means the loan or loans made to Borrower under this Agreement and the Related Documents as described.

**Loan Fund.** The words "Loan Fund" mean the undisbursed proceeds of the Loan under this Agreement together with any equity funds or other deposits required from Borrower under this Agreement.

**Note.** The word "Note" means the promissory note dated October 5, 2005, in the original principal amount of $4,725,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure Indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Plans and Specifications.** The words "Plans and Specifications" mean the plans and specifications for the Project which have been submitted to and initialed by Lender, together with such changes and additions as may be approved by Lender in writing.

**Project.** The word "Project" means the construction project as described in the "Project Description" section of this Agreement.

**Project Documents.** The words "Project Documents" mean the Plans and Specifications, all studies, data and drawings relating to the Project, whether prepared by or for Borrower, the Construction Contract, the Architect's Contract, and all other contracts and agreements relating to the

EXHIBIT "10"
Page 10 of 11



Loan No: 9744781

### CONSTRUCTION LOAN AGREEMENT
(Continued)

Page 11

Project or the construction of the Improvements.

**Property.** The word "Property" means the property as described in the "Project Description" section of this Agreement.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in the "Project Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**Value.** The word "Value" means such amount or worth as defined and determined by Lender in its sole discretion unless agreed to the contrary by Lender in writing.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS CONSTRUCTION LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS CONSTRUCTION LOAN AGREEMENT IS DATED OCTOBER 5, 2005.

BORROWER:

OCEAN VIEW MEDICAL INVESTORS, LLC

By: _____
Barry Beitler, Managing Member of Ocean View
Medical Investors, LLC

By: _____
John Berg, Managing Member of Ocean View
Medical Investors, LLC

BAB 8, LLC

By: _____
Barry Beitler, Managing Member of BAB 8, LLC

LENDER:

FIRST REGIONAL BANK

By: _____
Authorized Officer

LASER PRO Lending, Ver. 5.26.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2005.  All Rights Reserved.  - CA  W:\LAPPRO\TFLP\G4\LPL TR-I ied  PR-88

107

EXHIBIT "10"
Page 11 of 11

LandAmerica Commercial Services

RECORDATION REQUESTED BY:
FIRST REGIONAL BANK
South Bay Regional Office
990 West 190th Street, Suite 440
Torrance, CA 90502

WHEN RECORDED MAIL TO:
FIRST REGIONAL BANK
South Bay Regional Office
990 West 190th Street, Suite 440
Torrance, CA 90502

Recorded in Official Records, Orange County
Tom Daly, Clerk-Recorder
|||||||||||||||||||||||||||||||||||||||||    57.00
2005000821196 04:14pm 10/12/05
203 59 D11 19
0.00 0.00 0.00 0.00 0.00 51.00 0.00 0.00 0.00

FOR RECORDER'S USE ONLY

## CONSTRUCTION DEED OF TRUST

THIS DEED OF TRUST is dated October 5, 2005, among Ocean View Medical Investors, LLC, a California limited liability company as to an undivided 80% interest, whose address is 825 S. Barrington Avenue, Los Angeles, CA 90049 and BAB 8, LLC, a California limited liability company as to an undivided 20% interest, whose address is 825 S. Barrington Avenue, Los Angeles,, CA 90049 ("Trustor"); FIRST REGIONAL BANK, whose address is South Bay Regional Office, 990 West 190th Street, Suite 440, Torrance, CA 90502 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and LAWYERS TITLE COMPANY, whose address is 800 East Colorado Boulevard, Pasadena, CA 91101 (referred to below as "Trustee").

CONVEYANCE AND GRANT. For valuable consideration, Trustor irrevocably grants, transfers and assigns to Trustee in trust, with power of sale, for the benefit of Lender as Beneficiary, all of Trustor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in Orange County County, State of California:

PARCEL 1 OF PARCEL MAP NO. 80-719, IN THE CITY OF NEWPORT BEACH, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP FILED IN BOOK 163, PAGES 31 AND 32 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

The Real Property or its address is commonly known as 441 Old Newport Blvd., Newport Beach, CA 92663. The Assessor's Parcel Number for the Real Property is 425-271-12.

Trustor presently assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Trustor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. This is an absolute assignment of Rents made in connection with an obligation secured by real property pursuant to California Civil Code Section 2938. In addition, Trustor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS OF THE TRUSTOR UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST. THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS ALSO GIVEN TO SECURE ANY AND ALL OF TRUSTOR'S OBLIGATIONS UNDER THAT CERTAIN CONSTRUCTION LOAN AGREEMENT BETWEEN TRUSTOR AND LENDER OF EVEN DATE HEREWITH. ANY EVENT OF DEFAULT UNDER THE CONSTRUCTION LOAN AGREEMENT, OR ANY OF THE RELATED DOCUMENTS REFERRED TO

EXHIBIT "11"
Page 1 of 18

**DEED OF TRUST**

Loan No: 9744781                                    **(Continued)**                                    Page 2

**IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Deed of Trust, Trustor shall pay to Lender all amounts secured by this Deed of Trust as they become due, and shall strictly and in a timely manner perform all of Trustor's obligations under the Note, this Deed of Trust, and the Related Documents.

**CONSTRUCTION MORTGAGE.** This Deed of Trust is a "construction mortgage" for the purposes of Sections 9-334 and 2A-309 of the Uniform Commercial Code, as those sections have been adopted by the State of California.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Trustor agrees that Trustor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, Trustor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Trustor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Trustor represents and warrants to Lender that: (1) During the period of Trustor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Trustor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Trustor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Trustor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Trustor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Trustor or to any other person. The representations and warranties contained herein are based on Trustor's due diligence in investigating the Property for Hazardous Substances. Trustor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Trustor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Trustor's ownership or interest in the Property, whether or not the same was or should have been known to Trustor. The provisions of this section of the Deed of Trust, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Trustor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Trustor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Trustor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Trustor to make arrangements satisfactory to Lender to replace such Improvements with

EXHIBIT "11"
Page 2 of 18

**DEED OF TRUST**

**Loan No: 9744781**
**(Continued)**
Page 3

Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Trustor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Trustor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Trustor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Trustor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Trustor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Trustor agrees neither to abandon or leave unattended the Property. Trustor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**Construction Loan.** If some or all of the proceeds of the loan creating the Indebtedness are to be used to construct or complete construction of any Improvements on the Property, the Improvements shall be completed no later than the maturity date of the Note (or such earlier date as Lender may reasonably establish) and Trustor shall pay in full all costs and expenses in connection with the work. Lender will disburse loan proceeds under such terms and conditions as Lender may deem reasonably necessary to insure that the interest created by this Deed of Trust shall have priority over all possible liens, including those of material suppliers and workmen. Lender may require, among other things, that disbursement requests be supported by receipted bills, expense affidavits, waivers of liens, construction progress reports, and such other documentation as Lender may reasonably request.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Trustor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Trustor. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust:

**Payment.** Trustor shall pay when due (and in all events at least ten (10) days prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Trustor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due and except as otherwise provided in this Deed of Trust.

