1 | William N. Lobel, State Bar No. 93202
wlobel@lwgfllp.com
2 | Alan J. Friedman, State Bar No. 132580
afriedman@lwgfllp.com
3 | Beth E. Gaschen, State Bar No. 245894
bgaschen@lwgfllp.com
4 | **LOBEL WEILAND GOLDEN FRIEDMAN LLP**
650 Town Center Drive, Suite 950
5 | Costa Mesa, California 92626
Telephone: 714-966-1000
6 | Facsimile: 714-966-1002

7 | Attorneys for Debtor and
Debtor-in-Possession, John Jean Bral

8 |

9 | **UNITED STATES BANKRUPTCY COURT**

10 | **CENTRAL DISTRICT OF CALIFORNIA**

11 | **SANTA ANA DIVISION**

12 |

13 | IN RE: | Case No. 8:17-bk-10706-SC

14 | JOHN JEAN BRAL, | **Chapter 11**

15 | Debtor and Debtor-in-Possession. | **DECLARATION OF JOHN J. BRAL IN SUPPORT OF MOTION SEEKING: (1) DISALLOWANCE OF CLAIMS 14 AND 16; AND (2) STRIKING CLAIMS ALLEGED IN ADVERSARY NOS. 8:17-AP-01094 AND 8:17-AP-01092 ON THE GROUNDS THE SAME WERE FILED BASED UPON FALSIFIED EVIDENCE**

16 |

17 |

18 |

19 |

20 | | **DATE: December 14, 2017**
**TIME: 11:00 a.m.**
21 | | **PLACE: Courtroom 5C**

22 |

23 |

24 |

25 |

26 |

27 |

28 |

### DECLARATION OF JOHN J. BRAL

I, John J. Bral, hereby declare and state as follows:

1.     I am over the age of eighteen years.

2.     The facts stated herein are within my personal knowledge and if called upon to testify to the same I could and would testify competently thereto.

3.     Prior to 2007, Barry Beitler ("Beitler") and I jointly formed a series of limited liability companies to acquire and manage commercial real estate projects in Southern California, including Westcliff Investors, LLC ("Westcliff").

4.     Westcliff's sole asset, the Westcliff medical office in Newport Beach, California (the "Property"), has a fair market value of the Property of approximately $9.3-$9.6 million. The Property is subject to first and second priority liens that secure loans with an approximate balance owing of $4.3 million.

5.     Beitler set up and managed Westcliff's "Quickbooks" based accounting system for a number of years, and Beitler's personal accountant, Robert Sargent, prepared Westcliff's tax returns and the K-1s issued to the three members through at least 2012.

6.     At no point in time during this ten-year period did Beitler contend that the membership percentages listed in Westcliff's tax returns and in his individual K-1s (prepared by his accountant) were inaccurate.

7.     Beitler and I are the co-managing members of Westcliff.

8.     Attached hereto as Exhibit "1" is a true and correct copy of the "Operating Agreement of Westcliff Investors, LLC, a California Limited Liability Company" (the "Authentic Operating Agreement"). The following distinctive footer appears at the bottom of every page of the Authentic OPA: BB 1s/WESTCLIFFINVESTORS-OPERATING AGREEMENT-final.

9.     The Authentic Operating Agreement is the binding and effective operating agreement that has continuously governed Westcliff's affairs since the date it was executed by myself, Beitler and Betsy Boyd ("Boyd") in 2003. My initials appear on every page of this agreement.

10.     Boyd is Beitler's sister. She did not contribute any capital to Westcliff.

11.     The document entitled "Operating Agreement of Westcliff Investors, LLC, a California Limited Liability Company" (the "Altered OPA") attached to Proof of Claim 14 filed by Beitler and Proof of Claim 16 filed by Boyd has been falsified in many respects.

12.     I did not execute the Altered OPA and the initials that appear on the bottom left side of each page of this document are not mine. When I execute a document with a signature line, it is my practice to do so in a manner that causes my signature to go through the signature line. This practice is evident in the case of the valid signature that I made on the Authentic OPA.

13.     Section 4.1 of the Authentic OPA vests managerial control in Beitler and myself *as co-managers*. Beitler and my co-equal managerial powers over Westcliff are also referenced in Sections 4.2, 8.3, and 9.1(c) of the Authentic OPA.

14.     The co-managerial provision in Section 4.1 of the Authentic OPA has given rise to a managerial deadlock between Beitler and myself that I believe warrants Westcliff's dissolution.

15.     The falsified pages inserted into the Altered OPA (the "Falsified Pages"), with the exception of page 17, all attempt to eliminate my right to co-manage Westcliff.

16.     Falsified Page 4 in the Altered OPA includes two critical changes. It modified the split of commissions in Section 3.3 and it eliminated the co-managerial provision in Section 4.1 and the references to this co-managerial structure in Section 4.2 of the Authentic OPA.

17.     Section 3.3 (partial) which appears on page 4 of the Authentic OPA, states:

3.3 <u>Payments to Members</u>. "...Bral and Beitler agree to split **(60%/40%)** any and all commissions for leasing paid if any.  The same shall be true of any commission on the future sale of the Property.

(emphasis added). This section has been modified by Falsified Page 4 to state:

3.3 <u>Payments to Members</u>. "...Bral and Beitler agree to split **equally (50%/50%)** any and all commissions for leasing paid if any.  The same shall be true of any commission on the future sale of the Property."

(emphasis added).  The detrimental impact of this change is obvious.

