GARY E. KLAUSNER (SBN 69077)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: gek@lnbyb.com; kjm@lnbyb.com

TOM LALLAS (SBN 66512)
MARK D. HURWITZ (SBN 151159)
LEVY, SMALL & LALLAS
A Partnership Including Professional Corporations
815 Moraga Drive
Los Angeles, California 90049-1633
Telephone: (310) 471-3000; Facsimile: (310 471-7990
Email:  tlallas@lsl-la.com; mhurwitz@lsl-la.com

Attorneys for Creditors Barry Beitler; Cannae Financial, LLC;
AFG Investment Fund 7, LLC; BAB 8 LLC; Beitler & Associates, Inc. dba
Beitler Commercial Realty Services; Steward Financial LLC; and Betsy Boyd

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>JOHN JEAN BRAL<br><br>    Debtor and Debtor-in-Possession. | Case No. 8:17-bk-10706-SC<br><br>Chapter 11<br><br>**BEITLER CREDITORS' OBJECTIONS TO FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED CHAPTER 11 PLAN**<br><br>Disclosure Statement Hearing:<br>Date: May 31, 2018<br>Time: 11:00 a.m.<br>Courtroom:  5C |

1

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................. 2

II.   THE DISCLOSURE STATEMENT DESCRIBES A PLAN THAT IS
      FACIALLY UNCONFIRMABLE ............................................................. 5

      A.    The Plan Violates Section 1129(a)(3) ........................................... 5

            1.    The Plan Has Not Been Proposed In Good Faith ............................ 5

            2.    The Plan Appears To Impermissibly Expand The Debtor's
                  Setoff Rights ................................................................. 6

            3.    The "Limitation On Liability" Provision Of The Plan Does Not
                  Appear To Be Legal ........................................................... 6

      B.    The Plan Fails To Satisfy Section 1129(a)(5) ................................. 7

      C.    The Plan Does Not Satisfy Section 1129(a)(7) ............................... 8

            1.    The Plan Is Not Feasible ..................................................... 8

            2.    The Debtor Cannot Demonstrate That He Is Better Suited Than
                  A Chapter 7 Trustee To Administer The Estate's Assets, Because
                  He Is Not ........................................................................ 9

            3.    The Debtor's Valuations Of Mission And Westcliff Are
                  Unrealistic .................................................................... 10

      D.    The Plan Violates Section 1129(a)(9)(A) ...................................... 11

      E.    The Plan Cannot Satisfy Section 1129(a)(10) ............................... 12

      F.    The Plan Violates Section 1129(a)(11) ......................................... 13

      G.    The Plan Violates Section 1129(a)(15) ......................................... 15

      H.    The Plan Violates Section 1129(b)(2)(A) With Respect To Classes 5, 6
            and 7 ............................................................................... 16

      I.    The Plan Violates Section 1129(b)(2)(B) With Respect to Classes Of
            Unsecured Claims ............................................................... 18

III.  THE DISCLOSURE STATEMENT DOES NOT CONTAIN ADEQUATE
      INFORMATION ............................................................................. 19

i

**A.** **A Disclosure Statement Must Provide Creditors With Adequate Information** ...................................................................................**19**

**B.** **The Debtor's Liquidation Analysis And Projections Are Inadequate**.........**20**

**C.** **The Debtor's Feasibility Analysis And Risk Factors Analysis Is Meaningless And Flawed** ...........................................................................**21**

**D.** **Additional Issues Plaguing The Disclosure Statement**.................................**22**

**III.** **CONCLUSION** .......................................................................................................**22**

1

# TABLE OF AUTHORITIES

**Page(s)**

2

3

**Federal Cases**

4

*In re Atlanta West VI,*
　91 B.R. 620 (Bankr. N.D. Ga. 1988) ...................................................................5

5

*Barakat v. Life Ins. Co. of Va. (In re Barakat),*
6　99 F.3d 1520 (9th Cir. 1996) ...........................................................................13

7

*In re Brandon Mills Farms, Ltd.,*
8　37 B.R. 190 (Bankr. N.D. Ga. 1984) ...............................................................19

9

*In re California Fidelity, Inc.,*
　198 B.R. 567 (9th Cir. BAP 1996) ...................................................................19

10

*In re Calvanese,*
11　169 B.R. 104 (Bankr. E.D. Penn. 1994) .....................................................13, 16

12

*In re Calvanese,*
13　169 B.R. 109 ......................................................................................................15

14

*In re Cardinal Congregate I,*
　121 B.R. 760 (Bankr. S.D. Ohio 1990) ...........................................................19

15

*In re Ferretti,*
16　128 B.R. 16 (Bankr. D. N.H. 1991) .................................................................19

17

*Great Western Bank v. Sierra Woods Group,*
　953 F.2d 1174 ...................................................................................................17

18

19

*In re Hirt,*
　97 B.R. 981 (Bankr. E.D. Wis. 1989) ..............................................................19

20

*In re Holmes,*
21　301 B.R. 911 (Bankr. M.D. Ga. 2003) ............................................................14

22

*Kane v. Johns-Manville Corp.,*
23　843 F.2d 636 (2nd Cir. 1988) ..........................................................................12

24

*In re Krueger,*
　66 B.R. 463 ..................................................................................................11, 14

25

*In re Louden,*
26　69 B.R. 723 (Bankr. E.D. Mo. 1987) ..............................................................14

27

*In re M & S Associates, Ltd.,*
　138 B.R. 845 (Bankr. W.D. Tex. 1992) ...........................................................17

28

*In re Melcher,*
    2006 WL 6810966 (B.A.P. 9th Cir. 2006) ...................................................................6

*In re Moorpark Adventure,*
    161 B.R. 254 (Bankr. C.D. Cal. 1993) .......................................................................5

*Mutual Life Insurance Company of New York v. Patrician St. Joseph Partners*
    *Limited Partnership,*
    169 B.R. 669 (Bankr. D. Ariz. 1994) .......................................................................15

*In re Parks Lumber Co., Inc.,*
    19 B.R. 285 (Bankr. W.D. La. 1982) .........................................................................7

*In the Matter of Pizza of Hawaii, Inc.,*
    761 F.2d 1374 (9th Cir. 1985) ................................................................................14

*In re Produce Hawaii, Inc.,*
    41 B.R. 301 (Bankr. D. Hawaii 1984) .......................................................................7

*In re Rexford Properties LLC,*
    558 B.R. 352 (Bankr. C.D. Cal. 2016) .....................................................................13

*In re Sunflower Racing, Inc.,*
    219 B.R. 587 (Bankr. D. Kansas 1998) ...................................................................17

*Zachary v. California Bank & Trust,*
    811 F.3d 1191 (9th Cir. 2016) ................................................................................18

**Federal Statutes**

11 U.S.C. § 507(a) ...............................................................................................11

11 U.S.C. § 553 .....................................................................................................6

11 U.S.C. § 1115 ..................................................................................................18

11 U.S.C. § 1122 .............................................................................................12, 13

11 U.S.C. § 1123 ..................................................................................................12

11 U.S.C. § 1126(c) ..............................................................................................12

11 U.S.C. § 1125(b) ..............................................................................................19

11 U.S.C. § 1129(a) ................................................................................................2

11 U.S.C. § 1129(a)(1) .........................................................................................12

11 U.S.C. § 1129(a)(3) .......................................................................................5, 6

11 U.S.C. § 1129(a)(5) ...........................................................................................................7

