1  Alan J. Friedman (State Bar No. 132580)
   **SHULMAN HODGES & BASTIAN LLP**
2  100 Spectrum Center Drive, Suite 600
   Irvine, California 92618
3  Telephone:  (949) 340-3400
   Facsimile:  (949) 340-3000
4  Email:      afriedman@shbllp.com

5  Attorneys for Debtor and
   Debtor-in-Possession, John Jean Bral
6

7  William N. Lobel (State Bar No. 93202)
   **PACHULSKI STANG ZIEHL & JONES LLP**
8  650 Town Center Drive, Suite 1500
   Costa Mesa, California 92626
   Telephone:  (714) 383-4740
9  Facsimile:   (714) 383-4741
   Email :      wlobel@pszjlaw.com
10

11 Special Reorganization Counsel for Debtor
   and Debtor-in-Possession, John Jean Bral
12

13          **UNITED STATES BANKRUPTCY COURT**
14
     **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**
15 | In re | Case No. 8:17-bk-10706-SC |
16 | JOHN JEAN BRAL, | Chapter 11 |
17 |        Debtor and Debtor-in-
            Possession. | **SECOND AMENDED DISCLOSURE
            STATEMENT DESCRIBING CHAPTER 11
18         PLAN** |
19 | | **Disclosure Statement Hearing**: |

**DATE:**  July 19, 2018
**TIME:**   11:00 a.m.
**Place:**  **Courtroom 5C
            411 West Fourth Street
            Santa Ana, California 92701**

**Plan Confirmation Hearing:**
**DATE:**   **TBD**
**TIME:**   **TBD**
**Place:**  **Courtroom 5C
            411 West Fourth Street
            Santa Ana, California 92701**

Table of Contents

**Page**

I.      INTRODUCTION..............................................................................................9

        A.      The Purpose of This Document................................................................11

        B.      Deadlines for Voting and Objecting; Date of the Plan Confirmation

                Hearing......................................................................................................12

                1.      Time and Place of the Confirmation Hearing..............................12

                2.      Deadline for Voting for or Against the Plan..................................12

                3.      Deadline for Objecting to the Confirmation of the Plan................13

                4.      Identity of Person to Contact for More Information Regarding the

                        Plan................................................................................................13

        C.      Disclaimer................................................................................................13

II.     BACKGROUND ............................................................................................14

        A.      The Debtor's Real Property Assets ........................................................14

                1.      The Sandpiper Property................................................................14

                2.      The Los Angeles Condominium....................................................15

        B.      The Debtor's Personal Property Assets....................................................16

                1.      Mission Medical Investors, LLC ..................................................16

                2.      Westcliff Investors, LLC ..............................................................18

                3.      Venture Development Group ........................................................20

                4.      Bral Realty Advisors, Inc.............................................................20

                5.      Javaher Investors, LLC ................................................................21

                6.      Eye Street Medical Investors, LLC..............................................21

                7.      Spectrum 6 Medical Investors, LLC ............................................22

                8.      Venture Group of Companies, Inc. ..............................................23

                9.      Miscellaneous Personal Property ................................................23

        C.      The Events That Led to the Chapter 11 Filing ..........................................25

                1.      Beitler v. Bral, Case No. BS146302.............................................25

| | | | |
|---|---|---|---|
| | 2. | Beitler v. Bral, Case No. BC532523 | 27 |
| | 3. | Beitler and Beitler & Assoc. v. Bral, Case No. BC543410 | 28 |
| | 4. | Cannae Financial LLC v. Bral, et al., Case No. 30-2014-00733044 | 30 |
| | 5. | Cannae Financial LLC v. Bral, et al., Case No. 30-2015-00764942 | 32 |
| | 6. | Steward Financial, LLC and AFG assignees of First Citizens Bank v. Beitler, et al., Case No. BC525778 | 33 |
| | 7. | Steward Financial, LLC v. Bral, et al., Case No. 30-2016-00834111 | 34 |
| | 8. | Bral, et al. v. Beitler, et al., Case No. BC559311 | 36 |
| | 9. | Beitler v. Bral, et al., Case No. BC567567 | 36 |
| | 10. | Bral v. Westcliff Investors, LLC, Case No. BC553693 | 37 |
| D. | | Significant Events During the Bankruptcy Case | 38 |
| | 1. | Bankruptcy Proceedings | 38 |
| | 2. | The Beitler Avoidance Action | 43 |
| | 3. | The Non-Dischargeability Actions | 44 |
| | 4. | Motion to Strike Proofs of Claim Nos. 9 (BCRS), 11 (Beitler), 14 (Beitler) and 16 (Boyd) | 46 |
| | 5. | The Arbitrations | 48 |
| | 6. | Other Legal Proceedings | 51 |
| | 7. | Actual and Projected Recovery from Avoidance Actions and Causes of Action | 51 |
| III. | | SUMMARY OF THE PLAN | 53 |
| A. | | Overview of the Plan | 53 |
| B. | | What Creditors Will Receive Under the Proposed Plan | 54 |
| | 1. | Unclassified Claims | 54 |
| | 2. | Classified Claims | 58 |

C.   Means of Effectuating the Plan........................................................66
   1.   Funding the Plan........................................................66
   2.   Disbursing Agent ........................................................69
   3.   The Reorganized Debtor ........................................................69
D.   Risk Factors ........................................................70
E.   Provisions Governing Distributions........................................................71
   1.   Dates of Distributions........................................................71
   2.   Manner of Distribution........................................................72
   3.   Delivery of Distributions in General........................................................72
   4.   Rounding Payments........................................................73
   5.   Interest on Claims........................................................73
   6.   Compliance with Tax Requirements........................................................74
   7.   De Minimis Distributions ........................................................74
   8.   Setoffs ........................................................75
   9.   Limitation on Liability ........................................................75
F.   Other Provisions of the Plan........................................................76
   1.   Claim Objections and Disputed Claims........................................................76
   2.   Executory Contracts and Unexpired Leases........................................................78
   3.   Changes in Rates Subject to Regulatory Commission Approval ..79
   4.   Preservation of Causes of Action and Avoidance Actions ...........79
   5.   Retention of Jurisdiction ........................................................80
   6.   Tax Consequences of the Plan........................................................82
   7.   Exemption from Transfer Taxes........................................................83
IV.   CONFIRMATION REQUIREMENTS AND PROCEDURES ........................................................83
A.   Who May Vote or Object ........................................................83
   1.   Who May Object to Confirmation of the Plan........................................................83
   2.   Who May Vote to Accept/Reject the Plan........................................................84
   3.   Who is Not Entitled to Vote........................................................85

|   |   |   |   |
|---|---|---|---|
| 4. | Who Can Vote in More Than One Class | 86 |
| 5. | Votes Necessary to Confirm the Plan | 86 |
| 6. | Votes Necessary for a Class to Accept the Plan | 86 |
| 7. | Treatment of Nonaccepting Classes | 86 |
| 8. | Request for Confirmation Despite Nonacceptance by Impaired Class | 91 |

| B. | Liquidation Analysis | 91 |
|---|---|---|
| C. | Feasibility | 92 |
| D. | Compliance With Section 1129(a)(15) | 94 |

| V. | EFFECT OF CONFIRMATION | 95 |
|---|---|---|
| A. | Discharge | 95 |
| B. | Exculpation and Releases | 95 |
| C. | Vesting of the Assets | 95 |
| D. | Plan Creates New Obligations | 95 |
| E. | Creditor Action Restrained | 95 |
| F. | Material Default Defined | 96 |
| G. | Modification of the Plan | 96 |
| H. | Post-Confirmation Status Report | 96 |
| I. | Quarterly Fees | 97 |
| J. | Post-Confirmation Conversion/Dismissal | 97 |
| K. | Final Decree | 98 |

# TABLE OF AUTHORITIES

## STATUTES

**Page**

11 U.S.C. § 101 ................................................................................. 9, 101

11 U.S.C. § 108 ...................................................................................... 80

11 U.S.C. § 327 .................................................................................... 105

11 U.S.C. § 328 .................................................................................... 105

11 U.S.C. § 330 .................................................................................... 105

11 U.S.C. § 331 .................................................................................... 105

11 U.S.C. § 341(a) ................................................................................. 39

11 U.S.C. § 346 ...................................................................................... 80

11 U.S.C. § 362(a) ................................................................................. 97

11 U.S.C. § 502 ............................................................................. passim

11 U.S.C. § 503 .............................................................................. 99, 105

11 U.S.C. § 503(b) ......................................................................... 99, 105

11 U.S.C. § 503(b)(3)(D) ..................................................................... 105

11 U.S.C. § 505 ...................................................................................... 80

11 U.S.C. § 506(a) .............................................................................. 106

11 U.S.C. § 506(b) ................................................................................. 55

11 U.S.C. § 507(a) ......................................................................... passim

11 U.S.C. § 507(a)(2) ....................................................................... 54, 85

11 U.S.C. § 507(a)(3) ............................................................... 62, 85, 105

11 U.S.C. § 507(a)(4) ....................................................................... 62, 86

11 U.S.C. § 507(a)(5) ....................................................................... 62, 86

11 U.S.C. § 507(a)(6) ............................................................................. 62

11 U.S.C. § 507(a)(7) ............................................................................. 62

11 U.S.C. § 507(a)(8) ................................................... 57, 58, 85, 105

11 U.S.C. § 510 ................................................................................ 80, 99

| | |
|---|---|
| 11 U.S.C. § 511 | 55 |
| 11 U.S.C. § 521 | 38, 106 |
| 11 U.S.C. § 523(a)(2)(A) | 44, 45 |
| 11 U.S.C. § 523(a)(4) | 44, 45 |
| 11 U.S.C. § 523(a)(6) | 44, 45, 46 |
| 11 U.S.C. § 525 | 80 |
| 11 U.S.C. § 541 | 99, 103 |
| 11 U.S.C. § 542 | 99 |
| 11 U.S.C. § 543 | 80 |
| 11 U.S.C. § 544 | passim |
| 11 U.S.C. § 544(a) | 26, 28, 43, 100 |
| 11 U.S.C. § 545 | 80 |
| 11 U.S.C. § 547 | passim |
| 11 U.S.C. § 548 | 80, 99 |
| 11 U.S.C. § 549 | 80, 99 |
| 11 U.S.C. § 550 | passim |
| 11 U.S.C. § 551 | 80, 99 |
| 11 U.S.C. § 553 | 75, 80, 99, 106 |
| 11 U.S.C. § 1103 | 105 |
| 11 U.S.C. § 1006 | 38 |
| 11 U.S.C. § 1107 | 38 |
| 11 U.S.C. § 1108 | 38 |
| 11 U.S.C. § 1112(b) | 97 |
| 11 U.S.C. § 1125 | 9 |
| 11 U.S.C. § 1127(a) | 96 |
| 11 U.S.C. § 1127(b) | 96 |
| 11 U.S.C. § 1129 | 101 |
| 11 U.S.C. § 1129(a)(15) | 94 |

11 U.S.C. § 1129(a)(7)........................................................................................91

11 U.S.C. § 1129(a)(8)........................................................................................87

11 U.S.C. § 1129(b) ......................................................................................... passim

11 U.S.C. § 1129(b)(2)(A)(ii)..........................................................................89, 90

11 U.S.C. § 1141(b) ............................................................................................95

11 U.S.C. § 1141(d)(5)........................................................................................95

11 U.S.C. § 1144 ................................................................................................97

11 U.S.C. § 1146 ...........................................................................................80, 83

28 U.S.C. § 1930(a)(6).......................................................................................97

**RULES**

L.B.R. 3003(b)(1) ...............................................................................................99

John Jean Bral, the debtor and debtor-in-possession herein (the "Debtor"),[1] provides this Second Amended Disclosure Statement Describing Second Amended Chapter 11 Plan (the "Disclosure Statement") to creditors, pursuant to 11 U.S.C. § 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of his Second Amended Chapter 11 Plan (the "Plan") filed with the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court") in the above-captioned chapter 11 bankruptcy case (the "Case").

## I.    **INTRODUCTION**

The Case was commenced by the filing of a voluntary chapter 11 petition under the United States Bankruptcy Code (the "Bankruptcy Code" or "Code"), 11 U.S.C. §§ 101, et seq., on February 24, 2017 (the "Petition Date").

Chapter 11 allows debtors, and, under some circumstances, creditors and other parties in interest to propose a plan.  A plan may provide for a debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. The Debtor is the proponent of the Plan, which was sent to you in the same envelope as these documents.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.  **Your rights may be affected.  You should read these papers carefully and discuss them with your attorney, if you have one.  (If you do not have an attorney, you may wish to consult one).**

The Plan is a liquidation plan – which generally means that some or all of the Debtor's assets will be liquidated, and the proceeds thereof utilized to pay the Allowed Claims of creditors in full including interest (or up to the full amount of the proceeds), with any surplus not otherwise necessary to pay Allowed Claims in full with interest being retained by the Debtor.  Specifically, in this case, as described in detail below, Allowed Claims will be paid, in accordance with their respective priorities, from a Distribution Fund consisting of monies derived from the following:

---

[1] Any capitalized terms not defined in the text of this Disclosure Statement are defined in the Table of Definitions found at the end of the Disclosure Statement.

1.    The monetization of the Debtor's ownership interests in two limited liability companies, Mission Medical Investors, LLC ("<u>Mission</u>") and Westcliff Investors, LLC ("<u>Westcliff</u>" and, together with Mission, the "<u>Companies</u>").  Funds will be generated either through the sale of the real property assets held by each of the Companies or by the other members of the Companies purchasing the Debtor's membership interests;

2.    To the extent that the funds from the monetization of the Companies are insufficient to pay Allowed Claims in full, the Debtor will liquidate his other real and personal property, to the extent equity exists and the assets are not exempt;

3.    Potential recovery from a malpractice claim the Debtor holds against state court counsel;

4.    Proceeds from the Debtor's contribution claims against co-guarantors; and

5.    Potential recovery of attorneys' fees and costs sought by the Debtor against certain Beitler Parties (as such term is defined herein) and their counsel in connection with the Motion to Strike (as such term is defined herein).

The Debtor believes that the Distribution Fund will be sufficient to pay Allowed Secured, Administrative, and Priority Claims in full and will provide a pro rata distribution on account of Allowed Unsecured Claims, up to payment in full with interest.  As set forth in the initial and supplemental Declarations of Adam Meislik filed in support of approval of the Disclosure Statement and confirmation of the Plan (together, the "<u>Meislik Declaration</u>") [Docket Nos. 417 and 452], and in Exhibit "A" hereto, depending on the outcome of the claims objection and lien avoidance process and the amount of proceeds ultimately available to the Debtor from the above-referenced sources, the distribution to holders of Allowed Unsecured Claims is estimated to be between 20% and 100%

The Effective Date of the Plan will be the later of (1) the first (1st) Business Day that is at least thirty (30) days after the entry of an order confirming the Plan (the "Confirmation Order"); provided, however, that the Confirmation Order shall have become a Final Order, and (2) the first (1st) Business Day that is at least fifteen (15) days after any order awarding sanctions against any party in favor of the Debtor shall have become a Final Order, or is otherwise resolved by the parties.

### A.    The Purpose of This Document

The Disclosure Statement summarizes what is in the Plan and provides certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

1.    **WHO CAN VOTE ON OR OBJECT TO THE PLAN:**

2.    **THE TREATMENT OF YOUR CLAIM UNDER THE PLAN (*i.e.*, what you will receive on account of your Claim if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION IN CHAPTER 7;**

3.    **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE;**

4.    **WHAT THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

5.    **THE EFFECT OF CONFIRMATION; AND**

6.    **WHETHER THE PLAN IS FEASIBLE.**

The Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.  Shulman Hodges & Bastian LLP ("SH&B") and/or Pachulski Stang Ziehl & Jones LLP ("PSZ&J"), reorganization counsel for the Debtor, do not represent you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and Disclosure Statement, the Plan provisions will govern.

The Code requires that the Disclosure Statement contain "adequate information" concerning the Plan.  By order entered on [_____], 2018, the Court approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.  Any party can now solicit votes for or against the Plan.

**B.**    **Deadlines for Voting and Objecting; Date of the Plan Confirmation Hearing**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS IN THIS CASE.

**1.**    **Time and Place of the Confirmation Hearing**

The hearing where the Court will determine whether or not to confirm the Plan will take place on **[_____], 2018, at __:__ a.m./p.m**., in Courtroom 5C of the United States Bankruptcy Courthouse located at the Ronald Reagan Federal Building and Courthouse, 411 West Fourth Street, Santa Ana, California 92701.

**2.**    **Deadline for Voting for or Against the Plan**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to Shulman Hodges & Bastian LLP, attn.: Alan J. Friedman, Esq. and Lori A. Gauthier, 100 Spectrum Center Drive, Suite 600, Irvine, California 92618.

**Your ballot must be received no later than 5:00 (Pacific Time) [_____], 2018, or it will not be counted.**

**3.      Deadline for Objecting to the Confirmation of the Plan**

Objections to the confirmation of the Plan must be Filed with the Court and served upon counsel for the Debtor so as to be received on or before [_____], 2018.

**4.      Identity of Person to Contact for More Information Regarding the Plan**

Any interested party wishing further information about the Plan should contact Alan J. Friedman of Shulman Hodges & Bastian LLP, by phone at (949) 340-3400 or by email at afriedman@shbllp.com, or William N. Lobel of Pachulski Stang Ziehl & Jones LLP, by phone at (714) 384-4752 or email at wlobel@pszjlaw.com.

**C.      Disclaimer**

The financial data relied upon in formulating the Plan is based on the financial records of the Debtor, projections created by the Debtor, or information provided by other parties in interest.  The professionals employed by the Debtor drafted the Plan and the Disclosure Statement based upon this information and have no independent knowledge regarding the accuracy of the data.  The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

1
  **II.**    **BACKGROUND**

2
      **A.**    **The Debtor's Real Property Assets**

3
            **1.**    **The Sandpiper Property**

4
        The Debtor owns real property located at 64 Sandpiper, Irvine, California 92604,

5
which is the Debtor's primary residence (the "Sandpiper Property").  The Sandpiper

6
Property has an approximate value of $726,000, and is encumbered by three deeds of trust

7
held by (i) Suntrust Mortgage in the approximate amount of $88,506 (ii) Citibank, N.A. in

8
the approximate amount of $211,458, and (iii) Michelle Easton in the amount of $35,000,[2]

9
for a total of approximately $335,000 in non-judicial liens.  Cannae Financial, LLC

10
("Cannae") also has a recorded abstract of judgment against the Sandpiper Property

11
(recorded in or about August 2015) based upon a judgment it holds in the amount of

12
approximately $395,000 as of the Petition Date (not including post-judgment fees, costs

13
and post-petition interest) (referred to herein as the "Cannae Secured Claim").[3]  The Debtor

14
has claimed a $75,000 homestead exemption in the Sandpiper Property.  Based on a value

15
of approximately $726,000, after accounting for the non-judicial liens (totaling

---

16
    [2] Michelle Easton's secured claim is also collateralized by the Debtor's stock in Venture Development

17
Group.

18
    [3] *See* Section II.C.4. hereof for a further discussion of the Cannae Secured Claim.  The Cannae Secured
Claim is also secured by the Debtor's membership interest in Westcliff.  The Los Angeles Condominium (as
herein defined), which also served as collateral for the Cannae Secured Claim, has been sold, with all

19
proceeds going to pay the claim of the senior lender (Bayview Loan Servicing).  The Cannae Secured Claim
will be satisfied from the proceeds of the disposition of the Debtor's interest in Westcliff.  Pending such

20
payment, Cannae will retain its lien against the Sandpiper Property (subject to the Debtor's right to seek to
avoid any portion of such lien that impairs the Debtor's exemption in the Sandpiper Property under Section

21
522(f) of the Bankruptcy Code or otherwise).  The Cannae Secured Claim is classified as Class 7 under the
Plan.

22
    As discussed in further detail in Sections II.C.6. hereof, on or about March 19, 2014, a writ of attachment

23
securing the amount of $5,355,059.42 was issued against the Debtor, the Sandpiper Property (and the Los
Angeles Condominium) in favor of First-Citizens Bank & Trust Co. (referred to herein as the Writ of

24
Attachment).  Pre-petition, Steward Financial LLC ("Steward") asserted that the Writ of Attachment had been
assigned to it, which the Debtor disputed.  The Writ of Attachment expired pursuant to applicable law, and

25
Steward has not asserted a secured claim in the Case, but has filed two proofs of claim (Claim Nos. 19 and
20) asserting unsecured claims against the Debtor (referred to herein as the Steward Guaranty Unsecured

26
Claim (Claim No. 20) in the amount of approximately $2.6 million, and the Steward Foreclosure Differential
Unsecured Claim (Claim No. 19), in the amount of approximately $1.1 million (and a related non-

27
dischargeability action (referred to herein as Adversary 95) (together, the "Steward Disputed Unsecured
Claims")).  As discussed in further detail herein, the Debtor has objected to the Steward Disputed Unsecured

28
Claims and seeks dismissal of the Adversary 95.  The Steward Disputed Unsecured Claims are classified as
Class 10 under the Plan.

approximately $335,000), the costs of disposition and taxes (totaling approximately

$42,794) and the Debtor's homestead exemption (in the amount of $75,000), approximately

$273,242 in equity would remain subject to the abstract of judgment related to the Cannae

Secured Claim (*i.e.*, approximately $121,758 in exemption impairment).  In other words,

any amount over the amount of approximately $273,242 asserted by way of the Cannae

Secured Claim would impair the Debtor's homestead exemption.  The Debtor is reviewing

the appropriate steps to take under Section 522(f) of the Bankruptcy Code or otherwise to

avoid any lien to the extent it impairs the Debtor's homestead exemption.  The Debtor

expressly reserves the right to pursue such claim in the event that such issues cannot be

consensually resolved.

### 2.    The Los Angeles Condominium

Although title was held in the name of the Debtor as of the filing of the Case, the

Debtor only owned a one-third (1/3) interest in a condominium located at 1271 Federal

Avenue, Unit 302, Los Angeles, California 90025 (the "Los Angeles Condominium").  Barry

Beitler ("Beitler") owned the other two-thirds (2/3) interest in the Los Angeles Condominium.

The Los Angeles Condominium was valued at approximately $800,000, but was

encumbered by liens in the approximate amount of $806,489 held by The Bank of New

York Mellon f/k/a The Bank of New York as Trustee for the Certificate Holders of the

CWMBS, Inc., CHL Mortgage Pass-Through Trust 2007-HY6, Mortgage Pass-Through

Certificates, Series 2007-HY6 (Bayview Loan Servicing) ("Bayview") and $98,000 held by

Bank of America.[4]  A trustee's sale was scheduled for March 7, 2017, but was stayed by

the filing of the Case.  As there was no equity in this property, on October 25, 2017, relief

from stay was granted to allow Bayview to proceed with the trustee's sale [Docket No.194],

which sale was thereafter completed.  The Debtor no longer holds any interest in the Los

Angeles Condominium.  The Debtor asserts a claim against Beitler in the amount of

---

[4] *See* footnote 3 regarding the Cannae Secured Claim and the Writ of Attachment in connection with the
Los Angeles Condominium.

1    approximately $50,000 based on his failure to fund amounts in connection with the Los

2    Angeles Condominium.

3        **B.    The Debtor's Personal Property Assets**

4            **1.    Mission Medical Investors, LLC**

5            Mission is a California limited liability company that was formed on or about

6    December 4, 2003.  The Debtor contends that he holds a 40.375% (Capital) and 42.30%

7    (Profit and Loss) interest in Mission, and that he is the sole manager of Mission.[5]  Beitler is

8    the other member of Mission.  Mission operates as a single asset commercial real estate

9    investment company that purchased and operates a medical office building consisting of a

10   29,744 square foot building located at 27882 Forbes Road, Laguna Niguel, California

11   92677 (the "Mission Medical Building") along with excess land located next to the medical

12   building (the "Mission Land").  Based upon an appraisal dated January 5, 2017, the Debtor

13   believes the market value of the Mission Medical Building to be $18,850,000.  Based upon

14   an appraisal dated March 31, 2015, the Debtor believes that the Mission Land, as entitled

15   land, has an estimated value of $3,080,000.  The Mission Medical Building and the Mission

16   Land are subject to a first deed of trust in the approximate amount of $8,971,795 and a

17   disputed second lien in the approximate amount of $690,000 asserted by Avalon

18   Associates Ltd.  The Debtor personally guaranteed certain loans to Mission secured by the

19   Mission Medical Building and the Mission Land.[6]

20

21       [5] Beitler disputes these contentions and contends that the Debtor holds a lesser percentage related to the
22   Mission capital account and that Beitler is also a manager of Mission.  The Debtor disputes Beitler's
     contentions in this regard.  As discussed in Section II.D.5.c. hereof, the economic issues relating to the
23   pending dissolution action of Mission (including an accounting as to the Debtor's interest in Mission) will be
     determined by way of the Mission Arbitration.

24       [6] A contingent personal guaranty claim related to the obligations of Mission was inadvertently omitted
     from the Debtor's initially filed Schedules.  On or about April 20, 2018, the Debtor amended the Schedules to
25   include this claim, as well as to include certain contingent personal guaranty claims related to the obligations
     of Westcliff.  [Docket No. 402].  Such contingent claimant was provided with notice of a supplemental bar
26   date, but did not file a claim and it is the Debtor's position that such claim is now barred.  In any event, based
     on the value of the assets of Mission and Westcliff, there should ultimately be no liability related to any such
27   personal guarantees, and the Debtor reserves the right to object to, or seek to estimate, such claims.  To the
     extent that the Debtor ultimately pays more than his proportionate share of such personal guaranty liability,
28   the Debtor intends, and specifically reserves the right, to pursue any co-guarantors (including Beitler or his
     related entities, including any trust or entity in which Beitler holds an ownership interest) for claims of

The Debtor values his interest in Mission at $4,960,441 (before consideration of the tax implications for the Debtor based upon the sale of Mission's assets and a distribution to the Debtor).  Beitler disputes the Debtor's valuation and believes that the Debtor's interest in Mission is less.  As of the date hereof, Beitler has not provided any estimate of what he believes the Debtor's interest to be and has not provided the Debtor with any evidence supporting his contention.  The issues with respect to the value of the Debtor's interest in Mission will be determined in connection with the Mission Arbitration (as herein defined).  With the exception of Beitler's disputed secured claims related to the Judgment on Decision (in the approximate amount of $789,000) and Default Judgment (in the approximate amount of $2.6 million), allegedly secured by Charging Liens against the Debtor's membership interest in Mission and Westcliff, the Debtor believes that his interest in Mission is unencumbered.[7]

The Debtor sent a demand for arbitration on December 19, 2017, commencing an arbitration relating to the dissolution of Mission (the "Mission Arbitration").  On March 7, 2018, the Debtor submitted his List for Selection of Arbitrator.  As discussed in further detail in Section II.D.5.c. hereof, on April 2, 2018, the Court entered an order modifying the automatic stay to allow the Mission Arbitration to proceed following confirmation of the

---

contribution, reimbursement or otherwise and the Plan provides for the set-off of any such claims against claims asserted against the Debtor by any co-guarantor under applicable law.

With respect to any personal guaranty claim in connection with the disputed second lien asserted by Avalon Associates Ltd. against Mission's assets, the Debtor had listed this obligation as contingent, disputed and unliquidated on the initial Schedules.  The claimant failed to file a proof of claim.  Accordingly, it is the Debtor's position that any claim against the Debtor by Avalon Associates Ltd. based on the personal guaranty is barred.