**Right to Contest.** Trustor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Trustor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Trustor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Trustor



EXHIBIT "11"
Page 3 of 18

**DEED OF TRUST**
**(Continued)**

shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Trustor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Trustor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Trustor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Trustor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Trustor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Trustor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Trustor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Trustee and Lender being named as additional insureds in such liability insurance policies. Additionally, Trustor shall maintain such other insurance, including but not limited to hazard, business interruption, and boiler insurance, as Lender may reasonably require. Notwithstanding the foregoing, in no event shall Trustor be required to provide hazard insurance in excess of the replacement value of the improvements on the Real Property. Policies shall be written in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Trustor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Trustor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Trustor agrees to obtain and maintain Federal Flood Insurance, if available, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Trustor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Trustor fails to do so within fifteen (15) days of the casualty. If in Lender's sole judgment Lender's security interest in the Property has been impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If the proceeds are to be applied to restoration and repair, Trustor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Trustor from the proceeds for the reasonable cost of repair or restoration if Trustor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Trustor as Trustor's interests may appear.

**Trustor's Report on Insurance.** Upon request of Lender, however not more than once a year, Trustor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value

334

EXHIBIT "11"
Page 4 of 18

## DEED OF TRUST
**(Continued)**

of such property, and the manner of determining that value; and   (5)   the expiration date of the policy. Trustor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**TAX AND INSURANCE RESERVES.**  Subject to any limitations set by applicable law, Lender may require Trustor to maintain with Lender reserves for payment of annual taxes, assessments, and insurance premiums, which reserves shall be created by advance payment or monthly payments of a sum estimated by Lender to be sufficient to produce, amounts at least equal to the taxes, assessments, and insurance premiums to be paid. The reserve funds shall be held by Lender as a general deposit from Trustor, which Lender may satisfy by payment of the taxes, assessments, and insurance premiums required to be paid by Trustor as they become due. Lender shall have the right to draw upon the reserve funds to pay such items, and Lender shall not be required to determine the validity or accuracy of any item before paying it.   Nothing in the Deed of Trust shall be construed as requiring Lender to advance other monies for such purposes, and Lender shall not incur any liability for anything it may do or omit to do with respect to the reserve account.  Subject to any limitations set by applicable law, if the reserve funds disclose a shortage or deficiency, Trustor shall pay such shortage or deficiency as required by Lender.  All amounts in the reserve account are hereby pledged to further secure the Indebtedness, and Lender is hereby authorized to withdraw and apply such amounts on the Indebtedness upon the occurrence of an Event of Default.  Lender shall not be required to pay any interest or earnings on the reserve funds unless required by law or agreed to by Lender in writing.  Lender does not hold the reserve funds in trust for Trustor, and Lender is not Trustor's agent for payment of the taxes and assessments required to be paid by Trustor.

**LENDER'S EXPENDITURES.**  If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Trustor fails to comply with any provision of this Deed of Trust or any Related Documents, including but not limited to Trustor's failure to discharge or pay when due any amounts Trustor is required to discharge or pay under this Deed of Trust or any Related Documents, Lender on Trustor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property.  All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Trustor.  All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either  (1)  the term of any applicable insurance policy; or  (2)  the remaining term of the Note; or  (C)  be treated as a balloon payment which will be due and payable at the Note's maturity.  The Deed of Trust also will secure payment of these amounts.  Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.**  The following provisions relating to ownership of the Property are a part of this Deed of Trust:

**Title.**  Trustor warrants that:  (a) Trustor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and  (b) Trustor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

**Defense of Title.**  Subject to the exception in the paragraph above, Trustor warrants and will forever defend the title to the Property against the lawful claims of all persons.  In the event any action or proceeding is commenced that questions Trustor's title or the interest of Trustee or Lender under this Deed of Trust, Trustor shall defend the action at Trustor's expense.  Trustor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Trustor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.**  Trustor warrants that the Property and Trustor's use of the Property complies with

## DEED OF TRUST
### (Continued)

Loan No: 9744781                                                                                 Page 6

all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Trustor in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature, and shall remain in full force and effect until such time as Trustor's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to eminent domain and inverse condemnation proceedings are a part of this Deed of Trust:

**Proceedings.** If any eminent domain or inverse condemnation proceeding is commenced affecting the Property, Trustor shall promptly notify Lender in writing, and Trustor shall promptly take such steps as may be necessary to pursue or defend the action and obtain the award. Trustor may be the nominal party in any such proceeding, but Lender shall be entitled, at its election, to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Trustor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If any award is made or settlement entered into in any condemnation proceedings affecting all or any part of the Property or by any proceeding or purchase in lieu of condemnation, Lender may at its election, and to the extent permitted by law, require that all or any portion of the award or settlement be applied to the Indebtedness and to the repayment of all reasonable costs, expenses, and attorneys' fees incurred by Trustee or Lender in connection with the condemnation proceedings.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Deed of Trust:

**Current Taxes, Fees and Charges.** Upon request by Lender, Trustor shall execute such documents in addition to this Deed of Trust and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Trustor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Deed of Trust, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Deed of Trust.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Deed of Trust or upon all or any part of the Indebtedness secured by this Deed of Trust; (2) a specific tax on Trustor which Trustor is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust; (3) a tax on this type of Deed of Trust chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Trustor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Deed of Trust, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Trustor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Trustor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. Trustor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Trustor shall



336

**DEED OF TRUST**
**(Continued)**

Loan No: 9744781                                                                                           Page 7

not remove, sever or detach the Personal Property from the Property. Upon default, Trustor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Trustor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Trustor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Trustor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1)  Trustor's obligations under the Note, this Deed of Trust, and the Related Documents, and  (2)   the liens and security interests created by this Deed of Trust as first and prior liens on the Property, whether now owned or hereafter acquired by Trustor.  Unless prohibited by law or Lender agrees to the contrary in writing, Trustor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Trustor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Trustor and at Trustor's expense.  For such purposes, Trustor hereby irrevocably appoints Lender as Trustor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Trustor pays all the Indebtedness when due, and otherwise performs all the obligations imposed upon Trustor under this Deed of Trust, Lender shall execute and deliver to Trustee a request for full reconveyance and shall execute and deliver to Trustor suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property.  Lender may charge Trustor a reasonable reconveyance fee at the time of reconveyance.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Deed of Trust:

**Payment Default.** Trustor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Trustor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Deed of Trust or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Trustor.