18.     Sections 4.1 and 4.2 (partial), which appear on page 4 of the Authentic OPA, state:

4.1 <u>Management and Powers</u>. In entering into this Agreement, the intent of each Member is to engage actively in the management of the Company, **however, Barry Beitler <u>and John Bral</u> shall be designated as the Company's Co-Managing Members**. Accordingly, unless otherwise limited by the Articles or this

3

Agreement, Barry Beitler and John Bral, shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters equally and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.

4.2 Limitations on Power of Members. No Member shall have the authority to cause the Company to engage in the following transactions without first obtaining the written approval **of both John Bral or and Barry Beitler:**

(emphasis added). The footer that appears on the page 4 is the "BB 1s/WESTCLIFFINVESTORS-OPERATING AGREEMENT-final" referenced above.

19.    These sections have been modified by Falsified Page 4 to state:

4.1 <u>Management and Powers</u>. In entering into this Agreement, the intent of each Member is to engage actively in the management of the Company, **however, Barry Beitler shall be designated as the Company's Managing Member.** Accordingly, unless otherwise limited by the Articles or this Agreement, Barry Beitler, shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.

4.2 <u>Limitations on Power of Members</u>. No Member shall have the authority to cause the Company to engage in the following transactions without first obtaining the written approval of **both John Bral or Barry Beitler:**

(emphasis added).

20.    The critical difference between page 4 of the Authentic OPA and Falsified Page 4 is the elimination of my status as co-manager of Westcliff that appears in Section 4.1, and the deletion of the word "and" and the elimination of the line through the word "or" in Section 4.2.

21.    The initials on the bottom left side of Falsified Page 4 were not made by me. They are forgeries.

22.    The footer that appears on the Authentic OPA is "BB 1s/WESTCLIFFINVESTORS-OPERATING AGREEMENT-final". In contrast, the footer that appears on Falsified Page 4 is "BB 1s/WESTCLIFFINVESTORS-OPERATING AGREEMENT". The word "final" is missing in the latter footer.

23.    Additional falsifications appear on Falsified Page 8, Section 5.5. The Authentic OPA states:

5.5 <u>Distribution of Assets by the Company</u>. Subject to applicable law and any limitations contained elsewhere in this Agreement, **the Co-Managing Members** holding at least…

(emphasis added). This section reads as follows in Falsified Page 8 of the Altered OPA:

5.5 <u>Distribution of Assets by the Company</u>. Subject to applicable law and any limitations contained elsewhere in this Agreement, **the Members** holding at least…

(emphasis added). The word "Co-Managing" was deleted on the Falsified Page. The initial that appears on the bottom left of this page was not made by me. This page also has an incorrect footer.

24.    The modification made to page 12 of the Authentic OPA is similar. The last two lines of Section 8.3 of the Authentic OPA states:

All checks, drafts, and other instruments obligating the Company to pay money may be signed by any Co-Managing Member, acting alone up to $10,000. Any obligation of the Company over $10,000 shall require both Co-Managing Members' signatures or the written approval of both **Co-Managing Members**.

(Emphasis added). In Falsified Page 12 to the Altered OPA, this sentence reads:

All checks, drafts, and other instruments obligating the Company to pay money must be signed by the Managing Member, acting alone up to $50,000. Any obligation of the Company over $50,000 shall require the Managing Member's signature with the written approval of the **Managing Member**.

(Emphasis added). The initials on the bottom left of this page were not made by me, and the footer on this page is wrong.

25.    The alteration made to page 13 of the Authentic OPA was made to Section 9.1(c). This section authorized a dissolution "Upon the vote of **both Co-Managing Members**".

(Emphasis added). In Falsified Page 13 of the Altered OPA, this language has been changed to read "Upon a vote of **the majority of the Membership**". (Emphasis added). I believe the latter change was made in an attempt to vest control over the dissolution decision in Beitler and his sister, Boyd, since together they hold 52.5% of Westcliff's "Membership". The forged initial and incorrect footer also appear at the bottom of this page.

26.    Page 17 of the Authentic OPA included Section 12.13 quoted below

12.13 Consent of Spouse. Within ten (10) days after any individual becomes a Member or a Member marries, such Member shall have its spouse execute a consent substantially in the form attached to this agreement.

1   This section was entirely deleted in Falsified Page 17. The forged initial and incorrect footer also

2   appear at the bottom of this page.

3       27.     I was deposed by Beitler's counsel, Thomas Lallas, on November 15, 2017. Beitler

4   attended and actively participated (frequently submitting questions to counsel) in this deposition.

5       28.     During the morning deposition session, Mr. Lallas made a point of directing my

6   attention to Falsified Page 4, which included the modifications to Section 4.1 purporting to vest

7   total control over Westcliff in Beitler. When Lallas asked me if he had seen this control provision

8   before, I was confused and surprised, and I recall saying "no."

9       29.     Further use of the Altered OPA ceased after my counsel insisted upon an off the

10  record conference wherein the false nature of this document was made clear to opposing counsel.

11      I declare that the foregoing is true and correct under the penalty of perjury under the laws of

12      the United States of America.