11 U.S.C. § 1129(a)(7) ...........................................................................................................8

11 U.S.C. § 1129(a)(9)(A) ...............................................................................................11, 12

11 U.S.C. § 1129(a)(10) .......................................................................................................12

11 U.S.C. § 1129(a)(11) ...........................................................................................13, 14, 16

11 U.S.C. § 1129(a)(15) ...............................................................................................15, 16

11 U.S.C. § 1129(b) .................................................................................2, 16, 17, 18

11 U.S.C. § 1325(b)(2) .......................................................................................................15

**Federal Rules**

Fed.R.Bankr.P. 3020(a) .......................................................................................................11

1    Barry Beitler, Cannae Financial, LLC, AFG Investment Fund 7, LLC, BAB 8, LLC,

2    Beitler & Associates, Inc. dba Beitler Commercial Realty Services, Steward Financial LLC, and

3    Betsy Boyd (collectively, the "Beitler Creditors") hereby file these Objections to the First

4    Amended Disclosure Statement (the "Disclosure Statement") [Docket No. 415] describing the

5    First Amended Chapter 11 Plan (the "Plan") [Docket no. 416] proposed by John Jean Bral (the

6    "Debtor").[1]

### I.    PRELIMINARY STATEMENT

8    The Debtor's Disclosure Statement (i) fails to provide adequate information, and (ii)

9    describes a Plan that cannot be confirmed as a matter of law.  Rather than satisfying the very clear

10   and stringent plan confirmation requirements of Sections 1129(a) and 1129(b) of the Bankruptcy

11   Code, the Debtor proposed a vague and ambiguous "eternal" plan that delays indefinitely the

12   liquidation of all of the Debtor's assets, thereby, effectively, allowing the Debtor to stay in

13   Chapter 11 as long as he likes.  This concept is particularly offensive to the Beitler Creditors in

14   light of the Debtor's admission that he is insolvent, but will, nevertheless, indefinitely retain

15   estate property in which he has no equity.

16   Collectively, the Beitler Creditors hold approximately 75% of all claims against the

17   Debtor's estate, which includes approximately 90% of all general unsecured claims.  As such, the

18   Beitler Creditors have a substantial stake in the manner of the disposition of estate property and

19   the outcome of this case — in fact, a much greater stake than the Debtor.  Indeed, there are only

20   two general unsecured creditors, with meaningful claims, other that the Beitler Creditors.  The

21   Debtor's Plan requires creditors to wait for an unlimited period of time for the Debtor to liquidate

22   his assets, all of which will have to be liquidated at some point, given the Debtor's

23   acknowledgement that general unsecured creditors will not be paid in full in this case.  *See*

24   Disclosure Statement, p. 2, ll. 18 – 21 ("depending on the outcome of the claims objection and

25   lien avoidance process and the amount of proceeds available to the Debtor from the above-

26

27   _____

28   [1] Capitalized terms not otherwise defined have the same meaning ascribed to such terms in the Plan.

2

referenced sources, the distribution to holders of Allowed Unsecured Claims is estimated to be between 11.2% and 96.2%").[2]

The Debtor's acknowledgement that the Plan will fail to pay creditors in full, and that the Debtor has no equity in property of the estate, raises the following fundamental questions, which the Disclosure Statement fails adequately to answer:

**1. How will all of the Debtor's assets be liquidated, when, and by whom?**

**2. Why is the Debtor's long-term liquidation in the best interests of creditors?**

**3. Why should creditors be required to absorb the enormous costs of confirmation of a liquidating plan, which the Debtor appears to estimate at hundreds of thousands of dollars?[3]**

Neither the Plan nor the Disclosure Statement provides an answer to these questions.

Significantly, this is not an "operating" case.  The Debtor has generated no net income during the fifteen months he has been in chapter 11.  He has sold no assets and conducted no business.  There is no business to preserve, no employees to protect and no vendor relationships to continue.  There is nothing to reorganize or restructure.  The estate has already lost substantial value because of ongoing administrative expenses, to the detriment of creditors.  The Debtor's professional fees are now estimated by the Debtor to be at least $2.5 million by the unspecified Plan effective date, in a case where the Debtor has failed to generate a penny for his creditors.  There is nothing that the Debtor has done or will do in this case that could not have been or could be accomplished in a chapter 7 case.

---

[2] As discussed in detail below, the Beitler Creditors believe that the Debtor has substantially overvalued his interests in Mission and Westcliff, not only because the Beitler Creditors believe that the Debtor's interest in such entities is overstated, but also because the Beitler Creditor's believe the Debtor's valuation of the real properties owned by those entities is overstated and not realistic.  As a result, the Debtor's projections of what creditors will receive in this case is overstated and not realistic.

[3] The Debtor estimates that just his financial advisor alone will incur $250,000 in fees and expenses in connection with providing services to the Debtor.  The Debtor does not specify how much of his projected administrative expenses are related to the costs of confirming a plan in this case.  This information is critical for creditors and the Court to be able to conduct a meaningful liquidation analysis.

Presumably, the Debtor filed this case to avoid further litigation in the state court with the Beitler Creditors.  However, all that has done is move the venue to this court and provide the Debtor with the potential to use his estate assets to fund that litigation, but with no benefit to his creditors.  Chapter 11 was not designed for this purpose.

The Debtor's Plan only perpetuates this misuse of Chapter 11.  Rather than propose a prompt liquidation of all of his assets, the Plan allows the Debtor to defer the Effective Date of the Plan until "after the receipt by the Debtor of proceeds on account his ownership interests in Mission and/or Westcliff in an amount sufficient to pay all Allowed Administrative Claims in full…." *See* Disclosure Statement, p. 2, ll. 22 – 27.  Neither the Plan nor the Disclosure Statement provides an estimate of when that will occur.  It could be years from now, or never.  Thus, the Plan may never go effective.

Additionally, unless and until the Debtor's interests in either Mission or Westcliff have been monetized, in net amounts that are sufficient to pay administrative claims in full, the Debtor will apparently take no steps to liquidate any of his other assets, despite the fact that all of the Debtor's assets will have to be liquidated.  The Debtor provides no reason for this delay.

In contrast to the Debtor's indefinitely delayed liquidation, a chapter 7 trustee would move expeditiously to administer *all* property of the estate, not merely pick and choose which assets to monetize at some unspecified time in the future in some unspecified manner.[4]  Because of the

---

[4] The Debtor's liquidation analysis is fatally flawed for a number of reasons, not the least of which is that it does not take into account the accrual of interest on secured debt, until the debt is paid off.  For example, in the Debtor's liquidation analysis (Exhibit A to the Disclosure Statement), the Debtor lists a $35,000 debt secured by the Sandpiper Property, which will be paid when the Sandpiper Property is sold.  However, under the Debtor's Plan, the Sandpiper Property will not be sold until some unspecified time in the future, if at all.  In the meantime, interest will accrue on that debt.  Since the Debtor does not say when the Sandpiper Property will be sold, there is no way to know what net proceeds will be available for general unsecured creditors.  If the Debtor delays the sale of that property for many years, it will dramatically change the Debtor's own liquidation analysis.  A chapter 7 trustee would have no incentive or reason to delay the sale of assets for the sole benefit of the Debtor– in fact, the chapter 7 trustee would have every incentive to sell assets as soon as possible in order to avoid incurring additional interest obligations.