[7] See Sections II.C.1, II.C.4 and II.C.6 hereof for a discussion of the liens that were asserted pre-petition against the Debtor's membership interests in Mission.  In this regard, Steward does not assert a secured claim against the Debtor's membership interest in Mission based on the Writ of Attachment or otherwise, but has asserted unsecured claims in the Case (the Steward Disputed Unsecured Claims).  The Cannae Secured Claim is secured by the Debtor's interest in Westcliff, but not his interest in Mission.  With respect to Beitler's claims related to the Judgment on Decision and Default Judgment (allegedly secured by the Charging Liens against the Debtor's membership interest in Mission and Westcliff), the Court has determined that such Charging Liens are unperfected and thereby avoided under Section 544(a) pursuant to the Court's order granting summary judgment in connection with the Beitler Avoidance Action.  Because such order is not yet final, however, the Judgment on Decision and Default Judgment are treated as disputed secured claims under the Plan (Classes 5 and 6).  To the extent determined to be unsecured, such claims will be treated as Class 12 under the Plan.  The Debtor believes that his membership interest in Mission will ultimately be found to be unencumbered.

1    Plan (or earlier by agreement of the parties) [Docket No. 381] (the "Mission RFS Order").

2    Pursuant to the Mission RFS Order, the Mission Arbitration will determine the economic

3    issues relevant to the ownership interests in Mission, and such determination will be utilized

4    to determine the amount of proceeds that will be available to pay creditors' claims from the

5    Debtor's interest in Mission pursuant to the Plan.[8]

6                    **2.      Westcliff Investors, LLC**

7            Westcliff is a California limited liability company formed in or about February 2003.

8    The Debtor contends that he holds a 47.5% interest in Westcliff and is a co-manager with

9    Beitler.[9]   The other members of Westcliff are Beitler and his sister Betsy Boyd ("Boyd").

10   Westcliff operates as a single asset commercial real estate investment company that

11   purchased and operates a medical office building consisting of a 19,476 square foot

12   building on a 1.65 acre site located at 1901 Westcliff Drive, Newport Beach, California

13   92660 (the "Westcliff Medical Building").  The Westcliff Medical Building is secured by a first

14   deed of trust in the approximate amount of $3,792,545 and a second deed of trust in the

15   approximate amount of $400,000.  The Debtor has personally guaranteed the loans to

16   Westcliff secured by the Westcliff Medical Building.[10]   Based upon an appraisal dated April

17

18   [8] Notwithstanding the pendency of the Mission Arbitration, the members of Mission may seek to
19   implement a sale of the assets of Mission pursuant to the provisions of Mission's operating agreement without
     the necessity of a dissolution proceeding.

20   [9] Beitler (and Boyd) dispute the Debtor's contention related to his interest in Westcliff and contend that he
     owns a lesser percentage related to the Westcliff capital account.  The Debtor disputes Beitler's contentions
21   in this regard.  As discussed in Section II.D.5.c. hereof, the economic issues relating to the dissolution of
     Westcliff (including an accounting as to the Debtor's interest in Westcliff) will be determined by way of the
22   Westcliff Arbitration.

23   [10] Certain contingent personal guaranty claims related to the obligations of Westcliff were inadvertently
     omitted from the Debtor's initially filed Schedules.  On or about April 20, 2018, the Debtor amended the
24   Schedules to include these claims, as well as to include a contingent personal guaranty claim related to the
     obligations of Mission.  [Docket No. 402].  Such contingent claimants were provided with notice of a
25   supplemental bar date, but did not file claims and it is the Debtor's position that such claims are now barred.
     In any event, based on the value of the assets of Westcliff and Mission, there should ultimately be no liability
26   related to any such personal guarantees, and the Debtor reserves the right to object to, or seek to estimate,
     such claims.  To the extent that the Debtor ultimately pays more than his proportionate share of such personal
27   guaranty liability, the Debtor intends, and specifically reserves the right, to pursue any co-guarantors
     (including Beitler or his related entities, including any trust or entity in which Beitler holds an ownership
28   interest) for claims of contribution, reimbursement or otherwise and the Plan provides for the set-off of any
     such claims against claims asserted against the Debtor by any co-guarantor.

26, 2018, the Debtor believes the Westcliff Medical Building has an approximate value of $11,070,000.

The Debtor values his interest in Westcliff at $3,175,111 (before consideration of the tax implications for the Debtor based upon the sale of Westcliff's assets and a distribution to the Debtor). Beitler disputes the Debtor's valuation and believes that the Debtor's interest in Westcliff is less. As of the date hereof, Beitler has not provided any estimate of what he believes the Debtor's interest to be and has not provided the Debtor with any evidence supporting his contention. The issues with respect to the value of the Debtor's interest in Westcliff will be determined in connection with the Westcliff Arbitration (as herein defined). With the exception of the Cannae Secured Claim (in the approximate amount of $395,000) and Beitler's disputed secured claims related to the Judgment on Decision (in the approximate amount of $789,000) and Default Judgment (in the approximate amount of $2.6 million), allegedly secured by Charging Liens against the Debtor's membership interest in Westcliff and Mission, the Debtor believes that his interest in Westcliff is unencumbered.[11]

An arbitration with respect to the dissolution of Westcliff (the "Westcliff Arbitration") was scheduled through JAMS, and various discovery and pre-hearing dates and deadlines were set pursuant to the arbitrator's scheduling order issued on January 17, 2018. The parties were proceeding with discovery in compliance with the scheduling order and the arbitration hearing was scheduled to be held June 4 through June 6, 2018. As discussed in further detail in Section II.D.5.c. hereof, on April 2, 2018, the Court entered an order

[11] *See* Sections II.C.1, II.C.4 and II.C.6 hereon for a discussion of the liens that were asserted pre-petition against the Debtor's membership interests in Westcliff. In this regard, Steward does not assert a secured claim against the Debtor's membership interest in Westcliff based on the Writ of Attachment or otherwise, but has asserted unsecured claims in the Case (the Steward Disputed Unsecured Claims). The Cannae Secured Claim, however, is secured by the Debtor's interest in Westcliff. With respect to Beitler's claims related to the Judgment on Decision and Default Judgment (allegedly secured by the Charging Liens against the Debtor's membership interest in Westcliff and Mission), the Court has determined that such Charging Liens are unperfected and thereby avoided under Sections 544(a), 502 and 550, pursuant to the Court's order granting summary judgment in connection with the Beitler Avoidance Action. Because such order is not yet final, however, the Judgment on Decision and Default Judgment are treated as disputed secured claims under the Plan (Classes 5 and 6). To the extent determined to be unsecured, such claims will be treated as Class 12 under the Plan. The Debtor believes that, with the exception of the Cannae Secured Claim, his membership interest in Westcliff will ultimately be found to be unencumbered.

modifying the automatic stay to allow the Westcliff Arbitration to proceed following confirmation of the Plan (or earlier by agreement of the parties) [Docket No. 380] (the "Westcliff RFS Order").  Pursuant to the Westcliff RFS Order, the Westcliff Arbitration will determine the economic issues relevant to the ownership interests in Westcliff, and such determination will be utilized to determine the amount of proceeds that will be available to pay creditors' claims from the Debtor's interest in Westcliff pursuant to the Plan.

### 3.    Venture Development Group

Venture Development Group ("VDG") was formed in 2006 and is a real estate development company.  The Debtor's 100% interest in VDG is valued at $62,282 based on a joint venture agreement with LN Investments, LLC for the development of certain real property located at 27912 Forbes Road, Laguna Niguel, California 92677 and the value of obtaining entitlements for the real property.[12]  VDG, as the manager, is entitled to 50% of profits after investment members receive 100% return of capital.  It is estimated that the Debtor's efforts at the project located at 27912 Forbes Rd., Laguna Niguel, CA 92677, will result in a profit of approximately $300,000 in five years.  Applying VDG's 50% profit interest and discounting at 20% per annum to the present results in net present value is $60,282.  The discount rate reflects the inherent risk of the project and required rate of return to an investor.  Pursuant to the Plan, to the extent that the proceeds from the disposition of the Debtor's interests in Mission and Westcliff are insufficient to pay Allowed Claims in full, the Debtor will liquidate his non-exempt real and personal property with equity in order to satisfy the Debtor's payment obligations to holders of Allowed Claims under the Plan, including his interest in VDG.

### 4.    Bral Realty Advisors, Inc.

Bral Realty Advisors, Inc. ("BRA") was formed in 2013 and is owed 100% by the Debtor.  BRA is a commercial real estate brokerage and property management company, which provides services in all areas of commercial real estate.  The Debtor receives wages

---

[12] Michelle Easton's Class 3 Secured Claim (in the amount of $35,000) is secured by the Debtor's interest in VDG and the Sandpiper Property.

from this company.  The Debtor's interest in BRA is valued at $0.  BRA employs staff to provide management services and breaks even on these services.  These management contracts will most likely terminate upon execution of the Plan and therefore have no intrinsic value.  The Debtor intends to conduct brokerage service through BRA.  The Debtor's brokerage services are too closely tied to his personal goodwill and therefore have no divisible value with BRA.  The Debtor's interest in BRA is therefore valued at $0.  Pursuant to the Plan, to the extent that the proceeds from the disposition of the Debtor's interests in Mission and Westcliff are insufficient to pay Allowed Claims in full, the Debtor will liquidate his non-exempt real and personal property with equity in order to satisfy the Debtor's payment obligations to holders of Allowed Claims under the Plan, including his interest in BRA (to the extent any value exists).

### 5.    Javaher Investors, LLC

Javaher Investors, LLC ("Javaher") is a California limited liability company that was formed in 2006.  The Debtor holds a 9% interest in Javaher.[13]  Javaher owns real property located at 4715 Coffee Road, Bakersfield, California.  Based on the value of the real property (and a 30% discount for lack of control), the Debtor's interest in Javaher is valued at $130,549.  Pursuant to the Plan, to the extent that the proceeds from the disposition of the Debtor's interests in Mission and Westcliff are insufficient to pay Allowed Claims in full, the Debtor will liquidate his non-exempt real and personal property with equity in order to satisfy the Debtor's payment obligations to holders of Allowed Claims under the Plan, including his interest in Javaher.

### 6.    Eye Street Medical Investors, LLC

Eye Street Medical Investors, LLC ("Eye Street") is a California limited liability company that was formed in 2006.  The Debtor holds a 11.875% interest (Class A), plus an

---

[13] This interest in Javaher is currently held by Westcliff (which holds an 18% interest in Javaher).  The Debtor and Beitler have been in agreement for some time that such interests in Javaher should not be held by Westcliff, but are properly held by the Debtor and Beitler in equal shares (9% each).  The Debtor will take all appropriate actions necessary to implement the correct holdings of the Javaher interests by the Debtor and Beitler.

1    additional 2.5% interest (Class B), in the company.[14]  Eye Street owns real property located

2    at 2525 Eye Street, Bakersfield, California.  Based on the value of the real property (and a

3    30% discount for lack of control), the Debtor's interest in Eye Street is valued at $68,782.

4    Pursuant to the Plan, to the extent that the proceeds from the disposition of the Debtor's

5    interests in Mission and Westcliff are insufficient to pay Allowed Claims in full, the Debtor

6    will liquidate his non-exempt real and personal property with equity in order to satisfy the

7    Debtor's payment obligations to holders of Allowed Claims under the Plan, including his

8    interest in Eye Street.

9            **7.      Spectrum 6 Medical Investors, LLC**

10           Spectrum 6 Medical Investors, LLC ("Spectrum") is a California limited liability

11   company that was formed in 2006.  Spectrum owns property located at 15775 Laguna

12   Canyon Road, Irvine, California.  The Debtor holds a 1% Class B interest in Spectrum.

13   Based on the nature of the Debtor's interest (and a discount for lack of control), the

14   Debtor's interest in Spectrum is valued at $0.  If new information comes to light

15   substantiating an alleged transfer of a portion of a Spectrum Class A interest and an

16   accounting of status of the accrued preferred returns due to the Class A interests, it may

17   substantiate a value to the Debtor of up to approximately $30,000.  Pursuant to the Plan, to

18   the extent that the proceeds from the disposition of the Debtor's interests in Mission and

19   Westcliff are insufficient to pay Allowed Claims in full, the Debtor will liquidate his non-

20   exempt real and personal property with equity in order to satisfy the Debtor's payment

21   obligations to holders of Allowed Claims under the Plan, including his interest in Spectrum

22   (to the extent any value exists).

23

24

25           [14] The Class A interest in Eye Street is currently held by Westcliff (which holds an 23.75% interest in Eye
26   Street).  The Debtor and Beitler have been in agreement for some time that such interests in Eye Street
     should not be held by Westcliff, but are properly held by the Debtor and Beitler in equal shares (11.875%
27   each).  The Debtor will take all appropriate actions necessary to implement the correct holdings of the Eye
     Street interests by the Debtor and Beitler.  In addition, the Debtor directly holds an additional 2.5% (Class B)
28   interest in Eye Street.  This additional interest in Eye Street was inadvertently omitted from the Schedules and
     will be reflected in amended Schedules to be filed by the Debtor.

### 8.  Venture Group of Companies, Inc.

Venture Group of Companies, Inc. ("VGC") is a California corporation that was formed in 2011.  The Debtor owns 100% of the company, however, VGC has no assets, liabilities or activity and the Debtor's interest is estimated to have a value of $0.  Pursuant to the Plan, to the extent that the proceeds from the disposition of the Debtor's interests in Mission and Westcliff are insufficient to pay Allowed Claims in full, the Debtor will liquidate his non-exempt real and personal property with equity in order to satisfy the Debtor's payment obligations to holders of Allowed Claims under the Plan, including his interest in VGC (to the extent any value exists).

### 9.  Miscellaneous Personal Property

The Debtor has other miscellaneous personal property that was listed in his Schedules all of which is fully exempt, except for a portion of a 2012 Toyota Tundra.[15]

In addition to these assets, the Debtor asserts claims against Beitler for breach of fiduciary duty and breach of contract in connection with the various entities in which the Debtor and Beitler are co-members, including but not limited to Ocean View and a $50,000 claim related to the Los Angeles Condominium.  The Debtor is also in the process of evaluating the viability and likelihood of recovery on a malpractice claim that the Debtor may have against state court counsel.[16]  In addition, as discussed in further detail in

---

[15] The 2012 Toyota Tundra is the Debtor's only vehicle.  The other vehicles listed in the Schedules (co-leased or guaranteed by the Debtor) have been returned to the lessors in accordance with the lease terms, and the lessors assert no claims against the Debtor in connection therewith.  In this regard, the proof of claim filed by Honda has been disallowed, and the Debtor believes that the proof of claim filed by BMW will either be consensually withdrawn or will otherwise be subject to disallowance.

[16] In early 2018, one of the Debtor's state court counsel, Lloyd Chapman, passed away.  Based on his investigation, the Debtor does not believe that there would be any material recovery from Mr. Chapman's estate nor does he believe that any malpractice coverage exists and, therefore, does not believe there is any benefit to pursuing a malpractice claim against Mr. Chapman's estate.  The Debtor, however, believes that there exists a potential action against his other state court counsel, Samini Scheinberg PC, and is analyzing the pursuit of such claim as a source of recovery under the Plan.  The value of this potential malpractice claim is materially dependent on future events, including without limitation, the outcome of the Debtor's appeal seeking to set aside the entry of the Default Judgment in the amount of approximately $2.6 million to allow the claims to be decided on the merits.  Relief from stay to pursue the Debtor's appeal has just recently been granted and the briefing process is underway.  If the Debtor is unsuccessful in his appeal, then this claim could have a value of more than $2.6 million.  It is still unknown whether there exist any insurance policies to assist in the payment of any judgment that the Debtor might obtain.  On May 21, 2018, the Debtor issued a subpoena to Samini Scheinberg PC to determine whether there is coverage related to the malpractice claim.

Section III.F.4 hereof, the Debtor specifically retains his right to assert claims of contribution, reimbursement or otherwise against co-guarantors (specifically including Beitler and his related entities, including any trust or entity in which he holds an ownership interest), based on the enforcement of guaranties against the Debtor, and related set-off rights with respect to such claims and the claims asserted against him by such co-guarantors (including, without limitation, any personal guarantees related to the Companies, the Cannae Secured Claim, the Cannae Unsecured Claim and the Steward Guaranty Unsecured Claim or otherwise). [17]  These causes of action would revest in the Reorganized Debtor and the recovery from any such actions would be used to pay creditors (or would work as a setoff against any claim asserted against the Debtor by such claimant).  With respect to avoidance actions, the Debtor has undertaken a review of potential avoidance actions and, aside from certain actions that have already been commenced or have been reserved for as detailed in this Disclosure Statement relating to: (1) the setting aside of liens (*e.g.*, the Beitler Avoidance Action and any action under Section 522(f) to avoid the Cannae Secured Claim on the Sandpiper Property to the extent it impairs the Debtor's homestead exemption); and (2) a potential preference action against the Debtor's former counsel, LWGF, in the approximate amount of $10,000,[18] the Debtor does not believe that there exist additional meritorious avoidance actions that would result in a material recovery to the estate, but reserves his right to bring any such additional claims.

On May 10, 2018, the Debtor filed a Supplement to First Amended Disclosure Statement (the "Asset Value Schedule") [Docket No. 430], providing information regarding (1) the assets he intends to retain, and (2) the assets he intends to liquidate to the extent necessary to pay Allowed Claims in full pursuant to the Plan, and the Debtor's estimated values of such assets (with the exception of the Debtor's claim for attorneys' fees and costs

---

[17] The Debtor has filed amended Schedules setting forth such potential claims and set-off rights against such co-guarantors.  [Docket No. 436].

[18] If necessary, the Debtor and LWGF will enter into a tolling agreement so that such action, if necessary, can be commenced and/or consensually resolved following the confirmation of the Plan.

against certain Beitler Parties and their counsel in connection with the Motion to Strike, which was not included on the Asset Value Schedule). A copy of the Asset Value Schedule is attached as Exhibit "D" to the Supplemental Meislik Declaration [Docket No. 452].

**C.    The Events That Led to the Chapter 11 Filing**

The major factor leading up to this Case was the pre-petition litigation commenced by Beitler and entities controlled by him against the Debtor. With so many cases pending, the time and expense associated with the litigation, and the prejudice that would be caused by Beitler potentially obtaining charging orders and/or perfecting charging order liens against the Debtor's membership interests, the Debtor determined that it would be in his and his creditors' best interests to commence the Case. The commencement of the Case provides the Debtor with a breathing spell from the litigation while the Debtor, among other things, takes the steps necessary to monetize his membership interests in the Companies.

The following is a description of the pre-petition litigation and the current status of the claims related thereto:

**1.    Beitler v. Bral, Case No. BS146302**

On or about December 5, 2013, Beitler commenced an action against the Debtor in the Superior Court of California, County of Los Angeles for breach of contract, which was assigned Case No. BS146302. The case was tried before Private Judge Hon. Carl J. West (ret.) on or about June 16, 2016, and subsequently taken under submission. On or about October 11, 2016, Judge West issued a Statement of Decision finding in favor of Beitler in all material respects.

On or about November 17, 2016, the Superior Court entered a Judgment on Statement of Decision (the "Judgment on Decision"), which provides that Beitler shall have and recover against the Debtor: (1) damages in the sum of $591,826.61, plus accruing interest at the rate of $92.64 per day from and after June 15, 2016 through the date of entry of the Judgment; (2) Attorneys' fees in the sum of $118,083.50; (3) Costs in the sum of $2,387.37; (4) Fees paid to JAMS in the sum of $39,640.02; and (5) Transcript fees in the

1  sum of $1,672.61.  In addition, the Judgment on Decision would accrue post-judgment

2  interest at the statutory rate.

3       On or about January 18, 2017, Beitler filed and served motions for charging orders,

4  creating liens against the Debtor's membership interests in the Companies (defined herein

5  as the "Charging Liens") with respect to the amounts owed pursuant to the Judgment on

6  Decision.  Because the hearing on the motions was not heard as of the Petition Date,

7  however, the Debtor asserted that the Charging Liens were unperfected in the Case and

8  subject to avoidance under applicable law.  Beitler disagreed with the Debtor's contentions

9  in this regard.  On June 16, 2017, Beitler filed a proof of claim ("Claim No. 13-1"), asserting

10  a secured claim based on the amount due pursuant to the Judgment on Decision, in the

11  amount of $788,798.91 as of the Petition Date, not including post-judgment fees, costs and

12  post-petition interest.

13       On May 9, 2017 (as thereafter amended on October 6, 2017), following the Debtor's

14  demand to Beitler to remove the Charging Liens as they were avoidable (and Beitler's

15  unwillingness to do so), the Debtor commenced the Beitler Avoidance Action (described

16  below), asserting that the Charging Liens against the Debtor's interests in the Companies

17  related to the Judgment on Decision were unperfected and should be avoided under, *inter*

18  *alia*, 11 U.S.C. §§ 544(a), 547 and 550, and on October 13, 2017, filed an objection to

19  Claim No. 13-1 on these grounds.  [Docket No. 135].  As described in further detail below,

20  over Beitler's objection, the Court granted the Debtor's motion for summary judgment on

21  the avoidability of the Charging Liens under 11 U.S.C. § 544(a).  The order granting the

22  Debtor's motion for summary judgment (defined herein as the "MSJ Order") resolved, in the

23  Debtor's favor, the Debtor's claims under section 544(a), and related relief under sections

24  502 and 550, but left open for future proceedings the section 547 issues.

25       As the MSJ Order is not a final order at this point, however, the Plan treats the

26  Judgment on Decision as a disputed Secured Claim, and such claim is classified as Class

27  5 under the Plan.  To the extent that it is determined that the Class 5 Claim is not secured

28

against the Debtor's interests in the Companies, such claim will be treated as a Class 12

Unsecured Claim under the Plan.

### 2.    Beitler v. Bral, Case No. BC532523

On or about January 8, 2014, Beitler commenced an action against the Debtor in

Los Angeles Superior Court, commencing Case No. BC532523.  The complaint alleges

causes of action for: (1) breach of written contract; (2) money had and received; (3) money

lent; (4) unjust enrichment; (5) an accounting; (6) breach of fiduciary duty; (7) breach of oral

contract; (8) breach of implied contract; (9) unjust enrichment contribution; (10) equitable

indemnity; and (11) account stated.  On or about July 8, 2014, the Debtor filed his answer

to the complaint.

On or about November 7, 2016, as a discovery sanction, the Superior Court entered

an order striking the Debtor's answer and entered a default judgment in favor of Beitler.

The default judgment provides damages in the sum of $1,765,202, plus prejudgment

interest in the amount of $749,429 and post-judgment interest at the statutory rate (the

"Default Judgment").  On or about January 5, 2017, the Debtor filed an appeal of the

Default Judgment.  The Debtor believes that the striking of the answer and the entry of the

Default Judgment, which was entered as a "terminating sanction," was an abuse of

discretion and will be overturned on appeal to allow the merits of the dispute to be heard.

Beitler disagrees with the Debtor's contentions in this regard.  Relief from stay has been

granted to allow the Debtor's appeal of the Default Judgment to proceed, and the briefing

process is currently underway.

As with the Judgment on Decision discussed above, on or about January 18, 2017,

Beitler filed and served motions for charging orders, creating the Charging Liens against

the Debtor's membership interests in the Companies with respect to the amounts owed

pursuant to the Default Judgment.  Because the hearing on the motions was not heard as

of the Petition Date, however, the Debtor asserted that the Charging Liens were

unperfected in the Case and subject to avoidance under applicable law.  Beitler disagreed

with the Debtor's contentions in this regard.  On June 16, 2017, Beitler filed a proof of claim

("Claim No. 10"), asserting a secured claim based on the Default Judgment, in the amount of $2,589,725.46 as of the Petition Date, not including post-judgment fees, costs and post-petition interest.

On May 9, 2017 (as thereafter amended on October 6, 2017), following the Debtor's demand to Beitler to remove the Charging Liens as they were avoidable (and Beitler's unwillingness to do so), the Debtor commenced the Beitler Avoidance Action (described below), asserting that the Charging Liens against the Debtor's interests in the Companies related to the Default Judgment were unperfected and should be avoided under, *inter alia*, 11 U.S.C. §§ 544(a), 547 and 550.  Additionally, on October 13, 2017, the Debtor filed an objection to Claim No. 10, asserting that the Claim No. 10 is not supported by sufficient evidence (as it relies solely on the Default Judgment and charging order motions), and that such claim does not take into account the Debtor's defenses to the asserted liability, including with respect to the calculation of any such liability.  [Docket No. 142].

As with the Judgement on Decision discussed above, the MSJ Order resolved, in the Debtor's favor, the Debtor's claims under section 544(a), and related relief under sections 502 and 550, but left open for future proceedings the section 547 issues.

As the MSJ Order is not a final order at this point, however, the Plan treats the Default Judgment as a disputed Secured Claim, and such claim is classified as Class 6 under the Plan.  To the extent that it is determined that the Class 6 Claim is not secured against the Debtor's interests in the Companies, such claim will be treated as a Class 12 Unsecured Claim under the Plan.

### 3.    Beitler and Beitler & Assoc. v. Bral, Case No. BC543410

On April 21, 2014, Beitler and BCRS commenced an action in Los Angeles Superior Court against the Debtor, Venture RE Group, and BRA relating to the ownership and management of a number of limited liability companies formed by the Debtor and Beitler, including the Companies (the "Beitler/BCRS State Court Action").  The causes of action alleged in the Beitler/BCRS State Court Action are: (1) breach of fiduciary duty; (2) accounting; (3) unjust enrichment; (4) intentional misrepresentation; (5) negligent

misrepresentation; (6) breach of oral contract; and (7) breach of implied contract.   Trial in this matter was scheduled for June 12, 2017, but was stayed by the bankruptcy filing.  The Beitler/BCRS State Court Action is still pending, but remains stayed.

On June 16, 2017, Beitler filed a proof of claim ("Claim No. 11") and BCRS filed a substantially similar proof of claim ("Claim No. 9") asserting unsecured claims in undetermined amounts based on the allegations set forth in the Beitler/BCRS State Court Action.  On October 13, 2017, the Debtor filed objections to Claim Nos. 9 and 11 [Docket Nos. 151 (Claim No. 9) and 153 (Claim No. 10)], asserting, *inter alia*, that the claims are vague, ambiguous, contradictory and unsupported by evidence, the claimants fail to establish standing, and the claims are barred by the statute of limitations and the doctrine of laches.  Moreover, even assuming the claims could be considered notwithstanding these infirmities, the Debtor disputes the underlying allegations on the merits.  In addition, as discussed in Section II.D.3 hereof, Beitler and BCRS filed adversary proceedings against the Debtor in which the seek to hold the claims asserted by way of Claim Nos. 9 and 11 (as well as Claim No. 14 filed by Beitler)[19] non-dischargeable (defined herein as Adversary 92 and Adversary 94).  The Debtor has filed a motion to dismiss Adversary 92 and Adversary 94 on the grounds that, among other things, there is no underlying claim for the same reasons as set forth in the Debtor's objection to Claim Nos. 9, 11 and 14, and the actions otherwise fail to meet the standards for holding claims non-dischargeable.  Beitler and BCRS disagree with the Debtor's contentions in this regard and believe that Claim Nos. 9, 11 and 14 should stand in the amounts set forth therein and such claims should be found to be non-dischargeable.