**Compliance Default.** Failure to comply with any other term, obligation, covenant or condition contained in this Deed of Trust, the Note or in any of the Related Documents.

**Default on Other Payments.** Failure of Trustor within the time required by this Deed of Trust to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with the Property.

**Default in Favor of Third Parties.** Should Trustor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Trustor's property or Trustor's ability to repay the Indebtedness or perform their respective obligations under this Deed of Trust or any of the Related Documents.

337

**DEED OF TRUST**
**(Continued)**

Loan No: 9744781                                                                          Page 8

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Trustor or on Trustor's behalf under this Deed of Trust or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Deed of Trust or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution of Trustor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Trustor's existence as a going business or the death of any member, the insolvency of Trustor, the appointment of a receiver for any part of Trustor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Trustor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Trustor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Trustor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Trustor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Trustor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Trustor under the terms of any other agreement between Trustor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any Indebtedness or other obligation of Trustor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Adverse Change.** A material adverse change occurs in Trustor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default in payment is curable and if Trustor has not been given a notice of a breach of the same provision of this Deed of Trust within the preceding twelve (12) months, it may be cured if Trustor, after receiving written notice from Lender demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Trustor under this Deed of Trust, after Trustor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Foreclosure by Sale.** Upon an Event of Default under this Deed of Trust, Beneficiary may declare the entire Indebtedness secured by this Deed of Trust immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold



EXHIBIT "11"
Page 8 of 18

## DEED OF TRUST
### (Continued)

the Property, which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed of Trust, the Note, other documents requested by Trustee, and all documents evidencing expenditures secured hereby. After the lapse of such time as may then be required by law following the recordation of the notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell the Property at the time and place fixed by it in the notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of the Property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement in accordance with applicable law. Trustee shall deliver to such purchaser its deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee or Beneficiary may purchase at such sale. After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

**Judicial Foreclosure.** With respect to all or any part of the Real Property, Lender shall have the right in lieu of foreclosure by power of sale to foreclose by judicial foreclosure in accordance with and to the full extent provided by California law.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code, including without limitation the right to recover any deficiency in the manner and to the full extent provided by California law.

**Collect Rents.** Lender shall have the right, without notice to Trustor to take possession of and manage the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Trustor irrevocably designates Lender as Trustor's attorney-in-fact to endorse instruments received in payment thereof in the name of Trustor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Tenancy at Sufferance.** If Trustor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Trustor, Trustor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Note or by law.

**Notice of Sale.** Lender shall give Trustor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of



EXHIBIT "11"
Page 9 of 18

## DEED OF TRUST
(Continued)

Loan No: 9744781                                                              Page 10

the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Sale of the Property.** To the extent permitted by applicable law, Trustor hereby waives any and all rights to have the Property marshalled. In exercising its rights and remedies, the Trustee or Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Trustor also will pay any court costs, in addition to all other sums provided by law.

**Rights of Trustee.** Trustee shall have all of the rights and duties of Lender as set forth in this section.

**POWERS AND OBLIGATIONS OF TRUSTEE.** The following provisions relating to the powers and obligations of Trustee are part of this Deed of Trust:

**Powers of Trustee.** In addition to all powers of Trustee arising as a matter of law, Trustee shall have the power to take the following actions with respect to the Property upon the written request of Lender and Trustor: (a) join in preparing and filing a map or plat of the Real Property, including the dedication of streets or other rights to the public; (b) join in granting any easement or creating any restriction on the Real Property; and (c) join in any subordination or other agreement affecting this Deed of Trust or the interest of Lender under this Deed of Trust.

**Obligations to Notify.** Trustee shall not be obligated to notify any other party of a pending sale under any other trust deed or lien, or of any action or proceeding in which Trustor, Lender, or Trustee shall be a party, unless the action or proceeding is brought by Trustee.

**Trustee.** Trustee shall meet all qualifications required for Trustee under applicable law. In addition to the rights and remedies set forth above, with respect to all or any part of the Property, the Trustee shall have the right to foreclose by notice and sale, and Lender shall have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law.

**Successor Trustee.** Lender, at Lender's option, may from time to time appoint a successor Trustee to any Trustee appointed under this Deed of Trust by an instrument executed and acknowledged by Lender and recorded in the office of the recorder of Orange County County, State of California. The instrument shall contain, in addition to all other matters required by state law, the names of the original Lender, Trustee, and Trustor, the book and page where this Deed of Trust is recorded, and the name and address of the successor trustee, and the instrument shall be executed and acknowledged by Lender or its successors in interest. The successor trustee, without conveyance of the Property, shall succeed to all the title, power, and duties conferred upon the Trustee in this Deed of Trust and by applicable law. This procedure for substitution of Trustee shall govern to the exclusion of all other provisions for substitution.

**Acceptance by Trustee.** Trustee accepts this Trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.

**NOTICES.** Any notice required to be given under this Deed of Trust shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law),



340

# DEED OF TRUST
## (Continued)

when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. Trustor requests that copies of any notices of default and sale be directed to Trustor's address shown near the beginning of this Deed of Trust. All copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust shall be sent to Lender's address, as shown near the beginning of this Deed of Trust. Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Trustor agrees to keep Lender informed at all times of Trustor's current address. Unless otherwise provided or required by law, if there is more than one Trustor, any notice given by Lender to any Trustor is deemed to be notice given to all Trustors.

**STATEMENT OF OBLIGATION FEE.** Lender may collect a fee, not to exceed the maximum amount permitted by law, for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**LENDER'S RIGHT TO REAPPRAISE PROPERTY.** Lender may, not more often than once in any 12 month period, enter the Real Property through its agent for purposes of appraising the value of the Property. Upon the demand of Lender, Trustor shall reimburse Lender for its costs incurred in performing an appraisal of the Property.

**CONSENT TO LOAN PARTICIPATION.** Lender, may from time to time solicit purchasers for all or a portion of the Indebtedness. In connection with such a solicitation, Lender has the right to permit potential purchaser(s) to review all of the Lender's records and documents with respect to the Indebtedness, including confidential financial information and documents Grantor and/or Borrower have given to Lender. Grantor or Borrower waive any right of privacy with respect to information and documents provided to Lender. In connection with any potential sale of the Indebtedness by Lender, Grantor and/or Borrower agrees to acknowledge, at the Bank's request, the then outstanding balances of the Indebtedness and to acknowledge that Grantor and/or Borrower does not possess any claim, offset, or defense against Lender which would diminish the enforceability of the Indebtedness or any of the documents evidencing or securing the Indebtedness.

**FINANCIAL RECORDS.** Trustor will furnish to Lender financial statements and other related information at such frequencies and in such detail as Lender may reasonably request and permit Lender to examine and audit Trustor's books and records. .