13  Executed this 21st day of November 2017.

14

15

16                                            _____
                                              John J. Bral

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

OPERATING AGREEMENT
OF
WESTCLIFF INVESTORS, LLC,
a California Limited Liability Company


THIS OPERATING AGREEMENT (this "Agreement"), is made as of February 20, 2003, by and among BARRY BEITLER ("Beitler"), an individual, and JOHN BRAL ("Bral"), an individual and Betsy Boyd ("Boyd"), an individual, (collectively referred to as the "Members" or individually as a "Member"), with reference to the following facts:

A.    Articles of Organization (the "Articles") for WESTCLIFF INVESTORS, LLC (the "Company"), a limited liability company organized under the laws of the State of California, were filed with the California Secretary of State on February 20, 2003 as Document No. 200 30 39 / 0037

B.    The Members desire to adopt and approve an operating agreement for the Company under the Beverly-Killea Limited Liability Company Act (the "Act").

C.    The above individuals and only these individuals, as of the formation of this Operating Agreement shall serve to form Westcliff Investors, LLC.

NOW, THEREFORE, the Members by this Agreement set forth the operating agreement for the Company upon the terms and subject to the conditions of this Agreement.


## ARTICLE I - ORGANIZATIONAL MATTERS


1.1    <u>Name</u>. The name of the Company shall be "WESTCLIFF INVESTORS, LLC." The Company may conduct business under that name or any other name approved by the Members.

1.2    <u>Term</u>. The term of the Company commenced as of the date of the filing of the Articles of Organization and unless dissolved as set forth in Article 9.1, shall terminate on December 31, 2025 or as soon as agreed by the majority of the parties, subject to the Major Decisions provisions herein.

1.3    <u>Office and Agent</u>. The Company shall continuously maintain an office and registered agent in the State of California as required by the Act. The principal office of the

BB W WESTCLIFF INVESTORS-OPERATING AGREEMENT-final

1



Company shall be at 825 So. Barrington Avenue, Los Angeles, California 90049, or such location as the Members may determine. The registered agent shall by as stated in the Articles or as otherwise determined by the Members.

1.4 <u>Business of the Company</u>. Notwithstanding the purpose of the Company which is described in the Articles, the Company shall not engage in any business other than the following without the consent of all of the Members:

(i)    the business of acquiring, owning, developing, operating, managing and selling an office/medical building at 1901 Westcliff Drive, Newport Beach, California and;

(ii)    such other activities directly related to the foregoing business as may be necessary or advisable in the reasonable opinion of the Members to further such business.

## ARTICLE II - CAPITAL CONTRIBUTIONS

2.1 <u>Capital Contributions</u>. Each Member shall make a cash contribution to the capital of the Company in the amount shown opposite the Member's name on Exhibit "A" attached hereto, other than for Betsy Boyd who shall have no initial or additional capital contribution obligations. Except as expressly provided herein, each Member shall be required to make any additional contributions to the capital of the Company, where necessary, other than for Betsy Boyd. Except as provided in section 2.6, below, additional contributions to the capital of the Company shall be made only with the unanimous written consent of the Members and shall be made by all Members in proportion to the Membership Interests of the Members, where necessary, other than for Betsy Boyd. In the event that a Member makes an additional capital contribution in excess of his proportionate share as so determined, such excess of his proportionate share as so determined, such excess portion shall be entitled to a preferred return of ten (10%) per annum, accruing and compounding quarterly, from the date of such excess contribution until such excess amount is distributed to such Member. Except as provided in this Agreement, no Member may withdraw its capital contribution. A Member shall not be personally liable to any other Member for repayment of any capital contribution made to the Company by such other Member.

2.2 <u>Capital Accounts</u>.The Company shall establish an individual capital account (the "Capital Account") for each Member. The Company shall determine and maintain each Capital Account in accordance with Treasury Regulations Section 1.704-1(b) (2) (iv). Upon valid transfer of a Member's interest in the Company (the "Membership Interest") in accordance with Article VI, such Member's Capital Account shall carry over to the new owner.

2.3 <u>No Interest</u>.    The Company shall not pay any interest on initial capital contributions.

08 W WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

2





However, any additional capital contributions, as provided herein, shall be entitled to a preferred return equal to ten percent (10%) per annum, accruing and compounding quarterly.

2.4 <u>Loans to The Company</u>. Any monies loaned to the LLC by Barry Beitler or John Bral are collectively referred to as the "Member Loans.") The Member Loans shall not bear interest and shall only be repaid through the cash flow of the Property or the sale or refinance of the Property. Any and all initial monies necessary for the purchase of the Property, classified as loans to the Company, shall be repaid first to Bral and Beitler in full prior to any distributions of sale or refinance proceeds to Betsy Boyd for her interest in said Property i.e. by way of example, if Bral and Beitler each put up $200,000 into the Property and the Property sells for a $500,000 profit, Bral and Beitler are to receive 100% of their contribution prior to any calculation for distribution to any Member, including Boyd.

2.5. <u>Additional Required Capital Contributions</u>. Prior to commencement of construction of any addition to the Project by the Company or should any capital call be necessary amongst the Members, the Members shall make additional capital contributions to the Company. Any additional capital contributions shall bear interest, as provided in Section 2.3 herein, and shall be made in the following proportions:

| | |
|---|---|
| Beitler | 50.0% |
| Bral | <u>50.0%</u> |
| Total | 100.0% |

Any additional capital contributions shall be made by the above Members who shall receive all additional contributions in full from future sale or refinance prior to any participation by Boyd in distributions as further outlined in 2.4 above.

## ARTICLE III - MEMBERS

3.1 <u>Admission of Additional Members</u>. Additional Members may be admitted with the approval of all Members. Additional Members will participate in "Net Profits," "Net Losses" (as such terms are defined in Paragraph 5.1), and distributions of the Company on such terms as are determined by the Members. Exhibit "A" shall by amended upon the admission of an additional Member to set forth such Member's name and capital contribution.