1    foregoing, and for the additional reasons described below, the Plan is unconfirmable, and the

2    Disclosure Statement should not be approved.

3    **II.    THE DISCLOSURE STATEMENT DESCRIBES A PLAN THAT IS FACIALLY**

4    **UNCONFIRMABLE**

5    To the extent that a disclosure statement describes a plan that is unconfirmable, it should

6    not be approved. *See In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988) (denying

7    approval of disclosure statement describing unconfirmable plan "to avoid . . . a wasteful and

8    fruitless exercise" that would "further delay a debtor's attempts to reorganize").

9    In this case, the Disclosure Statement, itself, demonstrates that the Plan is fundamentally

10   flawed, unfair to creditors, and wasteful. *See In re Moorpark Adventure*, 161 B.R. 254, 256-258

11   (Bankr. C.D. Cal. 1993) (courts may consider substantive plan issues at the disclosure statement

12   hearing and deny approval to disclosure statements predicated upon facially unconfirmable

13   plans).

14   **A.    The Plan Violates Section 1129(a)(3)**

15   Section 1129(a)(3) of the Bankruptcy Code provides that a court may confirm a plan only

16   if the plan is proposed "in good faith and not by any means forbidden by law."  The Plan violates

17   this provision of the Bankruptcy Code for at least the following three reasons.

18   **1.    The Plan Has Not Been Proposed In Good Faith**

19   The Plan is designed to indefinitely delay the liquidation of the Debtor's assets and allow

20   the Debtor to continue using property that belongs to his creditors.  There are no deadlines or

21   timeframes provided by the Plan.  There is no explanation as to how and when the Debtor's assets

22   will be marketed and sold.  The Debtor's own projections are nonsensical because they do not

23   take into account the timing of any sales, the accrual of interest during the indefinite period of

24   delay, or the projected value of assets at the actual time of a sale.  And, the longer it takes for the

25   Plan to go effective and for the liquidation to be completed, the more professional fees (currently

26   being incurred by two senior partners of two different firms) will continue to ramp up.

27   Under the Debtor's Plan, the Debtor, "in the Debtor's discretion" *(see* Disclosure

28   Statement, p. 61, l. 3), may decide to delay the monetization of his assets for a number of years.

1 The Plan conditions the liquidation of the Debtor's non-Westcliff/Mission assets, which the

2 Debtor values at over $500,000 (*see* Disclosure Statement, p. 60, ll. 25 – 26) on first monetizing

3 the Debtor's disputed membership interests in Mission and Westcliff, (assets that are much more

4 difficult and complicated to monetize).  Therefore, there is no way for creditors to know when or

5 if they will ever receive distributions, and no way for creditors to compel the Debtor to liquidate

6 his non-Westcliff/Mission assets.

7       Not only do these glaring deficiencies render the Disclosure Statement meaningless and

8 not approvable, they render the Plan meaningless and facially unconfirmable.  *See In re Melcher*,

9 2006 WL 6810966, at *5 (B.A.P. 9th Cir. 2006) (plan with indefinite duration found to violate

10 section 1129(a)(3) as having been proposed in bad faith).

11     **2.**    **The Plan Appears To Impermissibly Expand The Debtor's Setoff**

12         **Rights**

13       The Plan provides for the impermissible "setoff" of claims that are not subject to setoff.

14 The Plan cannot expand the Debtor's setoff rights to include rights that are not afforded the

15 Debtor under applicable law.  As presently written, the Plan impermissibly expands the Debtor's

16 rights to setoff under 11 U.S.C. § 553.  While the Plan may preserve setoff rights, it can do so

17 only consistent with the law.

18     **3.**    **The "Limitation On Liability" Provision Of The Plan Does Not Appear**

19         **To Be Legal**

20       The "Limitation on Liability" provision of the Plan (*see* Disclosure Statement, p. 67, ll. 15

21 – 23), "fails to adequately disclose how the proposed limitation on liability and exculpation and

22 releases are consistent with the fiduciary obligations of the various parties under prevailing

23 caselaw." The "Exculpations and Releases" provision in the Plan (*see* Disclosure Statement, p.

24 88, ll. 1 – 13) exculpates and releases, without any support or explanation, the Debtor and his

25 professionals from, among other things, wrongful, negligent acts taken in connection with

26 administering the Plan. *See* UST Original Objection, p. 3, l. 15 – p. 4, l. 2.

27

28

1    The Plan demonstrates that the Debtor has abused the privilege of being a "debtor-in-

2    possession" and should no longer be entrusted with this bankruptcy estate, or the administration

3    of property of the bankruptcy estate.

4    **B.    The Plan Fails To Satisfy Section 1129(a)(5)**

5    Section 1129(a)(5)(A)(i) of the Bankruptcy Code provides that a court may confirm a

6    plan only if the plan proponent discloses "the identity and affiliations of any individual proposed

7    to serve, after confirmation of the plan, as a director, officer or voting trustee of the debtor . . . or

8    a successor to the debtor under the plan."

9    Section 1129(a)(5)(A)(ii) of the Bankruptcy Code requires that the appointment to, or

10    continuance in such office of such individual be "consistent with the best interests of creditors

11    and equity holders and with public policy." *In re Produce Hawaii, Inc.*, 41 B.R. 301, 304

12    (Bankr. D. Hawaii 1984); *In re Parks Lumber Co., Inc.*, 19 B.R. 285, 291 (Bankr. W.D. La.

13    1982).  The Beitler Creditors submit that public policy favors the conversion of this case to

14    chapter 7.

15    The assets of the estate belong to its creditors, and they should be in control of their

16    disposition.  They should not be subject to "the Debtor's discretion" *(see* Disclosure Statement, p.

17    61, l. 3), which enables the Debtor to delay the monetization of his assets for years.  The Plan fails

18    to provide for any timeframe or deadline to complete (or even start) the liquidation process.

19    There is no reason to allow the Debtor to remain in charge of property of the estate,

20    particularly considering his unwillingness and inability to effectively market and sell his assets,

21    and his incentive not to do so.  Nor is the Debtor's participation in this process necessary.  A

22    neutral, independent chapter 7 trustee, or other estate representative would expeditiously liquidate

23    all property of the estate, not merely pick and choose which assets to sell at some unspecified

24    future date, in some unspecified manner.

25    More importantly, this Debtor, in particular, cannot be trusted with this process.  This

26    Court has already experienced the Debtor's misuse of this Court's jurisdiction in the Ocean View

27    Medical Investor, LLC bankruptcy cases in which the Debtor filed or caused to be filed two cases

28    which this court found to have ben filed improperly and in bad faith, and in one of the two cases,

expressly found the Debtor to have filed false declarations and suborned perjury.[5]  The creditors

should not have to allow their assets to remain in the Debtor's hands, especially in light of his

expressed unwillingness to liquidate them.