---

[19] While not tied to litigation commenced pre-petition, on June 16, 2017, Beitler filed a proof of claim ("Claim No. 14") asserting an unsecured claim in an undetermined amount based on allegations relating to the ownership and management of the Companies.  Boyd filed a substantially similar proof of claim ("Claim No. 16") relative to her 5% interest in Westcliff.  On October 13, 2017, the Debtor filed objections to Claim Nos. 14 and 16, asserting, *inter alia*, that the claims are barred by the statute of limitations, the parole evidence rule and the doctrines of waiver and estoppel.  Moreover, even assuming the claims could be considered notwithstanding these infirmities, the Debtor disputes the underlying allegations on the merits. [Docket Nos. 161 and 155].  As discussed below, Claim Nos. 14 and 16 (as well as Claim Nos. 9 and 11) are subject to the Debtor's Motion to Strike.  Beitler and Boyd dispute the Debtor's contentions with respect to their claims and the Motion to Strike.

In addition, as discussed in detail below, such claims asserted by Beitler and BCRS are subject to the Debtor's Motion to Strike, pursuant to which the Debtor seeks the disallowance of certain claims asserted by Beitler, BCRS and Boyd (Claim Nos. 9, 11, 14 and 16) as the Debtor believes that such claims are based on falsified evidence (in the form of an altered version of the Westcliff Operating Agreement that is materially adverse to the Debtor and favorable to Beitler).  Beitler, BCRS and Boyd dispute the Debtor's contentions in connection with the Motion to Strike.

To the extent ultimately Allowed, any claim based on the Beitler/BCRS State Court Action, Claim No. 9 (BCRS) or Claim No. 11 (Beitler) – or Claim No. 14 (Beitler) or Claim No. 16 (Boyd) – will be treated as Class 13 Unsecured Claims under the Plan.

**4.    Cannae Financial LLC v. Bral, et al., Case No. 30-2014-00733044**

Cannae Financial LLC ("Cannae"), an entity owned by Beitler, filed a complaint against the Debtor on July 9, 2014, in Orange County Superior Court alleging breach of guaranty.  Cannae purchased a loan from Premier Business Bank that was provided to Ocean View Medical Investors, LLC ("Ocean View") and guaranteed by the Debtor.  Cannae sued the Debtor for breach of the guaranty.  Judgment after the granting of a motion for summary judgment was entered in favor of Cannae in the amount of $316,635.67 on July 16, 2015.  An award of attorney's fees was subsequently entered in the amount of $19,252.  The Debtor appealed the entered judgment (Case No. GC53083) (the "Cannae Appeal").  The appeal was dismissed, but the dismissal was subsequently vacated and the appeal proceeded until stayed by the bankruptcy filing.  On June 5, 2017, the Debtor filed a motion for relief from the automatic stay to allow oral argument in the Cannae Appeal to proceed (the "Cannae RFS Motion") [Docket No. 60].  The Cannae RFS Motion was granted at the hearing held on June 14, 2017, and the order entered that same day [Docket No. 71].

On June 16, 2017, Cannae filed a proof of claim ("Claim No. 17-1") asserting that the Cannae Secured Claim (in the amount of $394,483.12 as of the Petition Date (not including post-judgment fees, costs and post-petition interest)) was secured against the Debtor's

interest in Westcliff and his real property,[20] but also including the Debtor's interest in Mission as security.  On October 13, 2017, the Debtor filed an objection to Claim No. 17-1 for the purpose of clarifying that the Cannae Secured Claim is not secured by his interest in Mission.  [Docket No. 137].  This issue has been, or will be, resolved to clarify that Cannae has no lien on the Debtor's membership interests in Mission in connection with the Cannae Secured Claim.  The Debtor believes this issue should be resolved consensually or, alternatively, will be resolved summarily by the Court.

Oral argument on the Cannae Appeal was held on June 20, 2017, and the appellate court sustained the findings of the trial court as to the judgment against the Debtor based on the guaranty.

In connection with this suit by Cannae, Cannae had obtained a charging order against the Debtor's interest in Westcliff on December 7, 2015, and judgment liens on the Debtor's real property by recording abstracts of judgment in Orange, Los Angeles, and Kern counties in August 2015.  The judgment affirmed by way of the Cannae Appeal, therefore, is a secured claim against these assets (in the asserted amount of approximately $395,000 as of the Petition Date, not including post-judgement fees, costs and post-petition interest), and is so treated under the Plan as Class 7 (the "Cannae Secured Claim").

The Debtor reserves his rights of contribution and otherwise against any co-guarantor (specifically including Beitler and his related entities, including any trust or entity in which Beitler holds an ownership interest), with respect to the payment of the Cannae Secured Claim.  Pursuant to the Plan, the Debtor will be entitled to set-off any such claims against the co-guarantor(s) against amounts owed to such claimant by the Debtor.  As set forth in the Asset Value Schedule, the Debtor estimates his contribution claim against the co-guarantors (Beitler and The Beitler Family Trust) to be in the approximate amount of $263,333.

---

[20] Claim No. 17-1 states "TBD" as to the value of the property, and the amount that is secured versus unsecured.  However, based on the subsequent outcome in the Cannae Appeal sustaining the findings of the trial court as to the judgment against the Debtor, the Debtor believes that, because the Cannae Secured Claim is secured against his interest in Westcliff (and otherwise), that the Cannae Secured Claim is a fully secured claim and is so treated under the Plan.

**5.    Cannae Financial LLC v. Bral, et al., Case No. 30-2015-00764942**

On January 7, 2015, Cannae filed an action against the Debtor for breach of guaranty in Orange County Superior Court.  Cannae requested the entry of default against the Debtor and a default judgment in the amount of $1,210,792.29 was entered on June 23, 2015 (the "Cannae Default Judgement").  Cannae filed a motion for a charging order on September 16, 2015.  The Debtor filed a motion to set aside the judgment and Cannae Default Judgment on December 9, 2015.  Ultimately, the Court ruled that the judgment and Cannae Default Judgment should both be vacated and ruled that the motion for charging order was moot.

The Debtor filed an answer to the complaint on May 6, 2016, as well as a cross-complaint for contribution and declaratory relief for contribution.  Cannae filed a demurrer to the cross-complaint, which was granted by the superior court with 10 days leave to amend.  The cross-complaint was not amended.  This action is still pending, but has been stayed by the bankruptcy filing.

On June 16, 2017, Cannae filed a proof of claim ("Claim No. 18") asserting an unsecured claim based on the Cannae Default Judgment in the amount of $1,421,510.01 as of the Petition Date, not including post-judgment fees, costs and post-petition interest (the "Cannae Unsecured Claim").  On October 13, 2017, the Debtor filed an objection to Claim No. 18, asserting that the Cannae Unsecured Claim is not supported by sufficient evidence (as it relies solely on the Cannae Default Judgment, which has been set-aside), and that such claim is unliquidated and subject to determination by way of the claims objection process, and must take into account the Debtor's defenses to the asserted liability, including with respect to the calculation of any such liability.  [Docket No. 145].  Cannae disagrees with the Debtor's contentions in this regard and believes that the Cannae Unsecured Claim should stand in the amount set forth in the Cannae Default Judgment.  To the extent Allowed, the Cannae Unsecured Claim will be treated as a Class 11 Unsecured Claim under the Plan.

The Debtor reserves his rights of contribution and otherwise against any co-guarantor (specifically including Beitler and his related entities, including any trust or entity in which Beitler holds an ownership interest), with respect to the payment of the Cannae Unsecured Claim.  Pursuant to the Plan, the Debtor will be entitled to set-off any such claims against the co-guarantor(s) against amounts owed to such claimant by the Debtor.  As set forth in the Asset Value Schedule, the Debtor estimates his contribution claim against the co-guarantor (Beitler) to be up to the amount of $710,000.

> **6.**    **Steward Financial, LLC and AFG assignees of First Citizens Bank v. Beitler, et al., Case No. BC525778**

On October 25, 2013, First-Citizens Bank & Trust Co. ("FCBT") filed a complaint against Beitler, the Debtor, and others in the Los Angeles Superior Court for breach of guaranty related to a loan to Ocean View that was secured by real property owned by Ocean View (the "Ocean View Property").  On January 10, 2014, the Debtor filed his answer to the complaint.  On March 19, 2014, a writ of attachment securing $5,355,059.42 was issued against the Debtor, the Sandpiper Property and the Los Angeles Condominium (the "Writ of Attachment").  Steward Financial LLC ("Steward"), an entity owned by Beitler, acquired FCBT's interest in this litigation and continued the action against Ocean View and the Debtor.  Steward contends that it acquired the Ocean View Property, on or about March 20, 2015, for a $4.1 million credit bid.  On October 23, 2015, Steward filed a motion for summary judgment against the Debtor on his personal guaranty.  On December 31, 2015, the Debtor filed opposition to the motion for summary judgment.  On January 15, 2016, the Court entered its ruling denying the motion for summary judgment.  On November 17, 2016, the Debtor filed an application for an order setting aside the Writ of Attachment, which Steward claimed was assigned to it by FCBT, including on the grounds that the Writ of Attachment was not assignable to, or enforceable by, Steward.  On March 7, 2017, the Court entered its minute order stating that in light of the bankruptcy filing by the Debtor, the Debtor's application to set aside the Writ of Attachment was off calendar.  The action

remains pending, but stayed as a result of the bankruptcy filing.  The Writ of Attachment has expired pursuant to applicable law.

On June 16, 2017, Steward filed a proof of claim ("Claim No. 20") asserting an unsecured claim against the Debtor in the amount of at least $2,593,638.81 as of the Petition Date, not including fees and costs, or post-petition interest, reflecting the difference between Steward's $4.1 million credit bid and the total amount allegedly owed in connection with the Ocean View loan (the "Steward Guaranty Unsecured Claim").  On October 13, 2017, the Debtor filed an objection to Claim No. 20, asserting that the Steward Guaranty Unsecured Claim is not a valid claim because the guaranty was secured by real property and was extinguished under California law by virtue of Steward's foreclosure of the Ocean View Property.  [Docket No. 159].  Steward disagrees with the Debtor's contentions in this regard and believes that the Steward Guaranty Unsecured Claim should stand in the amount set forth in Claim No. 20.  To the extent Allowed, the Steward Guaranty Unsecured Claim will be treated as a Class 10 Unsecured Claim under the Plan.

The Debtor reserves his rights of contribution and otherwise against any co-guarantor (specifically including Beitler and his related entities, including any trust or entity in which Beitler holds an ownership interest), with respect to the payment of the Steward Guaranty Unsecured Claim.  Pursuant to the Plan, the Debtor will be entitled to set-off any such claims against the co-guarantor(s) against amounts owed to such claimant by the Debtor.  As set forth in the Asset Value Schedule, the Debtor estimates his contribution claim against the co-guarantor (Beitler) to be up to the amount of $1.3 million.

**7.    Steward Financial, LLC v. Bral, et al., Case No. 30-2016-00834111**

On February 5, 2016, Steward filed a complaint against the Debtor, James Hornbuckle and Cornerstone Law Corporation for: (1) abuse of process; (2) abuse of process; (3) intentional interference with contract; and (4) negligent interference contract in Orange County Superior Court.  In this action, Steward contends that it acquired the Ocean View Property at a foreclosure sale held on November 21, 2014, for a $3 million credit bid.  This sale was rendered void as a result of bankruptcy filings by Ocean View.  Steward

further contends that it acquired the Ocean View Property at a second foreclosure sale held after the dismissal of the Ocean View bankruptcy cases, on or about March 20, 2015, for a $4.1 million credit bid.  Steward requested the entry of default against the Debtor and his default was entered on May 20, 2016.  On July 27, 2016, the Debtor filed a motion to set aside the entry of default along with his answer to the complaint.  The motion to set aside was granted by minute order entered on November 1, 2016.  This matter is pending, but stayed by the bankruptcy.

On June 16, 2017, Steward filed a proof of claim ("Claim No. 19") asserting an unsecured claim against the Debtor in the amount of at least $1.1 million, not including fees, costs or interest, based on the differential between its first and second credit bids for the Ocean View Property (the "Steward Foreclosure Differential Unsecured Claim").  On October 13, 2017, the Debtor filed an objection to Claim No. 19, asserting that the Steward Foreclosure Differential Unsecured Claim is barred by the economic loss doctrine, is not a valid claim because any damage claim by Steward would be limited to the damage claim, if any, under the guaranty (which, as discussed above, Steward asserts as a separate claim against the Debtor by way of Claim No. 20) and the loss causation element fails.  [Docket No. 157].  As discussed in Section II.D.3 hereof, Steward also filed an adversary proceeding against the Debtor in which it seeks to hold the Steward Foreclosure Differential Unsecured Claim non-dischargeable (defined herein as Adversary 95).  The Debtor has filed a motion to dismiss Adversary 95 on the grounds that, among other things, there is no underlying claim for the same reasons as set forth in the Debtor's objection to Claim No. 19 and the action otherwise fails to meet the standards for holding a claim non-dischargeable.  Steward disagrees with the Debtor's contentions in this regard and believes that the Steward Guaranty Unsecured Claim should stand in the amount set forth in Claim No. 19 and should be found to be non-dischargeable.  To the extent Allowed, the Steward Guaranty Unsecured Claim will be treated as a Class 10 Unsecured Claim under the Plan.

The Debtor reserves his rights of contribution and otherwise against any co-guarantor related to the payment of any claim by the Debtor in connection with any claim

asserted by Steward in connection with Case No. 30-2016-00834111 (including, without limitation, in connection with the Steward Foreclosure Differential Unsecured Claim).  As set forth in the Asset Value Schedule, the Debtor estimates his contribution claim against the co-guarantors (James D. Hornbuckle and Cornerstone Law Corp.) to be up to the amount of $733,000.

## 8.    Bral, et al. v. Beitler, et al., Case No. BC559311

The Debtor and Ocean View filed a complaint against Beitler and Steward on April 15, 2014, alleging breach of the operating agreement of Ocean View.  A first amended complaint was filed to which Beitler filed a demurrer.  The demurrer was unopposed and on March 18, 2015, the Court ordered the Debtor to file a second amended complaint within 10 days.  No further amended complaint was filed and on May 29, 2015, the Debtor filed a request for dismissal of the entire action without prejudice.  The case was dismissed the same day.

Beitler filed a motion for attorneys' fees in the amount of $64,576.  On January 25, 2016, the Court ruled that Beitler was entitled to reasonable attorney's fees and on February 29, 2016, determined that the amount requested by Beitler was reasonable and he was thus awarded $64,576 in attorneys' fees against the Debtor.  On June 16, 2017, Beitler filed a proof of claim ("Claim No. 12") asserting an unsecured attorneys' fee claim in the amount of $71,705.68 as of the Petition Date, not including interest.  The Debtor has not objected to Claim No. 12 and it is treated as a Class 9 Unsecured Claim under the Plan.[21]

## 9.    Beitler v. Bral, et al., Case No. BC567567

Beitler filed a complaint against the Debtor and Ocean View on September 3, 2014, in Los Angeles Superior Court.  The second amended complaint was filed on December

---

[21] Beitler has also filed Claim No. 15 and Claim No. 21 in the Case, asserting unsecured claims in the amounts of $40,663.33 and $198,065.35, respectively.  The Debtor has filed objections to these Claims.  On May 24, 2018, Beitler filed a new claim, Claim No. 23, asserting claims in an undetermined amount based on contribution and indemnification in connection with a cross-complaint by Brothers, Inc. against the BCRS and the Debtor.  The Debtor reserves all rights to object to this Claim.  Such Claims, to the extent Allowed, shall be treated as Class 12 Unsecured Claims under the Plan.

24, 2015, and alleged causes of action for breach of contract and breach of fiduciary duty. On May 18, 2016, the Debtor filed an answer to the second amended complaint.  On September 1, 2016, a Request for Dismissal (of the entire action of all parties and all causes of action) was filed and the dismissal entered as requested on September 1, 2016.

On November 1, 2016, the Debtor filed a motion for order awarding attorney's fees. On February 2, 2017, an order granting the Debtor's motion for order awarding attorney's fees was entered, awarding attorney's fees to the Debtor in the amount of $30,000, subject to offset for sums owing by the Debtor on judgments and orders in favor of Beitler.  On February 28, 2017, Beitler filed a notice of appeal relating to the February 2, 2017 award of attorney's fees to the Debtor.  On or about March 21, 2018, Beitler filed a request to have the appeal dismissed.  As provided in the superior court's order, the amount awarded to the Debtor will be utilized as an offset against amounts owed to Beitler pursuant to the Plan.

### 10.    Bral v. Westcliff Investors, LLC, Case No. BC553693

On November 20, 2013, the Debtor filed a complaint against Westcliff, Beitler, and Boyd in the Orange County Superior Court for: (1) involuntary dissolution of limited liability company; (2) accounting; (3) breach of fiduciary duty; and (4) declaratory relief (the "Westcliff Litigation").  The case was transferred to Los Angeles Superior Court on August 5, 2014, and was subsequently ordered into arbitration (defined herein as the "Westcliff Arbitration").  In the Westcliff Litigation, a status conference and OSC regarding dismissal pursuant to reservation to arbitration is currently scheduled for June 26, 2018, a final status conference is scheduled for June 24, 2018 and trial is scheduled for July 30, 2018.  The Debtor anticipates that these matters will be vacated and the issues resolved by way of the Westcliff Arbitration.  As discussed in further detail in Section II.D.5 hereof, the Westcliff Arbitration (and the Mission Arbitration (as herein defined)) are currently stayed pending confirmation of the Plan, or agreement of the parties to move forward prior to such time. The Arbitrations will determine the economic matters related to the dissolution of the Companies under applicable California law, and such determinations will be used to establish the distributions to holders of Allowed Claims under the Plan.

**D.    Significant Events During the Bankruptcy Case**

**1.    Bankruptcy Proceedings**

**a.    Order for Relief**

The Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code on February 24, 2017.  The Debtor continues to manage his financial affairs and operate his bankruptcy estate as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.  No request for the appointment of a trustee or examiner has been made in the Case.  No official committee of unsecured creditors has been appointed in the Case.

**b.    The Debtor's Schedules, Interim Statements, and Operating Reports**

The Debtor believes that the Estate is in compliance with the requirements under 11 U.S.C. §§ 521, 1006 and 1107, and the applicable Guidelines of the Office of the United States Trustee ("OUST").  On March 10, 2017, the Debtor filed his bankruptcy schedules ("Schedules") and statement of financial affairs ("SOFA") [Docket No. 21].  On April 20, 2018 and May 16, 2018, the Debtor filed amended Schedules to reflect certain contingent guaranty claims related to the secured loans to the Companies that were inadvertently omitted from the initial Schedules[22] and other contingent guaranty claims, claims and potential causes of actions [Docket Nos. 402 and 436].  *See also* Asset Value Schedule attached as Exhibit "D" to the Supplemental Meislik Declaration [Docket No. 452] (which includes such claims and causes of action).  The Debtor filed Periodic Reports Regarding Value, Operations and Profitability of Entities in Which the Estate of John Bral Holds a Substantial or Controlling Interest as required by Bankruptcy Rule 2015.3 on March 27, 2017 [Docket No. 33] and September 27, 2017 [Docket No. 121].  The Debtor has prepared

---

[22] In light of the value of the Companies' assets, the Debtor believes that the claims of the Companies' lenders will be paid in full by the Companies and that the Debtor will have no personal liability vis-à-vis the guarantees of the Companies' loans (and the Debtor reserves his rights to object to, or seek to estimate, any such claims).  None of these contingent claimants filed proofs of claim by the supplemental bar date and, accordingly, it is the Debtor's position that these claims are barred.  To the extent there is any such liability, however, the Debtor intends to pursue, and specifically reserves his right to assert, claims of contribution, reimbursement or otherwise against any co-guarantors of these obligations, including Beitler or his related entities, including any trust or entity in which Beitler holds an ownership interest.

and submitted Monthly Operating Reports ("MOR") for the Estate through April 2018 [Docket Nos. 45, 54, 75, 92, 103, 118, 185, 202, 243, 273, 307, 356, 397 and 435].  The Debtor is current on the quarterly fees owed to the OUST.

### c.    Meeting of Creditors

The Debtor's meeting of creditors pursuant to § 341(a) of the Bankruptcy Code was held and concluded on April 3, 2017.

### d.    Chapter 11 Status Conference

An initial chapter 11 status conference was set by the Court for April 20, 2017.  The Debtor filed his required status report on April 6, 2017 [Docket No. 37] and a supplement to the status report on April 14, 2017 [Docket No. 42].  The Court vacated the hearing date based upon the pleadings filed and continued the status conference to August 17, 2017, pursuant to its scheduling order entered on April 17, 2017 [Docket No. 44].  At a hearing held on June 14, 2017, a chapter 11 status conference was set for July 11, 2017. Additional status conferences were set for August 17, 2017, November 9, 2017, December 14, 2017, February 21, 2018 and April 18, 2018.  The Debtor filed updated/supplemental Chapter 11 Status Conference Reports on August 10, 2017 [Docket No. 100], October 26, 2017 [Docket No. 195], November 30, 2017 [Docket No. 225], February 7, 2018 [Docket No. 299], February 16, 2018 [Docket No. 313] and April 4, 2018 [Docket No. 383].

### e.    The Employment of Professionals

By order entered on April 13, 2017, the Court authorized the employment of LWGF as the Debtor's general insolvency counsel [Docket No. 40].  The Debtor filed an application to employ Lloyd K. Chapman ("Chapman") as his special litigation counsel on June 1, 2017 [Docket No. 55].  An objection to the employment application was filed on June 15, 2017 [Docket No. 77] and, on July 12, 2017, the Debtor withdrew his application to employ Chapman [Docket No. 91].  On July 31, 2017, the Debtor filed an application to employ Hahn Fife & Company LLP ("Hahn") as his accountant [Docket No. 96].  An objection to the Hahn employment application was filed on August 15, 2017 [Docket No. 102].  By order entered on August 24, 2017, the Court authorized the employment of Hahn

as accountant [Docket No. 110].  On August 8, 2017, the Debtor filed an application to

employ Sall Spencer Callas & Krueger ("Sall Spencer") as his special counsel [Docket No.

98].  An objection to the employment application was filed on August 22, 2017 [Docket No.

106].  By order entered on October 1, 2017, the Court authorized the employment of Sall

Spencer as special counsel [Docket No. 144].  On November 16, 2017, the Debtor filed an

application to expand the scope of employment of LWGF to include defense of non-

dischargeability actions [Docket No. 203].  By order entered on December 12, 2017, the

Court authorized the expanded scope of employment to include defense of non-

dischargeability actions [Docket No. 236].  On January 31, 2018, following William N.

Lobel's departure from LWGF and joining PSZ&J, the Debtor filed an application to employ

PSZ&J as his special reorganization counsel [Docket No. 296].  By order entered on

February 21, 2018, the Court authorized the employment of PSZ&J as special

reorganization counsel [Docket No. 315].  On March 21, 2018, following Alan J. Friedman's

departure from LWGF and joining SH&B, the Debtor filed an application to employ SH&B

as his reorganization counsel [Docket No. 360].  By order entered on April 11, 2018, the

Court authorized the employment of SH&B as his reorganization counsel [Docket No. 390].

On April 24, 2018, the Debtor filed an application to employ Force 10 Partners as his

financial advisor [Docket No. 410].  On May 14, the Court authorized the employment of

Force 10 as the Debtor's financial advisor [Docket No. 434].

**f.**    **Exclusivity and Filing of Plan and Disclosure Statement**

The Bankruptcy Code provides debtors with an initial exclusive period of 120 days

from the petition date to file a plan of reorganization, and an initial exclusive period of 180

days to solicit acceptances of its plan, subject to the discretion of the bankruptcy court to

extend the exclusive periods.  During these exclusive periods no other person or entity is

permitted to file a plan of reorganization.  Here, the Debtor's initial statutory exclusive

periods to propose a plan and to obtain acceptances thereof were on June 26, 2017, and

August 23, 2017, respectively.

On June 23, 2017, the Debtor filed his Disclosure Statement Describing Chapter 11 Plan [Docket No. 85], Chapter 11 Plan [Docket No. 86] and Motion for Approval of Chapter 11 Disclosure Statement [Docket No. 87].  In an attempt to resolve disputes between the Debtor and Beitler and related parties, however, the hearing on approval of the Disclosure Statement and related deadlines were vacated and such matters were held in abeyance.

On March 14, 2018, the Court entered a Scheduling Order on Filing and Hearing on Debtor's Disclosure Statement Describing Debtor's Chapter 11 Plan (the "<u>Disclosure Statement Scheduling Order</u>") [Docket No. 355].  By the Disclosure Statement Scheduling Order, the deadline for the Debtor to file an amended Plan and Disclosure Statement was April 30, 2018, the deadline to file objections to the Disclosure Statement was May 17, 2018, and the reply deadline was May 24, 2018.  On May 17, 2018, the Beitler Parties filed an objection to the first amended Disclosure Statement [Docket No. 438].  On May 24, 2018, the Debtor filed his reply to the Beitler Parties' objection [Docket No. 451], and the supplemental Meislik Declaration [Docket No. 452].  A hearing on approval of the Disclosure Statement was held on May 31, 2018.  A continued hearing on approval of the Disclosure Statement is scheduled for July 19, 2018.  The deadline for the Debtor to file a further amended Disclosure Statement, reflecting the revisions set forth in the Debtor's reply and addressing the issues discussed at the May 31, 2018 hearing, is June 8, 2018. The deadline for obtaining acceptances to the Debtor's Plan has been extended through July 19, 2018.

The document you are reading is the Second Amended Disclosure Statement.

### g.    <u>Claims Bar Date</u>

Pursuant to Court order, June 16, 2017 (the "<u>Bar Date</u>") was fixed as the last date to File Proofs of Claim, except for governmental units.  The Debtor served creditors and parties in interest with the Bar Date Notice on April 21, 2017.[23]  The deadline to file

---

[23] On April 24, 2018, the Debtor served a supplemental notice of the bar date to the Companies' secured lenders that were not provided notice of initial bar date, with respect to any contingent guarantee claims the secured lenders might assert against the Debtor.  No claims were filed by these contingent claimants by the supplemental bar date.  In any event, the Debtor reserves all rights to object to or seek to estimate any such claims on any appropriate grounds, and reserves his rights of contribution and otherwise against any co-

objections to Filed Proofs of Claims was October 13, 2017.  The Debtor filed objections to the following claims, which have been sustained by the Court:

- Objection to Claim No. 22 of Samini Scheinberg, PC [Docket No. 131].  On February 12, 2018, this Court entered its order disallowing in its entirety Claim No. 22 [Docket No. 305].

- Objection to Claim No. 2 of American Honda Finance Corporation [Docket No. 133].  On December 21, 2017, this Court entered its order disallowing and expunging in its entirety Claim No. 2 [Docket No. 268].

- Objection to Claim No. 3 of Nuray DePriest [Docket No. 164].  On December 18, 2017, this Court entered its order disallowing and expunging in its entirety Claim No. 3 [Docket No. 264].

In addition, as discussed in Section II.C herein, the Debtor has filed objections to the following claims of Beitler and his related entities, as follows:

- Objection to Claim No. 13 of Beitler [Docket No. 135].
- Objection to Claim No. 17 of Cannae [Docket No. 137].
- Objection to Claim No. 21 of Beitler [Docket No. 139].
- Objection to Claim No. 10 of Beitler [Docket No. 142].
- Objection to Claim No. 18 of Cannae [Docket No. 145].
- Objection to Claim No. 14 of Beitler [Docket No. 147], as amended [Docket No. 161].
- Objection to Claim No. 15 of Beitler [Docket No. 149].
- Objection to Claim No. 9 of BCRS [Docket No. 151].
- Objection to Claim No. 11 of Beitler [Docket No. 153].
- Objection to Claim No. 16 of Boyd [Docket No. 155].
- Objection to Claim No. 19 of Steward [Docket No. 157].
- Objection to Claim No. 20 of Steward [Docket No. 159].

guarantor, including Beitler or his related entities, including any trust or entity in which Beitler holds an ownership interest, with respect to the payment of any such claims.