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.** This Deed of Trust, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust. No alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Trustor's residence, Trustor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Trustor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Governing Law. This Deed of Trust will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Deed of Trust has been accepted by Lender in the State of California.**

**Joint and Several Liability.** All obligations of Trustor under this Deed of Trust shall be joint and several, and all references to Trustor shall mean each and every Trustor. This means that each Trustor signing below is



EXHIBIT "11"
Page 11 of 18

**DEED OF TRUST**
**(Continued)**

Loan No: 9744781    Page 12

---

responsible for all obligations in this Deed of Trust. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Deed of Trust.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Deed of Trust unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Deed of Trust shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Deed of Trust. No prior waiver by Lender, nor any course of dealing between Lender and Trustor, shall constitute a waiver of any of Lender's rights or of any of Trustor's obligations as to any future transactions. Whenever the consent of Lender is required under this Deed of Trust, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Deed of Trust to be illegal, invalid, or unenforceable as to any person or circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other person or circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Deed of Trust. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Deed of Trust shall not affect the legality, validity or enforceability of any other provision of this Deed of Trust.

**Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Trustor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Trustor, Lender, without notice to Trustor, may deal with Trustor's successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Trustor from the obligations of this Deed of Trust or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**Waive Jury. All parties to this Deed of Trust hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Deed of Trust. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Deed of Trust shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Beneficiary.** The word "Beneficiary" means FIRST REGIONAL BANK, and its successors and assigns.

**Borrower.** The word "Borrower" means Ocean View Medical Investors, LLC; and BAB 8, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Trustor, Lender, and Trustee, and includes without limitation all assignment and security interest provisions relating to the Personal Property and Rents.

**Default.** The word "Default" means the Default set forth in this Deed of Trust in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act

342

**DEED OF TRUST**
**(Continued)**

Loan No: 9744781                                                                        Page 13

of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Trustor's obligations or expenses incurred by Trustee or Lender to enforce Trustor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust.

**Lender.** The word "Lender" means FIRST REGIONAL BANK, its successors and assigns.

**Note.** The word "Note" means the promissory note dated October 5, 2005, **in the original principal amount of $4,725,000.00** from Trustor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. **NOTICE TO TRUSTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.**

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Trustor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property. The words "Personal Property" also include all tangible and intangible items obtained or owned by, or in the possession of Trustor that are directly or indirectly related to the acquisition, development, design, construction, permitting, marketing, or habitation of the Real Property or the Improvements to be constructed on the Real Property, whether heretofore or hereafter issued, prepared, or executed, including without limitation all permits, licenses, authorizations and approvals, trademarks and tradenames, and any and all land use entitlements, development rights, sewer capacity, approvals, density allocations and other rights or approvals relating to or authorizing the development or occupancy of the Property, plus all utility or other deposits, reimbursement rights, studies, tests, contracts, plans and specifications, relating to the Property and Improvements.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust.

EXHIBIT "11"
Page 13 of 18

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future leases, rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property together with the cash proceeds of the Rents.

**Trustee.** The word "Trustee" means LAWYERS TITLE COMPANY, whose address is 800 East Colorado Boulevard, Pasadena, CA 91101 and any substitute or successor trustees.

**Trustor.** The word "Trustor" means Ocean View Medical Investors, LLC; and BAB 8, LLC.

**EACH TRUSTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND EACH TRUSTOR AGREES TO ITS TERMS, INCLUDING THE VARIABLE RATE PROVISIONS OF THE NOTE SECURED BY THIS DEED OF TRUST.**

**TRUSTOR:**

**OCEAN VIEW MEDICAL INVESTORS, LLC**

By: _____
    Barry Beitler, Managing Member of Ocean View Medical
    Investors, LLC

By: _____
    John Bral, Managing Member of Ocean View Medical
    Investors, LLC

**BAB 8, LLC**

By: _____
    Barry Beitler, Managing Member of BAB 8, LLC

344

EXHIBIT "11"
Page 14 of 18

| Loan No: 9744781 | **DEED OF TRUST**<br>**(Continued)** | Page 15 |
|---|---|---|

## CERTIFICATE OF ACKNOWLEDGMENT

STATE OF _California_                    )
                                         ) SS
COUNTY OF _Los Angeles_                  )

On _October 5_, 20 05 before me, _Darla A. Holmes_,
personally appeared **Barry Beitler**, ~~personally known to me~~ (or proved to me on the basis of satisfactory
evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me
that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

```
DARLA A. HOLMES
Commission # 1499216
Notary Public - California
Los Angeles County
My Comm. Expires Jul 6, 2008
```

(Seal)

EXHIBIT "11"
Page 15 of 18

| Loan No: 9744781 | **DEED OF TRUST**<br>**(Continued)** | Page 16 |

## CERTIFICATE OF ACKNOWLEDGMENT

STATE OF  _California_                    )
                                          ) SS
COUNTY OF  _Los Angeles_                  )

On _October 5_, 20_05_ before me, _Darla A. Holmes_

personally appeared **John Bral,** ~~personally known to me~~ (or proved to me on the basis of satisfactory evidence)
to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on
the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**WITNESS my hand and official seal.**

Signature _____

DARLA A. HOLMES
Commission # 1499216
Notary Public - California
Los Angeles County
My Comm. Expires Jul 6, 2008

(Seal)

346

**DEED OF TRUST**

Loan No: 9744781            **(Continued)**            **Page 17**

---

## CERTIFICATE OF ACKNOWLEDGMENT

STATE OF *California*         )

                           ) SS

COUNTY OF *Los Angeles*     )

On *October 5*, 20*05* before me, *Darla A. Holmes*,
personally appeared **Barry Beitler**, ~~personally known to me~~ (or proved to me on the basis of satisfactory
evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me
that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**WITNESS my hand and official seal.**

Signature _____                     **(Seal)**

*DARLA A. HOLMES
Commission # 1499216
Notary Public - California
Los Angeles County
My Comm. Expires Jul 6, 2008*

---

**(DO NOT RECORD)**

## REQUEST FOR FULL RECONVEYANCE

**(To be used only when obligations have been paid in full)**

To: _____, Trustee

The undersigned is the legal owner and holder of all indebtedness secured by this Deed of Trust. All sums
secured by this Deed of Trust have been fully paid and satisfied. You are hereby directed, upon payment to you
of any sums owing to you under the terms of this Deed of Trust or pursuant to any applicable statute, to cancel
the Note secured by this Deed of Trust (which is delivered to you together with this Deed of Trust), and to
reconvey, without warranty, to the parties designated by the terms of this Deed of Trust, the estate now held by
you under this Deed of Trust. Please mail the reconveyance and Related Documents to:

Date: _____      Beneficiary: _____

                                       By: _____

                                       Its: _____

LASER PRO Lending, Ver. 5.28.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2005  All Rights Reserved.  - CA  W:\LAPPS\CFI\LPL\G01.FC  TR-1640  PR-39

EXHIBIT "11"
Page 17 of 18



18551 Von Karman
Suite 100-200
Irvine, California 92612
Phone: (949) 223-5575

## PENALTY OF PERJURY AFFIDAVIT
### (GOVERNMENT CODE 27361.7)

I certify under the penalty of perjury that the notary seal on the document to which this statement is attached reads as follows:

Name of the Notary: Darla A. Holmes

Date Commission expires: July 6, 2008

County Where Bond is Filed: Los Angeles

Commission No.: 1499216        Manufacturer/Vendor No.: NNA1

Place of Execution: _____Irvine, Ca._____ Date: October 7, 2005

Signature: _____
                          LAWYERS TITLE COMPANY

I further certify under the penalty of perjury that the illegible portion of the document to which this statement is attached reads as follows (if applicable):

Date: October 7, 2005

Signature: _____
                          LAWYERS TITLE COMPANY

EXHIBIT "11"
Page 18 of 18

### FIRST-CITIZENS BANK & TRUST COMPANY
### NOTE GUARANTY
### CALIFORNIA

For Bank Use Only:

Account # _____ Obligor # 4320190 Future Obligation # _____ Current Obligation # 2019479

Account # _____ Obligor # _____ Future Obligation # _____ Current Obligation # _____

February 22, 2011
Date of Execution and Delivery

GUARANTOR(S):

Name: John Braj                         Name:

Address: 2601 Main St Ste 560           Address:
         Irvine, CA 92614-4224

Soc.Sec./Tax ID No. 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         Soc.Sec./Tax ID No.

LENDER: First-Citizens Bank & Trust Company    Branch No. 982    State In which Branch is Located: California

DEFINITIONS. The following words shall have the following meanings when used in this Guaranty:

Borrower. The word "Borrower" means each and every maker of the Note identified below and each and every person who at any time assumed, assumes, or otherwise became or becomes primarily liable on the Note identified below. If there is more than one Borrower, the word "Borrower" refers individually to each such Borrower and collectively to all such Borrowers.

Guarantor. The word "Guarantor" means the guarantor identified above, if there is only one guarantor. If there is more than one guarantor identified above, the word "Guarantor" refers individually to each such guarantor and collectively to all such guarantors.

Guaranty. The word "Guaranty" means this Note Guaranty.

Lender. The word "Lender" means First-Citizens Bank & Trust Company. The Lender's mailing address is: First-Citizens Bank & Trust Company, Loan Servicing Department-DAC20, P.O. Box 26592, Raleigh, NC 27611-6592. As of the date of this Guaranty, Lender is the owner and holder of the Note.

Note. The word "Note" refers to the following promissory note, credit agreement, instrument, agreement, obligation, or other evidence of debt:

Title of Instrument: Promissory Note

Dated: October 5, 2005              Original Principal Amount:    $ 4,725,000.00

Original Borrower(s)/Obligor(s): Ocean View Medical Investors LLC and BAD 8 LLC

Original Creditor/Payee: First Regional Bank

, together with all renewals, extensions, modifications, refinancings, consolidations, and substitutions thereof or therefor, and all increases therein. However, unless Guarantor otherwise agrees, the word "Note" does not include any modification, renewal, replacement or substitution of or for the promissory note, credit agreement, instrument, agreement, obligation, or other evidence of debt identified above signed after the date of this Guaranty that increases the face amount thereof for any reason other than to capitalize accrued interest and/or other sums that are then due and payable.

B14-84010 (CA) (1/11)

136

**GUARANTY.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees the payment to Lender or its order of all sums due on the Note, in legal tender. This is an unconditional and continuing guaranty for the prompt and punctual payment as and when due of all principal, interest, and other sums due on the Note, whether the Note is due in part or in full, at maturity or earlier, or by reason of acceleration or otherwise. This is a guaranty of payment and not of collection. The liability of each Guarantor under this Guaranty shall be joint and several.

This Guaranty applies only to the Note and does not apply to any other debt now or hereafter owed to Lender. However, if Lender currently holds or hereafter receives one or more additional guaranties from Guarantor, the rights of Lender under all such guaranties shall be cumulative. This Guaranty shall not affect or lessen any of such other guaranties. The liability of Guarantor will be the aggregate liability of Guarantor under the terms of this Guaranty and all such other unterminated guaranties. Guarantor has not signed this Guaranty in reliance on the guaranty(ies) of any other guarantor(s). Guarantor's liability under this Guaranty shall be separate and independent of the liability of Borrower and of the liability of any other guarantor(s) of all or any portion of the Note, and Guarantor's liability under this Guaranty shall not be affected or lessened by the guaranty(ies) of any other guarantor(s), the termination or revocation of any other guaranty(ies), or the release of any Borrower or of any other guarantor(s).

If the Note is not paid as and when due, Lender may call upon Guarantor from time to time to pay without first pursuing its remedies against any collateral and without first attempting to collect from any Borrower or any other person or entity who may be liable for all or any portion of the Note.

**DURATION OF GUARANTY.** This Guaranty will take effect when signed by Guarantor and received by Lender without the necessity of any acceptance by Lender or any notice to Guarantor or to any Borrower. This Guaranty will continue in full force and effect until the Note has been fully and finally paid and satisfied, the rights of each Borrower to obtain further credit advances under the Note have been terminated, and all other obligations of Guarantor under this Guaranty have been performed in full. It is anticipated that sums owing on the Note and covered by this Guaranty may fluctuate from time to time. Guarantor specifically acknowledges and agrees that reductions in the sums owed on the Note from time to time, even to zero dollars ($0.00), shall not terminate this Guaranty. This Guaranty is binding on Guarantor even though the indebtedness guaranteed may from time to time be zero dollars ($0.00).

If Lender is required or agrees to pay, return or restore any amounts previously paid on the Note because of any bankruptcy or insolvency proceeding or for any other reason, the obligations of Guarantor shall be reinstated and revived and the rights of Lender shall continue with regard to such amounts, all as though they had never been paid.