3.2 <u>Withdrawal or Resignations</u>. Any Member may withdraw or resign as a Member at any time upon one hundred twenty (120) days prior written notice to the Company, without prejudice to the rights, if any, of the Company or the other Members under any contract to which the withdrawing Member is a party. In the event of such withdrawal, such Member's Membership Interest shall be terminated, such Member shall thereafter only have the rights of a

DB lv WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

3




transferee as described in Paragraph 6.3 and such Membership Interest shall be subject to purchase and sale as provided in Paragraph 7.2. (No other Member may withdraw, retire or resign from Company.)

3.3 <u>Payments to Members</u>. Except as specified in this Agreement or pursuant to a transaction permitted by Paragraph 4.6, no Member or person or entity controlled by, controlling or under common control with the Member (each such person or entity is defined as an "Affiliate"), is entitled to remuneration for services rendered or goods provided to the Company, except as specifically provided by the Company. However, the Company shall reimburse the Members and their Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company, prepare the Articles and this Agreement and, as approved by the Members, for the actual cost of goods and materials used by the Company. At all times, whenever a vacancy in the Property becomes available, Beitler Commercial Realty Services shall be hired for the leasing at market commission rates. Bral and Beitler agree to split (60%/40%) any and all commissions for leasing paid if any. The same shall be true of any commission on the future sale of the Property. It is expressly agreed that payment of any real estate commission owing by the Company to Beitler Commercial Real Estate shall be paid if Company has sufficient cash flow to pay such commission without preventing the Company from meeting its other obligations.

## ARTICLE IV - MANAGEMENT AND CONTROL OF THE COMPANY

4.1 <u>Management and Powers</u>. In entering into this Agreement, the intent of each Member is to engage actively in the management of the Company, however, Barry Beitler and John Bral shall be designated as the Company's Co-Managing Members. Accordingly, unless otherwise limited by the Articles or this Agreement, Barry Beitler and John Bral, shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters equally and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.

4.2 <u>Limitations on Power of Members</u>. No Member shall have authority to cause the Company to engage in the following transactions without first obtaining the written approval of both John Bral ~~or~~ and Barry Beitler:

> (A) The sale, exchange or other disposition of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan, or in multiple transactions over a twelve (12) month period, except in the orderly liquidation and winding up of the business of the Company upon its duly authorized dissolution.

BB bj WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

4

(B) The refinance or financing of any kind or any transactions which may encumber the title of the Property.

(C) The merger of the Company with another limited liability company or corporation, general partnership, limited partnership or other entity (except that any act which would cause a Member to incur personal liability for the obligations of the Company or its successor shall also require the consent of such Member).

(D) An alteration of the authorized businesses of the Company as set forth in Paragraph 1.4.

(E) Any act which would make it impossible to carry on the ordinary business of the Company.

(F) The confession of a judgment against the Company.

(G) Any other transaction described in this Agreement as requiring the approval, consent or vote of the Members.

4.3  Member Approval.    No annual or regular meetings of the Members are required to be held.  However, if such meetings are held, such meetings shall be noticed as provided in this paragraph and shall be held and conducted pursuant to the Act.  In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Act.  Unless otherwise provided in this Agreement, approval of the Members shall mean the approval of Members who hold at least seventy-five percent (75%) of the Membership Interests.  All notices of meetings will be in writing and shall be deemed duly given: (i) if it is sent by telecopier to the Members at the telephone number provided by each Member for such purpose, in which case notice will be deemed to take place upon receipt; or (ii) if (and then three [3] business days after) it is sent by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient at the address set forth on Exhibit "A" to this Operating Agreement (as amended from time to time).  No meeting shall be held by the Members without (10) business days prior to notice, unless otherwise agreed in writing by all the Members.

4.4  Devotion of Time.    Each Member shall devote whatever time or effort as he or she deems appropriate for the furtherance of the Company's business.

4.5  Competing Activities.    The Members and their Affiliates may engage or invest in any activity, including without limitation those that might be in direct or indirect competition with the Company.  Neither the Company nor any Member shall have any right in or to such other activities or to the income or proceeds derived therefrom.  No Member shall be obligated to

DD IV WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

5

present any investment opportunity to the Company, even if the opportunity is of the character that, if presented to the Company could be taken by the Company. Each Member shall have the right to hold any investment opportunity for its own account of the recommend such opportunity to persons other than the Company. The Members acknowledge that certain Members and their Affiliates own and/or manage other businesses, including businesses that may compete with the company and for the Members' time. Each Member hereby waives any and all rights and claims which he or she may otherwise have against the other Members and their Affiliates as a result of any such activities.

4.6 <u>Transactions between the Company and the Members</u>. Notwithstanding that it may constitute a conflict of interest, the Members and their Affiliates may engage in any transaction with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, or an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from persons capable of similarly performing them or if Members holding a majority of the Membership Interests held by the Members having no interest in such transaction (other than their interests as Members) approve the transaction in writing.

## ARTICLE V - ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

5.1 <u>Definitions</u>. When used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Treasury Regulations.

"<u>Company Minimum Gain</u>" shall have the meaning given to the term "Partner Nonrecourse Debt" in Treasury Regulations Section 1.704-2 (d).

"<u>Member Nonrecourse Debt</u>" shall have the meaning given to the term "Partner Nonrecourse Debt" in Treasury Regulations Section 1.704-2 (b) (4).