**C.      The Plan Does Not Satisfy Section 1129(a)(7)**

      **1.      The Plan Is Not Feasible**

Section 1129(a)(7)(A) of the Bankruptcy Code (commonly referred to as the "best interest

of creditors test") requires that, with respect to each impaired class under the Plan, each member

of the class must either accept the Plan or receive under the Plan property having a value, as of

the Effective Date, that is not less than the amount that such claim holder would receive if the

Debtor's Chapter 11 case were converted to Chapter 7 liquidation.   The Beitler Creditors

maintain that this requirement cannot be met in this case, particularly since there is no way for

creditors to know what they will receive under the Plan, when they will receive it or how much it

will cost to complete that process.[6]   Moreover, there is no way to know when the Plan will

actually go into effect, because the Plan will not take effect until some unspecified time in the

future, if ever.

---

[5] This Court found during the first Ocean View bankruptcy case that "Mr. Bral on several occasions swore under penalty of perjury that Mr. Beitler is a member and co-manager even after the time he believed he says now that there was a resolution of some other mechanism to remove Mr. Beitler as a member…." And "there is evidence of backdating and the evidence is that [the Debtor's] pleadings in state court reference [Beitler] as the member."  Then, on February 9, 2015, while the ink was still drying on the order dismissing the first bankruptcy, a purported involuntary bankruptcy case was filed for Ocean View and assigned to this Court.  In that case, this Court found that "it was demonstrated that Mr. Bral had perhaps fabricated documents to demonstrate that [Beitler] had been removed and…he created documents after the fact….and…swore to it under penalty of perjury in state court actions to try to get receivers."

[6] The Debtor contends in conclusory fashion that the "best interests of creditors" test is met "because this is a liquidating plan and the Debtor is liquidating all of the assets that would otherwise be available to the hypothetical chapter 7 trustee for liquidation." *See* Disclosure Statement, p. 85, ll. 8 – 10.  This statement fails to consider the facts that: (1) the Debtor does not specify when he will liquidate "all of the assets" which could be years from now; and (2) the Debtor does not take into account the enormous amount of administrative fees he is projecting to incur in connection with a contested Plan confirmation process, which could be avoided in a chapter 7.  Nor has the Debtor compared the cost of liquidating his assets with the use of two expensive law firms versus the cost of a Chapter 7 liquidation.

Neither this Court nor creditors can rely on the Debtor's projections, or liquidation analysis, since there are no time limits, definitive liquidation processes, criteria for sales, or reliable estimates.  Moreover, the Debtor's liquidation analysis is unreliable because it fails to account for the accrual of interest on secured debt during the indefinite Plan period, or any potential change in property values.  Given the uncertain, indefinite nature of the Plan, creditors, and even the Debtor, would fare better in a chapter 7 case, where a Trustee could immediately begin the process of liquidating assets.  Before the Court considers confirmation of the Plan, the Court should consider whether this estate should be required to bear the cost of any Plan confirmation process at all, especially one that serves only to delay the necessary monetization of assets.

The Debtor projects that he "may need to pay $2.5 million worth of Administrative Claims on the Effective Date of the First Amended Plan, unless the claimant has agreed to be paid later or the Court has not yet ruled on the Claim." *See* Disclosure Statement, p. 50, ll. 19 – 22.  The Disclosure Statement projects $1 million in attorneys' fees, and $250,000 in financial advisory fees, through the effective date, in addition to close to $1.2 million in already-incurred administrative fees.  A substantial amount of these expenses can be avoided, if the entire contested plan confirmation process is avoided.  This is particularly true here, where the Debtor is not proposing to reorganize his financial affairs – he is proposing to liquidate his assets (albeit not in a fair or justifiable manner).  A chapter 7 trustee can reach the same outcome, without incurring millions of dollars of administrative expenses.

**2.      The Debtor Cannot Demonstrate That He Is Better Suited Than A Chapter 7 Trustee To Administer The Estate's Assets, Because He Is Not**

The Debtor contends that "he will be able to procure a much higher value for those assets than a chapter 7 trustee based upon his knowledge of the assets, their valuation and his experience in the industry, as well as his participation in the Arbitrations." *See* Disclosure Statement, p. 85, l. 10 – 14.  There is no evidence to support these statements.

Moreover, the basis of the Debtor's knowledge of the value of his assets are appraisals that the Debtor hired appraisers to prepare, not the Debtor's own "expertise."  Similarly, the

1   Debtor retained professionals to value the Debtor's interests in limited liability companies.

2   Moreover, the Debtor's knowledge of the value of his property has no bearing on who is best

3   situated to administer the estate's assets.  A chapter 7 trustee can participate in the Mission and

4   Westcliff dissolution proceedings as effectively as the Debtor.  Finally, since the Mission and

5   Westcliff arbitration proceedings are stayed until after a Plan is confirmed, a conversion of this

6   case now to chapter 7 will expedite those arbitration proceedings. Thus, the Debtor cannot satisfy

7   the "best interests" of creditors test.

8        The major difference between the two scenarios (the Debtor's Plan and a Chapter 7

9   liquidation) is that a chapter 7 trustee will immediately begin to market all of the Debtor's assets,

10  including the Debtor's home, whereas the Debtor's Plan seeks to delay the monetization of assets

11  as long as possible.

12       **3.    The Debtor's Valuations Of Mission And Westcliff Are Unrealistic**

13       The Debtor's valuation of Mission is dependent upon a development of a portion of the

14  real property owned by Mission (referred to by the Debtor as the Mission Medical Investors LLC

15  Unimproved Land), which is inconsistent with the terms of Mission's operating agreement, does

16  not provide a determination regarding the feasibility and cost of entitlements for development and

17  whether such entitlements can be achieved and be approved by governing authorities, does not

18  provide a determination of potential liability associated with development of that land, does not

19  provide a determination of how a project to develop that land is going to be financed or

20  structured, and does not provide a determination of what would be the net value to Mission

21  affecting the Debtor's membership interests.  Moreover, Mission does not have any operative

22  agreement with the adjacent landowner for development or any party that would allow for a

23  market value determination.  The purported development agreement for the Mission Medical

24  Investors LLC Unimproved Land involves an entity formed and wholly owned by the Debtor, in

25  conflict with Mission's interest, to develop such property and usurp an opportunity, which after

26  several years of attempting to effect has not succeeded or resulted in any development.

27       The Debtor's valuation of Westcliff is inconsistent with any purchase offer that the Debtor

28  has presented in the past three years (by approximately $2mm).

**D.    The Plan Violates Section 1129(a)(9)(A)**

Administrative claims pursuant to Sections 507(a)(2) and (3) must be paid in full on the effective date of a plan.  In an effort to circumvent this requirement, the Debtor proposes to delay the Effective Date for an indefinite period of time (maybe forever) until the Debtor has the funds necessary to pay his administrative costs.  Specifically, the Debtor's Plan provides the Effective Date of the Plan will not occur until "after the receipt by the Debtor of proceeds on account of his ownership interests in Mission and/or Westcliff in an amount sufficient to pay all Allowed Administrative Claims in full…."  Ignoring for the moment, that such an indefinite delay in the Effective Date makes the Effective Date illusory, this problem would not exist if the Debtor was in a Chapter 7 case, since there would be no need to file and confirm a Plan and satisfy section 1129(a)(9)(A).