As a result of the Motion to Strike (defined and discussed below), the hearings and any related deadlines with respect to the Beitler, BCRS, Boyd, Cannae and Steward claims were vacated in order to allow discovery to proceed.[24]

## 2.    The Beitler Avoidance Action

On May 9, 2017, the Debtor filed a complaint against Beitler for (1) Avoidance of Preference Pursuant to 11 U.S.C. § 547; (2) Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550; and (3) Disallowance of Claims Pursuant to 11 U.S.C. § 502 (the "Complaint") thereby commencing Adversary Proceeding No. 8:17-ap-1071-SC (the "Beitler Avoidance Action") to avoid and recover the liens created by the service of the notice of the motions for charging orders based on the Judgment on Decision and the Default Judgment (the "Charging Liens").  Beitler filed his answer to the Complaint on June 7, 2017.  On October 6, 2017, the Debtor filed an Amended Complaint (adding a cause of action under 11 U.S.C. § 544).  On October 20, 2017, Beitler filed his answer to the Amended Complaint.  On December 14, 2017, the Debtor filed a Motion for Summary Judgment ("MSJ") related to the Section 544 cause of action only.  On January 31, 2018, Beitler filed his opposition to the MSJ.  On February 7, 2018, the Debtor filed his reply to Beitler's opposition to the MSJ.  A hearing on the MSJ was held on February 21, 2018, with the only issues considered at such hearing were those relating to the Section 544 issues (and related Section 502 and 550 issues).  At the February 21, 2018 hearing, the Court granted the MSJ on the avoidability of the Charging Liens under 11 U.S.C. § 544(a).  The order granting the Debtor's motion for summary judgment under section 544(a), and related relief under sections 502 and 550, entitled Order Granting in Part and Continuing in Part Debtor's Motion for Summary Judgment, was entered on April 12, 2018 (the "MSJ Order") [Docket No. 43].  The MSJ Order resolved, in the Debtor's favor, the Debtor's claims under section 544(a), but left open for future proceedings the section 547 issues.  A stipulation regarding the interim nature of the MSJ Order was entered on April 24, 2018 [Docket No. 45].

---

[24] The Court continues to hold in abeyance all objections to claims of the Beitler Parties (including those that are not specifically related to the Motion to Strike) pending a determination on the Motion to Strike.

The Debtor believes that the Court's ruling on the section 544(a) issues renders a determination as to the section 547 issues unnecessary, and may seek an order in this regard or otherwise seek a disposition of the section 547 issues; however, the MSJ Order is currently not a final order.  The Debtor anticipates that, once a final order is entered in connection with Beitler Avoidance Action, Beitler will appeal any such final order and may seek a stay pending appeal.  The Debtor believes that any appellate court will agree with the Court's ruling avoiding Beitler's Charging Liens against the Debtor's interests in the Companies, thereby rendering any amount owed in connection with the Judgment on Decision and Default Judgment unsecured claims in the Case.  Beitler disagrees with the Debtor's contentions in this regard and believes that the Court's determination should be overturned on appeal, such that the amounts owed in connection with the Judgment on Decision and Default Judgment would be secured against the Debtor's interests in the Companies.

As the MSJ Order is not a final order at this point, the Plan treats the Judgment on Decision and Default Judgment as disputed Secured Claims, and such claims are classified as Class 5 and Class 6 under the Plan.  To the extent that it is determined that the Class 5 and Class 6 claims are not secured against the Debtor's interests in the Companies, such claims will be treated as a Class 12 Unsecured Claims under the Plan.

### 3.    The Non-Dischargeability Actions

The deadline to File a complaint seeking to hold a Claim non-dischargeable was June 2, 2017.  Three complaints were filed with the Court, as follows:[25]

### a.    Beitler v. Bral – Adversary 92

Beitler filed a complaint against the Debtor on June 2, 2017, Adversary No. 8:17-ap-01092-SC, seeking to hold an unliquidated claim against the Debtor in an amount of no less than $1,500,000 non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6) ("Adversary 92").  The claims asserted by way of Adversary 92 mirror the claims

---

[25] As with the objections to the claims of the Beitler Parties, the Court continues to hold in abeyance the non-dischargeability actions (Adversaries 92, 94 and 95) pending a determination on the Motion to Strike.

1 asserted by Beitler in Claim No. 11 and Claim No. 14 which, as discussed in Sections II.C.3

2 and II.D.4 hereof, are the subject of claim objections filed by the Debtor and the Motion to

3 Strike.  On November 9, 2017, the Debtor filed his Motion for Order Dismissing with

4 Prejudice all Claims for Relief Asserted by the Plaintiff ("Motion to Dismiss Adversary 92")

5 [Adv. Docket No. 25].  Beitler filed an amended complaint on December 1, 2017 [Adv.

6 Docket No. 35].  Pursuant to that certain Order Granting Stipulation Vacating Response

7 Deadline and Scheduling Status Conference entered by this Court on December 22, 2017

8 [Adv. Docket No. 44], the hearing on the Motion to Dismiss Adversary 92 was vacated, the

9 response deadline by which the Debtor had to file a response to the amended complaint

10 was vacated.  A status conference on this matter is currently scheduled for July 19, 2018.

**b.    Beitler & Associates, Inc. dba Beitler Commercial Realty
Services v. Bral – Adversary 94**

13 BCRS filed a complaint against the Debtor on June 2, 2017, Adversary No. 8:17-ap-

14 01904-SC, seeking to hold an unliquidated claim against the Debtor in an amount of no

15 less than $300,000 non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and

16 (a)(6) ("Adversary 94").  The claims asserted by way of Adversary 94 mirror the claims

17 asserted by BCRS in Claim No. 9 which, as discussed in Sections II.C.3 and II.D.4, are the

18 subject of a claim objection filed by the Debtor and the Motion to Strike.  On November 9,

19 2017, the Debtor filed his Motion for Order Dismissing with Prejudice all Claims for Relief

20 Asserted by the Plaintiff ("Motion to Dismiss Adversary 94") [Adv. Docket No. 25].  BCRS

21 filed an amended complaint on December 1, 2017 [Adv. Docket No. 35].  Pursuant to that

22 certain Order Granting Stipulation Vacating Response Deadline and Scheduling Status

23 Conference entered by this Court on December 22, 2017 [Adv. Docket No. 44], the hearing

24 on the Motion to Dismiss Adversary 94 was vacated, the response deadline by which the

25 Debtor had to file a response to the amended complaint was vacated.  A status conference

26 on this matter is currently scheduled for July 19, 2018.

### c. Steward Financial v. Bral

Steward filed a complaint against the Debtor on June 2, 2017, Adversary No. 8:17-ap-01095-SC, seeking to hold its currently unliquidated claim of $1,100,000 non-dischargeable under section 523(a)(6) of the Bankruptcy Code ("Adversary 95").  The claims asserted by way of Adversary 95 mirror the claims asserted by Steward in Claim No. 19 which, as discussed in Section II.C.7 hereof, is the subject of a claim objection filed by the Debtor.  On November 9, 2017, the Debtor filed his Motion for Order Dismissing with Prejudice all Claims for Relief Asserted by the Plaintiff ("Motion to Dismiss Adversary 95") [Adv. Docket No. 25].  Steward filed an amended complaint on December 1, 2017 [Adv. Docket No. 35].  Pursuant to that certain Order Granting Stipulation Vacating Response Deadline and Scheduling Status Conference entered by this Court on December 22, 2017 [Adv. Docket No. 44], the hearing on the Motion to Dismiss Adversary 95 was vacated, the response deadline by which the Debtor had to file a response to the amended complaint was vacated and the status conference was continued to February 21, 2018, and thereafter continued to April 18, 2018 and May 3, 2018.  A status conference on this matter is currently scheduled for July 19, 2018.

### 4. Motion to Strike Proofs of Claim Nos. 9 (BCRS), 11 (Beitler), 14 (Beitler) and 16 (Boyd)

On November 22, 2017, the Debtor filed his Motion Seeking: (1) Disallowance of Claims 14 and 16; and (2) Striking Claims Alleged in Adversary Nos. 8:17-ap-01094 and 8:17-ap-01092 on the Grounds that the Same Were Filed Based Upon Falsified Evidence [Docket No. 219] (the "Motion to Strike").  On November 30, 2017, Beitler, Boyd and BCRS filed their Opposition to the Motion to Strike [Docket No. 226].  On December 7, 2017, the Debtor filed his Reply to Opposition to the Motion to Strike [Docket No. 234].  A hearing on the Motion to Strike was initially scheduled for December 14, 2017, but has been continued from time to time in order to allow the parties to proceed with discovery relating to the Motion to Strike.

On March 26, 2018, the Debtor filed his Supplement to Motion Seeking: (1) Disallowance of Claims 14 and 16; and (2) Striking Claims Alleged in Adversary Nos. 8:17-ap-01094 and 8:17-ap-01092 on the Grounds the Same Were Filed Based Upon Falsified Evidence (the "MTS Supplement") [Docket No. 370].  The purpose of the MTS Supplement was to include Claim Nos. 9 and 11 in the relief being sought in the Motion to Strike, and to brief the applicability of the doctrine of unclean hands and the appropriate remedy in connection with the Motion to Strike.

On March 26, 2018, the Debtor also filed two (2) Joint Discovery Stipulations [Docket Nos. 368 and 369] pursuant to which the parties set forth their respective positions regarding the pending discovery disputes related to the Motion to Strike.  In addition, on March 26, 2018, the Debtor filed his Special Brief Re Application of Crime-Fraud Exception to All Attorney-Client Communications Relating to Proofs of Claim 9, 11, 14 and 16 (the "Crime Fraud Brief") [Docket No. 374].

On April 4, 2018, Beitler and Boyd filed a Statement regarding the Motion to Strike and the discovery disputes (the "MTS Statement") [Docket No. 386].  On April 4, 2018, Beitler, Boyd and BCRS filed a response to the Crime Fraud Brief [Docket Nos. 384 and 385].  On April 11, 2018, the Debtor filed a response in connection with the MTS Statement and a reply to the Crime Fraud Brief [Docket Nos. 391 and 395].

On April 18, 2018, the Court held a status conference relating to the Motion to Strike, and a hearing to resolve the issues raised in the Joint Discovery Stipulations and Crime Fraud Brief.  The issue in contest at this hearing was whether the course of conduct engaged in by Beitler, Boyd, and BCRS, as alleged by the Debtor, justified judicial review of privileged materials pursuant to the crime-fraud exception to the attorney-client and work product privileges.  The Court's tentative finding at the close of the hearing was that the requisite evidentiary threshold for judicial review of privileged material had in fact been met. The Court set a continued hearing for May 3, 2018 to allow the parties to make closing statements on the matter.  At the May 3, 2018 hearing, the Court determined that it would conduct a judicial review of the documents.

On May 24, 2018, the Debtor filed his Brief Regarding Further Evidence In Support of Motion Seeking: (1) Disallowance of Claims 14 and 16; and (2) Striking Claims Alleged in Adversary Nos. 8:17-ap-01094 and 8:17-ap-01092 on the Grounds the Same Were Filed Based Upon Falsified Evidence [Docket No. 219], as Amended and Supplemented [Docket No. 370]; and Request for Immediate Payment of the Debtor's Attorneys' Fees and Costs Related to the Motion to Strike [Docket No. 443] (the "Evidence Brief and MTS Fee Request").[26]  By the Evidence Brief and MTS Fee Request, the Debtor, among other things, requested that the Court require that the Beitler Parties and their counsel, Levy, Small & Lallas, pay the attorneys' fees and costs incurred by the Debtor in connection with the MTS (in the amount of no less than $470,000 through April 2018).  On May 29, 2018, the Beitler Parties filed their Response to the Evidence Brief and MTS Fee Request.

A status conference on the Motion to Strike was held on May 31, 2018.  At the status conference, the Court advised the parties that it had conducted its review of the documents supplied by the Beitler Parties, and that none of said documents would be made available to the Debtor.  The Court scheduled a continued hearing on the Motion to Strike for July 19, 2018.  The Beitler Parties' supplemental brief regarding the Motion to Strike is due June 28, 2018.  The Debtor's reply is due July 12, 2018.

### 5.    The Arbitrations

#### a.    The Mission Arbitration

A demand for arbitration was sent on December 19, 2017, commencing an arbitration relating to the dissolution of Mission (the "Mission Arbitration").  On March 7, 2018, the Debtor submitted his List for Selection of Arbitrator.  Pursuant to the Mission RFS Order (discussed and defined below), the Mission Arbitration has been stayed until after confirmation of the Plan, absent the parties' agreement to proceed prior to that time.[27]  As

---

[26] In support of the Evidence Brief and MTS Fee Request, the Debtor had filed, among other declarations, a Declaration of Ronald T. Williams (the "Williams Declaration") [Docket No. 445].  At the status conference held on May 31, 2018, the Debtor withdrew the Williams Declaration.

[27] The members of Mission may seek a sale of the Mission assets pursuant to the terms of the Mission operating agreement.  In such event, continuation of a dissolution proceeding with respect to Mission may not be necessary.

discussed below, the Plan provides for the Mission Arbitration to proceed not later than

thirty (30) days after the Confirmation Date.

### b.    The Westcliff Arbitration

Arbitration with respect to the dissolution of Westcliff, stemming from the Westcliff

Litigation (the "Westcliff Arbitration"), has been scheduled through JAMS, with various

discovery and pre-hearing dates and deadlines set pursuant to the arbitrator's scheduling

order issued on January 17, 2018.  The parties were proceeding with discovery in

compliance with the scheduling order and the arbitration hearing was scheduled to be held

June 4 through June 6, 2018.  Pursuant to the Westcliff RFS Order (discussed and defined

below), the Westcliff Arbitration has been stayed until after confirmation of the Plan, absent

the parties' agreement to proceed prior to that time.  Accordingly, the hearing and all

relevant dates pursuant to the scheduling order have been vacated, and will be

rescheduled either prior to the hearing set on the confirmation of the Plan depending on

whether the parties can agree on the terms of a stipulation to allow the Westcliff Arbitration

to proceed in advance of plan confirmation.  As discussed below, the Plan provides for the

Westcliff Arbitration to proceed not later than thirty (30) days after the Confirmation Date.

### c.    Motions for Relief from Stay Seeking to Proceed With
### Arbitrations

On February 15, 2018, Motions to Relief from Stay (the "RFS Motions") were filed by

Beitler [Docket No. 308] and Beitler and Boyd [Docket No. 309].  The RFS Motions

requested orders lifting the automatic stay so that Beitler and Boyd could proceed with

litigating their claims and counterclaims against the Debtor through arbitration proceedings

in connection with the Westcliff and Mission dissolutions.  On February 22, 2018, the

Debtor filed his Opposition to the RFS Motions [Docket No. 320].  On March 1, 2018,

Beitler and Boyd filed their Reply to the Debtor's Opposition to the RFS Motions [Docket

No. 340].  On March 15, 218, the Debtor filed his Motion to Strike Declaration of Tom Lallas

Filed in Support of Reply to Opposition to Motions for Relief [Docket No. 344].  On March 6,

2018, Beitler and Boyd filed their Opposition to the Motion to Strike Declaration of Tom

Lallas [Docket No. 346].  On March 7, 2018, the Debtor filed his Response to the Opposition to the Motion to Strike Declaration of Tom Lallas [Docket No. 348].  The Court denied this motion to strike the Declaration of Tom Lallas [Docket No. 375].

On March 8, 2018, a hearing was held on the RFS Motions, at which time the same were granted, subject to specific limitations.  On March 26, 2018, Beitler and Boyd lodged with the Court proposed orders granting the RFS Motions, together with a Memorandum in Support of Entry of the Form of Relief from Stay Orders submitted.

On March 30, 2018, the Debtor filed an Objection to Forms of Relief from Stay Orders Submitted by the Beitler Parties and Submission of Alternative Forms of Relief from Stay Orders (the "RFS Order Objection").  The Court sustained the Debtor's RFS Order Objection.

In this regard, on April 2, 2018, the Court entered an order modifying the automatic stay to allow the Westcliff Arbitration to proceed following confirmation of the Debtor's Plan (or earlier by agreement of the parties) [Docket No. 380] (the "Westcliff RFS Order").  Pursuant to the Westcliff RFS Order, the Westcliff Arbitration will determine the economic issues relevant to the ownership interests in Westcliff, and such determination will be utilized to determine the amount of proceeds that will be available to pay creditors' claims from the Debtor's interest in Westcliff pursuant to the Plan.

Similarly, on April 2, 2018, the Court entered an order modifying the automatic stay to allow the Mission Arbitration to proceed following confirmation of the Debtor's Plan (or earlier by agreement of the parties) (the "Mission RFS Order") [Docket No. 381].  Pursuant to the Mission RFS Order, the Mission Arbitration will determine the economic issues relevant to the ownership interests in Mission, and such determination will be utilized to determine the amount of proceeds that will be available to pay creditors' claims from the Debtor's interest in Mission pursuant to the Plan.

The Plan provides that, not later than thirty (30) days after the Confirmation Date, the Arbitrations, which are currently stayed, will be placed by back on calendar by the parties in the arbitral forums, and the Reorganized Debtor will pursue rulings in these

proceedings on the dissolution issues, and all on all other matters raised therein that do not conflict with the terms of the Plan or prior rulings of the Court.  The Debtor shall diligently pursue the aforementioned dissolution orders and either party may seek relief in the Court, including the imposition of sanctions, if the other party unduly delays or other interferes with the progress of the Arbitrations.

### 6.    Other Legal Proceedings

The Debtor has a significant amount of legal proceedings that were commenced pre-petition as set forth in Section II.C. above.  Except for the Cannae Appeal (which has now been resolved, resulting in the Cannae Secured Claim) and the Debtor's appeal seeking to set aside the Default Judgment (to allow the claim to be determined on its merits), such matters remained stayed.  As discussed in Section II.D.5.c hereof, the Arbitrations also remain stayed until the earlier of confirmation of the Plan or agreement of the parties to move forward at an earlier juncture.  The economic issues relating to the disposition of the Debtor's interests in the Companies will be determined by way of the Arbitrations (with such determinations then implemented by way of the Plan).

The Debtor believes that, with the exception of the above-referenced proceedings, the matters at issue in connection with non-bankruptcy legal proceedings are appropriately addressed in the context of the pending claim objections or otherwise determined in the bankruptcy context by the Court, including with respect to any claims against the Debtor asserted by Beitler, BCRS, Boyd, Cannae and/or Steward.

### 7.    Actual and Projected Recovery from Avoidance Actions and Causes of Action

As set forth in Section II.D.2 hereof, on April 12, 2018, the Court entered the MSJ Order in connection with the Beitler Avoidance Action, resolving, in the Debtor's favor, the Debtor's claims under section 544(a), and related relief under sections 502 and 550.  The Debtor believes that he will ultimately prevail in connection with any appeal of the MSJ Order, and that the Judgment on Decision and Default Judgment will be, as the Court has

ruled, unsecured vis-à-vis the Charging Liens against the Debtor's interests in the Companies.

The Debtor is in the process of evaluating the viability and likelihood of recovery on a malpractice claim that the Debtor may have against state court counsel and has issued a subpoena to state court counsel to determine if there is insurance coverage related to the malpractice claim.  In addition, the Debtor asserts claims against Beitler for breach of fiduciary duty and breach of contract in connection with the various entities in which the Debtor and Beitler are co-members, including but not limited to Ocean View, and for failure to reimburse funds in connection with the Los Angeles Condominium.  Further, as set forth in further detail in Section III.F.4 hereof, the Debtor reserves all rights to pursue claims of contribution, reimbursement or otherwise against co-guarantors of the Debtor based on the enforcement of guaranties against the Debtor, including against Beitler and his related entities, including any trust or entity in which Beitler holds an ownership interest, and James D. Hornbuckle and Cornerstone Law Corp.  Under the Plan, to the extent provided by applicable law, any such claims against co-guarantors will be set-off against the co-guarantors' claims against the Debtor.

The Debtor has undertaken an analysis of whether additional meritorious claims for preferential or fraudulent transfers exist.  While the Debtor believes that he has identified and has either brought, or intends to bring, all material claims (including, without limitation, the Beitler Avoidance Action, any action under Section 522(f) to avoid the Cannae Secured Claim on the Sandpiper Property to the extent it impairs the Debtor's homestead exemption and a potential preference action against the Debtor's former counsel, LWGF, in the approximate amount of $10,000,[28] claims for relief for all Avoidance Actions under 11 U.S.C. §§ 544 through 550, including, but not limited to, claims for the recovery of preferential transfers, are hereby reserved against any and all Persons and entities.  The omission of the identity of a recipient of a potentially avoidable and recoverable transfer of

---

[28] As set forth in footnote 18 above, if necessary, the Debtor and LWGF will enter into a tolling agreement so that such action, if necessary, can be commenced and/or consensually resolved following the confirmation of the Plan.

a particular payment is unintentional and shall not be deemed a waiver of the right of the Estate to recover any distribution(s), payment(s), or transfer(s) from any entity under any provision of the Bankruptcy Code.

These potential claims and causes of action, and the estimated values thereof, are set forth in the Asset Value Schedule attached as Exhibit "D" to the Supplemental Meislik Declaration [Docket No. 452].

Upon the Effective Date, no party shall have standing to bring or prosecute Avoidance Actions or other Causes of Action, except as specifically set forth below in Section III.F.4.

**III.    SUMMARY OF THE PLAN**

The following is a summary of the material provisions of the Plan.

**A.    Overview of the Plan**

Except for Classes 1 and 2, whose legal, equitable, and contractual rights are not being altered by the Plan and for which they will retain all of their rights against the Sandpiper Property, and Classes 3 and 4, who will be paid over time and will also retain their liens against the Sandpiper Property (and, in the case of Class 3, a lien against the Debtor's interest in VDG), all other Classes of Allowed Claims will be paid through the Distribution Fund generated by the monetization of the Debtor's membership interests in the Companies.  In this regard, either the Debtor's membership interests in the Companies will be purchased by one or more members of the Companies or the assets held by the Companies will be sold and the Debtor will receive a distribution based upon his ownership interests.  To the extent that these funds are insufficient to pay all Allowed Claims in full, the Debtor will liquidate his other real and personal property assets, to the extent there is equity and such property is not exempt.  After payment in full of all Allowed Class 5, Class 6 and Class 7 Secured,[29]  Administrative, and Priority Claims, the Allowed Unsecured

---

[29] Until paid in full, Class 7 (Cannae Secured Claim) will retain its lien on the Sandpiper Property (to the extent such lien does not impair the Debtor's homestead exemptions).  To the extent Class 5 and 6 are determined to be secured by the Debtor's membership interest in the Companies, such Allowed Claims shall be paid prior to distribution to lower priority claims.  If such claims are determined to be unsecured, such

Claims will share pro rata in the remaining monies, up to payment in full with interest, on account of such Allowed Claims.  The Plan allows the Debtor to maximize the return to creditors through the orderly administration of his assets.

Unless otherwise expressly stated in the Plan, the treatment of Allowed Claims under the Plan supersedes any agreements or rights the Holders of those Claims may have in or against the Debtor or his assets and is in full satisfaction of the legal, equitable, and contractual rights of the Holders of the Claim.

Unless the Plan provides otherwise, no Distributions will be made and no rights retained on account of any Claim that has not become an Allowed Claim.

**B.**    **What Creditors Will Receive Under the Proposed Plan**

As required by the Bankruptcy Code, the Plan classifies Claims in various Classes according to their rights against the Debtor.  The Plan states whether each Class of Claims is impaired or unimpaired.  The Plan provides the treatment each Class will receive.  In no event shall any creditor receive more than the creditor's Allowed Claim, plus interest, to the extent provided herein.

**1.    Unclassified Claims**

Certain types of Claims are not placed into voting classes but are instead unclassified.  They are not considered impaired and they do not vote on the Plan because they are automatically entitled to certain treatment under the Bankruptcy Code.  Accordingly, the following Claims have not been placed into a Class:

**a.    Administrative Expenses**

Administrative Claims are Claims for costs or expenses of administering the Debtor's Case which are allowed under § 507(a)(2) of the Bankruptcy Code.  The Bankruptcy Code requires that all Allowed Administrative Claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

---

claims will be paid as Class 12 Unsecured Claims, pro rata with other Unsecured Claims from the Distribution Fund, after payment to senior claimants.

The following chart lists all of the Debtor's § 507(a)(2) unpaid Administrative Claims and their treatment under the Plan:

| Description | Estimated Amount Owed | Treatment |
| --- | --- | --- |
| Clerk's Office Fees | $0 | Paid in full on or before the Effective Date. |
| OUST | $0 | Paid in full on or before the Effective Date. |
| Ordinary-Course Administrative Claims | $0 | Unless the Debtor objects to the Ordinary-Course Administrative Claim, the Claim will be allowed in accordance with the terms and conditions of the particular transaction giving rise to the Ordinary-Course Administrative Claim, and the Person Holding the Ordinary-Course Administrative Claim need not File any Request for Payment of its Claim. However, any Request for Payment, or Motion to allow a Claim as an Ordinary-Course Administrative Claim must be Filed with the Court and served on counsel for the Debtor or the Reorganized Debtor, as the case may be, and the OUST by no later than sixty (60) days after the Effective Date. |
| Non-Ordinary Course Administrative Claims | $0 | To the extent that any Non-Ordinary Course Administrative Claims are allowed, they will be paid in full by the Debtor on the later of the Effective Date or immediately after the Court enters a Final Order allowing the Non-Ordinary Course Administrative Claim. |
| Administrative Tax Claims | $0[30] | Unless the Debtor objects to an Administrative Tax Claim or otherwise disputes the Administrative Tax Claim in accordance with applicable law, the Claim will be Allowed in accordance with the terms and conditions of the particular transaction that gave rise to the Administrative Tax Claim, and the Person Holding the Administrative Tax Claim need not File any Request for Payment of its Claim. Any Allowed Administrative Tax Claim will be paid either (i) in the ordinary course of business, currently and timely as they are incurred and billed, or (ii) no later than the Effective Date, unless the Debtor objects to or otherwise disputes such Administrative Tax Claim in accordance with applicable law.  In an event of default, and to the extent such Administrative Tax Claim is also secured, the payment thereof will include all costs, fees, charges and interest, if applicable, as required 11 U.S.C. §§ 506(b) and 511, and applicable non-bankruptcy law. |

[30] This amount does not include any taxes that would be owed in connection with the disposition of the Debtor's assets.  As set forth in the Meislik Declaration, such taxes are included in the estimations of the proceeds available to satisfy creditor claims from the disposition of such assets.

| Description | Estimated Amount Owed | Treatment |
|---|---|---|
| LWGF | $1,198,634.39 as of the Effective Date. | Paid, *pari passu* among the Professionals, following entry of an order approving such Professional Fee Claim, from the Distribution Fund as such funds become available to the Debtor to pay Professional Fee Claims. |
| SH&B | $500,000 as of the Effective Date. | Paid, *pari passu* among the Professionals, following entry of an order approving such Professional Fee Claim, from the Distribution Fund as such funds become available to the Debtor to pay Professional Fee Claims. |
| PSZ&J | $500,000 as of the Effective Date. | Paid, *pari passu* among the Professionals, following entry of an order approving such Professional Fee Claim, from the Distribution Fund as such funds become available to the Debtor to pay Professional Fee Claims. |
| SALL SPENCER | $20,000 as of the Effective Date. | Paid, *pari passu* among the Professionals, following entry of an order approving such Professional Fee Claim, from the Distribution Fund as such funds become available to the Debtor to pay Professional Fee Claims.. |
| HAHN FIFE & COMPANY LLP | $25,000 as of the Effective Date. | Paid, *pari passu* among the Professionals, following entry of an order approving such Professional Fee Claim, from the Distribution Fund as such funds become available to the Debtor to pay Professional Fee Claims. |
| FORCE 10 | $250,000 as of the Effective Date. | Paid, *pari passu* among the Professionals, following entry of an order approving such Professional Fee Claim, from the Distribution Fund as such funds become available to the Debtor to pay Professional Fee Claims.. |

The following applies to Administrative Claims:

> (1)    Professional Fee Claims and Professional Fee Claim Lien

The Professionals in the Debtor's Case will be paid, *pari passu* among the Professionals from the Distribution Fund as such funds become available to the Debtor to pay Professional Fee Claims.  The Professionals understand that payment on account of their Professional Fee Claims may be subsequent to the Effective Date.  In consideration for their agreement not to require payment in full on account of their Professional Fee Claims on the Effective Date, in addition to Administrative Claim status, the holders of the Professional Fee Claims will be granted, *pari passu*, a super-priority claim and security

interest (junior only to the liens of the holders of Allowed Secured Claims in existence as of such time) in the Debtor's Assets (including, without limitation, the Companies and any sanction award, issued in connection with the Motion to Strike, or otherwise (the "<u>Professional Fee Claim Lien</u>").  The Professional Fee Claim Lien shall secure any and all fees and expenses incurred on behalf of the Debtor and Reorganized Debtor prior to and following the Effective Date of the Plan in connection with the Case, the Plan, its implementation, pursuing and/or defending Causes of Action (including, without limitation, Adversaries 92, 94 and 95), Objections to Claims, in connection with the Arbitrations or otherwise incurred in the representation of the Debtor, the Estate, or the Reorganized Debtor.  A form of security agreement reflecting the Professional Fee Claim Lien will be filed with the Court in connection with the Debtor's brief in support of confirmation of the Plan.