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, without notice to or demand upon Guarantor, without Guarantor's knowledge or consent, and without affecting or lessening Guarantor's liability under this Guaranty, from time to time: (a) to advance and re-advance loan proceeds; (b) to modify, alter, increase, renew, extend, accelerate, compromise or otherwise change (without limit as to the number of times or of the periods thereof) the terms of the Note, including but not limited to extending the time for payment, modifying the repayment terms and increasing or decreasing the interest rate (provided, however, that unless Guarantor otherwise agrees, this Guaranty shall not extend to any modification of the Note or to any renewal, substitution or replacement of or for the Note subsequent to the date of this Guaranty that increases the face amount of the Note for any reason other than to capitalize accrued interest and/or other sums then due and payable); (c) to release, substitute, settle with, agree not to sue, or deal with any Borrower, surety, endorser, or other guarantor on any terms or in any manner Lender may choose; (d) to take and hold collateral for the payment of the Note and/or this Guaranty, and to exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such collateral, with or without the substitution of new collateral; (e) to direct the order and manner for the disposition of any collateral for the payment of the Note and/or this Guaranty; (f) to determine the order of application of payments and credits to the Note; (g) to consent to any assumption of the Note; (h) to sell, transfer, assign, or grant participations in all or any part of the Note, and in connection therewith to disclose information (including financial information) relating to Guarantor and/or Borrower; (i) to assign or transfer this Guaranty in whole or in part; and (j) to extend credit to any Borrower or lease equipment or other goods to any Borrower (provided, however, that this Guaranty shall not extend to any such additional credit or leases without Guarantor's consent).

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (a) Lender's financial accommodations to Borrower (including the loan evidenced by the Note) are adequate consideration for the giving of this Guaranty; (b) Guarantor will receive direct or indirect benefit from Lender's loan(s) to Borrower and/or Lender's business dealings with Borrower; (c) this Guaranty is executed at Borrower's request and not at the request of Lender; and (d) Guarantor has adequate means to obtain information regarding each Borrower's financial condition on a continuing basis. This Guaranty is based solely on Guarantor's independent evaluation of each Borrower's financial condition and not upon any representation or statements made by Lender or on

2

EXHIBIT "12"
Page 2 of 7

Lender's behalf. Guarantor assumes full responsibility for obtaining such additional information concerning each Borrower's financial condition as Guarantor deems material to Guarantor's obligations under this Guaranty. Absent Guarantor's written request for such information and Borrower's consent to disclose such information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with any Borrower. Guarantor knowingly accepts the full range of risk encompassed in this Guaranty resulting from the possibility that Borrower's financial condition and/or ability to pay debts as they mature may deteriorate.

**GUARANTOR'S OBLIGATION TO PROVIDE FINANCIAL INFORMATION.** For purposes of this section, "Financial Information" means information relating to Guarantor's finances. Guarantor covenants and agrees with Lender that, so long as this Guaranty remains in effect, Guarantor will furnish Lender with such Financial Information at such times and in such detail as Lender may reasonably request, including, but not limited to, the following: (i) Guarantor's personal financial statement (if Guarantor is an individual); (ii) Guarantor's quarterly and year-end balance sheet and profit and loss statements (if Guarantor is engaged in business activities); (iii) copies of Guarantor's federal and state tax returns and all schedules relating thereto, including Schedule K-1 (if applicable); and (iv) such additional information and statements, lists of assets and liabilities, aging of receivables and payables, inventory schedules, budgets, forecasts, tax returns, and other reports with respect to Guarantor's financial condition and business operations as Lender may reasonably request from time to time.

Guarantor warrants and represents that (i) all Financial Information Guarantor has provided and that has been provided on Guarantor's behalf to date is true and accurate in all material respects and fairly presents Guarantor's financial condition and business transactions as of the date of the Financial Information provided, and (ii) Financial Information Guarantor provides and that is provided on Guarantor's behalf in the future will be true and accurate in all material respects and will fairly present Guarantor's financial condition and business transactions as of the date of the Financial Information provided. Guarantor further warrants and represents that, except as specifically disclosed in the Financial Information, (i) Guarantor has no direct or contingent liabilities; (ii) title to all assets listed in the Financial Information is solely in Guarantor's name, and no other person or entity has an interest in such assets; (iii) there exist no liens, encumbrances, or defects in or upon the assets listed in the Financial Information; (iv) all taxes owed by Guarantor have been fully paid and discharged, except taxes not then due and payable without penalty; (v) there are no claims, actions, or proceedings pending or threatened against Guarantor or any of Guarantor's property; and (vi) there are no judgments or liens against Guarantor or any of Guarantor's property. With respect to each copy of Guarantor's tax returns given to Lender, Guarantor warrants and represents that (i) the copy is a true and accurate copy of the return, as filed; (ii) the original of the return was properly signed or electronically authenticated by Guarantor or on Guarantor's behalf and submitted to the appropriate tax authority; and (c) the return accurately states the Guarantor's income, deductions and tax liability for the period stated. Guarantor acknowledges that Lender has relied and will rely on Guarantor's Financial Information.

Guarantor covenants and agrees to send written notice to Lender within five (5) business days after the occurrence of any change that is both material and adverse in (a) Guarantor's financial condition or business transactions, (b) Guarantor's ability to perform Guarantor's obligations to Lender, or (c) Financial Information previously given.

Guarantor authorizes Lender and its affiliates to make such credit, employment, and investigative inquires about Guarantor from time to time as Lender and its affiliates deem appropriate to evaluate Guarantor's financial strength, character, and credit history, to administer any loan(s) made to others guaranteed by Guarantor, and to collect any sums owing. Lender is authorized to verify information about Guarantor and obtain consumer report(s) about each individual who signs this Guaranty as a Guarantor or in a representative capacity on behalf of a Guarantor.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (a) to notify Guarantor of any advance or re-advance of loan proceeds; (b) to notify Guarantor of any modification, alteration, renewal, extension, acceleration, compromise or other change in the Note; (c) to continue lending money or to extend other credit to any Borrower or to notify Guarantor of any such loan or extension of credit; (d) to make any presentment, protest, or demand for payment; (e) to give Guarantor notice of any kind, including notice of acceptance of this Guaranty, notice of change of any terms of repayment of the Note, notice of delinquency, notice of default by Borrower or any other guarantor or surety, notice of any action or non-action taken by Borrower, Lender, or any other guarantor or surety of Borrower, notice of intent to accelerate, notice of acceleration, notice of nonpayment, notice of dishonor or notice of protest; (f) to resort for payment or to proceed directly or at once against any person or entity, including any Borrower or any other guarantor, before proceeding against Guarantor; (g) to proceed directly against or exhaust any collateral given to secure payment of the Note and/or this Guaranty before proceeding against Guarantor; (h) to apply any payments or proceeds received against the Note in any order; (i) to disclose any information about the Note, the Borrower, the collateral, or any other guarantor or surety, or about any action or non-action of Lender; (j) to marshal assets or liabilities or to sell assets in inverse order of alienation; or (k) to pursue any other remedy or course of action within Lender's power.