"<u>Member Nonrecourse Deductions</u>" shall mean items or Company loss, deduction, or Code Section 705 (a) (2) (B) expenditures which are attributable to Member Nonrecourse Debt.

"<u>Net Profits</u>" and "<u>Net Losses</u>" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting at the close

DD IV WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

6

of each fiscal year employed on the Company's information tax return filed for Federal income tax purposes.

"Nonrecourse Liability" shall have the meaning set forth in Treasury Regulation that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

5.2  Allocations of Net Profit and Net Loss (subject to Paragraphs 2.4 and 2.5 herein which shall prevail).

(a)  Net Loss.  Net Loss shall be allocated among the Members in proportion to their respective Membership Interests as set forth in Exhibit "A".

(b)  Net Profit. Net Profit shall be allocated among the Members in the following manner:

(i)  First, in the event of sale or refinance, to repay 100% of all capital contributions or additional capital contributions made by any Member;

(ii)  Second, to the Members to the extent of the distributions made pursuant to paragraph 5.5(a), below;

(iii)  Thereafter, among the Members in proportion to their respective Membership Interests as set forth in Exhibit "A."

5.3  Special Allocations.  Notwithstanding Paragraph 5.2:

(a)  Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2 (g) (2). Allocations pursuant to this Paragraph 5.3 (a) shall be made in proportion to the amounts required to be allocated to each Member under this Paragraph 5.3 (a).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f).  This Paragraph 5.3 (a) is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2 (f) and shall be interpreted consistently therewith.

(b)  Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt. If there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during



any fiscal year, each member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse (which share shall be determined in accordance with Treasury Regulations Section 1.704-2 (i) (5)) shall be specifically allocated items of Company income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2 (i) (5)). Allocations pursuant to this Paragraph 5.3 (b) shall be made in proportion to the amounts required to be allocated to each Member under this Paragraph 5.3 (b). The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2 (i) (4). This Paragraph 5.3 (b) is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2 (i) (4) and shall be interpreted consistently therewith.

(c) <u>Nonrecourse Deductions</u>. Any nonrecourse deductions (as defined in Treasury Regulations Section 1.704-2 (b) (1)) for any fiscal year or other period shall be specially allocated to the Members in proportion to their Membership Interests.

(d) <u>Member Nonrecourse Deductions</u>. Those items of expenditures which are attributable to Member Nonrecourse Debt for any fiscal year or other period shall be specifically allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Treasury Regulations Section 1.704-2 (i).

(e) <u>Deficit Capital Account Restoration</u>. In the event the Company is "liquidated" within the meaning of Treasury Regulations Section 1.704-2 (b) (ii) (g), a Member whose Capital Account has a deficit balance (after giving effect to all contributions, distributions, and allocations for all Fiscal Years, including the Fiscal Year during which such liquidation occurs), such Member shall contribute to the capital of the Company the amount necessary to restore such deficit balance to 1.704-2 (b) (2) (ii) (<u>b</u>) (<u>3</u>).

5.4 <u>Code Section 704(c) Allocations</u>. Notwithstanding any other provision in this Article V, in accordance with Code Section 704(c) and the Treasury Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated amount the Members so as to take account of any variation between the adjusted basis of such property to the Company for Federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this Paragraph 5.4 are solely for purposes of Federal, state and local taxes. As such, they shall not affect Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

5.5 <u>Distribution of Assets by the Company</u>. Subject to applicable law and any limitations contained elsewhere in this Agreement, the Co-Managing Members holding at least

DD.iv WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

8



seventy-five percent (75%) of the Membership Interests may elect from time to time to cause the Company to make distributions. Any payment by the Company with respect to Member Loans shall be credited first to interest then accrued, and the remainder, if any, to principal; and interest shall cease to accrue upon the principal so credited as of the date that such payment is actually made.

   (a) Distribution from the sale or refinance of the Project shall be made in the following order and priority:

      (i) First, one hundred percent (100%) to Beitler and Bral in an amount sufficient to repay Beitler and Bral their unreturned capital contributions; until each Member has recovered the amount of its initial and additional capital contributions; and

      (ii) Thereafter, to the Members in proportion to their Membership Interests.

   (b) Distributions from the cash flow resulting from the operation of the Project shall be made in the following order and priority:

      (i) First, one hundred percent (100%) to Beitler and Bral in an amount sufficient to provide to each of the Members the priority return on such Member's additional capital contributions to the company if so designated by the Co-Managing Members;

      (ii) Thereafter, to the Members in proportion to their Membership Interests;

Article VI - TRANSFER AND ASSIGNMENT OF INTERESTS

   6.1 Transfer and Assignment of Interests.   No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of its Membership Interest (collectively, "transfer") except with the prior approval of all Members, which approval may be given or withheld in the sole discretion of the Members, other than for each Member's ability to put his or her respective interest in a Trust or other estate planning mechanism which shall not be considered a Transfer hereunder.

   6.2 Transfers in Violation of this Agreement and Transfers of Partial Membership Interests.   Upon a transfer in violation of this Article VI, the transferee shall have no right to vote or participate in the management of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor would otherwise be entitled.  Notwithstanding the immediately preceding sentences, if, in the determination of the remaining Members, a transfer in violation of this Article VI would cause the termination of the Company under the Code, in the sole discretion of the remaining Members, the transfer shall be null and void.