A Plan, without any specificity as to the Effective Date, is unconfirmable. *See In re Krueger*, 66 B.R. 463, 465 (holding that plan that did not specify timeframe for sale of property was unconfirmable because it proposed payment to priority claimant upon sale and not on the effective date as required by the Bankruptcy Code, and that plan proponent's attempt to artificially set effective date of plan four months after plan confirmation hearing to circumvent the purpose of this requirement was unreasonable).

The Debtor apparently does not anticipate making any payments to administrative claimants except out of the proceeds of the sale of assets at some unspecified future time, which proceeds may not even be sufficient to pay administrative creditors in full, depending on (i) the Debtor's actual interest in Mission and Westcliff, (ii) the actual proceeds from monetizing those interests if any, (iii) the actual amount of debt secured by those interests, and (iv) the taxes due on the monetization of such interests.  Indeed, the Debtor's own "Risk Factors" discussion provides that "the Debtor's ability to make Effective Date payments and to fund payments on account of Allowed Claims depends largely on the Debtor's ability to monetize his interest in his Companies." *See* Disclosure Statement, p. 62, ll. 3 – 5.

The entire purpose of Bankruptcy Rule 3020(a) (which empowers the Court to require a plan proponent to deposit with the debtor-in-possession cash in the amount of all payments which

1   are required to be distributed on confirmation) is to make sure the plan proponent has the liquid

2   funds available to make those payments upon confirmation so the Court and other parties in

3   interest do not waste their time arguing over a plan that is clearly not confirmable in the first

4   place.

5       The Plan's failure to specify any actual time period for the monetization of the Debtor's

6   assets, and the Plan's completely untenable definition of the "Effective Date" of the Plan appear

7   to be a blatant attempt to circumvent the requirements of Section 1129(a)(9)(A) of the Bankruptcy

8   Code. The Plan is patently unconfirmable as a result.

9   **E.      The Plan Cannot Satisfy Section 1129(a)(10)**

10      Section 1129(a)(10) provides a plan cannot be confirmed unless, "[i]f a class of claims is

11  impaired under the plan, at least one class of claims that is impaired under the plan has accepted

12  the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. §

13  1129(a)(10).[7]  Section 1126(c) provides "[a] class of claims has accepted a plan if such plan has

14  been accepted by creditors, other than any entity designated under subsection (e) of this section,

15  that hold at least two-thirds in amount and more than one-half in number of the allowed claims of

16  such class held by creditors, other than any entity designated under subsection (e) of this section,

17  that have accepted or rejected such plan." 11 U.S.C. § 1126(c).

18      The Debtor has impermissibly "gerrymandered" claims, and the Debtor has impermissibly

19  and artificially impaired the secured claim of Michelle Easton, for the sole purpose of satisfying

20  the accepting impaired class requirement of Section 1129(a)(10).  There are nine purportedly

21  impaired classes of creditors under the Plan.  Seven of those nine classes are comprised of the

22  claims of the Beitler Creditors.  The other two classes are comprised of: (1) the purported secured

23  claim of Michelle Easton, designated as class 3, in the  amount of $35,000, and purportedly

24

25  _____

26  [7] The Plan also violates Section 1129(a)(1) of the Bankruptcy Code, which provides that a court
    may confirm a plan of reorganization only if "the plan complies with the applicable provisions of
27  this title."  The phrase "applicable provisions" has been interpreted to mean Section 1122 and
    1123 of the Bankruptcy Code which govern the classification of claims and interests and the
    contents of a plan of reorganization.  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 648-9 (2nd
28  Cir. 1988); 5 *Collier on Bankruptcy* 1129.02 (15th ed. 1986).

secured by a third priority security interest in the "Sandpiper Property" (the Debtor's residence); and (2) all general unsecured claims other than the general unsecured claims of the Beitler Creditors.

First, with respect to the claim of Michelle Easton, there is no evidence or information supporting this claim, or establishing that the claim is secured. Moreover, there is no discussion of the pre-petition terms of repayment of this claim, in order to determine whether the proposed treatment of this claim actually constitutes impairment of this claim.

Second, no legitimate or business justification has been offered for separately classifying the Beitler Creditors' unsecured claims from all other unsecured claims. *See In re Rexford Properties LLC*, 558 B.R. 352, 361 (Bankr. C.D. Cal. 2016) ("a claim that is substantially similar to other claims may be classified separately from those claims, even though section 1122(a) does not say so expressly. *Barakat v. Life Ins. Co. of Va. (In re Barakat)*, 99 F.3d 1520, 1524–25 (9th Cir. 1996). Substantially similar claims may be classified separately if there is a 'legitimate business or economic justification' for doing so. *Id.* at 1526. Separate classification for the sole purpose of obtaining acceptance of a class of creditors under the plan constitutes 'gerrymandering' and is not permitted. *Id.*").

Based on the foregoing, the Debtor's Plan's classification of claims appears to be an effort to "gerrymander" the claims of the Beitler Creditors, and artificially to impair the secured claim of Michelle Easton, for the purpose of obtaining an impaired consenting class, despite the fact that the Beitler Creditors hold approximately 90% of the claims in this case.

**F.    The Plan Violates Section 1129(a)(11)**

Section 1129(a)(11) provides that a plan may only be confirmed if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). "[A] planned liquidation does not create an exception to the feasibility requirement. Even a liquidating plan must be feasible. Indeed, many of the cases discussing the feasibility issue arise in the context of liquidating plans . . . ." *In re Calvanese*, 169 B.R. 104, 107 (Bankr. E.D. Penn. 1994) (holding

that plan that sought to make no payments to any creditors while real property was liquidated was unconfirmable); *In re Louden*, 69 B.R. 723, 725 (Bankr. E.D. Mo. 1987) (Chapter 11 liquidating plan not feasible because it is predicated on unrealistically high valuation of real estate that is proposed to be sold).

The purpose of Section 1129(a)(11) is to prevent confirmation of visionary schemes that promise creditors more under a proposed plan than can possibly be attained after confirmation. *See In the Matter of Pizza of Hawaii, Inc.*, 761 F.2d 1374 (9th Cir. 1985). "A Chapter 11 plan is not feasible unless it has a reasonable assurance of success. A Chapter 11 plan must offer a reasonable prospect of success and be workable." *In re Holmes*, 301 B.R. 911, 915 (Bankr. M.D. Ga. 2003), *citing United States v. Haas (In re Haas)*, 162 F.3d 1087, 1090 (11th Cir. 1998).