Any Professional seeking allowance of a Professional Fee Claim for services rendered in connection with the Debtor's Case must (1) File their application for allowance of compensation and reimbursement of expenses in connection with a duly noticed-hearing to be scheduled by the Debtor or Reorganized Debtor, or such other date as may be set by the Court, and (2) have the fees and expenses allowed by a Final Order.  Any party in interest may File an objection to such application within the time provided by the Local Bankruptcy Rules or within any other period that the Court sets.  Persons holding Professional Fee Claims who do not timely File and serve their applications for payment will be forever barred from asserting these Claims against the Reorganized Debtor or his property.

## b.    <u>Priority Tax Claims</u>

Priority Tax Claims include certain unsecured income, employment and other taxes described by Bankruptcy Code § 507(a)(8).  The Bankruptcy Code requires that each Holder of such a § 507(a)(8) Priority Tax Claim receive the present value of such Claim in regular installment payments in cash, over a period not exceeding five (5) years from the

Petition Date.  The following chart lists all of the Debtor's known § 507(a)(8) Priority Tax

Claims and their treatment under the Plan:

| Description | Amount Owed | Treatment |
|---|---|---|
| Internal Revenue Service ("IRS") | $0 | Paid on the later of (i) the Effective Date or (ii) upon entry of an order allowing the Claim, except to the extent that a Holder of such Claim agrees to other terms. |
| California Franchise Tax Board ("CFTB") | $0 | Paid on the later of (i) the Effective Date or (ii) upon entry of an order allowing the Claim, except to the extent that a Holder of such Claim agrees to other terms. |

## 2.    Classified Claims

### a.    Summary of Classes[31]

| Summary of Classes | |
|---|---|
| Class # | Claimant(s) |
| 1 | Secured Claim of Suntrust Mortgage (Sandpiper Property) |
| 2 | Secured Claim of Citibank (Sandpiper Property) |
| 3 | Secured Claim of Michelle Easton (Sandpiper Property and Debtor's interest in VDG) |
| 4 | Secured Claim of Orange County Treasurer-Tax Collector (Sandpiper Property) |
| 5 | Disputed Secured Claim of Beitler (Charging Lien – Judgment on Decision) |
| 6 | Disputed Secured Claim of Beitler (Charging Lien – Default Judgment) |
| 7 | Cannae Secured Claim (Debtor's interest in Westcliff and Sandpiper Property) (lien on Los Angeles Condominium no longer exists as property has been foreclosed) |
| 8 | Priority Claims |
| 9 | General Unsecured Claims (Unsecured Claims Not Including Disputed Unsecured Claims of Steward, Cannae, Beitler, Boyd and BCRS) |
| 10 | Disputed Unsecured Claims of Steward Financial LLC (Claim Nos. 19 and 20) |
| 11 | Disputed Unsecured Claims of Cannae (Claim No. 18) |
| 12 | Disputed Unsecured Claims of Beitler (Judgment on Decision and Default Judgment if Allowed as Unsecured Claims, Claim Nos. 12, 15 and 21) |
| 13 | Disputed Unsecured Claims of Beitler, BCRS and Boyd (Claim Nos. 9, 11, 14 and 16) |

---

[31] The Debtor's initially filed Plan contained additional classes of secured and unsecured claims that have been omitted in the Plan as such claims have been resolved due to the sale or return of the underlying collateral/property, as follows: (a) Secured Claim of Bayview Loan Servicing (Los Angeles Condominium) – property has been foreclosed; (b) Secured Claim of Bank of America (Los Angeles Condominium) – property has been foreclosed; (c) Secured Claim of American Honda Finance Corporation – vehicle returned; and (d) Unsecured General Unsecured Claim of BMW Financial Services NA LLC Dept. – vehicle returned.  To the extent that these creditors continue to assert claims against the Debtor, and any such claim is allowed, such claims will be treated as Class 9 General Unsecured Claims under the Plan.  The Debtor reserves all rights with respect to the assertion of such claims.

### b. **Secured Claims**

Secured Claims are Claims secured by liens on property of the Estate.  The

following chart lists all Classes of Secured Claims and their treatment under the Plan:

| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|---------|-------------|----------------|----------------|-----------|
| | **Secured Claims** | | | |
| 1 | Suntrust Mortgage<br><br>• Collateral: The Sandpiper Property<br><br>• Priority of Security Interest: First<br><br>• Total Claim Amount: $88,506.12<br><br>• Collateral Value: approximately $726,000 | N | N | Except to the extent that the Holder of the Allowed Class 1 Claim agrees to different treatment, the legal, equitable and contractual rights to which the Holder of the Allowed Class 1 Claim is entitled shall remain unaltered under the Plan. |
| 2 | Citibank<br><br>• Collateral: The Sandpiper Property<br><br>• Priority of Security Interest: Second<br><br>• Total Claim Amount: $211,457.95<br><br>• Collateral Value: approximately $726,000 | N | N | Except to the extent that the Holder of the Allowed Class 2 Claim agrees to different treatment, the legal, equitable and contractual rights to which the Holder of the Allowed Class 2 Claim is entitled shall remain unaltered under the Plan. |
| 3 | Michelle Easton<br><br>• Collateral: The Sandpiper Property, Debtor's interest in VDG<br><br>• Priority of Security Interest: Third (Sandpiper Property), sole secured claim (VDG)<br><br>• Total Claim Amount: $35,000 | N | Y | Except to the extent that the Holder of the Allowed Class 3 Claim agrees to different treatment, the Secured Claim of Michelle Easton shall be modified as follows:<br><br>Payments: The Allowed amount of Class 3 shall be due and payable four (4) years after the Effective Date.  All other provisions of the loan documents evidencing the Class 3 Claim shall remain unaltered under the Plan, including the interest rate of 6%.  The holder of the Allowed Class 3 Claim shall retain her liens until the Claim is paid in full. |

| Secured Claims | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | • Collateral Value: approximately $726,000 (Sandpiper Property); $60,282 (VDG) | | | |
| 4 | Orange County Treasurer-Tax Collector ("OCTTC")<br><br>• Collateral: The Sandpiper Property<br><br>• Total Claim Amount: $5,765.99<br><br>• Collateral Value: approximately $726,000 | N | N | Paid on the later of (i) the Effective Date or (ii) upon entry of an order allowing the Claim, except to the extent that a Holder of such Claim agrees to other terms. |
| 5 | Beitler – Disputed Secured Claim (Judgment on Decision)<br><br>• Disputed Collateral: Charging Lien on Debtor's distribution rights in Mission and Westcliff<br><br>• Total Claim Amount: approx. $788,798.91 | N | Y | Beitler's Class 5 Disputed Secured Claim (Judgment on Decision) is the subject of the Beitler Avoidance Action.  Pursuant to the MSJ Order, the Debtor believes that the Judgment on Decision will ultimately be determined to be unsecured; however, because the MSJ Order is not currently final, the Plan treats any disputed secured claim asserted by Beitler related to the Judgment on Decision as a Class 5 Claim.<br><br>Any Allowed Class 5 Claim shall be paid in full from the funds received by the Debtor on account of his membership interest in the Companies within fifteen (15) days of the Debtor's receipt thereof, and prior to payment of any Allowed Professional Fee Claims or Allowed Unsecured Claims.<br><br>In the event that, contrary to the MSJ Order, the Class 5 Claimant's Charging Lien is determined to be valid, the Class 5 Claimant shall retain any such valid Charging Lien against the Debtor's interests in the Companies until such time as its Allowed Class 5 Claim is paid in full in accordance with the terms of the Plan.<br><br>To the extent the Class 5 Claim is determined to be unsecured, such claim will be treated as a Class 12 Claim under the Plan, to the extent Allowed. |

| Secured Claims | | | | |
|---|---|---|---|---|
| **Class #** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | **Treatment** |
| 6 | Beitler – Disputed Secured Claim (Default Judgment)<br><br>• Disputed Collateral: Charging Lien on Debtor's distribution rights in Mission and Westcliff<br><br>• Total Claim Amount: approx. $2,589,725.46 | N | Y | Beitler's Class 6 Disputed Secured Claim (Default Judgment) is the subject of the Beitler Avoidance Action. Pursuant to the MSJ Order, the Debtor believes that the Default Judgment will ultimately be determined to be unsecured; however, because the MSJ Order is not currently final, the Plan treats any secured claim asserted by Beitler related to the Default Judgment as a Class 6 Claim.<br><br>Any Allowed Class 6 Claim shall be paid in full from the funds received by the Debtor on account of his membership interest in the Companies within fifteen (15) days of the Debtor's receipt thereof, and prior to payment of any Allowed Professional Fee Claims or Allowed Unsecured Claims.<br><br>In the event that, contrary to the MSJ Order, the Class 6 Claimant's Charging Lien is determined to be valid, the Class 6 Claimant shall retain any such valid Charging Lien against the Debtor's interests in the Companies until such time as its Allowed Class 6 Claim is paid in full in accordance with the terms of the Plan.<br><br>To the extent the Class 6 Claim is determined to be unsecured, such claim will be treated as a Class 12 Claim under the Plan, to the extent Allowed. |
| 7 | Cannae Secured Claim<br><br>• Collateral: the Debtor's distribution rights in Westcliff and the Sandpiper Property (formerly on Los Angeles Condominium, which was foreclosed)<br><br>• Total Claim Amount: $394,483.12 | N | Y | The Class 7 Claim shall be paid in full from the funds received by the Debtor on account of his membership interest in Westcliff within fifteen (15) days of the Debtor's receipt thereof, and prior to payment of any Allowed Professional Fee Claims or Allowed Unsecured Claims.<br><br>Until such time as the Cannae Secured Claim is paid in full, and subject to payment of such Class 7 Claim in accordance with the terms of the Plan, the holder of the Class 7 Claim shall retain its lien against the Debtor's interest in Westcliff, and against the Sandpiper Property (subject to any order avoiding such lien as impairing the Debtor's homestead exemption or otherwise). |

The values of the Debtor's assets serving as collateral for the above-referenced

Secured Claims is discussed in the Meislik Declaration, and are supported by appraisals

filed in support of this Disclosure Statement and Plan. If a secured creditor disputes the

value of its collateral as stated above, that secured creditor must timely File an objection to confirmation of the Plan, or the value stated by the Debtor may be determined to be the value of the collateral.  The objection must be accompanied by competent evidence of valuation.  If the value of the collateral is disputed, the Court may schedule a separate hearing to determine value; provided, however, that the issues regarding the valuation of the Debtor's interests in the Companies will be determined in connection with the Arbitrations, with such values being utilized to determine the amounts available for payment of creditors' claims under the Plan.

**c.    Class of Priority Claims**

Certain Priority Claims that are referred to in Bankruptcy Code §§ 507(a)(3), (4), (5), (6), and (7) are required to be placed in Classes in a chapter 11 plan.  The Bankruptcy Code requires that each Holder of a Priority Claim receive Cash on the Effective Date equal to the allowed amount of such Claim.  However, a Class of unsecured Priority Claim Holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such Claim.

The following chart lists all Classes containing the Debtor's Bankruptcy Code §§ 507(a)(3), (4), (5), and (7) Priority Claims and their treatment under the Plan:

| Priority Claims | | | | |
|---|---|---|---|---|
| **Class #** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | **Treatment** |
| 8 | Priority Claims<br><br>Estimated total amount of claims: $0 | N | N | Each Allowed Priority Claim in Class 8 will be paid in full on the Effective Date. |

**d.    Classes of Unsecured Claims**

Unsecured Claims are Claims not entitled to priority under Bankruptcy Code § 507(a).  The following chart identifies the Plan's treatment of Unsecured Claims:

| General Unsecured Claims | | | | |
|---|---|---|---|---|
| **Class #** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | **Treatment**[32] |
| 9 | General Unsecured Claims (Unsecured Claims Not Including Disputed Unsecured Claims of Steward, Cannae, Beitler, Boyd and BCRS)<br><br>Estimated Aggregate Claim Amount: $867,665, plus Undisputed Claim No. 12 in the amount of $71,705.68 | N | Y | Following payment in full of the Allowed Secured Claims in Classes 5, 6 and 7, Priority and Administrative Claims (including Allowed Professional Fee Claims), each Allowed Unsecured Claim in Class 9 will receive its pro rata share of the Distribution Fund, *pari passu* with the Allowed Unsecured Claims in Classes 10 through 13.  An initial distribution on account of Allowed Unsecured Claims will be made within fifteen (15) days of the date on which the Distribution Fund contains at least the amount of $100,000 available to make a distribution to the holders of such Allowed Unsecured Claims.  Thereafter, subsequent distributions will be made from the Distribution Fund within fifteen (15) days of the date on which the Distribution Fund contains additional distributable funds in increments of at least $100,000, until such time as a final distribution is made from the remaining funds in the Distribution Fund, up to payment in full, with interest, on account of such Allowed Unsecured Claims; except to the extent that a holder of such Claim agrees to other terms.<br><br>The Debtor estimates that the distributions to holders of Allowed Unsecured Claims will range from approximately 20% to 100% (plus interest).<br><br>(*See* Exhibit "A" to the Disclosure Statement for an analysis of the Class 9 Claims and the projected distributions to the holders of Allowed Class 9 Claims) |
| 10 | Disputed Unsecured Claims of Steward Financial LLC (Claim Nos. 19 and 20)<br><br>Estimated Aggregate Claim Amount: $0 to $3.7 million | N | Y | Following payment in full of the Allowed Secured Claims in Classes 5, 6 and 7, Priority and Administrative Claims (including Allowed Professional Fee Claims), each Allowed Unsecured Claim in Class 10 will receive its pro rata share of the Distribution Fund, *pari passu* with the Allowed Unsecured Claims in Classes 9, 11, 12 and 13.  An initial distribution on account of Allowed Unsecured Claims will be made within fifteen (15) days of the date on which the Distribution Fund contains at least the amount of $100,000 available to make a distribution to the holders of such Allowed Unsecured Claims.  Thereafter, subsequent distributions will be made from the |

---

[32] In the event that holders of Allowed Unsecured Claims are paid in full with interest, the Debtor will retain any remaining property or value.  The Debtor will also retain all exempt assets.

| | | | General Unsecured Claims | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment[32] |
| | | | | Distribution Fund within fifteen (15) days of the date on which the Distribution Fund contains additional distributable funds in increments of at least $100,000, until such time as a final distribution is made from the remaining funds in the Distribution Fund, up to payment in full, with interest, on account of such Allowed Unsecured Claims; except to the extent that a holder of such Claim agrees to other terms.<br><br>The Debtor estimates that the distributions to holders of Allowed Unsecured Claims will range from approximately 20% to 100% (plus interest).<br><br>(*See* Exhibit "A" to the Disclosure Statement for an analysis of the Class 10 Claims and the projected distributions to the holders of Allowed Class 10 Claims) |
| 11 | Disputed Unsecured Claims of Cannae (Claim No. 18)<br><br>Estimated Aggregate Claim Amount: $0 to $1.42 million | N | Y | Following payment in full of the Allowed Secured Claims in Classes 5, 6 and 7, Priority and Administrative Claims (including Allowed Professional Fee Claims), each Allowed Unsecured Claim in Class 11 will receive its pro rata share of the Distribution Fund, *pari passu* with the Allowed Unsecured Claims in Classes 9, 10, 12 and 13.  An initial distribution on account of Allowed Unsecured Claims will be made within fifteen (15) days of the date on which the Distribution Fund contains at least the amount of $100,000 available to make a distribution to the holders of such Allowed Unsecured Claims.  Thereafter, subsequent distributions will be made from the Distribution Fund within fifteen (15) days of the date on which the Distribution Fund contains additional distributable funds in increments of at least $100,000, until such time as a final distribution is made from the remaining funds in the Distribution Fund, up to payment in full, with interest, on account of such Allowed Unsecured Claims; except to the extent that a holder of such Claim agrees to other terms.<br><br>The Debtor estimates that the distributions to holders of Allowed Unsecured Claims will range from approximately 20% to 100% (plus interest).<br><br>(*See* Exhibit "A" to the Disclosure Statement for an analysis of the Class 11 Claims and the projected distributions to the holders of Allowed Class 11 Claims) |

| General Unsecured Claims | | | | |
|---|---|---|---|---|
| **Class #** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | **Treatment[32]** |
| | | | | |
| 12 | Disputed Unsecured Claims of Beitler (Judgment on Decision and Default Judgment if Allowed as Unsecured Claims, Claim Nos. 15, 21 and 23)<br><br>Estimated Aggregate Claim Amount: $0 to $3.69 million | N | Y | Following payment in full of the Allowed Secured Claims in Classes 5, 6 and 7, Priority and Administrative Claims (including Allowed Professional Fee Claims), each Allowed Unsecured Claim in Class 12 will receive its pro rata share of the Distribution Fund, *pari passu* with the Allowed Unsecured Claims in Classes 9, 10, 11 and 13.  An initial distribution on account of Allowed Unsecured Claims will be made within fifteen (15) days of the date on which the Distribution Fund contains at least the amount of $100,000 available to make a distribution to the holders of such Allowed Unsecured Claims.  Thereafter, subsequent distributions will be made from the Distribution Fund within fifteen (15) days of the date on which the Distribution Fund contains additional distributable funds in increments of at least $100,000, until such time as a final distribution is made from the remaining funds in the Distribution Fund, up to payment in full, with interest, on account of such Allowed Unsecured Claims; except to the extent that a holder of such Claim agrees to other terms.<br><br>The Debtor estimates that the distributions to holders of Allowed Unsecured Claims will range from approximately 20% to 100% (plus interest).<br><br>(*See* Exhibit "A" to the Disclosure Statement for an analysis of the Class 12 Claims and the projected distributions to the holders of Allowed Class 12 Claims) |
| 13 | Disputed Unsecured Claims of Beitler, BCRS and Boyd (Claim Nos. 9, 11, 14 and 16)<br><br>Estimated Aggregate Claim Amount: $0 (such claims are disputed and were filed in undetermined amounts) | N | Y | Following payment in full of the Allowed Secured Claims in Classes 5, 6 and 7, Priority and Administrative Claims (including Allowed Professional Fee Claims), each Allowed Unsecured Claim in Class 13 will receive its pro rata share of the Distribution Fund, *pari passu* with the Allowed Unsecured Claims in Classes 9, 10, 11 and 12.  An initial distribution on account of Allowed Unsecured Claims will be made within fifteen (15) days of the date on which the Distribution Fund contains at least the amount of $100,000 available to make a distribution to the holders of such Allowed Unsecured Claims.  Thereafter, subsequent distributions will be made from the Distribution Fund within fifteen (15) days of the date on which the Distribution Fund contains additional distributable funds in |

| General Unsecured Claims | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment[32] |
| | | | | increments of at least $100,000, until such time as a final distribution is made from the remaining funds in the Distribution Fund, up to payment in full, with interest, on account of such Allowed Unsecured Claims; except to the extent that a holder of such Claim agrees to other terms.<br><br>The Debtor estimates that the distributions to holders of Allowed Unsecured Claims will range from approximately 20% to 100% (plus interest).<br><br>(*See* Exhibit "A" to the Disclosure Statement for an analysis of the Class 13 Claims and the projected distributions to the holders of Allowed Class 13 Claims) |

## C.    Means of Effectuating the Plan

This section is intended to explain how the Debtor intends to effectuate the Plan, and how the Debtor intends to fund the obligations to Holders of Allowed Claims as provided in the Plan.  This section provides information regarding the funding sources for Plan obligations and other material issues bearing upon performance of the Plan.

### 1.    Funding the Plan

The Plan is a liquidating "pot plan."  This generally means that the Debtor's assets will be liquidated to pay Allowed Claims.  The Meislik Declaration, and Exhibit "A" to the Disclosure Statement, set forth the estimated distributions to the holders of Allowed Claims and the assumptions underlying such projections, including four scenarios which contemplate that the Charging Liens are either avoidable or unavoidable, and further contemplate whether the disputed claims against the Debtor are allowed or disallowed.  As set forth therein, if the Charging Liens remain avoided as set forth in the MSJ Order, all Allowed Administrative, Priority and Secured Creditors will be paid in full, and the Debtor estimates a distribution to Unsecured Creditors (depending on the allowance of disputed claims) up to 100%.  The scenarios also contemplate a circumstance where the Charging Liens are held to be unavoidable (contrary to the Court's MSJ Order).  In such event, Priority, Secured and Administrative Creditors will be paid in full and there would be at least

a 20% distribution on account of Unsecured Claims (depending on the allowance of disputed claims). Distributions to holders of Allowed Unsecured Claims, therefore, are estimated to range from 20% to 100%, depending on the monies flowing to the Distribution Fund from the disposition of the Debtor's assets, whether the Charging Liens are determined to be avoidable or not, and the amount of Claims that are ultimately Allowed.

Distributions required to be made under the Plan will be funded from a Distribution Fund consisting of monies derived from the following:

1.     The monetization of the Debtor's ownership interests in Westcliff and Mission. Funds will be generated either through the sale of the real property assets held by each of the Companies or by the other members of the Companies purchasing the Debtor's membership interests;

2.     To the extent that the funds from the monetization of the Companies are insufficient to pay Allowed Claims in full, the Debtor will liquidate his other real and personal property, to the extent equity exists and the assets are not exempt;

3.     Potential recovery from a malpractice claim the Debtor holds against state court counsel;

4.     Proceeds from the Debtor's contribution claims against co-guarantors; and

5.     Potential recovery of attorneys' fees and costs sought by the Debtor against certain Beitler Parties and their counsel in connection with the Motion to Strike.

As set forth above, Arbitrations are currently pending for the dissolution of Westcliff and Mission. Through these Arbitrations, the economic issues relating to the dissolution of the Companies will be determined and such determinations will be implemented by way of the Plan. Through the dissolution proceedings, the other members of the Companies will be required to purchase the Debtor's membership interests, if they desire for the Companies to continue in existence, or the assets of the Companies will be liquidated and the equity distributed to the members, including the Debtor. Alternatively, the members of

Mission may seek a sale of the assets (outside a dissolution context) pursuant to the terms of the Mission operating agreement.

As demonstrated by the Meislik Declaration, in the event of a liquidation of the Companies' assets, it is estimated that the Debtor would receive the following amounts on account of his membership interests in the Companies, totaling approximately $8,135,552:

**Westcliff:**  In the event of a sale of Westcliff's sole asset (the Westcliff Medical Building), the Debtor estimates that he would receive approximately $3,175,111 on account of his membership interest in Westcliff (prior to deducting for the capital gains that would be incurred).

**Mission:**  In the event of a sale of Mission's assets (the Mission Medical Building and the Land), the Debtor estimates that he would receive approximately $4,960,441 on account of his membership interest in Mission (prior to deducting for the capital gains that would be incurred).

In the event of a sale of the Companies' assets, however, such amounts (after accounting for the payment in full of Administrative and Secured Claims as contemplated under the Plan), would be subject to net tax liability in the amount of approximately $1.7 million.

The Debtor believes that any purchase by the other members of the Companies would result in proceeds in an amount no less than the amounts set forth above, and could result in a more favorable recovery by the Debtor as such an approach could result in more favorable tax consequences to the Debtor and, thereby, result in a greater distribution to the Debtor's creditors.  The determinations in connection with the Arbitrations will establish, under applicable California law, the amounts that will flow to the Debtor in connection with any dissolution of the Companies to be utilized as a funding source under the Plan.

As set forth in Section II.B hereof, the Debtor also has interests in multiple other limited liability companies and corporations, all of which hold real property.  To the extent necessary to pay creditor claims under the Plan (and to the extent value exists and such property is not exempt), the Debtor will either liquidate the assets held by the entities or he

will monetize his interests in the entities.  The Debtor expects that he would receive approximately $542,856 from the liquidation of these assets for the benefit of creditors, after deducting for taxes and costs of disposition.  To the extent necessary to pay creditor claims under the Plan (and to the extent value exists and such property is not exempt), the Debtor will liquidate the Sandpiper Property after liquidating other personal property interests, in the Debtor's discretion.  The Debtor also has a claim for contribution in connection with the Cannae Secured Claim against the other co-guarantors, Beitler and The Beitler Family Trust, estimated to be in amount of $262,989.  In addition, the Debtor seeks a payment by the Beitler Parties and/or their counsel of the Debtor's attorneys' fees and costs incurred in connection with the Motion to Strike, estimated in Exhibit "A" in the amount of in excess of $400,000.[33]  Lastly, the Debtor has a potential malpractice claim against state court counsel and other contingent claims set forth in the Asset Value Schedule that may lead to recoveries that would be utilized to pay creditors.

Based on these estimated values, the Debtor believes that the liquidation of his assets will generate the approximate amount of $9,341,397, which amount will be utilized, to the extent necessary, to fund payments to holders of Allowed Claims under the Plan.  In the event that Allowed Claims are paid in full, with interest, under the Plan, the Debtor shall retain any additional value remaining in his estate.

### 2.    Disbursing Agent

The Reorganized Debtor shall act as the disbursing agent for the purpose of making all the distributions provided for under the Plan.  The disbursing agent shall serve without bond, and will not receive compensation for distribution services.