3

138

EXHIBIT "12"
Page 3 of 7

Guarantor also waives any and all rights or defenses arising by reason of (a) the cessation from any cause whatsoever, other than payment in full, of the Note; (b) the application of proceeds of the Note by Borrower for purposes other than the purposes understood and intended by Guarantor and Lender; (c) any act of omission or commission by Lender which directly or indirectly results in or contributes to the discharge of Borrower or any other guarantor or surety, or the Note or the loss or release of any collateral by operation of law or otherwise; (d) any statute of limitations in any action under this Guaranty or on the Note or (e) any modification or change in terms of the Note, including, without limitation, the renewal, extension, acceleration, or other change in the time payment the Note is due and any change in the interest rate. Guarantor waives any right to claim a discharge of this Guaranty on the basis of suretyship or unjustified impairment of any collateral.

Guarantor waives (a) any rights or defenses based on any claim that Guarantor's obligations exceed or are more burdensome than those of Borrower; (b) any right or defense Guarantor may have at law or in equity, including California Code of Civil Procedure § 580a, to a fair market value hearing or action to determine a deficiency after a foreclosure; (c) Guarantor's rights of subrogation, reimbursement, indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 through 2855, inclusive, of the California Civil Code; (d) any rights and defenses Guarantor may have in respect of Guarantor's obligations as a guarantor or other surety by reason of any election of remedies by Lender; and (e) any rights or defenses Guarantor may have because the Note is or may be secured from time to time by real estate or an estate for years, including, without limitation, any rights or defenses that are based upon, directly of indirectly, the application of Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure to the Note. To that end:

Guarantor waives all rights and defenses that Guarantor may have because all or any part of the Note is or may be secured from time to time by real property. This means, among other things:

(1) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower.

(2) If Lender forecloses on any real property collateral pledged by Borrower:

(a) The amount of Borrower's obligation may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

(b) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower.

This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because the Note is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure. The obligations of Guarantor under this Guaranty shall survive any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the Security Instrument.

Guarantor waives all rights and defenses arising out of an election of remedies by Lender even though that election of remedies, such as a non-judicial foreclosure with respect to security for the Note, has destroyed Guarantor's rights of subrogation and reimbursement against Borrower by operation of Section 580d of the California Code of Civil Procedure or otherwise.

Guarantor also (a) waives any defense that arises because of any disability or any other defense any Borrower may assert; (b) waives any defense based on the assertion that the Note is invalid or unenforceable or that any Borrower never was or is no longer liable on the Note for any reason; (c) waives and agrees not to assert or claim at any time any deduction to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, recoupment or similar right, whether such claim or right may be asserted by Guarantor, by any Borrower, or by any other person or entity; (d) waives all homestead and other exemptions relating to any collateral that secures the payment of all or any part of the Note and/or this Guaranty; and (e) waives any and all rights (whether by subrogation, indemnity, reimbursement or otherwise) to recover from Borrower any amounts paid by Guarantor under this Guaranty unless and until the Note has been fully and finally paid and satisfied.

4

139

EXHIBIT "12"
Page 4 of 7

Guarantor understands and agrees that the foregoing waivers are unconditional and irrevocable waivers of substantive rights and defenses to which Guarantor might otherwise be entitled under state and federal law. Guarantor acknowledges that Guarantor has provided these waivers of rights and defenses with the intention that they be fully relied upon by Lender. Guarantor further understands and agrees that this Guaranty is a separate and independent contract between Guarantor and Lender, given for full and ample consideration, and is enforceable on its own terms. Until the Note is paid in full, Guarantor waives any right to enforce any remedy Guarantor may have against the Borrower or any other guarantor, surety, or other person, and further, Guarantor waives any right to participate in any collateral for the Note now or hereafter held by Lender.

**USE OF PROCEEDS.** Guarantor agrees that Lender has no duty to monitor or verify any Borrower's use of the proceeds of any loan or to ensure or verify that any loan proceeds are used for the purposes described in any credit application, loan agreement or any other document. Guarantor waives and agrees not to assert against Lender any claim or defense based on **(a)** the actual use of any loan proceeds, **(b)** the failure of any loan proceeds to be used for any purpose described in any credit application, loan agreement, or any other document, and **(c)** Lender's knowledge that loan proceeds were not used for the purpose described in any credit application; loan agreement or any other document.

**LENDER'S RIGHT OF SETOFF.** Unless this Guaranty is secured by a mortgage or deed of trust on California real property, Lender has the right of setoff provided by law and/or as provided by any deposit account agreement or other agreement Guarantor has or may hereafter have with Lender. Lender may exercise its right of setoff against all deposits, monies, securities and other property of Guarantor now or hereafter in Lender's possession or on deposit with Lender, whether held in general or special accounts or deposits, whether held alone or jointly with others and whether held for safekeeping or otherwise. However, Lender may not exercise a right of setoff against IRA, Keogh, agency, fiduciary or trust accounts. Lender may exercise its right of setoff without demand upon or notice to Guarantor or anyone else.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Whether or not any Borrower becomes insolvent, any right or claim Guarantor has or may acquire against any Borrower or any Borrower's property shall be subordinate and subject in right of payment to Lender's right to the payment of the Note in full.

**AMENDMENTS.** This Guaranty constitutes the entire understanding and agreement of Guarantor and Lender as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**APPLICABLE LAW.** This Guaranty shall be deemed to have been made under and shall be governed and construed in accordance with federal law and, to the extent not preempted by federal law, the law of the State of California.

**MARRIED GUARANTOR.** If Guarantor is a married individual, Guarantor warrants and represents that this Guaranty is given for the benefit of the marital community. Each person named separately as a Guarantor on the first page of this Guaranty hereby binds the marital community and agrees that recourse under this Guaranty may be had against both his or her separate property and all community property. If the spouse of a Guarantor is not named separately as a Guarantor on the first page of this Guaranty but nonetheless signs this Guaranty, he or she thereby binds the marital community and all community property (but not his or her sole and separate property) to the payment of Guarantor's obligations under this Guaranty.

**COSTS AND EXPENSES.** If any lawsuit, reference or arbitration is commenced which arises out of or is related to the Note or this Guaranty, the prevailing party shall be entitled to recover from the other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees (including allocated costs of services of in-house counsel) in the action or proceeding, in addition to costs and expenses otherwise allowed by law. In all other situations, including any bankruptcy or insolvency proceeding, Guarantor agrees to pay all of Lender's costs and expenses, including reasonable attorneys' fees (including allocated costs for services of Lender's in-house counsel) which may be incurred in any effort to collect or enforce the Note or this Guaranty.