BB b/ WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

9

6.3 <u>Transfers in Violation of this Agreement and Transfers of Partial Membership Interests.</u>  Upon a transfer in violation of this Article VI, the transferee shall have no right to vote or participate in the management of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the remaining Members, a transfer in violation of this Article VI would cause the termination of the Company under the Code, in the sole discretion of the remaining Members, the transfer shall be null and void.

## ARTICLE VII -    CONSEQUENCES OF DISSOLUTION EVENTS
## AND TERMINATION OF MEMBERSHIP INTEREST

7.1 <u>Dissolution Event</u>  Upon the occurrence of the death, withdrawal, resignation, retirement, insanity, bankruptcy or dissolution of any Member (the "Dissolution Event"), the Company shall dissolve unless all of the remaining Members (the "Remaining Members") consent within ninety (90) days of the Dissolution Event to the continuation of the business of the Company. If the Remaining Members so consent, the Company and/or the Remaining Members shall have the right to purchase and, if such right is exercised, the Member (or its legal representative) whose actions or conduct resulted in the Dissolution Event (the "Former Member") shall sell, the Former Member's Membership Interest (the "Former Member's Interest") as provided in this Article VII.

7.2 <u>Withdrawal.</u>    Notwithstanding Paragraph 7.1, upon the withdrawal by a Member in accordance with Paragraph 3.2 such Member shall be treated as a Former Member, and, unless the Company dissolves as a result of such withdrawal, the Company and/or the Remaining Members shall have the right to purchase and, if such right is exercised, the Former Member shall sell, the Former Member's Interest as provided in this Article VII.

7.3 <u>Purchase Price.</u>    The purchase price for the Former Member's Interest shall be the fair market value of the Former Member's Interest as determined by an independent appraiser jointly selected by the Former Member and Remaining Members holding a majority of the remaining Membership Interests. The Company and the Former Member shall each pay one-half (1/2) if the cost of the appraisal. Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

7.4 <u>Notice of Intent to Purchase.</u>    Within thirty (30) days after the fair market value of the Former Member's Interest has been determined in accordance with Paragraph 7.3, each Remaining Member shall notify the Members in writing of its desire to purchase a portion of the



Former Member's Interest.  The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest in the same proportion that the Membership Interest of the Remaining Member  bears to the aggregate of the Membership Interests of all or the Remaining Members electing to purchase the Former Member's Interest.

7.5 Election to Purchase Less Than All of the Former Member's Interest.  If any Remaining Member elects to purchase none or less than all of its pro rata share of the Former Member's Interest, then the Remaining Members can elect to purchase more than their pro rata share.  If the Remaining Member fail to purchase the entire interest of the Former Member, the Company may purchase any remaining share of the Former Member's Interest.

7.6 Payment of Purchase Price.  The Company or the Remaining Members, as the case may be, shall pay at the closing one-fifth (1/5) of the purchase price and the balance of the purchase price shall be paid in four (4) equal annual principal installments, plus accrued interest, and be payable each year on the anniversary date of the closing.  The unpaid principal balance shall accrue interest at the current applicable Federal rate as provided in the Code for the month in which the initial payment is made, but the Company and the Remaining Members shall have the right to prepay in full or in part at any time without penalty.  The obligation of each purchasing Remaining Member, and the Company, as applicable, to pay its portion of the balance due shall  be evidenced by a separate promissory note executed by the respective purchasing Remaining Member or the Company, as applicable.  Each such promissory note shall be in an original principal amount equal to the portion owed by the respective purchasing Remaining Member or the Company, as applicable.  The promissory note executed by each purchasing Remaining Member shall be secured by a pledge of that portion of the Former Member's Interest purchased by such Remaining Member.

7.7 Closing of Purchase of  Former Member's Interest.  The closing for the sale of a Former Member's Interest pursuant to this Article VII shall be held at 10:00 A.M. at the principal office of Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day.    At the closing, the Former Member shall  deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest.  The Former Member, the Company and the  Remaining Members shall do all things and execute and deliver all papers as may be reasonably necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

## ARTICLE VIII - ACCOUNTING, RECORDS, REPORTING BY MEMBERS

8.1 Books and Records.  The books and records of the Company shall be kept in accordance with the accounting methods followed for Federal income tax purposes.  The Company shall maintain at its principal office in California all of the following:

DB h/ WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

11



(a)  A current list of the full name and last known business or
residence address of each Member set forth in alphabetical order,
together with the capital contributions, capital account and
Membership Interest of each Member;

(b)  A copy of the Articles and any and all amendments thereto
together with executed copies of any powers of attorney pursuant
to which the Articles or any amendments thereto have been executed;

(c)  Copies of the Company's Federal, state, and local income tax or
information returns and reports, if any, for the six (6) most recent taxable
years;

(d)  A copy of this Agreement and any and all amendments thereto
together with executed copies of any powers of attorney pursuant to
which this Agreement or any amendments thereto have been executed;

(e)  Copies of the financial statements of the Company, if any, for the
six (6) most recent fiscal years; and

(f)  The Company's books and records as they relate to the internal affairs of the
Company for at least the current and past four (4) fiscal years.

8.2 <u>Reports</u>.    The Company shall cause to be filed, in accordance with the Act,
all reports and documents required to be filed with any governmental agency.  The Company
shall cause to be prepare at least annually information concerning the Company's operations
necessary for the completion of the Members' Federal and state income tax returns.  The
Company shall send or cause to be sent to each Member within ninety (90) days after the end of
each taxable year: (i) such information as is necessary to complete the Members' Federal and
state income tax or information returns and (ii) a copy of the Company's Federal, state, and local
income tax or information returns for the year.