In this case, what reasonable assurance of success has the Debtor possibly provided? The answer is an unequivocal "none". The Debtor is not proposing to contribute or risk *any* new money. There is no proposed buyer of any of the Debtor's assets, no timeframe for the marketing and sale of any of the Debtor's assets, no marketing strategy, no idea of who will market the Debtor's assets, no standards for determining whether any purported buyer can actually consummate a transaction, or any other assurance that: (1) the Debtor will actually take any action in a timely manner to market and sell his assets; (2) his assets will sell timely; and (3) his assets will sell at a price that will actually pay all secured claims and administrative claims in full while also affording a distribution to general unsecured creditors. Indeed, the Debtor readily admits that he has no intention to market or monetize any of his assets until after he monetizes his interests in Mission and Westcliff, even though he also readily admits that his liabilities outweigh the value of his assets. Moreover, the Debtor provides no analysis or discussion whatsoever, of *when* his flawed Plan would take effect, and *when* creditors will see any payments. *See In re Krueger*, 66 B.R. at 465 ("such an eternal plan cannot be approved").

The Plan, at no cost or risk to the Debtor, shifts the entire risk of payment upon creditors, who are forced to wait an unspecified period of time to get paid. The Plan "conspicuously violates the objectives and purposes of the Code. The protection of creditor's interests is important. In a Chapter 11 filing, however, 'successful debtor reorganization and maximization

14

1  of the value of the estate' are the primary purposes of the Bankruptcy Code . . . 'Chapter 11 is

2  designed to avoid liquidations under Chapter 7 . . . .'" *Mutual Life Insurance Company of New*

3  *York v. Patrician St. Joseph Partners Limited Partnership*, 169 B.R. 669, 683 (Bankr. D. Ariz.

4  1994) (holding that plan not in best interests of creditors and violated primary purpose behind

5  Bankruptcy Code).

6    Here, the Plan admittedly serves no legitimate reorganization purpose. The Debtor is not

7  offering *any* funding to make the Plan work. Administrative creditors are required to wait for

8  payment of their claims in direct violation of the clear requirements of the Bankruptcy Code.

9    "What the courts which have analyzed similar 'wait and sell' plans have appeared to

10  almost uniformly conclude is that, unless an immediate sale or other benefit which will benefit an

11  objecting creditor is not only clearly defined but also is imminently likely to transpire, the plan

12  will be deemed infeasible." *In re Calvanese*, 169 B.R. 109. It is for these reasons that it does not

13  make any sense for the estate to expend any additional time or resources dealing with the Plan and

14  why the Disclosure Statement should not be approved.

15  **G.    The Plan Violates Section 1129(a)(15)**

16    Section 1129(a)(15) of the Bankruptcy Code provides that "[i]n a case in which the debtor

17  is an individual and in which the holder of an allowed unsecured claim objects to the confirmation

18  of the plan – (A) the value, as of the effective date of the plan, of the property to be distributed

19  under the plan on account of such claim is not less than the amount of such claim; or (B) the value

20  of the property to be distributed under the plan is not less than the projected disposable income of

21  the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on

22  the date that the first payment is due under the plan, or during the period for which the plan

23  provides payments, whichever is longer." 11 U.S.C. § 1129(a)(15).

24    The Debtor concedes that he is unable to comply with Section 1129(a)(15)(A). *See*

25  Disclosure Statement, p. 87, ll. 4 – 22. However, the Debtor contends that he can comply with

26  Section 1129(a)(15)(B) because "the value of the property to be distributed under the First

27  Amended Plan exceeds the Debtor's projected disposable income during the plan period." *See*

28  *id.*, ll. 19 – 21. However, the Debtor fails to specify the duration of the plan period. In fact, there

1  is no indication whatsoever in the Plan or the Disclosure Statement of what is the "plan period",

2  how long it will take the Debtor to monetize all of his assets, or when creditors will actually

3  receive distributions.  Without an actual "plan period" there is no way of knowing whether the

4  Debtor has met the requirements of Section 1129(a)(15)(B).

5  **H.      The Plan Violates Section 1129(b)(2)(A) With Respect To Classes 5, 6 and 7**

6          Under the Plan, classes 5, 6 and 7 (secured claims held by certain of the Beitler Creditors)

7  are required to wait for payment until the Debtor's interests in Mission and Westcliff are sold,

8  without any payments in the interim, and without any other rights or remedies, including the right

9  to proceed with a foreclosure sale of their collateral.  The timeframe that these creditors are

10  required to wait while the Debtor markets and monetizes his assets is unknown.  While they are

11  required to wait indefinitely, the Plan does not provide for and cannot sustain appropriate interest

12  payments to them, meaning that such payments will have to accrue, and thus any alleged equity in

13  the Debtor's interests in Mission and Westcliff will deteriorate to the detriment of these creditors,

14  administrative creditors and general unsecured creditors.

15          In that regard, the Plan is a negative amortization plan that does not provide for **any**

16  payments to the largest secured creditors in this case while the Debtor's interests, if any, in

17  Mission and Westcliff are adjudicated, marketed, and sold.  In a transparent attempt to circumvent

18  the "fair and equitable" cramdown requirements of Section 1129(b)(2)(A), the Plan can only be

19  described as a negative amortization plan that is not in the "best interests of creditors" because it

20  does not provide for any payments to classes 5, 6 or 7 while the collateral securing the claims of

21  such classes is marketed and prior to such collateral actually being sold.[8]

22          Negative amortization is defined as:

23              "A provision wherein part or all of the interest on a secured claim is not

24              paid currently, but instead is deferred and allowed to accrue.  The accrued

25

26  _____

27  [8] Setting aside the inability to comply with Section 1129(b)(2)(A), this problem with the Plan also
   renders it infeasible under Section 1129(a)(11). *See In re Calvanese*, 169 B.R. 104, 111 fn. 3

28  (Bankr. E.D. Penn. 1994) ("a plan containing a negative amortization provision may also run
   afoul of the feasibility requirement of 11 U.S.C. § 1129(a)(11)").

1                            interest is added to the principal and paid when income is higher or when

2                            the collateral is sold.  The overall rate of interest on the claim is referred to

3                            as the accrual rate.  The rate to be actually paid on a monthly basis is

4                            referred to as the pay rate.  The difference between the two represents the

5                            extent of negative amortization."

6  *In re M & S Associates, Ltd.*, 138 B.R. 845, 850 (Bankr. W.D. Tex. 1992).

7       "Negative amortization plans are not barred per se.  But they are viewed with suspicion.

8  Courts judge them on whether they are fair and equitable by assessing the risk they place on the

9  creditor who is not receiving principal and interest payments." *In re Sunflower Racing, Inc.*, 219

10  B.R. 587, 603-604 (Bankr. D. Kansas 1998) (plan not fair and equitable because placed undue

11  risk of failure on secured creditor that was not afforded adequate payments in a liquidation plan).

12       The Debtor's Plan does not provide for ***any*** payments to classes 5, 6 or 7 while the

13  Debtor's interests in Mission and Westcliff are adjudicated and sold.  Thus, interest payments will

14  accrue during the undisclosed and uncapped timeframe for the sale of such interests.  As a result,

15  the purported equity in such assets may be obliterated, to the detriment of creditors.  The entire

16  risk of the failure of the Plan is being placed on the shoulders of creditors.  Unless the Debtor is

17  willing to fund this shortfall with new cash that does not constitute property of the estate, the Plan

18  fails to meet the cramdown requirements of Section 1129(b)(2)(A).