### 3.    The Reorganized Debtor

As the Debtor is an individual, he will remain in charge of his financial affairs post-confirmation as the Reorganized Debtor.

---

[33] It is likely that once the Motion to Strike proceedings have been completed, the amount of fees and expenses being sought by the Debtor in connection therewith will be in excess of $500,000.

### D.    Risk Factors

Performance of the obligations under the Plan are subject to various factors and contingencies, some of which are described in this section.  The following discussion summarizes some of the material risks associated with the Plan, but is not intended to be exhaustive.  Moreover, it should be read in connection with the other disclosures contained in this Disclosure Statement and the Plan.  Each creditor, in conjunction with its advisors, should supplement the following discussion by analyzing and evaluating the Plan and Disclosure Statement as a whole.  THE RISKS ASSOCIATED WITH THE PLAN MUST BE CAREFULLY CONSIDERED IN DETERMINING WHETHER TO ACCEPT THE PLAN.

The Debtor's ability to fund payments on account of Allowed Claims depends largely on the Debtor's ability to monetize his interests in the Companies.  There is always a risk that the value of the membership interests will be lower than expected or the underlying real property held by the Companies sold for less than expected.  These matters will be determined in connection with the Arbitrations which, absent agreement of the parties, will proceed following confirmation of the Plan.  In addition, while the Debtor has attempted to provide a reasonable basis for estimating the tax (capital gains) impact that would be triggered by the sale of the Companies' assets, the Debtor may be subject to higher taxes, which would reduce the funds available to distribute to holders of Allowed Claims.

Another risk factor is that, while the Debtor believes that he will be successful in challenging certain of the claims asserted against him, these matters will be determined in connection with, among other things, pending claim objection proceedings and the Motion to Strike.  In the event that the Debtor is not successful in disallowing some or all of these disputed claims, the amount of claims may significantly exceed the liquidation value of the Debtor's assets, resulting in a lower, or zero, pro rata distribution to holders of Allowed Unsecured Claims.  A further risk factor is whether the Charging Liens will be avoidable, as set forth in the MSJ Order, or whether the Claims subject to the Charging Liens (to the extent ultimately allowed) will be paid as Secured Claims under the Plan.  Such a

determination will have a material impact on the amounts that will be distributed to holders of Allowed Unsecured Claims.

Moreover, the ongoing litigation matters and disputes between the Debtor and Beitler (and related parties) are resulting in the incurrence of significant Professional Fees which will need to be paid in Allowed Amounts prior to any distributions to Unsecured Creditors.

The distributions to creditors under the Plan, therefore, depends on two primary factors – the value of the Debtor's assets that will be liquidated to fund the payments to creditors (the denominator), and the amount and priority of the claims that will ultimately be asserted against such amounts (the numerator).  These assumptions are discussed in the Meislik Declaration, and Exhibit "A" hereto, and the distributions to Unsecured Claimants are estimated to range from 20% to 100%, depending on the assumptions relating to these factors.

E.    **Provisions Governing Distributions**

1.    **Dates of Distributions**

Payments shall be deemed timely made if made as soon as practicable after the applicable date provided by the Plan, but, in any event, except as otherwise provided herein, within fifteen (15) days thereof.  Any Distribution required to be made pursuant to the Plan from funds reserved for this purpose in the Distribution Fund (*i.e.*, when a Disputed Claim becomes an Allowed Claim) shall be deemed timely made if made of as soon as practicable after such determination, but, in any event, within fifteen (15) days thereafter.

With respect to Unsecured Claims, the Plan provides that, following payment in full of the Allowed Secured Claims in Classes 5, 6 and 7, Priority and Administrative Claims (including Allowed Professional Fee Claims), each Allowed Unsecured Claim will receive its pro rata share of the Distribution Fund, *pari passu* with other the Allowed Unsecured Claims.  An initial distribution on account of Allowed Unsecured Claims will be made within fifteen (15) days of the date on which the Distribution Fund contains at least the amount of

$100,000 available to make a distribution to the holders of such Allowed Unsecured Claims.  Thereafter, subsequent distributions will be made from the Distribution Fund within fifteen (15) days of the date on which the Distribution Fund contains additional distributable funds in increments of at least $100,000, until such time as a final distribution is made from the remaining funds in the Distribution Fund, up to payment in full, with interest, on account of such Allowed Unsecured Claims.

### 2.      Manner of Distribution

At the option and in the sole discretion of the Reorganized Debtor, monetary distributions made by made by (i) wire transfers from, or (ii) check drawn down on a domestic bank approved by the OUST.

### 3.      Delivery of Distributions in General

Distributions to Holders of Allowed Claims shall be made by the Reorganized Debtor (a) at the addresses set forth on the Proof of Claim filed by such Holders, (b) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Reorganized Debtor has not received a written notice of a change of address, or (c) in the case of a Holder of a Claim that is governed by an agreement and is administered by an agent or servicer, at the address (i) set forth on any Proof of Claim filed by the agent or servicer, (ii) in the Schedules for the agent or servicer if no Proof of Claim has been filed, or (iii) contained in the official records of such agent or servicer.  Holders of Claims may change the address to which Distributions will be sent by filing a written change of address with the Court and serving a copy of the change of address on the Reorganized Debtor.

If a Distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtor as undeliverable or otherwise unclaimed ("Undeliverable Distribution"), the Reorganized Debtor shall make no further Distributions to such Holder unless and until the Reorganized Debtor is notified in writing of such Holder's then-current address, at which time all Undeliverable Distributions shall be made to such Holder without interest.  All Undeliverable Distributions shall be returned to the Reorganized Debtor until such Undeliverable Distributions are claimed.  The Reorganized Debtor shall, in the case of

Cash, hold Undeliverable Distributions in a segregated interest-bearing account for Undeliverable Distributions until such Undeliverable Distributions become deliverable, is claimed or is forfeited. Nothing contained in the Plan shall require the Debtor, or anyone else, to attempt to locate the intended recipient of an Undeliverable Distribution.

Any Holder of an Allowed Claim that does not present itself within six (6) months of the Distribution Date upon which the Undeliverable Distribution was made shall be deemed to have forfeited its right or Claim to or interest in the Undeliverable Distribution and shall be forever barred and enjoined from asserting any Claim for the Undeliverable Distribution against the Debtor and his Estate, the Reorganized Debtor, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of their property. In such cases, the Undeliverable Distribution and accrued interest thereon shall become property of the Reorganized Debtor free and clear of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be distributed in accordance with the terms of the Plan.

### 4.    Rounding Payments

The Reorganized Debtor shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

### 5.    Interest on Claims

Unless otherwise specifically provided for in the Plan or by Court order, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In the event that there are sufficient assets to provide for payment in full of all Allowed Claims, however, such Allowed Claims will be entitled to post-petition interest at the Federal Judgment Rate prior to the retention by the Debtor of any surplus assets.

### 6.    Compliance with Tax Requirements

In connection with the Plan, and all Distributions under the Plan, the Reorganized Debtor shall, to the extent applicable, comply with all tax withholding, payment and reporting requirements imposed by federal, state, or local taxing authorities.  The Reorganized Debtor shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  All amounts properly withheld from Distributions to a Holder of a Claim as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder.  All persons Holding Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes.  If such information has not been received by the Reorganized Debtor, then the Reorganized Debtor may, at his option, withhold the amount required and distribute the balance to such Holder or decline to make the Distribution until the information is received.

Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtor for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Debtor in connection with such Distribution.  Any property to be distributed pursuant to the Plan shall, pending implementation of such arrangements, be treated as an Undeliverable Distribution pursuant to Section III.E.3 above.

### 7.    De Minimis Distributions

The Reorganized Debtor shall not have any obligations to make a Distribution on account of an Allowed Claim if the amount to be distributed to the specific Holder of the

Allowed Claim on a Distribution Date is for an amount of $5.00 or less, and may, at the

Reorganized Debtor's option, either add the Distribution to the next Distribution if the

collective amount would be greater than $5.00 or treat the Distribution as an Undeliverable

Distribution.

### 8.    Setoffs

Except as otherwise stated in the Plan, the Debtor may, pursuant to 11 U.S.C. § 553

or applicable non-bankruptcy law, but shall not be required to, set off against any Allowed

Claim and the Distribution to be made pursuant to the Plan on account of such Allowed

Claim any account stated, Claim, right, or Cause of Action which the Debtor, Reorganized

Debtor or the Estate possesses against the Holder of such Allowed Claim; provided,

however, that neither the failure to effect such a setoff nor the allowance of any Claim shall

constitute a waiver or release by the Debtor or Reorganized Debtor of any such account,

Claim, right, and Cause of Action that the Debtor, Reorganized or the Estate may possess

against the Holder of such Allowed Claim.  Without limiting the generality of the foregoing,

and only to the extent allowable under applicable law, under the Plan, and without the

necessity of further Court order, the Debtor shall be entitled set off against any Allowed

Claim held by a co-guarantor (specifically including Beitler and his related entities, including

any trust or entity in which he holds an ownership interest or any entity owned by him or for

which he serves as trustee) any claims based on contribution, reimbursement or otherwise

that arise in favor of the Debtor or Reorganized Debtor under applicable law by virtue of the

payment (or contemplated payment) of any Allowed Claim based upon a guaranty for which

both the Debtor and Beitler (or his related entities, including any trust or entity in which

Beitler holds an ownership interest) are obligated (including, without limitation, any personal

guarantees related to the Companies, the Cannae Secured Claim, the Cannae Unsecured

Claim and the Steward Guaranty Unsecured Claim or otherwise).

### 9.    Limitation on Liability

The Debtor, and any of his respective agents or Professionals, shall not be liable for

(i) any acts or omissions, except for willful misconduct, breach of fiduciary duty or gross

negligence in connection with implementing the Distribution provision of the Plan and the making or withholding of Distributions under the Plan, or (ii) any change in the value of Distributions made under the Plan resulting from any delays in making such Distributions in accordance with the terms of the Plan (including, but not limited to, any delays caused by the resolution of Disputed Claims).

**F.    Other Provisions of the Plan**

**1.    Claim Objections and Disputed Claims**

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE BY CLAIMANTS WHOSE CLAIMS WERE NOT SCHEDULED (BUT WERE PROVIDED NOTICE OF THE BAR DATE) OR WERE SCHEDULED AS UNKNOWN, DISPUTED, CONTINGENT OR UNLIQUIDATED WAS JUNE 16, 2017 (AS TO CREDITORS OTHER THAN GOVERNMENTAL UNITS) AND WAS AUGUST 23, 2017 (AS TO GOVERNMENTAL UNITS).  THE SUPPLEMENTAL BAR DATE FOR CERTAIN SPECIFIED CREDITORS WAS MAY 24, 2018.[34]

**a.    Standing and Claim Objection Deadline**

The deadline to file objections to filed proofs of claims by the Debtor or any other party in interest was October 13, 2017.  As discussed in Sections II.C and II. D.1.c hereof, the Debtor filed objections to numerous filed proofs of claim by the October 13, 2017 claim objection deadline.  With the exception of the objections to the claims asserted by Beitler

---

[34] The Debtor filed amended Schedules listing the holders of the secured loans against the Companies' assets and certain other contingent claims which are personally guaranteed by the Debtor, certain of which were not listed on the initial Schedules.  [Docket Nos. 402 and 436].  The entities not listed on the initial Schedules were not previously provided with notice of the initial Bar Date.  On April 24, 2018, the Debtor provided notice of a supplemental Bar Date to such entities so that they were provided with a 30-day period to file proofs of claim in the Case.  [Docket No. 411].  In the case of Avalon Associates Ltd., the claimant was listed on the initial Schedules as contingent, unliquidated and disputed, was provided notice of the initial Bar Date, and failed to file a proof of claim in the Case based on a personal guaranty by the Debtor or otherwise. Any such claim against the Debtor, therefore, is barred.  As Avalon Associates Ltd. had been provided notice of the initial Bar Date, it was not provided with the supplemental Bar Date notice.  None of these contingent claimants filed proofs of claim by the supplemental Bar Date and, therefore, it is the Debtor's position that such claims are barred.

On May 24, 2018, Beitler filed amended Claim Nos. 9 and 11.  Beitler also filed a new claim, Claim No. 23, asserting claims in an undetermined amount based on contribution and indemnification in connection with a cross-complaint by Brothers, Inc. against the BCRS and the Debtor.  The Debtor reserves all rights with respect to this claim and the underlying action.

and related parties (*i.e.*, Beitler, Boyd, BCRS, Cannae and Steward), which objections are still pending (as is the related Motion to Strike), the Debtor's claim objections have been sustained.  The Reorganized Debtor or any other party in interest may obtain an extension of the deadline for filing claim objections by filing a motion in the Court, based upon a showing of "cause."

### b.    No Distribution Pending Allowance

Notwithstanding any other provision of the Plan, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim; provided, however, that if the only dispute regarding a Disputed Claim is to the amount of the Disputed Claim, the Holder of a Disputed Claim shall be entitled to a Distribution on account of that portion of the Disputed Claim which the Debtor does not dispute at the time and in the manner that the Debtor makes Distributions to the Holders of Allowed Claims pursuant to the provisions of the Plan.

A Disputed Claim is a Claim that has not been allowed or disallowed and to which either: (i) a Proof of Claim has been Filed or deemed Filed and the Debtor or another party in interest has Filed an objection; (ii) no Proof of Claim has been Filed and the Claim was not scheduled or the Debtor has scheduled such claim as disputed, contingent, unliquidated or unknown.

In addition, pursuant to 11 U.S.C. § 502(d), the Claim(s) of any holder of a voidable transfer shall be disallowed in toto if the transferee has not paid the amount or turned over the property received as required under the sections under which the transferee's liability arises.

The Debtor or Reorganized Debtor, as the case may be, will have the power and authority to settle and compromise a Disputed Claim with Court approval and compliance with Bankruptcy Rule 9019 unless the amount allowed by the compromise does not exceed $5,000, in which case no Court approval is necessary.

### c.   Reserves for Disputed Claims

In the event that Disputed Claims are pending at the time of a Distribution under the Plan, the Debtor shall establish and maintain a reserve for such Disputed Claims.  The amount to be established as a reserve for a Disputed Claim shall be in an amount mutually acceptable to the Debtor and the Claimant, or shall be in an amount to be determined by the Court.

### 2.   Executory Contracts and Unexpired Leases

### a.   Assumption and Assignment

Other than the various limited liability company operating agreements to which the Debtor is a party, any executory contracts and/or unexpired leases to be assumed pursuant to the provisions of sections 365 and 1123 of the Code shall be the subject of a motion filed by the Debtor prior to the Effective Date of the Plan.  Out of an abundance of caution, the various limited liability company operating agreements to which the Debtor is a party will be assumed to the extent that they are executory contracts through the Confirmation Order.

### b.   Rejections

The Debtor is conclusively deemed to have rejected all executory contracts and unexpired leases not previously assumed as of the Effective Date.  A Proof of Claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than 30 days after entry of the Confirmation Order.  Claims arising from the rejection of an executory contract or unexpired lease under this section are General Unsecured Claims in Class 9, except to the extent the Court orders otherwise.  Any such damage Claims that are not timely Filed and served will be forever barred and unenforceable against the Debtor, the Estate, the Reorganized Debtor, and their respective property.  Persons holding these Claims who fail to timely file Claims will be barred from receiving any Distributions under the Plan on account of their requested damage Claims. The Debtor does not believe that there will be any damage claims in connection with rejection claims.

**3.      Changes in Rates Subject to Regulatory Commission Approval**

The Debtor is an individual not subject to governmental regulatory commission approval of any rates.

**4.      Preservation of Causes of Action and Avoidance Actions**

The Debtor reserves for the Estate and the Reorganized Debtor all rights to commence and pursue, as appropriate, any and all Causes of Action and Avoidance Actions, whether arising prior to or after the Petition Date, in any court or other tribunal, including without limitation, in an adversary proceeding Filed in the Court, except for as otherwise provided in the Plan.  On the Effective Date, the Reorganized Debtor will be vested with authority to enforce, file, litigate, prosecute, settle and collect with respect to Causes of Action and Avoidance Actions, although he will not be required to do so and the determination of whether to do so will be made solely by the Reorganized Debtor in his absolute discretion.

Unless a Cause of Action or Avoidance Action against any Person is expressly waived, relinquished, released, compromised or settled as provided or identified in the Plan, any Confirmation Order or prior order of the Court, the Debtor expressly reserves any Causes of Action and Avoidance Actions for later adjudication, including without limitation, the Beitler Avoidance Action (and any appeal related thereto), any action to avoid any lien impairing the Debtor's homestead exemption rights, and any claims for contribution, reimbursement or otherwise against any co-guarantor (including Beitler or his related entities, including any trust or entity in which Beitler holds an ownership interest) related to the payment of any personal guaranty claims against the Debtor (including without limitation, personal guarantees of the Companies' obligations, the Cannae Secured Claim, the Cannae Unsecured Claim and the Steward Guaranty Unsecured Claim), and the right of setoff with respect thereto.  Therefore, no preclusion doctrine, including, without limitation, the doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Causes of Action or Avoidance Actions upon or after Confirmation or consummation of the Plan.  All

Avoidance Actions and other Causes of Action are preserved under the Plan for the benefit of the Estate, except as otherwise provided for in the Plan.  Any recoveries from Avoidance Actions and/or other Causes of Action will be paid to the Reorganized Debtor.

ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR SETOFF THAT IS AVOIDABLE UNDER THE CODE OR THAT HOLDS A CLAIM AGAINST THE ESTATE THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE TO RETURN AN AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW THEIR RECORDS AND/OR THE DEBTOR'S SCHEDULES FOR FURTHER INFORMATION, HOWEVER, ALL RIGHTS OF THE DEBTOR AND THE ESTATE ARE RESERVED WITH RESPECT TO ANY AND ALL TRANSFERS OR SETOFF WHICH MAY BE AVOIDABLE UNDER THE BANKRUPTCY CODE.

### 5.     Retention of Jurisdiction

The Court will retain exclusive jurisdiction during the Plan payout period to resolve disputes and conflicts arising from the administration of the Plan, upon request of a party in interest and after notice and a hearing, including, without limitation:

1.     The adjudication of the validity, scope, classification, allowance, and disallowance of any Claim, including with respect to set-off rights;

2.     The estimation of any Claim, including with respect to any reserve on account of any Disputed Claim;

3.     The allowance or disallowance of Professional Fee Claims, compensation, or other Administrative Claims;

4.     To hear and determine Claims concerning taxes pursuant to Bankruptcy Code §§ 346, 505, 525, and 1146;

5.     To hear and determine any action or proceeding brought under Bankruptcy Code §§ 108, 510, 543, 544, 545, 547, 548, 549, 550, 551, and 553;

6.     To hear and determine all actions and proceedings which relate to pre-confirmation matters;

7.      To hear and determine any issue relating to the assumption or rejection of executory contracts and unexpired leases;

8.      To hear and determine any modification to the Plan in accordance with the Bankruptcy Rules and the Bankruptcy Code;

9.      To enforce and interpret the terms of the Plan;

10.     To correct any defects, cure any omissions, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purpose and intent of the Plan;

11.     The entry of any order, including injunctions, necessary to enforce title, rights and powers of the Debtor or Reorganized Debtor, and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Court may deem necessary including, without limitation, any right of the Debtor or Reorganized Debtor to recover and liquidate assets, including, without limitation, the implementation of the determinations in the Arbitrations contemplated by the Plan;

12.     To determine the validity, extent and priority of all liens and security interests against property of the Estate or the Reorganized Debtor;

13.     To hear and resolve any disputes regarding employment applications and professional fees and any issues related to the Professional Fee Claim Lien;

14.     To hear and determine such matters and make such orders as are consistent with the Plan as may be necessary to carry out the provisions thereof and to adjudicate any disputes arising under or relating to any order entered by the Court in this Case;

15.     To hear and determine such matters relating to the Debtor's discharge;

16.     The entry of an order concluding and terminating this Case; and

17.     To resolve any disputes as to whether there has been a default under the Plan.

### 6.      Tax Consequences of the Plan

CREDITORS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX
LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS,
AND/OR ADVISORS.  The following disclosure of possible tax consequences is intended
solely for the purpose of alerting readers about possible tax issues the Plan may present to
the Debtor and the Reorganized Debtor.  The Debtor and his professionals CANNOT and
DO NOT represent that the tax consequences contained below are the only tax
consequences of the Plan because the Tax Code embodies many complicated rules which
make it difficult to state completely and accurately all of the tax implications of any action.

Due to the unsettled and complex nature of some of the tax issues, as well as the
possibility that developments subsequent to the date hereof could affect the tax
consequences of the Plan, the following discussion should not be regarded as definitive or
as covering all possible tax consequences.  Additionally, this summary does not discuss all
aspects of federal income taxation that may be relevant to a particular creditor in light of its
individual circumstances or to certain creditors subject to special treatment under the
federal income tax law (for example, life insurance companies, tax-exempt organizations,
foreign corporations and individuals who are not citizens or residents of the United States).

As stated above, creditors concerned with how the Plan will affect their own tax
liability should consult with their own accountants, attorneys, and/or advisors.  As set forth
in the Meislik Declaration, the Debtor has made a preliminary determination as to the tax
consequences of the Plan, including with respect to the disposition of his membership
interests in the Companies.  As set forth therein, the Debtor estimates that there would be
approximately $1.7 million in capital gain taxes in the event that the underlying assets of
the Companies are sold at their fair market value or the Debtor's membership interests are
sold to the other members of the Companies, at their fair market value as a result of the
dissolution actions, or otherwise.  In addition, there may be capital gain tax obligations
incurred in connection with the disposition of the underlying assets of the other entities in
which the Debtor holds an interest, or upon the disposition of the Debtor's membership

interests in said entities.  Such estimated amounts are reflected in the projected recoveries to creditors under the Plan.

### 7.    Exemption from Transfer Taxes

Pursuant to Bankruptcy Code § 1146(a), any transfers from the Debtor to the Reorganized Debtor or to any other Person pursuant to the Plan in the United States shall not be subject to any stamp, real estate transfer, personal property, recording or other similar tax, and the Confirmation Order shall direct the appropriate state or local governmental official or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without payment of any such tax or governmental assessment.

### IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for Filing Claims. The Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a plan.  Some of the requirements include that the plan must be proposed in good faith, acceptance of the plan, whether the plan pays creditors at least as much as creditors would receive in a chapter 7 liquidation, and whether the plan is feasible.  These requirements are not the only requirements for confirmation.

### A.    Who May Vote or Object

### 1.    Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but as explained below, not everyone is entitled to vote to accept or reject the Plan.

### 2. Who May Vote to Accept/Reject the Plan

A creditor has a right to vote for or against the Plan if that creditor has a Claim that: (a) either is an Allowed Claim or is allowed for voting purposes; (b) is classified in an impaired Class; and (c) is entitled to receive or retain some property on account of its Claim.[35]

### a. What is an Allowed Claim

As noted above, a creditor must first have an Allowed Claim to have the right to vote. Generally, any Proof of Claim will be Allowed, unless a party in interest Files an objection to that Claim. When an objection to a Claim is Filed, the Holder of the Claim cannot vote unless and until the Court, after notice and hearing, either overrules the objection or allows the Claim for voting purposes. Any Person who seeks temporary allowance of its Claim for the purpose of voting on the Plan must promptly take the steps necessary to File an appropriate motion requesting the same and arrange an appropriate hearing with the Court.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE BY CLAIMANTS WHOSE CLAIMS WERE NOT SCHEDULED (BUT RECEIVED NOTICE OF THE BAR DATE) OR WERE SCHEDULED AS UNKNOWN, DISPUTED, CONTINGENT, OR UNLIQUIDATED WAS JUNE 16, 2017 (AS TO CREDITORS OTHER THAN GOVERNMENTAL UNITS) AND WAS AUGUST 23, 2017 (AS TO GOVERNMENTAL UNITS). THE SUPPLEMENTAL BAR DATE AS TO CERTAIN SPECIFIED CREDITORS (NOT PREVIOUSLY PROVIDED WITH NOTICE OF THE INITIAL BAR DATE) IS MAY 24, 2018.[36] A creditor may have an Allowed Claim even if a Proof of Claim was not timely filed. A Claim is deemed Allowed if (1) it is scheduled on the Debtor's Schedules and such Claim

---

[35] If the Plan provides that a Class will receive or retain no property on account of its Claim, that Class is deemed to reject the Plan under Bankruptcy Code § 1126(g) and therefore is not entitled to vote.

[36] The Debtor has filed amended Schedules listing the holders of the secured loans against the Companies' assets which are personally guaranteed by the Debtor. On April 24, 2018, the Debtor provided notice of a supplemental Bar Date to these entities so that they were provided with a 30-day period to file proofs of claim in the Case. [Docket No. 411]. No proofs of claim were filed by these entities and it is the Debtor's position that such claims are barred. Notwithstanding, the Debtor reserves his right to object to, or seek to estimate, any such claims, and reserves his rights of contribution and otherwise against any co-guarantor, including Beitler or his related entities, including any trust or entity in which Beitler holds an ownership interest, with respect to the payment of any such claims.

is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the Claim.

### b.    What is an Impaired Claim

As noted above, the Holder of an Allowed Claim only has the right to vote if it is in a Class that is impaired under the plan.  A Class is impaired if the plan alters the legal, equitable, or contractual rights of the members of that Class.  For example, a Class comprised of General Unsecured Claims is impaired if the plan fails to pay the members of that Class 100% of what they are owed or otherwise impairs the legal rights of the Holders of the Claims.

In this case, the Debtor believes that Classes 3, and 5 through 13 are impaired and Holders of Claims in each of these Classes are therefore entitled to vote to accept or reject the Plan, unless otherwise specified below.  The Debtor believes that Classes 1 and 2 are unimpaired under the Plan.  Any party in interest who disputes the Debtor's characterization of its Claim as being in an impaired or unimpaired Class may File an objection to the Plan contending that the Debtor incorrectly characterized the Claim or Class.

### 3.    Who is Not Entitled to Vote

The following four types of Claims are not entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to Bankruptcy Code §§ 507(a)(2), (a)(3), and (a)(8); and (4) Claims in Classes that do not receive or retain any value under the plan.  Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the plan.  Claims entitled to priority pursuant to Bankruptcy Code §§ 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such Claims are not placed into Classes and they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes that do not receive or retain any value under the plan do not vote because such Classes are deemed to have rejected the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4.    Who Can Vote in More Than One Class

A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject the Plan in both capacities by casting one ballot for the secured portion of the Claim and another ballot for the unsecured portion of the Claim.  Also, a creditor who has a Claim for wages or unpaid vacation, healthcare or retirement benefits may have both a Priority Claim up to the maximum specified in 11 U.S.C. §§ 507(a)(4) and (a)(5), provided the conditions for priority treatment as specified under 11 U.S.C. § 507(a) are met, and a General Unsecured Claim for all amounts exceeding the statutory maximum.  The Holder of such a Claim may cast a ballot for the priority portion of the Claim and another ballot for the general unsecured portion of the Claim.

### 5.    Votes Necessary to Confirm the Plan

If impaired Classes exist, the Court cannot confirm the Plan unless (1) at least one impaired Class has accepted the Plan without counting the votes of any insiders within that Class, and (2) all impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting Classes, as discussed later in Section IV.A.7 and IV.A.8 below.

### 6.    Votes Necessary for a Class to Accept the Plan

A Class of Claims is considered to have accepted the Plan when more than one-half (½) in number, and at least two-thirds (2/3) in dollar amount, of the Claims which actually voted, voted in favor of the Plan.