**NOTICES.** Unless otherwise required by law or this Guaranty, any notice given by either party to the other under this Guaranty shall be in writing and may be hand delivered, sent by any nationally recognized overnight courier service, mailed through the US Postal Service or sent by telefacsimile. Any such notice shall be effective when actually delivered (when sent by telefacsimile or hand delivered), when deposited with a nationally recognized overnight courier, or when deposited in the United States mail, first class postage prepaid, addressed to the party to whom the notice is to be given at the address shown above or to such other addresses as either party may designate to the other in writing. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address.

5

EXHIBIT "12"
Page 5 of 7

INTERPRETATION. This Guaranty shall be binding upon Guarantor and inure to the benefit of Lender. The words "Guarantor," "Borrower," and "Lender" include their respective heirs, legal representatives, successors, assigns (including, without limitation, any debtor in possession or trustee in bankruptcy for Guarantor), and transferees, as well as the successor trusts, corporations, limited liability companies, partnerships or other similar entities of each arising from mergers, consolidations, alterations, conversions, name changes, or changes to the identity of any trustees, officers, directors, members, managers, general partners, limited partners or other agents. Guarantor's liability under this Guaranty shall continue in full force and effect and shall not be affected or lessened by (a) any merger, consolidation, alteration, conversion or other change of form, name change or other change affecting Guarantor or any Borrower, or (b) changes in the identity of any trustees, officers, directors, members, managers, general partners, limited partners or other agents of Guarantor or any Borrower. Any successor business entity to Guarantor shall be fully liable as Guarantor under this Guaranty. If Guarantor or any Borrower is a trust, corporation, limited liability company, partnership or similar entity, it is not necessary for Lender to inquire into the powers of any Borrower or Guarantor or of the trustees, officers, directors, members, managers, general partners, limited partners or other agents acting or purporting to act on their behalf, and any obligation made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty. Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty. If a court of competent jurisdiction finds any provision of this Guaranty to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances, and all provisions of this Guaranty in all other respects shall remain valid and enforceable.

WAIVER. Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

MISCELLANEOUS. Any photocopy, microfilm, microfiche or optical image of this Guaranty may be presented as evidence in lieu of the original in any legal proceeding to enforce the terms of this Guaranty and shall have the same validity as the original.

*The remainder of this page has been left blank intentionally. The signature page follows.*

6

141

EXHIBIT "12"
Page 6 of 7

☐ If checked, this Guaranty is modified, amended and supplemented by that Addendum attached hereto and incorporated herein by reference.

---

### NOTICE TO COSIGNER (Traducción en Inglés Se Requiere Por La Ley)

You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.

The creditor can collect this debt from you without first trying to collect from the borrower. The creditor can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become a part of your credit record.

This notice is not the contract that makes you liable for the debt.

### AVISO PARA EL FIADOR (Spanish Translation Required By Law)

Se le está pidiendo que garantice esta deuda. Piénselo con cuidado antes de ponerse de acuerdo. Si la persona que ha pedido este préstamo no paga la deuda, usted tendrá que pagarla. Esté seguro de que usted podrá pagar si sea obligado a pagarla y de que usted desea aceptar la responsabilidad.

Si la persona que ha pedido el préstamo no paga la deuda, es posible que usted tenga que pagar la suma total de la deuda, mas los cargos por tardarse en el pago o el costo de cobranza, lo cual aumenta el total de esta suma.

El acreedor (financiero) puede cobrarle a usted sin, primeramente, tratar de cobrarle al deudor. Los mismos metodos de cobranza pueden usarse contra el deudor, podran usarse contra usted, tales como presentar una demanda en corte, quitar parte de su sueldo, etc. Si alguna vez no se cumpla con la obligación de pagar esta deuda, se puede incluir esa información en la historia de credito de usted.

Este aviso no es el contrato mismo en que se le echa a usted la responsabilidad de la deuda.

---

IN WITNESS WHEREOF, each Guarantor has hereunto set his or her hand or caused this Guaranty to be signed in its name by a person or persons duly authorized, all as of the date of this Guaranty.

**BUSINESS ENTITY GUARANTOR:**                    **INDIVIDUAL GUARANTOR(S):**

_____                         _____
Name of Guarantor                                 Print or Type Name: John Bral

By:_____
_____
Name and Title

By:_____                         Print or Type Name:_____
_____
Name and Title

7

142

EXHIBIT "12"
Page 7 of 7

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

650 Town Center Drive, Suite 950, Costa Mesa, CA 92626

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF JOHN J. BRAL IN SUPPORT OF OBJECTIONS TO CLAIMS 9, 11, 14, 16, 19 and 20** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On October 13, 2017, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) October 13, 2017, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**
(state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) October 13, 2017, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.
<u>SERVED VIA PERSONAL DELIVERY/ATTORNEY SERVICE</u>
The Honorable Scott C. Clarkson
United States Bankruptcy Court
Central District of California
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5130/Courtesy Bin
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 10/13/2017 | Lori Gauthier | /s/ Lori Gauthier |
|------------|---------------|-------------------|
| *Date* | *Printed Name* | *Signature* |

## SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):

- **Thomas H Casey**    kdriggers@tomcaseylaw.com, msilva@tomcaseylaw.com
- **Alan J Friedman**    afriedman@lwgfllp.com,
  nlockwood@lwgfllp.com;jokeefe@lwgfllp.com;banavim@lwgfllp.com;lgauthier@lwgfllp.com
- **Daniel K Fujimoto**    wdk@wolffirm.com
- **Beth Gaschen**    bgaschen@wgllp.com,
  kadele@wgllp.com;lfisk@wgllp.com;lgauthier@lwgfllp.com;nlockwood@lwgfllp.com
- **Michael J Hauser**    michael.hauser@usdoj.gov
- **Mark D Hurwitz**    mhurwitz@lsl-la.com, dsmall@lsl-la.com
- **Gary E Klausner**    gek@lnbyb.com
- **William N Lobel**    wlobel@lwgfllp.com,
  nlockwood@lwgfllp.com;jokeefe@lwgfllp.com;banavim@wgllp.com
- **Kathleen J McCarthy**    kdriggers@tomcaseylaw.com,
  msilva@tomcaseylaw.com
- **William F McDonald**    Caecf@tblaw.com,
  wfm@tblaw.com;snchampney@tblaw.com
- **Krikor J Meshefejian**    kjm@lnbrb.com
- **Edward G Schloss**    egs2@ix.netcom.com
- **Valerie Smith**    claims@recoverycorp.com
- **Daniel B Spitzer**    dspitzer@spitzeresq.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Zann R Welch**    ecfnotices@ascensioncapitalgroup.com

## SERVED VIA FIRST-CLASS MAIL:

Office of the United States Trustee
411 West Fourth Street, Suite 7160
Santa Ana, CA 92701

Gary E. Klausner, Esq.
Levene Neale Bender, et al
10250 Constellation Blvd, Suite 1700
Los Angeles, CA  90067