8.3 <u>Bank Accounts</u>.    The Members shall maintain the funds of the Company in one    or
more separate bank accounts in the name of the Company, and shall not permit the funds of the
Company to be commingled in any fashion with the funds of any other person.  Any Member,
acting alone, is authorized to endorse checks, drafts, and other evidences of indebtedness made
payable to the order of the Company, but only for the purpose of deposit into the Company's
accounts.  All checks, drafts, and other instruments obligating the Company to pay money may
be signed by any Co-Managing Member, acting alone up to $10,000.  Any obligation of the
Company over $10,000 shall require both Co-Managing Member's signatures or the written
approval of both Co-Managing Members.

DB:ls\ WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

12





8.4 Tax Matters for the Company.  Beitler is designated as "Tax Matters Partner" (as defined in Code Section 6231), to represent the Company (at the Company's expense) in connection with all examination of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith, subject to the limitations contained in Paragraph 4.2.

## ARTICLE IX  -  DISSOLUTION AND WINDING UP

9.1 <u>Conditions of Dissolution</u>.   The Company shall dissolve upon the occurrence of any of the following events:

(a)  Upon the happening of any event of dissolution specified in the Articles;

(b)  Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the California Corporations Code;

(c) Upon the vote of both Co-Managing Members;

(d)  The occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Paragraph 7.1 to continue the business of the Company within ninety (90) days after the occurrence of such event; or



(c) The sale of all or substantially all of the assets of Company.

9.2 <u>Winding Up</u>.    Upon the dissolution of the Company, the Company's assets shall be disposed of and its affairs wound up.  The Company shall give written notice of the commencement of the dissolution to all of its known creditors.

9.3 <u>Order of Payment of Liabilities Upon Dissolution</u>.  After determining that all the known debts and liabilities of the Company have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with their positive Capital Account balances, after taking into account income and loss allocations for the Company's taxable year during which liquidation occurs.

9.4 <u>Limitations on Payments Made in Dissolution</u>.  Except as otherwise specifically provided in this Agreement, each Member shall be entitled to look only to the assets of the Company for the return of its capital contribution and/or share of Net Profits against any other Member except as provided in Article X.

9.5 <u>Certificates</u>.   The Company shall file with the California Secretary of State a Certificate of Dissolution upon the dissolution of the Company and a Certificate of Cancellation upon the completion of the winding up of the Company's affairs.

## ARTICLE X  -  INDEMNIFICATION

10.1    <u>Indemnification of Agents</u>.    The Company shall indemnify any Member and may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding arising out of or connected to the business of the company or that, being or having been such a Member, officer, employee or agent, he or she is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit. Further, any Member shall indemnify and hold harmless the Company and/or the other Members of the Company in the event that the Company and/or the other Members are made a party to any threatened or pending action, suit or proceeding between or by a Member and a third party or entity not arising out of or related to the business of Company.

## ARTICLE XI  - INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Members and the Company as follows:

11.1    <u>Preexisting Relationship or Experience</u>.   It has a preexisting personal or business

DD I:\ WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

14

relationship with the Company or one or more of its officers or controlling persons, or by reason of its business or financial experience, or by reason of the business or financial experience of its financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, it is capable or evaluating the risks and merits of an investment in the Company and of protecting its own interests in connection with this investment.

11.2 <u>No Advertising</u>. It has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, article or any other form of advertising or general solicitation with respect to the sale of the Membership Interest.

11.3 <u>Investment Intent</u>. It is acquiring the Membership Interest for investment purposes for its own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest. No other person will have any direct or indirect beneficial interest in or right to the Membership interest.

## ARTICLE XII   -   MISCELLANEOUS

12.1 <u>Counsel to the Company</u>.   Counsel to the Company may also be counsel to any Member or any Affiliate of a Member. The Members may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction (the "Rules"). The Company has initially selected Jeff Katofsky of the Law Offices of Jeff Katofsky, LLP (the Company Counsel"), as legal counsel to the Company. Each Member acknowledges that the Company Counsel does not represent any Member in the absence of a clear and explicit agreement to such effect between the Member and the Company Counsel, and that in the absence of any such written agreement the Company Counsel shall owe no duties directly to a Member. Each Member further acknowledges: (i) that the Company Counsel has represented the interests of Beitler in connection with the formation of the Company and the preparation and negotiation of this Agreement, and John Bral has selected separate Counsel in connection with the formation of the Company and the preparation and negotiation of this Agreement, (ii) while communications with the Company Counsel concerning the formation of the Company and its Members may be confidential with respect to third parties, no Member has any expectation that such communications are confidential with respect to Members which are represented individually by the Company Counsel.

12.2   <u>Complete Agreement</u>. This Agreement and the Articles constitute the complete and exclusive statement and agreement among the Members with respect to the subject matter herein and therein and replace and supersedes all prior written and oral agreements among the Member. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

12.3    Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

12.4    Interpretation. All pronouns shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the interpretation of any provision of this Agreement. Numbered or lettered articles, paragraphs and subparagraphs herein contained refer to articles, paragraphs and subparagraphs of this Agreement unless otherwise expressly stated. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden or proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member of its counsel.

12.5    Jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and Federal courts sitting in California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each Member further agrees that personal jurisdiction over it may be effected by service of process by registered or certified mail addressed as provided in Paragraph 12.8 of this Agreement, and that when so made shall be as if served upon it personally within the State of California.