19       "[T]he fairness of a . . . plan that includes negative amortization should be determined on a

20  case-by-case basis." *Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174. 1177-1178 (9[th]

21  Cir. 1992).  The factors used in determining the fairness of such a plan include: (1) Does the plan

22  offer a market rate of interest and present value of the deferred payments; (2) is the amount and

23  length of the proposed deferral reasonable; (3) is the ratio of debt to value satisfactory throughout

24  the plan; (4) is the plan feasible; (5) are the risks unduly shifted to one creditor; (6) does the plan

25  preclude the secured creditor's foreclosure; (7) did the original debt repayment terms provide for

26  negative amortization; and (8) are there adequate safeguards to protect against plan failure. Id. at

27  1178.  In this case, *none* of these factors are discussed in the Disclosure Statement, or fall in the

28  Debtor's favor.

1    The amount and length of the proposed deferral of payments to classes 5, 6 and 7 and the

2    other creditors are unknown and uncapped.  No timeframe for the sale of the Debtor's assets is

3    proposed.  The Plan provides no such safeguards to protect against these risks of nonpayment to

4    secured creditors, administrative creditors or general unsecured creditors.  The Plan is completely

5    illusory.

6    **I.    The Plan Violates Section 1129(b)(2)(B) With Respect to Classes Of Unsecured Claims**

7    Section 1129(b)(2)(B) provides that the condition that a plan be fair and equitable with

8    respect to a class of unsecured claims, includes the requirement that "(i) the plan provides that

9    each holder of a claim of such class receive or retain on account of such claim property of a value,

10    as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of

11    any claim or interest that is junior to the claims of such class will not receive or retain under the

12    plan on account of such junior claim or interest any property, except that in a case in which the

13    debtor is an individual, the debtor may retain property included in the estate under section 1115,

14    subject to the requirements of subsection (a)(14) of this section." 11 U.S.C. § 1129(b)(2)(B). *See*

15    *Zachary v. California Bank & Trust*, 811 F.3d 1191 (9th Cir. 2016) (adopting the "narrow" view

16    and holding that the absolute priority rule applies in individual chapter 11 cases).

17    Under the Plan, the Debtor proposes to retain property for an indefinite period of time,

18    without specifying when property will be sold, or providing any deadline for the sale of any

19    property.  While the Debtor pays "lip service" to the idea that his property will be sold, the

20    unlimited time that he can avoid disposing of his assets is, effectively, no different than retaining

21    them.

22    Finally, the Debtor proposes to retain property that he claims to be exempt.  However,

23    such retention may be a violation of the absolute priority rule.  Based on the plain meaning of

24    Section 1129(b)(2)(B), the junior interest holder (here, the debtor) may not "retain...*any*

25    property....".[9]  The Code does not say: "except for property that is exempt".  Thus, the Debtor's

26

27    [9] If this court adopted the viewpoint that exempt property is not exempt from the absolute priority
       rule, then chapter 7 would provide a benefit for the Debtor that is not otherwise available to the
28    Debtor under the Plan.

1  intention to retain his exempt property makes the Plan unconfirmable.

2  **III.    THE DISCLOSURE STATEMENT DOES NOT CONTAIN ADEQUATE**

3  **INFORMATION**

4  **A.    A Disclosure Statement Must Provide Creditors With Adequate Information**

5  Section 1125(b) requires that prior to the solicitation of acceptances of a Chapter 11 plan,

6  each impaired claimant and interest holder must receive a disclosure statement that has been

7  previously approved by the court as containing "adequate information" which is:

8  [I]nformation of a kind, and in sufficient detail, as far as is reasonably

9  practicable in light of the nature and history of the debtor and the condition

10  of the debtor's books and records, that would enable a hypothetical investor

11  typical of holders of claims or interests of the relevant class to make an

12  informed judgment about the plan . . . .    11 U.S.C. §1125(a)(1).

13  The Disclosure Statement is the Bankruptcy Code's tool to provide creditors with

14  information to decide how to vote on, and whether to object to, a plan. *See In re California*

15  *Fidelity, Inc.*, 198 B.R. 567, 571 (9th Cir. BAP 1996).  Fundamental to the Chapter 11 process is

16  full and complete disclosure. *In re Brandon Mills Farms, Ltd.*, 37 B.R. 190, 192 (Bankr. N.D. Ga.

17  1984) (stating that the purpose of the disclosure statement is to inform creditors as fully as

18  possible).  In order for creditors to be able to exercise their rights, a disclosure statement must be

19  clear and comprehensible before it can be approved by a court.  *In re Ferretti*, 128 B.R. 16, 19

20  (Bankr. D. N.H. 1991).  "Where inaccuracies are so numerous or significant that creditors or

21  interest holders can no longer make an informed judgment about whether to accept or reject the

22  proposed plan of reorganization, approval of the Disclosure Statement must be denied." *In re*

23  *Cardinal Congregate I*, 121 B.R. 760, 766-767 (Bankr. S.D. Ohio 1990); *see also In re Hirt*, 97

24  B.R. 981, 983 (Bankr. E.D. Wis. 1989) (denying the approval of a disclosure statement where the

25  document contained numerous inaccuracies and because the plan proponent failed to provide

26  detailed financial information).  Without full disclosure of adequate information, creditors and

27  other parties in interest are unable to exercise their voting rights and their rights to object to

28  confirmation of the Plan.

**B.    The Debtor's Liquidation Analysis And Projections Are Inadequate.**

The Debtor's liquidation analysis and projections are misleading, unreliable and flawed for, at least, the following reasons:

1.    They are based upon a purported sale of assets at the present time, when in fact, the Plan does not provide any timeframe or deadline for a sale of any assets.  The liquidation analysis does not take into account the accrual of interest on account of debt secured by property while the Debtor continues to retain such property.  By way of example and not limitation, in the Debtor's liquidation analysis (Exhibit A to the Disclosure Statement), the Debtor lists a $35,000 debt secured by the Sandpiper Property, which will have to be paid when the Sandpiper Property is sold.  However, under the Debtor's Plan, the Sandpiper Property will not be sold until some unspecified time in the future, if at all.  In the meantime, under the Plan, interest will accrue on that debt, which will be paid, under the Plan, at the time the Sandpiper Property is sold.  Since we have no idea when the Sandpiper Property will be sold by the Debtor, we have no way to know what net proceeds will actually be available for general unsecured creditors.  If it is the Debtor's intention to delay the sale of that property for many years, it will dramatically change the analysis, particularly since a chapter 7 trustee will have no incentive to delay the administration and monetization of all assets.

2.    They include as a chapter 7 expense, chapter 11 administrative expenses in the amount of $2.5 million, despite the fact that those expenses presumably include the expense of confirming a plan, which expenses could be wholly avoided if this case were converted to chapter 7 now.  The Debtor's inclusion of chapter 11 plan confirmation expenses in his analysis of what creditors would receive in a chapter 7 is misleading and does not accurately depict what would occur if this case is converted to chapter 7 now.

3.    They fail to account for the payment of future United States Trustee's quarterly fees until the Plan takes effect, and after the Plan takes effect, including in connection with the monetization of any assets.  Accordingly, the administrative fee estimates provided by the Debtor appear to be understated, particularly in light of the new quarterly fee calculation requirements adopted by the United States Trustee.  As a result, the Debtor's estimates for distributions to

general unsecured creditors in a chapter 11, is overstated.