### 7.    Treatment of Nonaccepting Classes

If at least one impaired Class votes to accept the Plan, and other impaired Classes vote to reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner required by the Bankruptcy Code.  The process by which nonaccepting Classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown."  The Bankruptcy Code allows the plan to be "crammed down" on nonaccepting Classes of Claims if it meets all consensual requirements except the voting

requirements of § 1129(a)(8) and if the plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired Class that has not voted to accept the plan as referred to in § 1129(b) and applicable case law.

Section 1129(b)(1) provides:

> [I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponents of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan [1] does not discriminate unfairly, and [2] is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).

### a.    The Plan Does Not Discriminate Unfairly

In this case, under the Plan, each Class is receiving the same treatment provided to creditors with similar or identical legal rights.  As the Plan provides for the same treatment for all claims in each Class and with respect to similarly situated Classes, there is no unfair discrimination.

### b.    The Plan is Fair and Equitable With Respect to Secured Claims

With respect to an objecting class of secured claims, a plan is fair and equitable if:

> (i)(I) the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of an allowed amount of such claims; and

> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

> (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

1   (iii) for the realization by such holders of the indubitable
    equivalent of such claims.

2

3   11 U.S.C. § 1129(b)(2).

4       Thus, to be "fair and equitable" with respect to a class of secured claims, a plan

5   must pay secured creditors the present value of their allowed secured claims.  See 11

6   U.S.C. § 1129(b)(2)(A).  Section 1129(b)(2)(A)(i)(II) provides that the "present value stream

7   of payment offered by a debtor pursuant to a plan of reorganization must equal or exceed

8   the value of a creditor's allowed secured claim when such payment stream is discounted at

9   the cram-down interest rate."

10      In this case, the Plan does not impair the rights of the holders of Allowed Secured

11  Claims in Classes 1, 2 and 4 (Secured Claims of SunTrust, Citibank and Orange County

12  Treasurer-Tax Collector on the Sandpiper Property).  Accordingly, the Secured Claims

13  subject to the "fair and equitable test" under the Plan are Class 3, Class 5, Class 6 and

14  Class 7.

15              (1)    The Plan is Fair and Equitable in Its Treatment of the

16                     Class 3 Secured Claim

17      Under the Plan, the Debtor has provided that the Class 3 Secured Claim of Michelle

18  Easton (in the amount of $35,000 as of the Petition Date) will be paid 4 years after the

19  Effective Date with interest at 6% as provided in the underlying loan agreement.  The Class

20  3 Secured Claim is secured by the Sandpiper Property and the Debtor's interest in VDG,

21  which will continue to serve as collateral for the Class 3 Secured Claim until paid in full.

22  Accordingly, as the Plan provides for payment in full of the Class 3 Claim, with interest at

23  the contract rate, from the disposition of her collateral, such treatment reflects fair and

24  equitable treatment that complies with 11 U.S.C. § 1129(b)(2)(A)(i)(II).

25      The Plan further provides that the Class 3 Claimant will retain her liens on the

26  collateral pending payment in full under the Plan.  As such, the Plan complies with 11

27  U.S.C. § 1129(b)(2)(A)(i)(I).  In addition, when the collateral is liquidated, the Debtor will

28

necessarily have to pay the Class 3 Claim in full on account of her liens in satisfaction of 11 U.S.C. § 1129(b)(2)(A)(ii).

The Plan, therefore, is fair and equitable in its treatment of Class 3, to the extent such claimant objects to its treatment under the Plan.

(2)    The Plan is Fair and Equitable in Its Treatment of the Beitler Secured Claims in Classes 5 and 6

The Class 5 Disputed Secured Claim of Beitler (Judgment on Decision) and the Class 6 Disputed Secured Claim of Beitler (Default Judgment) (asserted in the amounts of approximately $788,000 and $2.6 million, respectively), will – to the extent ultimately allowed as secured claims, accrue post-judgment interest at the legal rate until such claims are paid from the proceeds of the collateral, consisting of the Debtor's membership interests in the Companies, which are more than sufficient to pay the Class 5 and 6 Claims in full.  Accordingly, as the Plan provides for payment in full of the Class 5 and Class 6 Secured Claims (if ultimately allowed as secured claims), with interest at the legal rate, from the disposition of their collateral, such treatment reflects fair and equitable treatment that complies with 11 U.S.C. § 1129(b)(2)(A)(i)(II).

The Plan further provides that Beitler will retain any valid liens on the collateral pending payment in full under the Plan.  As such, the Plan complies with 11 U.S.C. § 1129(b)(2)(A)(i)(I).  In addition, when the collateral is liquidated, the Debtor will necessarily have to pay Beitler in full on account of any Allowed Secured Class 5 and Class 6 Claims in satisfaction of 11 U.S.C. § 1129(b)(2)(A)(ii).

The Plan, therefore, is fair and equitable in its treatment of Classes 5 and 6, to the extent such claimants object to their treatment under the Plan.

(3)    The Plan is Fair and Equitable in Its Treatment of the Cannae Secured Claim in Class 7

The Debtor has provided that the Class 7 Cannae Secured Claim (in the amount of approximately $395,000 as of the Petition Date) will accrue post-judgment interest at the legal rate until it is paid from the proceeds of its collateral, consisting of the Debtor's

distribution rights in Westcliff,[37] which is more than sufficient to pay the Class 7 Claim in full with interest.  The Cannae Secured Claim is also secured by the Sandpiper Property (to the extent such security interest does not impair the Debtor's homestead exemption), which will continue to serve as collateral for the Cannae Secured Claim until paid in full (the Los Angeles Condominium was sold, so no longer exists as security for the Cannae Secured Claim).  Accordingly, as the Plan provides for payment in full of the Cannae Secured Claim, with interest at the legal rate, from the disposition of its collateral, such treatment reflects fair and equitable treatment that complies with 11 U.S.C. § 1129(b)(2)(A)(i)(II).

The Plan further provides that Cannae will retain its liens on its collateral pending payment in full under the Plan.  As such, the Plan complies with 11 U.S.C. § 1129(b)(2)(A)(i)(I).  In addition, when the collateral is liquidated, the Debtor will necessarily have to pay Cannae in full on account of its liens in satisfaction of 11 U.S.C. § 1129(b)(2)(A)(ii).

The Plan, therefore, is fair and equitable in its treatment of Class 7, to the extent such claimant objects to its treatment under the Plan.

### c.    The Plan is Fair and Equitable With Respect to Unsecured Claims

With respect to unsecured claims, a plan is fair and equitable if:

> (i) the plan provides that each holder of a claim of such class receive or retain on account of such property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

---

[37] As noted herein, the Debtor has filed an objection to Claim No. 17-1 to the extent it purports to assert that the Debtor's interests in Mission are collateral for the Cannae Secured Claim.  There is no basis for such claimed collateral (provided in support of Claim No. 17-1 or otherwise), and the Debtor believes that this issue should be resolved consensually or summarily by the Court.

1    11 U.S.C. § 1129(b)(2)(B).

2    In this case, as set forth in the Meislik Declaration and Exhibit "A" thereto, under

3    certain conditions (assuming that the Charging Liens are avoided, the Debtor is successful

4    in the disallowance of certain Claims, and the Debtor receives the amounts estimated to

5    flow to the Debtor from the liquidation of his assets as set forth in Exhibit "A" hereto), it is

6    estimated that holders of Allowed Unsecured Claims will receive between 20% to 100% of

7    their Allowed Claims.  In the event Allowed Unsecured Claims are paid in full, the Plan

8    contemplates the payment of interest on account of such Allowed Claims.

9    Thus, even if the value of the Debtor's assets is not sufficient to satisfy all Allowed

10    Claims in full, the Plan still satisfies § 1129(b)(2)(B)(ii) (commonly known as the "absolute

11    priority rule"), as the Debtor will not receive or retain under the Plan any amounts except

12    those expressly provided for by § 1129(b)(2)(B)(ii) (including any post-petition assets and

13    earnings), and the Debtor is not receiving or retaining under the Plan any exempt property

14    as such property is not property of the estate.  In this regard, the Debtor will liquidate all

15    non-exempt real and personal property with equity to pay the Allowed Claims of creditors,

16    retaining only those assets specifically provided for under the Bankruptcy Code, as set forth

17    in the Asset Value Schedule attached as Exhibit "D" to the Supplemental Meislik

18    Declaration [Docket No. 452]

19    Under these circumstances, the requirements of 11 U.S.C. § 1129(b)(2)(B) are

20    satisfied and the Plan may be confirmed notwithstanding the objection of any unsecured

21    creditor.

22    **8.      Request for Confirmation Despite Nonacceptance by Impaired**

23    **Class**

24    The Debtor will ask the Court to confirm the Plan by "cramdown" on all impaired

25    Classes if any of these Classes do not vote to accept the Plan.

26    **B.    Liquidation Analysis**

27    Another confirmation requirement is the so-called "Best Interests Test" embodied in

28    Bankruptcy Code § 1129(a)(7), which requires a liquidation analysis.  Under the Best

Interests Test, if a claimant is in an impaired Class and that claimant does not vote to accept the plan, then that claimant must receive or retain under the plan property of a value not less than the amount that such Holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

In a chapter 7 case, the debtor's assets are usually sold by a chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative Claims are paid next. Next, unsecured creditors are paid from any remaining sale proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their Allowed Claims in relationship to the amount of total allowed unsecured claims.

For the Court to be able to confirm the Plan, the Court must find that all creditors who do not accept the Plan will receive at least as much under the Plan as holders would receive under a chapter 7 liquidation. The Debtor maintains that this requirement is met here because this is a liquidating plan and the Debtor is liquidating all of the assets that would otherwise be available to the hypothetical chapter 7 trustee for liquidation. However, the Debtor maintains that he will be able to procure a much higher value for those assets than a chapter 7 trustee based upon his knowledge of the assets, their valuation and his experience in the industry, as well as his participation in the Arbitrations pursuant to which, among other economic determinations, the Debtor's interests in the Companies will be valued. These figures were not estimated; however, they will naturally result in lower realized asset values. The liquidating plan also avoids the incurrence of both the trustee and the trustee's professionals' fees thereby providing additional funds for creditors which are estimated at $403,492. The Debtor's liquidation analysis, demonstrating that the Plan satisfies the Best Interests of Creditors test under Section 1129(a)(7) of the Bankruptcy Code), is set forth in Exhibit "A" hereto and supported by the Meislik Declaration.

## C.    Feasibility

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the

need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

In this Case, the Debtor maintains that the requirement of feasibility is satisfied. Effective Date Payments will be paid from the Distribution Fund, which as set forth above, is estimated to be in an amount of approximately $9,341,397 (including the monetization of the Companies and other real and personal property, and including claims of contribution against the co-guarantors for 2/3 of the amount paid by the Debtor on account of the Cannae Secured Claim and an estimated amount of $400,000 in attorneys' fees and costs sought against the Beitler Parties and their counsel in connection with the Motion to Strike).

Tax obligations arising from the dispositions of the Debtor's assets are estimated at approximately $1.7 million.  Professional Fee Claims are expected to be approximately $2.5 million as of the Effective Date and, to the extent not paid by the Effective Date, will be secured by the Professional Fee Claim Lien.  The other claims that will be paid through the Plan consist of the Allowed Secured Claims, Priority Claims, and Allowed Unsecured Claims.  The Debtor does not anticipate that there will be any Priority Claims.  As for the Allowed Secured Claims, to the extent that the Debtor does not liquidate the Sandpiper Property, Classes 1 through 4, and Class 7 (to the extent such lien does not impair the Debtor's homestead exemption), will retain their liens against the Sandpiper Property and will be paid according to the terms of the underlying agreements with the Debtor or in accordance with the Plan.  If the Sandpiper Property is sold, the Claims in these Classes will be paid in full from the sale proceeds (with the exception of the Class 7 Claim which will be paid first from the proceeds from the dissolution of Westcliff).  As the MSJ Order is not yet a final order, the Plan classifies the Judgment on Decision and Default Judgment in Classes 5 and 6.  However, to the extent that the Charging Liens related to such Class 5 and 6 Claims are held to be avoidable (pursuant to the MSJ Order or otherwise), the Debtor will not have to pay Classes 5 and 6 as secured claims.  In such event, Classes 5 and 6 will be treated as Class 12 Claims and will receive their pro rata distribution on account of any Allowed Unsecured Claim such creditors may ultimately hold.  Classes 9 through 13 consist

of the Allowed Unsecured Claims and those creditors will receive a pro rata share of the remaining funds on account of their Allowed Unsecured Claims.

In sum, as set forth in the Meislik Declaration, and Exhibit "A" hereto, the Debtor believes that he will have sufficient cash on hand on the Effective Date to fund all required payments under the Plan.

YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO ANY OF THE DEBTOR'S FINANCIAL STATEMENTS.

**D.      Compliance With Section 1129(a)(15)**

Section 1129(a)(15) provides that "[i]n a case in which the debtor is an individual <u>and</u> in which the holder of an allowed unsecured claim objects to the confirmation of the plan – (A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or      (B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor . . . to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer."  11 U.S.C. § 1129(a)(15).

If no objection to the confirmation of the Plan is filed by a general unsecured creditor who holds an Allowed Claim, the provisions of Section 1129(a)(15) will not be applicable. Should a general unsecured creditor who holds an Allowed Claim object to the confirmation of the Plan, as set forth in the Meislik Declaration, and Exhibit "B" hereto, based on projections of the Debtor's disposable income (which projections include information regarding the actual income and expenses projected, and the methodology utilized to determine these projections and value), the value of the property to be distributed under the Plan exceeds the Debtor's projected disposable income during the plan period. Accordingly, the Plan satisfies § 1129(a)(15)(B).

## V. EFFECT OF CONFIRMATION

### A. Discharge

The Debtor will be subject and entitled to the provisions and procedures of Bankruptcy Code § 1141(d)(5), and any applicable law thereon, and the Court's granting of a discharge to the Debtor in accordance therewith.

### B. Exculpation and Releases

Effective upon the entry of the Confirmation Order, except as limited by applicable statutes and case law with respect to willful misconduct, breach of fiduciary duty and/or gross negligence, neither the Debtor, the Reorganized Debtor, the Professionals, nor any of their respective members, officers, directors, shareholders, employees, or agents, shall have or incur any liability to any Persons, including any creditor of the Debtor for any act taken or omission made in connection with or related to the negotiation, formulation, or preparation of the Plan and the Disclosure Statement, the approval of the Disclosure Statement, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, the Case, or the property to be distributed under the Plan, except that the Reorganized Debtor will be liable for performance and obligations assumed by him or imposed upon him under or by the Plan.

### C. Vesting of the Assets

On the completion of all payments due and payable under the Plan, all property of the Estate will vest in the Reorganized Debtor pursuant to § 1141(b), free and clear of all claims and interests except as provided in the Plan.

### D. Plan Creates New Obligations

Except as otherwise stated in the Plan, the payments promised in the Plan constitute new contractual obligations that replace those obligations to creditors that existed prior to the Effective Date.

### E. Creditor Action Restrained

Creditors may not take any action to enforce either preconfirmation obligations or obligations due under the Plan, so long as the Debtor is not in material default under the

Plan.  If the Debtor is in material default under the Plan, affected creditors may: (i) take any action permitted under nonbankruptcy law to enforce the terms of the Plan; or (ii) move to dismiss this case or to convert this case to a chapter 7 bankruptcy case.

**F.    Material Default Defined**

If the Debtor fails to make any payment required under the Plan, or to perform any other obligation required under the Plan for more than fifteen (15) days after the time specified in the Plan, the affected creditor may serve upon the Debtor and the Debtor's attorneys a written notice of default.  The Debtor is in material default under the Plan if the Debtor fails within twenty-one (21) days of the service of such notice of default on the Reorganized Debtor and his counsel, plus three (3) additional days if served by mail, either: (i) to cure the default or (ii) to obtain from the Court an extension of time to cure the default or a determination that no default occurred.

**G.    Modification of the Plan**

The Debtor may modify the Plan at any time before confirmation subject to Bankruptcy Code § 1127(a).  If the Plan is modified, however, the Court may require a new disclosure statement or re-voting on the Plan depending upon the nature of the modifications and their effect on parties in interest.  The Reorganized Debtor may also seek to modify the Plan at any time after confirmation subject to Bankruptcy Code § 1127(b), if: (a) the Plan has not been substantially consummated; and (b) the Court, after notice and a hearing, authorizes the proposed modification.

**H.    Post-Confirmation Status Report**

Within 120 days of the entry of the Confirmation Order, the Reorganized Debtor shall file a status report with the Court explaining what progress has been made towards consummation of the confirmed Plan, including with respect to the status of the Arbitrations and the status of pending claim objections.  The status report shall be served on the OUST and the parties who have requested special notice.  Further status reports shall be filed every 120 days and served on the same entities.

**I.      Quarterly Fees**

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) prior to confirmation shall be paid to the OUST on or before the Effective Date.  Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the OUST by the Reorganized Debtor until a final decree, or the entry of an order dismissing the case or converting the case to chapter 7, at the rate in effect at the time such fees are due.

**J.      Post-Confirmation Conversion/Dismissal**

After the Plan is confirmed, the Court, upon a motion by a creditor or party in interest and after notice and a hearing, may convert this Case to one under chapter 7 of the Bankruptcy Code or dismiss this Case under Bankruptcy Code § 1112(b) upon a showing of cause therefore, including, without limitation, if there is a material default by the Reorganized Debtor with respect to the confirmed Plan.  If the Court orders the Case converted to chapter 7 after the Plan is confirmed, then all property that had been property of the Estate and that has not been distributed under the Plan will revest in the chapter 7 estate.  The automatic stay provisions of § 362(a) of the Bankruptcy Code will be reimposed upon the revested property only to the extent that relief from stay was not previously authorized by the Court during the Case.

The Confirmation Order may also be revoked under very limited circumstances. Pursuant to § 1144 of the Bankruptcy Code, the Court may revoke the Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke the confirmation within 180 days after the entry of the Confirmation Order.

**K.**   **Final Decree**

Pursuant to Bankruptcy Rule 3022, a Final Decree may be not be entered until a bankruptcy case is fully administered.  The Court may, however, allow a Final Decree to be entered at an earlier date if requested, or for cause shown.

Respectfully submitted,

By: _____

John J. Bral, Debtor

## TABLE OF DEFINITIONS

"**Administrative Claim**" means a Claim against the Debtor for administrative costs or expenses that are allowable under Bankruptcy Code § 503(b).

"**Administrative Tax Claim**" means an Administrative Claim or other Claim that is not an Allowed Secured Claim that a government unit asserts against the Debtor for taxes (or for related interest or penalties) for any tax period that, either in whole or in part, falls within the period beginning on the Petition Date and ending on the Effective Date.

"**Allowed Claim**" means a Claim against the Debtor, other than an Administrative Claim, to the extent that:

a.    Either: (i) a Proof of Claim was Filed by the Bar Date; or (ii) a Proof of Claim is deemed timely Filed either under Bankruptcy Rule 3003(b)(1) or by a Final order; and

b.    Either: (i) the Claim is not a Disputed Claim; (ii) the Claim is allowed by a Final Order; or (iii) the Claim is allowed under the Plan.

"**Allowed [Class Designation and/or Secured, Priority, or General Unsecured] Claim**" means an Allowed Claim in the specified Class and/or of the specified type.

"**Asset Value Schedule**" means the Supplement to First Amended Disclosure Statement [Docket No. 430], attached to the Supplemental Meislik Declaration as Exhibit "D."

"**Assets**" means all tangible and intangible assets and property of every kind and nature of the Debtor and/or his Estate, and all proceeds thereof, existing as of the Effective Date.

"**Avoidance Action**" means Causes of Action arising under 11 U.S.C. §§ 510, 541, 542, 544, 547, 548, 549, 550, 551, and/or 553, or under related state or federal statutes and common law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such Causes of Action.

"**Bankruptcy Code**" or "**Code**" means Title 11 of the United States Code, as amended.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Bar Date**" means the last date for filing Proofs of Claim in the Debtor's Case.  The initial Bar Date was June 16, 2017 (as to Creditors other than Governmental Units) and August 23, 2017 (as to Governmental Units).  The supplemental Bar Date (as to certain Creditors not previously provided with notice of the initial Bar Date) was May 24, 2018.

"**Bar Date Notice**" means the notice of the Bar Date served on creditors of the Estate on April 21, 2017 and the supplemental notice of the Bar Date served on certain creditors of the Estate on April 24, 2018.

"**BCRS**" means Beitler & Associates, Inc. dba Beitler Commercial Realty Services.

"**Beitler**" means Barry Beitler.

"**Beitler Avoidance Action**" means Adversary Proceeding No. 8:17-ap-01071-SC, commenced by the filing of the Beitler Avoidance Complaint.

"**Beitler Avoidance Complaint**" means the complaint and first amended complaint filed by the Debtor against Beitler for (1) Avoidance of Preference Pursuant to 11 U.S.C. § 547; (2) Avoidance of Unperfected Liens Pursuant to 11 U.S.C. § 544(a); (3) Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550; and (4) Disallowance of Claims Pursuant to 11 U.S.C. § 502.

"**Beitler Parties**" means Beitler, Cannae, BCRS, Steward, Boyd, AFG Investment Fund 7, LLC and BAB 8 LLC (or some of them, depending on the particular context).

"**Boyd**" means Betsy Boyd.

"**BRA**" means Bral Realty Advisors, Inc.

"**Business Day**" means any day, other than a Saturday, a Sunday or a "legal holiday" as defined in Rule 9006(a) of the Bankruptcy Rules.

"**Cannae**" means Cannae Financial, LLC.

"**Case**" means the Debtor's case under chapter 11 of the Bankruptcy Code that is pending before the United States Bankruptcy Court for the Central District of California, Santa Ana Division, as Case No. 8:17-bk-10706-SC.

"**Cash**" means legal tender of the United States of America.

"**Cause of Action**" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims (as defined in Code § 101(5)) and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise that the Debtor and/or the Estate may hold against any Person as of the Effective Date.

"**CCP**" means California Code of Civil Procedure.

"**CFTB**" means California Franchise Tax Board.

"**Charging Lien**" means those liens on the Debtor's membership interests in the Companies created by the filing and service of motions for charging orders by Beitler, on or about January 18, 2017, with respect to the amounts owed pursuant to the Judgment on Decision and Default Judgment.

"**Citibank**" means Citibank, N.A.

"**Claim**" means a claim, as the term "claim" is defined in Bankruptcy Code § 101(5), against the Debtor.

"**Class**" or "**Class of Claims**" means a group of Claims as classified in the Plan.

"**Companies**" refers to Mission and Westcliff, collectively.

"**Confirmation Date**" means the date on which the Court enters the Confirmation Order on its docket.

"**Confirmation Hearing**" means the hearing held by the Court on the confirmation of the Plan.

"**Confirmation Order**" means the Court order confirming the Plan under Bankruptcy Code § 1129.

"**Court**" means the United States Bankruptcy Court for the Central District of California, Santa Ana Division.

"**Debtor**" refers to John Jean Bral.

"**Default Judgment**" means the default judgment entered against the Debtor on November 7, 2016 in Case No. BC532523.

"**Disclosure Statement**" or "**Disclosure Statement**" means the Debtor's Second Amended Disclosure Statement Describing Second Amended Chapter 11 Plan, including any modifications or amendments to the Disclosure Statement.

"**Disputed Claim**" means a Claim that has not been allowed or disallowed and to which either: (i) a Proof of Claim has been Filed or deemed Filed and the Debtor or another party in interest has Filed an objection; (ii) no Proof of Claim has been Filed and the Claim was not scheduled or the Debtor has scheduled such claim as disputed, contingent, unliquidated or unknown.

"**Distribution**" means any distribution pursuant to the Plan to the Holders of an Allowed Claim.

"**Distribution Date**" means the date upon which the Distribution was made.

"**Distribution Fund**" means the monies derived from the following: (1) the monetization of the Debtor's interests in Companies, that will be generated either by the other members of the Companies purchasing the Debtor's interests or through the sale of the real property assets held by each of the Companies; (2) the liquidation of the Debtor's other real and personal property, to the extent equity exists and the assets are not exempt; (3) potential recovery from a malpractice claim the Debtor holds against state court counsel; (4) proceeds from the Debtor's contribution claims against co-guarantors; and (5) potential recovery of attorneys' fees and costs sought by the Debtor against certain Beitler Parties and their counsel in connection with the Motion to Strike.  The Distribution Fund will be used to fund Plan payments.

"**Effective Date**" means the later of (1) the first (1st) Business Day that is at least thirty (30) days after the entry of an order confirming the Plan (the "Confirmation Order"); provided, however, that the Confirmation Order shall have become a Final Order, and (2) the first (1st) Business Day that is at least fifteen (15) days after any order awarding

sanctions against any party in favor of the Debtor shall have become a Final Order, or is otherwise resolved by the parties.

"**Effective Date Payments**" means Distributions or payments required by the Plan to be made by the Debtor on the Effective Date.

"**Estate**" means the bankruptcy estate created in the Debtor's Case under Bankruptcy Code § 541.

"**Eye Street**" means Eye Street Medical Investors, LLC.

"**FCBT**" means First-Citizens Bank & Trust Co.

"**File**," "**Filed**," or "**Filing**" means duly and properly filed with the Court and reflected on the Court's official docket.

"**Final Order**" means an order or judgment of the Court entered on the Court's docket:

    a.    That has not been reversed, rescinded, stayed, modified, or amended;

    b.    That is in full force and effect; and

    c.    With respect to which (i) the time for appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely Filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending, or (ii) any such appeal or petition has been dismissed or resolved by the highest court to which the order or judgment was appealed or from which review, rehearing, remand, or a writ of certiorari was sought.

"**General Unsecured Claim**" means an unsecured Claim against the Debtor, however arising, not entitled to priority under Section 507 of the Bankruptcy Code.

"**Holder**" means an entity holding a Claim.

"**IRS**" means the Internal Revenue Service.

"**Javaher**" means Javaher Investors, LLC.

"**Judgment on Decision**" refers to the Judgment on Decision issued by the Superior Court on November 17, 2016 in Case No. BS146302.

"**Los Angeles Condominium**" refers to the real property located at 1271 Federal Avenue, Unit 302, Los Angeles, California 90025.

"**LWGF**" means Lobel Weiland Golden Friedman LLP.

"**Mission**" means Mission Medical Investors, LLC.

"**Mission Land**" refers to the excess land located next to the Mission Medical Building.

"**Mission Medical Building**" refers to the medical office building consisting of a 29,744 square foot office building located at 27822 Forbes Road, Laguna Niguel, California 92677.

"**MOR**" means the Debtor's monthly operating reports.

"**Motion**" means a request asking a judge to issue a ruling or order on a legal matter.

"**Non-Ordinary Course Administrative Claims**" means Administrative Claims that are not Ordinary Course Administrative Claims, Administrative Tax Claims, or Professional Fee Claims, including Claims that may arise from agreements entered into with the Estate after the Petition Date other than trade agreements.

"**OCTTC**" means the Orange County Treasurer-Tax Collector.

"**Ocean View**" means Ocean View Medical Investors, LLC.

"**Ordinary Course Administrative Claims**" means Administrative Claims other than Administrative Tax Claims, Professional Fee Claims, and Non-Ordinary Course Administrative Claims, based upon liabilities that the Debtor incurs in the ordinary course.

"**OUST**" means the Office of the United States Trustee, Santa Ana Division.

"**Pacific Time**" means the time in Los Angeles, California.