12.6    Arbitration. Except as otherwise provided in this Agreement, any controversy between the parties arising out of this Agreement shall be submitted to the American Arbitration Association for arbitration in Los Angeles, California. The costs of the arbitration, including any American Arbitration Association administration fee, the arbitrator's fee, and costs for the use of facilities during the hearings, shall be borne equally by the parties to the arbitration. Attorneys' fees may be awarded to the prevailing or most prevailing party at the discretion of the arbitrator. The provisions of Sections 1282.6, 1283, and 1283.05 of the California Code of Civil Procedure apply to the arbitration. The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, or not available in a court of law. The decision of the arbitrator shall be final, binding and non-appealable.

12.7    Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

12.8    Notices. Any notices to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member at the address specified in Exhibit "A" hereto. Any party may, at any time by giving five (5) days' prior written notice to the other Members, designate any other address in substitution of the foregoing address to which

DB to/ WESTCLIFFINVESTORS-OPERATING AGREEMENT-final

16

such notice will be given.

12.9    Amendments.    All amendments to this Agreement will be in writing and signed by all of the Members.

12.10    Multiple Counterparts.    This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

12.11    Attorney Fees.    In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate allowed by law. For the purposes of this Paragraph: (i) attorney fees shall include, without limitation, fees incurred in the following: (1) post-judgment motions; (2) contempt proceedings; (3) garnishment, levy and debtor and third party examinations; (4) discovery; and (5) bankruptcy litigation and (ii) the term "prevailing party" shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

12.12    Remedies Cumulative.    The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

12.13    Consent of Spouse.    Within ten (10) days after any individual becomes a Member or a Member marries, such Member shall have its spouse execute a consent substantially in the form attached to this Agreement.

IN WITNESS WHEREOF, all of the Members of WESTCLIFF INVESTORS, LLC, a California limited liability company, have executed this Agreement, consisting of pages, including this page, and Exhibit "A", effective as of the date written above.

_____
Barry Beitler

_____
John Bral

_____
Betsy Boyd

## EXHIBIT "A"

### CAPITAL CONTRIBUTIONS
### AND ADDRESSES OF MEMBERS

### OF

### WESTCLIFF INVESTORS, LLC
### a California limited liability company

| Member's Name | Member's Address | Member's Initial Capital | Member's Membership Interest |
|---|---|---|---|
| Barry Beitler | 825 S. Barrington Los Angeles, CA 90049 | 50% of all required capital | 47.5% |
| John Bral | 64 Sandpiper Irvine, CA 92604 | 50% of all required capital | 47.5% |
| Betsy Boyd | 3456 Summerset Circle Costa Mesa, CA  92626 | -0- | 5.0% |
| TOTALS | | 100% of all required capital | 100.0% |





# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

650 Town Center Drive, Suite 950, Costa Mesa, CA 92626

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF JOHN J. BRAL IN SUPPORT OF MOTION SEEKING: (1) DISALLOWANCE OF CLAIMS 14 AND 16; AND (2) STRIKING CLAIMS ALLEGED IN ADVERSARY NOS. 8:17-AP-01094 AND 8:17-AP-01092 ON THE GROUNDS THE SAME WERE FILED BASED UPON FALSIFIED EVIDENCE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On November 22, 2017, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) November 22, 2017, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Office of the United States Trustee
411 W. Fourth Street
Suite 7160
Santa Ana, CA 927601-4593

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) November 22, 2017, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.
SERVED VIA PERSONAL DELIVERY/ATTORNEY SERVICE:
The Honorable Scott C. Clarkson, United States Bankruptcy Court, Central District of California, Ronald Reagan Federal Building and Courthouse, 411 West Fourth Street, Suite 5130/Courtesy Bin, Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 11/22/2017 | Lori Gauthier | /s/ Lori Gauthier |
|---|---|---|
| Date | Printed Name | Signature |

#1140591

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

- **Thomas H Casey**    kdriggers@tomcaseylaw.com, msilva@tomcaseylaw.com
- **Alan J Friedman**    afriedman@lwgfllp.com,
  nlockwood@lwgfllp.com;jokeefe@lwgfllp.com;banavim@lwgfllp.com;lgauthier@lwgfllp.com
- **Daniel K Fujimoto**    wdk@wolffirm.com
- **Beth Gaschen**    bgaschen@wgllp.com,
  kadele@wgllp.com;lfisk@wgllp.com;lgauthier@lwgfllp.com;nlockwood@lwgfllp.com
- **Michael J Hauser**    michael.hauser@usdoj.gov
- **Mark D Hurwitz**    mhurwitz@lsl-la.com, dsmall@lsl-la.com
- **Gary E Klausner**    gek@lnbyb.com
- **William N Lobel**    wlobel@lwgfllp.com,
  nlockwood@lwgfllp.com;jokeefe@lwgfllp.com;banavim@wgllp.com
- **Kathleen J McCarthy**    kdriggers@tomcaseylaw.com, msilva@tomcaseylaw.com
- **William F McDonald**    Caecf@tblaw.com, wfm@tblaw.com;snchampney@tblaw.com
- **Krikor J Meshefejian**    kjm@lnbrb.com
- **Edward G Schloss**    egs2@ix.netcom.com
- **Valerie Smith**    claims@recoverycorp.com
- **Daniel B Spitzer**    dspitzer@spitzeresq.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Zann R Welch**    ecfnotices@ascensioncapitalgroup.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                           **F 9013-3.1.PROOF.SERVICE**