**C.    The Debtor's Feasibility Analysis And Risk Factors Analysis Is Meaningless And Flawed**

Neither the Disclosure Statement nor the Plan provides any sort of timeframe for the monetization of assets and distributions to creditors.  Indeed, the United States Trustee indicated in his opposition to the Debtor's original disclosure statement that "it could be years before there are final orders dissolving [Mission and Westcliff].  This puts the entire case in limbo for a lengthy period of time.  In particular, it is unclear how any provisions of the plan can be enforced when you have a situation where there is a confirmed plan that has not yet gone effective…if the Debtor is dilatory in his prosecution of the dissolution actions there is no creditor recourse but to wait it out.  One can argue that the Debtor has no incentive to accelerate the dissolution process since he is required to sell his current residence if the dissolution of the entities does not generate sufficient revenue to pay creditors in full." *See U.S. Trustee's Limited Objection To Debtor's Disclosure Statement* [Docket No. 224], p. 2, ll. 8 – 22.  The Beitler Creditors share the same concerns, which remain unresolved.  In this regard, the Debtor has failed to make a full and fair comparison of his proposed "slow moving" liquidation, to a liquidation in chapter 7.

The indefinite delay in the monetization of assets, a cornerstone of the Debtor's Plan, renders the Debtor's projections, valuations, and assumptions, meaningless, since they have no predictive value.  By the time any liquidation action is taken by the Debtor, the estimates in the Disclosure Statement will have become stale.  Since the Effective Date of the Plan will not occur until after the Debtor's interests, if any, in Mission and Westcliff are monetized, which could be years from now, the information in the Disclosure Statement will be worthless.  The indefinite nature of the liquidation process provided for in the Plan renders the Disclosure Statement not approvable.

/ / /

/ / /

/ / /

/ / /

**D.    Additional Issues Plaguing The Disclosure Statement**

1.    The Debtor's contention that he will liquidate "any other real or personal property" only to the "extent necessary" (*see* Disclosure Statement, p. 2, l. 27 – p. 3, l. 2) is completely misleading, and contradictory, because it suggests that there is a scenario where the Debtor will not have to liquidate any assets other than his interests in Mission and Westcliff.  However, the Debtor himself acknowledges that there is no such scenario, given his estimate that, general unsecured creditors will receive between 11.2% and 96.2% of their allowed claims. *See* Declaration of Adam Meislik [Docket No. 417], para. 8, filed by the Debtor ("the distribution to holders of Allowed Unsecured Claims is estimated to be between 11.2% and 96.2%").

2.    Neither the Plan nor the Disclosure Statement provides information regarding the Debtor's potential malpractice claims, and the current status of those claims.  The Debtor retained counsel in August 2017 to evaluate potential malpractice claims against the Debtor's former counsel.  The Debtor has failed to provide creditors, including the Beitler Creditors, with the report which was supposed to have been prepared by special counsel.

3.    Neither the Plan nor the Disclosure Statement provides any analysis of potential claims, if any, arising from the rejection of executory contracts or unexpired leases. If the Debtor expects such claims to arise, he should say so.  If he does not expect such claims to arise, he should say so. Without such information, creditors will not be able to evaluate whether the total creditor pool may increase, thereby further reducing distributions to general unsecured creditors.

### III.    CONCLUSION

The entire purpose of the Plan appears to be to delay the liquidation of all of the Debtors' assets, at the expense of the creditors of the Debtors' estate.  In the meantime, the Debtor gets to retain possession and control of assets in which he has no equity, without contributing anything of value, while forcing creditors to bear all of the risk of failure of the Debtor's ill-conceived plan of delay.  In the meantime, the Debtor proposes to incur an enormous amount of administrative expenses in connection with the "orderly" administration of the Debtor's bankruptcy estate.  A chapter 7 trustee will be able to achieve far better results, in less time, at a fraction of the cost.

1    The Debtor's request for approval of the Disclosure Statement should be denied and the Court

2    should issue an order to show cause why this case should not be converted to chapter 7.

3    Dated: May 17, 2018            LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

4

5                              By:     /s/ Gary E. Klausner

6                                    GARY E. KLAUSNER
                                   KRIKOR J. MESHEFEJIAN

7    Dated: May 17, 2018            LEVY, SMALL & LALLAS

8                              A Partnership Including Professional Corporations
                             TOM LALLAS

9                              MARK D. HURWITZ

10                              By:

11                                  TOM LALLAS

12                              Attorneys for Creditors Barry Beitler, Cannae Financial,
                             LLC, AFG Investment Fund 7, LLC, BAB, 8 LLC, Beitler

13                              & Associates, Inc. dba Beitler Commercial Realty Services,
                             Steward Financial LLC, and Betsy Boyd

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled: **BEITLER CREDITORS' OBJECTIONS TO FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED CHAPTER 11 PLAN** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **May 17, 2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Thomas H Casey**    kdriggers@tomcaseylaw.com, msilva@tomcaseylaw.com
- **Alan J Friedman**    afriedman@shbllp.com, lgauthier@shbllp.com
- **Daniel K Fujimoto**    wdk@wolffirm.com
- **Beth Gaschen**    bgaschen@wgllp.com,
  kadele@wgllp.com;vrosales@lwgfllp.com;cbmeeker@gmail.com;cyoshonis@lwgfllp.com
- **Michael J Hauser**    michael.hauser@usdoj.gov
- **Mark D Hurwitz**    mhurwitz@lsl-la.com, dsmall@lsl-la.com,kfinn@lsl-la.com
- **Gary E Klausner**    gek@lnbyb.com
- **William N Lobel**    wlobel@pszjlaw.com,
  nlockwood@pszjlaw.com;jokeefe@pszjlaw.com;banavim@pszjlaw.com
- **Kathleen J McCarthy**    kdriggers@tomcaseylaw.com, msilva@tomcaseylaw.com
- **William F McDonald**    Caecf@tblaw.com, wfm@tblaw.com;snchampney@tblaw.com
- **Krikor J Meshefejian**    kjm@lnbrb.com
- **Babak Samini**    saminicourtnotice@gmail.com,
  bsamini@saminilaw.com;nprado@saminilaw.com;lnavarro@saminilaw.com;swatts@sami nilaw.com
- **Edward G Schloss**    egs2@ix.netcom.com
- **Valerie Smith**    claims@recoverycorp.com
- **Daniel B Spitzer**    dspitzer@spitzeresq.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Zann R Welch**    ecfnotices@ascensioncapitalgroup.com

**2.  SERVED BY UNITED STATES MAIL**: On **May 17, 2018**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 17, 2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

1

***Served via Attorney Service***
Hon. Scott C. Clarkson

2

United States Bankruptcy Court
Ronald Reagan Federal Building and Courthouse

3

411 West Fourth Street, Suite 5130 / Courtroom 5C
Santa Ana, CA 92701-4593

4

I declare under penalty of perjury under the laws of the United States of America that the foregoing is

5

true and correct.

6

| May 17, 2018 | Stephanie Reichert | /s/ Stephanie Reichert |
| --- | --- | --- |
| *Date* | *Type Name* | *Signature* |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**