"**Periodic Report**" means the Periodic Report Regarding Value, Operations and Profitability of Entities in Which the Estate of John Bral Holds a Substantial or Controlling Interest as required by Bankruptcy Rule 2015.3, as may be updated from time to time.

"**Person**" means any individual, corporation, general partnership, limited partnership, limited liability company, association, joint-stock company, joint venture, estate, trust,

government, political subdivision, governmental unit (as defined in the Bankruptcy Code),

official committee appointed by the OUST, unofficial committee of creditors, or entity.

"**Petition Date**" refers to the petition date of the Debtor, February 24, 2017.

"**Plan**" or "**Second Amended Plan**" means the Second Amended Chapter 11 Plan,

including any modifications or amendments to the Plan.

"**Priority Claim**" means an Allowed Claim entitled to priority against the Estate under

Bankruptcy Code §§ 507(a)(3)-(7).

"**Priority Tax Claim**" means an Allowed Claim entitled to priority against the Estate

under Bankruptcy Code § 507(a)(8).

"**Professionals**" collectively means the persons and entities employed by the Debtor

pursuant to order of the Court in accordance with Bankruptcy Code §§ 327 or 1103.

"**Professional Fee Claim**" means:

a.    A Claim under Bankruptcy Code §§ 327, 328, 330, 331, 503, or 1103 for

compensation for professional services rendered or expenses incurred on the

Estate's behalf, or

b.    A Claim either under Bankruptcy Code § 503(b)(4) for compensation for

professional services rendered or under Bankruptcy Code § 503(b)(3)(D) for

expenses incurred in making a substantial contribution to the Estate.

"**Professional Fee Claim Lien**" has the meaning ascribed to such term in Section

II.B.1.a.(1).

"**Proof of Claim**" means a written statement filed in a Case by a creditor in which the

creditor sets forth the amount of its Claim, in accordance with Rule 3001 of the Bankruptcy

Rules.

"**Reorganized Debtor**" means the Debtor post-confirmation.

"**Request for Payment**" means a request for the payment of an Ordinary Course

Administrative Claim or a Non-Ordinary Course Administrative Claim as described in

Section II.B.1 of the Plan.

"**Sandpiper Property**" refers to the real property located at 64 Sandpiper, Irvine, California 92604, which is the Debtor's primary residence.

"**Schedules**" means the Schedules of Assets and Liabilities filed by the Debtor in the Case, as required by § 521(1) of the Code, Bankruptcy Rules 1007(a)(3) and (b)(l), and Official Bankruptcy Form No. 6, as the Schedules may be amended from time to time.

"**Secured Claim**" means a Claim that is secured by a valid and unavoidable lien against property in which the Estate has an interest or that is subject to setoff under Bankruptcy Code § 553.  A Claim is a Secured Claim only to the extent of the value of the Claim Holder's interest in that property or to the extent of the amount subject to setoff, as applicable, as determined under Bankruptcy Code § 506(a).

"**SOFA**" means the Debtor's statements of financial affairs.

"**Spectrum**" means Spectrum 6 Medical Investors, LLC.

"**Steward**" means Steward Financial LLC.

"**Tax Code**" means the Internal Revenue Code.

"**Trustee**" refers to a hypothetical chapter 7 trustee.

"**Undeliverable Distribution**" means a Distribution to any Holder of an Allowed Claim that is returned to the Debtor and/or Disbursing Agent as undeliverable or otherwise unclaimed.

"**VDG**" mean Venture Development Group.

"**VGC**" means Venture Group of Companies, Inc.

"**Westcliff**" means Westcliff Investors, LLC.

"**Westcliff Medical Building**" refers to the medical office building consisting of a 19,476 square foot building on a 1.65 acre site located at 1901 Westcliff Drive, Newport Beach, California 92660 owed by Westcliff.

EXHIBIT "A"

John Jean Bral
Case: 8:17-bk-10706
**Chapter 11 Scenario Analysis**

EXHIBIT A - 1/7

| | | |
|---|---|---|
| 1st Distribution Fund Source - Proceeds from Sale of Mission and Westcliff | $ | 8,135,552 |
| 2nd Distribution Fund Source - Other Real and Personal Property | | 542,856 |
| 3rd Distribution Fund Source - Cannae/Attorneys Fees/Malpractice | | 662,989 |
| Total | $ | 9,341,397 |

| | | | Scenario 1 — Charging liens remain avoided. All claims under classes 10,11,12,13 allowed. | | | Scenario 2 — Charging liens remain avoided. All disputed claims under classes 10,11,12,13 disallowed, except judgment on Decision/Default Judgment(1). | | |
|---|---|---|---|---|---|---|---|---|
| **Class** | **Description** | **Amount** | **Secured** | **Unsecured** | **Balance** | **Secured** | **Unsecured** | **Balance** |
| 5,6 | Beitler/Disputed Charging Lien | $ 3,378,524 | | Reclassed to 12 | | | Reclassed to 12 | |
| 7 | Cannae/Sandpiper / Westcliff distributions | 394,483 | 394,483 | | | 394,483 | | |
| 8 | Priority Claims/None | - | | | | | | |
| 9 | General Unsecured Claims/Unsecured Claims Not Including Disputed Unsecured Claims of Beitler, Steward, Cannae, Boyd and BCRS | 939,371 | | 939,371 | | | 939,371 | |
| 10 | Disputed Steward Claims/Disputed Unsecured Claims of Steward Financial LLC (Claim Nos. 19 and 20) | 3,693,639 | | 3,693,639 | | | | |
| 11 | Disputed Cannae Claims/Claim No. 18 | 1,421,510 | | 1,421,510 | | | | |
| 12 | Disputed Unsecured Beitler Claims/Judgment on Decision and Default Judgment if Allowed as Unsecured Claims, Claim Nos. 15, 21 and 23 | 238,729 | | 3,617,253 | | | 3,378,524 | |
| 13 | Disputed Unsecured Claims/Disputed Unsecured Claims of Beitler, BCRS and Boyd (Claim Nos. 9, 11, 14 and 16) | - | | | | | | |
| | Total | | $ 394,483 | $ 9,671,773 | | $ 394,483 | $ 4,317,895 | |
| | **Proceeds from Asset Liquidations** | | | | 9,341,397 | | | 9,341,397 |
| | Total Secured | | 394,483 | | | 394,483 | | |
| | Payments to Secured | | (394,483) | | | (394,483) | | |
| | Balance for Taxes | | | | 8,946,914 | | | 8,946,914 |
| | Taxes Due | | | $1,700,000 | | | $1,700,000 | |
| | Tax payments | | | (1,700,000) | | | ($1,700,000) | |
| | Balance | | | | 7,246,914 | | | 7,246,914 |
| | Best Interests of Creditors - Chapter 7 Costs | | | | - | | | - |
| | Payments to Trustee and Trustee Counsel | | | | - | | | - |
| | Balance for Chapter 11 Admins | | | | 7,246,914 | | | 7,246,914 |
| | Chapter 11 Admin Fees (including UST) | | | | 2,593,414 | | | 2,593,414 |
| | Payments to Chapter 11 Admins (Including UST) | | | | (2,593,414) | | | (2,593,414) |
| | Balance for Priority Unsecured | | | | 4,653,500 | | | 4,653,500 |
| | Priority Unsecured | | | | - | | | - |
| | Payments to Priority Unsecured | | | | - | | | - |
| | Balance for Allowed Unsecured | | | | 4,653,500 | | | 4,653,500 |
| | **Total Allowed Unsecured** | | | | 9,671,773 | | | 4,317,895 |
| | Distribution to Allowed Unsecured | | | | 4,653,500 | | | 4,317,895 |
| | **Liquidated %** | | | | **48.1%** | | | **100.0%** |
| | **Return to Debtor** | | | | - | | | 335,604 |

(1) The Default Judgment is shown here in the asserted amount of approx $2.6 million. If the Debtor is successful in his appeal to set aside the Default Judgment and the claim is considered on its merits, however, the $2.6 million claim could be materially reduced.

John Jean Bral
Case: 8:17-bk-10706
Chapter 11 Scenario Analysis

EXHIBIT A - 2/7

| | | |
|---|---|---:|
| 1st Distribution Fund Source - Proceeds from Sale of Mission and Westcliff | $ | 8,135,552 |
| 2nd Distribution Fund Source - Other Real and Personal Property | | 542,856 |
| 3rd Distribution Fund Source - Cannae/Attorneys Fees/Malpractice | | 662,989 |
| Total | $ | 9,341,397 |

| | | | Charging liens not avoided. All claims under classes 10,11,12,13 allowed. | | | Charging liens not avoided(1). All disputed claims under classes 10,11,12,13 disallowed. | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Scenario 3 | | | Scenario 4 | |
| | Voting Classes | | | | | | | |
| Class | Description | Amount | Secured | Unsecured | Balance | Secured | Unsecured | Balance |
| 5,6 | Beitler/Disputed Charging Lien | $ 3,378,524 | $ 3,378,524 | | | $ 3,378,524 | | |
| 7 | Cannae/Sandpiper / Westcliff distributions | 394,483 | 394,483 | | | 394,483 | | |
| 8 | Priority Claims/None | - | | | | | | |
| 9 | General Unsecured Claims/Unsecured Claims Not Including Disputed Unsecured Claims of Beitler, Steward, Cannae, Boyd and BCRS | 939,371 | | 939,371 | | | 939,371 | |
| 10 | Disputed Steward Claims/Disputed Unsecured Claims of Steward Financial LLC (Claim Nos. 19 and 20) | 3,693,639 | | 3,693,639 | | | | |
| 11 | Disputed Cannae Claims/Claim No. 18 | 1,421,510 | | 1,421,510 | | | | |
| 12 | Disputed Unsecured Beitler Claims/Judgment on Decision and Default Judgment if Allowed as Unsecured Claims, Claim Nos. 15, 21 and 23 | 238,729 | | 238,729 | | | | |
| 13 | Disputed Unsecured Claims/Disputed Unsecured Claims of Beitler, BCRS and Boyd (Claim Nos. 9, 11, 14 and 16) | - | | | | | | |
| | Total | | $ 3,773,007 | $ 6,293,248 | | $ 3,773,007 | $ 939,371 | |
| | **Proceeds from Asset Liquidations** | | | | **9,341,397** | | | **9,341,397** |
| | Total Secured | | 3,773,007 | | | 3,773,007 | | |
| | Payments to Secured | | (3,773,007) | | | (3,773,007) | | |
| | Balance for Taxes | | | | 5,568,389 | | | 5,568,389 |
| | Taxes Due | | | $1,700,000 | | | $1,700,000 | |
| | Tax payments | | | ($1,700,000) | | | ($1,700,000) | |
| | Balance | | | | 3,868,389 | | | 3,868,389 |
| | Best Interests of Creditors - Chapter 7 Costs | | | | - | | | - |
| | Payments to Trustee and Trustee Counsel | | | | - | | | - |
| | Balance for Chapter 11 Admins | | | | 3,868,389 | | | 3,868,389 |
| | Chapter 11 Admin Fees (including UST) | | | 2,593,414 | | | 2,593,414 | |
| | Payments to Chapter 11 Admins (Including UST) | | | (2,593,414) | | | (2,593,414) | |
| | Balance for Priority Unsecured | | | | 1,274,975 | | | 1,274,975 |
| | Priority Unsecured | | | - | | | - | |
| | Payments to Priority Unsecured | | | - | | | - | |
| | Balance for Allowed Unsecured | | | | 1,274,975 | | | 1,274,975 |
| | **Total Allowed Unsecured** | | | **6,293,248** | | | **939,371** | |
| | Distribution to Allowed Unsecured | | | 1,274,975 | | | 939,371 | |
| | **Liquidated %** | | | **20.3%** | | | **100.0%** | |
| | **Return to Debtor** | | | | - | | | 335,604 |

(1) The Default Judgment is shown here in the asserted amount of approx $2.6 million.  If the
Debtor is successful in his appeal to set aside the Default Judgment and the claim is considered
on its merits, however, the $2.6 million claim could be materially reduced.

**John Jean Bral**
Case: 8:17-bk-10706
**Best Interests Test**

| Best Interests Test - Unsecured Claims  %s | (All) | | | |
|---|---|---|---|---|

| Chapter | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 4 |
|---|---|---|---|---|
| 11 | 48% | 100% | 20% | 100% |
| 7 | 45% | 100% | 15% | 100% |

**John Jean Bral**
Case: 8:17-bk-10706

EXHIBIT A - 4/7

**Notes to Scenario Analysis**

| | Amount | Liquidation % | Liquidated Value | Notes |
|---|---|---|---|---|
| 1st Distribution Fund Source - Proceeds from Sale of Mission and Westcliff | $ 8,135,552 | 100.0% | $ 8,135,552 | Net proceeds from the sale of Mission and Westcliff |
| Gross Proceeds Available for Distribution | **8,135,552** | | **8,135,552** | |
| | | | | |
| Chapter 11 Administrative Claims | | | | |
| Professional Fees | (2,500,000) | 100.0% | (2,500,000) | |
| Clerk and OUST | (93,414) | 100.0% | (93,414) | |
| Total | (2,593,414) | | **(2,593,414)** | 0.0% |
| | | | | |
| 2nd Distribution Fund Source - Other Real and Personal Property | | | | |
| Cash | 1,000 | 0.0% | - | |
| 2012 Toyota Tundra | 10,800 | 0.0% | - | Exempt |
| Personal Property | 9,550 | 0.0% | - | Exempt |
| Mass Mutual Insurance Policy | 10,000 | 0.0% | - | Exempt |
| Preference Action - LWGF | 10,000 | 100.0% | 10,000 | |
| VDG | 60,282 | 100.0% | 60,282 | |
| Javahar, Eye Street and Spectrum | 199,332 | 100.0% | 199,332 | |
| Sandpiper (Net of Class 1,2,3,4 payments) | 348,242 | 78.5% | 273,242 | Net of $75,000 homestead exemption |
| Total | 649,206 | | 542,856 | |
| | | | | |
| 3rd Distribution Fund Source - Cannae/Attorneys Fees/Malpractice | 662,989 | 100.0% | 662,989 | $262,989 is 66.6% of the $394,483 Cannae claim due from Beitler entities |
| | | | | + $400,000 in attorney fee reimbursement related to fraud. |
| | | | | + TBD malpractice claims. |
| | | | | |
| Net tax liability created from Asset Sales | ($1,700,000) | 100.0% | (1,700,000) | Capital Gains tax liability created by asset sales, less NOLs, |
| | | | | tax deductible business payments, section 121 exclusions and payments to professionals. |

**Best Interest Test**

| | | | | |
|---|---|---|---|---|
| Chapter 7 Administrative Expenses | | | | |
| Chapter 7 Trustee Fees | (303,492) [1] | | | |
| Chapter 7 Trustee Counsel Fees | (100,000) | | | |
| Total | (403,492) | 100.0% | $ (403,492) | |

**[1] Ch. 7 Trustee Liquidation Fees**

| | Ch. 7 Trustee Fee Schedule | | | Fees |
|---|---|---|---|---|
| | **Fee %** | **Fee $** | | **Fees** |
| Up to 5,000.00 | 25.0% | 5,000 | 5,000 | $ (1,250) |
| 5,000.01-49,999.99 | 10.0% | 45,000 | 45,000 | (4,500) |
| 50,000-999,999.99 | 5.0% | 950,000 | 950,000 | (47,500) |
| 1,000,000 and above | 3.0% | | 8,341,397 | (250,242) |
| | | | | (303,492) |

**Claims**

A.  Claims amounts are the best known figures from filed claims, or in the absence, scheduled claims and may exclude judgment and post-petition interest.
B.  Claims do not reflect any offsets that would otherwise reduce the allowable claim.

**John Jean Bral**
Case: 8:17-bk-10706
**Schedule of Assets and Liabilities**

EXHIBIT A - 5/7

| Asset | Undivided FMV Value | Working Capital (Net) | Accrued Property Taxes | Entity Level Secured Debt | | | | Selling Costs | 100% Undivided Proceeds | Debtor Ownership Interest (Net) | DLOC [a] | Proceeds to Debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 1st Deed | 2nd Deed | 3rd Deed | Total | | | | | |
| 64 Sandpiper, Irvine CA Property [1] | $ 726,000 | $ - | $ 6,494 | $ 88,506 | $ 211,458 | $ 35,000 | $ 341,458 | $ 36,300 | $ 348,242 | 100.000% | 0.0% | $ 348,242 |
| Mission Medical Investors LLC Building [2] | 18,850,000 | 116,506 | - | 8,971,795 | 690,000 | - | 9,661,795 | 565,500 | 8,739,211 | 42.300% | 0.0% | 3,696,686 |
| Mission Medical Investors LLC Unimproved Land [2] | 3,080,000 | - | - | - | - | - | - | 92,400 | 2,987,600 | 42.300% | 0.0% | 1,263,755 |
| Westcliff Investors, LLC [3] | 11,070,000 | 139,090 | - | 3,792,545 | 400,000 | - | 4,192,545 | 332,100 | 6,684,445 | 47.500% | 0.0% | 3,175,111 |
| Venture Development Group [4] | 60,282 | - | - | - | - | - | - | - | 60,282 | 100.000% | 0.0% | 60,282 |
| Bral Realty Advisors, Inc. [5] | - | | - | - | - | - | - | - | - | 100.000% | 0.0% | - |
| Javaher Investors, LLC [6] | 3,250,000 | 56,500 | - | 1,125,222 | - | - | 1,125,222 | - | 2,181,278 | 8.550% | 30.0% | 130,549 |
| Eye Street Medical Investors LLC [7] | 3,280,000 | 60,823 | - | 2,627,821 | - | - | 2,627,821 | - | 713,002 | 13.781% | 30.0% | 68,782 |
| Spectrum 6 Medical Investors, LLC [8] | - | N/M | - | N/M | N/M | N/M | - | - | - | 1.000% | 30.0% | - |
| Venture Group of Companies, LLC [9] | - | | - | - | - | - | - | - | - | 100.000% | 0.0% | - |
| **Total** | **$ 40,316,282** | **$ 372,919** | **$ 6,494** | **$ 16,605,889** | **$ 1,301,458** | **$ 35,000** | **$ 17,948,841** | **$ 1,026,300** | **$ 21,714,060** | | | **$ 8,743,408** |

Notes:
[1] John Bral's primary residence located at 64 Sandpiper, Irvine, CA 92604.
[2] Mission operates as a single asset commercial real estate investment company: 29,744 sq. ft. building located at 27882 Forbes Road, Laguna Niguel, CA 92677.
[3] Westcliff operates as a single asset commercial real estate investment company: 19,476 sq. ft. building located at 1901 Westcliff Dr., Newport Beach, CA 92660.
[4] VDG is a real estate development company. VDG is party to a JV agreement with LN Investments LLC for the development of property at 27912 Forbes Rd., Laguna Niguel, CA 92677.
[5] BRA is an entity through which John Bral conducts commercial real estate brokerage and property management services. No going concern value, de minimis liquidation value.
[6] Javaher owns real property located at 4715 Coffee Rd., Bakersfield, CA. Held by WestCliff Investors LLC. Ownership is net to Debtor.
[7] Eye Street owns real property located at 2525 Eye St., Bakersfield, CA. Held by WestCliff Investors LLC. Ownership is net to Debtor.
[8] Spectrum 6 Medical Investors owns property located at 15775 Laguna Canyon Rd., Irvine CA.
[9] VGC is a California corp with no assets, liabilities or activity.

**John Jean Bral**
Case: 8:17-bk-10706
**Real Estate Fractional Interest Price Discount Studies**

EXHIBIT A - 6/7

| Study | Low | Average | Median | High | |
|---|---|---|---|---|---|
| Harris-McCormick-Davis Study | 5.6% | -32.1% | | -87.0% | |
| Healy Study | -3.0% | -23.5% | | -52.0% | |
| Peter Patchin Study | 0.0% | -36.8% | | -82.4% | |
| Peterson-Hanson- Klafter Study | -23.4% | -50.0% | | -83.5% | [1] |
| Humphrey Study | 0.0% | | | -67.0% | |
| Eckhoff Accountancy Corp. Study | | -37.0% | -38.0% | | |

Source: "Valuing Real Estate Fractional Ownership Interests", Katherine A Gilbert and C. Ryan Stewart.

[1] Study reviewed transaction in the Tucson, AZ area.  It should be noted that the Tucson, AZ real estate market was experiencing an unstable real estate investment climate during the analysis time period.

**John Jean Bral**
Case: 8:17-bk-10706
**Claims Classification**

| Class | Type | Creditor | Insider | Impaired | Collateral/Notes | Amount |
|---|---|---|---|---|---|---|
| 1 | Secured | Suntrust Mortgage | No | No | Sandpiper Property | $    88,506 |
| 2 | Secured | Citibank | No | No | Sandpiper Property | 211,458 |
| 3 | Secured | Michelle Easton | No | Yes | Sandpiper Property / Debtor's interest in VDG | 35,000 |
| 4 | Secured | Orange County Tax Collector | No | No | Sandpiper Property | 6,494 |
| 5 | Secured | Beitler | No | Yes | Disputed Charging Lien | 788,799 |
| 6 | Secured | Beitler | No | Yes | Disputed Charging Lien | 2,589,725 |
| 7 | Secured | Cannae | No | Yes | Sandpiper / Westcliff distributions | 394,483 |
| 8 | Priority | Priority Claims | No | No | None | - |
| 9 | Unsecured | General Unsecured Claims | No | Yes | Unsecured Claims Not Including Disputed Unsecured Claims of Beitler, Steward, Cannae, Boyd and BCRS | 939,371 |
| 10 | Unsecured | Disputed Steward Claims | No | Yes | Disputed Unsecured Claims of Steward Financial LLC (Claim Nos. 19 and 20) | 3,693,639 |
| 11 | Unsecured | Disputed Cannae Claims | No | Yes | Claim No. 18 | 1,421,510 |
| 12 | Unsecured | Disputed Unsecured Beitler Claims | No | Yes | Judgment on Decision and Default Judgment if Allowed as Unsecured Claims, Claim Nos. 15, 21 and 23 | 238,729 |
| 13 | Unsecured | Disputed Unsecured Claims | No | Yes | Disputed Unsecured Claims of Beitler, BCRS and Boyd (Claim Nos. 9, 11, 14 and 16) | $    - |

EXHIBIT "B"

**John Jean Bral**

Case: 8:17-bk-10706

**Monthly Profit & Loss**

|  | Escalator | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| Cash - BOM | | $ 1,000 | $ 12,240 | $ 25,161 | $ 39,229 | $ 54,496 |
| **Income** | | | | | | |
| Gross Wages & Commissions | 3.0% | $ 144,000 | $ 148,320 | $ 152,770 | $ 157,353 | $ 162,073 |
| Tax, Medicare and SS Deductions | 3.0% | 57,600 | 59,328 | 61,108 | 62,941 | 64,829 |
| Net Wages & Commissions | | 86,400 | 88,992 | 91,662 | 94,412 | 97,244 |
| Disbursements from Mission Medical Investors | 3.0% | - | - | - | - | - |
| **Total Income** | | **86,400** | **88,992** | **91,662** | **94,412** | **97,244** |
| **Expenses** | | | | | | |
| Rental / Home Ownership Expenses | 2.0% | 31,027 | 31,824 | 32,460 | 33,110 | 33,772 |
| Real Estate Taxes | 2.0% | 251 | - | - | - | - |
| Insurance | 2.0% | 420 | 428 | 437 | 446 | 455 |
| Maintenance & Repairs | 2.0% | 100 | - | - | - | - |
| HOA dues | 2.0% | 402 | - | - | - | - |
| Electricity | 2.0% | 2,100 | 2,142 | 2,185 | 2,229 | 2,273 |
| Water, Sewer and Garbage Collection | 2.0% | 1,620 | 1,652 | 1,685 | 1,719 | 1,754 |
| Telephone, Cable and Internet | 2.0% | 2,520 | 2,570 | 2,622 | 2,674 | 2,728 |
| Food | 2.0% | 23,400 | 23,868 | 24,345 | 24,832 | 25,329 |
| Clothing, Laundry and Dry Cleaning | 2.0% | 1,980 | 2,020 | 2,060 | 2,101 | 2,143 |
| Personal Care Products and Services | 2.0% | 4,200 | 4,284 | 4,370 | 4,457 | 4,546 |
| Medical and Dental Expenses | 2.0% | 1,500 | 1,530 | 1,561 | 1,592 | 1,624 |
| Entertainment | 2.0% | 5,100 | 5,202 | 5,306 | 5,412 | 5,520 |
| Life Insurance | 2.0% | 540 | 551 | 562 | 573 | 585 |
| **Total Expenses** | | **75,160** | **76,072** | **77,593** | **79,145** | **80,728** |
| **Disposable Income** | | **11,240** | **12,920** | **14,069** | **15,267** | **16,516** |
| Cash - EOM | | $ 12,240 | $ 25,161 | $ 39,229 | $ 54,496 | $ 71,012 |

| Net Present Value @ 5yr Tsy (2.8%) | $64,918 |
|---|---|

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**650 Town Center Drive, Suite 1500, Costa Mesa, CA  92626**

A true and correct copy of the foregoing document entitled **SECOND AMENDED DISCLOSURE STAEMENT DESCRIBING CHAPTER 11 PLAN** will be served or was served (a) on the judge in chamber in the form and manner required by LBR 5005-2(d); and the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **6/8/2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On _____ I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **6/8/2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 6/8/2018 | Nancy Lockwood | /s/ Nancy Lockwood |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                      **F 9013-3.1.PROOF.SERVICE**

**1**. <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>:

- **Thomas H Casey**    kdriggers@tomcaseylaw.com, msilva@tomcaseylaw.com
- **Alan J Friedman**    afriedman@shbllp.com, lgauthier@shbllp.com
- **Daniel K Fujimoto**    wdk@wolffirm.com
- **Beth Gaschen**    bgaschen@wgllp.com,
  kadele@wgllp.com;vrosales@wgllp.com;cbmeeker@gmail.com;cyoshonis@wgllp.com
- **Michael J Hauser**    michael.hauser@usdoj.gov
- **Mark D Hurwitz**    mhurwitz@lsl-la.com, dsmall@lsl-la.com,kfinn@lsl-la.com
- **Gary E Klausner**    gek@lnbyb.com
- **William N Lobel**    wlobel@pszjlaw.com, nlockwood@pszjlaw.com;jokeefe@pszjlaw.com;banavim@pszjlaw.com
- **Kathleen J McCarthy**    kdriggers@tomcaseylaw.com, msilva@tomcaseylaw.com
- **William F McDonald**    Caecf@tblaw.com, wfm@tblaw.com;snchampney@tblaw.com
- **Krikor J Meshefejian**    kjm@lnbrb.com
- **Babak Samini**    saminicourtnotice@gmail.com,
  bsamini@saminilaw.com;nprado@saminilaw.com;lnavarro@saminilaw.com;swatts@saminilaw.com
- **Edward G Schloss**    egs2@ix.netcom.com
- **Valerie Smith**    claims@recoverycorp.com
- **Daniel B Spitzer**    dspitzer@spitzeresq.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Zann R Welch**    ecfnotices@ascensioncapitalgroup.com

**2**. <u>**SERVED BY OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL:**</u>

<u>Via Overnight Mail</u>:
The Honorable Scott C. Clarkson, United States Bankruptcy Court,
Central District of California, Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5130 (courtesy bin)
Santa Ana, CA 92701-4593

<u>Via Email</u>:
Tom Lallas:  tlallas@lsl-la.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**